**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| CYNTHIA B. SCOTT, BOBINETTE D. FEARCE, ) | |
| PATRICIA KNIGHT, MARGUERITE ) | |
| RICHARDSON and REBECCA L. SCOTT, ) | |
| Prisoners residing at FLUVANNA ) | |
| CORRECTIONAL CENTER FOR WOMEN, ) | |
| Route 250 West, ) | |
| Troy, VA 22974, ) | |
| ) | |
| Individually, and on behalf of all others ) | |
| similarly situated, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v.                              ) | Civil Action No. __-_____ |
| ) | (Judge _____) |
| HAROLD W. CLARKE ) | |
| Director ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS ) | |
| 6900 Atmore Drive ) | |
| Richmond, VA 23261-6963, ) | |
| ) | |
|         and ) | |
| ) | |
| A. DAVID ROBINSON ) | |
| Chief of Corrections Operations ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS ) | |
| 6900 Atmore Drive ) | |
| Richmond, VA 23261-6963, ) | |
| ) | |
|         and ) | |
| ) | |
| FREDERICK SCHILLING ) | |
| Director of Health Services ) | |
| VIRGINIA DEPARTMENT OF CORRECTIONS ) | |
| 6900 Atmore Drive ) | |
| Richmond, VA 23261-6963, ) | |
| ) | |
|         and ) | |
| ) | |

PHYLLIS A. BASKERVILLE )
Warden )
FLUVANNA CORRECTIONAL CENTER )
  FOR WOMEN )
Route 250 West )
Troy, VA 22974, )
 )
        and )
 )
ARMOR CORRECTIONAL HEALTH )
SERVICES, INC. )
4960 S.W. 72nd Ave. )
Suite 400 )
Miami, FL 33155 )
 )
**SERVE:** CT CORPORATION )
4701 Cox Rd., Suite 301 )
Glen Allen, VA 23060-6802, )
 )
        and )
 )
JOHN/JANE DOE, M.D. )
Acting Medical Director )
FLUVANNA CORRECTIONAL CENTER )
  FOR WOMEN )
Route 250 West )
Troy, VA 22974, )
 )
                    *Defendants.* )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Cynthia B. Scott, Bobinette D. Fearce, Patricia Knight, Marguerite Richardson and Rebecca L. Scott (collectively, "the named plaintiffs"), for themselves individually and on behalf of a class of additional unnamed plaintiffs similarly situated, submit this Complaint seeking declaratory and injunctive relief against defendants Harold W. Clarke, John M. Jabe, Frederick Schilling, Phyllis A. Baskerville, Armor Correctional Health Services, Inc., and John/Jane Doe, M.D., Acting Medical Director of the Fluvanna Correctional Center for Women

("FCCW") (collectively "defendants"). The named plaintiffs hereby allege, on the basis of their personal knowledge, information and belief, as follows:

**NATURE OF THE CASE**

1.     This is an action brought by the named plaintiffs, prisoners residing at FCCW, a facility of the Commonwealth of Virginia Department of Corrections, located in Troy, Virginia, seeking declaratory and injunctive relief to address and remedy the failure of FCCW, on a systemic, pervasive and on-going basis, to provide its residents with medical care sufficient either in nature or in extent to satisfy the minimum standards mandated by the Eighth Amendment to the United States Constitution.

2.     The named plaintiffs seek preliminary and permanent relief from defendants' knowing and intentional failure, acting under color of State law, to provide the named plaintiffs and all other similarly-situated women residing at FCCW with medical care adequate to protect them from substantial existing, on-going and/or imminent physical injury, illness and undue risk of premature death in deliberate indifference to their rights under the Eighth Amendment to be free from cruel and unusual punishment.

**JURISDICTION AND VENUE**

3.     The named plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, because it arises under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3), because it seeks to redress the deprivation, under color of State law, of rights, privileges and immunities secured to the named plaintiffs and the members of the class they seek to represent by the Constitution and laws of the United States. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

4.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because one or more of the defendants reside in this judicial district, and because all or a substantial part of the events, acts and/or omissions giving rise to the named plaintiffs' claims occurred in this judicial district.

## PARTIES

### A.    Plaintiffs

5.    Plaintiff Cynthia B. Scott, a 42-year old African-American woman, has been incarcerated at FCCW since 2003.  Ms. Scott, who is serving a sentence that expires in 2040, is afflicted with a broad array of serious health problems and physical ailments including, but not necessarily limited to, sarcoidosis, a potentially life-threatening disease involving cellular inflammation in and around vital organs such as her lungs, liver, spleen and pancreas, as well as her eyes.  Ms. Scott also suffers from a potentially life-threatening pulmonary embolism.

6.    Plaintiff Bobinette D. Fearce, a 60-year old African-American woman, was first incarcerated at FCCW in 1998 upon its opening, after eleven years of imprisonment at Goochland Correctional Center for Women.  Ms. Fearce, who is serving a sentence that may expire in or about 2017, is afflicted with a broad array of serious health problems and physical ailments including, but not necessarily limited to, degenerative cervical spine and disc disease, carpal tunnel syndrome affecting both of her wrists, chronic severe pain in multiple parts of her body, incontinence due to a weak and failing bladder, and temporomandibular joint disorder resulting in a misaligned left jaw.

7.    Plaintiff Patricia Knight, a 55-year old African-American woman, has been incarcerated at FCCW since 2006.  Ms. Knight, who is serving a sentence that expires in the latter half of 2012, is afflicted with a broad array of serious health problems and physical ailments including, but not necessarily limited to, diminished strength and gripping capacity in

her hands and weight-bearing capacity in her legs due to a stroke suffered in 2005, chronic and severe pain in her neck, back and knees due to the effects of degenerative spinal disc disease and arthritis, and chest pain due to angina. Ms. Knight also suffers from chronic reflux symptoms and nausea associated with after-effects of gastric bypass surgery she had prior to her arrival at FCCW.

8.     Plaintiff Marguerite Richardson, a 56-year old Caucasian woman, has been incarcerated at FCCW since 1998. Ms. Richardson, who is serving a sentence that will expire between 2030 and 2042, is afflicted with a broad array of serious health problems and physical ailments including, but not necessarily limited to, high blood pressure and poor circulation, Hepatitis C, a large growth underneath her right ribcage which has yet to be definitively diagnosed, intense and chronic pain in her lower back, right hip and right leg, ankle and foot believed to be associated with either degenerative disc disease, sciatica and/or arthritis, and MRSA, a highly-contagious form of bacterial infection.

9.     Plaintiff Rebecca L. Scott, a 29-year old Caucasian woman, has been incarcerated at FCCW since 2000. Ms. Scott, who is serving a sentence that expires in 2015, is afflicted with a broad array of serious health problems and physical ailments including, but not necessarily limited to, profound deafness, a recurring, extremely painful deformed toenail on the big toe of her right foot and disabling chronic back pain attributable to misalignment of bones adjacent to her spine.

**B.     Defendants**

10.     Defendant Harold W. Clarke is the Director of the Commonwealth of Virginia Department of Corrections ("VDOC"). As such, Mr. Clarke is the legal custodian of all prisoners sentenced to periods of incarceration by the courts of Virginia for felony offenses, and is responsible for the safe, secure and humane housing and treatment of those prisoners,

including the plaintiffs.  VDOC retains a nondelegable duty under the Constitution and laws of the United States and of the Commonwealth of Virginia to ensure that the medical care provided to prisoners residing in its correctional facilities meets or exceeds applicable constitutional minimum standards.

11.     Defendant A. David Robinson is the Chief of Corrections Operations of VDOC. In that capacity, Mr. Robinson, upon information and belief, exercises general supervisory authority over VDOC's provision of medical care services to prisoners incarcerated in VDOC correctional facilities.

12.     Defendant Frederick Schilling is the Director of Health Services of the VDOC.  In that capacity, Mr. Schilling, upon information and belief, exercises direct day-to-day supervisory authority over the provision, under contract, of medical care services to prisoners incarcerated in VDOC correctional facilities by defendant Armor Correctional Health Services.

13.     Defendant Phyllis A. Baskerville is an employee of VDOC and has served as the Warden of FCCW since sometime in 2011.  In this capacity, Ms. Baskerville is directly responsible at all times for the safe, secure and humane housing and treatment of all prisoners residing at FCCW, including the plaintiffs.

14.     Defendant Armor Correctional Health Services, Inc. ("Armor"), is a for-profit corporation, organized and existing under the laws of the State of Florida and maintaining its principal place of business in Miami, Florida.  On or about October 18, 2011, Armor assumed contractual responsibilities, pursuant to modifications to an existing contract between Armor and VDOC -- Contract DOC-05-024-Armor -- to provide all medical, dental and mental health services needed to afford adequate and necessary health care to all prisoners residing at certain VDOC correctional facilities, including FCCW.  In this capacity, Armor replaced and/or

- 6 -

succeeded Corizon Health, Inc., formerly known as PHS Correctional Healthcare (formerly known as Prison Health Services, Inc.) ("PHS"), which provided healthcare services to prisoners residing at FCCW, subject to the terms and conditions of Contract DOC-05-024-PHS, from April 19, 2006 and continuously thereafter until these obligations were transferred to and assumed by Armor in October 2011.

