# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

CYNTHIA B. SCOTT, *et al.*,    )
                          )
        *Plaintiffs,*    )
                          )    Case No. 3:12-cv-00036-NKM
    v.    )    Sr. Judge Norman K. Moon
                          )
HAROLD W. CLARKE, *et al.*,    )
                          )
        *Defendants.*    )
                          )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Mary C. Bauer, VSB No. 31388
Abigail Turner, VSB No. 74437
Brenda E. Castañeda, VSB No. 72809
Angela A. Ciolfi, VSB No. 65337
Erin M. Trodden, VSB No. 71515
Ivy A. Finkenstadt, VSB No. 84743
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553

Deborah M. Golden (admitted *pro hac vice*)
Elliot Mincberg
D.C. PRISONERS' PROJECT OF
THE WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page(s)

Table of Authorities ................................................................................................. iii

STATEMENT OF THE CASE ...................................................................................... 1

PROCEDURAL POSTURE ........................................................................................... 2

STATEMENT OF FACTS ............................................................................................. 5

    A.    VDOC contracts with private for-profit companies for medical care at FCCW ..... 5

    B.    VDOC retains ultimate control and responsibility for provision of medical care ................................................................................................ 6

    C.    VDOC fails to adequately supervise contractors ..................................... 9

    D.    VDOC fails to use its grievance system to adequately address prisoner medical grievances or to identify systemic problems ............................................. 11

    E.    Plaintiffs and other similarly situated prisoners at FCCW suffer grave and foreseeable lapses in care ....................................................................... 13

        1.    FCCW fails to diagnose or treat serious medical conditions that can cause death or permanent disability if untreated ....................................... 13

        2.    FCCW fails to schedule referrals to outside specialists in a timely manner even when specialized care is necessary to diagnose or treat serious medical conditions ..................................................................... 16

        3.    FCCW refuses to implement treatment plans ordered by outside specialists ............................................................................................. 17

        4.    FCCW denies patients with disabilities and serious medical conditions needed accommodations ........................................................................ 18

        5.    FCCW withholds medication that prisoners need to manage pain or treat illnesses ....................................................................................... 19

THE PROPOSED CLASS ........................................................................................... 20

ARGUMENT ............................................................................................................... 20

i

I.    PLAINTIFFS' PROPOSED CLASS SATISFIES ALL OF THE
      THRESHOLD REQUIREMENTS FOR CERTIFICATION UNDER
      FED. R. CIV. P. 23(a) .................................................................................22

      A.    Numerosity ................................................................................................22

      B.    Common Questions of Law and Fact ("Commonality") ......................................23

            1.    Whether VDOC's contract system permits improper cost considerations to
                  interfere with treatment of serious medical conditions ..............................25

            2.    Whether VDOC uses specious security justifications to trump treatment or
                  accommodation of serious medical conditions and disabilities ................28

            3.    Whether VDOC fails to provide appropriate oversight, training, and
                  supervision of medical care at FCCW .....................................................30

            4.    Whether VDOC systematically provides inadequate medical care to the
                  women residing at FCCW.......................................................................32

      C.    Typicality Of Plaintiffs' Claims..............................................................................36

      D.    Fairness And Adequacy Of Representation ..........................................................39

II.   THIS CASE IS PROPERLY MAINTAINABLE AS A CLASS ACTION
      PURSUANT TO FED. R. CIV. P. 23(b)(2) ....................................................................40

CONCLUSION ..............................................................................................................41

Case 3:12-cv-00036-NKM-JCH   Document 132   Filed 08/14/14   Page 3 of 49   Pageid#: 1459

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Davis,*
275 F.3d 849 (9th Cir. 2001) ....................................................................................37

*Bradley v. Harrelson*,
151 F.R.D. 422 (M.D. Ala. 1993) ........................................................................36, 41

*Brown v. Plata*,
__ U.S. __, 131 S. Ct. 1910 (2011)..............................................................20, 21, 33

*Butler v. Suffolk Cnty,*
289 F.R.D. 80 (E.D.N.Y. 2013) .................................................................................35

*Chief Goes Out v. Missoula Cnty*,
Case No. CV-12-155-M-DWM, 2013 WL 139938 (D. Mont. Jan. 10, 2013) .......................35

*Clarke v. Lane*,
267 F.R.D. 180 (E.D. Pa. 2010)................................................... 23, 36, 38-39, 41

*Dean v. Coughlin*,
107 F.R.D. 331 (S.D.N.Y. 1985) ....................................................................22, 23, 36

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ....................................................................................37

*Flynn v. Doyle*,
No. 06-C-537, 2007 WL 805788 (E.D. Wis. Mar. 14, 2007) ............................22, 36

*Gray v. Hearst Commc'ns, Inc.*,
444 Fed. App'x 698 (4th Cir. 2011) .........................................................................24

*Gunnells v. Healthplan Servs., Inc.*,
348 F.3d 417 (4th Cir. 2003) ....................................................................................22

*Henderson v. Thomas*,
289 F.R.D. 506 (M.D. Ala. 2012)..............................................................................35

*Hilton v. Wright*,
235 F.R.D. 40 (N.D.N.Y. 2006)................................................................................41

*Holsey v. Armor & Co.*,
743 F.2d 199 (4th Cir. 1984) ....................................................................................32

iii

*Hughes v. Judd*,
  Case No. 8:12-cv-568-T-23MAP, 2013 WL 1821077 (M.D. Fla. Mar. 27, 2013),
  *report and recommendation adopted*, 2013 WL 1810806 (M.D. Fla. April 30, 2013)..........35

*Indiana Protection and Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Corrections*,
  Case No. 1:08-cv-01317-TWP/MJD, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012).............35

*Jones v. Gusman*,
  Civ. Action Nos. 12-859, 12-138, 2013 WL 2458817 (E.D. La. June 6, 2013) ............... 34-35

*Knight v. Lavine*,
  Case No. 1:12-cv-611, 2013 WL 427880 (E.D. Va. Feb. 4, 2013) ..................................23, 32

*Lambertz-Brinkman v. Reisch*,
  No. CIV-07-3040, 2008 WL 4774895 (D.S.D. Oct. 31, 2008) ............................23, 36, 39, 41

*Martinez-Hernandez v. Butterball, LLC*,
  Case No. 5:07-cv-174-H(2), 2011 WL 4549606 (E.D.N.C. Sept. 29, 2011)..........................32

*McGlothin v. Connors*,
  142 F.R.D. 626 (W.D. Va. 1992) .......................................................................... 23-24, 39

*Olson v. Brown*,
  284 F.R.D. 398 (N.D. Ind. 2012) ..........................................................................35

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ......................................................................... *passim*

*Riker v. Gibbons*,
  No. 3:08-cv-00115 LRH-RAM, 2009 WL 910971 (D.Nev. Mar. 31, 2009).........23, 36, 39, 41

*Robert E. v. Lane*,
  530 F. Supp. 930 (N.D. Ill. 1981) .......................................................................39

*Rosas v. Baca*,
  Case No. CV-12-00428 DDP, 2012 WL 2061694 (C.D. Cal. June 7, 2012) ................... 35-36

*Rubidoux v. Celani*,
  987 F.2d 931 (2d Cir. 1993)..............................................................................37

*Scott v. Family Dollar Stores, Inc.*,
  733 F.3d 105 (4th Cir. 2013) ..............................................................................24

*Smentek v. Sheriff of Cook County*,
  No. 09-C-529, 2010 WL 4791509 (N.D. Ill. Nov. 18, 2010) .................................38

*Soutter v. Equifax Info. Servs., LLC*,
  498 Fed App'x 260 (4th Cir. 2012) .......................................................................37

iv

*Talbott v. GC Servs. Ltd. P'ship*,
    191 F.R.D. 99 (W.D. Va. 2000)........................................................................23

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ......................................................................41

*Wal-Mart Stores, Inc. v. Dukes*,
    __ U.S. __,131 S. Ct. 2541 (2011)........................................................ *passim*

**Statutes**

42 U.S.C. § 1983 ..............................................................................................2

**Rules**

Rule 23(a), Fed. R. Civ. P. .......................................................................5, 22

Rule 23(a)(1), Fed. R. Civ. P. ........................................................................22

Rule 23(a)(2) ), Fed. R. Civ. P ..................................................... 23, 24, 33, 36

Rule 23(a)(3) ), Fed. R. Civ. P ................................................................. 36, 38

Rule 23(a)(4) ), Fed. R. Civ. P ................................................................. 36, 39

Rules 23(b)(2) ), Fed. R. Civ. P ............................................................5, 40, 41

Rule 23(b)(3) ), Fed. R. Civ. P ........................................................................24

**Other Authorities**

1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:3 (4th ed. 2002) ...................23

1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:10 (4th ed. 2002) ........... 24-25

8 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 25.20 (4th ed. 2002) .......... 40-41

7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*
    § 1762 (3d ed. 2005) ..................................................................... 22-23

7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* §
    1776.1 (3d ed. 2005) ..........................................................................41

Plaintiffs Cynthia B. Scott, Bobinette Fearce, Marguerite Richardson and Rebecca Scott ("Plaintiffs"), by their undersigned attorneys, submit this Memorandum of Law in support of their Motion for Class Certification.

## STATEMENT OF THE CASE

On behalf of themselves and the other women incarcerated at Fluvanna Correctional Center for Women ("FCCW"), Plaintiffs seek to end systemic, pervasive and ongoing violations of their constitutional right to receive adequate, appropriate medical care. As the sole custodians of their health and welfare, the Defendants have a non-delegable duty to see that women at FCCW receive adequate evaluations and treatment of their serious medical needs. Instead of attending to that duty, the Defendants have engineered a medical gulag that systematically ignores or interferes with the treatment needs of the women whose health outcomes depend wholly on Defendants' faithful exercise of diligence and professionalism in the delivery of care. Prison doctors systematically drag their feet in diagnosing and treating patients and in referring patients with complex medical needs to specialists and, once referred, defer or deny necessary and life-sustaining treatments prescribed by those specialists. Prison officials, in reviewing complaints and grievances, routinely display callous disregard for the need to access treatment for serious medical complaints, even when the urgency would be obvious to a lay person. These are just a few of the ways that the Defendants' deliberate indifference manifests in deleterious and injurious care.

As explained below, this is a classic case for certification as a class action. The Plaintiff class consists of approximately 1,200 female prisoners forced, by virtue of their imprisonment, to live and die at the mercy of FCCW's deeply flawed prison healthcare system. The case concerns a common course of conduct by Defendants reflecting their deliberate indifference to the

prisoners' serious medical needs. As a result, the principal factual and legal questions are common to the entire class, and the injuries that the named Plaintiffs suffered are typical of those suffered by the other women in the class, all of whom are tormented by the woefully deficient care that FCCW routinely provides.

