CYNTHIA B. SCOTT, ET AL.,

*Plaintiffs*,

v.

HAROLD W. CLARKE, ET AL.,

*Defendants*.

CIVIL ACTION NO. 3:12-CV-00036

**MEMORANDUM OPINION**

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Plaintiffs, all prisoners residing at Fluvanna Correctional Center for Women ("FCCW"), a facility of the Commonwealth of Virginia Department of Corrections (the "VDOC"), filed this action pursuant to 42 U.S.C. § 1983 alleging that Defendants[1] violated Plaintiffs' constitutional rights under the Eighth Amendment to be free from cruel and unusual punishment. Plaintiffs assert that FCCW fails to provide adequate medical care and that Defendants are deliberately indifferent to this failure. Plaintiffs request a declaratory judgment and preliminary and permanent injunctions ordering FCCW to provide adequate medical care to Plaintiffs and all other similarly situated women residing at FCCW.

Plaintiffs filed a motion seeking certification of a class consisting of themselves and all other women who currently reside or will in the future reside at FCCW and who have sought, are currently seeking, or will seek adequate, appropriate medical care for serious medical needs, as contemplated by the Eighth Amendment to the Constitution of the United States.[2] The VDOC Defendants

---

[1] The remaining Defendants, or the "VDOC Defendants," are Harold W. Clarke, the Director of the VDOC; David Robinson, VDOC's Chief of Corrections Operations; Frederick Schilling, VDOC's Director of Health Services; and Phyllis A. Baskerville, the Warden at FCCW. I will also refer to Defendants as "the VDOC."

[2] This case was filed in July 2012. I have denied several motions to dismiss, and I awarded attorneys' fees
(continued...)

responded in opposition to Plaintiffs' motion, but do not contest the showings made by Plaintiffs with respect to each element of Rule 23(a), or controvert Plaintiffs' arguments as to why this action is properly certified pursuant to Rule 23(b)(2), and to the extent the VDOC Defendants challenge the merits of Plaintiffs' claims, a determination of the propriety of class certification (absent circumstances not present here) does not turn upon an assessment of the merits of the putative class's claim.

At the conclusion of the hearing in this matter, I stated that I would grant Plaintiffs' motion. As described more fully herein, Plaintiffs present fully developed legal arguments and a record in support of their factual assertions that meet the threshold standards for class certification established in Rule 23(a) of the Federal Rules of Civil Procedure, and I am satisfied that, in accordance with Plaintiffs' requests for declaratory and injunctive relief, the matter is appropriate for certification under Rule 23(b)(2).

## I.[3]

### A.

Operated by the VDOC, FCCW houses approximately 1,200 women, a majority of whom are 35 years of age or older and are serving median sentences of twenty years. FCCW includes a medical building in which medical, dental, and mental health services are provided. FCCW is the prison within the VDOC system purportedly able to provide the most complete medical care to

---

[2](...continued)
to Plaintiffs upon resolution of a discovery dispute in Plaintiffs' favor. I recently heard the parties' cross-motions for summary judgment, and I will issue my opinion regarding those motions in the near future.

[3] The factual allegations recounted herein are generally supported by the record that has been developed so far; however, they are not conclusions for the purpose of summary judgment.

women prisoners, and it is where women with serious medical problems are sent in the first instance, or to which they are transferred from other VDOC facilities for the purpose of receiving a supposedly "heightened" level of care.

Since FCCW opened in 1998, the VDOC has contracted with outside medical providers for health care at the facility. Since at least November 2011, a frequently changing series of private, for-profit corporations have contracted to provide almost all medical, dental, and mental health services to the women at FCCW, with limited exceptions for services provided directly by the VDOC. The new contractor generally re-hires the medical personnel employed by the prior contractor. Frederick Schilling, the VDOC's Health Services Director, testified that the price bid is the primary factor in the selection of the winning contractor from among competing bidders. Regarding the procurement process that resulted in Armor's replacement of Corizon in 2011, he stated, "The number one difference [between the winning and losing bidder] was price."

Beginning in 2011, the VDOC sought bids for the FCCW contract based on "capitated financing," in which the contractor sets up a pricing schedule that fluctuates monthly, based on the facility's average daily population. "Capitated financing" allows the VDOC to predict, with some degree of certainty derived from population forecasts, how much it will spend on medical care over the life of the contract. Prior to the 2011 change, contracts were based upon a risk/reward-sharing model, under which the VDOC and the private contractor shared equally in the risk that medical expenses might exceed expectations (up to a certain pre-determined level, where 100% of the risk falls back upon the VDOC).

Under the capitated financing scheme, also known as a "full-risk contract," the contractor bears the full risk that health care costs may exceed the per prisoner price dictated by the pricing

-3-

schedule in the contract.[4]  The capitated financing model was used in the 2011 contract, the 2013 contract, and the new contract that is supposed to have gone into effect on October 1, 2014.  The contractor using the capitated system receives a fixed amount of money per prisoner, and its profit increases as the cost of care it provides to the prisoners decreases, regardless of how much or how little care is provided to the prisoners.

The VDOC promulgates standard operating procedures for the provision of health care within its prisons, including those prisons, such as the FCCW, where health care services are rendered by private contractors.  Private contractors – for example, Corizon Health, Inc. ("Corizon") and Armor Correctional Health Services, Inc. ("Armor") (collectively, the "contractors"), both of which were formerly defendants in this case – have their own procedures, but they must also follow the VDOC's procedures.  Additionally, a contractor's doctors must use the VDOC formulary for prescribing medication.  Although a series of private health care contractors has come and gone in rotating fashion during the sixteen years since FCCW opened, the policies, practices, and many of the personnel providing care have largely remained the same.  According to individual health care providers who have worked at FCCW, a change of contractor only rarely causes a substantive change in the provision of care; rather, only certain administrative procedures and the nature or volume of paperwork actually change.

### B.

The warden at FCCW is the highest-ranking VDOC official at the facility.  The warden has authority over all staff, including medical personnel.  Even when there is a private medical contractor, the warden remains ultimately responsible for the operation of the facility, including

---

[4] There are some narrow exceptions where the VDOC bears the full cost, e.g., for treatments related to the hepatitis C virus, HIV/AIDS, and hemophilia.

health care treatment and security. The VDOC determines the medical accommodations prisoners may receive, and medical staff has no authority to override VDOC criteria.

Plaintiffs allege that directives from VDOC security staff are arbitrary, with a medical-condition accommodation being permitted one day and then deemed impermissible the next. For example, doctors were once permitted to write "medical profiles" prescribing bathroom access for women with incontinence, but those have now been prohibited by VDOC security staff. Dr. David MacDonald, the medical director at FCCW for approximately five years, testified as follows: "The warden *in particular asked me to stop writing profiles for bathroom privileges* and [stated] that they [VDOC correctional staff] would handle that necessity." (Emphasis added.) Similarly, doctors formerly prescribed extra toilet paper for women with incontinence or excessive menstrual or rectal bleeding, but they are no longer permitted to do so. Plaintiffs claim that, as a result, prisoners are confronted with the choice between soiling themselves or being disciplined for "inappropriate bathroom usage."

