# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

CYNTHIA B. SCOTT, ET AL.,

_Plaintiffs_,

v.

HAROLD W. CLARKE, ET AL.,

_Defendants_.

CIVIL ACTION NO. 3:12-CV-00036

**MEMORANDUM OPINION**

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

Plaintiffs, all prisoners residing at Fluvanna Correctional Center for Women ("FCCW"), a facility of the Commonwealth of Virginia Department of Corrections (the "VDOC"), filed this action pursuant to 42 U.S.C. § 1983 alleging that Defendants violated Plaintiffs' constitutional rights under the Eighth Amendment to be free from cruel and unusual punishment.[1]  Plaintiffs assert that FCCW fails to provide adequate medical care and that Defendants are deliberately indifferent to this failure.  Plaintiffs request a declaratory judgment and preliminary and permanent injunctions ordering FCCW to provide adequate medical care to Plaintiffs and all other similarly situated women residing at FCCW.  The matter is set for a two-week bench trial to commence on December 1, 2014.

The case is presently before me on consideration of the parties' cross-motions for summary

---

[1] This case has a long procedural history.  Suffice it to say that the remaining Defendants, or the "VDOC Defendants," are Harold W. Clarke, the Director of the VDOC; David Robinson, VDOC's Chief of Corrections Operations; Frederick Schilling, VDOC's Director of Health Services; and the Warden at FCCW. I will also refer to Defendants as "the VDOC."

Pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, I have certified a class consisting of Plaintiffs and all other women who currently reside or will in the future reside at FCCW and who have sought, are currently seeking, or will seek adequate, appropriate medical care for serious medical needs, as contemplated by the Eighth Amendment to the Constitution of the United States.  _See_ docket nos. 188 & 189.

judgment. For the reasons stated herein, I will grant Plaintiffs' motion seeking partial summary judgment on two key elements of their complaint – that is, that Defendants bear a non-delegable "constitutional duty to provide adequate medical treatment to" Plaintiffs, *West v. Atkins*, 487 U.S. 42, 56 (1988), and that the specific health problems and conditions of which the named Plaintiffs complain constitute "serious medical needs," "deliberate indifference to" which is "proscribed by the Eighth Amendment," *Estelle v. Gamble*, 429 U.S. 97, 104 (1975). Granting Plaintiffs' motion necessarily means that Defendants' motion must, to some extent, be denied, given that Defendants contend, among other things, that they have contractually delegated their duty to provide adequate medical care; moreover, my review of the record leads me to conclude, as explained herein, that I must deny Defendants' motion in its entirety.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment (or partial summary judgment) "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. In considering a motion for summary judgment under Rule 56, a court must view

the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

When faced with cross-motions for summary judgment, the standard is the same. The court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotations omitted). If the court finds that there is a genuine issue of material fact, both motions must be denied, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *Trigo v. Travelers Commercial Ins. Co.*, 755 F. Supp. 2d 749, 752 (W.D. Va. 2010). The mere existence of "*some*" factual disputes will not defeat summary judgment; the dispute must be "genuine" and concern "material" facts, *Anderson*, 477 U.S. at 247–248; *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008); in other words, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Only legitimate disputes over facts that might affect the outcome of the suit under the governing law fall within that category. *Id.*; *see also Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th Cir. 2012).

## II. FACTUAL BACKGROUND

### A.

Operated by the VDOC, FCCW houses approximately 1,200 women, a majority of whom are 35 years of age or older and are serving median sentences of twenty years. FCCW includes a medical building in which medical, dental, and mental health services are provided. FCCW is the

-3-

prison within the VDOC system purportedly able to provide the most complete medical care to women prisoners, and it is where women with serious medical problems are sent in the first instance, or to which they are transferred from other VDOC facilities for the purpose of receiving a supposedly "heightened" level of care.

Since FCCW opened in 1998, the VDOC has contracted with outside medical providers for health care at the facility. Since at least November 2011, a frequently changing series of private, for-profit corporations have contracted to provide almost all medical, dental, and mental health services to the women at FCCW, with limited exceptions for services provided directly by the VDOC. The new contractor generally re-hires the medical personnel employed by the prior contractor. Frederick Schilling, the VDOC's Health Services Director, testified that the price bid is the primary factor in the selection of the winning contractor from among competing bidders. Regarding the procurement process that resulted in Armor's replacement of Corizon in 2011, he stated, "The number one difference [between the winning and losing bidder] was price."

Beginning in 2011, the VDOC sought bids for the FCCW contract based on "capitated financing," in which the contractor sets up a pricing schedule that fluctuates monthly, based on the facility's average daily population. "Capitated financing" allows the VDOC to predict, with some degree of certainty derived from population forecasts, how much it will spend on medical care over the life of the contract. Prior to the 2011 change, contracts were based upon a risk/reward-sharing model, under which the VDOC and the private contractor shared equally in the risk that medical expenses might exceed expectations (up to a certain pre-determined level, where 100% of the risk falls back upon the VDOC).

Under the capitated financing scheme, also known as a "full-risk contract," the contractor bears the full risk that health care costs may exceed the per prisoner price dictated by the pricing

-4-

schedule in the contract.[2]  The capitated financing model was used in the 2011 contract, the 2013 contract, and the new contract that is supposed to have gone into effect on October 1, 2014.  The contractor using the capitated system receives a fixed amount of money per prisoner, and its profit increases as the cost of care it provides to the prisoners decreases, regardless of how much or how little care is provided to the prisoners.

The VDOC promulgates standard operating procedures for the provision of health care within its prisons, including those prisons, such as the FCCW, where health care services are rendered by private contractors.  Private contractors – for example, Corizon Health, Inc. ("Corizon") and Armor Correctional Health Services, Inc. ("Armor") (collectively, the "contractors"), both of which were formerly defendants in this case – have their own procedures, but they must also follow the VDOC's procedures.  Additionally, a contractor's doctors must use the VDOC formulary for prescribing medication.  Although a series of private health care contractors has come and gone in rotating fashion during the sixteen years since FCCW opened, the policies, practices, and many of the personnel providing care have largely remained the same.  According to individual health care providers who have worked at FCCW, a change of contractor only rarely causes a substantive change in the provision of care; rather, only certain administrative procedures and the nature or volume of paperwork actually change.

The warden at FCCW is the highest-ranking VDOC official at the facility.  The warden has authority over all staff, including medical personnel.  Even when there is a private medical contractor, the warden remains ultimately responsible for the operation of the facility, including health care treatment and security.  The VDOC determines the medical accommodations prisoners

---

[2] There are some narrow exceptions where the VDOC bears the full cost, e.g., for treatments related to the hepatitis C virus, HIV/AIDS, and hemophilia.

Case 3:12-cv-00036-NKM   Document 201   Filed 11/25/14   Page 5 of 47   Pageid#: 3955

may receive, and medical staff has no authority to override VDOC criteria.

### B.

I have reviewed the allegations and the evidence concerning Plaintiffs' medical conditions in several opinions I have issued in the course of this case. The following is but a sampling, and is not an exhaustive or conclusive list, of Plaintiffs' significant health problems. I include it here as a factual prelude to my finding that Plaintiffs have carried their summary judgment burden to show that the specific health problems and conditions of which they complain constitute "serious medical needs," "deliberate indifference to" which is "proscribed by the Eighth Amendment." *See Estelle*, *supra*, 429 U.S. at 104.

Cynthia Scott has sarcoidosis, a chronic and life-threatening disease involving cell inflammation in and around vital organs such as her lungs, liver, spleen, pancreas, and eyes. She has also experienced deep-vein thrombosis, *i.e.*, a blood clot that formed in a vein deep in the body. In 2012, a fragment of the blood clot in her left leg traveled to her lungs, resulting in a pulmonary embolism.

Marguerite Richardson has Hepatitis C ("HCV"). Due to liver damage related to her Hepatitis C, she suffers from elevated ammonia levels and symptoms of hepatic encephalopathy, such as memory loss, related to the poor functioning of her liver's ability to remove toxins from her blood. Ms. Richardson has also been diagnosed with Methicillin-resistant Staphylococcus aureus ("MRSA"), a highly contagious form of bacterial infection that may be fatal if left untreated.

Rebecca Scott has been profoundly deaf since childhood and needs hearing aids to communicate and understand commands from security staff at FCCW. She also has asthma and frequently needs to use an inhaler to breathe.

Bobinette Fearce suffers from degenerative disc disease affecting her spine, carpal tunnel

-6-

syndrome in both her wrists, and chronic pain related to her disc and joint problems. Ms. Fearce also has incontinence and chronic kidney disease.

Hundreds of other women incarcerated at FCCW suffer from serious medical conditions that are likely to cause significant deterioration in their health, permanent functional impairment, or death if untreated or treated improperly. For example, many women, including D.E, A.M., T.G., E.G., K.C., and M.W., have diabetes.[3] E.G., L. S-M, D.D., L.G., and B.E.G. have each been treated for cancer. M.W. has suffered a series of amputations related to untreated blood clots.

Indeed, more than half of FCCW's general population has long-term health conditions or illnesses justifying the need for chronic care treatment and monitoring.

Debbie Daley was diagnosed with colorectal cancer shortly after arriving at FCCW in July 2013. In November 2013, Ms. Daley's oncologist at the University of Virginia Hospital Medical Center ("U.Va.," or "U.Va. Hospital") said Ms. Daley needed chemotherapy. Due to scheduling delays by FCCW medical personnel and transportation cancellations by FCCW staff, Ms. Daley did not begin chemotherapy treatment until eight months later in July 2014. When Ms. Daley arrived for her appointment at U.Va. on July 2, 2014, the U.Va. doctors found her febrile, septic, and in great pain due to a cancer-related infection. Ms. Daley was admitted to the U.Va. Hospital for several weeks to treat her infection with IV antibiotics. Chemotherapy soon followed.

Ms. Daley's U.Va. oncologist, Dr. Erica Ramsdale, was so concerned about Ms. Daley's condition upon her arrival at the hospital on July 2, 2014, that she contacted the U.Va. Ethics Consult Service ("U.Va. Ethics") to ask for guidance in dealing with what Dr. Ramsdale considered to be medical neglect. Dr. Ramsdale accepted U.Va. Ethics' recommendation to declare Ms. Daley

---

[3] Prisoners who are not named plaintiffs, but who have submitted declarations describing the medical failures they have experienced, are referred to herein by their initials.

an "unsafe discharge" unless FCCW would agree¸ *inter alia*, to provide prompt transportation to any appointments, appropriate pain treatment, compliance and follow-through with chemotherapy treatments, and antibiotic treatment of further infections.

By letter from counsel, Ms. Daley complained to the VDOC about her medical treatment at FCCW and requested an investigation of the delays in her chemotherapy treatment and the lack of proper follow-up care for her infection, cancer, and pain management as ordered by the physicians at U.Va. The VDOC responded that "VDOC officials are aware of the issues concerning Ms. Daley's medical treatment"; however, "VDOC officials do not interfere with or otherwise direct the medical treatment and care provided by Corizon staff at FCCW. Accordingly, decisions concerning Ms. Daley's medical treatment and care are not made by VDOC officials." The VDOC further indicated that "VDOC officials cannot 'ensure that Ms. Daley [will] remain at UVa hospital until her course of antibiotic treatment for sepsis is complete' or 'take action to stop [the medical provider's] refusal to provide Ms. Daley the antibiotics ordered by the oncologist at UVa . . . .'" The VDOC's letter does commit that it will provide transportation to and from outside medical appointments.

### III. PLAINTIFFS' MOTION

#### A.

"To incarcerate, society takes from prisoners the means to provide for their own needs. . . . A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in a civilized society." *Brown v. Plata*, 563 U.S. ___, ___, 131 S. Ct. 1910, 1928 (2011); *see also Estelle, supra*, 429 U.S. at 103 (acknowledging as an "elementary principle[] . . . the government's obligation to provide medical care for those whom

-8-

it is punishing by incarceration."); Va. Code.§ 53.1-32.A ("It shall be the general purpose of the state correctional facilities to provide proper . . . medical and mental health care and treatment . . . [to] prisoners committed or transferred thereto.").

The VDOC has opted to provide medical care to State prisoners by selecting, through a competitive bidding process, a private, for-profit company with which the VDOC contracts to render medical care services at designated state correctional facilities, including FCCW. However, it is well settled that choosing to meet the duty to provide prisoners with medical care through the services of a private contractor has no bearing on VDOC's constitutional and statutory responsibility to assure that the care provided is adequate and appropriate to meet prisoners' legitimate needs.

The Supreme Court of the United States held in *West v. Atkins*, 487 U.S. 42, 56 (1988), that "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." Consistent with this principle, the lower courts of the United States have repeatedly concluded that State and local governments may not insulate themselves from Eighth Amendment claims premised upon allegations of deficient medical care by delegating responsibility for the provision of medical care to third parties.

For example, in *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700 (11th Cir. 1985), the United States Court of Appeals for the Eleventh Circuit expressly rejected the premise that a county government's delegation of its obligation to afford medical care to inmates at the county jail to a contractor could shield the county from legal responsibility for claims alleging deficient care, reasoning, *id*. at 705, that

> [t]he federal courts have consistently ruled that governments, state and local, have an
> obligation to provide medical care to incarcerated individuals. *See Estelle*, *supra*. This
> duty is not absolved by contracting with an entity such as Prison Health Services.

-9-

> Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service. In that sense, the county's duty is non-delegable.

*See also Gil v. Vogliano*, 131 F. Supp. 2d 486, 493 (S.D. N.Y. 2001) ("[A] municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third-party to provide care."): *Covington v. Westchester County Jail*, 1998 WL 26190, at *4 (S.D. N.Y. Jan. 26, 1998) (concluding that county jail faced direct, not vicarious, liability for any constitutional violations committed by its medical care contractor under the "non-delegable duty theory of *Ancata*"); *Bryant v. Maffucci*, 729 F. Supp. 319, 324 (S.D. N.Y. 1990) (citing *Ancata*, holding that, "[a]lthough defendants deny any substantive responsibility for the medical treatment of inmates, and deny any control over or direct responsibility for Correctional Health Services, they may not avoid liability by delegating the duty to provide medical care").

The VDOC contends that its medical care providers, Armor and Corizon, and their respective employees, "are and have been independent contractors, not agents of VDOC," deriving this argument from the decision of the Supreme Court of Virginia in *Ogunde v. Prison Health Servs., Inc.*, 274 Va. 55 (2007) ("*Ogunde II*"). The Court determined in *Ogunde II* that Prison Health Services ("PHS") – the corporate predecessor of Corizon – and its employees were "independent contractors" in rendering medical care at a State correctional facility pursuant to a contract with VDOC, rather than an acting agent of the State. *Id*. at 62. Relying upon this holding, the VDOC argues that

> the rendering of health care services at FCCW is and has been under the control of the Contract Providers, not VDOC, and the Contract Providers have and continue to supervise and direct their employees at FCCW.
>
> Therefore, the Contract Providers are and have been independent contractors, not agents of VDOC. As such, VDOC is not liable for the acts or omissions of the

-10-

Contract Providers and their employees at FCCW.

The VDOC's attempted reliance upon *Ogunde II* is misplaced. Neither the Commonwealth nor the VDOC were named as a party defendant in *Ogunde II*, and the plaintiff in that case did not assert any *constitutional* claim against the VDOC premised upon allegations of deficient care on the part of the VDOC's medical care contractor in violation of the Eighth Amendment. The question of whether the VDOC bore ultimate legal responsibility for sub-standard medical care allegedly rendered to the plaintiff by the VDOC's contractor was not presented in *Ogunde II*. Quite to the contrary, the Court considered the question of PHS's status only in connection with its evaluation of the contractor's defense that it was acting as an agent of the State and therefore should be shielded from exposure to the plaintiff's medical malpractice claim based upon principles of sovereign immunity. *See* 274 Va. at 60-63. The Court determined that, because PHS was an independent contractor, not a state agent, it was not shielded by sovereign immunity from potential malpractice liability. *Id*. at 61-62.

The reasoning and result in *Ogunde II* have no bearing whatsoever on the issues presented here. Controlling Eighth Amendment jurisprudence provides that contracting with a third party to provide medical care to a governmental entity's prison population does not relieve the government of its constitutional duty under the Eighth Amendment to ensure the adequacy of the care, regardless of how the third party is characterized. *See West*, *supra*, 487 U.S. at 56 ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical care to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights."); *Ancata*, 769 F.2d at 705 (the government's constitutional obligation to provide prisoners with adequate medical care is non-delegable). In *West*, the Supreme Court expressly observed that, "[w]hether a physician is on the state payroll or is paid by contract, the

dispositive issue concerns the relationship among the State, the physician, and the prisoner," 487 U.S. at 56, and noted that, were the law otherwise, "'the state [would] be free to contract out all services which it is constitutionally obligated to provide and leave its citizens with no means for vindication of those rights, whose protection has been delegated to "private" actors, when [the rights] have been denied,'" *id*. at 56 n. 14 (citation omitted). Accordingly, whether Armor or Corizon has functioned as an "independent contractor" under Virginia law is not relevant in this case; under federal constitutional principles that apply to this case, their status cannot shield the VDOC from potential liability for violations of the Eighth Amendment resulting from the contractors' provision of sub-standard medical care.

Moreover, where a State effectively cedes final decision-making authority with respect to the provision of or failure to provide medical care to a third-party contractor, the contractor's policies and decisions effectively become and constitute the policies and decisions of the State. *See, e.g.*, *Ancata*, 769 F.2d at 705 n. 9 ("where a governmental entity delegates the final authority to make decisions then those decisions necessarily represent official policy" (citing *Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir. 1982)); *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (county could not "shield itself from § 1983 liability by contracting out its duty to provide medical services . . . [because] the private company's policy becomes that of the County if the County delegates final decision-making authority to it" (citation omitted)).

Evidence in this case supports a conclusion that the VDOC has ceded final decision-making authority with respect to some medical care judgments to its medical care contractor. I have implicitly recognized in previous opinions in this case that the ultimate legal responsibility for (and potential liability associated with) the provision of medical care at FCCW lies with the VDOC, notwithstanding that day-to-day medical services are contractually provided. I now hold, as a matter

-12-

of law, that the VDOC has a non-delegable to provide to Plaintiffs – indeed, to all prisoners within its custody – medical care that meets constitutional minimum standards.[4]

### B.

At the outset of this opinion, I cited *Estelle v. Gamble*, wherein the Supreme Court "conclude[d] that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). In accordance with this principle, the progeny of *Estelle* recognize that a threshold element of an Eighth Amendment claim premised upon allegations of deficient medical care is the claimant's showing that the health problem of which she complains involves a "serious medical need." *See, e.g.*, *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008); *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 104 (4th Cir. 1995); *Taylor v. Barnett*, 105 F. Supp. 2d 483, 487 (E.D. Va. 2000) ("[f]irst, [the plaintiff] must demonstrate a sufficiently serious medical need" (citations omitted)). This element of the Eighth Amendment analysis is evaluated under an objective standard. *Brice*, 58 F.3d at 104 ("[t]o establish . . . a constitutional violation, a claimant must prove that, objectively assessed, he had a 'sufficiently serious' medical need to require medical treatment" (citations omitted)); *cf. De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) ("*De'lonta II*") ("we first resolve that De'lonta has alleged an

---

[4] I note that Defendants' response in opposition to Plaintiffs' motion (as well as Defendant's own motion for summary judgment and their response in opposition to Plaintiffs' motion for class certification) appears to have abandoned their "independent contractor" theory in favor of their fallback position that they are entitled to rely on the judgment of those directly providing medical care to FCCW inmates. Indeed, Defendants concede that the "VDOC has a duty to make adequate medical care accessible to its offenders," but qualify that concession with the claim that "they are also entitled to rely on the judgment of the medical providers at its facilities." However, this argument is valid only to the extent that prison officials invoking the argument did not "tacitly authorize" and were not otherwise "deliberately indifferent" to the alleged sub-standard medical care. *See, e.g.*, *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). I will discuss the alternative argument in my analysis of Defendants' motion for summary judgment.

objectively serious medical need").

In *Iko*, the United States Court of Appeals for the Fourth Circuit cited the following standard for determining the presence or absence of a "serious medical need": "[b]eginning with the objective component [of the Eighth Amendment analysis], a 'serious . . . medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognized the necessity of a doctor's attention.'" 535 F.3d at 241 (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

In the instant case, the undisputed material facts establish that the Plaintiffs have serious medical needs, *i.e.*, medical problems that (i) have been diagnosed by physicians as mandating treatment; (ii) are (in at least some instances) so obvious that even a lay person would easily recognize the necessity of a doctor's attention; (iii) absent treatment, could result in further significant injury or the unnecessary and wanton infliction of pain; (iv) a reasonable doctor or patient would find important and worthy of comment or treatment; (v) significantly (and adversely) affect each of the Plaintiffs' daily activities; or (vi) involve the existence of chronic and substantial pain. *See, e.g., Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014); *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); *see also Mahan v. Plymouth Cnty. House of Corr.*, 64 F.3d 14, 18 (1st Cir. 1995) (serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would recognize the necessity for a doctor's attention"); *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1096 (11th Cir. 2014) (same); *Randle v. Alexander*, 960 F. Supp. 2d 457, 480 (S.D. N.Y. 2013) ("In determining seriousness of a medical condition, courts look to certain factors, including: (1) 'whether a "reasonable doctor or patient would find [it] important and worthy of comment"; (2) whether the condition "significantly affects an individual's daily activities"; (3) and

-14-

whether it causes "chronic and substantial pain."'" (quoting *Chance v. Armstrong*, 143 F.3d 968, 702 (2d Cir. 1998))).

To underscore the seriousness of Plaintiffs' medical needs, I will briefly reiterate some of their documented conditions.

In August 2010, Cynthia Scott was diagnosed with sarcoidosis, a potentially life-threatening chronic inflammatory disease that can affect the body's vital organs including the heart, lungs, liver, spleen, pancreas and eyes. In March of 2012, Ms. Scott began experiencing serious swelling in her left leg that was ultimately determined to involve a blood clot (deep-vein thrombosis), resulting in a pulmonary embolism in connection with which she was hospitalized on an emergency basis. In 2013, Ms. Scott wore a Holter monitor for 24 hours on two occasions to evaluate the condition of her heart and was advised that the results were abnormal. In 2014, the results of urinalysis indicated that Ms. Scott confronts a risk of kidney failure.

Marguerite Richardson first learned that she was infected with HCV in 1994. HCV is a chronic disease that may progress over the course of several decades. Since 2012, Ms. Richardson has experienced elevated levels of ammonia in her blood stream and occasional symptoms of hepatic encephalopathy, including memory loss and disorientation. In late 2013, it was determined that Ms. Richardson may have cirrhosis of the liver attributable to her HCV. Ms. Richardson suffers from swelling and painful open sores ("venous stasis ulcers") on the back of her lower left leg that were diagnosed, in the spring of 2012, to be infected with MRSA, a potentially-contagious form of bacterial infection which may be fatal if not properly treated.

Rebecca Scott has a severely deformed ingrown toenail on the big toe of her right foot that periodically becomes inflamed, infected and extremely painful, making it very difficult for Ms. Scott to walk. Ms. Scott has been profoundly hearing-impaired since early childhood, a severe disability

-15-

that necessitates her use of functioning hearing aids in order to communicate and hear and respond to commands. Ms. Scott has chronic asthma and requires the use of an inhaler in order to breathe properly.

Bobinette Fearce suffers from a host of significant medical problems including, but not limited to the following: degenerative disc disease affecting her neck and spine and causing continuous and debilitating chronic back pain; bi-lateral carpal tunnel syndrome in her wrists; a bladder condition causing constant incontinence; and chronic kidney disease.

Additionally, the named Plaintiffs have offered the sworn Declarations of a host of additional FCCW class members who have likewise attested to significant health problems and concerns from which the Declarants suffer that also constitute or involve "serious medical needs," such as deep-vein thrombosis, colorectal cancer, breast cancer, congestive heart failure, HIV, cervical cancer, chronic rectal bleeding and various types of diabetes.

Many of the ailments described herein have been diagnosed by doctors as requiring treatment, *e.g.*, Cynthia Scott's sarcoidosis and deep-vein thrombosis; Ms. Richardson's HCV and MRSA; Rebecca Scott's asthma; and Ms. Fearce's degenerative disc disease, bi-lateral carpal tunnel syndrome, and kidney disease. Cynthia Scott's severely swollen leg associated with her blood clot, Ms. Richardson's open sores on her left leg, and Rebecca Scott's severely deformed toenail are all conditions that even a lay person would recognize as meriting a doctor's attention. Rebecca Scott's hearing impairment and asthma, and Ms. Fearce's carpal tunnel syndrome and incontinence no doubt affect their respective daily activities in a significant way. Virtually all of Plaintiffs' maladies involve chronic and substantial pain and, absent treatment, could give rise to further significant injury and the unnecessary infliction of pain. Their health problems are of a sort that an objectively reasonable patient would deem important and worthy of comment and treatment. Moreover, upon

his comprehensive review of Plaintiffs' primary medical records (as they have been maintained at FCCW and by the VDOC), as well as his review of the deposition testimony and discovery responses, Plaintiffs' medical expert witness, Dr. Greifinger,[5] found and concluded that the health problems and concerns of which the Plaintiffs complain constitute "serious medical needs" of which the VDOC Defendants are aware.

Indeed, there has been no contention otherwise by Defendants, given that they concede that "Plaintiffs have submitted their expert's report finding that *they* have serious medical needs," and those findings remain unchallenged. Rather, Defendants attempt to take issue with Plaintiffs' proposition that the numerous additional FCCW prisoners who have submitted Declarations describing their own medical issues (and problematic encounters with the medical care delivery system at FCCW) also have "serious medical needs." Defendants contend that the Plaintiffs "have failed to demonstrate that their declarants at FCCW have serious medical needs." This assertion is wrong as a matter of fact;[6] moreover, it is irrelevant, given that the Declarants are obviously

---

[5] Plaintiffs' expert, Dr. Robert Greifinger, a physician licensed by the State of New York, has extensive experience in correctional healthcare, including the following: managing the provision of medical care at Riker's Island, New York City's main jail complex, from 1987 to 1989; serving for six years as the Chief Medical Officer for the New York State Department of Corrections, where he had overall responsibility for the provision of all inmate health services for a system involving 68,000 prisoners; serving as a court-appointed monitor overseeing medical care in the jails in Philadelphia, Pennsylvania; Fulton County, Georgia; DeKalb County, Georgia; Albuquerque, New Mexico; and for the State of Alabama's women's prison from 2006 to 2009. Dr. Greifinger is currently the court-appointed monitor regarding medical care at the Metropolitan Detention Center in Albuquerque as well as at the Orleans Parish Prison in New Orleans, Louisiana, and he monitors multiple jail and prison correctional healthcare systems on behalf of the Civil Rights Division of the United States Department of Justice. Additionally, he serves as a consultant to the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security. Dr. Greifinger has authored or co-authored dozens of articles addressing correctional medicine published in peer-reviewed journals; and is the editor of, as well as the author of one chapter in, the Second Edition of *Clinical Practice in Correctional Medicine* (2006). He has been found qualified to testify as an expert witness with respect to correctional medical care standards and practices by courts in more than 60 cases from 2000 to the present.

[6] As I have already observed, Plaintiffs' motion for partial summary judgment is based upon the "serious medical needs" of the named Plaintiffs, and the VDOC Defendants have conceded this point. A finding that
(continued...)

-17-

members of the Fed. R. Civ. P. 23(b)(2) certified class, of which the Declarants are clearly members.

In sum, assessed by any objective test, Plaintiffs have serious medical needs. Accordingly, I find that the Plaintiffs have satisfied the "serious medical needs" element of their Eighth Amendment claims as a matter of law.

## IV. DEFENDANTS' MOTION

### A.

Defendants' opening bid is to contend that a one-year statute of limitations applies to Plaintiffs' complaint, and that their claims are barred to the extent that they are premised upon underlying allegations of sub-standard medical care that pre-dates July 24, 2011, *i.e.*, one year before Plaintiffs' original complaint was filed. Defendants' argument fails for several reasons.

First, the Supreme Court has held that the state limitations period for personal injury cases is applicable to § 1983 claims. *See Wilson v. Garcia*, 471 U.S. 261, 275-76 (1985) (a civil action filed pursuant to 42 U.S.C. § 1983 adopts the statute of limitations that the forum state uses for general personal injury cases); *Owens v. Okure*, 488 U.S. 235, 249–50 (1989) (same). Virginia applies a two-year limitations period for personal injury actions. *See* Va. Code § 8.01-243(A). Defendants contend that a different statute of limitations found in the Code of Virginia limits Plaintiffs' claims. Section 8.01-243.2, "**Limitations of actions by confined persons; exhaustion,**" provides that

---

[6](...continued)
the Declarants have serious medical needs is not necessary in order for the Plaintiffs' Motion to be granted. And, under the standards applied by the courts in Eighth Amendment deliberate indifference cases, the medical issues described by the Declarants are, as a matter of law, "serious medical needs." Significantly, other than stating that the Declarants' medical needs are not serious, the VDOC Defendants never substantively contend otherwise. As I remarked early in this opinion, it is well established that, in order to defeat a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.

-18-

> [n]o person confined in a state or local correctional facility shall bring or have brought on his behalf any personal action relating to the conditions of his confinement until all available administrative remedies are exhausted. Such action shall be brought by or on behalf of such person within one year after cause of action accrues or within six months after all administrative remedies are exhausted, whichever occurs later.

However, § 8.01-243.2 was enacted in 1998, and no federal court in Virginia has ever found that it applies to a prisoner's civil rights claim in federal court; rather, every federal court in Virginia that has considered the argument has rejected it.[7] *See, e.g., Shelton v. Angelone*, 148 F. Supp. 2d 670, 677 (W.D. Va. 2001) (holding that Virginia Code § 8.01–243(A) is the applicable statute of limitations for a prisoner's civil rights action filed pursuant to 42 U.S.C. § 1983, not Virginia Code § 8.01–243.2).

Moreover, Defendants' statute of limitations argument wholly ignores the fundamental nature and substance of the Plaintiff's Eighth Amendment claim. A merely cursory review of the second amended complaint (or any of the complaints) reveals that Plaintiffs brought suit to terminate an ongoing systemic pattern and practice of failure to provide constitutionally adequate medical care on the part of the VDOC and its contractual providers. Plaintiffs allege that the unlawful conduct was continuing as of the date the lawsuit was filed, and that it continues as of today. The particular episodes of deficient medical care alleged in the complaint are not invoked as separate claims for relief, seeking recovery on the basis of separate instances of compensable harm. On the contrary, the examples of alleged sub-standard care set forth in Plaintiffs' pleadings – which are now supported by sworn declarations, deposition testimony, and other competent record evidence – are offered as corroboration for Plaintiffs' assertion that the VDOC has engaged in an ongoing pattern

---

[7] As for state courts, in *Ogunde v. Commonwealth*, 271 Va. 639 (2006) ("*Ogunde I*"), the Supreme Court of Virginia found that the Virginia Tort Claims Act's ("VTCA") statute of limitations applied, rather than the statute of limitations for personal actions brought by confined persons, despite the fact that the tort claim concerned conditions of confinement. *Id.* at 373. The *Ogunde I* Court relied on the fact that the VTCA is a self-contained act and incorporates its own statute of limitations. *Id.*

-19-

and practice of wrongful, unconstitutional acts and omissions reflecting deliberate indifference to the serious medical needs of the prisoners residing at FCCW.

For decades, the Fourth Circuit has recognized, both within and outside the context of § 1983 litigation, that claims premised upon allegations concerning a continuing pattern of unlawful conduct that remains in effect when a lawsuit is filed are not barred by the statute of limitations, even if the alleged pattern commenced prior to an otherwise pertinent limitations period. *See*, *e.g.*, *A Society Without a Name v. Comm. of Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) ("'In general, to establish a continuing violation[,] the plaintiff must establish that the unconstitutional or illegal act was a fixed and continuing practice.' In other words, if the plaintiff can show that illegal act did not occur just once, but rather 'in a series of separate acts[,] and the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation.'" (quoting *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166-67 (4th Cir. 1991)); *see also Jersey Heights Neighborhood Ass'n v. Glendenning*, 174 F.3d 180, 189 (4th Cir. 1999) ("[u]nder established law, a 'continuing violation is occasioned by continual unlawful acts'" (dictum) (citation omitted)); *Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) ("The district court found that the VHA had alleged an ongoing constitutional violation, and that the statute [of limitations] would not have begun to run until the violation ended. We believe this was correct."), *aff'd sub nom. Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498 (1990); *Jenkins v. Home Ins. Co.*, 635 F.2d 310, 312 (4th Cir. 1980) (reversing dismissal of employment discrimination action based on appellate court's determination that "the Company's alleged discriminatory violation occurred in a series of separate but related acts throughout the course of Jenkins' employment. . . . Thus, the Company's alleged discrimination was manifested in a continuing violation which ceased only at the end of Jenkins' employment"); *Eldridge v. Bouchard*, 620 F. Supp. 678, 682-83 (W.D. Va. 1985)

-20-

("[T]he conduct which plaintiffs allege to be an unconstitutional denial of federally protected rights is repetitive – beginning in 1974 and continuing to this day. . . . [T]his court finds that plaintiffs have stated facts which indicate that the conduct alleged to be wrongful is continuing in nature by reason of . . . defendants' actions. Therefore, the Virginia statute of limitations does not bar this action.") (citation omitted)).

The "continuation violation" principle has been applied by federal courts in rejecting statute-of-limitations defenses directed at the claims of prisoners alleging deliberate indifference to their serious medical needs in violation of the Eighth Amendment. For example, in *Baker v. Sanford*, 484 F. App'x 291 (11th Cir. 2012), the Eleventh Circuit reversed a lower court's dismissal of a prisoner's claim based upon allegations of inadequate medical care to which he was subject at a Florida prison dating from 2003, asserted in a lawsuit commenced in 2011. The district court held that the claim was time-barred, applying Florida's residual four-year statute of limitations, but the Eleventh Circuit disagreed, reasoning as follows:

> [A]n "allegation of a failure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided." *Lavellee v. Listi*, 611 F.2d 1129, 1132 (5th Cir. 1980). The critical distinction in the continuing violation analysis is whether the prisoner complains "of the present consequences of a onetime violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." *Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003) (internal quotation marks omitted).
>
> Here, we conclude from the record that the district court erred in dismissing Baker's complaint for failure to state a claim upon which relief could be granted because his claims were not barred by the four-year statute of limitations. Baker's amended complaint alleged that although he specifically requested medical treatment for his ongoing fungal infection multiple times in 2007 and 2010, prison medical staff refused his requests. Further, he incorporated various grievance forms documenting these unsuccessful requests for treatment. Therefore, Baker properly alleged that the prison official's prolonged failure to provide adequate medical treatment despite his repeated grievances constituted a continuous injury during the statute of limitations period.

-21-

*Id.* at 293; *see also Jervis v. Mitcheff*, 258 Fed. App'x 3, 5-6 (7th Cir. 2007) (noting that deliberate indifference to a serious medical need is, by its nature, a continuing violation that ends only when treatment is provided or the inmate is released); *Heard v. Sheahan*, 253 F.3d 316, 318-19 (7th Cir. 2001) (reversing dismissal of prisoner's deliberate indifference claim regarding medical care on limitations grounds, concluding that "the suit charges that the defendants inflicted cruel and unusual punishment on the plaintiff by refusing to treat his condition. The refusal continued for as long as the defendants had the power to do something about his condition, which is to say until he left the jail. Every day that they prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew."); *Neel v. Rehberg*, 577 F.2d 262, 264 (5th Cir. 1978); *Wilson v. Groze*, 800 F. Supp. 2d 949, 955 (N.D. Ill. 2011) ("As *Heard* suggests, an Eighth Amendment violation arising out of a defendant's deliberate indifference to a prisoner's serious medical needs is a continuing violation, and thus can accrue for as long as a defendant knows about a prisoner's serious medical condition, has the power to provide treatment, and yet withholds treatment." (citation omitted)).

Here, each of the named Plaintiffs has identified a continuing sequence of instances in which she alleges she has experienced sub-standard medical care at FCCW, reflecting an ongoing pattern of deliberate indifference to serious medical needs for which the Plaintiffs seek to hold the VDOC liable. For each Plaintiff, at least one of the instances alleged occurred within one year of the commencement of this lawsuit on July 24, 2012. Under these circumstances, Plaintiffs are permitted to support their timely claim with evidence of earlier examples of deficient medical care occurring more than one year before the date on which this case was filed. *See, e.g.*, *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 346 (4th Cir. 1994) ("Statutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action.");

-22-

*Furr v. AT&T Techs., Inc.*, 824 F.2d 1537, 1543 (10th Cir. 1987) ("[d]iscriminatory acts occurring before the filing periods are relevant evidence of the continuing unlawful practice and its discriminatory intent, and are used by the courts to fashion a remedy" (citations omitted)).

The one-year statute of limitations invoked by the VDOC neither dictates the dismissal of any of Plaintiffs' Eighth Amendment claims nor imposes an impediment to the scope of the evidence Plaintiffs may use to prove the VDOC's continuing pattern and practice of deliberate indifference to Plaintiffs' serious medical needs.

### B.

Defendants contend that they are entitled to summary judgment because "Plaintiffs failed to exhaust their administrative remedies concerning [their] factual allegations," as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).[8] My review of the facts disclosed by the record and the governing law discloses that Plaintiffs have satisfied the exhaustion requirement.

### 1.

In the first instance, Defendants present incomplete and unreliable evidence to support its argument. Defendants' argument that Plaintiffs have failed to exhaust their administrative remedies is an issue upon which Defendants bear the burden of proof, *see, e.g.*, *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 683 (4th Cir. 2005), and the inaccuracy and incompleteness of the VDOC's own medical grievance records provides an insufficient foundation for Defendants' motion.

---

[8] In their answer to the original complaint, Defendants raised Plaintiffs' alleged failure to exhaust the available administrative remedies, as required by the PLRA. However, Defendants subsequently filed a motion to dismiss and opposed Plaintiffs' motion for class certification without advancing any failure-to-exhaust arguments, raising the argument for the first time on summary judgment, more than two years after filing their Answer.

-23-

Defendants rely upon an affidavit submitted by FCCW's current Institutional Ombudsman and Grievance Coordinator, T. Swann, to assert that Cynthia Scott failed to submit "any regular grievances regarding any of the allegations in this civil action" before the case was filed on July 24, 2012. However, the record contains documents from Ms. Scott's personal files, produced to Defendants in discovery, reflecting that, in late December 2010, Ms. Scott filed an Informal Complaint with FCCW raising the issues concerning improper medication of her sarcoidosis (in contravention of the instructions of the specialists who treated her condition at UVA Medical Center) that are expressly referenced in the pleadings. Then, dissatisfied with the response provided to her Informal Complaint, Ms. Scott submitted a Regular Grievance addressing the same subject-matter on January 10, 2011. This grievance was rejected by Ms. Swann's predecessor in the position of FCCW Grievance Coordinator, Ms. Soukup, on the grounds (erroneous, as the record discloses) that Ms. Scott had failed to seek resolution of her concerns through the submission of an Informal Complaint.[9] Ms. Scott sought review of that ruling through an appeal to the VDOC's Regional Ombudsman, submitted on January 13, 2011, but the appeal was denied on the grounds that "[t]here is no further review of intake decisions," as the VDOC's own records reflect.

Defendants concede that Bobinette Fearce fully and properly exhausted one medical grievance "concerning ineffective treatment of her wrist" prior to the filing of this action, but states that Ms. Fearce failed to "advance[ ] any of the other remaining allegations in this lawsuit through Level II of the offender grievance procedure." Defendants fail to observe, however, that Ms. Fearce filed

---

[9] In late 2010 and early 2011, Ms. Soukup, the FCCW Grievance Coordinator, was on leave. A significant volume of medical grievances submitted by FCCW prisoners during this time did not receive a response. Cynthia Scott raised questions about why there was no response to grievances she had submitted with Mr. Sims, who was filling in for Ms. Soukup; on February 10, 2011, Mr. Sims responded that "[a]ll paperwork from the time that Ms. Soukup was out was returned to her for filing." Upon Ms. Soukup's return from her absence, she conducted a search for the grievances that had been submitted while she was away, but they were never located.

-24-

Level I Regular Grievances (i) in December 2010 regarding her "severe pain due to degenerative joint disease and arthritis," and (ii) in July 2010 concerning her request for additional diagnostic testing by her specialists at U.Va. regarding her neurological problems – and both of these subjects are detailed in the complaint. As reflected by the VDOC's own records, the VDOC never provided a response to these Level I grievances, which is a precondition to a Level II appeal. Additionally, Ms. Fearce submitted medical grievances to which she never received any response (timely or otherwise) concerning her temporomandibular joint (TMJ) problem and her transfer to a distant building despite her myriad mobility and chronic pain challenges. Ms. Fearce pursued Level II appeals regarding these grievances, which were rejected by VDOC due to her failure to attach Level I responses, which she was never provided, or because VDOC contended she had failed to provide other required documentation.

Defendants contend that, prior to filing this lawsuit, Marguerite Richardson failed to initiate any regular grievances with respect to the medical problems she has alleged in the lawsuit. The record discloses that this assertion is not true. Regarding an abnormal, painful growth under her right rib-cage, Ms Richardson followed up on an unsuccessful Informal Complaint with a Regular Grievance on February 24, 2011, as reflected on the grievance log she contemporaneously maintained. She followed up on an Informal Complaint regarding her need for bathroom access due to incontinence caused by medications she was taking, to which no response was provided, with a Regular Grievance on February 14, 2011. With respect to FCCW's failure to provide Ms. Richardson with adequate diagnostic information or any treatment of her Hepatitis C, she filed an Informal Complaint on January 19, 2011, and then challenged what she perceived to be an unsatisfactory response by filing a Regular Grievance dated February 2, 2011. Ms. Richardson suffers from severe chronic pain and numbness in her back and legs, regarding which she filed an

Informal Complaint about the lack of diagnosis and inadequate pain medication on February 11, 2011. Following her receipt of an inadequate response, she filed a Regular Grievance on February 19, 2011.

In none of these instances was Ms. Richardson provided with a receipt upon the filing of her Regular Grievance, per the VDOC's written operating procedure governing the grievance process. More importantly, none of the four referenced Regular Grievances was the subject of a timely (or any) written response from FCCW. On March 12, 2011, Ms. Richardson initiated Informal Complaints regarding FCCW's failure to respond to her Grievances, and also wrote a letter to the Warden addressing this problem. When no response was forthcoming either from the Grievance Coordinator or the Warden, Ms. Richardson wrote an appeal letter to Robert White, the Regional Ombudsman, detailing her efforts and explaining her concerns. She attached handwritten Level II Grievance Appeals to this letter and requested that Mr. White forward them to the VDOC Health Services Administrator for disposition. Citing the absence of Level I responses, Mr. White declined to do so.

Defendants assert that, before this action was filed, Rebecca Scott "did not advance any regular grievances concerning the allegations in this lawsuit through Level II of the offender grievance procedure." However, according to the VDOC's own Offender Grievance Report concerning Ms. Scott, she submitted a Regular Grievance, in follow-up to a rejected Informal Complaint, on December 22, 2010, addressing her infected and painful ingrown toenail. Ms. Scott's personal records reflect that she initiated a Level II appeal on or about February 4, 2011, after FCCW failed to respond to her Regular Grievance. Regardless of how this Level II appeal was resolved, it constitutes a full and proper exhaustion of the medical grievance process by Ms. Scott, contrary to Defendants' contention.

-26-

Accordingly, based on Plaintiffs' documents and, in some instances, the VDOC's own records, it is apparent that Ms. Swann's Affidavit, and the VDOC's representations based thereon, are incomplete, or inaccurate, or both. Thus, as a threshold matter, I cannot find that Defendants have met their burden of proof, which requires a definitive showing of Plaintiffs' failure to exhaust all available administrative remedies.

## 2.

The PLRA requires prisoners to exhaust "such administrative remedies *as are available*" before bringing an action in federal court regarding conditions of confinement. *See Moore v. Bennette*, *supra*, 517 F.3d at 725, quoting 42 U.S.C. § 1997e(a) (emphasis added). Based upon the common meaning of "available," the Fourth Circuit, in *Moore*, held that

> an administrative remedy is not considered to have been available if a prisoner, through no fault of [her] own, was prevented from availing [herself] of it. *See Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1227 (10th Cir. 2007); *Kabaq v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). . . . [T]o be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. Having done that, a prisoner has exhausted [her] available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Id*. at 725 (citation omitted); *accord Oliver v. Virginia Dep't of Corr.*, 2010 WL 1417833, at *6 n. 10 (W.D. Va. April 6, 2010).

"[W]hen prison officials prevent inmates from using the administrative process . . . the process that exists on paper becomes unavailable in reality." *Hill v. O'Brien*, 387 F. App'x 396, 400 (4th Cir. 2010) (citing authorities). Thus, in considering Defendants' failure-to-exhaust argument, I am "'obligated to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials.'" *Id*. at 401 (citation omitted); *see also Finley v. Gonzales*, 2009 WL 382744, at *5 (E.D. Cal. Feb. 13, 2009) ("[E]xhaustion occurs when prison officials prevent exhaustion from

-27-

occurring through misconduct or fail to respond to a grievance within policy time limits." (citing supporting decisions from Third, Fourth, Fifth, Sixth, Seventh, Eighth and Tenth Circuits)), *report and recommendation adopted*, 2009 WL 982082 (E.D. Cal. April 9, 2009).

The record reflects that, in addition to the medical grievance Defendants admit was properly exhausted by Bobinette Fearce, Ms. Fearce and the other named plaintiffs exhausted numerous other medical grievances to the extent the VDOC's "available" administrative remedies permitted. Plaintiffs' sworn Declarations and corroborating contemporaneous documentation, in some instances clearly supported by the VDOC's own grievance records, show the following:

- Cynthia Scott's Regular Grievance concerning FCCW's improper medication of her sarcoidosis was incorrectly rejected by the FCCW Grievance Coordinator on an erroneous basis, and that Ms. Scott's appeal of this action to the VDOC Regional Ombudsman was denied;

- Ms. Fearce submitted Regular Grievances with respect to lack of adequate treatment for her chronic pain associated with her degenerative joint disease, arthritis and other neurological problems to which VDOC never responded, as confirmed by the VDOC's own records, and she avers (with supporting documentation) that, in two other instances, no responses were provided to her in regard to Regular Grievances addressing her TMJ disorder and with respect to the adverse impact a building transfer had on her chronic pain-compromised mobility;

- Ms. Richardson submitted Regular Grievances in regard to the painful growth under her ribcage, her Hepatitis C, the denial of a medical profile granting her bathroom access, and her chronic back and leg pain, none of which received a response, resulting in VDOC's refusal to process her attempted Level II appeals on the grounds that they lacked Level I responses that she was never provided; and

- Rebecca Scott pursued a Level II appeal, upon which VDOC apparently failed to act, after submitting a Regular Grievance concerning a lack of treatment of her painful, infected ingrown toenail to which FCCW never responded.

This evidence establishes Plaintiffs' substantial efforts to exhaust the medical grievance process with respect to precisely the same health problems and deficient care that are alleged in the pleadings. Given the record and the arguments put forth in Defendants' motion, I must conclude that the VDOC frustrated Plaintiffs' efforts by failing to respond to grievances as required by the

-28-

VDOC's own operating procedures.  Thus, given the factual circumstances and the applicable law, I deem the medical grievances at issue here exhausted.[10]  *See Hill*, *supra*, 387 F. App'x at 400-01 (reversing grant of summary judgment in favor of defendants in regard to prisoner's non-exhaustion in light of prisoner's evidence indicating that defendants hindered his attempts to exhaust grievances by refusing to provide him with proper forms and reflecting their destruction of or failure to respond to grievances he submitted); *Widener v. City of Bristol*, 2014 WL 3058560, at *3-4 (W.D. Va. July 2, 2014) (denying defendants' summary judgment motion based on non-exhaustion in light of evidence "that the plaintiff attempted to exhaust the administrative remedies available to him before filing this suit" and the defendants' failure to meet their burden of proving that the plaintiff's efforts did not constitute exhaustion); *Allah v. Comm. of Virginia*, 2011 WL 251214, at *4-5 (W.D. Va. Jan. 25, 2011) (denying VDOC's motion for summary judgment based on non-exhaustion in light of VDOC's failure to respond to plaintiff's request form and other activities by which VDOC "frustrated" the plaintiff's efforts to pursue his grievance); *cf. Oliver*, *supra*, 2010 WL 1417833, at *6 n.10 ("[t]o be sure, if prison officials impede a prisoner's attempts to exhaust by . . . failing to respond to a proper grievance, a prisoner may be excused from exhaustion requirements" (citations omitted)).

---

[10] I note that, in addition to the efforts to the named Plaintiffs, the record discloses that several other women (Ruth Hill, Michele Wagoner, and Rhonda Woods) who are members of the class I certified under 23(b)(2) also fully and properly exhausted medical grievances prior to the filing of this action.  Considered in tandem with the exhausted grievances of the named Plaintiffs, these additional exhausted medical grievances easily support a finding of PLRA exhaustion on behalf of the entire class.  *See, e.g., Chandler v. Crosby*, 379 F.3d 1278,1287 (11th Cir. 2004) ("We hold that a class of prisoner-plaintiffs certified under Rule 23(b)(2) satisfies the PLRA's administrative exhaustion requirement through 'vicarious exhaustion' *i.e.*, when 'one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class.'" (citations omitted)); *see also Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004); *Jackson v. District of Columbia*, 254 F.3d 262, 269 (D.C. Cir. 2001); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 97 (E.D. N.Y. 2013); *Jones'El v. Berge*, 172 F. Supp. 2d 1128, 1133 (W.D. Wis. 2001); *Hattie v. Hallock*, 8 F. Supp. 2d 685, 689 (N.D. Ohio 1998).  The "vicarious exhaustion" principle applies here.

-29-

**3.**

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation.

*Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) (citing *Booth v. Churner*, 532 U.S. 731, 737 (2001)).

As a matter of policy, the host of grievances reflecting allegations of deficient medical care at FCCW, filed by the named Plaintiffs and other class members, are sufficient to satisfy the fundamental objective underlying the PLRA exhaustion-of-remedies requirement of notifying the VDOC of the systemic problems that are subject of this lawsuit and providing it with an opportunity to address those problems.

Plaintiffs have pursued a vast array of grievances addressing myriad problems with the medical care provided at FCCW. Cynthia Scott's grievance, while specific to her own circumstances, advised the VDOC of the practice of FCCW medical providers unilaterally diverging from the course of treatment prescribed for a prisoner by outside specialists, and also addressed the problem of FCCW's failure to maintain continuity in the administration of prescribed medications. Ms. Fearce's grievance, regarding which Defendants concede full exhaustion, addressed the ineffectiveness of FCCW's treatment of the chronic pain caused by her carpal tunnel syndrome and FCCW's refusal to consider the corrective surgery for this condition that was prescribed by the specialist at U.Va. Ms. Fearce's other grievances discussed above focused on (i) FCCW's general unwillingness or inability to provide adequate treatment for severe chronic pain associated with her degenerative joint disease and arthritis; (ii) FCCW's refusal to refer her to U.Va. for follow-up diagnostic testing and care with respect to her chronic neurological problems; (iii) FCCW's failure

-30-

to follow through with regard to the course of treatment identified by its own medical staff as necessary to address her TMJ disorder; and (iv) FCCW's disregard for her chronic pain and related mobility limitations in transferring her from a centrally located building to a more distant building, arguably at the urging of correctional staff.

Ms. Richardson's grievances brought to the VDOC's attention the matters of (i) FCCW's failure to diagnose and treat uncertain medical problems such as the painful growth underneath her ribcage; (ii) FCCW's failure to provide reasonable accommodations to prisoners with special medical needs such as her need for bathroom access due to medication-influenced incontinence; (iii) FCCW's failure to provide adequate diagnostic information to prisoners with chronic illnesses such as her Hepatitis C; and (iv) FCCW's deficient treatment of prisoners suffering from severe chronic pain.

Rebecca Scott's grievances focused on FCCW's failure or refusal to identify and implement an effective course of treatment for her painful, infected toenail.

Medical grievances submitted and fully exhausted by other class members likewise advised the VDOC of recurring deficiencies in the provision of medical care at FCCW. Michele Wagoner exhausted a Level I grievance addressing discontinuity in FCCW's provision to her of prescribed cholesterol medication, which was determined by VDOC to be "founded" in November 2011. Ms. Wagoner also fully exhausted a Level II grievance regarding the failure of FCCW medical staff to properly monitor her cholesterol level between July 2010 and November 2011. Ruth Hill exhausted a Level II appeal of a medical grievance in June 2012 in which she complained of scheduling issues in regard to a provider's appointment to which she had been determined to be entitled to Sick Call, but which was cancelled and then not rescheduled. Ms. Hill's grievance was also determined by VDOC to be "founded". Finally, class member Rhonda Woods fully exhausted through completion

-31-

of the Level II appeal process two distinct medical grievances, rendered in March and April 2012. One concerned ineffective medications for the severe, chronic pain and high ammonia levels in her bloodstream resulting from her cirrhosis of the liver, and the other addressed FCCW's general failure to treat her Hepatitis C. Additionally, a third Level II appeal pursued by Ms. Woods regarding FCCW's deficient treatment of her chronic pain and refusal to act on the prescribed course of pain medication recommended by her specialist at U.Va. was resolved by the VDOC on July 11, 2012, two weeks before this case was filed.

Collectively, at the very least, the substance of the named Plaintiffs' and the class members' exhausted grievances advised the VDOC of many, if not all, of the ways in which FCCW's practices manifest its failure to provide constitutionally adequate medical care to prisoners on a systemic basis, and placed the VDOC in a position to require FCCW to improve its performance with respect to its provision of medical care if the VDOC had been so inclined. That is all that is required by the PLRA exhaustion provision. *See, e.g., Mathis v. GEO Group*, 2011 WL 2899135, *6-7 (E.D. N.C. July 18, 2011) (rejecting defendants' contention that named plaintiffs' exhaustion of grievances with respect to "one specific health care-related issue" per each grievance was inadequate to support action challenging prison's systemic failure to provide adequate medical care in deliberate indifference to prisoners' serious medical needs; the court determined that "Calland and Terrell have exhausted grievances which are sufficient in detail to alert the BOP defendants to a failure to provide them with medical care . . . and also provide fair notice of the alleged systemic problems at Rivers described in . . . plaintiffs' third amended complaint"), *reconsideration den.*, 2012 WL 43586, at *3 (E.D. N.C. Jan. 9, 2012); *see also Flynn v. Doyle*, 2007 WL 805788, at *11-13 (E.D. Wis. March 14, 2007) (prisoner plaintiffs' exhaustion of numerous individual grievances illustrating problems with various aspects of the medical and mental health care provided at women's prison satisfied

-32-

PLRA exhaustion requirements in context of class action challenging the inadequacy of the care provided on a systemic basis); *Amador v. Andrews*, 655 F.3d 89, 103-04 (2d Cir. 2011) (individual grievances addressing prison's failure to protect specific women inmates from sexual assault by male correctional officers sufficiently implicated issues regarding policies and procedures that their exhaustion was adequate to support class action seeking systemic relief); *Riggs v. Valdez*, 2010 WL 4117085, at *12 (D. Idaho Oct. 18, 2010) (rejecting proposition that each of the interrelated "policies and practices" that the prisoner plaintiffs identified in their Eighth Amendment action alleging the prison's deliberate indifference to their safety and security constituted a separate "claim" as to which PLRA exhaustion was required).

### C.

The ultimate issue in this case is whether Defendants acted (or failed to act) in a manner reflecting deliberate indifference to the serious medical needs of Plaintiffs and other women incarcerated at FCCW. Defendants contend that they are entitled to judgment as a matter of law on this issue on the basis of the following three conclusory assertions:

- Plaintiffs cannot show that the VDOC Defendants "'participated directly' in denial of treatment that resulted in an objectively serious medical condition to Plaintiffs, deliberately interfered with FCCW doctors' treatment, or tacitly authorized or were indifferent to the FCCW physicians' misconduct";

- Plaintiffs cannot show that the contracts between the VDOC and the contract providers facilitated or resulted in inadequate medical care at FCCW; and

- Plaintiffs cannot show that the VDOC's policies, practices, and procedures, of which VDOC and its employees have control, have facilitated or resulted in inadequate medical care at FCCW.

Defendants are wrong on all three points. Plaintiffs have demonstrated, to the extent required, the existence of disputed issues of material fact concerning (i) the VDOC's tacit authorization of and indifference to the sub-standard medical care provided at FCCW; (ii) the manner in which the

-33-

contract entered into between the VDOC and Corizon facilitated the provision of sub-standard medical care at FCCW; and (iii) the manner in which the VDOC's policies, practices and procedures have facilitated or resulted in the provision of substandard medical care at FCCW.

I have already discussed my finding that Plaintiffs have satisfied the objective component of demonstrating a "serious medical need." Indeed, Defendants have never argued that Plaintiffs' Eighth Amendment claim should be rejected based upon lack of evidence of "serious medical needs." Rather, their argument for summary judgment is premised upon Plaintiffs' purported inability to meet the subjective element of a cognizable Eighth Amendment claim.

> The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "[D]eliberate indifference entails something more than mere negligence . . . [b]ut is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. at 835. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. *Id*. at 837; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

*De'lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) ("*De'lonta I*"); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001) ("Deliberate indifference requires a showing that the defendants actually know of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." (citing *White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) ("A claim of deliberate indifference . . . implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice.")).

Under these standards, applied in the context of this case, Plaintiffs have met their burden of showing that there are genuine issues of material fact in dispute regarding the question of deliberate indifference.

-34-

**1.**

Defendants do not support their assertions of what Plaintiffs "cannot show" with any evidence. Contrary to Defendants' argument, it is arguable that the VDOC's officials and employees have been aware, since well before this litigation was initiated, of Plaintiffs' allegations and claims concerning sub-standard medical care on a systemic basis at FCCW. It is likewise arguable that the VDOC took no action, in light of its apparent knowledge and awareness, to address or correct the problem, and that the provision of constitutionally deficient medical care at FCCW persists unabated. Plaintiffs' arguments and evidence in support thereof wholly undercuts Defendants' bald insistence that the VDOC and its employees never tacitly approved of or were deliberately indifferent to the quality of care at the facility.

On June 13, 2012, more than five weeks before this action was filed, Abigail Turner, Esq., one of Plaintiffs' counsel, transmitted a letter on behalf of Bobinette Fearce to then-Warden Phyllis Baskerville at FCCW, with a copy to then-acting VDOC Medical Director Mark Amonette, addressing concerns regarding FCCW's denial or restriction of bathroom access to Ms. Fearce, given her acknowledged physiological problem with incontinence. Ms. Turner complained on Ms. Fearce's behalf regarding (i) the general lack of as-needed bathroom access from the "dry" cells at FCCW; (ii) FCCW's failure to keep Ms. Fearce supplied with adult diapers, which she needed to deal with her incontinence problem, and her lack of as-needed laundry or bathing privileges; and (iii) FCCW's denial (or rescission) of the Medical Profile previously held by Ms. Fearce, pursuant to which she had been assigned to a single-capacity cell for privacy reasons. The letter referred briefly to caselaw identifying the potential Eighth Amendment implications of the difficulties reported on Ms. Fearce's behalf, and it requested a response from the VDOC within five days.

When neither Dr. Amonette nor Warden Baskeville responded to the letter, Ms. Turner

addressed, on June 26, 2012, follow-up correspondence to A. David Robinson, VDOC Chief of Corrections Operations, recounting Ms. Fearce's concerns and noting certain actions undertaken at FCCW in regard to Ms. Fearce that appeared to be in retaliation for the transmission of her earlier letter. Apart from a perfunctory acknowledgement by Mr. Robinson of his receipt of Ms. Turner's letter, there was no response to the letter and there is no evidence of any action on VDOC's part to look into Ms. Fearce's complaints or to address them in any way.

Subsequently, on July 13, 2012, Plaintiffs' counsel transmitted a letter to VDOC Director Harold W. Clarke, as well as Mr. Robinson and Warden Baskerville, notifying the VDOC that the Plaintiffs and other women residing at FCCW "have suffered and continue to suffer the adverse physical and mental effects of FCCW's failure to provide care or provision of deficient care in deliberate indifference to their serious medical conditions." The letter continued, in pertinent part, as follows:

> We address our concerns to you as the officials responsible for administration and oversight of the contract between the Department of Corrections and Armor Correctional Health Services, Inc. and with the prior provider, Corizon Health, Inc. (formerly PHS Correctional Healthcare, Inc.). You bear the responsibility to insure the provision of adequate, appropriate health care to the residents at FCCW. At FCCW, you have delegated the provision of medical care to Armor. You have an affirmative duty to insure that Armor's performance of its contractual obligations does not involve practices and procedures that fail to provide FCCW's residents with the care they need. We believe that the medical care Armor and its predecessors have provided exposes the women at Fluvanna to undue pain, suffering and an increased risk of further illness or premature death.
>
> Dozens of women have repeatedly filed grievances concerning FCCW's provision of deficient medical care and have appealed those grievances to the Warden and to the Level II grievance appeal system. The doctors and the DOC have often met those grievances with summary dismissals and a medical care system that reflects continuing disregard for legitimate concerns. As a result, the systemic deficiencies characterizing Armor's and its predecessor's contract performance at FCCW persist.

Otherwise, the letter provided its recipients with an itemized listing of specific areas of

concern in regard to the quality of medical care provided at FCCW, such as the inadequate Sick Call process; FCCW's consistent failure or refusal to provide those suffering from severe chronic pain with effective medication; FCCW's failure to provide women suffering from bladder-control problems with bathroom access on an as-needed basis; and FCCW's failure or refusal to carry out the courses of treatment prescribed for prisoners by outside specialists, among a host of others. The letter also advised the addressees of the potential legal implications of the sub-standard care described under the Eighth Amendment, and invited the VDOC to commence negotiations. Upon the VDOC's complete failure to acknowledge its receipt of, or otherwise respond to, the Plaintiffs' letter of July 13, 2012, this action was initiated on July 24, 2012.

The record discloses Mr. Robinson's testimony that no actions have been undertaken by the VDOC regarding the medical care provided at FCCW as a result of the filing of this lawsuit. Frederick Schilling, the VDOC's Health Services Director, has testified that the pendency of this lawsuit and the allegations set forth by the Plaintiffs regarding the sub-standard medical care provided by the VDOC's contractors at FCCW, Armor and Corizon, had no impact at all on the VDOC's evaluation of those entities as bidders on the VDOC contract that took effect on May 1, 2013, or on the VDOC's selection of Corizon as the successful bidder. Meanwhile, Plaintiffs continue to experience the adverse effects of health problems they already had at the time this action was filed, as well as new health concerns in connection with which they remain subject to the seriously deficient medical care that is provided by FCCW on a systemic basis. The medical grievances that Plaintiffs have continued to file and exhaust during the pendency of this case, as memorialized by the VDOC's own records, provide evidence to support Plaintiffs' allegations of ongoing serious risks to Plaintiffs' health and well-being, and the VDOC's unyielding indifference to those risks.

-37-

With the selection of Corizon to again serve as the VDOC's contractual medical care provider at multiple VDOC facilities, including FCCW, effective as of May 1, 2013, the VDOC appointed monitors to oversee Corizon's provision of medical care at the subject prisons, subject to the direct oversight and supervision of a registered nurse, Catherine Thomas. The VDOC delegated the responsibility to develop the monitoring tools intended to guide the contract monitors' on-going assessment of Corizon's performance to Ms. Thomas, rather than a physician. Ms. Thomas, in turn, developed the monitoring criteria not in consultation with any VDOC physician, but rather with Mr. Schilling, who is not a doctor and has no training as a medical care provider. The monitoring system Mr. Schilling and Ms. Thomas developed derives from VDOC Operations Procedures, and was designed to evaluate the nature and extent of Corizon's compliance with VDOC policies, not to measure patient outcomes or monitor specific illnesses. The tools themselves monitor compliance in a number of areas based upon selection and review of a sample of patient charts, which are then scored. The VDOC determined that a compliance level of 80% in each monitored category is an acceptable score, because this is the level used by VDOC facilities in their own continuous quality improvement process. However, because scores regarding different aspects of contractual performance are combined, overall compliance can be over 80% on one of the consolidated measures even when a particular component of that measure falls well below 80% by VDOC's own standards.

Where Corizon's performance falls short of the mark on a particular metric, the responsibility is entrusted to the contractor to develop and implement a solution. The VDOC does not intervene in regard to matters of sub-standard performance on Corizon's part. Moreover, the VDOC has never imposed, or even considered imposing, any penalty or sanction in response to the contractor's deficient performance in regard to provision of medical care. In accordance with these principles,

-38-

although the VDOC Contract Monitor has repeatedly identified significant shortcomings in the manner in which Corizon is providing medical care at FCCW, *e.g.*, with respect to, *inter alia*, substantial delays in the provision of doctor appointments to prisoners identified by the Sick Call process as requiring a doctor's attention; substantial delays in the provision of provider appointments to prisoners designated for chronic care; and major and recurring deficiencies associated with FCCW's ordering, maintenance and administration of medications prescribed to treat prisoners, there is no indication that the VDOC ordered or undertook any affirmative steps to require corrective action.

William Nicholson, the VDOC's Pharmacy Director, personally visited FCCW on January 15, 2014, in light of an "increase in the number of founded medication related grievances at FCCW." Mr. Nicholson met with Warden Brown at FCCW on this occasion, and she has acknowledged her agreement with his statement that "[t]he visit and recent reports are disturbing with regard to the medication management operation at Fluvanna." This accords with the findings and opinions of Plaintiffs' medical expert, Dr. Greifinger, who determined on the basis of a detailed analysis of Plaintiffs' medical records that each of them had directly experienced the consequences of a "failure to provide timely delivery or administration of prescribed medication" that "put these women at serious risk of harm."

A further illustration of the VDOC's arguable failure to respond to evidence of sub-standard medical care provided at FCCW is provided by the deposition testimony of its Medical Director, Dr. Amonette. He testified that, in his own post-mortem evaluation of the death of FCCW prisoner Jeanna Wright, which is specifically addressed and described in the Plaintiffs' second amended complaint, he reached the conclusion that Ms. Wright's cancer had not been properly diagnosed in a timely way. Apart from possibly mentioning this conclusion to VDOC Health Services Director

-39-

Schilling, Dr. Amonette took no action to bring this probable mis-diagnosis to anyone's attention.

Even when confronted with independent evidence of obvious deficiencies in care, the VDOC has proclaimed that, notwithstanding its constitutional obligation to ensure the provision of adequate and appropriate medical care to prisoners residing at FCCW, "VDOC officials do not interfere with or otherwise direct the medical care provided by Corizon staff at FCCW."

Defendants state that "[w]hen, based on the evidence presented, a fair minded jury could not reasonably find for the plaintiff, summary judgment is appropriate." However, the converse is also true: if a reasonable fact-finder could conclude, on the basis of the evidence presented in opposition to a motion, that judgment may be rendered in favor of the non-moving party, summary judgment must be denied. Here, I conclude that, based upon the evidence before me, a fact-finder could reasonably determine that the VDOC is deliberately indifferent to the serious medical needs of the Plaintiffs and the entire class of women residing at FCCW. As a result, Defendants' request for judgment as a matter of law on this issue must be rejected.

A reasonable finder of fact could conclude that the evidence establishes that the VDOC Defendants were directly notified of, and thus possessed subjective knowledge regarding, the serious medical needs of women prisoners at FCCW and their concerns that the sub-standard quality of medical care provided by VDOC's contractors was insufficient to meet those needs and placed them at a substantial risk of serious harm. The VDOC's failure to require or undertake corrective action and its "hands-off" attitude towards its medical care contractors under these circumstances constitute ample grounds for a finding of deliberate indifference.

> A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness.

-40-

*McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (reversing grant of summary judgment in defendants' favor in light of existence of evidence establishing genuine issues of material fact as to whether prison physician and head nurse were deliberately indifferent to plaintiff's need for further diagnostic testing to determine cause of severe, chronic pain of which he constantly complained); *see also Kuhne*, *supra*, 745 F.3d at 1096-97 (reversing grant of summary judgment in favor of defendants based on determination that evidence existed on the basis of which a reasonable jury could find that refusal to provide adequate medical attention and consultation with an outside specialist to address prisoner's proliferative diabetic retinopathy constituted deliberate indifference to serious medical need); *Coleman v. Sweetin*, 745 F.3d 756, 765-66 (5th Cir. 2014) (evidence reflecting defendant prison nurse practitioner's refusal to respond to the plaintiff's persistent sick call requests or provide plaintiff with pain medication even when plaintiff was in so much pain that he could not lie down or use the toilet in a normal manner following a fall resulting in a later-diagnosed broken hip was sufficient to establish basis for a finding of deliberate indifference requiring reversal of lower court's judgment of dismissal); *Hayes*, *supra*, 546 F.3d at 522-26 (reversing summary judgment entered in favor of prison physician who disclaimed awareness that plaintiff had a serious medical need requiring treatment in light of evidence establishing physician's steadfast refusal to refer plaintiff to an outside specialist who could have diagnosed plaintiff's serious testicular disorder despite plaintiff's constant complaints of excruciating pain); *cf. De'Lonta II*, 708 F.3d at 526 ("'[A] total deprivation of care is not a necessary condition for finding a constitutional violation: Grossly incompetent or inadequate care can [also] constitute deliberate indifference[.]'" (quoting *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (internal quotation omitted)).

-41-

**2.**

As I have previously observed in this and other opinions in this case, the contract entered into between the VDOC and Corizon, pursuant to which Corizon replaced Armor as medical care provider at 17 VDOC facilities, including FCCW, effective May 1, 2013, is based upon a "capitated financing" model. Under this approach, pricing of the contract is based on assumptions regarding an average cost of medical care per prisoner and each facility's projected average daily population. This financing methodology allows the VDOC to predict, with a reasonably high degree of confidence, how much it will have to spend on medical care over the life of the contract.

Under a contract premised upon the "capitated financing" approach, also known as a "full-risk" contract, the contractor bears the *full risk* that the medical care costs may exceed the presumptive cost-per-prisoner estimate that dictates the agreed-upon contract price. Because assumptions regarding adequate staffing, costs for medication, and other relevant variables are all factored into the medical-cost-per-prisoner amount that serves as the basis for the pricing of the contract, and the contractor agrees to receive a fixed sum of money, regardless of how much or how little care it ultimately must provide to prisoners in performing the contract, the contractor's profit margin directly depends upon the amount of care it provides.

Against this backdrop, and with full awareness – as a result of the pendency of this lawsuit – of the existence of allegations that the medical care at FCCW was already sub-standard on a systemic basis, the VDOC chose Corizon to serve as its contractor for the May 1, 2013, contract, based on a bid that was $17 million lower than the bid of Armor, the VDOC's incumbent provider. Bruce Teal, Armor's Chief Executive Officer, testified that, based on its incumbent status, Armor was well aware of the costs of providing care at FCCW facilities, and that "under no circumstances" could Armor have agreed to serve as the VDOC's medical care provider under the new contract for

-42-

the amount bid by Corizon.

Given these facts (*i.e.*, a fixed-cost contract structured in a manner that provides the contractor incentive to minimize the costs of care in order to maximize its profit margin, the VDOC's pre-existing awareness of allegations of deficient care at FCCW, and the VDOC's acceptance of a bid by Corizon to secure the VDOC's business that was $17 million lower than that of the then-current contractual medical provider), a reasonable fact-finder could conclude that a reduced level of medical care was the virtually inevitable result of the VDOC's decision to select Corizon as its contractor. The fact-finder could likewise conclude that the VDOC's decision to favor lower contract cost over the likely quality of the resulting care reflects deliberate indifference to the serious medical needs of the prisoners in VDOC's custody and residing in facilities subject to the May 1, 2013 contract.

> In the case of a private for-profit corporation hired to perform a public function, there is an increased risk that the corporation's actions will diverge from the public interest. Unlike public officials, corporate officers and employees are hired to serve the interests of the corporation and, more specifically, its stockholders, whose principal interest is earning a financial return on their investment. Indeed, corporate officers owe a fiduciary duty to advance stockholders' interests, but they owe no such fiduciary duty to the public at large. . . . *Especially when a private corporation is hired to operate a prison, there is an obvious temptation to skimp on civil rights whenever it would help to maximize shareholders' profits.*

*Manis v. Corr. Corp. of Am.*, 859 F. Supp. 302, 305 (M.D. Tenn. 1994) (emphasis added); *accord Hartman v. Corr. Medical Servs., Inc.*, 960 F. Supp. 1577, 1581 (M.D. Fla. 1996). It would be reasonable to conclude that the general inclination of a private for-profit medical care contractor was magnified, given the reduced amount of Corizon's bid to win the contract. Although the VDOC arguably recognized the significant risk that this set of circumstances might have an adverse impact on the quality of the resulting medical care and appointed contract monitors as a supposed mitigation measure, the evidence supports a reasonable conclusion that it has failed to act on the monitors'

-43-

concrete findings of deficient care at FCCW.

A reasonable fact-finder could conclude that, because of the cost considerations upon which the contractual relationship between the VDOC and Corizon is based, the VDOC displaced its constitutional obligation to provide adequate medical care. *See*, *e.g.*, *Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 184 (11th Cir. 2012) (affirming judgment entered in accordance with jury verdict against defendants where, "if the jury did ask itself why [Corizon] delayed treatment for Mr. Field's paralysis, it could have concluded that it delayed treatment to save costs."); *Ancata*, 769 F.2d at 704 ("if necessary medical treatment has been delayed for non-medical [*i.e.*, cost-saving] reasons, a case of deliberate indifference has been made out" (citation omitted)).

### 3.

Defendants insist that FCCW's correctional staff's practice of limiting or depriving incontinent prisoners at FCCW of bathroom access on an as-needed basis does not reflect deliberate indifference to serious medical needs or constitute a denial of adequate medical care. In support of this contention, Defendants portray the bare, unsupported statements of opinion rendered by their proffered expert witness, Ronald J. Angelone, as "facts," and further characterize these "facts" as undisputed.

Regarding the lack of prisoner access to the bathroom at FCCW when the prisoners are locked in their cells, Mr. Angelone opines that, "[m]ost times the request to leave the cell is allowed immediately, but on some occasions an offender may have to wait a short period of time in her cell so that the next offender who had requested earlier to use the restroom facilities can be released from her cell." This statement is contradicted by the facts alleged in the Plaintiffs' pleadings and supported by their sworn declarations and deposition testimony; accordingly, it is a disputed factual issue. Likewise, Defendants' bald assertion that the "Plaintiffs cannot show that VDOC Defendants

-44-

and employees mandated to medical staff at FCCW that [prisoners' medical profiles granting bathroom privileges] be revoked" cannot be reconciled with the testimony of former FCCW Medical Director David MacDonald, M.D., who expressly stated that he stopped writing medical profiles for bathroom access at the request of "security."

Plaintiffs' medical expert, Dr. Greifinger (who, unlike Mr. Angelone, is qualified to address this issue from a clinical perspective) has opined that the urinary incontinence experienced by women at FCCW such as Bobinette Fearce and Marguerite Richardson constitutes a serious medical need. He has further concluded that "[t]he Defendants failed to accommodate Ms. Fearce's need for frequent toileting that was caused by her inability to get an appropriate level of medical care," and that "Ms. Richardson's toileting needs have been consistently abridged." Both conclusions are encompassed within the scope of Dr. Greifinger's overall opinion that "[t]he care provided to the Plaintiffs in this case was deficient. It systematically falls far below the standards of correctional care and correctional healthcare."

Thus, there exists, at a minimum, a genuine issue of material fact regarding the extent to which the VDOC's own practices and policies facilitated or caused the provision of sub-standard medical care at FCCW.

### D.

Defendants move for summary judgment on the ground that neither the manner in which the VDOC has responded to Plaintiffs' medical grievances nor the substance of the grievance responses can serve as the basis for imposing Eighth Amendment liability. This contention is puzzling, given that my review of Plaintiffs' pleadings and motions discloses no such claim. To be sure, "the Constitution creates no entitlement to grievance procedures or access to any such procedures voluntarily established by a state," *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1975), and district courts

-45-

routinely "have applied *Adams* and held that a prison official's failure to comply with the grievance procedure is not actionable under Section 1983," *Fisher v. Neale, et al.*, 2010 WL 3603495, at *7 (E.D. Va. Sept. 8, 2010) (collecting cases). However, I find no argument on Plaintiffs' part that the VDOC's responses (or failures to respond) to Plaintiffs' medical grievances, in and of themselves, constitute deliberate indifference to a serious medical need. Rather, as plainly stated in the second amended complaint (and the previous complaints), the substance of the numerous medical grievances that the named Plaintiffs and other women residing at FCCW have submitted serve as evidence that the VDOC was placed on notice of the systemic problems regarding the manner in which medical care is and has been provided at FCCW, and it is these systemic problems that provide the basis of the Eighth Amendment claim in this action. "Though a prison official has no substantive constitutional duty to respond to grievances, he or she does have a duty to prevent and remedy constitutional violations within his [or her] supervision and control." *Young v. Wexford Health Sources*, 2012 WL 621358, at *5 (N.D. Ill. Feb. 14, 2012) (citations omitted). Therefore, "[a] prison official may . . . be held liable under 42 U.S.C. § 1983 for failing to respond to violations of a prisoner's constitutional rights *that come to his or her attention via the grievance process*." *Id.* (emphasis added). As I have already discussed in this opinion, Plaintiffs are using the medical grievance record to show that it provided sufficient notice to alert prison officials at FCCW and the VDOC to "an excessive risk to inmate health or safety." *Farmer*, *supra*, 511 U.S. at 837. "Once the official knows of that risk, the refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).

## V. CONCLUSION

For the stated reasons, I will deny Defendants' motion for summary judgment, and I will grant

Plaintiffs' motion for partial summary judgment.

An appropriate order accompanies this memorandum opinion.

Entered this 25th day of November, 2014.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE