# **EXHIBIT 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

CYNTHIA B. SCOTT, *et al.*,          )
                                     )
              *Plaintiffs,*          )
                                     )      Case No. 3:12-cv-00036-NKM
       v.                            )      Sr. Judge Norman K. Moon
                                     )
HAROLD W. CLARKE, *et al.*,          )
                                     )
              *Defendants.*          )
_____)

## SETTLEMENT AGREEMENT

Plaintiffs Cynthia B. Scott, Belinda Gray, Toni Hartlove, Karen Powell and Lucretia

Robinson,[1] for themselves individually and as representatives of a class of additional unnamed

plaintiffs similarly situated ("the Plaintiffs"), and defendants Harold W. Clarke, A. David

Robinson, Frederick Schilling and Tammy Brown, each in their official capacities as

representatives of the Virginia Department of Corrections ("the VDOC Defendants"), for their

Settlement Agreement in resolution of the above-captioned lawsuit, hereby jointly state as

follows:

## I.      INTRODUCTION

1.      The Plaintiffs initiated this class-action lawsuit on July 24, 2012, pursuant to the

Eighth Amendment to the Constitution of the United States and 42 U.S.C. § 1983, seeking

declaratory and injunctive relief with respect to alleged constitutionally-deficient medical care

---

[1]      Original Named-Plaintiff Bobinette D. Fearce requested voluntary dismissal from this case, without opposition by the Defendants, by Motion filed March 28, 2015.  *See* ECF Docket No. 207.  The Motion was granted by Order dated March 31, 3015.  (ECF Dkt. No. 208).  Original Named-Plaintiff Marguerite Richardson requested voluntary dismissal from this case, without opposition by the Defendants, by Motion filed June 17, 2015.  (ECF Dkt. No. 210).  The Motion was granted by Order on June 22, 2015.  (ECF Dkt. No. 214).  On July 24, 2015, the Plaintiffs filed a Consent Motion for Substitution of New Class Representatives and supporting Memorandum, requesting that four class members be substituted as new class representatives in place of original Named-Plaintiffs Ms. Fearce, Ms. Richardson and Ms. Rebecca Scott, who would soon be released from FCCW.  *See* ECF Dkt. Nos. 215, 216.  The Substitution Motion was granted by oral Order entered July 29, 2015 (ECF Dkt. No. 217), designating Belinda Gray, Toni Hartlove, Karen Powell and Lucretia Robinson as new class representatives.

afforded to themselves and all other women residing at the Fluvanna Correctional Center for Women ("FCCW"), which the Plaintiffs contend reflects deliberate indifference on the part of the VDOC Defendants to the Plaintiffs' serious medical needs.

2. By Memorandum Opinion and Order dated November 20, 2014, the Court granted the Plaintiffs' Motion for Class Certification and certified the class described by the Plaintiffs' Motion pursuant to Fed. R. Civ. P. 23(b)(2). (ECF Dkt. No. 188). Thereafter, the Court entered an Order of Partial Summary Judgment in favor of the Plaintiffs on November 25, 2014, holding, *inter alia*, that:

> a. the Plaintiffs established, as a matter of law, that they fully and properly exhausted all pre-litigation administrative remedies available to them, as required by applicable provisions of the Prison Litigation Reform Act, 42 U.S.C. § 1997e (*see* Memorandum Opinion dated November 25, 2014, at 23-33 & nn.8-10 (ECF Dkt. No. 201));

> b. the Plaintiffs established, as a matter of law, that individually and as a class, they suffer from "serious medical needs" as a predicate to a viable cause of action for "deliberate indifference" under the Eighth Amendment (*id*. at 13-18 & n.7);

> c. the Plaintiffs established, as a matter of law, that the VDOC Defendants have a non-delegable duty under the Eighth Amendment to provide constitutionally-adequate medical care to all prisoners within their custody, including the Plaintiffs (*id*. at 8-13); and that

> d. the VDOC Defendants failed, as a matter of law, to demonstrate on the basis of material facts as to which there is no genuine issue in dispute, that they could not be found liable for providing insufficient medical care, or failing to provide medical care under circumstances in which such care was due, reflecting "deliberate indifference" to the Plaintiffs' and the class members' serious medical needs in violation of the Eighth Amendment (*id*. at 33-46).

3. The parties have engaged in extensive discovery and have vigorously litigated this matter in accordance with their respective claims and defenses with regard to the issues presented by the Plaintiffs' original and amended Complaints.

4.      The VDOC has denied liability for the Eighth Amendment violations alleged by the Plaintiffs in their original and amended Complaints filed in this action.

5.      The parties, upon due consideration, determined that it was in their respective, as well as their mutual, best interests to resolve their differences and to conserve the time, effort expense and resources of the parties and the Court that would be consumed by continuing to litigate this matter.

6.      Accordingly, the parties, by and through their respective counsel of record, entered into a Memorandum of Understanding ("MOU"), effective as of November 25, 2014, setting forth mutually agreed-upon terms and conditions for the settlement of this action upon the completion of the parties' collaborative effort to identify, adopt and implement operative standards for the provision of constitutionally-adequate medical care at FCCW going forward, subject to the oversight of a party-designated Compliance Monitor and this Court's continuing supervisory jurisdiction.

7.      The duties and responsibilities imposed upon the parties by Sections 1 and 2 of the MOU having now been substantially performed to the parties' mutual satisfaction, they now present their Settlement Agreement, as set forth below, for the Court's review and approval pursuant to Fed. R. Civ. P. 23(e).  This Settlement Agreement applies to FCCW.

## II.      **DEFINITIONS**

1.      **"Settlement Agreement"** shall mean this document and all of the terms and conditions set forth herein as submitted to the Court for approval.

2.      **"Plaintiffs"** shall mean the named Plaintiffs and class representatives Cynthia B. Scott, Belinda Gray, Toni Hartlove, Karen Powell and Lucretia Robinson.

3

3.    The **"Class"** shall mean the class certified by the Court pursuant to Fed. R. Civ. P. 23(b)(2) in its Memorandum Opinion and Order entered November 20, 2014, consisting of "all women who currently reside or will in the future reside at FCCW and who have sought, are currently seeking or will seek adequate, appropriate medical care for serious medical needs, as contemplated by the Eighth Amendment to the Constitution[.]"

4.    **"FCCW"** shall mean the Fluvanna Correctional Center for Women, located in Troy, VA.

5.    **"Defendant"** for purposes of this Settlement Agreement shall mean the Virginia Department of Corrections, acting by and through its duly-authorized employees performing in their official capacities, including but not limited to the individual named defendants Harold W. Clarke, A. David Robinson, Frederick Schilling and Tammy Brown, and their respective successors, agents and assigns.

6.    **"Parties"** shall mean, collectively, the Plaintiffs and the Defendant as defined hereinabove.

7.    **"Effective Date"** shall mean the date on which the Court enters a Consent Order of Judgment granting final approval to this Settlement Agreement.

8.    **"Contractor"** shall mean Armor Correctional Healthcare, Inc. or any other entity with which the Defendant may choose to enter into a contractual agreement pursuant to which that entity assumes the obligation to provide medical and/or mental health services to prisoners residing at FCCW in exchange for monetary compensation.

9.    **"Compliance Monitor"** shall mean the individual person jointly designated by the Parties or selected by the Court who shall periodically review, evaluate and report to the Parties concerning the Defendant's performance of its obligation to provide constitutionally-

adequate medical care to the members of the Class in accordance with the provisions of this Settlement Agreement, and the requirements of the Eighth Amendment.

10.     **"Facility"** shall mean the Fluvanna Correctional Center for Women.

### III.     SUBSTANTIVE PROVISIONS

### 1.     Statement Of Purpose

In order to insure that the quality and quantity of medical care to be provided by the Defendant to prisoners residing at FCCW as of and following the Effective Date of this Settlement Agreement shall meet or exceed constitutional requirements under the Eighth Amendment, the Defendant shall be obligated to achieve and maintain compliance with the Operating Procedures, Guidelines and Standards governing the provision of medical care that are set forth in this Section below or incorporated in this Section by reference.  The provisions included in this Section, expressly or as incorporated by reference, are intended to insure that prisoners incarcerated at FCCW receive adequate, appropriate and timely medical care to protect them from substantial existing, ongoing and/or imminent physical injury, illness, chronic pain and undue risk of worsening health or premature death.

### 2.     Governing Practices And Procedures

### a.     VDOC Operating Procedures

In accordance with the provisions of Section 2 of the Parties' MOU, the Plaintiffs and the Defendant each named a correctional medical care expert/consultant of their own choosing to conduct a comprehensive review of all of the VDOC's existing Operating Procedures ("OPs") governing or having a bearing on the Defendant's and its Contractor's provision of medical care to prisoners incarcerated at FCCW.  On the basis of that review, modifications to the language of specific provisions in certain of the OPs were proposed by the Parties' experts/consultants in order to enhance the likelihood that medical care afforded to prisoners in a manner adhering to

5

these revised OPs will meet constitutional requirements. Following negotiations, the Defendant has accepted, adopted and will implement certain of the recommended modifications to its OPs at FCCW.[2] The VDOC OPs applicable at FCCW are incorporated herein by reference, and adherence to the OPs by the Defendant and its Contractor in providing medical care to the Plaintiff Class as of and following the Effective Date shall be evaluated by the Compliance Monitor in assessing the Defendant's fulfillment of its obligations to provide medical care meeting constitutional requirements under the terms of this Settlement Agreement and the Eighth Amendment.

### b. Additional Guidelines And Standards

In addition to the OPs, including but not limited to those modified pursuant to the Memorandum of Understanding process described above, the Defendant's obligation to provide constitutionally-adequate medical care at FCCW pursuant to the terms of this Settlement Agreement and the requirements of the Eighth Amendment shall be carried out in accordance with the Guidelines and Standards set forth below. During the time period that this Settlement Agreement is in effect, the Defendant's performance of these obligations shall be evaluated on an ongoing basis by the Compliance Monitor in accordance with the procedures described in Section IV. of this Agreement below.

---

[2]     A list of the OPs that were modified pursuant to the provisions of Section 2 of the Parties' MOU and a summary of the revisions thereto is attached hereto as Appendix A. In the event the Defendant seeks to affect any further changes to its OPs governing or relating to the provision of medical care at FCCW during the pendency of this Settlement Agreement, it shall provide notice of the proposed changes to the Plaintiffs and the Compliance Monitor at least 20 days before such changes are scheduled to take effect. In the event the Plaintiffs object to the proposed changes on the grounds that the provision of medical care in accordance with the changed OP would result in an Eighth Amendment violation, the Plaintiffs may seek a ruling from the Court precluding adoption of the proposed changes pursuant to the dispute resolution procedures set forth in Section V.2. of this Agreement below.

6

## Guidelines for FCCW

i.     VDOC Clinical Practice, Medical and Nursing Guidelines

- The Defendant shall refer to and follow generally accepted national clinical guidelines for chronic disease, as they evolve, including the current guidelines for the treatment of diabetes and hypertension, respectively.

- VDOC's 2015 clinical guideline for Hepatitis B shall include, in Section XII thereof, pregnancy as an indication for treatment, as untreated Hepatitis B infection poses a serious risk of harm to a fetus. Under Section XVI, the discontinuation of treatment for risky rule violations shall be considered by physicians on a case-by-case basis, taking into account the public health risk posed by such discontinuation in any specific case.

- VDOC's updated clinical guideline for Hepatitis C shall be reviewed for further updating on an annual basis. This guideline shall be revised to expressly provide for continuity of treatment for newly-incarcerated prisoners who were receiving treatment in the community. "Control" of comorbid conditions, such as diabetes, shall be defined, and the level of control for diabetes shall be A1c hemoglobin level ≤9.0. Treatment shall be afforded to any prisoner with a remaining sentence of nine months or more at the time the need for treatment is identified, and a prisoner need not have been incarcerated for three years before she is eligible for treatment. Under Section X1.4, .5 and .6, the discontinuation of treatment for risky rule violations shall be considered by physicians on a case-by-case basis, taking into account the public health risk posed by such discontinuation in any specific case.

- The Defendant shall refer to the Federal Bureau of Prisons (BOP) clinical guideline and other generally accepted national guidelines for treatment of skin and soft-tissue infections.

- In regard to the VDOC Medical and Nursing Guidelines, the guideline governing AIMs (abnormal involuntary movements) testing of prisoners on antipsychotic medications shall be modified to provide that an AIMs test should be performed as a baseline for any prisoner with a prescription for any first-generation or second-generation

7

antipsychotic medication, and the test should be repeated every six months, at a minimum.

- The guideline regarding treatment of Urinary Tract Infections shall be modified to provide for a physician visit within 72 hours of diagnosis absent an indication of a need for greater urgency.

- Handcuffs applied in the front of the offender are the only restraints authorized when transporting an offender who is pregnant or in post-partum recovery outside the secure perimeter. Female offenders in their second and third trimesters of pregnancy shall be transported by wheelchair or gurney instead of walking in order to prevent accidental falls posing a risk of harm to the fetus. Restraint by handcuffs of offenders during active labor and delivery, or at any other time when the Health Services Administrator determines that the use of handcuffs might jeopardize the health or wellbeing of the pregnant woman or fetus is not permitted. Medical profiles for use of bottom bunks shall be granted to pregnant offenders and other offenders whose physical disabilities or illnesses make climbing to an upper bunk infeasible as a practical matter.

## Standards for FCCW

i.  **Provider staffing levels.**

*Standard:* FCCW shall establish and maintain a sufficient number of health staff of varying types or adopt such other measures as shall be necessary to provide inmates with adequate and timely evaluation and treatment, including continuity and coordination of care. Nurse practice shall be performed within the scope of nursing licenses, and neither registered nurses (RNs) nor licensed practical nurses (LPNs) shall make medical decisions beyond the scope of their professional training. Nursing coverage shall be provided around the clock.

ii.  **Intake screening of offenders.**

*Standard:* Receiving screening shall be performed on all inmates upon arrival at the intake facility as soon as possible to ensure that emergent and urgent health needs are met and to protect staff and prisoners from unnecessary exposure to communicable disease.

iii.  **Comprehensive health assessments.**

*Standard:* Comprehensive health assessments shall be performed on intake and thereafter according to revised OP 720.3. Age and gender specific screening and testing shall conform to generally accepted national guidelines. These health assessments should be performed no later than 14 days after intake, or sooner depending on medical appropriateness. Patients on medication for acute or chronic conditions at time of intake shall have continuity of medication.

iv.  **The Sick Call Process/Access to Health Services.**

*Standard:* Non-emergency requests for care shall be screened for urgency within 24 hours. Physician/mid-level practitioner referrals should be accomplished in no more than 72 hours for urgent problems or deterioration of chronic conditions. FCCW shall assure continuity when requests for examination and/or treatment concern lapses in prescribed medication.

v.  **Offenders' Co-Pay Policy.**

*Standard:* FCCW shall suspend all co-payments for medical care for six months commencing as of the Effective Date, after which co-payment requirements will resume in accordance with then-existing VDOC policy. There will be no co-payments for medications for chronic conditions, emergency care, or treatment of communicable diseases (e.g., MRSA, HIV, HCV). Co-payments shall not be charged until the service is performed or until the first dose of ordered medication is provided. Under no circumstances will there be co-payments for wheelchair or stretcher transport for acute or urgent conditions. Co-payment, if any, for medical equipment (*e.g.*, crutches, walkers, canes, etc.) that FCCW provides to prisoners in accordance with its legal obligation to afford reasonable accommodations in regard to disabilities will be determined pursuant to the parties' development of a comprehensive ADA policy under Section III.2.c. of this Agreement, below. Co-payments will not be charged for providing prisoners with an initial copy of the results of diagnostic or laboratory tests ordered by the practitioners.

vi.  **Diagnosis and Treatment.**

*Standard:* Prisoners should have unimpeded access to timely medical care at an appropriate level, including, among other things, adequate pain management for acute and chronic conditions.

9

vii. **Response to Medical Emergencies/Emergency Medical Care.**

*Standard:* Response to medical emergencies should be timely and should conform to appropriate standards of care. Emergency medications, medical supplies and equipment shall be regularly maintained and readily available.

viii. **Infirmary Conditions and Operations.**

*Standard:* Infirmary care shall be appropriate to meet the serious medical needs of patients. This includes physical plant accommodations; infectious disease control; sanitation and hygiene; privacy; heat and hot water; functioning medical equipment; and staffing. Each admission should have admission notes, treatment plans, and discharge plans. Infirmary patients should have access to recreation and programming, except as specifically limited by their medical conditions.

ix. **Chronic Care.**

*Standard:* Offenders shall have continuity and coordination of care for chronic conditions such as hypertension, diabetes, cancer and other diseases that require periodic care and treatment. They shall be monitored every six months if their condition is controlled and stable. For those whose conditions are not controlled and stable, they shall be monitored every three months, at a minimum.

x. **Infectious Disease control and infectious waste management.**

*Standard:* An effective program includes surveillance, prevention, and control of communicable disease. Among other things, this includes expedited access to prophylactic measures for high-risk exposures, such as blood-borne exposures.

xi. **Utilization Management.**

*Standard:* The quality of care can be enhanced by effective care management. Quality can be diminished by underuse of appropriate health care services, overuse of services (e.g., unnecessary testing that leads to unnecessary interventions) and misuse of resources. The UM program shall work to enhance quality of care by providing timely access to an appropriate level of care.

10

a. **Timely Referral to Outside Providers for Specialized Care.**

   Physician requests for off-site care shall be processed in a timely manner and considered in accordance with nationally-accepted criteria, e.g., InterQual, Milliman, etc. A physician shall make any recommendations or decisions other than approvals. The referring physician shall have an appeal process, and appeals shall be resolved in a timely manner. New referrals should be accomplished within 30 days. The referring physician shall examine the patient monthly while awaiting the referral appointment to ascertain any deterioration in condition.

b. **Timely Compliance with Consultant Recommendations/**

   Consultant recommendations, including those regarding follow-up appointments, shall be acknowledged in the medical record and either followed or amended, with medical record documentation of the rationale for not following consultants' recommendations.

c. **Prescription of Non-Formulary Medications.**

   The Formulary shall include a procedure to waive Formulary restrictions with respect to otherwise necessary and/or appropriate medications not listed. If a waiver request is denied, the referring physician shall have a right of appeal to the VDOC Medical Director, and appeals shall be resolved in a timely manner.

xii. **Continuity in Supply and Distribution of Medication.**

*Standard:* Medication services shall be clinically appropriate and medications shall be provided in a timely, safe, and sufficient manner, including continuity of medication on intake and renewal of prescriptions whenever clinically appropriate. Pharmaceutical operations shall be sufficient to meet the needs of the Facility and conform to legal requirements.

To the extent possible, arrangements shall be made to provide medication indoors during inclement weather. The timing of medication administration shall be considerate of sleep requirements and relationship to the timing of meals, where medically appropriate, e.g., diabetes. Morning pill call shall be conducted no earlier than 5:30 a.m.

11

All prescription medications delivered or administered to patients will be labeled according the Virginia Regulations Governing the Practice of Pharmacy.[3]  This shall include, among other things, patient name, identification number, drug name, instructions, and expiration date.  Further, appropriate safeguards should be in place so that medications that should not be crushed are not crushed.

xiii.    **Continuity in Supply and Distribution of Medical Equipment/Supplies (prostheses, wheelchairs, adult diapers, bandages, etc.).**

*Standard:*  Durable medical equipment in appropriate working order and supplies shall be ordered, maintained, provided and available for daily use, as medically necessary.

xiv.    **Physical Therapy.**

*Standard:* Physical therapy services shall be available on-site or off-site, as appropriate, and, subject to the offender's consent, shall be carried out as prescribed by the patient's physician.

xv.    **The Medical Grievance Process.**

*Standard:*  The grievance mechanism is an important component of the Facility quality management program.  The grievance process allows a patient to question or complain about health care services.  The Facility shall log and track incoming grievances to assure timely responses.  The Facility shall be responsive to the complaint in a timely and meaningful manner.  The Facility shall perform quantitative and qualitative analysis of grievance data as part of its quality management program.  FCCW data shall be analyzed by VDOC as part of its contract oversight function.

xvi.    **Appropriate Offender Access To Information regarding Medical Care.**

*Standard:* Information on access to health services shall be communicated orally and in writing to prisoners on arrival at the facility, tailored in a form and language that each prisoner can understand.  Patients shall be provided with the results of laboratory and diagnostic testing and the recommendations of consulting practitioners in a comprehensible form and timely manner.

---

[3]     https://www.dhp.virginia.gov/pharmacy/pharmacy_laws_regs.htm, accessed 15 December 2014.

12

Diagnostic reports or patient instructions from consulting physicians shall be provided to an offender upon request at no charge for the first copy.

xvii. **Appropriate Accommodations for Prisoners with Special Needs.**

*Standard:* Prisoners are essentially dependent on the physical conditions of and services provided by their facilities. The Facility shall make reasonable accommodations for physically challenged and mentally ill prisoners, consistent with and as required by the law. This shall include, among other things, medical and mental health care and physical plant accommodations; medication; protection from heat injury; skilled nursing care and programming. Health and custody staff shall avoid disciplining prisoners for their disabilities and provide personal safety protection for those with disabilities, especially the elderly. Among other things, this includes access to medical services in Building 2 and wheelchair access in dining halls. In addition, patients shall be provided toilet access, consistent with their medical needs as determined by a practitioner.

xviii. **Guidance/Training of Correctional Staff.**

*Standard:* Health care staff shall work with Facility administration to provide training and guidance to custody staff on first aid to the extent needed; recognizing the need for emergency care; cardiopulmonary resuscitation; recognizing acute manifestation of chronic illness (e.g., diabetes, asthma, seizures) and adverse effects of medication; suicide prevention; and recognizing signs and symptoms of mental illness.

xix. **Care/Release of Terminally-Ill Offenders**

*Standard:* FCCW shall have and maintain a program to provide palliative care, including pain management, where medically appropriate. FCCW shall have a program to address the needs of terminally ill patients, including voluntary hospice programs. The health care staff shall recommend transfer or early release to legal authorities, where medically appropriate.

xx. **Conduct Of and Follow-Up Regarding Mortality Reviews.**

*Standard:* Mortality review is an important component of a quality management program. Within 30 days of a death, the Medical Director of the Facility shall complete a review of the care provided to each decedent. This review should be self-critical,

13

including explicit consideration as to whether the death was preventable. It should also include a discussion of how the care might have been improved, even if the death was not preventable. The review should include recommendations for improving care for presentation to the VDOC Quality Management Committee. The mortality review at the facility level shall become part of the VDOC statewide mortality review.

The mortality review shall be reopened, as necessary or appropriate, in consideration of an autopsy and toxicology report, when these are released.

xxi. **Criteria for Performance Measures, Evaluation, and Comprehensive Quality Improvement.**

*Standard:* FCCW shall measure its performance on each aspect of the obligations imposed by this Settlement Agreement. This measurement shall be quantitative, based on focused or comprehensive medical record review where applicable. Measures shall conform to the circumstances at FCCW and shall be approved by the Compliance Monitor.

In addition, the quality management program shall consider data from mortality reviews, grievance analyses, and any patient satisfaction surveys.

Data shall be analyzed qualitatively so as to identify opportunities for improvement and identify remedies. Performance shall be tracked and trended over time and shared with the Parties through counsel on a quarterly basis while this Settlement Agreement is in effect.

FCCW will develop an annual quality management program plan that takes into consideration known impediments to quality care and opportunities for improvement. On an annual basis, FCCW will produce a self-critical evaluation of the prior year's clinical performance and an evaluation of the value of the quality management program. This evaluation will be used to develop the annual quality management program plan.

xxii. **Performance Evaluation and Quality Improvement, including Contractor Monitoring and Compliance, beyond expiration of the Settlement Agreement.**

*Standard:* VDOC will actively participate in Quality Improvement Committee meetings, as part of clinical oversight and as partners with the Contractor in providing continuous and unimpeded access to an appropriate level of health care at FCCW. Through its

14

oversight, VDOC will work to reduce barriers to timely access to care at FCCW, and provide remedies where opportunities for improvement are identified. VDOC will assure that improvements in care at FCCW are supported by sustainable systems of care.

The Compliance Monitor will evaluate VDOC's progress in self-identification of opportunities for improvement and will evaluate the sustainability of documented improvements in care and clinical outcomes at FCCW.

### c. Establishment Of Additional Relevant Policies

The Parties acknowledge that VDOC does not currently have an OP regarding reasonable accommodations for physical disabilities of incarcerated individuals consistent with the mandate of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq*., and its implementing regulations and standards. Nor does VDOC currently have an OP establishing concrete and definitive practices and procedures to govern the Defendant's self-evaluation with respect to the quality and quantity of the medical care it provides to prisoners on an ongoing basis in accordance with widely-recognized Continuous Quality Improvement ("CQI") concepts. The Defendant agrees that the Parties, their respective correctional medical experts/consultants and the Compliance Monitor, acting in mutual good faith and working in concert, shall develop, adopt and implement new VDOC OPs for FCCW concerning Reasonable Accommodation of Disabilities and CQI, respectively, within 120 days of the Effective Date of this Settlement Agreement. In the event a disagreement between the Parties arises with respect to the content of these new OPs, such dispute shall be resolved by the Compliance Monitor.

### d. Performance Measuring Tools

In evaluating the Defendant's performance and satisfaction of its obligation to provide the prisoners incarcerated at FCCW with constitutionally-adequate medical care in accordance with the Eighth Amendment and the terms and conditions of this Settlement Agreement, the Compliance Monitor shall utilize and report on the basis of application of the Performance

15

Measuring Tools to be developed by the Compliance Monitor with a focus on each of the subjects identified on the list attached as Appendix B of this Agreement and fully incorporated herein by reference.

## IV.    MONITORING

### 1.    Monitor Selection

Pursuant to Section 1 of the Parties' MOU, the Parties have jointly selected Nicholas Scharff, M.D., MPH, the former Chief Medical Officer of the Commonwealth of Pennsylvania Department of Corrections, to serve as the Compliance Monitor for purposes of this Settlement Agreement.[4]  In the event the Compliance Monitor position becomes vacant before the full duration of the monitoring period contemplated by this Settlement Agreement has expired, the Parties, by counsel, shall meet, confer and seek to agree upon another knowledgeable individual with expertise and experience in the field of correctional medicine to fill the vacancy as promptly as practicable.  If the Parties' representatives are unable to reach agreement on the selection of an individual to serve as Dr. Scharff's successor in the role of Compliance Monitor, each Party shall nominate one correctional medical expert to the Court, accompanied by a written submission setting forth its nominee's qualifications to serve and any arguments either Party may wish to make concerning the other Party's nominee, and the Court shall select the Compliance Monitor from the Parties' competing nominees, the Court's determination in this regard to be final.

### 2.    Monitoring Functions

#### a.    Visits To FCCW

The Compliance Monitor shall, during the first two years that this Settlement Agreement is in effect, conduct an in-depth visit on site at FCCW at least four times per year.  The duration of the initial visit shall presumptively be at least 24 hours, to be conducted over the course of 3 to

---

[4]    A copy of Dr. Scharff's current Curriculum Vitae is attached as Appendix C to this Settlement Agreement.

16

5 days.  The duration of visits thereafter shall be determined in accordance with the Compliance Monitor's discretion.  If the Monitor, in the exercise of his discretion, on the basis of application of the Guidelines, Standards and Performance Measuring Tools set forth or referenced herein, determines that appropriate progress has been demonstrated toward the goal of constitutionally-adequate medical care on a consistent basis by the end of the second year that this Settlement Agreement is in effect, he may reduce the frequency of his visits to FCCW to at least once during each four-month period, for a total of three annual visits in the third year.  Otherwise, the number of annual visits in the third year shall be no fewer than the number of annual visits during the second year.  If the Monitor, in the exercise of his discretion as described above, determines that appropriate progress has been demonstrated toward the goal of constitutionally-adequate medical care on a consistent basis during the third year that this Settlement Agreement is in effect, he may reduce the frequency of his visits to FCCW to at least once during each six-month period, for a total of two annual visits in the fourth year.  Otherwise, the number of annual visits in the fourth year shall be no fewer than the number of annual visits during the third year. The Monitor, in his discretion, may determine that it is necessary to visit FCCW more frequently than the minimum number of visits prescribed for any year during the time period that this Settlement Agreement is in effect.

### b. Focus/Purpose Of Visits To FCCW

The purpose and focus of the Compliance Monitor's periodic visits to FCCW shall be to observe, evaluate and analyze the nature and extent of all aspects of the Defendant's performance of its obligation to provide constitutionally-adequate medical care to the Class, as required by the Eighth Amendment and in accordance with the provisions of Section III of this Settlement Agreement.

c. **Monitor Reporting**

The Compliance Monitor shall prepare a written report to the Parties setting forth his findings after each visit to FCCW. Each report shall be provided to counsel for the Parties in draft form fourteen days before the intended date of its issuance in final form, and the Compliance Monitor shall consider the Parties' comments and suggestions and make such changes, if any, as he deems appropriate to the draft before issuing the report. The reports shall be written with due regard for the privacy interests of individual prisoners and the Defendant's interest in protecting against the disclosure of non-public information that may legitimately be regarded as affecting security considerations.

For purposes of each report, the Compliance Monitor shall evaluate the status of the Defendant's performance of its obligations under the Eighth Amendment and this Settlement Agreement, focusing on the Operating Procedures, Guidelines and Standards, and utilizing the Performance Measuring Tools, set forth or incorporated by reference in Section III above. With respect to each element of the Defendant's performance evaluated, the Compliance Monitor shall rate the Defendant as non-compliant, partially compliant or fully compliant with the obligations contemplated in Section III above. In order to assess compliance, the Monitor shall review a sufficient number of pertinent medical charts and other relevant documents to accurately evaluate current conditions; interview all necessary medical personnel and correctional staff; and interview a sufficient number of prisoners to gain a complete and accurate sense of the status of provision of medical care at the time of each visit. The Compliance Monitor shall be responsible for independently verifying any representations made by the Defendant and/or the Contractor regarding progress towards satisfaction of the obligation to provide constitutionally-adequate medical care in accordance with the provisions of Section III and examining all supporting documentation. Each report shall describe the measures undertaken by the Compliance Monitor

18

to analyze conditions and assess compliance, including identification of documents reviewed, individuals interviewed, medical practices and procedures observed and locations investigated, and shall expressly and with specificity set forth the basis for each of the Compliance Monitor's findings and conclusions.

If the Compliance Monitor, during the time period in which this Settlement Agreement is in effect, identifies a deficiency in any aspect of the medical care provided by the Defendant at FCCW that he deems to involve constitutionally-inadequate care, he shall promptly bring the problem at issue to the Defendant's attention by written notice. The date of receipt of such notice by the Defendant shall trigger the running of a 30-day time period within which the Defendant may determine and implement a cure of the problem identified, or attempt to otherwise resolve the problem through negotiations with the Compliance Monitor.

If the Plaintiffs, during the time period in which this Settlement Agreement is in effect, identify a deficiency in any aspect of the medical care provided by the Defendant at FCCW that they believe involves constitutionally-inadequate care, they, by and through their counsel and with or without the concurrence of the Compliance Monitor, may bring the problem at issue to the Defendant's attention by written notice. The date of receipt of such notice by the Defendant shall trigger the running of a 30-day time period within which the Defendant may determine and implement a cure of the problem identified, or attempt to otherwise resolve the problem through negotiations with the Plaintiffs' counsel. To the extent they deem necessary or appropriate, the Parties may enlist the assistance and input of the Compliance Monitor in attempting to resolve such problems as may be identified.

The Plaintiffs' opportunity, acting by and through their counsel, to bring issues of allegedly constitutionally-inadequate medical care to the attention of the Defendant directly as

described in the preceding paragraph shall not constitute a substitute for any individual prisoner's obligation to comply with the Inmate Grievance Procedure, and Plaintiffs' counsel shall advise the Plaintiffs accordingly.

Copies of the reports prepared by the Compliance Monitor shall be public records and shall be maintained on file in the Prison Library at FCCW and available for review by the prisoners residing there, such copies to be redacted to the extent necessary to protect against the disclosure of the identity of any particular prisoner discussed therein, the disclosure of any non-public information relating to security considerations, or the disclosure of information deemed to be Confidential by the parties as described more fully in Section IV.4. below.

3.   **Monitor Access**

Subject to the express understanding that the Compliance Monitor may be escorted by VDOC correctional personnel when visiting within secure areas of FCCW as the Defendant deems necessary or appropriate, the Compliance Monitor shall have liberal and prompt access upon request to all areas within FCCW in which medical care services or accommodations for disabilities are provided; to all medical and security personnel employed at FCCW; to all prisoners residing at FCCW; and to all medical grievance records and medical records maintained by FCCW and/or the Defendant pertaining to prisoners residing at FCCW.  All interviews conducted by the Compliance Monitor shall be confidential, even if subject to visual observation by FCCW correctional staff from an appropriate distance.  There shall be no retaliation on the part of FCCW correctional staff or other VDOC personnel against any prisoner residing at FCCW on the basis of such prisoner's active involvement in this lawsuit or her interaction with the Compliance Monitor.  The Defendant shall instruct all VDOC and Contractor employees to cooperate fully with the Compliance Monitor.  The Defendant shall

20

provide documents to the Compliance Monitor upon his request (*e.g.* census summaries, incident and compliance reports involving medical issues, grievances, etc.) within 7 days of the date of the request. The Compliance Monitor, in his sole discretion, may engage in *ex parte* communications with any of the Parties, without any obligation to disclose the existence or the substance of any such communications to any other Party either before or after they are conducted.

4. **Reporting Of Deaths**

The Defendant shall, within 24 hours of any such occurrence, notify the Compliance Monitor of the death of any FCCW prisoner and shall, as soon as possible thereafter, forward to the Compliance Monitor, with a copy to the Plaintiffs' counsel, any Incident Reports or Reports of Sudden and Unusual Incidents concerning the death, whether prepared by VDOC personnel (including investigators employed by the VDOC Special Investigation Unit) or the Contractor's personnel; all medical records of the deceased prisoner; any medical and/or mental health reports regarding or relating to the death or the deceased prisoner; as well as any and all final reports prepared by or on behalf of the VDOC concerning any prisoner death at FCCW. To the extent requested by the Defendant and agreed upon by the Compliance Monitor and Plaintiffs' counsel, documents provided pursuant to this provision shall be handled and maintained in a Confidential manner, and public copies of any report prepared by the Compliance Monitor containing a specific reference to information derived from such Confidential documents shall be redacted or filed under seal if submitted to the Court.

5. **Limitations On The Scope Of The Compliance Monitor's Role**

The Compliance Monitor shall not voluntarily testify as a witness or affiant in any other litigation matter or proceeding with respect to any actual or alleged acts or omissions on the part

of the Defendant or any of its agents, representatives or employees related to this Settlement

Agreement, nor as to any matter or subject of which he learned or became informed as a result of

the performance of his role under this Settlement Agreement.  Unless a conflict of interest is

knowingly and expressly waived by all Parties, the Compliance Monitor shall not accept

employment or provide consulting services that would present or constitute such a conflict with

his responsibilities under this Settlement Agreement, including being retained (on a paid or

unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's

attorney, in connection with any claim or lawsuit against the Defendant or its agents,

representatives or employees.  The Compliance Monitor is not a State, County or local agency or

agent thereof and, accordingly, the work papers developed and/or maintained by the Compliance

Monitor in connection with the performance of his responsibilities under this Settlement

Agreement shall not be deemed public records subject to public inspection or disclosure except

for final versions of his reports to the Parties.  Upon the expiration of one year after the date on

which this Settlement Agreement concludes, the Compliance Monitor shall either return all

VDOC documents that he obtains pursuant to the provisions of this Agreement to the possession

and custody of the VDOC or shall certify to the VDOC in writing, subject to the penalty of

perjury, that all such documents have been destroyed.  Neither the Compliance Monitor nor any

person or entity hired or otherwise retained by the Compliance Monitor to assist in the

performance of his responsibilities under this Settlement Agreement or in furtherance thereof

shall be subject to or liable for any claim, lawsuit or demand arising out of that performance.

6.     **Monitor Replacement**

The Compliance Monitor, except at his own election, may be terminated and replaced

only upon mutual agreement of the Parties or by Order of the Court upon motion, but solely for

good cause shown that is unrelated to the substance of his findings and conclusions. Good cause, for these purposes, shall include gross neglect of duties resulting in deficient performance; willful misconduct; inappropriate personal relationship with a representative of either of the Parties; a conflict of interest; or actual or alleged involvement in any criminal or other unlawful conduct during the pendency of this Settlement Agreement.

7.    **Monitor Compensation**

The Compliance Monitor's reasonable fees and expenses incurred in performing his duties under the provisions of this Settlement Agreement shall be borne by the Defendant pursuant to the terms discussed and agreed upon between the Defendant and the Compliance Monitor.

## V.    ENFORCEMENT

1.    The Court shall retain jurisdiction over the Parties for purposes of ensuring the implementation of this Settlement Agreement and shall preside over such further proceedings as may be necessary or appropriate to enforce its terms and conditions.

2.    In the event that a problem of constitutionally-deficient medical care on the part of the Defendant, and brought to the Defendant's attention by the Compliance Monitor or the Plaintiffs' counsel pursuant to the provisions of Section IV.2.c. of this Settlement Agreement, has not been cured or otherwise resolved to the satisfaction of the Plaintiffs or the Compliance Monitor upon expiration of the 30-day period following the provision of such notice to the Defendant, the Plaintiffs, by and through their counsel, may initiate proceedings before the Court seeking specific performance of the terms of this Settlement Agreement, contempt sanctions against the Defendant, or both. The Plaintiffs shall bear the burden of proof by a preponderance of the evidence in such proceeding. In the event the Plaintiffs prevail in the prosecution of such

enforcement action, they may petition the Court for an award of their reasonable costs and attorneys' fees incurred in bringing the action.

3.      In the event of a medical emergency posing a substantial threat of immediate harm to any prisoner residing at FCCW, as identified by the Compliance Monitor or the Plaintiffs through counsel, the notice and 30-day cure provisions of this Settlement Agreement shall be deemed waived by the Defendant and the Plaintiffs, through counsel, may seek immediate enforcement of its terms by the Court.

## VI.      CONSTRUCTION, IMPLEMENTATION AND TERMINATION

1.      The implementation of this Settlement Agreement shall begin no later than the Effective Date.

2.      Except to the extent otherwise agreed upon by the Parties under a specific provision set forth herein, the Defendant shall implement all provisions of this Settlement Agreement within 30 days of the Effective Date.

3.      The VDOC Operating Procedures applicable to FCCW, except to the extent maintained on a confidential, non-public basis pursuant to applicable law or regulation, and the Guidelines, Standards and Performance Measuring Tools governing and establishing a basis for assessment of whether the provision of medical care at FCCW is satisfying constitutional standards, shall all be copied and made available for prisoner access and review at various locations within the Prison, including but not limited to the Prison Library, where a copy of these materials clearly and legibly labeled as such will be on display in an easily recognized and accessible location.

4.      All women incarcerated at FCCW as of the Effective Date, and all women entering FCCW thereafter during the term that this Settlement Agreement is in effect, shall be

24

provided in a timely manner with an Information Sheet, the contents of which shall be mutually agreed upon by the Parties, advising the recipients of the existence and material terms and conditions of this Settlement Agreement including, without limitation, contact information for the Compliance Monitor. The Information Sheet shall expressly advise that any direct communications by any offender to the Compliance Monitor regarding any medical care problem or concern shall not be a substitute for the obligation to comply with the Offender Grievance Procedure.

5.      Failure by any Party to enforce or seek to enforce this Settlement Agreement or any provision thereof with respect to any deadline or any other obligation to be performed hereunder shall not be construed as a waiver of that Party's right to enforce or seek to enforce other deadlines or conditions of this Settlement Agreement.

6.      This Settlement Agreement reflects and shall constitute the entire agreement of the Parties. No prior or contemporaneous communications, oral or written, shall be deemed relevant or admissible in any proceeding for purposes of determining the meaning of any provisions hereof, in this or any other action.

7.      This Settlement Agreement shall be applicable to and binding upon the Parties and their successors, officers, agents, employees and assigns. Any VDOC Requests for Proposal and/or contracts for the provision of medical care at FCCW issued or entered into on or after the Effective Date shall expressly incorporate by reference and shall be subject to all of the terms and conditions of this Settlement Agreement.

8.      Except as regards the members of the Plaintiff Class, this Settlement Agreement is not intended to affect, impair, enhance or expand the right of any individual person or entity to seek relief against the Defendant, its employees or agents for their past, current or future

conduct; accordingly, this Settlement Agreement, except to the extent expressly set forth herein, does not alter any legal standards governing any such claim under federal and/or Virginia law.

9.      If any provision of this Settlement Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect or impair this Settlement Agreement as a whole or any of the remaining provisions thereof except as dictated by applicable law or public policy.

10.      This Settlement Agreement shall terminate as of the date on which the Defendant has achieved substantial compliance with all elements of performance of its obligations to provide constitutionally-adequate medical care under the Eighth Amendment, subject to the Compliance Monitor's evaluation under this Settlement Agreement, and has consistently maintained such substantial compliance for a period of one year, provided, however, that the termination may not take effect less than three years from the Effective Date unless the Parties, by and through their respective counsel, mutually agree to termination within a shorter period of time.

## VII.    ATTORNEYS' FEES AND COSTS

The Parties, in mutual good faith, shall exercise their best efforts to agree upon the measure of reasonable attorneys' fees and litigation costs, including such attorneys' fees and costs as may be incurred in implementing the terms and conditions of this Settlement Agreement (except as contemplated by Section V.2. hereof), that shall be paid to the Plaintiffs by the Defendant.  If, within 30 days after the date on which the Motion for Preliminary Approval of this Agreement is filed, the parties have been unable to resolve the matter of recoverable attorneys' fees and costs by mutual agreement, the Plaintiffs may submit a petition to the Court

for the determination and awarding of fees and costs to the Plaintiffs as the prevailing parties in this action pursuant to 42 U.S.C. §1988.

## VIII.   <u>PLRA FINDINGS</u>

The Parties hereby stipulate, and request that the Court, upon independent review and consideration, find that this Settlement Agreement complies with the Prison Litigation Reform Act.  The Parties agree that the prospective relief established by this Settlement Agreement is narrowly drawn, extends no further than is necessary to address and remedy the violations of federal rights alleged by the Plaintiffs in their pleadings in this action, is the least intrusive means necessary to correct these alleged violations, and will not have any adverse impact on public safety or the operation of the criminal justice system.  Accordingly, the Parties agree and they jointly request that the Court find that this Settlement Agreement complies in all respects with the provisions and requirements of 18 U.S.C. § 3626(a).  Any admission made for purposes of this Settlement Agreement is not admissible if presented by any third party in any other proceeding.  This Settlement Agreement is not intended to have and shall not have any preclusive effect except as between the Parties hereto, and does not resolve, adjudicate or bar, or purport to resolve, adjudicate or bar, any claim for damages against the Defendant by any former, current or future Class member.

DATED: September 14, 2015

Respectfully submitted,

_Cynthia B. Scott_
Cynthia B. Scott, Class Representative


_Belinda D. Gray_
Belinda Gray, Class Representative


_Toni Hartlove_
Toni Hartlove, Class Representative


_Karen C. Powell_
Karen Powell, Class Representative


_Lucretia Robinson_
Lucretia Robinson, Class Representative

Mary C. Bauer, VSB No. 31388
([mary@justice4all.org](mary@justice4all.org))                    (
Abigail Turner, VSB No. 74437
([abigail@justice4all.org](abigail@justice4all.org))
Brenda E. Castañeda, VSB No. 72809
([brenda@justice4all.org](brenda@justice4all.org))
Anglea Ciolfi, VSB No. 65337
([angela@justice4all.org](angela@justice4all.org))
Erin M. Trodden, VSB No. 71515
([erin@justice4all.org](erin@justice4all.org))
Ivy A. Finkenstadt, VSB No. 84743
([ivy@justice4all.org](ivy@justice4all.org))
LEGAL AID JUSTICE CENTER
1000 Preston Ave., Suite A
Charlottesville, VA  22903
(434) 977-0553

         and

Deborah M. Golden (admitted *pro hac vice*)
([Deborah_Golden@washlaw.org](Deborah_Golden@washlaw.org))
Elliot Mincberg
WASHINGTON LAWYERS' COMMITTEEE FOR
  CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C.  20036
(202) 319-1000

         and

29

Theodore A. Howard (admitted *pro hac vice*)
([thoward@wileyrein.com](mailto:thoward@wileyrein.com))
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000


By:____*/s/Brenda E. Castañeda*_____

    Attorneys for Plaintiffs



Richard C. Vorhis, VSB No. 23170
[rvorhis@oag.state.va.us](mailto:rvorhis@oag.state.va.us))
J. Michael Parsons, VSB No. 68520
([jparsons@oag.state.va.us](mailto:jparsons@oag.state.va.us))
Correctional Litigation Section,
Criminal Justice and Public Safety
 Division
OFFICE OF THE ATTORNEY GENERAL
900 East Main Street
Richmond, VA  23219
(804) 784-0046


By:____*/s/Richard C. Vorhis*_____

    Attorneys for Defendants


**APPROVED AND SO ORDERED** this __ day of _____, 2015

                                   _____
                                   The Hon. Norman K. Moon
                                   Senior U.S. District Judge

30

# **APPENDIX A**

## <u>SUMMARY OF VDOC OPERATING PROCEDURES REVISIONS</u>

As an element of the resolution agreed upon by Plaintiffs Cynthia B. Scott, *et al*., and the Virginia Department of Corrections (VDOC) Defendants in settlement of the case captioned *Scott, et al. v. Clarke, et al.*, Case No. 3:12-cv-00036-NKM (W.D. Va.), and in accordance with the provisions of Section 2 of the Memorandum of Understanding entered into by the parties on November 25, 2014, the parties, with the assistance of and in collaboration with their respective medical consultants and the designated Compliance Monitor, Nicholas Scharff, M.D., MPH, have agreed upon revisions to the following VDOC Operating Procedures (OPs) which, as revised, will serve as guidance for the provision of medical care at Fluvanna Correctional Center for Women on and after the Effective Date of the Settlement Agreement:

OP 411.1        Offender Transportation [Non-Public]

OP 420.2        Use of Restraints and Management of Offender Behavior [Non-Public]

OP 425.2        Hospital Security [Non-Public]

OP 701.1        Health Services Administration

OP 720.1        Access to Health Services

OP 720.2        Medical Screening Classification and Levels of Care

OP 720.3        Health Maintenance Program

OP 720.4        Co-Payment for Health Care Services

OP 720.5        Pharmacy Services

OP 730.1        Mental Health Services:  Administration

OP 730.2        Mental Health Services:  Screening, Assessment and Classification

OP 730.5        Mental Health Services:  Suicide Prevention and Behavior Management

OP 740.1        Infectious Disease Control

OP 810.1        Offender Reception and Classification

An itemized summary of the agreed-upon revisions follows:

1. **OP 411.1 Offender Transportation [Non-Public]**

   The revisions to OP 411.1 accomplish the following changes:

   a.   Acknowledge that removal of restraints for purposes of necessary medical treatment is acceptable.

   b.   Strike an appropriate balance between safety concerns and doctor-patient privacy in the context of correctional officer observation of off-site encounters between a prisoner and her medical care provider.

   Also acknowledge that in the event a prisoner is required to disrobe for purposes of examination or treatment, the correctional officer maintaining visual observation of the prisoner shall be the same sex as the prisoner absent an emergency.

2. **OP 402.2 Use of Restraints And Management of Offender Behavior [Non-Public]**

   The revisions to OP 420.2 accomplish the following changes:

   a.   Provide for additional measures to assure the safe transportation of pregnant offenders restrained by handcuffs during their second and third trimesters of pregnancy.

   b.   Provide for additional safety measures with respect to monitoring of prisoners subject to restraints in their cells for behavior management reasons.

3. **OP 425.2 Hospital Security [Non-Public]**

   The revisions of OP 425.2 accomplish the following changes:

   a.   Recognize that off-site specialists and medical providers at FCCW should be able to communicate directly and in real time with one-another in the course of the off-site specialist's examination of the prisoner.

   b.   Recognize the option of removing restraints, fully or in part, upon the request of attending medical staff in connection with diagnostic examination or treatment.

   c.   Recognize, per the revisions to OP 411.1, § XV.A.7.d., that when a prisoner off-site must disrobe for specialist diagnosis or treatment, the observing correctional officer must be of the same sex, except in emergency circumstances.

4. **OP 701.1 Health Services Administration**

   a.   Section IV.A.3.

   This provision, as revised, will state as follows:

2

The [Health Services Unit] and the medical department at [FCCW] shall develop measurable goals and objectives in support of the mission and philosophy of DOC healthcare, including, but not limited to, performance measures for timely access to care and medication; continuity of care and medication; coordination of care and clinical quality in accordance with Departmental clinical guidelines and nursing protocols. These goals and objectives are reviewed annually and updated as needed.

5. **OP 720.1 Access to Health Services**

    a.    Section III.

        i.    The Definition for "Access to Care," as revised, will state as follows:

            Access to Care -- In a timely manner, patients are seen by a clinician, given a professional judgment, and receive care that is ordered.

        ii.    A Definition for "Medical Practitioner" has been added and will state as follows:

            Medical Practitioner -- A physician, physician's assistant, or nurse practitioner licensed to practice medicine in the Commonwealth of Virginia or in the jurisdiction where the treatment is to be rendered or withheld.

        iii.    The Definition for "Sick Call," as revised, will state as follows:

            Sick Call -- Care for ambulatory offenders with health care requests which are evaluated and treated in a clinic setting, it is the system through which each offender reports for and receives appropriate health services for a non-emergency illness or injury, in a timely manner in consideration of medical urgency.

        iv.    A Definition for "Urgent Care" has been added and will state as follows:

            Urgent Care -- Treatment of an acute condition or deterioration of a chronic condition that is not emergent, but if left untreated could deteriorate into a more serious or emergent problem.

    b.    Section IV.A.I.

The initial statement in this provision, as revised, will state as follows:

The Facility Unit Head, in conjunction with the Health Authority, will ensure that offenders have timely access to, and are provided adequate health care services. The continuity of health care including the continuity of medication shall be available from admission to discharge.

3

c.      Section IV.A.2.

This new provision will state as follows:

The facility shall establish and maintain a sufficient number of health staff of varying types or adopt such other measures as shall be necessary to provide offenders with adequate and timely evaluation and treatment, including continuity and coordination of care.  Nurse practice falls within the scope of nursing licenses.  Nursing coverage is available around the clock at FCCW.

d.      Section IV.A.3.

This provision, as revised, will state, in pertinent part, as follows:

Each Health Authority shall ensure that offenders entering their facility are provided with information about procedures to access routine and emergency healthcare.  Information on access to health services is communicated to offenders in writing and orally in a form and language that is easily understood.

e.      Section IV.A.5.

This provision, as revised, will state as follows:

Offenders have unimpeded access to healthcare, including, but not limited to, adequate pain management for acute and chronic conditions and to a system for processing complaints regarding health care.  Offenders may process complaints regarding health care through the Offender Grievance Procedure in institutions or by appeal to the Facility Unit Head at Community Corrections facilities.

f.      Section IV.A.9.

This new provision will state as follows:

Offenders are to be notified that laboratory and diagnostic testing results have been received and reviewed and that the results are either (check box) "acceptable" or "please see practitioner to discuss the results."

g.      Section IV.A.12.c.

This new provision will state as follows:

Co-payment fees shall be waived when appointments or services, including follow-up appointments, are initiated by health care staff, including visits for medication renewals, and for preventive screenings.

h.      Section IV.B.1.

This provision, as revised, will state as follows, and will be moved to become Section IV.B.8.

4

Each facility shall evaluate all offender health care complaints. The grievance mechanism is an important component of the facility quality management program. The grievance process allows a patient to question or complain about health care services. The facility logs and tracks incoming grievances to assure timely responses. The facility is responsive to the complaints in a timely and meaningful manner. The facility performs quantitative and qualitative analysis of grievance data as part of its quality management program. FCCW data is analyzed by DOC as part of its contract oversight function.

i.      Section IV.B.2.

This provision, as revised, will state as follows:

        1.      Emergency Complaints

             a.      Twenty-four hour emergency medical services shall be available and complaints handled immediately. Each facility shall have a written plan to provide 24-hour emergency care (*see* Operating Procedure 720.7, *Emergency Medical Equipment and Care*).

             b.      An adequate inventory of first aid kits and emergency medical equipment and supplies should be maintained at all times in accordance with Operating Procedure 720.7, *Emergency Medical Equipment and Care*. Facilities shall provide for on-site emergency first aid, CPR, and crisis intervention.

j.      Section IV.B.3.

Medical requests should be triaged within 24 hours by a qualified health care professional or health-trained staff, and the offender seen by a qualified health care professional within 72 hours.

             a.      For medical complaints deemed to be urgent, a referral shall be made for the offender to see a medical practitioner, and the offender should be seen by the practitioner within 72 hours of the referral.

             b.      For medical complaints determined to be routine, if referral to a medical practitioner is deemed to be indicated, the offender should be seen by the practitioner within two weeks of the referral.

**6.      OP 720.2 Medical Screening Classification and Levels of Care**

a.      Section III

      i.      A Definition for "Health-Trained Staff" has been added and will state as follows:

5

Health Trained Staff -- A DOC employee, generally a correctional officer, who has been trained to administer health screening questionnaires, including training as to when to refer an offender to health care staff and at what level of urgency.

ii.     The Definition for "Qualified Healthcare Personnel," as revised, will state as follows:

Qualified Healthcare Personnel -- A licensed LPN, RN, physician assistant, nurse practitioner or physician.

b.      Section IV.A.3.

This new provision will be transferred and inserted within OP 720.1, § IV.A.1., subject to a cross-reference to OP 810.1 if VDOC deems appropriate.

c.      Section IV.B.1

This provision, as revised, will state as follows:

An intake medical screening shall be performed by health-trained staff or qualified health care personnel upon the offender's arrival into the DOC, *i.e.*, at a Reception and Classification Center, Detention Center, or Diversion Center. The purpose of the medical intake screening is to ensure that emergent and urgent health needs are met and to protect staff and offenders from unnecessary exposure to communicable disease.

d.      Section IV.B.4.

This provision, as revised, will include, among the list of subjects as to which inquiry is made in the course of intake medical screening, the following additional subject:

- Current and prescribed medications

e.      Section IV.B.5.

This new provision will state as follows:

For offenders on medication, a medical practitioner shall decide whether to continue, discontinue or modify the medication within 24 hours of arrival and shall prescribe accordingly. Medication shall be available to the offender at any time considered appropriate by the medical practitioner.

f.      Section IV.D.1.g.

This provision will state as follows:

6

Cervical cytology (Pap test) and testing for Chlamydia and gonorrhea (females).

g.      Section IV.E.2.a.

This provision, as revised, will state as follows:

[Health Appraisals shall be conducted] [w]ithin 14 days after arrival at the facility, but sooner for incoming offenders with more urgent conditions, and in all cases consistent with the degree of urgency.

h.      Section IV.E.6.

This provision, as revised, will state as follows:

The health assessment shall conform to age and gender recommendations following generally accepted national guidelines, including pelvic examinations, Pap smears and mammography.

i.      Section IV.I.5.a.-e.

This provision, as revised, as follows:

The following medical categories must be considered in identifying offenders who may require medical classification and possible separation for appropriate diagnosis and treatment:

          (i)      communicable disease

          (ii)      physical disability

          (iii)      cognitive or developmental disability

          (iv)      serious mental illness

          (v)      risk of harm to self or others

          (vi)      chronic illness and debility.

j.      Section V.A.2.a.

This provision, as revised, will state as follows:

Offenders shall have continuity and coordination of care for chronic conditions such as hypertension, diabetes, cancer, and other diseases that require periodic care and treatment.  They shall be monitored every six months if their condition is controlled and stable.  For those whose conditions are not controlled and stable, they shall be monitored every three months, at a minimum.

k.    Section V.A.5.b.i.

This provision, as revised, will state as follows:

Infirmary care is appropriate to meet the serious medical needs of patients.  This includes physical plant accommodations and hygiene; privacy; heat; and staffing.

l.    Section V.A.5.b.ii.

This provision, as revised, will state as follows:

Each facility with an infirmary shall develop procedures to define the scope of services available, including a program to provide palliative care, including pain management, where medically appropriate.  There shall be a program to address the needs of terminally ill patients, including voluntary hospice programs.  *See* Operating Procedure 820.2, *Re-entry Planning*, for information on release of terminally ill offenders.

m.    Section V.A.9.a.

This new provision will state as follows:

Offenders are essentially dependent on the physical conditions of and services provided by their facilities.  The Facility shall make reasonable accommodations for physically-challenged and mentally ill prisoners, consistent with and as required by the law.  This shall include, but not be limited to, medical and mental health care and physical plant accommodations; medication; protection from heat injury; skilled nursing care and programming.  Health care, security and other staff shall avoid disciplining prisoners for their disabilities and shall provide personal safety protection for those with disabilities, especially the elderly.  This includes access to medical services in Building 2 and wheelchair access in dining halls.  In addition, patients shall be provided toilet access, consistent with their medical needs as determined by a medical practitioner.

n.    Section V.A.9.g.

This new provision will state as follows:

Physical therapy shall be available on or off-site, as appropriate, and shall be carried out, subject to the offender's consent, a prescribed by the offender's physician.

o.    Section V.B.1.

This provision, as revised, will state as follows:

The utilization management program works to enhance quality of care by providing timely access to an appropriate level of care.

8

p.      Section V.B.8.a-b.

These provisions, as revised, will state as follows:

All UM requests shall be reviewed and returned to the facility within 5 working days. All urgent UM requests are returned within 48 hours. Denials or alternate recommendations shall only be issued by a licensed physician.

q.      Section V.B.16.

This new provision will state as follows:

Initial referrals shall be accomplished within 30 days of the initial request. When this is not possible, unless otherwise indicated, a physician shall see the patient every 30 days until the [referral] visit is accomplished, to review for deterioration and increased urgency.

r.      Section V.B.19.a.-b.

This new provision will state as follows:

Consultant recommendations shall be acknowledged in the Health Record and either followed or amended, with Health Record documentation of the rationale for not following the consultant's recommendations. Follow-up appointments shall be scheduled by the Facility and realized, as per the consultants' orders as determined by the facility physician. Some types of follow-up care can be provided by the facility physician without transporting the offender to the consultant.

7.      **OP 720.3 Health Maintenance Program**

a.      Section IV.A.1.-2.

This provision, as revised, will state, in pertinent part, as follows:

Each facility should operate a health education program appropriate to its mission and offender population, so that health education and wellness information is provided to all offenders. Education methods may include posters, printed materials, seminars, videos, and individual instruction. The form and format should be designed to maximize offender comprehension.

b.      Section IV.C.3.

This provision, as revised, will state as follows:

The conditions for periodic health examinations for offenders are determined by the Health Authority, based on age and gender, in accordance with generally accepted national standards.

9

c.     Section IV.D.6.

This provision, as revised, will state as follows:

Each offender who does not have a record of a positive test result will be offered a test for infection with human immunodeficiency virus (HIV) at intake and within 180 days of the offender's scheduled release.

**8.     OP 720.4 Co-Payment for Health Services**

OP 720.4 shall be suspended in its entirety for six months from the Effective Date of the Settlement Agreement pending the parties' work on development of a comprehensive Operating Procedure with respect to compliance with the Americans With Disabilities Act, pursuant to their Settlement Agreement, Section III.2.c. at page 15.

**9.     OP 720.5 Pharmacy Services**

a.     Section IV.A.2.

This provision, as revised, will state as follows:

[Proper management of pharmaceuticals includes] [a] formalized process for obtaining non-formulary medications and a process for the prescribing physician to appeal denials of non-formulary prescriptions.

b.     Section IV.A.3.

This provision, as revised, will state as follows:

There is continuity of medication on intake, whenever clinically appropriate, as determined by the DOC physician.

c.     Section IV.A.9.

This provision, as revised, will state as follows:

Timing of medication administration is medically appropriate.  Facility administration must coordinate medically necessary medication administration schedules with facility operation and offender movement schedules.

d.     Section IV.A.10.

This provision, as revised, will state as follows:

Prescription medications shall be administered according to the Virginia Regulations Governing the Practice of Pharmacy.  This shall include, among other things, labels with patient name, drug name, instructions and expiration date.

e.     Section IV.A.11.

10

This new provision will state as follows:

Provision should be made for medications to be delivered to offenders indoors during increment weather.

**10.     OP 730.2 Mental Health Services: Screening, Assessment and Classification**

a.      Section III.

A Definition for "Health-Trained Staff" has been added and will state as follows:

Health-Trained Staff -- A DOC employee, generally a correctional officer, who has been trained to administer health screening questionnaires, including training as to when to refer an offender to health care staff and at what level of urgency.

**11.     OP 730.5 Mental Health Services: Suicide Prevention and Behavior Management**

a.      Section V.G.1.-13.

These provisions, as revised, will state as follows:

1.      This operating procedure provides guidance whereby offenders may be restrained within a cell for clinical reasons as determined by a Qualified Mental Health Professional (QMHP), subject to consultation with a DOC physician or Ph.D.-level psychologist, after reaching the conclusion that less intrusive measures would not be successful.

*               *               *

c.      Initial authorization is for up to 12 hours but the offender may be released earlier based on the recommendation of the QMHP or physician.

*               *               *

5.      When contact with a DOC physician or Ph.D.-level psychologist is not possible, the Facility Unit Head or Administrative Duty Officer may determine that an emergency exists and authorize temporary restraint of an offender within a cell until a DOC physician or Ph.D.-level psychologist can be contacted.

6.      When a QMHP, subject to consultation with a DOC physician or Ph.D.-level psychologist, considers it necessary for an offender to be restrained beyond 12 hours, the clinician will advise the Warden.

*               *               *

11

7.    At the 12-hour mark, an *Incident Report Addendum* will be completed by the Warden documenting either approval for continued restraints or disapproval and the offender's release from restraints.

8.    If the clinician recommends that restraints be continued beyond 24 hours, the Warden will be advised and will contact the Regional Administrator for approval.  If the Regional Administrator approves the request, s/he will notify the Regional Operations Chief.

9.    At the 24-hour mark, an *Incident Report Addendum* will be completed by the Warden documenting either the approval of continued restraints or disapproval and the offender's release from restraints.

10.   When an offender is going to be restrained in excess of 24 hours, the QMHP, subject to consultation with a DOC physician or Ph.D.-level psychologist, will:

    a.    Notify the Regional Mental Health Clinical Supervisor (MHCS) *via* telephone and *via* e-mail, attaching the most recent *Mental Health Monitoring Reports* 730_F14, progress notes, and any other related documentation as to why the offender was initially placed in restraints and why restraints are recommended beyond 24 hours.

    b.    Update the MCHS every day that the offender remains in restraints.

11.   When an offender is going to be restrained in excess of 24 hours the Mental Health Clinical Supervisor will notify the Chief of Mental Health and provide an update every day that the offender remains in restraints.

12.   An offender may not be restrained beyond 48 hours without the approval of Regional Administrator, Regional Operations Chief, Chief of Corrections Operations, and the Chief of Mental Health.

13.   Approved Restraints

                    *              *              *

    iii.   Medically ordered restraints are limited to Humane Restraints. This requirement does not preclude the use of metal restraints by security when Humane Restraints have proven ineffective due to an offender's behavior or prior history.  The offender's wrists and/or ankles will be wrapped in gauze or adhesive tape by medical staff prior to metal restraints being applied.

b.    Section V.G.18.

This provision, as revised, will state, in pertinent part, as follows:

12

A nursing or other qualified medical person, when on duty at the Facility, will examine the offender as soon as possible after restraints have been initially applied, and at any time when they are reapplied, to ensure that circulation is adequate. Health-trained staff or health services nurses shall monitor and document vital signs at least every two hours. Medical personnel shall assure that the patient has adequate hydration, release for toileting, and release of limbs to prevent the development of blood clots.

c.      Section V.G.19.

This provision, as revised, will state, in pertinent part, as follows:

> b.      Health trained staff or health services nurses will directly observe the offender in restraints *at least* every fifteen minutes, and more often if necessary, as directed by the QMHP or physician. Documentation of the status checks, behaviors, etc., will be made on the *Special Watch Log*. 425-FS.

d.      Section VII.A.1.

This provision, as revised, will state as follows:

As legally appointed custodians of offenders, the DOC has a responsibility to provide for their health and safety. An offender who chooses to go on a hunger strike (*i.e.*, refuses fluids and/or nutrition intake for five consecutive meals) presents a unique challenge to the orderly operation of a correctional facility due to extra demands placed on security staff, the necessary medical assessments and daily evaluations, increased psychological monitoring and administrative review.

e.      Section VII.B.1.

This provision, as revised, will state as follows:

The Shift Commander will notify medical staff, mental health staff and the Administrative Duty Officer after the offender's declaration of a hunger strike and/or after the fifth consecutive missed meal as documented via the routine security checks.

f.      Section VII.B.9.

This provision, as revised, will state as follows:

Nursing staff shall visit the offender on a hunger strike daily, with measurement and recording of weight and vital signs. Nursing staff shall notify a physician if the offender is losing weight.

12.     **OP 740.1 Infectious Disease Control**

   a.     Section IV.A.2.-3.

   This provision, as revised, will state as follows:

   Each facility should establish and maintain a multidisciplinary team that includes clinical, security and administrative representatives and meets at least quarterly to review communicable disease and infection control activities.  There is an effective program that includes surveillance, prevention and control of communicable disease.  Among other things, this includes expedited access to prophylactic measures for high-risk exposures, such as blood exposures.

   b.     Section IV.B.1.

   This provision, as revised, will state as follows:

   All workers who may come in contact with blood and other potentially infectious material in order to perform their jobs, especially Health Care Personnel (HCP) and offenders who work in health care areas, should routinely use barrier precautions to protect skin and mucous membranes.  This includes the regular use of gloves, facemasks, face shields, eyewear, and gowns or aprons as needed. Disposables should be used, as much as possible, and discarded in an approved manner after each use.

   c.     Section IV.C.1.d.

   This new provision will state as follows:

   Health care staff shall be trained on the urgency of evaluation and prophylactic treatment for high-risk exposures.

   d.     Section IV.M.4.a. & c.

   This new provision will state as follows:

   An offender exposed should be evaluated as to whether the exposure was "high risk."  In the case of a high-risk exposure, the exposed offender should be directed to a facility for evaluation and prophylactic treatment, immediately and no longer than within a few hours after the exposure.  There is a very small window of opportunity to prevent the development of HIV infection and/or viral hepatitis in an exposed person.

13.     **OP 810.1 Offender Reception and Classification**

   a.     Section III

   A Definition for "Health-Trained Staff" has been added and will state as follows:

14

Health-Trained Staff -- A DOC employee, generally a correctional officer, who has been trained to administer health screening questionnaires, including training as to when to refer an offender to health care staff and at what level of urgency.

# **<u>APPENDIX B</u>**

Case 3:12-cv-00036-NKM-JCH   Document 221-1   Filed 09/15/15   Page 48 of 57   Pageid#: 4132

**SUBJECTS FOR COMPLIANCE**
**MONITOR'S PERFORMANCE MEASURING TOOLS**

As contemplated by Section III.2.d. of the parties' Settlement Agreement, the

Compliance Monitor shall develop Performance Measuring Tools for utilization in evaluating the

Defendant's performance and satisfaction of its obligation to provide constitutionally-adequate

medical care at FCCW. Those Tools will have as their focus the following subjects, as

previously identified by the parties in Section 2 of their November 25, 2014 Memorandum of

Understanding:

1. Provider staffing levels

2. Intake screening of offenders

3. Comprehensive health assessments

4. The Sick Call Process/Access to Health Services

5. Offender's Co-Pay Policy

6. Diagnosis and Treatment of Offender Illnesses

7. Response to medical emergencies/Emergency Medical Care

8. Infirmary Conditions and Operations

9. Chronic Care

10. Infectious disease control/Infectious waste management

11. Utilization Management

    a. Timely referrals to outside providers of specialized care

    b. Access to non-formulary medications

12. Medication administration

13. Continuity in supply and distribution of Medical Equipment

14. Follow-up care in accordance with outside specialists' instructions

15. Physical therapy

16.    Offender Grievance Process (Medical care issues)

17.    Offender access to information regarding diagnosis and treatment

18.    Reasonable accommodations for disabilities and special needs

19.    Guidance/training of Correctional Staff

20.    Care/release of terminally-ill offenders

21.    Conduct of and follow up regarding Mortality Reviews

22.    Continuous Quality Improvement protocols

23.    Contractor oversight by VDOC

2

# **APPENDIX C**

# NICHOLAS SCHARFF M.D.

252 Hathaway Lane
Wynnewood PA 19096
Phone: 610-299-8075
Fax: 610-642-0438
nscharff3@gmail.com

---

## SUMMARY

General internist with extensive patient care and administrative experience in private practice, public health, and corrections, now retired from the Pennsylvania Department of Corrections and working part-time as a correctional physician and consultant in correctional medicine and health care administration.

## MEDICAL LICENSURE

| | |
|---|---|
| Pennsylvania Medical Physician & Surgeon, MD017314E | expires 12/31/2014 |
| Delaware Physician M.D., C1-0010760 | expires 03/31/2015 |
| U.S. Drug Enforcement Agency Practitioner, BS0440719 | expires 02/29/2016 |
| Delaware Controlled Substance Registration, DR-0009851 | expires 06/30/2015 |

## PROFESSIONAL EXPERIENCE

### LAW DEPARTMENT, CITY OF PHILADELPHIA
2014-present

**Medical Contract Monitor, Philadelphia Prison System**. Inspection of procedures and outcomes in the medical program. Semi-annual inspections and ongoing involvement with PPS and contractor quality assurance/quality improvement personnel.

### CORRECT CARE SOLUTIONS
2014-present

**Correctional Physician, Howard R. Young Correctional Institution, Wilmington, DE.** Medical assessment and treatment of sentenced and un-sentenced inmate patients; routine periodic evaluation, acute and chronic care.
3-6/2014

**Correctional Physician, State Correctional Institution, Graterford, PA.** Medical assessment and treatment of sentenced inmate patients including routine periodic evaluation, acute, and chronic care.
1/2015-present

**State Medical Director, Acting, part-time, Lemoyne, PA.** Assist CCS Regional Vice President and PA DOC Chief of Clinical Services in administration of correctional medical services in Pennsylvania prisons.
6/2015-present

### COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF CORRECTIONS
04/2004-12/2013

**Chief of Clinical Services**, Bureau of Healthcare Services. Responsibility for oversight, quality assurance/quality improvement, and policy for medical care, psychiatric care, dentistry, including policy revision, program planning, and program evaluation. Primary liaison to the Secretary of Corrections, the rest of the Department of Corrections, and other
2006-2013

agencies in Pennsylvania government.

**Assistant Medical Director**, Bureau of Healthcare Services.  Responsibility for oversight of adult medical care programs as provided by medical care contractor, quality assurance/quality improvement programs, infection control program; participation in policy revision, program planning, and program evaluation.                                          2004-2006

## Society for Correctional Physicians

Board of Directors,                                                     2011-2013
Chairman of Policy Committee                                            2013

## Star Center for Sensory Therapies and Research, Greenwood, CO.

Board of Directors                                                      2012-present

## Zubrow Kershbaum Cohen MD PC

**Private practice of internal medicine** at Pennsylvania Hospital in Philadelphia.       1981-2003
Practice sold in 1997 to the Benjamin Franklin Clinics of the
Pennsylvania Hospital, which was in turn subsumed into the Clinical Care
Associates of the University of Pennsylvania Health System in 2000.

**Teaching rounds** Pennsylvania Hospital one or two months annually, rounding          1977-2003
with a team of interns, residents, and students.

**Journal Club** for internal medicine residents, Pennsylvania Hosptial, weekly.         2003-present

**Chairman, Tissue Utilization and Transfusion Committee** of the Professional           1986-89
Staff of the Pennsylvania Hospital.

 **Executive Committee of the Professional Staff** of the Pennsylvania Hospital          1993-94


**Secretary, Board of Directors, Pennsylvania Hospital PHO**                             1994-97

Chair Credentialing Committee, 1995-97
Chair Provider Services Committee 1996-97


## Correctional Medical Care, Inc.

                                                                        2001-2003

**Corporate Medical Director.**  Oversight of clinical services provided by corporate Staff, clinical activities of Medical Audit, Pharmacy & Therapeutics, Quality Assurance, and Utilization Review committees, and Risk Management program; screening and credentialing of medical professionals; final level of clinical appeals in grievance system; participation in continuing education and patient education programs.

## Americor, Inc.

                                                                        2003

**Vice-president for Medical Affairs.**  Oversight of clinical services provided by corporate staff, clinical activities of Medical Audit, Pharmacy & Therapeutics, Quality Assurance, and Utilization Review committees, and Risk Management program; screening and credentialing of medical professionals; final level of clinical appeals in grievance system; participation in continuing education and patient education programs.

**DEPARTMENT OF PUBLIC HEALTH, CITY OF PHILADELPHIA**

**Medical Director, Family Medical Care Services.** Physician recruitment and          7/81-6/85
      oversight for seven District Health Centers providing comprehensive outpatient
      care throughout the City of Philadelphia.  Consultation with the Director of
      Family Medical Care, and coordination with other categorical programs in the
      Department of Public Health.  Instituted a Quality Assurance Program.

      **Medical Advisory Committee, Quality Assurance Committee, HealthPASS**,
      an early Medicaid HMO serving patients in Southwest Philadelphia.  I represented Family          1982-85
      Medical Care Services on the Medical Advisory Committee, which became the Quality
      Assurance Committee.

**EIGHTH AND SPRUCE MEDICAL ASSOCIATES OF THE  PHILADELPHIA HEALTH PLAN**          7/77-7/81

GROUP MEDICAL DIRECTOR at Pennsylvania Hospital, negotiated annual capitation
      agreements with participating specialist physicians, supervised and represented Group
      physicians in our own negotiations with the Board and administration.

      **Member, Board of Directors of Philadelphia Health Plan**, representing Eighth
      and Spruce Medical Associates.

# U.S. Peace Corps, Nepal

Community development volunteer in a rural district in the Western Hills., speaking          6/66-6/69
predominately Nepali, in which I am still fairly fluent; worked for the Home Ministry
in a training-program for members of newly-constituted Village Councils teaching the
essentials of their new form of government.  Extended service for a third year in
Kathmandu at program headquarters in the Ministry of Home Panchayat, developing
teaching aids concerning village health and sanitation practices.

## EDITORIAL EXPERIENCE

*Hospital Physician*, editorial board                                                    2002-2009
*Journal of Correctional Health Care*, reviewer                                          2003-2004

## PUBLICATIONS

Larney S, Mahowald M, Scharff N, *et al.*, "Epidemiology of Hepatitis C Virus in Pennsylvania
State Prisons, 2004-2012: Limitations of 1945-1965 Birth Cohort Screening in Correctional
Settings," *Am J Public Health* 104(6):e69-e74.

## PRESENTATIONS

Montgomery County Correctional Facility, Montgomery County, Pennsylvania, presentation to     2/13/03
the Board of Directors:   "Responding to Hepatitis C"

Centers for Disease Control and Prevention, Division of Viral Hepatitis:  "Viral Hepatitis:     7/14/03
Considerations for Jails" presented at a Consultancy on Management of Viral Hepatitis in Jails,
Atlanta, Georgia

Johns Hopkins Bloomberg School of Public Health, "Corrections and Public Health" in          2/21/05
*Contemporary Issues in Public Health ( 550.862.81).*

Johns Hopkins Bloomberg School of Public Health, "Remarks on Mid-Career MPH Training and      5/2005
the Distance Learning Program"

PA Mid-Atlantic AIDS Education and Training Center, "Medical Challengfes in an Aging Prison     6/12/2006
Population"

Pennsylvania Viral Hepatitis Conference, "Hepatitis B & C:  Case Management Strategies"        11/17/06

St. Joseph's Hospital, Reading, PA, "Correctional Health and Health Care"                      11/20/06

American Correctional Association Meeting, Tampa, FL, "Meeting Community Standards" and         1/20/2007
"Immunization Program in the Pennsylvania DOC."

Pennsylvania Hospital Medical Grand rounds, "Corrections and Correctional Health"              1/14/2008

Penn Presbyterian Hospital Global Health Group, Philadelphia, "Correctional Health Care"       9/2008 and annually since

National Commission for Correctional Health Care Leadership Institutes, "Quality Improvement    7/2009-14
and Managing Change."  Using a quality improvement program to create and sustain a culture of
change.

University of Pennsylvania School of Nursing, Philadelphia, "Corrections and Correctional       8/2012
Health"

PA DOC Crisis Intervention Training, "Confusion and Behavior:  Beyond Mad and Bad" at Crisis    10/2012 – 12/2014
Intervention Training course for correctional personnel, presented approximately every 2 months.

National Commission for Correctional Health Care Leadership Institutes, "Infecton Control in the    7/2014
Correctional Setting."  Organizing and deploying an infection control program for prisons, jails,
and correctional systems.

## EDUCATION AND TRAINING

### Johns Hopkins Bloomberg School of Public Health
Master of Public Health.                                                    6/00-5/03

### The Pennsylvania Hospital, Philadelphia, Pennsylvania
Internship and Residency, internal medicine.                               6/74 -7/77

### Columbia University College of Physicians and Surgeons
Doctor of Medicine.                                                        1970 –74

### Yale University

Bachelor of Arts in English Literature.                                          1962 –66

## **Legal Depositions and Trial Experience since 2004**

Estate of Joseph Robinson v. a Dr. Bober, Atlantic County;                6/2006
Deposed and testified June-July 2006

Estate of Travis Magditch v. Lehigh County *et al.*, Lehigh County, No. 2012-C-5428   3/2015

### **BOARD CERTIFICATIONS**

American Board of Internal Medicine                          1977-present