15.　　Armor, in succeeding to and assuming PHS' rights and obligations as the contractual provider of healthcare services at FCCW, and retaining essentially the same medical staff as was previously employed by PHS, effectively adopted and ratified PHS' prior policies and customs with respect to the systemic failure to provide necessary and appropriate medical care and/or provision of deficient medical care to prisoners at FCCW, as its own.

16.　　Defendant John/Jane Doe, an employee and/or agent of Armor, assumed responsibilities as the Acting Medical Director of FCCW on or about July 2, 2012. He/she filled the position previously occupied by David MacDonald, M.D., an employee and/or agent of Armor and, upon information and belief, the Medical Director at FCCW as an employee or agent of PHS, and subsequently Armor, since 2008. Dr. MacDonald's responsibilities, policies and practices remained consistent over the course of his employment at FCCW by both companies. Defendant Doe, his/her predecessor Dr. MacDonald, and the employees and/or agents of Armor working under his/her or Dr. MacDonald's supervisory authority, are directly responsible for the provision of adequate, appropriate and humane medical care services to all prisoners residing at FCCW, including the named plaintiffs, as contemplated by the Constitution and laws of the United States and of the Commonwealth of Virginia, as well as in accordance with Armor's contractual obligations to VDOC.

17.     Each of the individual defendants is sued in his or her official capacity.  At all times relevant to the events, acts and/or omissions alleged in this Complaint, the individual defendants and Armor, individually and collectively, have acted under color of State law, pursuant to their authority and responsibilities as officials, employees and/or agents of the Commonwealth of Virginia.

## FACTUAL BACKGROUND

### A.     FCCW And Its Medical Services

18.     FCCW, which was conceived, designed and constructed specifically for the purpose of serving as a "model" women's prison, opened in 1998.  The facility houses approximately 1,200 prisoners (about forty percent of the total number of women prisoners in Virginia), a majority of whom are 35 years of age or older and are serving median sentences of 20 years.  FCCW was designed to include a 68,000-square foot medical building in which medical, dental and mental health services are provided for the women comprising FCCW's own general population.  The medical unit also serves incarcerated women with serious medical problems residing in other VDOC facilities, who are transferred to FCCW for the purpose of receiving a heightened level of care.

19.     Subject to the supervision and oversight of defendant Doe and, previously, Dr. MacDonald, the Medical Director at FCCW, Armor employs a Medical Staff consisting of Donald A. Remaly, M.D., another general practice physician, and approximately 10-to-15 additional health care providers including, upon information and belief, registered nurses, licensed practical nurses and certified nursing assistants.

20.     These registered nurses, licensed practical nurses and certified nursing assistants perform the initial "intake" examinations of prisoners upon their arrival at FCCW, the purpose of which is to review each prisoner's medical history and make specific notations regarding the

prisoner's existing condition(s), medical needs (if any) and pending course of treatment, in order to determine what each such prisoner might need by way of continuing attention and/or treatment during her term of incarceration at FCCW.

21. The nurses also preside over and administer the "Sick Call" process at FCCW. At Sick Call, prisoners complaining of health problems, having submitted a written request for care, are screened and evaluated for the purpose of determining their need for an appointment with a physician. Absent waivers which are virtually never granted, each prisoner is charged a $5.00 "co-pay" fee for each Sick Call visit. The nurses staffing Sick Call are also authorized to administer first aid and dispense, in limited quantities, non-prescription pain medication.

22. Under the Sick Call protocol, persons lacking the medical training and experience of physicians, certified physicians' assistants or registered nurses, are delegated the responsibility and authority to determine whether a prisoner will be scheduled for an appointment with a doctor and what, if any, treatment short of a doctor's appointment an ailing prisoner will receive. Only upon referral to a doctor will the prisoner be accorded the opportunity to have an appropriately-trained medical professional determine whether she merits or requires enhanced treatment or care by a specialist outside of FCCW.

23. Apart from the routine Sick Call process, prisoners may submit a request for care on an emergency basis; however, FCCW, upon information and belief, virtually never honors prisoners' requests for emergency medical care, regardless of the true circumstances or the prisoners' actual needs.

24. The nursing staff also has responsibility for distributing prescription medication to prisoners through the "Pill Line" process in which, often under extremely harsh conditions -- such as having to stand outdoors in a single-file line at 3:00-4:00 a.m., exposed to rain, snow,

severe cold or excessive heat on a nightly basis -- the prisoners are ostensibly provided with the medication dictated by their various ailments and conditions. With disturbing regularity, however, prisoners may stand in the Pill Line for one hour or more, under harsh circumstances, only to receive the incorrect prescription, or to be told that their medication was forgotten back at the Infirmary by the nurses, or is simply unavailable because delivery of the medication to FCCW is late arriving or was never even ordered in the first place because the prescription was misplaced or the order was not placed due to "oversight".

  **B.**  **The Named Plaintiffs' Individual Medical Issues And Claims**

  25.  Plaintiff **Cynthia Scott**, who is 42 years of age, suffers from asthma and a host of other serious medical problems. In connection with a complaint that she was having great difficulty breathing, she was seen at Sick Call in August 2009 for what was originally believed to be chronic bronchitis.

  26.  By the time Ms. Scott was seen at Sick Call for a follow-up examination regarding what was thought to be bronchitis in September 2009, she had begun to experience a lack of appetite and significant weight loss. No cause was determined for these symptoms.

  27.  Based upon her complaints that she was experiencing hot and cold sweats, continued breathing problems and a continuing significant weight loss, Dr. Remaly saw Ms. Scott in February 2010. He told her that her symptoms were the result of the on-set of the early stages of menopause. He also stated that her body was rejecting protein and that she needed a higher-protein diet. Although a blood test confirmed the existence of a protein deficiency, nothing was done by FCCW to alter or improve her diet.

  28.  During the first six months of 2010, Ms. Scott, without either dieting or exercising, lost more than 40 pounds, in regard to which early menopause and a protein deficiency were the only explanations offered by FCCW Medical Staff.

29.     On or about June 18, 2010, in response to Ms. Scott's ongoing complaints of severe shortness of breath, a chest x-ray was taken.  A nurse-practitioner informed Ms. Scott that the x-ray showed the presence of large masses in each of her lungs, which the nurse stated were probably cancer.  Not until then was Ms. Scott sent to the University of Virginia Medical Center ("UVA") for CT-scans, which were conducted on July 7 and July 14, and a lung biopsy on July 19, 2010.

30.     On August 5, 2010, UVA oncologists told Ms. Scott that she has sarcoidosis -- a disease in which abnormal collections of chronic inflammatory cells (granulomas) form as nodules within the chest cavity which, in some cases, may cause respiratory failure and death -- rather than lung cancer.  The specialists prescribed 40 mgs. per day of Prednisone for 30 days, followed by a reduction in the dosage to 20 mg./day for an additional 60 days, after which she was to have a follow-up examination.

31.     Upon Ms. Scott's return to FCCW, Dr. MacDonald, without any consultation with her UVA specialists, summarily reduced her prescription to 30 mg./day of Prednisone (rather than 40 mg./day) for the first 30 days followed by 20 mg./day for the next 40 days (instead of 60 days).

32.     On or about November 7, 2010, Ms. Scott informed FCCW Medical Staff that she had run out of medication.  In response, she was given 10 mgs./day of Prednisone from November 8 through November 17, after which her medication ran out again.  As a result of another complaint, she was given 5 mg./day of Prednisone from November 24 to December 7, 2010.

33.     On December 16, 2010, Ms. Scott had her follow-up appointment with her specialists at UVA.  This was the first time that she or her doctors learned that Dr. MacDonald

had departed from the prescribed course of medication that the UVA doctors had established in August. The UVA specialists placed Ms. Scott back on 10 mg./day of Prednisone for three months, and specifically instructed that FCCW carry out the prescription as ordered, without deviation.

34. Ms. Scott's UVA Health System medical records for October 27, 2011 report that, as of that date, her sarcoidosis had spread to her liver and spleen. Her UVA doctors were hampered in their attempt to conduct a six-minute treadmill test to assess the adverse impact of the sarcoidosis on her lung capacity due to the fact that her legs were bound in shackles that the FCCW correctional officer accompanying her to UVA refused to remove.

35. Ms. Scott has repeatedly sought, and continues to seek, specific information regarding the implications of her sarcoidosis diagnosis, the course of future treatment that is to be followed for her illness and her long-term prognosis. FCCW Medical Staff has ignored or, in any event, failed to respond to her inquiries.

36. In January 2012, Ms. Scott began to experience severe swelling in her lower left leg. Dr. Remaly thought that the swelling might be attributable to birth-control pills (Nortrel) that Ms. Scott had been taking regularly over the course of many years, and ordered that she discontinue the medication.

37. Despite termination of the birth-control pills, the severe swelling did not abate, but rather got worse, and Ms. Scott initiated a series of Sick Call visits, sometimes two or three per week, seeking treatment. None was provided.

38. On or about the evening of May 1, 2012, with the swelling so extreme that Ms. Scott lost feeling in her toes and felt that her lower leg was likely to burst open, correctional officers in Ms. Scott's building summoned an FCCW nurse to examine Ms. Scott in the Nurse's

Station.  The nurse immediately called and left a message for Dr. MacDonald, who came to examine Ms. Scott the next morning at 6:15 a.m.  After a brief examination, Dr. MacDonald advised Ms. Scott that the swelling was due to arthritis and that she should put on a pair of support stockings to alleviate the problem.

39.    Certain that arthritis was not the cause of the extreme, painful swelling, Ms. Scott placed a call to her mother, who then contacted Dr. MacDonald by telephone to express her serious concerns regarding her daughter's condition.  Dr. MacDonald assured Ms. Scott's mother that Ms. Scott was being "well taken care of".

40.    On May 3, 2012, Ms. Scott was seen by Dr. Remaly for a regularly-scheduled appointment regarding her sarcoidosis.  Dr. Remaly rejected Dr. MacDonald's conclusion that Ms. Scott's swollen leg was attributable to arthritis, and ordered that she be sent to UVA for an ultrasound of her leg and foot.  The following day, Dr. MacDonald again examined Ms. Scott and informed her that someone would come to FCCW on May 8, 2012 to perform the ultrasound.

41.    Not until late in the afternoon on May 10, 2012 was the ultrasound on Ms. Scott finally conducted.  The examiner told Ms. Scott that she "didn't like what she saw" and ordered that Ms. Scott be taken immediately to the Emergency Room at UVA Medical Center.  An ultrasound performed upon Ms. Scott's arrival at UVA confirmed that she had a blood clot in her left leg, and a subsequent x-ray examination established that fragments of the blood clot had traveled to her lungs.  She was immediately admitted to UVA for an overnight stay and started on injections of Levenox, an anticoagulant.

42.    After receiving Levenox injections in her stomach at 9:00 p.m. on May 10 and at 9:00 a.m. the following morning, Ms. Scott was released from UVA and returned to FCCW on the afternoon of May 11, 2012.  She was told that she was to continue to receive abdominal

injections of Levenox twice a day for seven days, with blood work to be performed at regular intervals to ensure that the medication was working properly, and that after seven days, she would transition to Coumadin (Warfarin), an alternative anticoagulant available in pill form which she would likely need to take for the rest of her life.

43.     Upon her arrival back at FCCW, a nurse, at Dr. MacDonald's direction, removed from Ms. Scott's possession the copy of the written directions explaining her intended course of treatment that had been provided to her at UVA.  Ms. Scott did not receive the Levenox injection at 9:00 p.m. on the evening of May 11 that she was supposed to receive.  At 4:00 a.m. Pill Line on May 12, she was informed by a nurse that there were no orders regarding any injections she was to be provided.  Ms. Scott returned to her cell and immediately prepared and submitted an Emergency Medical Grievance.  It was returned, signed by the same nurse Ms. Scott had spoken to at Pill Line, indicating that her prescribed medication would have to be ordered.  At the 9:45 a.m. Pill Line later on May 12, Ms. Scott received one 120 mg. injection.

44.     In the following days, Ms. Scott received only one 120 mg. injection of Levenox based on Dr. MacDonald's instructions, rather than two injections of 100 mgs. each as had been expressly ordered by her treating physician at UVA, causing Ms. Scott grave concern that potentially life-threatening blood clots in her system are not being treated properly.  Finally on May 15, she began to receive injections of 100 mg. of Levenox twice per day.

45.     Ms. Scott has suffered, and continues to suffer, physical pain and discomfort, and needless uncertainty giving rise to extreme mental anguish and emotional distress, due to defendants' past, present and on-going acts and omissions reflecting their deliberate indifference to her serious medical problems and needs.

46.     Plaintiff **Bobinette Fearce**, who is 60 years of age, was diagnosed with a degenerative disc disease and had surgery in 2001, which was performed by Dr. Gregory Helm, a neurosurgeon at UVA.  The surgery involved the fusing of two vertebrae in the front of her neck. Although extended physical therapy was prescribed for Ms. Fearce to assist her rehabilitation from this surgery, Ms. Fearce was provided with limited physical therapy only irregularly, during the first three months after her return to FCCW, which was then discontinued entirely.

47.     In late 2007, Ms. Fearce began to experience a loss of strength in her hands, as well as a loss of balance when standing, and was returned to UVA for a series of diagnostic examinations and tests by the neurological specialists on staff there, including an MRI in December 2007 and a CT-scan in March 2008.

48.     The tests showed that Ms. Fearce is suffering from further degenerative disc disease at several different levels of her cervical spine, which was of a "significant" degree of severity in some areas and "mild" in others.  The UVA specialists also determined that Ms. Fearce has "moderately severe right and mild left" carpal tunnel syndrome.

49.     In regard to treatment of Ms. Fearce's bilateral carpal tunnel syndrome, Dr. Helm prescribed that she be provided wrist splints, and noted that if the splints were ineffective, carpal tunnel release, a form of corrective surgery, should be the next step.

50.     Ms. Fearce was supplied with wrist splints by FCCW in 2008, but they were ineffective in relieving her symptoms and she continues to suffer severe pain and weakness in her arms and wrists and numbness in her fingers, even when her wrists are immobilized.

51.     In mid-2009, Ms. Fearce continued to complain of severe chronic pain and discomfort in her neck, back and wrists associated with the degenerative cervical spinal disease and carpal tunnel syndrome from which she suffers.  Dr. Remaly, rather than referring

Ms. Fearce back to her UVA specialists for further examination and treatment (including the carpal tunnel release surgery that had previously been prescribed), decided to treat Ms. Fearce's condition by providing her with injections of Prednisone and hydrocortisone to her wrists and back on a twice-monthly basis. The injections, which commenced in August 2009, proved ineffective to relieve Ms. Fearce's pain and other symptoms within a few months' time.

52. Despite Ms. Fearce's repeated pleas to be sent back to UVA for further examination by Dr. Helm and/or other neurological specialists with the training and experience to assess her condition and devise an effective (or, at a minimum, a more effective) course of treatment, FCCW Medical Staff has refused to refer Ms. Fearce back to UVA for specialized care. As a result, the extent of the further progression of Ms. Fearce's degenerative spine disease, and its possible adverse impact upon Ms. Fearce's overall health and well-being, have not been assessed since March 2008.

53. In the meantime, FCCW has disregarded Ms. Fearce's need for an altered course of medication and treatment, including physical therapy, to address her constant, chronic pain. In response to one complaint by Ms. Fearce regarding the inadequacy of her prescribed pain medications, Dr. MacDonald refused to either change Ms. Fearce's medication or increase her dosage, stating that "[t]here are risks to taking long-term Tylenol and non-steroidal anti-inflammatory drugs (NSAIDS). We try to limit the use of these, in order to avoid the risks of liver and kidney disease." Dr. MacDonald's solution was to advise Ms. Fearce to purchase the over-the-counter form of Tylenol from the FCCW Commissary. FCCW, however, limits the amount of medication a prisoner may purchase at the Commissary at any one time to twelve packets, each containing two 325-mg. tablets, and also limits the frequency with which such purchases may be made to once every 10 days-to-two weeks, even assuming that Ms. Fearce

possessed sufficient financial resources to purchase her own pain medications on a regular basis, given her limited ability to perform wage-earning jobs within the Prison in light of her myriad physical ailments. These factors combine to eliminate any realistic possibility that Ms. Fearce could effectively offset her deficient course of prescription medication for severe chronic pain through the purchase of packets of over-the-counter Tylenol tablets, at her own expense, from the Commissary.

54. Due to a chronic bladder problem dating from sometime in 2004, Ms. Fearce suffers from incontinence, and must wear adult diapers at all times. In late 2006, Ms. Fearce was sent to UVA for an examination, and a specialist diagnosed "pneumaturia and stress incontinence of urine" relating to "moderate to marked descensus of the bladder." Surgery involving the insertion of a "mid-urethral sling" was prescribed. However, upon Ms. Fearce's return to FCCW, Dr. MacDonald informed her that she is "too old" to be afforded the surgery that would correct her bladder condition.

55. Dr. MacDonald issued Ms. Fearce a Medical Profile -- a written authorization prepared by the Medical Staff allowing an prisoner some form of special accommodation for specific medical reasons -- allowing her to use the bathroom on an as-needed basis, and to utilize the laundry facilities to wash her clothes on an as-needed basis if they became soiled, in recognition of her incontinence. However, Dr. MacDonald later arbitrarily rescinded the Medical Profile upon the demand of FCCW Correctional Staff, despite no change in Ms. Fearce's medical condition or resulting physical needs, based solely upon alleged security concerns that have never been explained to Ms. Fearce or articulated in writing insofar as she is aware.

56.     As a result of the rescission of the Medical Profile granting Ms. Fearce bathroom and laundry privileges, Ms. Fearce has frequent occasions on in which she wets herself and soils her clothing or bedding, which she is not permitted to wash until her next regularly-scheduled access to the laundry, whenever that might be.  These incidents cause Ms. Fearce to experience extreme personal discomfort, embarrassment and humiliation, and subject her to ridicule by other prisoners.

57.     Ms. Fearce suffers from temporomandibular joint (TMJ) disorder, a condition that began to cause her serious problems in 2007-08.  Ms. Fearce's jaw is misaligned upon closure due to the disorder.  It causes her, on a recurring basis, to inadvertently bite herself on the inner wall of her left cheek, as well as her tongue.  Repeated accidental bites to the same areas of her inner cheek and tongue have resulted in cuts and bruises that never have the chance to heal and have become ulcerated, making it extremely painful for Ms. Fearce to eat, as well as to talk.  Ms. Fearce has repeatedly sought appointments with FCCW Medical Staff and/or Dental Staff seeking treatment for the cuts, bruises and open sores in her mouth attributable to her TMJ disorder.

58.     At an appointment conducted on or about June 3, 2010, Dr. Remaly told Ms. Fearce that she requires corrective dental treatment to address her TMJ disorder and misaligned bite, without which the internal damage to her cheek and tongue will recur indefinitely.

59.     On June 15, 2010, Ms. Fearce was seen for examination by Dr. Wood, a dentist on staff at FCCW.  Dr. Wood advised Ms. Fearce that she needs braces, and oral surgery, to permanently correct her TMJ disorder, but that neither of these measures would be provided to Ms. Fearce during her incarceration at FCCW because they are too expensive.

60.     Dr. Wood devised a multi-step strategy intended to partially mitigate the continuing adverse effects of Ms. Fearce's TMJ problem.  Dr. Wood indicated that she would schedule an appointment to fill cavities that are present in certain of Ms. Fearce's teeth, and took a molded impression of Ms. Fearce's teeth in order to create a permanent tooth guard for Ms. Fearce to wear to protect against accidental bites after the cavities were filled.  Dr. Wood also used a file to dull the sharp edges of some of Ms. Fearce's teeth, in order to make inadvertent bites to her inner cheek and tongue less penetrating, painful and harmful.

61.     Subsequent to the mid-June 2010 appointment with Dr. Wood, no follow-up appointment for the filling of Ms. Fearce's cavities was scheduled or provided.  In addition, the filing of the sharp edges of Ms. Fearce's teeth by Dr. Wood left those teeth painfully sensitive to heat, cold and any hard substances Ms. Fearce attempts to chew.  Meanwhile, Ms. Fearce's TMJ disorder remains untreated, and her misaligned teeth continue to cause extremely painful accidental biting of her inner cheek and tongue, aggravating prior cuts and sores and creating new ones for which FCCW Medical Staff's sole advice is that she gargle with salt water in an attempt to ward off infections.

62.     Due to the host of medical problems with which she is afflicted including, in particular, a chronically stiff and sore neck and back attributable to her degenerative disc disease, as well as arthritis in her left hip and right knee, Ms. Fearce must often walk with a cane.   This is significantly more difficult due to the numbness and weakness in her hands and wrists caused by her bilateral carpal tunnel syndrome.

63.     In recognition of Ms. Fearce's mobility challenges and in order to provide her with better access to the Infirmary and the locations where meals are served and Ms. Fearce takes continuing education classes, Ms. Fearce was provided a Medical Profile in or about

November 2009, indicating that she should be transferred to a one-person cell in Building 2, a centrally-located housing unit at FCCW.

64.     Ms. Fearce was residing in general population in a double cell in Building 3, awaiting the transfer to a single cell in Building 2 dictated by her Medical Profile when, as of June 29, 2010, Ms. Fearce was transferred, at the direction of FCCW Correctional Staff, to a cell in Building 5, the residential unit located farther away from the various locations to which Ms. Fearce must walk on a frequent basis than any other housing unit at FCCW.

65.     Ms. Fearce complained about her transfer to Building 5, on the grounds that the action was in direct contradiction of her Medical Profile, and that walking from Building 5 to the Infirmary, meals, classes, etc., was causing her undue pain and harm.  Her Medical Profile for her transfer to a single cell in Building 2 was summarily rescinded by FCCW Medical Staff based on alleged security considerations raised by Correctional Staff bearing no relationship to any legitimate medical justification.  Not until September/October 2010 was Ms. Fearce finally transferred from Building 5 to Building 2, where she resided until recently.

66.     Bathroom access is critical for prisoners like Ms. Fearce who have medical problems that make it difficult, if not impossible, for them to wait long periods of time to use the bathroom.  In addition to the incontinence from which Ms. Fearce suffers, as addressed above, she also must take laxatives several times a week that assist her in relieving herself.  A recent change in internal policy at FCCW, involving the implementation of a nighttime bathroom "list", means that during overnight hours when Ms. Fearce calls the guard in the building in which she resides to indicate her need to use the bathroom, her name is placed at the end of a list of other prisoners who asked to use the bathroom before her.  At times, the wait has been as long as fifty-five minutes, causing Ms. Fearce great emotional distress and/or in having to relieve herself in

her diaper. To compound the problem, after years of having a Medical Profile providing her with the opportunity to reside in a single cell in which Ms. Fearce was permitted to change her diaper and to change out of soiled clothing, when necessary, in privacy, Ms. Fearce's Medical Profile was recently revoked and she was reassigned to a double cell that she must share with a roommate. Ms. Fearce's incontinence and need to utilize diapers has not changed, and the justification for her prior Medical Profile for a single cell remains the same. Dr. MacDonald, in response to Ms. Fearce's grievance, stated that she did not qualify for a single cell.

67.    By letter dated June 13, 2012, directed to defendant Warden Baskerville by undersigned counsel from the Legal Aid Justice Center on Ms. Fearce's behalf, Ms. Fearce's serious concerns regarding the adoption of the nighttime bathroom list policy and the revocation of her Medical Profile for a single cell were raised and immediate corrective action on the part of FCCW was requested. Although a prompt response to the letter was sought, Warden Baskerville never responded to the June 13 letter.

68.    Meanwhile, Ms. Fearce was suddenly transferred to a Ward in the Infirmary shared with five other women, where she is being confined without access to any recreational activities or the opportunity to attend religious services or education classes. Based upon several comments by Dr. MacDonald to Ms. Fearce referencing "the June 13 letter", it appears that Ms. Fearce is being retaliated against for having attempted to raise legitimate concerns with respect to the nature and quality of her medical care at FCCW through the assistance of legal counsel.

69.    Ms. Fearce has suffered, and continues to suffer, physical pain and discomfort, and needless uncertainty giving rise to extreme mental anguish and emotional distress, due to defendants' past, present and on-going acts and omissions reflecting their deliberate indifference to Ms. Fearce's serious medical problems and needs.

70.     Plaintiff **Patricia Knight**, who is 55 years of age, suffered a stroke while incarcerated at the Piedmont Regional Jail in or about April 2005 which resulted in her temporary loss of weight-bearing capacity in her legs as well as the loss of strength and gripping capacity in her hands.  In 2006, Ms. Knight was transferred to FCCW so that she could receive rehabilitative care.

71.     Because Ms. Knight was unable to walk at the time of her arrival at FCCW, she was immediately admitted to the Infirmary following her intake screening.  Ms. Knight remained in the Infirmary for 11 months.  During that time, she was not provided with any physical therapy.  As a result, the loss of strength and gripping capacity in Ms. Knight's hands essentially became permanent.  Some of the weight-bearing capacity returned to Ms. Knight's legs over time despite FCCW's failure to provide any physical therapy.  However, her ability to walk remains severely compromised due to her difficulties in holding and supporting a walker or a cane because of the weakness in her hands.

72.     In 2007, Ms. Knight began to suffer from severe neck pain, for which she sought medical attention.  Ms. Knight had to request repeated Sick Call visits over a period of nearly six months before she was finally referred for an appointment with a doctor, who acknowledged her need for specialized treatment.  Ms. Knight subsequently had surgery at the Medical College of Virginia ("MCV") to remove the C3 and C4 disks from her neck in order to relieve the severe pain she was experiencing.

73.     After this surgery, Ms. Knight's treating specialists at MCV prescribed physical therapy to assist her rehabilitation upon her return to FCCW.  But, again, FCCW failed to provide it.

74.     Ms. Knight has routinely recurring severe neck and back pain, but receives no chronic care for her on-going condition.  Instead, she must repeatedly submit Sick Call requests seeking medical attention, and, per FCCW policy, is charged a $5.00 "co-pay" for each individual Sick Call visit.  This imposes an extreme economic hardship upon Ms. Knight given her physical incapacity to work in order to earn money.

75.     When Ms. Knight arrived at FCCW at 2006, she was taking Ranexa, a prescription medication used to treat chronic chest pain (angina).  Thereafter, FCCW discontinued Ms. Knight's Ranexa prescription without explanation.  A doctor at MCV involved in treating Ms. Knight in connection with her spinal surgery in 2007 advised her that she needed to resume taking Ranexa, but upon her return to FCCW, Dr. MacDonald rejected this instruction on the grounds that the medication was too expensive.

76.     Ms. Knight, in late 2010, requested physical therapy to address extreme pain in her knees attributable to arthritis.  Dr. MacDonald responded that Ms. Knight's knee pain is due to excessive body weight, and that exercise and weight loss would reduce pressure on Ms. Knight's joints without any need for physical therapy.  Dr. MacDonald ignored the fact that the constant weakness and pain in Ms. Knight's legs and her inability to walk without a walker or a cane essentially preclude her from exercising with sufficient frequency and vigor to cause meaningful weight loss.  Meanwhile, Ms. Knight's repeated requests for pain medication stronger than over-the-counter Tylenol for her chronic and severe knee, back and neck pain have been either ignored or refused by FCCW Medical Staff.

77.     Ms. Knight had gastric bypass surgery prior to her arrival at FCCW in 2006.  Recently, Ms. Knight has become increasingly concerned that the partitioning of her stomach or the stomach-intestine or stomach-bowel connections established by the surgery may be failing,

as she has begun experiencing severe reflux symptoms and nausea during and after every meal. Ms. Knight has initiated numerous Sick Call visits based on these ill feelings, and has requested that she be referred to a specialist knowledgeable with respect to the after-effects and possible complications associated with the surgical procedure she had. FCCW Medical Staff has ignored, or refused to respond to, her requests for assistance.

78. Ms. Knight has suffered, and continues to suffer, physical pain and discomfort, and needless uncertainty giving rise to extreme mental anguish and emotional distress, due to defendants' past, present and on-going acts and omissions reflecting their deliberate indifference to Ms. Knight's serious medical problems and needs.

79. Plaintiff **Marguerite Richardson**, who is 56 years of age, suffers from high blood pressure and poor circulation, for which use of the prescription drug Lasix has been directed. The drug has a diuretic effect on Ms. Richardson, causing her to have frequent need to use the bathroom.

80. Ms. Richardson has repeatedly requested FCCW Medical Staff to issue her a Medical Profile granting her bathroom privileges on an as-needed basis, but these requests have been rejected on the grounds that the Profile would not be honored by Correctional Officers in any event and that bathroom access is a "security issue" subject to the sole discretion of the Warden. Ms. Richardson has been subjected to disciplinary charges on multiple occasions when she has used the bathroom without prior permission in order to avoid urinating on herself.

81. Ms. Richardson has been told that she has Hepatitis C, an infectious disease affecting the liver, caused by the Hepatitis C virus (HCV), which is often asymptomatic. Since learning that she carries the HCV, Ms. Richardson has repeatedly requested that she be provided information regarding its effects, and treatment to the extent treatment is appropriate. FCCW

Medical Staff has ignored or refused to respond to Ms. Richardson's numerous inquiries. She is completely uncertain as to what, if any, adverse impact HCV may be having on her health and well-being.

82.     Ms. Richardson has a large growth located under her right ribcage that causes her severe pain and discomfort. At various times, a nurse told Ms. Richardson that the growth might be a hernia of her liver, and Dr. Remaly suggested that the growth might be attached to her stomach wall. In response to Ms. Richardson's requests for tests to establish a definitive diagnosis and a plan for treatment, Dr. MacDonald wrote a note on February 21, 2011, stating: "If you have a hernia, surgeons will usually not repair. If it is protruding (bulging) and you cannot reduce it, let me know." FCCW Medical Staff has failed to make any further response to Ms. Richardson's continuing efforts to find out the nature of her condition and how it might be treated.

83.     Ms. Richardson suffers from intense chronic pain in her lower back, and shooting pains and numbness through her right hip and down her right leg, ankle and foot. Although FCCW Medical Staff have suggested to Ms. Richardson at various times that she has degenerative disc disease, sciatica and/or arthritis, Ms. Richardson remains uncertain of the cause of the severe pain she is experiencing and has repeatedly requested examination and testing. In February 2011, Dr. MacDonald responded that Ms. Richardson's problem "has been determined to be lumbar pain with a loss of sensation to part of [her] lower extremities," and stated that "no further tests are needed at this time." Apart from this statement, which merely describes her reported symptoms, Ms. Richardson's entreaties have not received any response.

84.     In the Spring of 2011, Ms. Richardson sought medical attention through Sick Call visits for a number of small, painful sores or boils on the back of her lower left leg.

Ms. Richardson was prescribed an antibiotic -- Bactrim -- to treat the sores, but they did not go away and continued to cause her pain through the Summer and Fall.

85. In January 2012, Ms. Richardson's severely swollen, discolored left foot was examined by Dr. Remaly, and fluid was extracted for analysis. Ms. Richardson's prescribed dosage of Bactrim was increased, but she was not provided any medication for pain. The test results were not revealed to her.

86. Ms. Richardson continued to experience severe swelling and extreme pain in her lower leg and foot. Emergency medical grievances she filed seeking treatment and pain medication were disregarded.

87. Finally, at a Sick Call visit in May 2012, one of the FCCW nurses called up the results of Ms. Richardson's prior test on a computer in the Infirmary and informed her that she had Methicillin-resistant Staphylococcus aureus (MRSA), a highly contagious form of bacterial infection which may be fatal if left untreated. Only after this disclosure was Ms. Richardson's medication changed from Bactrim to Keflex, which has begun to gradually treat the infection in an effective manner.

88. Ms. Richardson has suffered, and continues to suffer, physical pain and discomfort, and needless uncertainty giving rise to extreme mental anguish and emotional distress, due to defendants' past, present and on-going acts and omissions reflecting their deliberate indifference to Ms. Richardson's serious medical problems and needs.

89. Plaintiff **Rebecca Scott**, who is 29 years of age, has experienced, over several years, a recurring problem with an extremely painful deformed toenail on the big toe of her right foot, which causes her great discomfort and makes it very difficult for her to walk on a day-to-day basis.

90.     Ms. Scott has put in numerous requests for Sick Call visits to have the toe examined, and has seen Dr. Remaly for the problem.  Despite her extreme pain and discomfort, however, Dr. Remaly has told Ms. Scott that there is nothing wrong with the toenail, and he has refused to provide her with any treatment other than to trim the nail so close to the skin that her toe itself has been cut and become infected, making her condition even more painful.

91.     After a nurse suggested that Ms. Scott  contact Dr. MacDonald, she did so in November 2010, requesting that he arrange for her to see a specialist who could remove the toenail permanently.  In a written response to her request, Dr. MacDonald stated:  "Toe nail fungus is frustrating.  Some people have realized that putting oil/tabasco sauce or hair products under the toe nail kills the fungus.  I have had some success on the outside with Vick's Vapor-Rub/tabasco sauce/etc."

92.     Ms. Scott contacted Dr. MacDonald again, pointing out that her problem is not "toe nail fungus" but rather a deformed toenail that she wanted permanently removed.  In mid-December 2010, Dr. MacDonald responded as follows:  "Toe nail fungus is a frustrating problem.  Your toe nail was removed.  When a nail is removed, it may grow back crooked. Repeated toe nail removal may not help.  If you continue to have problems, [contact me again]."

93.     Subsequent to this exchange, Ms. Scott's on-going attempts to obtain effective and/or specialized care for her deformed toenail condition have drawn no response from FCCW Medical Staff.  The extreme pain and discomfort in her foot continue.

94.     For several months, Ms. Scott has been requesting a referral to an outside ear/nose/throat (ENT) specialist that FCCW Medical Staff has consistently refused to honor. Ms. Scott's hearing, which is already substantially diminished due to her profound deafness, is

adversely affected each time her tonsils become infected and inflamed, a condition she experiences several times a year.

95.    Dr. Remaly has told Ms. Scott that she needs to have her tonsils removed to prevent the recurring tonsillitis from which she suffers; however, Dr. MacDonald proclaimed that he "does not believe in" removal of the tonsils by surgery.  As a result, Ms. Scott's requests to be seen by an outside ENT specialist have been summarily rejected.

96.    Ms. Scott is also afflicted by a recurring back problem, which she experiences when misaligned bones in her back rub against her spine.  She is essentially rendered immobile when the condition flares up.

97.    Despite clear documentation in Ms. Scott's medical records  reflecting that she is asthmatic, Dr. Remaly prescribed Mobic (Meloxicam), a nonsteroidal anti-inflammatory drug which is contra-indicated for individuals with asthma, as the medical treatment for her back.  Even after Ms. Scott had an adverse reaction upon her initial use of Mobic, Dr. Remaly declined to change the prescription.  Only as a result of the intervention of a nurse practitioner on staff at FCCW was Ms. Scott taken off Mobic and prescribed Prednisone for her injured back.

98.    Ms. Scott has repeatedly requested a regimen of physical therapy to address her back issues; all such requests have been disregarded.

99.    Ms. Scott has suffered, and continues to suffer, physical pain and discomfort, and needless uncertainty giving rise to extreme mental anguish and emotional distress, due to defendants' past, present and on-going acts and omissions reflecting their deliberate indifference to her serious medical problems and needs.

### C. FCCW's Systemic Failure To Provide Constitutionally-Adequate Medical Care

100. The named plaintiffs incorporate by reference, as though fully restated herein, the allegations set forth in Paragraphs 1 through 99 above.

101. The experiences reflected by and embodied in the named plaintiffs' respective individual allegations provide only a partial indication of the systemic, pervasive nature of the deficiencies characterizing FCCW's provision of and/or failure to provide medical care services to the women prisoners residing there. Given FCCW's status as the facility, within the VDOC system, to which women prisoners with the most serious medical problems are sent for a purportedly heightened level of care, the critical implications of the systemic deficiencies characterizing the provision of medical care at FCCW are both apparent and disturbing.

102. The pervasive shortcomings in FCCW's provision of medical care to its residents can be broadly viewed as attributable to two principal considerations: (i) deviations from the accepted and appropriate standard of care on the basis of cost considerations driven by Armor's motivation to minimize its expenses and thereby maximize its corporate profits; and (ii) deviations from the accepted and appropriate standard of care on the basis of purported security concerns devoid of any genuine and legitimate penological justification. Neither of these considerations can validate or justify defendants' past, present and on-going acts and omissions constituting and/or reflecting deliberate indifference to plaintiffs' serious medical problems and needs.

103. Under the provisions of VDOC Operating Procedure No. 866.1, "Offender Grievance Procedure," defendant Schilling, as Regional Ombudsman, is the individual to whom grievances initiated by prisoners residing at Fluvanna with respect to failure to provide medical care or provision of deficient medical care are or at relevant times were directed for ultimate

review and disposition when such grievances have not been resolved to the satisfaction of the prisoner at earlier stages in the grievance process. As a result, Mr. Schilling has or, in contravention of relevant policy and sound correctional practice, has purposefully avoided, direct personal knowledge of the substance of prisoner grievances describing the pervasive nature of the deficient medical care to which the named plaintiffs and other prisoners similarly situated have been subjected at FCCW, as set forth in this Complaint.

104. Under the provisions of VDOC Op. Proc. No. 866-1, defendant Baskerville, as FCCW Warden, reviews and determines prisoner grievances with respect to failure to provide medical care or provision of deficient medical care in those instances in which a prisoner's complaint regarding the nature or extent of medical care she has (or has not) received is not resolved to the prisoner's satisfaction on an informal basis. As a result, Ms. Baskerville has or, in contravention of relevant policy and sound correctional practice, has purposefully avoided, direct personal knowledge of the substance of prisoner grievances describing the pervasive nature of the deficient medical care to which the named plaintiffs and other prisoners similarly situated have been subjected at FCCW, as set forth in this Complaint.

105. As a result of its officials' and employees' direct participation in and awareness of the review process involving FCCW prisoners' hundreds of grievances recounting FCCW's systemic provision of deficient medical care and/or outright failure to provide appropriate medical care, without requiring FCCW and Armor and/or PHS to adopt and implement corrective measures, VDOC has adopted and engaged in a custom or practice of deliberate indifference to plaintiffs' serious medical problems and needs.

### 1. Deviations From The Appropriate Standard Of Care Based On Cost Considerations

#### (a) Deficient Sick Call Process

106. Upon information and belief, Armor maintains lower operating expenses, and thus increases its profits under its contract with VDOC, by retaining and employing licensed practical nurses (LPNs) and certified nursing assistants (CNAs) -- rather than physicians or registered nurses -- to make critical medical judgments. LPNs and CNAs administer the Sick Call process and make threshold determinations as to whether prisoners complaining of medical problems should be referred to a doctor for examination and treatment. The lack of training, expertise and experience that is characteristic of these lower-cost paraprofessionals creates a Sick Call process in which determinations regarding prisoners' serious (or potentially serious) medical problems and needs are made by individuals unqualified to perform this function, with severe consequences for those prisoners subject to incorrect judgments.

107. The plight of plaintiffs Cynthia Scott and Patricia Knight illustrate the serious implications for FCCW prisoners of a Sick Call process administered by under-qualified individuals employed on the basis of considerations of expense reduction and profit maximization rather than fundamental medical competency. Ms. Scott was seen at Sick Call for many months during which she suffered from breathing difficulties, catastrophic weight loss for which there was no explanation, and a protein deficiency in regard to which no modification of her diet was implemented before she was finally referred for testing that revealed she is afflicted with sarcoidosis, a serious, potentially life-threatening disease. Ms. Knight suffered through a repeated, fruitless series of Sick Call visits spanning six months before she was finally referred to a doctor concerning her severe, chronic neck pain. That doctor, upon finally examining

- 31 -

Ms. Knight, immediately acknowledged her need for specialized treatment, resulting in belated spinal disk-removal surgery.

108.    Cynthia Scott revisited the potentially life-threatening consequences of the woefully inadequate Sick Call process more recently in connection with the blood clot causing severe swelling and extreme pain in her lower left leg, in connection with which she had Sick Call visits from January to May 2012 before her circumstances became so dire that an ultrasound revealing the presence of the clot was finally ordered and conducted.  Likewise, Marguerite Richardson's MRSA was dismissed as insignificant, or actively concealed, for months by those staffing Sick Call, before she was finally informed that she was afflicted with this highly-contagious bacterial infection and began to receive proper treatment.

109.    Defendants' failure, or refusal, to expend the resources required to provide a Sick Call process that is staffed by properly trained and experienced medical personnel competent to adequately and properly assess the nature and extent of FCCW prisoners' actual or potentially serious medical problems and refer them accordingly for appropriate attention and treatment constitutes deliberate indifference to serious medical needs.

> **(b)    Failure/Refusal To Acknowledge, Examine, Diagnose And Treat Serious  Or Potentially Serious Prisoner Medical Problems**

110.    Upon information and belief, under the provisions of the contract between Armor and VDOC, the greater the amount of time and attention that Armor devotes to the medical needs of a particular prisoner, the greater the resulting expense, thus adversely affecting Armor's profits.

111.    As a result, prisoners residing at FCCW have repeatedly been subjected to situations in which FCCW Medical Staff have failed, or refused, to invest the time or effort

required to acknowledge, examine, diagnose and treat them with respect to existing or potentially serious medical problems and concerns.

112.    The circumstances of plaintiffs Marguerite Richardson and Cynthia Scott are illustrative.  Ms. Richardson, who has a bulging mass underneath her right ribcage, which causes her severe pain and discomfort, has tried for months to persuade FCCW Medical Staff to perform tests, determine a diagnosis and prescribe treatment for this growth, all to no avail.  She still awaits an appropriate examination, diagnosis and treatment.  Similarly, despite repeated complaints over a period of more than nine months during which she suffered chest pains, shortness of breath, night sweats and catastrophic weight loss, FCCW Medical Staff offered Ms. Scott nothing but a diagnosis of "protein deficiency" in her diet (in regard to which no corrective action was taken) and an assessment that she was experiencing "early-stage menopause".  Only in June 2010 was Ms. Scott finally provided with chest x-rays that ultimately led to further testing and a diagnosis of sarcoidosis -- a serious, potentially life-threatening disease.  Subsequent to this diagnosis, FCCW Medical Staff have steadfastly refused to inform Ms. Scott regarding the long-term implications of the disease from which she suffers.

113.    Defendants' failure, or refusal, to acknowledge, examine, diagnose and treat the serious, or potentially serious, medical problems of FCCW prisoners in an appropriate and timely manner, as reflected by the experiences of Ms. Richardson and Ms. Scott, constitutes deliberate indifference to serious medical needs.

### (c)    Failure/Refusal To Refer Prisoners For Needed Specialized Care

114.    Upon information and belief, under the provisions of the contract between Armor and VDOC, each referral of an FCCW prisoner to UVA or other outside medical facilities for specialized evaluation or care increases the operating expenses for which Armor is responsible

and thus decreases its profits. As a result, FCCW prisoners have repeatedly been subjected to situations in which FCCW Medical Staff has failed, or refused, to make such referrals, despite the prisoners' clearly apparent and often previously documented need for specialized care.

115. The circumstances of plaintiffs Bobinette Fearce and Rebecca Scott are illustrative. The progression of Ms. Fearce's degenerative spine disease, and its possible adverse effects upon her overall health and well-being, have not been measured or assessed by the specialists at UVA who previously treated her since March 2008. FCCW Medical Staff's steadfast refusal to send Ms. Fearce back to UVA despite the acknowledged nature of her condition and her repeated requests causes her to suffer extreme, on-going pain. Likewise, the refusal of FCCW Medical Staff to refer Rebecca Scott to an outside ENT specialist despite clear acknowledgement by Dr. Remaly of her need for a tonsillectomy in order to prevent the recurring throat infections that adversely affect her already-diminished hearing has no possible legitimate medical justification.

116. Defendants' failure, or refusal, in the face of a recognized need, to refer FCCW prisoners for specialized medical care at outside facilities constitutes deliberate indifference to serious medical needs.

### (d) Failure/Refusal To Carry Out Specialists' Prescribed Courses Of Treatment

117. Upon information and belief, under the provisions of the contract between Armor and VDOC, the greater the expense absorbed by Armor in regard to carrying out the courses of treatment prescribed by outside specialists in order to address the illnesses of FCCW prisoners that they have examined and diagnosed, the greater the adverse impact upon Armor's profits.

118. As a result, FCCW Medical Staff routinely disregards the courses of treatment prescribed for prisoners by outside specialists who have examined them, in favor of treatment

that is less expensive, but also less efficacious, in responding to the serious medical conditions and severe pain from which the prisoners suffer.

119.    The circumstances of plaintiff Bobinette Fearce are illustrative.  As described more fully above, Ms. Fearce suffers from severe chronic pain in her wrists, which, as a result of a CT-scan taken in March 2008 by UVA specialists, was diagnosed as attributable to "moderately severe right and mild left" carpel tunnel syndrome.  The specialists concluded that if the wrist splints they prescribed for Ms. Fearce proved ineffective to treat the condition, carpel tunnel release, a surgical procedure, should be employed.

120.    However, when wrist splints failed to address or remedy Ms. Fearce's severe, chronic wrist pain, FCCW Medical Staff, rather than refer Ms. Fearce back to UVA for the carpel tunnel release surgery that had already been prescribed, unilaterally initiated an alternative course of treatment, involving the administration of steroid injections.  The injections of Prednisone and hydrocortisone have been ineffective to remedy Ms. Fearce's severe, on-going wrist pain.  FCCW Medical Staff, notified by Ms. Fearce that the alternative (and significantly cheaper) course of treatment upon which they settled was not working, has taken no further action to address, much less resolve, Ms. Fearce's chronic wrist pain.

121.    The circumstances of plaintiff Cynthia Scott are likewise illustrative.  As reviewed above, Ms. Scott's UVA oncologists prescribed 40 mgs. per day of Prednisone for 30 days, followed by a reduced dosage of 20 mgs. per day for 60 days, in order to treat her sarcoidosis, in August 2010.  However, immediately upon her return to FCCW, Dr. MacDonald unilaterally reduced the prescribed course of medication to 30 mgs. of Prednisone (rather than 40 mgs.) for 30 days, followed by 20 mgs. per day for 40 days (rather than 60 days).  As a result, long before Cynthia Scott's scheduled follow-up appointment with her specialists in mid-

December 2010, she ran out of the medication that had been prescribed by specialists for her treatment and was deprived of the beneficial effects on her condition that her specialists determined would result from the course of treatment they prescribed but FCCW repudiated. Likewise, Dr. MacDonald unilaterally reduced the dosage of anti-coagulant medication Ms. Scott was prescribed to receive following the discovery that she had a blood clot in her leg, fragments of which broke off and migrated to her lungs – posing a threat to her continued well-being.

122.    Defendants' failure, or refusal, in the face of specific instructions provided by outside medical specialists, to carry out the courses of treatment prescribed for plaintiffs and other similarly-situated FCCW prisoners, constitutes deliberate indifference to serious medical needs.

### (e)    Failure/Refusal To Provide Prisoners With Effective Medication For Severe, Chronic Pain

123.    Upon information and belief, under the provisions of the contract between Armor and VDOC, the greater the expense absorbed by Armor in providing FCCW prisoners experiencing severe, chronic pain attributable to their serious health problems with effective pain medication in adequate amounts to relieve the prisoners' suffering, the greater the adverse impact upon Armor's profits.

124.    As a result, FCCW Medical Staff, as a matter of routine, intentionally withholds from FCCW prisoners' pain medication of a nature and extent sufficient to provide the prisoners with relief from the severe, chronic pain they are experiencing.

125.    The circumstances of plaintiffs Bobinette Fearce and Patricia Knight, respectively, are illustrative.  Although, as described more fully above, Ms. Fearce suffers from a host of chronic conditions, including but not limited to, degenerative disc disease affecting her spine and carpal tunnel syndrome in both of her wrists, Dr. MacDonald has repeatedly refused to

increase Ms. Fearce's dosage of pain medication or to provide her with more effective alternative pain medication and has, instead, essentially instructed Ms. Fearce to fend for herself by suggesting that she can supplement her pain treatments by purchasing over-the-counter Tylenol from FCCW Commissary at her own expense. Similarly, FCCW Medical Staff has repeatedly refused to provide Ms. Knight with anything more than over-the-counter Tylenol for her chronic and severe knee, back and neck pain attributable to degenerative disc disease and arthritis.

126. Defendants' failure, or refusal, in the face of recognized suffering and need, to provide plaintiffs and other similarly-situated FCCW prisoners with pain medication sufficient in nature and extent to relieve the prisoners severe, chronic pain constitutes deliberate indifference to serious medical needs.

## 2. Deviations From The Appropriate Standard Of Care Based Upon Non-Medical "Security" Considerations

127. In recognition of the particular circumstances and needs encountered by plaintiffs and other similarly-situated FCCW prisoners as a result of the medical conditions from which they suffer, FCCW Medical Staff has occasionally issued Medical Profiles allowing certain special accommodations to these prisoners. However, the Medical Profiles have been arbitrarily revoked on the basis of purported "security" considerations raised by FCCW Correctional Staff, which lack either a medical or a legitimate penological justification.

128. As a result, plaintiffs and other similarly-situated FCCW prisoners have been arbitrarily deprived of the marginally greater degree of personal comfort, dignity and relief from pain, embarrassment and humiliation that were afforded by the accommodations established by their Medical Profiles.

129. The circumstances of plaintiffs Bobinette Fearce and Marguerite Richardson, respectively, are illustrative. Although, as described more fully above, Ms. Fearce suffers from a

chronic incontinence condition in regard to which FCCW Medical Staff has refused to consider allowing her to have corrective surgery, Ms. Fearce was, temporarily, issued a Medical Profile that established her entitlement to use the bathroom and the laundry facilities on an as-needed basis in recognition of her condition. However, despite the lack of any change in Ms. Fearce's condition, or her resulting physical and hygienic needs, Dr. MacDonald summarily rescinded the Medical Profile solely because FCCW Correctional Staff asked him to do so. Ms. Fearce's Medical Profile for transfer to a single cell in Building 2, which was issued in recognition of her serious mobility limitations, was revoked under similar circumstances, without any medical or penological justification. Ms. Richardson, whose medication required for treatment of her high blood pressure and poor circulation causes her to experience a constant need for access to a bathroom, was denied a Medical Profile granting her bathroom privileges on an as-needed basis by FCCW Medical Staff on the grounds that FCCW Correctional Staff would not recognize or honor such a Profile even if one were provided.

130.    Defendants' failure, or refusal, to grant and/or maintain special accommodations dictated by prisoners' needs specifically attributable to their medical conditions on the basis of arbitrary "security" considerations having neither a medical nor a legitimate penological justification constitutes deliberate indifference to serious medical needs.

### 3. Unnecessary And Preventable Fatalities Attributable To FCCW's Systemic Failure To Provide Constitutionally-Adequate Medical Care Have Already Occurred And Will Continue To Occur

131.    Upon information and belief, the systemic practices and procedures adopted and implemented by PHS, and subsequently Armor have resulted in deaths which provision of appropriate medical care could and should have prevented. Such practices and procedures embody and reflect deliberate indifference to the serious medical needs of prisoners residing at

FCCW and continue to pose an increased and undue risk of premature death to the named plaintiffs and the members of the class they seek to represent.

132. One such instance of unnecessary and preventable death involves the case of Darlene White, a 47-year old African-American woman and a long-time FCCW prisoner, who died in the Infirmary in the early morning hours of December 21, 2011.

133. Upon information and belief, sometime during the afternoon of December 20, 2011, Ms. White, an acknowledged diabetic, entered the Infirmary, complaining of a severe headache, nausea and diarrhea. Upon information and belief, after Ms. White experienced a wave of nausea and vomited near the control "bubble" in the Infirmary, a nurse gave her a shot of medication intended to relieve the nausea and sent Ms. White back to her housing unit.

134. Upon information and belief, in the early evening of the same day, Ms. White returned to the Infirmary, again complaining of severe headache and nausea. She was seated in a chair, inside the "F-Ward" segment of the Infirmary, rocking back and forth, holding her head and moaning in pain. A nurse checked Ms. White's blood sugar and found that it was radically elevated above normal levels.

135. Upon the nurse's instruction, Ms. White laid down on a bed in Room 2-F, continuing to hold her head, rocking and moaning in severe pain. A short time later, Ms. White requested help from another prisoner in the room, indicating that she was sick and in great pain. As the other prisoner was leaving the room to call for help, Ms. White again began vomiting. A short while later, a nurse entered the room and asked Ms. White a series of questions, none of which she answered. Ms. White did, however, say that she had defecated on herself and needed to be changed. The nurse indicated that she would get someone to clean up Ms. White's vomit and change her, and left the room. The nurse returned some time later and spread a paper gown

over the place on the floor where Ms. White had vomited. The nurse also placed a paper cup and a bedpan on the bed where Ms. White was laying, instructing Ms. White to use the cup and the bedpan if she needed to urinate or had diarrhea. Although Ms. White was barely conscious by this time, the nurse stated that she wanted to measure Ms. White's fluid intake. However, the nurse never checked Ms. White's vital signs, or examined or otherwise touched Ms. White in any way.

136.    Upon information and belief, sometime later a different nurse entered Room 2-J and set about inserting an IV intake terminal into Ms. White's arm. The nurse spoke to Ms. White, asked her questions, and requested Ms. White's cooperation with respect to insertion of the IV, but Ms. White was completely non-responsive. The nurse stated that she intended to give Ms. White some IV fluids to make her feel better, but Ms. White did not react or respond. The other prisoner in the room reported that Ms. White needed to be changed, and the nurse responded "Oh. O.K." She left the room thereafter and no one came back to clean up or change Ms. White, or to check on her condition despite her obvious non-responsiveness.

137.    At about 3:15 a.m. on December 21, the other prisoner located in Room 2-J heard a ratting sound emanating from Ms. White's throat and pushed the emergency button and told the nearby guard that Ms. White needed immediate attention. A nurse rushed into the room, yelling at Ms. White to elicit a response, but none was forthcoming. The nurse ran into the hallway and called a "Code Blue". Although the nurses converging on the room thereafter discussed the performance of CPR, none was performed and no vital signs were measured.

138.    At about 3:45 a.m., a guard instructed one of the nurses to call an ambulance. However, when the emergency response team arrived on the scene, they stayed for only a few

minutes and took no action, as it was apparent that Ms. White was deceased and that no emergency existed.

139.    Dr. MacDonald later entered the ward to which the prisoners who had been present in the room with Ms. White had been moved.  He informed them that Infirmary personnel were "investigating" to make sure that no one on staff had caused Ms. White any harm, and stated that "we want to make sure that none of you are mistreated when you come here for medical care.  I know that you get very good medical care here.  Believe me, you do get good care."

140.    Upon information and belief, another case of unnecessary and eminently preventable death involved a prisoner named Jeanna Wright.

141.    Upon information and belief, Ms. Wright complained of severe abdominal pain, accompanied by regular, sometimes daily, vaginal or rectal bleeding, for at least one year. Ms. Wright requested, paid for, and attended numerous Sick Call visits regarding her symptoms, but FCCW Medical Staff routinely assured here that she was "fine".

142.    Finally, earlier this year, Ms. Wright was seen by a doctor and referred to UVA for further examination and diagnostic testing, upon which it was discovered that she was suffering from Stage IV abdominal cancer.  Ms. Wright was held over at UVA for several weeks, during which time such treatment as could be provided, given her condition, was rendered.

143.    Ms. Wright returned to FCCW, and was admitted to the Infirmary, on or about April 12, 2012.  She passed away two days later.

144.    The fate encountered by prisoners Darlene White and Jeanna Wright, a described herein, almost certainly awaits additional FCCW prisoners if corrective action is not undertaken

promptly to remedy the clear deficiencies in the nature and the extent of the medical care the facility provides.

145.    Absent immediate corrective action, FCCW will continue to subject the named plaintiffs and the members of the class they seek to represent to further undue pain and suffering and the possibility of premature death in deliberate indifference to these prisoners' serious medical needs.

## CLASS ACTION ALLEGATIONS

146.    The named plaintiffs bring this action for themselves individually and on behalf of all others similarly situated, pursuant to the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

147.    The named plaintiffs seek to represent a class consisting of all prisoners who currently reside or will reside in the future at FCCW and who have sought, currently seek or will seek medical care while residing at FCCW.  They seek certification pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure in order to represent a class of persons requesting declaratory and injunctive relief to terminate the ongoing course of conduct on the part of the defendants that is depriving the named plaintiffs and the class members of their constitutional rights to adequate medical care, and to enjoin the policies and practices adopted and implemented by the defendants that result in the deprivation of  those rights.

148.    Approximately 1,200 women are incarcerated at FCCW on a day-to-day basis. The proposed class is, accordingly, so numerous that the joinder of all class members is impracticable.

149.    All FCCW prisoners comprising the proposed class are equally subject to the actual or potential adverse impacts on their physical health and mental and emotional well-being resulting from the long-standing and on-going pattern and practice of systemic unconstitutional

acts and omissions on the part of the defendants described in this Complaint. Thus, common questions of law and fact exist as to all class members. Those common questions include, but are not necessarily limited to: (i) whether defendants systematically provide inadequate medical care to the prisoners residing at FCCW; (ii) whether defendants' acts and/or omissions in the provision of or failure to provide medical care at FCCW reflect deliberate indifference to the serious medical needs of the prisoners residing at FCCW; (iii) whether defendants' provision of inadequate medical care on a systemic basis has placed the prisoners residing at FCCW at an unreasonable risk of suffering new or worsening physical injury, illness, mental anguish, emotional distress and the prospect of premature death; and (iv) whether defendants have violated the rights of the prisoners residing at FCCW to be free from cruel and unusual punishment as proscribed by the Eight Amendment?

150.    The named plaintiffs' claims are typical of the claims of the proposed class as a whole. The named plaintiffs are individual prisoners at FCCW suffering from an array of serious medical problems and reflecting a range of serious health care needs that are typical of prisoner populations in general and the prisoner population at FCCW in particular. The named plaintiffs and the proposed class they seek to represent have suffered direct injuries, and will continue to be directly injured, due to the defendants' unlawful and unconstitutional pattern and practice of providing inadequate medical care at FCCW.

151.    The named plaintiffs will fairly and adequately represent the interests of the proposed class. They have no interests separate from or in conflict with those of the class as a whole and seek no relief other than the declaratory and injunctive relief which is sought on behalf of the entire class. The named plaintiffs are represented by competent legal counsel with substantial experience in complex civil rights litigation matters, including class actions.

152.     The defendants have acted, or failed and/or refused to act, on grounds that apply generally to the proposed class, such that final injunctive and declaratory relief is appropriate with respect to the class as a whole.

**CLAIM FOR RELIEF**
**(Declaratory And Injunctive Relief Pursuant To The Eighth Amendment to the U.S. Constitution and 42 U.S.C. § 1983)**

153.     The named plaintiffs incorporate by reference, as though fully restated herein, the allegations set forth in Paragraphs 19 through 152 above.

154.     Defendants' deliberate indifference to the named plaintiffs' serious medical needs causes unavoidable physical pain and suffering, mental anguish, emotional distress, the deterioration of their health and an undue risk of premature death which, for some women at FCCW has, upon information and belief, already occurred.

155.     Defendants' policies, practices, acts and/or omissions constitute and reflect deliberate indifference to the serious medical and health care needs of the prisoners residing at FCCW and violate the Cruel and Unusual Punishment Clause of the United States Constitution, which is applicable to the Commonwealth of Virginia and those acting on its behalf under color or state law pursuant to the Fourteenth Amendment to the Constitution.

156.     Defendants' policies, practices, acts and/or omissions have placed or will place the named plaintiffs and the members of the proposed class they seek to represent at an unreasonable risk of suffering new or worsening serious medical illnesses, injuries and harm.

157.     As a proximate cause of defendants' unconstitutional policies, practices, acts and/or omissions in regard to the provision of inadequate medical care at FCCW, the named plaintiffs and others similarly situated have suffered, are currently suffering and will continue to suffer immediate and irreparable injury, including physical, psychological and emotional injury and the substantially increased risk of premature death.  No adequate, readily available and

complete remedy at law exists to address defendants' wrongful conduct as described herein. The declaratory and injunctive relief sought herein is necessary to prevent new, on-going and future injury.

## PRAYER FOR RELIEF

**WHEREFORE,** the named plaintiffs respectfully pray that this Court:

a.  Issue an order certifying this action to proceed as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2).

b.  Approve the undersigned to serve as class counsel pursuant to Fed. R. Civ. P. 23(a)(4) and 23(g).

c.  Issue a judgment declaring that defendants' policies, practices, acts and/or omissions as described herein are unlawful and violate plaintiffs' rights under the Constitution and laws of the United States;

d.  Preliminarily and permanently enjoin defendants, their subordinates, agents, employees, representatives and all others acting or purporting to act in concert with them or on their behalf from subjecting plaintiffs to the unlawful and unconstitutional treatment described herein, and issue such injunctive orders as are necessary and/or appropriate to preclude such conduct on an ongoing basis;

e.  Maintain ongoing supervisory jurisdiction of this matter in order to monitor and enforce the defendants' full and continuing compliance with the injunctive relief ordered herein;

f.  Award plaintiffs their reasonable attorneys' fees and litigation costs pursuant to 42 U.S.C. § 1988 and other applicable law; and

g.  Grant all such other and further relief as this Court may deem necessary and/or appropriate in the interests of justice.

DATED:       July  24, 2012

                              Respectfully submitted,
                              CYNTHIA SCOTT, *et. al.*
                              By Counsel


                              _____/s/ Brenda E. Castañeda_____
OF COUNSEL:                   Alex R. Gulotta, VSB No. 37097
                              Executive Director
Theodore A. Howard[*]         ([alex@justice4all.org](mailto:alex@justice4all.org))
WILEY REIN LLP                Brenda E. Castañeda, VSB No. 72809
1776 K Street, N.W.           Staff Attorney
Washington, D.C.  20006       ([brenda@justice4all.org](mailto:brenda@justice4all.org))
(202) 719-7000                Abigail Turner, VSB No. 74437
                              Litigation Director
Philip Fornaci*               ([abigail@justice4all.org](mailto:abigail@justice4all.org))
Deborah Golden*               LEGAL AID JUSTICE CENTER
Ivy Finkenstadt*              1000 Preston Avenue, Suite A
D.C. PRISONERS' PROJECT OF    Charlottesville, VA  22903
THE WASHINGTON LAWYERS'       (434) 977-0553
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C.  20036
(202) 319-1000                Attorneys for Plaintiffs

_____

[*]       Motions for *Pro Hac Vice* Admission will be filed in accordance with W.D. Va. Civ.
R. 6(d).