## **PROCEDURAL POSTURE**

The Plaintiffs initiated this action on July 24, 2012, pursuant to 42 U.S.C. § 1983, against defendants Harold A. Clarke, Director of the Virginia Department of Corrections ("VDOC"); A. David Robinson, VDOC Chief of Corrections Operations; Frederick Schilling, VDOC Director of Health Services; and Phyllis A. Baskerville, then the Warden at FCCW (collectively, the "VDOC Defendants"), all in their respective official capacities. In addition, Plaintiffs named the private, for-profit health-care contractor, Armor Correctional Health Services, Inc. ("Armor"), chosen by VDOC effective as of November 1, 2011 to provide medical and mental health care at FCCW, and John/Jane Doe, M.D., Armor's Acting Medical Director at FCCW, whose identity at the time of initial filing was unknown to Plaintiffs. Plaintiffs' Complaint for Declaratory and Injunctive Relief (ECF Dkt. No. 1, ¶¶ 10-16.)

The VDOC Defendants and Armor filed their respective Answers to the Complaint on August 21, 2012 (*see* ECF Dkt. Nos. 12, 14.) In addition, the VDOC Defendants concurrently filed a Motion to Dismiss, contending that the Complaint failed to state any claim upon which relief could be granted and could not, in any event, serve as the basis for certification of a class action. (ECF Dkt. Nos. 10, 11.)

Following full briefing and oral argument, this Court denied the Motion to Dismiss on December 11, 2012, based, *inter alia*, upon its finding that:

> [T]he claims against the VDOC Defendants are not premised on a theory of
> *respondeat superior*; rather, the complaint alleges that the VDOC Defendants

2

have a non-delegable duty to provide constitutionally adequate medical care, and
that the VDOC Defendants are directly liable, not vicariously liable, for the
VDOC's policy and practice of providing insufficient health care. The complaint
lays out thoroughgoing allegations that the VDOC Defendants were (and are)
directly on notice of systemic and pervasive problems regarding the provision of
medical care at FCCW, but have failed to take any action. As for the argument
against class certification, Plaintiffs have not yet even filed a motion to certify a
class, and the VDOC's request that I deny certification is premature.

Memorandum Decision (ECF Dkt. No. 33, at 2-3.)

Thereafter, Plaintiffs moved for leave to file a First Amended Complaint on January 22,

2013. (ECF Dkt. No. 35.) The First Amended Complaint was accepted for filing on February 6,

2013 (ECF Dkt. Nos. 38, 39),[1] and Defendants answered the amended pleading thereafter. (*See*

ECF Dkt. Nos. 40, 41.)

Subsequently, as the parties commenced discovery, defendant Armor filed a Motion to

Dismiss on April 30, 2013, advising that as of the May 1, 2013, its contract with the VDOC

would conclude and arguing that Plaintiffs' claims for declaratory and injunctive relief, *vis-à-vis*

Armor, would be rendered moot. (*See* ECF Dkt. Nos. 43, 44.) The Court granted Armor's

motion and dismissed it from the case on October 4, 2013. (*See* ECF Dkt. No. 77.) In the

meantime, Corizon Health, Inc. ("Corizon") assumed the role of medical and mental health

provider at FCCW, pursuant to the terms of a contract with VDOC which took effect on May 1,

2013.[2] Plaintiffs moved for leave to file a Second Amended Complaint, naming Corizon and its

---

[1]     In lieu of their initial "Doe" allegations regarding the Acting Medical Director, Plaintiffs'
amended pleading designated Paul C. Ohai, M.D., Armor's Medical Director at FCCW, as a
named Defendant. *Id.*, ¶ 15 (ECF Dkt. No. 39).

[2]     For the vast majority of the relevant time period leading up to the initiation of this lawsuit
in July 2012, the entity providing systemically deficient medical care at FCCW was Prison
Health Services, Inc., which then became known as PHS Correctional Healthcare, Inc. ("PHS").
PHS merged with Correctional Medical Services, Inc. in June 2011, to form Corizon shortly
before Corizon was succeeded as the VDOC's contractual medical care provider at FCCW by
former defendant Armor as of on or about November 1, 2011. (*See* 2d Am. Compl., ¶¶ 13-14

3

new Medical Director at FCCW, Mark Militana, M.D., as defendants, on June 26, 2013. (*See* ECF Dkt. No. 50.) Plaintiffs' Motion was granted and their Second Amended Complaint was accepted by this Court for filing as of July 15, 2013. (*See* ECF Dkt. Nos. 55, 58.)[3]

On June 3, 2014, a little less than one month before the cutoff for fact discovery, Plaintiffs learned that defendant Corizon had notified the VDOC of Corizon's unilateral determination to cancel its contract, effective as of on or about October 1, 2014. Corizon subsequently confirmed its contract cancellation in motion papers filed with this Court seeking a stay of all proceedings pending the VDOC's conducting of an emergency procurement process to select a new medical care contractor and Corizon's presumptive dismissal from this case on mootness grounds upon the selection of a new contractor.[4]

The Plaintiffs filed an Opposition to Corizon's Motion to Stay on June 17, 2014 (ECF Dkt. No. 121), and Corizon replied on June 27, 2014 (ECF Dkt. No. 123). During the pendency of this Court's consideration of Corizon's Motion, and prior to its denial of the Motion of July 28, 2014 (ECF Dkt. Nos. 127, 128), the parties reached a negotiated accommodation pursuant to which the Court granted dismissal of Corizon from this action, with prejudice, by Order entered July 31, 2014. (*See* ECF Dkt. No. 129.) Accordingly, the VDOC Defendants are the sole parties against whom the Plaintiffs are proceeding at this point.

---

at 6-7.) Plaintiffs will refer to both Armor and Corizon in these papers, where appropriate, as "the Contractor(s)".

[3]     Dr. Militana, individually, filed a Motion to Dismiss Plaintiffs' Second Amended Complaint which was rejected by this Court on November 15, 2013. (ECF Dkt. No. 84.) Subsequently, Dr. Militana was relieved of his duties as Medical Director and then left Corizon. As a result, he was dismissed as a defendant from this action, upon mutual consent of the parties, by Order dated May 21, 2014. (ECF Dkt. No. 114.)

[4]     Defendant Corizon Health, Inc.'s Emergency Motion to Stay Litigation Pending Joinder of Necessary Party, filed June 2, 2014 (ECK Dkt. No. 117).

4

Plaintiffs now move for class certification pursuant to Rules 23(a) and 23(b)(2), Fed. R. Civ. P.

## STATEMENT OF FACTS

A.    <u>VDOC contracts with private for-profit companies for medical care at FCCW.</u>

Operated by VDOC, FCCW houses approximately 1,200 women, a majority of whom are 35 years of age or older and are serving median sentences of twenty years. The prison includes a medical building in which medical, dental and mental health services are provided. As the prison within the VDOC system purportedly able to provide the most complete medical care to women prisoners, FCCW is where women with serious medical problems are sent in the first instance, or to which they are transferred from other VDOC facilities for the purpose of receiving a heightened level of care. (2d. Am. Compl. ¶ 20; VDOC Am. Answer ¶ 17.)

Since FCCW opened in 1998, VDOC has contracted with outside medical providers for health care at the facility. Since at least November 2011, a series of frequently rotating private, for-profit corporations have provided almost all medical, dental and mental health services to the women at FCCW, with limited exceptions for services provided directly by VDOC. (*See* Ex.1, Schilling Dep. 50:20-22, Mar. 25, 2014.) Because VDOC assumes that any new contractor will re-hire the medical personnel previously employed by the prior contractor to provide similar services to patients, the contract price often becomes a determinative factor in the selection of the winning contractor from among competing bidders. As Frederick Schilling, VDOC's Health Services Director, testified regarding the procurement process resulting in Armor's replacement of Corizon in 2011: "The number one difference [between the winning and losing bidder] was price." (*See id.* at 89:15, 80:9-21.)

Beginning in 2011, VDOC asked companies bidding for the FCCW contract to offer "capitated financing," in which the contractor sets up a pricing schedule that fluctuates monthly

5

based on the facility's average daily population. (*See* Ex. 1, Schilling Dep. 81:7-83:10.) Capitated financing allows VDOC to predict with a high degree of certainty, based on population forecasts, how much it will have to spend on medical care over the life of the contract. (*See id.* at 82:21-83:6.) Prior to the 2011 change, contracts were based upon a risk/reward-sharing model, under which VDOC and the private contractor share equally in the risk that medical expenses might exceed expectations (up to a certain pre-determined level where 100% of the risk would fall back upon VDOC). (*See id.* at 86:2-87:6.) Under the capitated financing scheme, also known as a "full-risk contract," the contractor bears the full risk that health care costs may exceed the per prisoner price dictated by the pricing schedule in the contract.[5] (*See id.* at 83:17-22; *see also* Ex. 2, Teal Dep. 25:2-22, May 21, 2014.) The 2011 and 2013 contracts, as well as the new contract to go into effect on October 1, 2014, used the capitated financing model. Because the contractor received a fixed amount of money per prisoner using this capitated system regardless of how much or how little care it provided to the prisoners, its profit margin would increase as the cost of care it provided to the prisoners decreased.

B.     <u>VDOC retains ultimate control and responsibility for provision of medical care</u>.

VDOC promulgates standard operating procedures for provision of health care within its prisons, including those, like FCCW, where the health care services are rendered by private contractors. Private contractors, such as Corizon and Armor, have their own procedures, but must also follow VDOC's procedures. (*See* Ex. 3, Lambert Dep. 27:3-12, June 24, 2014; *see also* Ex. 4, McQueen Dep. 68:4-8, June 18, 2014.) Additionally, contractors' doctors must use the VDOC formulary for prescribing medication. (*See* Ex. 5, Amonette Dep. 170:11-13, June 27, 2014.) Although a series of private health care contractors has come and gone in the sixteen

---

[5] There are some narrow exceptions for treatments related to Hepatitis C Virus, HIV/AIDS, and hemophilia, where VDOC bears the full cost.

years since FCCW opened, policies, practices, and many of the personnel providing care have largely remained the same. According to health care providers actually working at the prison, a change in contractor rarely signals a change in the quality or quantity of care; only certain administrative procedures and the nature or volume of paperwork actually change. (*See* Ex. 6, MacDonald Dep. 24:2 to 25:1, May 12, 2014; *see also* Ex. 7, Anderson Dep. 14:4-10, June 12, 2014; *see also See* Ex. 8, Banks-Johnson Dep. 11:19-12:18, May 27, 2014.)

The warden at FCCW is the highest-ranking VDOC official at the facility and has authority over all staff, including medical personnel. (*See* Ex. 9, Brown Dep. 10:15-22, June 13, 2014.) Even when there is a private contractor, the warden remains ultimately responsible for operation of the facility, including health care treatment and security. (*See id.* at 10:15-22.) Similarly, VDOC determines what medical accommodations prisoners may receive, and medical staff has no authority to override VDOC criteria. (*See* Ex. 6, MacDonald Dep. 193:5-13.) Directives from VDOC security staff can be capricious, with a medical-condition accommodation being permitted on one day and deemed impermissible the next. For example, doctors were once permitted to write "medical profiles" prescribing bathroom access for women with incontinence, but those have now been prohibited by security. Dr. David MacDonald, the FCCW Medical Director for approximately five years, testified: "The warden in particular asked me to stop writing profiles for bathroom privileges and that they [VDOC correctional staff] would handle that necessity." (*See id.* at 199:3-20.) As a result, prisoners are confronted with the choice between soiling themselves or being disciplined for inappropriate bathroom usage. (*See* Ex. 10, M. Richardson Decl.¶¶ 6-8 (describing FCCW's refusal to issue her a profile for as-needed bathroom use and stating, "I have been subjected to disciplinary charges when I used the bathroom without prior permission in order to avoid urinating on myself."); *see also* Ex. 11,

Greifinger Expert Report, Apr. 25, 2014, at 11.)[6]  Similarly, doctors can no longer prescribe

extra toilet paper for women with incontinence or excessive menstrual or rectal bleeding.  (*See*

Ex. 12, Young Dep. 61:5-62:19, June 3, 2014.)

Pursuant to VDOC's policies and practices, non-medical staff's decisions trump medical

staff's treatment protocols.  For example, security concerns have been allowed to affect the time

frame within which a prisoner can be sent out for an appointment to see an outside

provider.  (*See* Ex. 6, MacDonald Depo 114:17-115:5.)  Security staff actions have also

prevented prisoners from accessing health care even within the facility.  For instance, one VDOC

report reviewing medical operations at FCCW recounts with concern an incident in which a

prisoner with a broken ankle suffered for several weeks without treatment, and missed an

appointment at least once because, "[p]er the LT [lieutenant], the offenders can only come over

for medical appointments on Friday."  (*See* Ex. 25, Monthly Facility Report, Mar. 8,

2013.)  According to Nurse Woodson, who ran Sick Call at FCCW for many years, she

---

[6] Dr. Robert Greifinger is a physician licensed by the State of New York and has extensive experience in correctional healthcare, including managing the provision of medical care at Riker's Island, New York City's Jail, from 1987 to 1989; serving for six years as the Chief Medical Officer for the New York State Department of Corrections, where he had overall responsibility for the provision of all inmate health services for a system involving 68,000 prisoners; serving as a court-appointed monitor overseeing medical care in the jails in Philadelphia, PA; Fulton County, GA; DeKalb County, GA; and Albuquerque, NM, as well as for the State of Alabama's women's prison from 2006 to 2009.  Dr. Greifinger is currently the court-appointed monitor regarding medical care at the Metropolitan Detention Center in Albuquerque as well as the Orleans Parish Prison in New Orleans, LA, and he monitors multiple jail and prison correctional healthcare systems on behalf of the Civil Rights Division of the U.S. Department of Justice and serves as a consultant to the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security.

Dr. Greifinger has also authored or co-authored dozens of articles addressing correctional medicine published in peer-reviewed journals; and is the editor of, as well as the author of one chapter in, the Second Edition of *Clinical Practice in Correctional Medicine* (2006).  He has been found qualified to testify as an expert witness with respect to correctional medical care standards and practices by courts in more than 60 cases from 2000 to the present. His full CV and qualifications are found in Ex. 11.

experienced difficulty seeing patients for scheduled appointments during lockdowns. (*See* Ex. 14, Woodson Dep. 115:19-116:13, May 27, 2014.)

      C.     <u>VDOC fails to adequately supervise contractors</u>.

VDOC provides very little supervision of the privately-provided care at FCCW. VDOC provides virtually no meaningful follow-up even when it identifies serious deficiencies. Prior to May 2013, a VDOC regional nurse periodically visited FCCW. (*See* Ex. 15, Robinson Dep. 114:8-115:1, June 27, 2014.) More recently VDOC has used "contract monitors," who visit the facilities regularly, review medical charts, and grade the contractor's compliance using a series of metrics selected by VDOC. VDOC instituted the contract monitoring system when Corizon took over the health care contract from Armor on May 1, 2013. Having selected Corizon as the lowest bidder on the contract, VDOC determined that monitors were necessary to make sure the care Corizon provided met VDOC standards. (*See* Ex. 1, Schilling Dep. 110:8-22.) Catherine Thomas, the head Contract Monitor, is a VDOC nurse (RN) with 40 years of experience. (*See* Ex. 16, Thomas Dep. 5:9-6:22, June 13, 2014.) VDOC entrusted Ms. Thomas with developing the monitoring tools based on VDOC policies and procedures. (*See id.* at 8:19-9:16.) David Robinson, Chief of Corrections Operations at VDOC, did not give Ms. Thomas any direction with regard to how she should develop those standards. (*See* Ex. 15, Robinson Dep. 94:7-16.) According to Mr. Robinson, no VDOC policy specifically governs compliance or noncompliance with the contract for health services. (*See id.* at 94:18-95:3.)

Even so, Ms. Thomas relied on VDOC policies and procedures to develop the monitoring criteria, in consultation with Fred Schilling, the lead administrator for health services. (*See* Ex. 16, Thomas Dep. 9:4-22.) Mr. Schilling is an administrator and does not have training as a medical care provider. (*See* Ex. 1, Schilling Dep. 10:22-12:6.) The policies from which Ms. Thomas developed the monitoring tools deal with day-to-day operations of health services

delivery, and not with specific illnesses or patient outcomes. (*See* Ex. 16, Thomas Dep. 11:6-12:3.) The tools themselves monitor compliance in a number of areas based upon selection and review of a sample of patient charts, which are then scored. According to Ms. Thomas, VDOC has determined that a compliance level of 80% is an acceptable score, because this is the level used by VDOC facilities in their own continuous quality improvement process. (*See id.* at 21:5-22:6.) Because scores regarding different aspects of care are combined, overall compliance can be over 80% on one of the consolidated measures even when a particular component of that measure falls well below 80% by DOC's own standards. (*See id.* at 49:19-50:13; *see also* Ex. 17, Contract Monitor Report of Nov. 2013.)

Ms. Thomas compiles monthly reports from the site monitors and sends those reports to various VDOC and Corizon officials. If Corizon falls short on some metric, it is then up to Corizon to create a quality improvement plan. (*See* Ex. 16, Thomas Dep. 18:20-19:3.) Neither the Medical Director at FCCW nor Corizon's Regional Medical Director, the two individuals most likely to have authority to implement changes, regularly receives the reports. (*See* Ex. 18, Rodgers Dep. 185:5-186:8, June 30, 2014.) Ms. Thomas keeps copies of these plans when Corizon provides them, but does not share them with Mr. Schilling or Mr. Robinson at VDOC. Ms. Thomas testified that to her knowledge no penalties are imposed on Corizon for non-compliance with DOC policies or its own improvement plans. (*See* Ex. 16, Thomas Dep. 18:20-19:19.) Even when monitoring reports consistently identified serious flaws in pharmacy operations for over six months and lengthy backlogs in appointments with physicians, VDOC supervisors simply left it up to the contract monitors to work with Corizon to address these issues. (*See* Ex. 15, Robinson Dep. 98:17-99:12; 100:16-101:2.) VDOC neither contemplated nor took any action to impose a default under the contract. (*See id.* at 110:6-111:15.)

D.    <u>VDOC fails to use its grievance system to adequately address prisoner medical grievances or to identify systemic problems.</u>

Prisoners are required to use the administrative grievance procedure developed by VDOC in order to seek resolution of their medical issues and concerns. (*See* Ex. 9, Brown Dep. 32:5-33:25; 44:3-6.) Although VDOC receives many prisoner grievances regarding medical issues at both the institutional level and at VDOC headquarters, VDOC has systematically failed adequately to respond to prisoner grievances regarding insufficient medical care. Similarly, VDOC refuses to use the process to identify larger systemic issues that merit attention and corrective action. *See generally* Ex. 19, Greifinger Rebuttal Report, June 28, 2014, at 2-3.

Responses to individual prisoner grievances at the institutional level do not address serious health care concerns when raised by the prisoners. For instance, Dr. Greifinger described the responses to Plaintiff Cynthia Scott's grievances as "highly dispassionate and bureaucratic." He continued:

> There are frequent responses that just say she filled out the wrong kind of form or her complaint is too late to consider. Responses to grievances and complaints that indicate a need for urgency, such as medication lapses, are frequently not answered until ten days after the form was submitted. . . . On May 13, 2012, Ms. Scott complained that Dr. MacDonald was indifferent (Bates p. PLCS 00000157). The response was, "I don't see a question." To me, indifference is a serious charge and deserves a meaningful response.

(Ex. 11, Greifinger Expert Report, Apr. 25, 2014, at 4 (citations omitted).) Notwithstanding the numerous examples of cursory, bureaucratic, or inadequate responses to prisoner medical grievances, Warden Brown testified that she gives the grievance system at FCCW "an A+." (Ex. 9, Brown Dep. 31:18-22.)

Responses to Level 2 Grievances sent to the most senior Health Care Administrator, Fred Schilling, at VDOC headquarters likewise receive insufficient attention across the

board.  According to the VDOC Defendants' own expert Ron Angelone, a former Director of

VDOC himself, a grievance response is adequate if "it is answered in a timely manner and

neither avoids or ignores the issues of the complaint or grievance."  (*See* Ex. 20, Expert Report

of Ron Angelone, May 23, 2014, at 6.)  However, as Dr. Greifinger points out, Mr. Angelone's

"view is simplistic and bureaucratic."  Dr. Greifinger writes:

> Through [Mr. Angelone's] lens, the resolution of real deficiencies in a
> correctional facility's provision of medical care is outside his visual field... The
> standards for medical care in prison are timely access to an appropriate level of
> care and care that is ordered by a physician. To my knowledge, there is no
> standard of medical care in prison that is satisfied by trying hard.

(Ex. 19, Greifinger Rebuttal Report, 2-3.) Although Mr. Schilling testified that he sends Level 2

medical grievances to Dr. Amonette for review (*see* Ex. 1, Schilling Dep. 139:4-8), Dr.

Amonette stated that he does not review the Level 2 grievances—the reviews are instead done by

Howard Ray, a nurse in Mr. Schilling's office.  Mr. Ray rarely consults with Dr. Amonette, and

Dr. Amonette testified that no DOC physician regularly reviews Level 2 grievances concerning

medical care (*see* Ex. 5, Amonette Dep. 167:21-169:5).

Beyond an insufficient response to individual complaints, VDOC fails to utilize prisoner

grievances to identify serious systemic deficiencies.  Mr. Schilling testified that complaints do

not raise a red flag as long as they are determined to be unfounded:

> Q… The fact that you've [hypothetically] gotten 50 Level 2 grievances with regard to the
> same problem within a two-month period, wouldn't in and of itself raise any red flag?
> A.  No.

(Ex. 1, Schilling Dep. 152:11-15.)  Dr. Greifinger found that the failure of DOC to set up a

practice of reviewing the substance of prisoner complaints results in the dismissal of legitimate

complaints and grievances without correcting problems:

> [Frederick Schilling] testified that grievance data were not routinely analyzed. . .
> He also testified to what I consider a perverse understanding of the grievance
> process, i.e., even if a grievance correctly identifies a problem, it will still be

12

called "unfounded" if the health staff solely tried to prevent the problem or provided a wholly untimely response. . . This perverse definition of "unfounded" and the reluctance to analyze grievance data is an example of the "head in a sand" approach to legitimate complaints and grievances.

(Ex. 11, Greifinger Expert Report, Apr. 25, 2014, at 12; *see also* Ex. 1, Schilling Dep. 144:13-150:18.)

Not only were the VDOC Defendants fully on notice of the many deficiencies in medical care by the providers they had selected, they then willfully ignored those concerns.

E.  Plaintiffs and other similarly situated prisoners at FCCW suffer grave and foreseeable lapses in care.

Prisoners at FCCW have suffered and continue to suffer the consequences of a host of serious, systematic failures in medical care. These failures have placed the Plaintiffs and other inmates who access FCCW medical care at risk of serious harm, deterioration in their health and even death, and have caused serious harms and fatalities in the past.

1.  **FCCW fails to diagnose or treat serious medical conditions that can cause death or permanent disability if untreated.**

Prisoners at FCCW suffer roadblocks both in requesting and accessing medical care, and in receiving diagnoses and treatment for their serious medical conditions.

**Sick Call**

FCCW's sick call process, the principal means by which prisoners request and access medical care, is often significantly backlogged and fails to diagnose and treat serious conditions in a timely way. Often the nurses triaging sick call requests are not registered nurses, but licensed practical nurses with less medical training, (*see* Ex. 4, McQueen Dep. 69:16-70:16, *see also* Ex. 14,Woodson Dep. 9:4-8.), and VDOC's contract monitors have noted substantial delays in the processing of sick call requests (*see*, *e.g.*, Ex. 21, Contract Monitor Mgr. Report, Aug. 2013 (noting that "M.D. sick call is behind—from June 28th to present")). Under these circumstances,

13

FCCW prisoners face a substantial risk that their serious medical issues will be overlooked or not treated in time to avoid harm. The situation of Plaintiff Cynthia Scott is illustrative. Ms. Scott experienced swelling in her left leg and initiated a series of sick calls, sometimes two or three per week, to determine the cause, but nothing was done. (*See* Ex. 22, Decl. C. Scott ¶¶ 32-33.) Even after Dr. Donald Remaly examined her and referred her to UVA for an ultrasound, the Medical Director rescinded that order, delaying the ultrasound until the service could come to FCCW. The ultrasound technician quickly halted the procedure when she saw a blood clot and ordered that Ms. Scott be immediately taken to UVA's emergency room. By the time Ms. Scott got to UVA, an ultrasound determined part of the blood clot had traveled to her lungs, a very serious development that placed her life at risk. (*See* Ex. 22, Decl. C. Scott ¶ 37; *see also* Ex. 11, Greifinger Expert Report, Apr. 25, 2014, at 11.)

Similarly, Plaintiff Marguerite Richardson made numerous sick call visits beginning in spring 2011 for the painful sores and boils on the back of her leg, but received no effective treatment until a nurse reviewed the results of previously-conducted lab tests and told her she had Methicillin-resistant Staphylococcus aureus (MRSA), a highly contagious form of bacterial infection which may be fatal if left untreated. (*See* Ex. 10, Decl. M. Richardson ¶ 27.)

**Diagnosis and Treatment**

Similarly, even after prisoners are seen by a provider, FCCW medical staff routinely fail to diagnose and treat serious medical problems. For example, Dr. MacDonald testified that VDOC guidelines did not indicate that treatment for Marguerite Richardson was warranted, despite the fact that she had Hepatitis C, elevated liver enzymes, and a painful, swollen torso. (Ex. 6, MacDonald Dep.144:15-145:15.) In fact, as Plaintiffs' expert, Dr. Greifinger noted, "[t]here is no documentation in the medical record that the health staff at FCCW ever considered

14

Ms. Richardson for treatment [for Hepatitis C] when she was within the window of opportunity for this treatment . . . She was denied treatment for a condition that is curable in many patients . . . ," and as a result she now has signs of cirrhosis and decompensated liver failure. (Ex. 11, Greifinger Expert Report, Apr. 25, 2014, at 9.)

Other prisoners at FCCW have similarly been placed at risk by FCCW personnel's failure to diagnose and treat their conditions. (*See generally* witness declarations, Exs. 23-24, 27-28, 30-31, 33-34, 36-37, 42, 44, and 46-51; *see also* Ex. 45, Declarant Chart.) For example, prisoner B.S. [7] experienced intense lower back pain in May 2012. She sought treatment at the FCCW infirmary. She sent to UVA where she was treated for pneumonia and released. The pain continued for several more months and B.S. begged for help from doctors at FCCW. Finally, in November of 2012, she was sent out again to UVA, where she was diagnosed with osteomyelitis, a spine infection. The infection had continued for so long at that point that the tissue between her spinal discs had completely deteriorated. (Ex. 23, Decl. B.S. ¶¶ 4-10.) Similarly, prisoner M.W. repeatedly complained of pain and numbness in her right foot. Her complaints were not adequately addressed, and her diabetes-related circulation problems worsened, ultimately resulting in the amputation of her right foot and the lower part of her leg. When the wound care at FCCW was inadequate, the stump became infected and a second amputation was done above her knee. (Ex. 24, Decl. M.W. ¶¶5- 23.)

---

[7] Prisoners submitting declarations are here referred to by their initials. *See* Exs. 23-24, 27-28, 30-31, 33-34, 36-37, 42, 44-51, Declarations and summary, for their full names and declarations describing the medical failures they have experienced.

15

### 2. FCCW fails to schedule referrals to outside specialists in a timely manner even when specialized care is necessary to diagnose or treat serious medical conditions.

FCCW also has a policy and practice of failing to schedule and/or send prisoners to outside specialists in a timely way. In March 2014, requests made under the utilization management process, which is used to approve offsite provider visits and tests, were taking up to three weeks or longer to be approved. (*See* Ex. 13, Facility Report, Mar. 13, 2014 (noting that requests submitted on February 21 were still open as of March 13).) As of May 27, 2014, referrals to outside providers that were considered urgent were still taking a week or more simply to be approved. (*See* Ex. 14, Woodson Dep. 36:22-38:8.) These delays are modest compared to some that the Plaintiffs experienced. Cynthia Scott, for example, experienced a six week delay between when her doctors at UVA treating her for sarcoidosis took an EKG and were concerned about the results, and when she was sent back for the follow-up MRI they had requested. (*See* Ex. 6, MacDonald Dep. 110:12-113:15, dep. ex. 13, C. Scott grievance.) Similarly, on August 22, 2013, Dr. Sylvia McQueen ordered a colonoscopy for Plaintiff Bobinette Fearce. (*See* Ex. 4, McQueen Dep. 145:8-16.) As a Corizon vice president at the time, Dr. McQueen was not subject to the utilization management approval process and directly approved the colonoscopy order herself (*id.* at 144:5-12); yet Ms. Fearce still did not have the colonoscopy until February 22, 2014, six months after it was ordered (*see* Ex. 26, Decl. B. Fearce ¶ 36, p. 11 .).

Other prisoners at FCCW also experienced substantial delays in seeing outside providers for treatment and tests. For example, prisoner C.R. has had several episodes of throwing up blood, and in late February 2014, UVA hospital told her that she had an ulcer caused by damage from the ibuprofen and Lovenox she was taking, and that she should return in two months for a gastrointestinal scope. As of May 20, 2014, FCCW has not sent her back for this follow up. (*See* Ex. 27, Decl. C.R. ¶ 14.) Similarly, A.C. has suffered consistent, daily rectal bleeding, with

16

blood flow similar to a heavy menstrual period, during the time she has been incarcerated at FCCW. Although some measures have been undertaken to address this problem, advice to her from doctors at FCCW that she needs to be referred for corrective surgery beginning sometime in 2013 had not been acted upon as of April 23, 2014, the date of her Declaration. (*See* Ex. 28, Decl. A.C. ¶ 9.)

### 3. FCCW refuses to implement treatment plans ordered by outside specialists.

Even after prisoners have seen outside providers for specialized diagnosis and treatment, FCCW staff ignore or refuse to follow the treatment orders of those outside providers due to VDOC's policies and practices. Dr. Paul Ohai, who worked for both Corizon and Armor, for the latter as a Regional Medical Director, testified that under either Corizon or VDOC policy, the physician at the prison is expected to review and change a specialist's orders:

> Q. So when the prisoner returns to the prison, the physician at the prison would review the specialist's orders?
> A. That's correct.
> Q. And that physician might change some of the orders?
> A. As per policy, he's expected to. Either Corizon or DOC policy, he's supposed to. That's part of his job.

(Ex. 29, Ohai Dep. 123:6-14, June 27, 2014.) A UVA specialist recommended Plaintiff Marguerite Richardson for a liver biopsy, and she filed a grievance when FCCW failed to send her for the biopsy pursuant to the specialist's recommendation. In response to her grievance, FCCW staff told her the procedure had been denied because liver biopsies are "no longer the standard of practice." As Dr. Greifinger notes, "[o]ne wonders why FCCW physicians would send a patient to a specialist, only to reject that specialist's recommendation . . . in Ms. Richardson's particular case, I expect the gastroenterologist at the tertiary care center knew more about what was appropriate for this individual patient" than did the individual responding to the grievance. (Ex. 11, Greifinger Expert Report, Apr. 25, 2014, at 10-11.)

As the declarations of other prisoners show, Ms. Richardson's case is not isolated, and numerous other prisoners have seen the treatments prescribed by offsite specialists ignored or modified. In particular, D.S.'s HIV specialist recommended that her HIV medication be switched from Atripla to Stribild due to adverse mental health effects of Atripla. Her medication was not changed for two months because FCCW "wanted to use up all the old Atripla pills" before changing medications. (*See* Ex. 30, Decl. D.S. ¶ 7.) Similarly, B.E.G.'s surgeons placed an expander in her chest following her mastectomy for breast cancer, and the expander was supposed to remain for only six months. B.E.G. was not sent for follow-up to have the expander removed and to receive reconstructive surgery, despite the fact that her mastectomy took place in 2012. Furthermore, after a heart attack in September of 2012, B.E.G. was seen by a cardiologist who recommended an outside appointment for a heart test using a halter monitor, and she has not received that either. (*See* Ex. 31, Decl. B.E.G. ¶¶ 11, 17.)

### 4. FCCW denies patients with disabilities and serious medical conditions needed accommodations.

VDOC's policies and practices deny needed accommodations to prisoners at FCCW with disabilities and serious medical conditions. For example, the cells at FCCW do not have toilets, so prisoners must leave their cells to use the bathroom. At times when the cells are locked, such as during the daily counts or at night, prisoners cannot leave their cells to use the bathroom without obtaining permission from security. (*See* Ex. 20, Angelone Report, at 7.) Medical staff previously issued profiles allowing prisoners with incontinence or other medical conditions to use the bathroom as needed, but as Dr. MacDonald said, "[s]ecurity said it was an onerous aspect for them to carry and they would rather take care of it on their own without profiles. So I stopped writing profiles." (*See* Ex. 6, MacDonald Dep. 155:12-156:5.) As a result, prisoners like Marguerite Richardson and Bobinette Fearce, both of whom suffer from incontinence,

sometimes wet or soil themselves because they are not allowed access to the bathroom. (*See* Ex. 26, Decl. B. Fearce ¶ 16-18; *see also* Ex. 10, Decl. M. Richardson ¶¶ 6-8.) Similarly, FCCW waited four months to repair or replace the malfunctioning hearing aids upon which plaintiff Rebecca Scott depends, resulting in her being written up for disciplinary violations because she could not hear announcements given over the intercom. (*See* Ex. 32, Decl. R. Scott ¶ 15.)

Numerous other prisoners have been denied needed accommodations for their medical conditions as well. Prisoner L.S.M. has a previous hip injury that requires her to use a cane for balance and a walker outside. FCCW took both of these away upon her arrival at the prison and would not return them for approximately a week. FCCW would also only allow her to raise one medical issue at a time in her sick call requests. (Ex. 33, Decl. L.S.M. ¶ 26.) Similarly, D.E. wears a bracelet stating that she is a fall risk, but nonetheless was taken to an offsite oncologist appointment wearing shackles and cuffs without sufficient staff assistance, which caused her to fall and hurt her knee. (*See* Ex. 34, Decl. D.E. ¶ 17.) The declarations of the above prisoners thus bear out that prisoners across the board at FCCW suffer the consequences of the same series of medical failures that affected and continue to affect the Plaintiffs.

### 5. FCCW withholds medication that prisoners need to manage pain or treat illnesses.

Due to VDOC's policies and practices, FCCW consistently fails to provide medications that prisoners need to treat illnesses or manage pain. VDOC contract monitors have noted major deficiencies on multiple occasions in how medications are ordered, stored, and administered. (*See, e.g.*, Ex. 35, email of William Nicholson to Catherine Thomas, Jan. 24, 2014.) Long delays are typical in filling prescriptions for medications for chronic conditions such as diabetes, seizures, and cardiac conditions. Moreover, non-formulary medications can take up to a year to be approved. (*See* Ex. 12, Young Dep. 28:16-29:5, 31:5-9, 41:2-15.) FCCW also fails to provide

19

adequate pain medication to prisoners with severe, chronic conditions such as degenerative joint disease, instead telling them to buy over-the-counter medications such as Tylenol through the commissary. (*See* Ex. 26, Decl. B. Fearce ¶ 13; *see also* ECF Dkt. No. 58, Am. Compl. ¶ 54.) These delays and denials can have catastrophic consequences. For example, I.F., an athlete before going to FCCW, now uses a wheelchair because she does not receive sufficient anti-inflammatories or pain medications to prevent the swelling and pain in her burn-scarred legs. (*See* Ex. 36, Decl. I.F. ¶¶ 10-11.) Similarly, FCCW staff gave T.G. the wrong medications for her Type I diabetes, including being given Metformin and glyburide, used only for Type II diabetics. This causes her diabetes to be very poorly controlled; she is frequently faint, and her vision has deteriorated to the point that she can no longer read small print. (*See* Ex. 37, Decl. T.G. ¶¶ 6-7, 19, 25.)

## THE PROPOSED CLASS

Plaintiffs propose, and seek certification regarding, a class consisting of all prisoners who currently reside or will reside in the future at FCCW and who have sought, currently seek or will seek medical care while residing at FCCW.

## ARGUMENT

Supreme Court jurisprudence establishes that the deprivation of medical care to which Plaintiffs and class members allege they have been subjected is impermissible under the Eight Amendment's bar to cruel and unusual punishment. "Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates may actually produce physical torture or a lingering death," in violation of the Eighth Amendment. *Brown v. Plata*, __ U.S. __, 131 S. Ct. 1910, 1928 (2011) (citations omitted). "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care." *Id.* Here, as in *Brown,* "[p]laintiffs rely on systemwide deficiencies in the provision of

20

medical . . . care that, taken as a whole, subject sick . . . prisoners to 'substantial risk of serious harm' and cause the delivery of care to fall below the evolving standards of decency that mark the progress of a maturing society." *Id*. at 1925 n.3. (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

> As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty. Yet the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958) (plurality opinion)).

> To incarcerate, society takes from prisoners the means to provide for their own needs. . . . A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in a civilized society.

*Brown*, 131 S. Ct. at 1928. Consistent with the foregoing fundamental principles, the named Plaintiffs here seek declaratory and injunctive relief, for themselves and on behalf of all women who reside or will reside at FCCW, to prevent a perpetuation of the substandard medical care rendered by the VDOC at the prison on a systemic basis.

The Plaintiffs' evidence, as summarized above, makes out a clear case not only that Plaintiffs have already suffered harm but that many other FCCW prisoners have as well, based on the Defendants' provision of inadequate medical care and/or complete failure to provide care under circumstances in which it was clearly necessary. Moreover, the Defendants' pattern and practice of deficient care subject the Plaintiffs and all others who are or will be incarcerated at FCCW to an ongoing substantial risk of serious harm contravening established Eighth Amendment standards. As demonstrated more fully below, Plaintiffs meet each requirement for class certification, and certification allowing this case to proceed as a class action is thus plainly appropriate and warranted.

# I. PLAINTIFFS' PROPOSED CLASS SATISFIES ALL OF THE THRESHOLD REQUIREMENTS FOR CERTIFICATION UNDER FED. R. CIV. P. 23(a)

"[F]ederal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice for the affected parties and . . . promote judicial efficiency." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (citation and internal quotations omitted). "[C]ourts routinely certify class actions involving prisoners, including cases challenging prison health care, mental health care, and dental care." *Flynn v. Doyle*, No. 06-C-537, 2007 WL 805788, at *3 (E.D. Wis. Mar. 14, 2007) (citing cases); *see also Dean v. Coughlin*, 107 F.R.D. 331, 333 (S.D.N.Y. 1985) (citing cases).

Rule 23(a) provides that:

One or more members of a class may sue . . . as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defense of the representative parties are typical of the claims or defense of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs' proposed class satisfies each of these threshold requirements.

## A. Numerosity

With approximately 1,200 women prisoners housed at FCCW every day who are subject to its medical care system, the proposed class is sufficiently large, on its face, to satisfy the Rule 23(a)(1) "numerosity" criterion. Joinder of all FCCW prisoners would be impracticable.[8]

---

[8] "Impracticable," for these purposes, does not mean "impossible"; rather, Plaintiffs must merely show that the number of allegedly affected individuals is sufficiently large that "[i]t

In general, if a proposed class size exceeds 25 plaintiffs, joinder is usually presumed impracticable. *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 102 (W.D. Va. 2000); *see also Knight v. Lavine*, Case No. 1:12-cv-611, 2013 WL 427880, at *2 (E.D. Va. Feb. 4, 2013) ("The Fourth Circuit has affirmed certification for classes as small as 18 people.") (*citing Cypress v. Newport News Gen. and Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967)).

"Furthermore, other factors [besides mere numbers] weigh in favor of finding that numerosity is met here, including the fluidity of prison populations and [individual] prisoners' lack of access to counsel." *Riker v. Gibbons*, No. 3:08-cv-00115 LRH-RAM, 2009 WL 910971, at *2 (D. Nev. Mar. 31, 2009). *See also Clarke v. Lane*, 267 F.R.D. 180, 195 (E.D. Pa. 2010) (numerosity requirement satisfied by class of residents of facility holding up to 300 prisoners at a time); *Lambertz-Brinkman v. Reisch*, No. CIV-07-3040, 2008 WL 4774895, at *1 (D.S.D. Oct. 31, 2008) ("Because the class includes future inmates, I find that joinder of all members would be impracticable."); *Dean*, 107 F.R.D. at 332-33 ("The fluid composition of a prison population is particularly well-suited for class status, because, although the identity of the individuals involved may change, the nature of the wrong and the basic parameters of the group affected remain constant.").

### B. Common Questions Of Law And Fact ("Commonality")

Rule 23(a)(2) requires Plaintiffs, as movants, to demonstrate that "there are questions of law or fact common to the class" that they seek to represent. While "[t]he requirement that questions of law or fact must be common to the class is to be liberally construed," *see McGlothin*

---

would be extremely difficult or inconvenient to join all the members of the class." *See generally* 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1762 at 176 (3d ed. 2005) (footnote omitted); *see also* 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:3 at 225 (4th ed. 2002) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.").

23

*v. Connors*, 142 F.R.D. 626, 632 (W.D. Va. 1992), a rigorous assessment of whether the Plaintiffs satisfy the "commonality" element of Rule 23(a) is mandated by the decision of the Supreme Court majority in *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __,131 S. Ct. 2541 (2011). Under *Wal-Mart*, '[c]ommonality requires Plaintiffs to demonstrate that the class members 'have suffered the same injury' . . . not . . . merely that they have all suffered a violation of the same provision of law." 131 S. Ct. at 2551, *citing Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982). Thus, Plaintiffs' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. "'What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id*. (*citing* Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original)); *see generally Gray v. Hearst Commc'ns, Inc.,* 444 Fed. App'x 698, 700 (4th Cir. 2011); *cf. Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 113 (4th Cir. 2013).

Notwithstanding the heightened scrutiny to be accorded the "commonality" requirement prescribed by *Wal-Mart*, it remains clear that "'[e]ven a single [common] question" of law or fact will suffice to satisfy the requirements of Rule 23(a)(2). *Wal-Mart*, 131 S. Ct. at 2556 (citation omitted). In addition, here, as distinguished from *Wal-Mart*, which principally involved claims for damages as to which certification was sought under Rule 23(b)(3), the commonality element is most easily established in proposed class actions seeking injunctive or declaratory relief; "suits for injunctive relief by their very nature present common questions of law and fact." *McGlothlin*, 142 F.R.D. at 633; *see generally* 1 Conte & Newberg, *supra*, § 3:10 at 277-78

24

("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected."). Plaintiffs' allegations meet the requirements of the post-*Wal-Mart* analytical framework for determining "commonality".

The essential questions in this case do not vary among class members. Common questions of fact include: (1) whether the VDOC's contract system permits improper cost considerations to interfere with treatment of serious medical conditions; (2) whether VDOC uses specious security justifications to trump treatment or accommodation of serious medical conditions and disabilities; (3) whether VDOC fails to provide appropriate oversight, training, and supervision of medical care at FCCW; and (4) whether, as a result, VDOC systematically provides inadequate medical care to the women residing at FCCW. Common questions of law include: (1) whether the systemic and pervasive deficiencies in care at FCCW have placed its residents at unreasonable risk of suffering new or worsening physical injury, illness, mental anguish, emotional distress and/or the prospect of premature death; and (2) whether VDOC's policies, procedures, and practices reflect deliberate indifference to the serious medical needs of residents of FCCW such that it has violated their right to be free from cruel and unusual punishment as proscribed by the Eighth Amendment.

> **1.** **Whether VDOC's contract system permits improper cost considerations to interfere with treatment of serious medical conditions**

An initial common question of fact is whether VDOC allows cost considerations to improperly interfere with the treatment of prisoners. Under the capitated contract model, the contractor bears the risk of loss if healthcare costs are higher than predicted. (*See* Ex. 2, Teal Dep. 25:2-22; *see also* Ex. 1, Schilling Dep. 83:17-22.) This contract gives the contractor a clear incentive to cut corners when it comes to patient care, because it receives a fixed amount of

money for each prisoner in the system, and the less money it spends on care for those prisoners, the more money it can keep as profit, regardless of the negative health outcomes for prisoners. Therefore, the incentive structure of the capitated contract encourages the health care contractor to spend less money on medical care, and consequently provide less care or lower quality care in order to increase its own profits. VDOC, by turn, has set up a contract monitoring system that purports to monitor compliance with VDOC operating procedures, but does not address in any meaningful way the repeated deficiencies in the contractors' medical care delivery system. VDOC merely relies on the contractor's nurses, and not even the physicians, to correct any deficiencies that VDOC has identified.

In 2013, well after VDOC was put on formal notice of the issues raised by this lawsuit, VDOC awarded a contract for healthcare at FCCW and several other facilities to Corizon, which bid *$17 million less* than the bid of its nearest competitor, Armor. Bruce Teal, CEO of Armor, testified that Armor was well aware of the costs of providing care, since it was the incumbent contractor prior to the bidding process, and that "[u]nder no circumstances" could Armor have provided care for the amount bid by Corizon. (*See* Ex. 2, Teal Depo 39:18-40:21.) Apparently aware of the possibility that care provided pursuant to such a low-cost contract could conceivably be deficient, VDOC appointed seven contract monitors and a contract monitor supervisor to monitor the health services provided by Corizon beginning on May 1, 2013. (*See* Ex. 1, Schilling Dep. 110:8-17.)

Despite acknowledging, however, that a low contract price in relation to other bidders could adversely affect the quality of the care to be provided (*see* Ex. 1, Schilling Dep. 109:4-110:17), the system developed by VDOC to monitor the contractor's provision of services largely tracks compliance with procedures. It does not include monitoring of patient impacts or

26

status, even at a level equivalent to that met by Armor and Corizon in tracking statistics regarding, for example, insulin treatment for diabetics or diabetic prisoners' blood sugar levels. (*See* Ex. 29, Ohai Dep. 49:18-50:13; *see also* Ex. 38, Corizon Infection Control Monthly Stats; *see also* Ex. 16, Thomas Dep. 11:24-12:3.)  For those inane and bureaucratic metrics that are measured by VDOC, there is no penalty for non-compliance.  (*See* Ex. 16, Thomas Dep. 19:12-19.)

VDOC's established practice of contracting out prisoner medical care to the lowest bidder—even at an unrealistically low bid—and its failure to monitor the quality of the care provided results in an impermissibly and dangerously low quality of care for prisoners at FCCW.   The most obvious ways in which cost considerations adversely affect the quality of care include replacing a medication with a less-expensive one without apparent regard for efficacy (*see*, *e.g.*, Ex. 18, Rodgers Dep. 95:18-96:13), or rejecting an outside specialist referral or a specialist's prescribed course of treatment.  (*See, e.g.*, Ex. 9, Brown Dep. 43:19-24 (acknowledging that cost is one of several factors used to determine whether a patient should receive a certain medical service); *see also* Ex. 6, MacDonald Dep. 64:9-18 (acknowledging he took costs into consideration when providing care); *see also* Ex. 12, Young Dep. 34:6-35:10 (explaining how she had trouble getting paperwork approved for testing she deemed necessary for patients).)

The detriment to prisoners' care due to improper cost considerations is even farther-reaching, as when the contractor struggles to retain or hire sufficient staff, or relies heavily on temporary workers for assistance.  (*See, e.g.,* Ex. 18, Rodgers Dep. 180:5-18; *see also* Ex. 14, Woodson Dep. 85:8-13, 109:1-111:21; *see also* Ex. 7, Anderson Dep. 114:17-115:3; and Ex. 15, Robinson Dep. 100:16-101:2.)  As a result of staffing deficiencies, for example, sick call

provider visits at FCCW fell behind for at least several months in 2013, a problem that both Corizon and VDOC knew about and purportedly struggled to address.  (*See* Ex. 16, Thomas Depo, 23:23-25:5; *see also* Ex. 18, Rodgers Dep. 179:19-181:9.) Chronic care visits for FCCW prisoners also fell behind.  (*See* Ex. 12, Young Dep. 41:16-21; *see also* Ex. 18, Rodgers Dep. 186:11-13.)  Sick call delays are particularly pernicious because sick call is the only way for patients to be seen and diagnosed by a physician or nurse practitioner.  Dr. MacDonald described Sick Call:

> A sick call is the way people schedule an appointment. . . . For an appointment to be seen, that's basically how you access care. . . . That's a DOC criteria, not mine.  It's not my preference . . . . I would welcome, and I think many of us would, a constructive alternative to that.

(Ex. 6, MacDonald Dep. 174:14-176:9 (intervening question omitted).) All class members are affected alike by VDOC's failure to ensure adequate staffing at sick call, or develop a more effective alternative to the sick call provider referral process that gets patients prompt access to a doctor when they need care.

### 2. Whether VDOC uses specious security justifications to trump treatment or accommodation of serious medical conditions and disabilities

A second issue common to all class members is whether VDOC allows what it claims to be security justifications to trump the treatment or accommodation of prisoners at FCCW. VDOC policies and practices place security concerns ahead of medical care in numerous ways. VDOC policy governs what medical profiles may be granted to prisoners, (*see* Ex. 39, May Dep. 61:16-22 and 63:10-13, May 21, 2014; *see also* Ex. 6, MacDonald Dep. 192:12-193:13), and VDOC personnel have mandated that doctors stop granting medical profiles for bathroom privileges. (*See* Ex. 6, MacDonald Dep.199:16-20.)  Warden Brown testified that no priority is currently given to women with incontinence in allowing bathroom use. (*See* Ex. 9, Brown Dep.

104:21-24.) The VDOC's expert admitted that VDOC limits the movement of prisoners to the bathroom at FCCW due to staffing concerns. (*See* Ex. 20, Angelone Report, at 8.) As Dr. Greifinger noted, however, the VDOC made the choice to have no toilets in the cells, and sufficient staffing would be a solution to addressing the alleged security concerns. (*See* Ex. 19, Greifinger Rebuttal Report, June 28, 2014, at 3.)

Similarly, VDOC personnel have a practice of taking away braces, canes, and other medical devices from prisoners upon intake to FCCW. Armor was aware that security staff would take away knee braces or analogous supports because of concerns that they "contain metal or some item that they believe would be potentially dangerous." (*See* Ex. 40, Hatcher Dep. 123:18-124:1, June 24, 2014; *see also* Ex. 18, Rodgers Dep. 113:19-114:4.) VDOC has also denied medical profiles for extra blankets, extra pillows, mattresses, or wedges to treat swelling in limbs based on alleged security concerns. (*See* Ex. 12, Young Dep. 60:22-61:4; *see also* Ex. 22, Decl. C. Scott ¶ 52.) As Dr. Young noted, however, "[T]hat changes. Things will be allowed for a while and then they won't be." (Ex. 12, Young Dep. 61:3-4.)

VDOC also has a practice of limiting when prisoners can see offsite specialists. Dr. Rodgers told an oncologist at UVA that "she had no control over transportation [of prisoners to offsite appointments] and that the prison could cancel it for any reason." (Ex. 41, Decl. E. Ramsdale with attached Letter of Erika Ramsdale, M.D. to Sylvia McQueen M.D., July 14, 2014, at 3.) These statements and documents demonstrate that VDOC's practices with regard to security and medical care are systemic and potentially affect all FCCW inmates, not merely the named Plaintiffs. Whether the VDOC places specious security concerns above providing adequate medical care and/or fails to appropriately balance security concerns with medical needs

29

in a manner that does not interfere with the provision of medically necessary care is a question of fact common to all class members.

### 3. Whether VDOC fails to provide appropriate oversight, training, and supervision of medical care at FCCW

Third, ample evidence demonstrates that VDOC fails to provide appropriate oversight, training, and supervision of medical care at FCCW. According to Dr. Greifinger, "[t]he deficiencies in care that I found in [the cases reviewed] indicate a systemic failure to follow accepted and appropriate policies; these are failures in practices that risked harm and caused harm. These are a result of failures in supervision, failures in training; and failures in oversight by VDOC." (*See* Ex. 11, Greifinger Expert Report, Apr. 24, 2014, at 12.) Dr. Greifinger also found that "VDOC oversight appears to be tolerant of and even congratulatory with respect to identified deficiencies in utilization management, nursing practices, medication management, medication administration documentation, and medical record documentation." (*See* Ex. 43, Greifinger Supplemental Report, May 14, 2014, at 4.)

VDOC fails to adequately supervise both employees and contractors responsible for providing appropriate medical care. For example, there are no protocols, rules, or procedures for making sure that medically related grievances are reviewed by someone adequately trained to recognize symptoms and know proper treatment. (S*ee*, *e.g.*, Ex. 6, MacDonald Dep. 163:17-164:2.) Even at the highest level of appeal, medical grievances are reviewed not by a doctor, but by a nurse. (*See* Ex. 5, Amonette Dep. 168:2-169:5.) Moreover, VDOC officials supervising the provision of care are given no specific directions about when problems should be reported to higher officials. (*See, e.g.*, Ex. 15, Robinson Dep. 95:10-15; 101:12-17 (testifying that he gave FCCW's contract monitor supervisor no specific directions about what issues related to quality of care that she should call to his attention and that she should involve him only when

"something was at a crisis level"); *see also, e.g.*, Ex. 5, Amonette Dep. 147:22-148:22 (testifying that he had never read the VDOC operating procedure requiring him, as chief physician, to send reports on serious or unusual incidents to the chief of corrections operations).)

VDOC officials demonstrate a cavalier attitude toward prisoners' life-threatening medical conditions that fosters a pervasive culture of callous disregard to known deficiencies in care. According to Dr. Greifinger, "[e]ach of the Plaintiffs filed numerous grievances, complaints, and appeals, putting the Defendants on notice of the deficiencies in care . . . Many of the responses to these notices were unnecessarily bureaucratic and callous, e.g., wrong form." (*See* Ex. 11, Greifinger Expert Report, Apr. 24, 2014, at 10.) For example, when one woman filed an emergency grievance complaining of profuse rectal bleeding with "clots the size of quarters," the response indicated that it did "not meet the definition for an emergency and life-threatening" and that she should simply "call to the infirmary." (*See* Ex. 44, Emergency Grievance of A.C., Apr. 14, 2014.) VDOC employees and contractors routinely ignore legitimate complaints about medical services and, inexplicably, refuse to respond to multiple problems described in a single complaint. (*See* Ex. 6, MacDonald Dep. 149:19-150:7 (explaining that when prisoners ask multiple questions, "we really only have to answer one thing"); *see also* Ex. 33, Decl. L.S.M. ¶ 19 (FCCW only allows one issue at a time to be raised in sick call requests).) Though VDOC employees were well aware of numerous serious medical care issues raised by prisoners at both the institutional level and at VDOC headquarters, these flaws were routinely excused so long as the grievance coordinator responded in a timely manner and the care provider "tried hard" to address a problem, regardless of whether the substance of the complaints had merit or an appropriate level of care was actually provided in response. (*See* Ex. 19, Greifinger Rebuttal Report, June 28, 2014, at 3; *see also* Ex. 20, Angelone Report, at 5-7.)

### 4. Whether VDOC systematically provides inadequate medical care to the women residing at FCCW

Finally, whether VDOC systematically provides inadequate medical care to the women residing at FCCW is a question of fact common to all class members. Plaintiffs have provided declarations from 17 women in addition to the named Plaintiffs demonstrating that their shared experiences with medical care at FCCW have been consistently damaging and traumatic.

Accordingly, for the named Plaintiffs to proceed as individual litigants would not make sense. The key factual issues at the heart of FCCW's constitutionally-deficient medical care turn not on each individual plaintiff's particular personal health concerns, but rather on FCCW's systemic inability or unwillingness to provide a level of medical care to all of its residents that complies with constitutional norms. While the claims of the class members must arise from similar practices and be based on the same legal theory, the commonality requirement does not require that all class members share identical factual histories. *See Holsey v. Armor & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) ("Despite the presence of individual factual questions, the commonality criterion of Rule 23(a) is satisfied by the common questions of law presented.").[9]

Numerous courts presented with closely-analogous factual circumstances have concluded that the prisoners' claims easily satisfy the Rule 23(a)(2) commonality requirement. *See, e.g., Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). In *Parsons*, the Arizona Department of Corrections sought interlocutory appellate review of a federal district court's decision to certify a

---

[9] *See generally Knight v. Lavine*, 2013 WL 427880, at *2 (where the primary question presented in ERISA breach-of-fiduciary-duty action was common to all 401(k) plan participant class members, individual issues concerning quantification of their respective losses did not preclude class certification); *Martinez-Hernandez v. Butterball, LLC,* Case No. 5:07-cv-174-H(2), 2011 WL 4549606, at *4 (E.D.N.C. Sept. 29, 2011) (individual distinctions between putative class members regarding impact upon each of defendants' unlawful wage/hour practices did not impede a "commonality" finding in light of court's determination that "this case involves a uniform policy or practice of compensating employees based on their scheduled shifts.").

32

class in an action brought by state prisoners alleging deficient medical, dental and mental health care of a systemic nature in the state's correctional facilities.[10]  The State's principal argument on appeal was that the district court erred in finding that the prisoners' claims satisfied the "commonality" requirement of Rule 23(a)(2) under the heightened scrutiny mandated by the Supreme Court in *Wal-Mart*.  The Ninth Circuit flatly rejected the defendants' argument that the presence of individualized medical injuries defeats class certification, noting that the defendants' position "amounts to a sweeping assertion that, after *Wal-Mart*, Eighth Amendment claims can *never* be brought in the form of a class action." *Id*. at 675-76 (emphasis in original).  The Court explained that "[t]he defendants' view rests . . . on a fundamental misunderstanding of *Wal-Mart*, Eighth Amendment doctrine, and the plaintiffs' constitutional claims." *Id*. at 676.

Invoking the Supreme Court's reasoning and holding in *Brown v. Plata*, *supra*, and focusing upon the specific nature and substance of the plaintiffs' claims, the Court concluded that

> [h]ere, a proper understanding of the nature of the plaintiffs' claims clarifies the issue of commonality.  What all members of the putative class . . . have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent.  As the district court recognized, although a presently existing risk may ultimately result in different future harm for different inmates -- ranging from no harm at all to death -- every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm.  . . .

> The putative class . . . members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected by ADC expose them to a substantial risk of harm.

*          *          *

---

[10] Notably, medical, mental, and dental health care services are provided to the State of Arizona by Corizon—VDOC's current contractor in the case at bar. *See Parsons*, 754 F.3d at 662.

The district court thus did not abuse its discretion in deciding to structure the litigation in the form of a class of "all prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC." After all, every inmate in ADC custody is necessarily subject to the same medical, mental health, and dental care policies and practices of the ADC. And any one of them could easily fall ill, be injured, need to fill a prescription, require emergency or specialist care, crack a tooth, or require mental health treatment. It would indeed be surprising if any given inmate did *not* experience such a health care need while serving his sentence. Thus, every single ADC inmate faces a substantial risk of serious harm if ADC policies and practices provide constitutionally deficient care for treatment of medical, dental, and mental health needs. As Justice Kennedy explained in *Plata*, inadequate health care in a prison system endangers every inmate[.]

*Id*. (emphasis in original; citations omitted).

The reasoning articulated by the Court and the result reached with respect to the "commonality" criterion in *Parsons* are directly applicable here. Whether the policies and practices at FCCW that the Plaintiffs contend reflect substandard medical care on the part of the Defendants -- *e.g.*, the defective Sick Call process; FCCW's refusal to refer or undue delay in referring prisoners for specialized care; the failure to maintain continuity in the provision of prescribed, potentially life-sustaining medications; etc. -- place the Plaintiffs and other current and future FCCW prisoners at a substantial risk of serious harm to which the Defendants are deliberately indifferent, implicates questions of fact and law common to the entire putative class.

Numerous other federal district courts have recognized, in the aftermath of *Wal-Mart*, that its analytical regime concerning "commonality" serves as no barrier to the certification of class actions in cases involving prisoners' claims alleging a pattern and practice of conduct resulting in unconstitutional conditions of confinement. *See, e.g., Jones v. Gusman*, Civ. Action Nos. 12-859, 12-138, 2013 WL 2458817, at *40-42 (E.D. La. June 6, 2013) (in action brought by residents of Orleans Parish Prison challenging unlawful conditions with respect to safety and security, medical and mental health care, environmental conditions, fire safety and lack of Spanish language translation services, all attributed to Parish Sheriff's systemic policies, court

34

found "commonality" and "typicality" criteria satisfied notwithstanding *Wal-Mart*); *Hughes v. Judd*, Case No. 8:12-cv-568-T-23MAP, 2013 WL 1821077, at \*19-25 (M.D. Fla. Mar. 27, 2013) (in action brought by parents and guardians of juvenile detainees alleging Polk County Sheriff's deliberate indifference to guard-detainee and detainee-detainee violence and to the harm caused to detainees resulting from Sheriff's unlawful policy governing the use of pepper spray in the County Jail, magistrate judge found that all elements of Rule 23(a), including "commonality", were satisfied in light of analysis mandated by *Wal-Mart*), *report and recommendation adopted as modified on other grounds,* 2013 WL 1810806 (M.D. Fla. April 30, 2013); *Butler v. Suffolk Cnty,* 289 F.R.D. 80, 96-101 (E.D.N.Y. 2013) (prisoners residing in County correctional facilities brought class action seeking declaratory and injunctive relief challenging systemic adverse environmental conditions resulting from County's alleged policies and practices reflecting deliberate indifference to their health; the district court, over defendants' *Wal-Mart* challenge, certified the class, holding that "[w]hether the County was aware of and deliberately indifferent to the conditions at the SCCF is a common question subject to class-wide resolution." (Citation omitted.)).[11] This Court should hold accordingly.

---

[11] *Accord Chief Goes Out v. Missoula Cnty*, Case No. CV-12-155-M-DWM, 2013 WL 139938, at \*4-\*7 (D. Mont. Jan. 10, 2013) (denial of fresh air and outdoor exercise); *Indiana Protection and Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Corrections*, Case No. 1:08-cv-01317-TWP/MJD, 2012 WL 6738517, at \*18 (S.D. Ind. Dec. 31, 2012) (denial of adequate mental health care and excessive use of solitary confinement; "The mentally ill prisoners here, have demonstrated through a wealth of evidence, that the class is united by the common question of whether the lack of treatment and isolated living conditions in IDOC facilities violate the Eighth Amendment."); *Henderson v. Thomas*, 289 F.R.D. 506, 511-12 (M.D. Ala. 2012) (policy pursuant to which HIV-positive prisoners were segregated from remainder of prison population in violation of Americans With Disabilities Act and Rehabilitation Act); *Olson v. Brown*, 284 F.R.D. 398, 410 (N.D. Ind. 2012) ("[I]n this case, Mr. Olson has shown that the [Tippecanoe County Jail's] specific practices relative to the handling (or non-handling) of grievances, opening of legal mail, and restricting access to the law library, have caused the inmates to suffer the same potential injury, which ties all of their jail standards claims together." (Citations omitted.)); *Rosas v. Baca*, Case No. CV-12-00428 DDP (SHx), 2012 WL 2061694, at \*2-5 (C.D. Cal. June

35

## C.    Typicality Of Plaintiffs' Claims

Rule 23(a)(3) mandates that "the claims . . . of the representative parties [must be] typical

of the claims . . . of the class."  As the courts have frequently observed, this "typicality" criterion

has close conceptual connections to both the Rule 23(a)(2) "commonality" requirement,

discussed above, and the Rule 23(a)(4) "adequacy of representation" inquiry, addressed *infra*.

Thus, as the Supreme Court noted in *Wal-Mart*:

> We have previously stated in this context that "[t]he commonality and typicality
> requirements of Rule 23(a) tend to merge.  Both serve as guideposts for
> determining whether under the particular circumstances maintenance of a class
> action is economical and whether the named plaintiff's claim and the class claims
> are so interrelated that the interests of the class members will be fairly and
> adequately protected in their absence.  Those requirements therefore also tend to
> merge with the adequacy-of-representation requirement[.]

131 S. Ct. at 2551 n.5, *citing Falcon*, 457 U.S. at 157-58 & n.13.

---

7, 2012) (unlawful policy of failing to prevent deputy-on-inmate and inmate-on-inmate violence
in Los Angeles County jail system).

By the same token, *Parsons* confirms the continuing vitality of the plethora of pre-*Wal-Mart*
decisions in which prisoners' claims of deficient medical care of a systemic nature were certified
to proceed as class actions.  *See, e.g., Clarke*, 267 F.R.D. at 196 ("failure to provide adequate
healthcare" is the overarching common factual issue, notwithstanding differences in particular
allegations of individual named plaintiffs); *Riker*, 2009 WL 910971, at *3 ("In this case, there
are common issues of both fact and law.  The common issue of fact concerns the policies and
inadequacies Plaintiffs allege inhere in [the prison's] health care system.  The common issue of
law concerns whether these policies and inadequacies constitute a[n] Eighth Amendment
violation."); *Lambertz-Brinkman*, 2008 WL 4774895, at *2 ("All members of the class seek a
declaration that an illegal policy and practice exists and an injunction should be issued
prohibiting such practice.  This is sufficient to establish the requisite commonality."); *Flynn*,
2007 WL 805788 at *4 ("The commonality and typicality requirements are also more easily met
when the class members only seek injunctive relief, rather than monetary damages."); *Bradley v.
Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993) ("Though there certainly may be some factual
differences between the individual class members and the nature or severity of their illness, such
individual differences do not defeat certification because there is no requirement that every class
member be affected by the institutional practice or condition in the same way."); *Dean*, 107
F.R.D. at 333 ("[T]he claims of each class member need not be identical to raise common factual
and legal questions regarding the adequacy of an entire [prison health-care] system.").

36

Where "[t]he representative party's interest in prosecuting his own case . . . simultaneously tend[s] to advance the interests of the absent class members," the typicality standard is satisfied. *Soutter v. Equifax Info. Servs., LLC*, 498 Fed App'x 260, 264 (4th Cir. 2012); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006); *see generally Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) (the "named plaintiffs' injuries [need not] be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs, and that the injuries result from the same, injurious course of conduct"); *Rubidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").

In essence, the Court must examine the extent to which the Plaintiffs, by proving the facts necessary to establish a *prima facie* case on their claims with respect to the systemic deficiencies characterizing the medical care system at FCCW and Defendants' deliberate indifference to Plaintiffs' serious medical needs, "would also prove the claims of the absent class members." *Deiter*, 436 F.3d at 467. Here, Plaintiffs have alleged a broad variety of medical problems -- diseases, physical afflictions, deteriorating conditions and chronic pain -- that are generally representative of the adverse health issues experienced by the entire prisoner population at FCCW. If Plaintiffs succeed in demonstrating by a preponderance of admissible evidence that the methods and procedures employed by FCCW in responding to their medical problems and concerns fail to pass constitutional muster and are attributable to deliberate indifference on the part of the Defendants, the resulting declaratory and injunctive relief would doubtless benefit plaintiffs and all other FCCW prisoners alike.

Thus, for example, if the evidence and testimony adduced by plaintiffs with respect to the allegations of named plaintiffs Cynthia Scott and Marguerite Richardson that their receipt of appropriate medical attention and care for serious illnesses was unduly and improperly delayed due to the incompetence of unqualified Sick Call personnel, employed by the Contractor as a cost-saving measure, who lacked the requisite training, experience or expertise to recognize these Plaintiffs' need to be seen immediately by a physician (*see* Statement of Facts, *supra*, at 13-14), that proof would support the inference that Ms. Scott's and Ms. Richardson's respective unfortunate encounters with the Sick Call process are typical of the experiences of the FCCW prisoner population as a whole. Likewise, if Plaintiffs successfully establish the merits of the allegations of plaintiffs Cynthia Scott and Bobinette Fearce that FCCW Medical Staff routinely disregards the courses of treatment prescribed for FCCW prisoners by outside specialists by, for example, altering or completely failing to carry out instructions with respect to prescription medications as a cost-cutting measure (Statement of Facts, *supra*, at 17-18, 25-26), this proof would again support an inference that the improper conduct of the Medical Staff in these instances is typical of their conduct with respect to the FCCW prisoner population at large.

Accordingly, the typicality requirement of Rule 23(a)(3) is clearly met here, as numerous other tribunals have recognized in certifying substantially similar prisoners' medical care class actions. *See, e.g., Parsons,* 754 F.3d at 686 ("It does not matter than the named plaintiffs may have in the past suffered varying injuries or that they may currently have different healthcare needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every other class member." (Citation omitted.)); *Smentek v. Sheriff of Cook County*, No. 09-C-529, 2010 WL 4791509, at *7 (N.D. Ill. Nov. 18, 2010) (injunctive class certified regarding inadequate provision of dental care); *Clarke*, 267

38

F.R.D. at 197 (named plaintiff's inadequate health care claim typical of the claims of the class he sought to represent); *Riker*, 2009 WL 910971, at *3-4 (prisoners' claims of inadequate health care typical of class claims); *Lambertz-Brinkman*, 2008 WL 4774895, at *2 (female prisoners' claims of inadequate health care typical of class claims); *Robert E. v. Lane*, 530 F. Supp. 930, 942 (N.D. Ill. 1981) (prison health care claims typical where plaintiffs sought to certify class based on allegations of "systemic behavior and harm").

### D.    Fairness And Adequacy Of Representation

Rule 23(a)(4) requires a determination that the class representatives will fairly and adequately represent the interests of the entire class.  Satisfaction of this element turns on two inquiries -- whether the named plaintiffs have interests conflicting with those of absent class members; and whether class counsel are competent to conduct the class action and fairly represent the interests of the class.  *McGlothlin*, 142 F.R.D. at 633.  Here, plaintiffs do not have any interests in conflict with the interests of the members of the class they seek to represent. Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole -- a declaratory judgment and an injunctive order requiring the Defendants to provide the constitutionally-required level of care sufficient to meet the serious medical needs of *all* FCCW prisoners, present and future.  Moreover, each of the named plaintiffs understands and fully accepts her responsibility as a class representative to vigorously prosecute this case in furtherance of her own interests and the interests of the class as a whole.

Plaintiffs are represented by experienced and qualified counsel who are competent to conduct this action and fairly represent the interests of plaintiffs and the class as a whole.  (*See* Ex. 52, T. Howard Decl.; *see also* Ex. 53, M. Bauer Decl.; *see also* Ex. 54, Deborah Golden Aff.) The Legal Aid Justice Center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs are well-known and highly respected public interest legal services

organizations with substantial experience with respect to and involvement in civil rights litigation, including class actions, in Virginia and, as regards the Washington Lawyers' Committee, other jurisdictions. Those two organizations are joined as co-counsel by the Washington, D.C. law firm of Wiley Rein LLP, which is representing the Plaintiffs in a pro bono capacity. Wiley Rein, a firm of more than 275 attorneys, has a national reputation for competency in complex civil litigation matters and its lead counsel in this case has significant experience in prisoners' civil rights cases and class actions. Accordingly, the requirements of Rule 23(a)(4) are clearly satisfied here.

## II. THIS CASE IS PROPERLY MAINTAINABLE AS A CLASS ACTION PURSUANT TO FED. R. CIV. P. 23(b)(2)

Plaintiffs seek certification of this case to proceed as a class action pursuant to the provisions of Rule 23(b)(2), which indicates that certification is proper where:

> [t]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

This standard is plainly met here. Plaintiffs' amended pleadings allege that the Defendants have provided deficient medical care, or failed to provide medical care under circumstances in which it is plainly warranted and needed, on a systemic basis that jeopardizes the continuing health and well-being of Plaintiffs and all other prisoners residing or who will reside at FCCW. If Plaintiffs ultimately prevail on the merits of their claims, the resulting declaratory and injunctive relief to be ordered by this Court will likewise apply to and benefit all members of the proposed class. Thus, as the leading commentators on class action practice and procedure have recognized, this is precisely the type of case for which class certification pursuant to Rule 23(b)(2) was intended:

> Rule 23(b)(2) was drafted specifically to facilitate relief in civil rights suits. Most class actions in the constitutional and civil rights areas seek primarily declaratory and injunctive relief on behalf of the class and therefore readily satisfy the Rule 23(b)(2) class action criteria.

8 Conte & Newberg, *supra*, § 25.20 at 550 (citations omitted). *See generally Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 (4th Cir. 2006) ("Rule 23(b)(2) was created to facilitate civil rights class actions.").

Consistent with this principle, federal courts have routinely certified Rule 23(b)(2) classes in cases involving constitutional claims of prisoners alleging inadequate medical care and seeking injunctive relief. *See, e.g., Parsons*, 754 F.3d at 688-89 ("[B]y allegedly establishing systemic policies and practices that place every inmate in ADC custody in peril, and by allegedly doing so with deliberate indifference to the resulting risk of serious harm to them, the defendants have acted on grounds that apply generally to the proposed class . . . rendering certification under Rule 23(b)(2) appropriate."); *accord Clarke*, 267 F.R.D. at 198; *Riker*, 2009 WL 910971, at *5; *Lambertz-Brinkman*, 2008 WL 4774895, at *4; *Hilton v. Wright*, 235 F.R.D 40, 53 (N.D.N.Y. 2006); *Bradley*, 151 F.R.D. at 427; *see generally* 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1776.1 at 111-12 (3d ed. 2005) (citing cases). The same outcome is plainly warranted and appropriate here.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted.

DATED:        August 14, 2014

Respectfully submitted,

Mary C. Bauer, VSB No. 31388
(mary@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Angela Ciofi, VSB No. 65337
(angela@justice4all.org)

41

Erin M. Trodden, VSB No. 71515
(erin@gustice4all.org)
Ivy A. Finkenstadt, VSB No. 84743
(ivy@justice4all.org)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553

     and

Deborah M. Golden (admitted *pro hac vice*)
(Deborah_golden@washlaw.org)
Elliot Mincberg
D.C. PRISONERS' PROJECT OF
THE WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

     and

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000


By:      ***/s/Brenda E. Castañeda***
     Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of August, 2014, true and correct copies of

Plaintiffs' Memorandum in Support of Their Motion for Class Certification, with supporting

Exhibits, were served electronically upon the following:

> J. Michael Parsons, Esq., AAG II
> OFFICE OF THE ATTORNEY GENERAL
> Public Safety and Enforcement Division
> 900 East Main Street
> Richmond, VA  23219
> (jparsons@oag.state.va.us)
>
> Attorneys for the Virginia Department of Corrections
> Defendants

_____*/s/Brenda E. Castañeda*_____
Brenda E. Castañeda

43