According to Plaintiffs, the VDOC's policies and practices permit decisions by non-medical staff to trump the medical staff's treatment protocols. For example, security concerns have been raised to justify limiting the time within which a prisoner can be sent out for an appointment to see an outside medical provider. Security staff decisions also limit prisoners' access to health care even within the facility. For instance, one VDOC report reviewing medical operations at FCCW recounts with concern an incident in which a prisoner with a broken ankle suffered for several weeks without treatment, and missed an appointment at least once because, "[p]er the LT [lieutenant], the offenders can only come over for medical appointments on Friday." Nurse Woodson, who ran "sick call" at FCCW for many years, states that she experienced difficulty seeing patients for scheduled appointments during lockdowns.

-5-

Plaintiffs claim that the VDOC provides little supervision of the privately-provided care at FCCW, and that the VDOC provides little or no follow-up when it identifies deficiencies. Prior to May 2013, a VDOC regional nurse periodically visited FCCW, while more recently, the VDOC has used "contract monitors," who visit the facilities regularly, review medical charts, and grade the contractor's compliance using a series of metrics selected by the VDOC. The VDOC instituted the contract monitoring system when Corizon took over the health care contract from Armor in May 2013. Having selected Corizon as the lowest bidder on the contract, the VDOC determined that monitors were necessary to make sure Corizon provided care that met VDOC standards.

Catherine Thomas, the head Contract Monitor for the VDOC, is a registered nurse ("RN") with over 40 years of experience. The VDOC assigned Ms. Thomas to develop monitoring tools based on VDOC policies and procedures. David Robinson, Chief of Corrections Operations at the VDOC, did not give Ms. Thomas any direction with regard to how she should develop those standards. According to Mr. Robinson, no VDOC policy specifically governs compliance or noncompliance with the contract for health services. Even so, Ms. Thomas relied on VDOC policies and procedures to develop the monitoring criteria, in consultation with Fred Schilling, the lead administrator for health services. Mr. Schilling is an administrator and does not have training as a medical care provider. The policies from which Ms. Thomas developed the monitoring tools deal with day-to-day operations of health services delivery, and not with specific illnesses or patient outcomes. The tools themselves monitor compliance in a number of areas based upon selection and review of a sample of patient charts, which are then scored. According to Ms. Thomas, the VDOC has determined that a compliance level of 80% is an acceptable score, because this is the compliance level targeted by VDOC facilities in the VDOC's continuous quality improvement process. Scores regarding different aspects of care are combined and, thus, given the nature of averages, a

-6-

consolidated measure can return an overall compliance score greater than 80%, even though particular components of the measurement fall well below 80% (by the VDOC's own standards).

Ms. Thomas compiles monthly reports from the site monitors and sends those reports to various VDOC and private contractor officials. If the contractor falls short on any particular metric, it is then up to the contractor to create a quality improvement plan. Neither the Medical Director at FCCW nor any official with the private contractor, *e.g.*, Corizon's Regional Medical Director, regularly receives the reports. For example, Ms. Thomas keeps copies of reports when the contractor provides them, but does not share them with Mr. Schilling or Mr. Robinson at the VDOC. Ms. Thomas testified that, to her knowledge, no penalties are imposed on the contractor for non-compliance. For example, when monitoring reports identified serious flaws in pharmacy operations for over six months and lengthy backlogs in appointments with physicians, VDOC supervisors left it to the contract monitors to address these issues with the contractor, and the VDOC never contemplated any action to impose a default under the contract.

### C.

All VDOC inmates, including the women incarcerated at FCCW, are required to use the administrative grievance procedure developed by the VDOC in order to seek resolution of their medical issues and concerns. Plaintiffs allege that, although the VDOC receives many prisoner grievances regarding medical issues at both the institutional level and at VDOC headquarters, the VDOC has systematically failed adequately to respond to prisoner grievances regarding insufficient medical care, and the VDOC similarly refuses to use the process to identify larger systemic issues that merit attention and corrective action. In Plaintiffs' view, the VDOC grievance system, at least as it is administered at FCCW, is used not to resolve grievances, but to prevent grievances from advancing by imposing an arbitrary and capricious bureaucratic burden on an inmate who avails

-7-

herself of the grievance process.

Plaintiffs' expert, Dr. Robert Greifinger, a physician licensed by the State of New York, has extensive experience in correctional healthcare, including the following: managing the provision of medical care at Riker's Island, New York City's main jail complex, from 1987 to 1989; serving for six years as the Chief Medical Officer for the New York State Department of Corrections, where he had overall responsibility for the provision of all inmate health services for a system involving 68,000 prisoners; serving as a court-appointed monitor overseeing medical care in the jails in Philadelphia, Pennsylvania; Fulton County, Georgia; DeKalb County, Georgia; Albuquerque, New Mexico; and for the State of Alabama's women's prison from 2006 to 2009. Dr. Greifinger is currently the court-appointed monitor regarding medical care at the Metropolitan Detention Center in Albuquerque as well as at the Orleans Parish Prison in New Orleans, Louisiana, and he monitors multiple jail and prison correctional healthcare systems on behalf of the Civil Rights Division of the United States Department of Justice. Additionally, he serves as a consultant to the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security.[5]

Dr. Greifinger's report supports Plaintiffs' allegations that FCCW's responses to individual prisoner grievances at the institutional level do not address serious health care concerns when they are raised. For instance, Dr. Greifinger described the responses to Plaintiff Cynthia Scott's grievances regarding "valid" medical complaints as "highly dispassionate and bureaucratic." He continued:

> There are frequent responses that just say she filled out the wrong kind of form or her

---

[5] Dr. Greifinger has authored or co-authored dozens of articles addressing correctional medicine published in peer-reviewed journals; and is the editor of, as well as the author of one chapter in, the Second Edition of *Clinical Practice in Correctional Medicine* (2006). He has been found qualified to testify as an expert witness with respect to correctional medical care standards and practices by courts in more than 60 cases from 2000 to the present.

-8-

complaint is too late to consider. Responses to grievances and complaints that indicate a need for urgency, such as medication lapses, are frequently not answered until ten days after the form was submitted. A few responses acknowledge the problems. One answer was redacted! . . . [M]ost are unresponsive to her pleas for information and timely access to care.

(Internal citations omitted.) Reviewing "the medical care for Plaintiffs Cynthia B. Scott, Bobinette D. Fearce, Marguerite Richardson and Rebecca L. Scott (Plaintiffs)," Dr. Greifinger "found persistent and systematic barriers to access to an appropriate level of care and to care ordered by physicians for these patients . . . . Each of them has serious medical needs. The Defendants in all cases were aware of these serious medical needs."

Dr. Greifinger observed "a remarkable consistency to the complaints among the Plaintiffs and between the complaints of the Plaintiffs and the unnamed proposed class members." Outlining "critical barriers to appropriate care for the Plaintiffs," Dr. Greifinger discussed

the patterns and practices that have caused actual harm . . . and the risk of harm to each of the Plaintiffs caused by systematic failures in the sick call process; failure to provide timely delivery or administration of prescribed medication; delays in diagnosis and treatment including failures to refer or undue delay in referring to outside specialists; failure to carry out specialists' prescribed courses of treatment; denial of an appropriate level of care; failure to accommodate disability; and punishment for disability.

(Paragraph numbering and internal citations omitted.)

Significantly, Dr. Greifinger concluded that "[e]ach of the Plaintiffs filed numerous complaints, grievances, and appeals, putting the Defendants on notice of the deficiencies in care." (Internal citations omitted.) He continued:

Many of the responses to these notices were unnecessarily bureaucratic or callous, e.g., wrong form. This kind of response is alienating and it foments distrust and disrespect.

Some of the grievance "responses" are notably unresponsive. For example, Bobinette Fearce filed a grievance regarding failure to follow the UVA [University of Virginia Hospital Medical Center] recommendation for a referral to a cardiologist. The response was categorized as unfounded because FCCW physicians had not ordered it. I wonder why, then, the FCCW physician referred her to the ER. There is no clinical

-9-

justification in the record to decline to follow through on the UVA ER physician's recommendation. Another example is Margaurite [*sic*] Richardson's request for a liver biopsy based on the UVA consultant's recommendation. The response in this case was that liver biopsies are no longer the standard of practice. One wonders why FCCW physicians would send a patient to a specialist, only to reject that specialist's recommendation. In fact, while there are other screening tests that have become available to use prior to biopsy, in Ms. Scott's [*sic*] particular case, I expect that the gastroenterologist at the tertiary care center knew more about what was appropriate for this individual patient than the grievance officer.

(Paragraph numbering and internal citations omitted.)

Notwithstanding numerous examples of cursory, bureaucratic, or inadequate responses to prisoner medical grievances, Warden Brown testified that she gives the grievance system at FCCW "an A+."

According to the VDOC Defendants' own expert, Ron Angelone, a former VDOC Director himself, a grievance response is adequate if "it is answered in a timely manner and neither avoids or ignores the issues of the complaint or grievance." Dr. Greifinger describes Mr. Angelone's view as "simplistic and bureaucratic," writing that,

[t]hrough [Mr. Angelone's] lens, the resolution of real deficiencies in a correctional facility's provision of medical care is outside his visual field. . . . The standards for medical care in prison are timely access to an appropriate level of care and care that is ordered by a physician. To my knowledge, there is no standard of medical care in prison that is satisfied by *trying hard*.

(Emphasis added.)

The record shows the following regarding the review of medical grievances. Mr. Schilling testified that he sends Level 2 medical grievances to the VDOC's Dr. Amonette for review, but Dr. Amonette stated that he does not review the Level 2 grievances; instead, the reviews are performed by Howard Ray, a nurse in Mr. Schilling's office. In turn, Mr. Ray rarely consults with Dr. Amonette, and Dr. Amonette testified that no VDOC physician regularly reviews Level 2 grievances concerning medical care. Mr. Schilling testified that complaints do not raise a red flag as long as

-10-

they are determined to be unfounded. When Schilling was asked, "The fact that you've [hypothetically] gotten 50 Level 2 grievances with regard to the same problem within a two-month period, wouldn't in and of itself raise any red flag?" he replied, "No."

Dr. Greifinger reports that the VDOC's failure to review the substance of prisoner complaints results in the dismissal of legitimate complaints and grievances without correcting problems. Dr. Greifinger observed that

> Schilling testified that grievance data were not routinely analyzed . . . . He also testified to what I consider a perverse understanding of the grievance process, *i.e.*, *even if a grievance correctly identifies a problem, it will still be called "unfounded" if the health staff solely tried to prevent the problem or provided a wholly untimely response* . . . . This perverse definition of "unfounded" and the reluctance to analyze grievance data is an example of the "head in a sand" approach to legitimate complaints and grievances.

(Emphasis added; internal citations omitted.)

Dr. Greifinger concludes that "[t]he failure to respond appropriately to complaints, grievances, appeals, and even lawyers' letters indicates an obstinacy to provide timely access to an appropriate level of care."

### D.

Plaintiffs allege that FCCW inmates have suffered and continue to suffer the consequences of a host of serious, systematic failures in medical care, and that these failures have placed the Plaintiffs and other inmates who access FCCW medical care at risk of serious harm, deterioration in their health, and even death. Plaintiffs further allege that the deficiencies in medical care have caused serious harms and fatalities in the past. As I have observed in previous opinions in this case, the allegations in the complaint were well-pleaded, and the allegations in the instant motion support the merits of Plaintiffs' class allegations of the VDOC's general, systemic failure to treat serious medical conditions at FCCW. I will repeat only a few of the examples.

-11-

Plaintiffs allege that FCCW inmates must negotiate arbitrary roadblocks both in requesting and accessing medical care, and in receiving diagnoses and treatment for their serious medical conditions. Plaintiffs present, for example, FCCW's sick call process, the principal means by which prisoners request and access medical care. According to Plaintiffs, sick call is often significantly backlogged and fails to diagnose and treat serious conditions in a timely way. Often the nurses who preform triage screening of sick call requests are not registered nurses, but are licensed practical nurses (with less medical training), and the VDOC's own contract monitors have noted substantial delays in the processing of sick call requests. Under these circumstances, FCCW prisoners face a substantial risk that their serious medical issues will be overlooked or not treated in time to avoid harm.

The situation of Plaintiff Cynthia Scott is illustrative. Ms. Scott experienced swelling in her left leg and initiated a series of sick calls – sometimes two or three sick calls a week – to determine the cause, but nothing was done to help her. Even after Dr. Donald Remaly examined her and referred her to the University of Virginia Hospital Medical Center ("U.Va.," or "UVA") for an ultrasound, the Medical Director rescinded that order, delaying the ultrasound until the service could come to FCCW. However, when the service came to FCCW and the ultrasound procedure was begun, the ultrasound technician found a blood clot, quickly halted the procedure, and ordered that Ms. Scott be immediately taken to the U.Va. emergency room. By the time Ms. Scott arrived at U.Va., further ultrasound diagnosis determined that part of the blood clot had traveled to her lungs, a very serious development that placed her life at risk.

Similarly, Plaintiff Marguerite Richardson made numerous sick call visits, beginning in the spring of 2011, regarding painful sores and boils on the back of her leg, but she received no effective treatment until a nurse belatedly reviewed the results of previously conducted lab tests and informed

-12-

her that she had Methicillin-resistant Staphylococcus aureus (MRSA), which is a highly contagious form of bacterial infection that may be fatal if left untreated.

Even after prisoners are seen by a provider, Plaintiffs allege that FCCW medical staff routinely fail to diagnose and treat serious medical problems. For example, Dr. MacDonald testified that VDOC guidelines did not indicate that treatment for Marguerite Richardson was warranted, despite the fact that she had Hepatitis C, elevated liver enzymes, and a painful, swollen torso. As Dr. Greifinger noted, "[t]here is no documentation in the medical record that the health staff at FCCW ever considered Ms. Richardson for treatment [for Hepatitis C] *when she was within the window of opportunity for this treatment . . . She was denied treatment for a condition that is curable in many patients . . . ,*" and as a result *she now has signs of cirrhosis and decompensated liver failure.* (Emphasis added.)

Other prisoners at FCCW have similarly been placed at risk by the failure to diagnose and treat their conditions. For example, prisoner B.S.[6] experienced intense lower back pain in May 2012. She sought treatment at the FCCW infirmary. She was sent to U.Va., where she was treated for pneumonia and released. The pain continued for several more months and B.S. begged for help from doctors at FCCW. Finally, in November of 2012, she was sent again to U.Va., where she was diagnosed with osteomyelitis, a spine infection. The infection had continued for so long at that point that the tissue between her spinal discs had completely deteriorated.

Prisoner M.W. repeatedly complained of pain and numbness in her right foot. Her complaints were not adequately addressed, and her diabetes-related circulation problems worsened, ultimately resulting in the amputation of her right foot and the lower part of her leg. The stump became

---

[6] Prisoners who are not named plaintiffs, but who have submitted declarations describing the medical failures they have experienced, are referred to here by their initials.

-13-

infected – Plaintiffs allege that the infection "arguably" was the result of inadequate wound care at FCCW – and it was necessary for M.W. to undergo a second amputation above her knee.

Plaintiffs allege that FCCW has a policy and practice of failing to schedule or send prisoners to see outside specialists in a timely manner. As recently as March 2014, requests made under the utilization management process, which is used to approve offsite provider visits and tests, took up to three weeks or longer just to be approved. As of May 27, 2014, referrals to outside providers that were considered urgent still took a week or more to be approved. However, these delays are modest compared to some of the documented delays that named Plaintiffs have experienced. For example, doctors at U.Va., treating Cynthia Scott for sarcoidosis, were concerned about the results of Ms. Scott's EKG and ordered a follow-up MRI. Ms. Scott did not undergo the MRI for another six weeks. Similarly, on August 22, 2013, Dr. Sylvia McQueen ordered a colonoscopy for Plaintiff Bobinette Fearce. *As a Corizon vice president at the time, Dr. McQueen was not subject to the utilization management approval process and directly approved the colonoscopy order herself.* Still, Ms. Fearce did not have the colonoscopy until February 22, 2014, six months after it was ordered.

Plaintiffs allege that other prisoners at FCCW have also experienced substantial delays in seeing outside providers for treatment and tests. For example, prisoner C.R. experienced several episodes of throwing up blood, and in late February 2014, physicians at U.Va. informed her that she had an ulcer caused by damage from the drugs she was taking (ibuprofen and Lovenox[7]), and that she should return in two months for a gastrointestinal scope. As of May 20, 2014, FCCW had not sent C.R. for this examination. Similarly, prisoner A.C. has suffered consistent, daily rectal

---

[7] Lovenox is a trade name for enoxaparin sodium, an anticoagulant used, among other things, to prevent and treat deep vein thrombosis or pulmonary embolism. *See* http://en.wikipedia.org/wiki/Enoxaparin_sodium (last accessed October 16, 2014).

bleeding, with blood flow similar to a heavy menstrual period, during the time she has been incarcerated at FCCW. Beginning in 2013, she has received repeated advice to her *from doctors at FCCW* that she needs to be referred for corrective surgery. As of April 23, 2014 (the date of her declaration), she had received no further treatment for the condition.

Plaintiffs allege that, even after prisoners have seen outside providers for specialized diagnosis and treatment, FCCW staff, following the VDOC's policies and practices, ignore or refuse to follow the treatment orders of those outside providers. Dr. Paul Ohai, who worked for both Corizon and Armor (for the latter as a Regional Medical Director), testified as follows that, under either Corizon or VDOC policy, the physician at the prison is expected to review and change a specialist's orders:

> Q. So when the prisoner returns to the prison, the physician at the prison would review the specialist's orders?
>
> A. That's correct.
>
> Q. And that physician might change some of the orders?
>
> A. As per policy, he's expected to. Either Corizon or DOC policy, he's supposed to. That's part of his job.

As previously mentioned, a U.Va. specialist recommended Plaintiff Marguerite Richardson for a liver biopsy, and she filed a grievance when FCCW failed to send her for the biopsy pursuant to the specialist's recommendation. In response to her grievance, FCCW staff told her the procedure had been denied because liver biopsies are "no longer the standard of practice." However, as Dr. Greifinger observed, "[o]ne wonders why FCCW physicians would send a patient to a specialist, only to reject that specialist's recommendation . . . in Ms. Richardson's particular case, I expect the gastroenterologist at the tertiary care center knew more about what was appropriate for this

-15-

individual patient" than did the individual responding to the grievance.[8]

The declarations of other prisoners suggest that Ms. Richardson's case is not isolated, and Plaintiffs allege that numerous other FCCW prisoners have seen the treatments prescribed by off-site specialists ignored or modified. In particular, D.S.'s HIV specialist recommended that her HIV medication be switched from Atripla to Stribild due to the adverse mental health effects of Atripla. Her medication was not changed for two months because FCCW "wanted to use up all the old Atripla pills" before changing medications. Similarly, B.E.G.'s surgeons placed an expander in her chest following her mastectomy for breast cancer, and the expander was supposed to remain for only six months. B.E.G. has never been sent for follow-up to have the expander removed and to receive reconstructive surgery, despite the fact that her mastectomy took place in 2012. Furthermore, after a heart attack in September of 2012, B.E.G. was seen by a cardiologist who recommended an outside appointment for a heart test using a halter monitor, but she has not received a halter monitor, either.

Plaintiffs allege that the VDOC's policies and practices deny needed accommodations to prisoners at FCCW with disabilities and serious medical conditions. For example, cells at FCCW are not equipped with toilets, so prisoners must leave their cells to use the bathroom. At times when the cells are locked, such as during the daily counts or at night, prisoners cannot leave their cells to use the bathroom without obtaining permission from security. As previously mentioned, medical staff formerly issued profiles allowing prisoners with incontinence or other medical conditions to use the bathroom as needed, but as Dr. MacDonald testified, "[s]ecurity said it was an onerous aspect for them to carry and they would rather take care of it on their own without profiles. So I

_____

[8] It appears that liver biopsies very well may be the standard of practice for hepatitis C patients, such as Marguerite Richardson. "Consensus conference statements recommended liver biopsy in the management of almost all patients with hepatitis C and B." http://en.wikipedia.org/wiki/Liver_biopsy (last accessed October 15, 2014).

stopped writing profiles." As a result, because prisoners like Marguerite Richardson and Bobinette Fearce, both of whom suffer from incontinence, are not allowed access to a bathroom, they sometimes are forced to wet or soil themselves. Similarly, FCCW waited four months to repair or replace the malfunctioning hearing aids upon which plaintiff Rebecca Scott depends. According to Plaintiffs, Rebecca Scott was written up for disciplinary violations because she could not hear announcements given over the intercom.

Plaintiffs allege that numerous other prisoners have been denied needed accommodations for their medical conditions as well. Prisoner L.S.M. has a previous hip injury that requires her to use a cane for balance and a walker outside. Upon L.S.M.'s arrival at FCCW, prison staff took both of these away from her and did not return them for approximately a week. FCCW also forbade L.S.M. from raising more than one medical issue at a time in her sick call requests, denying requests on the ground that she had raised more than one medical issue. D.E. wears a bracelet stating that she is a fall risk, but nonetheless was taken to an off-site oncologist appointment wearing shackles and cuffs without sufficient staff assistance, which caused her to fall and permanently injure her knee. These declarations support the allegations that prisoners across the board at FCCW suffer the consequences of the same series of medical failures that affected and continue to affect the named Plaintiffs.

Plaintiffs allege that, because of the VDOC's policies and practices, FCCW consistently fails to provide medications that prisoners need to treat illnesses or manage pain. The VDOC's own contract monitors have noted major deficiencies on multiple occasions in how medications are ordered, stored, and administered. Long delays are typical in filling prescriptions for medications for chronic conditions such as diabetes, seizures, and cardiac conditions. Moreover, non-formulary medications can take up to a year to be approved. FCCW also fails to provide adequate pain medication to prisoners with severe, chronic conditions such as degenerative joint disease, instead

-17-

telling them to buy over-the-counter medications such as Tylenol through the commissary. These delays and denials can have catastrophic consequences. For example, Plaintiffs allege that I.F., an able-bodied person before her incarceration at FCCW, now uses a wheelchair because she does not receive sufficient anti-inflammatories or pain medications to prevent the swelling and pain in her burn-scarred legs. Similarly, FCCW staff gave T.G. the wrong medications for her Type I diabetes, including being given Metformin and glyburide, which are treatments for Type II diabetics. This causes her diabetes to be very poorly controlled; she is frequently faint, and her vision has deteriorated to the point that she can no longer read small print.

## II.

The deprivation of medical care to which the named Plaintiffs and the class members allege they have been subjected is impermissible under the Eight Amendment's bar to cruel and unusual punishment. "Prisoners are dependent on the State for food, clothing, and necessary medical care. A prison's failure to provide sustenance for inmates may actually produce physical torture or a lingering death" in violation of the Eighth Amendment. *Brown v. Plata*, 563 U.S. ___, ___, 131 S. Ct. 1910, 1928 (2011) (quotations and citations omitted). "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care." *Id*. Here, as in *Brown*, "[p]laintiffs rely on systemwide deficiencies in the provision of medical . . . care that, taken as a whole, subject sick . . . prisoners . . . to 'substantial risk of serious harm' and cause the delivery of care to fall below the evolving standards of decency that mark the progress of a maturing society." *Id*. at 563 U.S. at ___ n. 3., 131 S. Ct. at 1925 n. 3 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

As a consequence of their own actions, prisoners may be deprived of rights that are

-18-

fundamental to liberty. But the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons. Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86,100 (1958) (plurality opinion)).

> To incarcerate, society takes from prisoners the means to provide for their own needs. . . . A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in a civilized society.

*Brown*, 563 U.S. at ___, 131 S. Ct. at 1928. Consistent with these fundamental principles, the named Plaintiffs here seek declaratory and injunctive relief, for themselves and on behalf of all women who reside or will reside at FCCW, to prevent a perpetuation of the substandard medical care rendered by the VDOC at the prison on a systemic basis.

Plaintiffs' allegations and evidence in support thereof, as summarized above, presents a case not only that the named Plaintiffs have already suffered harm, but that many other FCCW prisoners have as well, based on the Defendants' provision of inadequate medical care, or even the complete failure to provide care under circumstances in which it was obviously necessary. Moreover, Plaintiffs allege a pattern and practice of deficient care that subjects the named Plaintiffs and all others who are or will be incarcerated at FCCW to an ongoing substantial risk of serious harm in contravention of established Eighth Amendment standards. As discussed more fully below, Plaintiffs meet each requirement for class certification.

## III.

### A.

"[F]ederal courts should give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case best serve the ends of justice

-19-

for the affected parties and . . . promote judicial efficiency." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (quotations and citation omitted). Furthermore,"courts routinely certify class actions involving prisoners, including cases challenging prison health care, mental health care, and dental care." *Flynn v. Doyle*, 2007 WL 805788, at *3 (E.D. Wis. Mar. 14, 2007) (citing cases, certifying a class of "current and future [inmates at Taycheedah Correctional Institution (TCI) in Fond du Lac, Wisconsin], and . . . current and future TCI prisoners who have a disability"); *see also Dean v. Coughlin*, 107 F.R.D. 331, 333 (S.D.N.Y. 1985) (citing cases, and certifying class of "all persons who will be inmates" to challenge inadequate dental care).

### B.

Rule 23(a) provides that

> [o]ne or more members of a class may sue . . . as representative parties on behalf of all members only if:
> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defense of the representative parties are typical of the claims or defense of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs' proposed class satisfies each of these threshold requirements.

### 1. "Numerosity"

With approximately 1,200 women prisoners housed at FCCW who are subject to its medical care system, the proposed class is sufficiently large, on its face, to satisfy the Rule 23(a)(1) "numerosity" criterion.

Joinder of all FCCW prisoners would be impracticable. "Impracticable," for the purposes of Rule 23, does not mean "impossible"; rather, Plaintiffs must show that the number of allegedly affected individuals is sufficiently large that "[i]t would be extremely difficult or inconvenient to join all the members of the class." *See generally* 7A Charles A. Wright, Arthur R. Miller & Mary

-20-

Kay Kane, *Federal Practice and Procedure* § 1762 at 176 (3d ed. 2005) (footnote omitted); *see also* 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:3 at 225 (4th ed. 2002) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."). In general, if a proposed class size exceeds 25 plaintiffs, joinder is usually presumed impracticable. *Talbott v. GC Servs. Ltd. P'ship*, 191 F.R.D. 99, 102 (W.D. Va. 2000); *see also Knight v. Lavine*, 2013 WL 427880, at *2 (E.D. Va. Feb. 4, 2013) ("The Fourth Circuit has affirmed certification for classes as small as 18 people.") (citing *Cypress v. Newport News Gen. and Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967)).

"Furthermore, other factors weigh in favor of finding that numerosity is met here, including the fluidity of prison populations and [individual] prisoners' lack of access to counsel." *Riker v. Gibbons*, 2009 WL 910971, at *2 (D. Nev. Mar. 31, 2009); *see also Clarke v. Lane*, 267 F.R.D. 180, 195 (E.D. Pa. 2010) (numerosity requirement satisfied by class of residents of facility holding up to 300 prisoners at a time); *Lambertz-Brinkman v. Reisch*, 2008 WL 4774895, at *1 (D. S.D. Oct. 31, 2008) ("Because the class includes future inmates, I find that joinder of all members would be impracticable."); *Dean*, 107 F.R.D. at 332-33 ("The fluid composition of a prison population is particularly well-suited for class status, because, although the identity of the individuals involved may change, the nature of the wrong and the basic parameters of the group affected remain constant.").

### 2. "Commonality"

Rule 23(a)(2) requires Plaintiffs, as movants, to demonstrate that "there are questions of law or fact common to the class" that they seek to represent. While "[t]he requirement that questions of law or fact must be common to the class is to be liberally construed," *see McGlothin v.*

-21-

*Connors*, 142 F.R.D. 626, 632 (W.D. Va. 1992), a rigorous assessment of whether the Plaintiffs

satisfy the "commonality" element of Rule 23(a) is mandated by the decision of the Supreme Court

of the United States in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, ___, 131 S. Ct. 2541 (2011).

Under *Wal-Mart*, "[c]ommonality requires Plaintiffs to demonstrate that the class members 'have

suffered the same injury' . . . not . . . merely that they have all suffered a violation of the same

provision of law." 564 U.S. at ___, 131 S. Ct. at 2551 (citing *Gen. Tel. Co. of Southwest v.

Falcon*, 457 U.S. 147, 157 (1982)). Thus, Plaintiffs' claims "must depend upon a common

contention . . . of such a nature that it is capable of classwide resolution – which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke." *Wal-Mart*, 564 U.S. at ___, 131 S. Ct. at 2551. "'What matters to class

certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive

the resolution of the litigation.'" *Id.* (citing Nagareda, *Class Certification in the Age of Aggregate

Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis in original)); *see also Gray v. Hearst Commc'ns,

Inc.*, 444 Fed. App'x 698, 700 (4th Cir. 2011); *cf. Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105,

113 (4th Cir. 2013).

Notwithstanding the heightened scrutiny prescribed by *Wal-Mart* to be applied to the

"commonality" requirement, it remains clear that "'[e]ven a single [common] question'" of law or

fact will suffice to satisfy the requirements of Rule 23(a)(2). *Wal-Mart*, 564 U.S. at ___, 131 S. Ct.

at 2556 (citation omitted). In addition, *Wal-Mart* principally involved claims for damages as to

which certification was sought under Rule 23(b)(3), while the commonality element is more easily

established in proposed class actions seeking injunctive or declaratory relief, such as the instant

case. Indeed, "suits for injunctive relief by their very nature present common questions of law and

fact." *McGlothlin*, 142 F.R.D. at 633; *see generally* 1 Conte & Newberg, *supra*, § 3:10 at 277-78

-22-

("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected."). Plaintiffs' allegations meet the requirements of the post-*Wal-Mart* analytical framework for determining "commonality."

The essential questions in this case – questions of fact and questions of law – do not vary among class members.

Common questions of *fact* include the following: (a) whether the VDOC's contract system permits improper cost considerations to interfere with treatment of serious medical conditions; (b) whether the VDOC uses specious security justifications to trump treatment or accommodation of serious medical conditions and disabilities; (c) whether the VDOC fails to provide appropriate oversight, training, and supervision of medical care at FCCW; and (d) whether, as a result, the VDOC systematically provides inadequate medical care to the women residing at FCCW.

Common questions of *law* include the following: (a) whether the systemic and pervasive deficiencies in care at FCCW have placed its residents at unreasonable risk of suffering new or worsening physical injury, illness, mental anguish, emotional distress, and the prospect of premature death; and (b) whether the VDOC's policies, procedures, and practices reflect deliberate indifference to the serious medical needs of residents of FCCW such that it has violated their right to be free from cruel and unusual punishment as proscribed by the Eighth Amendment.

Whether VDOC systematically provides inadequate medical care to the women residing at FCCW is a question of fact common to all class members. Plaintiffs have provided declarations from 17 women in addition to the named Plaintiffs demonstrating that their shared experiences with medical care at FCCW have been consistently damaging and traumatic. For the named Plaintiffs to proceed as individual litigants would not make sense. The key factual issues at the heart of

-23-

Plaintiffs' claims of constitutionally deficient medical care do not turn on an individual plaintiff's particular personal health concerns, but rather on FCCW's and the VDOC's alleged systemic failure to provide a level of medical care to all of its residents that complies with constitutional norms. While the claims of the class members must arise from similar practices and be based on the same legal theory, the commonality requirement does not require that all class members share identical factual histories. *See Holsey v. Armor & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) ("Despite the presence of individual factual questions, the commonality criterion of Rule 23(a) is satisfied by the common questions of law presented.").[9]

Numerous courts presented with similar factual circumstances have concluded that the prisoners' claims easily satisfy the Rule 23(a)(2) commonality requirement. *See, e.g., Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). In *Parsons*, the Arizona Department of Corrections sought interlocutory appellate review of a federal district court's decision to certify a class in an action brought by state prisoners alleging deficient medical, dental and mental health care of a systemic nature in the state's correctional facilities.[10] On appeal, the State of Arizona's principal argument was that the district court erred in finding that the prisoners' claims satisfied the "commonality" requirement of Rule 23(a)(2) under the heightened scrutiny mandated by the Supreme Court in *Wal-Mart*. The United States Court of Appeals for the Ninth Circuit rejected the defendants' argument

---

[9] *See generally Knight v. Lavine, supra*, 2013 WL 427880, at *2 (where the primary question presented in ERISA breach-of-fiduciary-duty action was common to all 401(k) plan participant class members, individual issues concerning quantification of their respective losses did not preclude class certification); *Martinez-Hernandez v. Butterball, LLC*, 2011 WL 4549606, at *4 (E.D. N.C. Sept. 29, 2011) (individual distinctions between putative class members regarding impact upon each of defendants' unlawful wage/hour practices did not impede a "commonality" finding in light of court's determination that "this case involves a uniform policy or practice of compensating employees based on their scheduled shifts.").

[10] Coincidentally, medical, mental, and dental health care services are provided to the State of Arizona by Corizon, the VDOC's current contractor. See Parsons, 754 F.3d at 662.

-24-

that the presence of individualized medical injuries defeats class certification, noting that the defendants' position "amounts to a sweeping assertion that, after *Wal-Mart*, Eighth Amendment claims can *never* be brought in the form of a class action." *Id*. at 675-76. The Court of Appeals explained that "[t]he defendants' view rests . . . on a fundamental misunderstanding of *Wal-Mart*, Eighth Amendment doctrine, and the plaintiffs' constitutional claims." *Id*. at 676.

Invoking the Supreme Court's reasoning and holding in *Brown v. Plata*, *supra*, and focusing upon the specific nature and substance of the plaintiffs' claims, the Ninth Circuit concluded that

> [h]ere, a proper understanding of the nature of the plaintiffs' claims clarifies the issue of commonality. What all members of the putative class . . . have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent. As the district court recognized, although a presently existing risk may ultimately result in different future harm for different inmates – ranging from no harm at all to death – every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide ADC policy or practice that creates a substantial risk of serious harm. . . .
>
> The putative class . . . members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke: whether the specified statewide policies and practices to which they are all subjected by ADC expose them to a substantial risk of harm. . . .
>
> The district court thus did not abuse its discretion in deciding to structure the litigation in the form of a class of "all prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC." After all, every inmate in ADC custody is necessarily subject to the same medical, mental health, and dental care policies and practices of the ADC. And any one of them could easily fall ill, be injured, need to fill a prescription, require emergency or specialist care, crack a tooth, or require mental health treatment. It would indeed be surprising if any given inmate did *not* experience such a health care need while serving his sentence. Thus, every single ADC inmate faces a substantial risk of serious harm if ADC policies and practices provide constitutionally deficient care for treatment of medical, dental, and mental health needs. As Justice Kennedy explained in *Plata*, inadequate health care in a prison system endangers every inmate[.]

*Parsons*, 754 F.3d 678-79 (citations omitted).

The reasoning articulated by the Ninth Circuit and the result reached with respect to the "commonality" criterion in *Parsons* are directly applicable here. Plaintiffs allege that the policies and practices at FCCW – *e.g.*, the defective sick call process; FCCW's refusal to refer or undue delay in referring prisoners for specialized care; the failure to maintain continuity in the provision of prescribed, potentially life-sustaining medications; etc. – reflect substandard medical care on the part of the Defendants. Whether these policies and practices place the Plaintiffs and other current and future FCCW prisoners at a substantial risk of serious harm to which the Defendants are deliberately indifferent implicates questions of fact and law common to the entire putative class.

Other district courts have recognized, in the aftermath of *Wal-Mart*, that its analytical regime concerning "commonality" does not serve as a barrier to the certification of class actions in cases involving prisoners' claims alleging a pattern and practice of conduct resulting in unconstitutional conditions of confinement. *See*, *e.g.*, *Jones v. Gusman*, 2013 WL 2458817, at *40-42 (E.D. La. June 6, 2013) (in action brought by residents of Orleans Parish Prison challenging unlawful conditions with respect to safety and security, medical and mental health care, environmental conditions, fire safety and lack of Spanish language translation services, all attributed to Parish Sheriff's systemic policies, court found "commonality" and "typicality" criteria satisfied, *Wal-Mart* notwithstanding); *Hughes v. Judd*, 2013 WL 1821077, at *19-25 (M.D. Fla. Mar. 27, 2013) (in action brought by parents and guardians of juvenile detainees alleging Polk County Sheriff's deliberate indifference to guard-detainee and detainee-detainee violence and to the harm caused to detainees resulting from Sheriff's unlawful policy governing the use of pepper spray in the County Jail, magistrate judge found that all elements of Rule 23(a), including "commonality", were satisfied in light of *Wal-Mart* analysis), report and recommendation adopted as modified on other grounds, 2013 WL 1810806 (M.D. Fla. April 30, 2013); *Butler v. Suffolk Cnty*, 289 F.R.D. 80, 96-101 (E.D. N.Y. 2013)

-26-

(prisoners residing in County correctional facilities brought class action seeking declaratory and injunctive relief challenging systemic adverse environmental conditions resulting from County's alleged policies and practices reflecting deliberate indifference to their health; the district court, over defendants' challenge based on *Wal-Mart*, certified the class, holding that "[w]hether the County was aware of and deliberately indifferent to the conditions at the SCCF is a common question subject to class-wide resolution" (citation omitted)).[11]

### 3. "Typicality"

Rule 23(a)(3) mandates that "the claims . . . of the representative parties [must be] typical of

---

[11] *Accord Chief Goes Out v. Missoula Cnty*, 2013 WL 139938, at *4-*7 (D. Mont. Jan. 10, 2013) (denial of fresh air and outdoor exercise); *Indiana Protection and Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Corrections*, 2012 WL 6738517, at *18 (S.D. Ind. Dec. 31, 2012) (denial of adequate mental health care and excessive use of solitary confinement; "The mentally ill prisoners here, have demonstrated through a wealth of evidence, that the class is united by the common question of whether the lack of treatment and isolated living conditions in IDOC facilities violate the Eighth Amendment."); *Henderson v. Thomas*, 289 F.R.D. 506, 511-12 (M.D. Ala. 2012) (policy pursuant to which HIV-positive prisoners were segregated from remainder of prison population in violation of Americans With Disabilities Act and Rehabilitation Act); *Olson v. Brown*, 284 F.R.D. 398, 410 (N.D. Ind. 2012) ("[I]n this case, Mr. Olson has shown that the [Tippecanoe County Jail's] specific practices relative to the handling (or non-handling) of grievances, opening of legal mail, and restricting access to the law library, have caused the inmates to suffer the same potential injury, which ties all of their jail standards claims together." (Citations omitted.)); *Rosas v. Baca*, 2012 WL 2061694, at *2-5 (C.D. Cal. June 7, 2012) (unlawful policy of failing to prevent deputy-on-inmate and inmate-on-inmate violence in Los Angeles County jail system).

By the same token, *Parsons* confirms the continuing vitality of pre-*Wal-Mart* decisions in which prisoners' claims of deficient medical care of a systemic nature were certified to proceed as class actions. *See, e.g., Clarke*, 267 F.R.D. at 196 ("failure to provide adequate healthcare" is the overarching common factual issue, notwithstanding differences in particular allegations of individual named plaintiffs); *Riker*, 2009 WL 910971, at *3 ("In this case, there are common issues of both fact and law. The common issue of fact concerns the policies and inadequacies Plaintiffs allege inhere in [the prison's] health care system. The common issue of law concerns whether these policies and inadequacies constitute a[n] Eighth Amendment violation."); *Lambertz-Brinkman*, 2008 WL 4774895, at *2 ("All members of the class seek a declaration that an illegal policy and practice exists and an injunction should be issued prohibiting such practice. This is sufficient to establish the requisite commonality."); *Flynn*, 2007 WL 805788 at *4 ("The commonality and typicality requirements are also more easily met when the class members only seek injunctive relief, rather than monetary damages."); *Bradley v. Harrelson*, 151 F.R.D. 422, 426 (M.D. Ala. 1993) ("Though there certainly may be some factual differences between the individual class members and the nature or severity of their illness, such individual differences do not defeat certification because there is no requirement that every class member be affected by the institutional practice or condition in the same way."); *Dean*, 107 F.R.D. at 333 ("[T]he claims of each class member need not be identical to raise common factual and legal questions regarding the adequacy of an entire [prison health-care] system.").

Case 3:12-cv-00036-NKM   Document 188   Filed 11/20/14   Page 27 of 33   Pageid#: 3879

the claims . . . of the class." As the courts have frequently observed, this "typicality" criterion has close conceptual connections to both the Rule 23(a)(2) "commonality" requirement, discussed above, and the Rule 23(a)(4) "adequacy of representation" inquiry, addressed *infra*. The Supreme Court noted as follows in *Wal-Mart*:

> We have previously stated in this context that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement[.]

564 U.S. at ___ n. 5, 131 S. Ct. at 2551 n. 5 (citing *Falcon*, 457 U.S. at 157-58 & n. 13).

Where "[t]he representative party's interest in prosecuting his own case . . . simultaneously tend[s] to advance the interests of the absent class members," the typicality standard is satisfied. *Souter v. Equifax Info. Servs., LLC*, 498 Fed App'x 260, 264 (4th Cir. 2012); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006); *see also Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) (the "named plaintiffs' injuries [need not] be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs, and that the injuries result from the same, injurious course of conduct"); *Rubidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.").

The essential question here is the extent to which the named Plaintiffs, by demonstrating the facts necessary to establish a *prima facie* case on their claims with respect to the systemic deficiencies characterizing the medical care system at FCCW and Defendants' deliberate indifference to Plaintiffs' serious medical needs, "would also prove the claims of the absent class

-28-

members." *Deiter*, 436 F.3d at 467. Here, Plaintiffs have alleged a broad variety of medical problems – diseases, physical afflictions, deteriorating conditions, and chronic pain – that are generally representative of the adverse health issues experienced by the entire prisoner population at FCCW. If Plaintiffs succeed in demonstrating by a preponderance of admissible evidence that the methods and procedures employed by FCCW in responding to their medical problems and concerns fail to pass constitutional muster and are attributable to deliberate indifference on the part of the Defendants, the resulting declaratory and injunctive relief would doubtless benefit the named Plaintiffs and all other FCCW prisoners alike.

Accordingly, the typicality requirement of Rule 23(a)(3) is met here, as numerous other courts have recognized in certifying substantially similar prisoners' medical care class actions. *See, e.g.,* *Parsons*, 754 F.3d at 686 ("[i]t does not matter than the named plaintiffs may have in the past suffered varying injuries or that they may currently have different healthcare needs; Rule 23(a)(3) requires only that their claims be 'typical' of the class, not that they be identically positioned to each other or to every other class member" (citation omitted)); *Smentek v. Sheriff of Cook County*, 2010 WL 4791509, at *7 (N.D. Ill. Nov. 18, 2010) (injunctive class certified regarding inadequate provision of dental care); *Clarke*, 267 F.R.D. at 197 (named plaintiff's inadequate health care claim typical of the claims of the class he sought to represent); *Riker*, 2009 WL 910971, at *3-4 (prisoners' claims of inadequate health care typical of class claims); *Lambertz-Brinkman*, 2008 WL 4774895, at *2 (female prisoners' claims of inadequate health care typical of class claims); *Robert E. v. Lane*, 530 F. Supp. 930, 942 (N.D. Ill. 1981) (prison health care claims typical where plaintiffs sought to certify class based on allegations of "systemic behavior and harm").

### 4. Fairness and Adequacy of Representation

Rule 23(a)(4) requires a determination that the class representatives will fairly and adequately

represent the interests of the entire class. Satisfaction of this element turns on two inquiries -- whether the named plaintiffs have interests conflicting with those of absent class members; and whether class counsel are competent to conduct the class action and fairly represent the interests of the class. *McGlothlin*, 142 F.R.D. at 633. Here, Plaintiffs do not have any interests in conflict with the interests of the members of the class they seek to represent. Plaintiffs do not seek relief for themselves different in quality or character from the relief sought for the class as a whole. Rather, Plaintiffs seek a declaratory judgment and an injunctive order requiring the Defendants to provide the constitutionally-required level of care sufficient to meet the serious medical needs of *all* FCCW prisoners, now and in the future. Moreover, each of the named plaintiffs understands and fully accepts her responsibility as a class representative to vigorously prosecute this case in furtherance of her own interests and the interests of the class as a whole.

Plaintiffs are represented by experienced and qualified counsel who are competent to conduct this action and fairly represent the interests of plaintiffs and the class as a whole. The Legal Aid Justice Center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs are well-known public interest legal services organizations with substantial experience with respect to and involvement in civil rights litigation, including class actions, in Virginia and, as regards the Washington Lawyers' Committee, other jurisdictions. Those two organizations are joined as co-counsel by the Washington, D.C. law firm of Wiley Rein LLP, which is representing the Plaintiffs in a pro bono capacity. Wiley Rein is a firm of more than 275 attorneys that handles complex civil litigation matters, and its lead counsel in this case has significant experience in prisoners' civil rights cases and class actions.[12] Accordingly, the requirements of Rule 23(a)(4) are

---

[12] *See, e.g.*, docket nos. 109 & 110 (memorandum opinion and order granting Plaintiffs' petition for attorneys' fees).

-30-

satisfied here.

*C.*

Plaintiffs seek certification of this case to proceed as a class action pursuant to the provisions of Rule 23(b)(2), which provides that certification is proper where "[t]he party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

That standard is met here. Plaintiffs' amended pleadings allege that the Defendants have provided deficient medical care, or failed to provide medical care under circumstances in which it is plainly warranted and needed, on a systemic basis that jeopardizes the continuing health and well-being of Plaintiffs and all other prisoners residing or who will reside at FCCW. If Plaintiffs ultimately prevail on the merits of their claims, the resulting declaratory and injunctive relief will likewise apply to and benefit all members of the proposed class. As the leading commentators on class action practice and procedure have recognized, this is precisely the type of case for which class certification pursuant to Rule 23(b)(2) was intended: "Rule 23(b)(2) was drafted specifically to facilitate relief in civil rights suits. Most class actions in the constitutional and civil rights areas seek primarily declaratory and injunctive relief on behalf of the class and therefore readily satisfy the Rule 23(b)(2) class action criteria." 8 Conte & Newberg, *supra*, § 25.20 at 550 (citations omitted). *See generally Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 (4th Cir. 2006) ("Rule 23(b)(2) was created to facilitate civil rights class actions.").

Consistent with this principle, federal courts regularly certify Rule 23(b)(2) classes in cases involving constitutional claims of prisoners alleging inadequate medical care and seeking injunctive relief. *See, e.g., Parsons*, 754 F.3d at 688-89 ("[B]y allegedly establishing systemic policies and practices that place every inmate in ADC custody in peril, and by allegedly doing so with deliberate

-31-

indifference to the resulting risk of serious harm to them, the defendants have acted on grounds that apply generally to the proposed class . . . rendering certification under Rule 23(b)(2) appropriate."); *accord Clarke*, 267 F.R.D. at 198; *Riker*, 2009 WL 910971, at *5; *Lambertz-Brinkman*, 2008 WL 4774895, at *4; *Hilton v. Wright*, 235 F.R.D 40, 53 (N.D.N.Y. 2006); *Bradley*, 151 F.R.D. at 427; *see generally* 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1776.1 at 111-12 (3d ed. 2005) (citing cases).[13]

## IV.

As explained herein, this is an appropriate case for certification as a class action. The proposed class of plaintiffs consists of approximately 1,200 female prisoners whose health concerns are allegedly subject to a flawed prison healthcare system. The case concerns allegations of a common course of conduct by Defendants reflecting deliberate indifference to the prisoners' serious medical needs. As a result, the principal factual and legal questions are common to the entire class, and the injuries that the named Plaintiffs claim to have suffered are typical of those suffered by the other women in the class.

---

[13] As I have already observed, "courts routinely certify class actions involving prisoners, including cases challenging prison health care, mental health care, and dental care." *Flynn v. Doyle*, 2007 WL 805788, at *3 (E.D. Wis. Mar. 14, 2007) (citing cases, certifying a class of "current and future [inmates at Taycheedah Correctional Institution (TCI) in Fond du Lac, Wisconsin], and . . . current and future TCI prisoners who have a disability"); *see also Dean v. Coughlin*, 107 F.R.D. 331, 333 (S.D.N.Y. 1985) (citing cases, and certifying class of "all persons who will be inmates" to challenge inadequate dental care); *Penland v. Warren Co. Jail*, 797 F.2d 332, 333-35 (6th Cir. 1986) (certifying (b)(2) class of "present and future prisoners" to challenge conditions of confinement, including health care); *Bradley v. Harrelson*, 151 F.R.D. 422, 425-27 (M.D. Ala. 1993) (certifying (b)(2) class of seriously mentally ill prisoners to challenge adequacy of mental health services); *Robert E. v. Lane*, 530 F. Supp. 930, 941-44 (N.D. Ill. 1981) (certifying (b)(2) class of "all persons who are or will be incarcerated at Stateville and who need or will need mental health services"); *Jones 'El v. Berge*, 2001 WL 34379611, at *12-13 W.D. Wis.2001) (certifying 23(b)(2) class of prisoners subject to "systemic" unconstitutional conditions of confinement, including inadequate medical, mental health, and dental care); *Hassine v. Jeffes*, 846 F.2d 169, 175-80 (3d Cir. 1988) (certifying 23(b)(2) class of prisoners challenging conditions of confinement).

-32-

An appropriate order accompanies this memorandum opinion.

Entered this ___20th___ day of November, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE