# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **CYNTHIA B. SCOTT,** *et al.*, | ) | |
| *Plaintiffs,* | ) | **CASE NO. 3:12-CV-00036** |
| | ) | |
| **v.** | ) | |
| | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| **HAROLD W. CLARKE,** *et al.*, | ) | |
| | ) | **By: Norman K. Moon** |
| *Defendants.* | ) | **United States District Judge** |

This civil rights class action is before the Court after a fairness hearing regarding final approval of the parties' proposed settlement. Plaintiffs filed proposed findings of fact and conclusions of law, which Defendants reviewed in advance of filing and with which they concur. (Dkt. no. 255 at 1). Plaintiffs also moved for attorneys' fees and, after negotiations, the parties have submitted proposed supplemental findings and conclusions on that issue. (Dkt. no. 259). This case has been thoroughly and fairly litigated, and the proposed settlement is now ripe for final approval, as is a ruling regarding attorneys' fees.

Prisoners at the Fluvanna Correctional Center for Women ("FCCW") brought suit in July 2012, alleging violations of the Eighth Amendment's prohibition on cruel and unusual punishment based on substandard medical care. Defendants unsuccessfully moved to dismiss the case. (*See*, *e.g.*, dkt. nos. 33, 76). After extensive discovery, the parties filed cross-motions for summary judgment. (Dkt. nos. 135, 137). Additionally, Plaintiffs sought certification of a class of present and future prisoners at FCCW. (Dkt. no. 131). The Court certified the class under Fed. R. Civ. P. 23(b)(2). (Dkt. nos. 188, 189). The Court also granted Plaintiffs' motion for partial summary judgment and denied Defendants motion for summary judgment. (Dkt. nos. 201, 202). With a bench trial imminent, the parties notified the Court on November 25, 2014

1

that they had reached a settlement in principle. (Dkt. no. 203). After lengthy negotiations over several months, the parties submitted a consent motion for preliminary approval of their settlement, which was granted. (Dkt. nos. 220, 221-1, & 222).

In evaluating the appropriateness of final approval against the relevant legal standards, the Court draws upon its familiarity with the facts and history of the case, the evidence previously placed in the record, testimony from the fairness hearing, and the parties' proposed findings of fact and conclusions of law. The Court also has considered the handful of objections to the proposed settlement. For the reasons that follow, final approval of the settlement agreement will be given.

## PROCEDURAL HISTORY

Plaintiffs, prisoners residing at FCCW, a facility of the Virginia Department of Corrections ("VDOC"), initiated this class-action lawsuit on July 24, 2012, pursuant to the Eighth Amendment to the Constitution of the United States and 42 U.S.C. § 1983, seeking declaratory and injunctive relief with respect to alleged constitutionally-deficient medical care afforded to themselves and all other women residing at FCCW. Plaintiffs contended the deficient medical care reflects deliberate indifference on the part of the VDOC Defendants to Plaintiffs' serious medical needs. The complaint, subsequently amended, provided detailed allegations of insufficient medical care: *e.g.*, prison officials changing or disregarding the recommendations or prescriptions of medical professionals; failure to timely respond to medical emergencies or to non-emergencies such that medical conditions worsened; failure to administer medications or doing so under extreme conditions (such as in inclement weather at two or three o'clock in the morning); insufficient medical staffing; refusal to provide medical services on

2

grounds of cost or pretextual security concerns; and the failure to treat known, obvious, or suspected medical conditions such as MRSA, cancer, or diabetes.

On December 11, 2012 and October 4, 2013, the Court entered opinions denying various motions to dismiss the complaint for failure to state a claim. (Dkt. nos. 33 &76). The case proceeded for several more months in discovery. In August and September of 2014, Plaintiffs filed a motion to certify the class and for partial summary judgment, while Defendants also moved for summary judgment. (Dkt. nos. 131, 135, 138). By Memorandum Opinion and Order dated November 20, 2014, the Court granted Plaintiffs' motion for class certification and certified a class consisting of "all . . . women who currently reside or will in the future reside at FCCW and have sought, are currently seeking or will seek adequate, appropriate medical care for serious medical needs, as contemplated by the Eighth Amendment to the U.S. Constitution," pursuant to Fed. R. Civ. P. 23(b)(2). (Dkt. no. 188).

Thereafter, the Court entered an Order granting partial summary judgment in favor of the Plaintiffs and denying the VDOC Defendants' motion for summary judgment in its entirety on November 25, 2014, holding, *inter alia*, that:

- Plaintiffs established, as a matter of law, that they fully and properly exhausted all pre-litigation administrative remedies available to them, as required by applicable provisions of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e (*See* Memorandum Opinion dated November 25, 2014, at 23-33 & nn.8-10 (Dkt. no. 201));

- Plaintiffs established, as a matter of law, that individually and as a class, they suffer from "serious medical needs" as a predicate to a viable cause of action for "deliberate indifference" under the Eighth Amendment (*Id*. at 13-18 & n.6);

- Plaintiffs established, as a matter of law, that the VDOC Defendants have a non-delegable duty under the Eighth Amendment to provide constitutionally-adequate medical care to all prisoners within their custody, including the Plaintiffs (*Id*. at 8-13); and that

- VDOC Defendants failed, as a matter of law, to demonstrate on the basis of material facts as to which there is no genuine issue in dispute, that they could not be found liable for

providing insufficient medical care, or failing to provide medical care under circumstances in which such care was due, reflecting "deliberate indifference" to the Plaintiffs' and the class members' serious medical needs in violation of the Eighth Amendment. (*Id*. at 33-46.)

The parties negotiated the proposed Settlement, first agreeing in principle to a resolution, which they then reduced to writing on November 25, 2014 in the form of a Memorandum of Understanding ("MOU") regarding the substance and content of the Settlement and the process by which a final agreement would be reached. The parties notified the Court that they had reached an agreement in principle that same day, on the eve of trial. (Dkt. no. 204). Since that time, the parties have engaged in extensive communications by telephone, e-mail, and three in-person meetings involving counsel, VDOC officials, medical experts, and at times the proposed Settlement Compliance Monitor, Dr. Nicholas Scharff. The purpose of these meetings and correspondence was to finalize the Settlement Agreement terms, as well as changes to the VDOC Operating Procedures that governed the provision of medical care at FCCW, as contemplated in the parties' MOU.

A final, fully-executed Settlement Agreement, with Appendices and Exhibits thereto, were submitted to the Court on September 15, 2015. *See* Dkt. nos. 220 & 221. On September 16, 2015, the Court granted preliminary approval of the class settlement. (Dkt. no. 222). The Defendants subsequently certified on September 24, 2015 that notice of the proposed settlement and class members' right to object was distributed to each prisoner housed at FCCW. (Dkt. nos. 224 & 224-1). The Defendants further certified that notice of the Settlement was also sent on September 22, 2015 to the appropriate federal officials as required by the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715. (Dkt. no. 223).

As described in further detail below, this Court conducted a Fairness Hearing on November 9, 2015 to receive evidence and testimony to assist in evaluating whether the

settlement of this action on the terms and conditions provided for in the proposed Settlement Agreement is fair, reasonable, and adequate.

## FINDINGS OF FACT

### Summary of the Proposed Settlement Agreement

The Settlement Agreement in this case consists of two broad components: review and revision of VDOC policies governing medical care at FCCW, and monitoring of FCCW's compliance by an independent monitor. (Dkt. no. 221-1 (Settlement Agreement)). Plaintiffs and Defendants, in consultation with their respective experts and Dr. Scharff (the proposed compliance monitor), agreed to revisions of certain VDOC Operating Procedures, which, as revised, will provide guidance for the provision of enhanced medical care at FCCW. The provisions revised are:

> OP 411.1 Offender Transportation [Non-Public]
> OP 420.2 Use of Restraints and Management of Offender Behavior [Non-Public]
> OP 425.2 Hospital Security [Non-Public]
> OP 701.1 Health Services Administration
> OP 720.1 Access to Health Services
> OP 720.2 Medical Screening Classification and Levels of Care
> OP 720.3 Health Maintenance Program
> OP 720.4 Co-Payment for Health Care Services
> OP 720.5 Pharmacy Services
> OP 730.1 Mental Health Services: Administration
> OP 730.2 Mental Health Services: Screening, Assessment and Classification
> OP 730.5 Mental Health Services: Suicide Prevention and Behavior Management
> OP 740.1 Infectious Disease Control
> OP 810.1 Offender Reception and Classification

(Dkt. no. 221-1, App'x. A).

The parties also negotiated and agreed upon a set of additional medical guidelines and standards addressing issues and problems at FCCW that Plaintiffs alleged in their Complaint and developed throughout the pendency of this case. These subjects include, *inter alia*, provider staffing levels, the medical intake process, comprehensive health assessments, the sick call

5

process, the co-pay policy, diagnosis and treatment, response to emergencies, infirmary conditions, chronic care, infectious disease control, utilization management, continuity of medications and treatment supplies, physical therapy, medical grievances, access to information regarding care, accommodations for prisoners with disabilities, staff training, care and release of terminally-ill prisoners, conduct of mortality reviews, and criteria for measuring performance and quality improvement and contractor monitoring. (Dkt. no. 221-1 at 6-15).

The parties also agreed to create an additional Operating Procedure for FCCW regarding reasonable accommodations for physical disabilities of incarcerated individuals consistent with the mandate of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 *et seq*., and its implementing regulations and standards. (Doc. no. 221-1 at 15). This procedure will be developed in consultation with the parties' respective medical experts and the compliance monitor within 120 days of the effective date of the settlement agreement. (*Id*.).

Lastly, the parties agreed that they will develop an Operating Procedure establishing concrete and definitive practices and procedures to govern VDOC's self-evaluation with respect to the quality and quantity of the medical care it provides to prisoners at FCCW on an ongoing basis in accordance with widely-recognized Continuous Quality Improvement ("CQI") concepts. This procedure will be developed in consultation of the parties' respective medical experts and the compliance monitor within 120 days of the effective date of the settlement agreement. (*Id*.).

The parties jointly selected Dr. Nicholas Scharff, M.D., MPH, the former Chief Medical Officer of the Commonwealth of Pennsylvania Department of Corrections, to serve as the Settlement Compliance Monitor. The parties believe that Dr. Scharff is appropriately qualified for this role.[1] Dr. Scharff's *curriculum vitae* is attached as Appendix C to the settlement

---

[1]    Based on a review of Dr. Scharff's *curriculum vitae* and his testimony at the fairness hearing, the Court agrees with the parties' assessment.

agreement. Dr. Scharff will develop performance monitoring tools for each of the subjects listed in Appendix B of the settlement agreement in regard to which a constitutionally-adequate level of care is owed. This will involve detailed tracking of samples of representative data and measuring and re-measuring over time to determine whether progress has been made. (*See* Dkt. no. 251 (Transcript of Nov. 9, 2015 Fairness Hearing) at 50-51 (hereinafter "Hr'g Tr.")).

Under the settlement, Dr. Scharff initially will visit FCCW four times a year. He will interview patients and staff and gather data while on-site, and will analyze the data off-site and provide a report reflecting the results of each visit to the parties. (Dkt. no. 221-1 at 16-17; Hr'g Tr. at 48). On his visits, Dr. Scharff will have access to speak confidentially with personnel and prisoners, as well as review facilities, medical files, and grievances as he deems necessary. The visits will occur over the period of a minimum of three years. (Dkt. no. 221-1 at 16-17, 20-21; Hr'g Tr. 48). Dr. Scharff will identify to the parties any areas or subjects where he finds that VDOC is not in compliance with the provisions of the settlement or Eighth Amendment standards. VDOC will have 30 days from the date of such notice within which to correct any areas of noncompliance, after which, if the problems persist, Plaintiffs will have the option of filing a motion in this Court to enforce the settlement, seek contempt sanctions, or both. (Dkt. no. 221-1 at 19).

In summary, the Settlement Agreement addresses with particularity each of the problems Plaintiffs identified in their Complaint and fully developed in the record with the evidence supporting their memorandum in support of the motion for class certification (dkt. no. 132) and their memorandum in support of their motion for partial summary judgment (dkt. no. 138).

### Testimony at the Fairness Hearing

Plaintiff Cynthia Scott. Cynthia Scott has resided at FCCW since 2003. She testified

that, at age 31, she had very few health problems when she first arrived at FCCW and led an active lifestyle of yoga, basketball, and other activities. Her health has deteriorated and now she requires the use of a wheelchair or cane for mobility and is in constant pain. (Hr'g Tr. at 6:10-8:9). Ms. Scott testified about problems at FCCW with delayed diagnoses, following the orders of medical specialists, denial of necessary medications, and FCCW's failure to maintain an adequate supply of and provide prescribed medications. For example, Ms. Scott testified that FCCW failed to seek and obtain for her necessary treatment from a specialist for the bone disease in her wrists, shoulders, and hips. (Hr'g Tr. at 8:10-10:15).

Ms. Scott also testified that FCCW delayed diagnosing a potentially deadly blood clot in 2012, instead telling her that her cold, swollen, and icy foot that persisted over six months was a symptom of arthritis. (Hr'g Tr. at 10:16-13:18). Ms. Scott described unsanitary conditions at the Infirmary – including blood and feces on the walls – and difficulties in receiving prompt attention from a nurse when patients push the call button. (Hr'g Tr. at 15:17-22). She further testified that residents continue to experience problems with the medical care at FCCW, including the pharmacy running out of prescribed medications and delays responding to emergency calls for medical help. (Hr'g Tr. at 19:13-21:23). Ms. Scott believes that, with effective outside monitoring, the Settlement Agreement will resolve the problems at FCCW. (Hr'g Tr. at 22:25-23:3).

Plaintiff Toni Hartlove. Toni Hartlove has resided at FCCW since 1999. (Hr'g Tr. at 25:3-4). Ms. Hartlove testified about problems at FCCW concerning deficiencies with respect to medication administration, chronic care, pain management, and infirmary conditions. For example, she testified that she takes two medications daily that are necessary to prevent her from having seizures. (Hr'g Tr. at 25:21-26:1). These seizures are terrifying. She is immobilized and

8

cannot speak or move. The seizures are also psychologically scarring. She feels afraid and worries that she may physically injure herself in a fall. (Hr'g Tr. at 26:21-27:16). Her medications have lapsed three times in just the last year, causing grand mal seizures each time. (Hr'g Tr. at 28:7-10). Ms. Hartlove believes the medical staff at FCCW frequently diverts medication prescribed to other inmates and gives it to her when FCCW prematurely runs out of her medication. *Id*.

Ms. Hartlove has also been experiencing leg pain, and was just diagnosed with compressed discs. (Hr'g Tr. at 29:14-20). Although the pain is so intense that she cannot walk, she has been provided no prescription for pain medication except for 7-10 days of Motrin, and was then simply told to buy Advil or Tylenol at the commissary. The over-the-counter medications reduce the pain but do not sufficiently control it. (Hr'g Tr. at 33:4-20). Ms. Hartlove's back condition will require surgery, and she is very worried about what will happen to her while she recovers in the infirmary because of the lack of adequate nurse staffing and the unsanitary conditions she has seen there. There are not enough nurses to pay appropriate attention to the patients and their needs. Infirmary patients are not allowed recreation, exercise, to go to school, to perform their jobs, to attend church services, or to participate in other activities. Most infirmary patients are not allowed to use the commissary. (Hr'g Tr. at 31:19-33:3). Before she stopped working because of her back pain, Ms. Hartlove worked as a laundry technician for 35 cents an hour, earning about $42 a month. From that amount, she must buy all her necessities at the commissary, in addition to paying sick call co-pays and buying needed medications. (Hr'g Tr. at 33:18 -34:13). Ms. Hartlove testified that the Settlement Agreement will be a fair and adequate solution to the problems identified in the lawsuit if it is followed. (Hr'g Tr. 25:17-20).

9

Plaintiff Lucretia Robinson. Lucretia Robinson has resided at FCCW since 2013. (Hr'g Tr. at 35:19-20). Ms. Robinson testified about problems with medical intake of new prisoners at FCCW, as well as problems with medication administration, treatment of prisoners with physical disabilities, and ongoing delays in pill line and provider access. For example, she testified that when she came to FCCW, she brought with her a walker and a cane she needed to move around because of an accident in which she was involved several years before. Both were taken away from her at intake, and as a result she had difficulty moving around, falling on multiple occasions. She also experienced a significant delay in getting a walker that had wheels, which she needed, and when she finally got it, she was charged a co-pay of almost $90. (Hr'g Tr. at 39:8-40:9).

Further, Ms. Robinson testified that she was diagnosed with and treated for breast cancer while in the regional jail, and that part of her prescribed long-term cancer treatment was a daily regimen of tamoxifen. When she arrived at FCCW, her prescription for tamoxifen was not refilled, and she was told that it would need to be approved before she could receive it. She had a lapse of approximately six weeks until she began receiving tamoxifen again. Even after her prescription for tamoxifen was approved, she testified that there have been other times when it has been allowed to lapse. (Hr'g Tr. at 36:3-38:3). Finally, she testified that the pill line, *i.e.*, the process by which medication is distributed to prisoners, experiences frequent delays because the nurses who administer medication are often called away to deal with emergencies elsewhere. (Hr'g Tr. at 40:16-41:10). With regard to the settlement, Ms. Robinson testified that intensive monitoring will be critical to the success of the settlement. (Hr'g Tr. at 41:20-42:4).

Dr. Erika Ramsdale. Dr. Erika Ramsdale is an oncologist and Assistant Professor of Medicine at the University of Virginia Medical School ("UVA"). (Hr'g Tr. at 73:11-24). As

part of her duties at UVA, Dr. Ramsdale treated Debbie Daley, a prisoner at FCCW, for locally advanced rectal cancer. (Hr'g Tr. at 73:25-74:6). Ms. Daley had been diagnosed with colorectal cancer shortly after arriving at FCCW in July 2013. (Dkt. no. 139, Ex. 37, Decl. Debbie Daley ¶ 4; Hr'g Tr. at 74:11-12). Dr. Ramsdale testified that FCCW medical personnel repeatedly changed Ms. Daley's oncologist's recommendations for long-acting and short-acting pain medications, leaving her in excruciating pain. (Hr'g Tr. at 74:24-75:3, 76:12-78:4).

In November 2013, Ms. Daley's UVA oncology specialists decided that she needed chemotherapy instead of surgery because her tumor had not shrunk sufficiently as a result of radiation treatment. (Hr'g Tr. at 78:17-79:15). The oncology team recommended pre-chemotherapy evaluation in November 2013, which Ms. Daley did not receive until April 2014 because FCCW failed to take her to a scheduled UVA appointment in February. (Hr'g Tr. at 79:18-23). FCCW further delayed the chemotherapy treatment until July 2014, by unsuccessfully attempting to transfer her treatment from Dr. Ramsdale to the Medical College of Virginia and due to scheduling delays caused by medical personnel at FCCW. (Hr'g Tr. at 81:1-82:7; 82:24-83:7).

In February 2014, Dr. Ramsdale called Dr. Patricia Rodgers at FCCW to inquire why Ms. Daley missed her scheduled appointment. Dr. Rodgers said she did not know but that "she had no control over transportation and that the prison could cancel it for any reason." (Hr'g Tr. at 79:16-81:4). Ms. Daley had an abscess on her buttocks related to her cancer. When it became infected in June 2014, Dr. Carter, medical director at FCCW, refused to treat her with antibiotics for three weeks. When she arrived at UVA for an appointment to set up her chemotherapy treatments on July 2, 2014, Dr. Ramsdale found that Ms. Daley was febrile, septic, and in great pain. Dr. Ramsdale admitted Ms. Daley to the UVA Hospital for several weeks to treat her

infection with IV antibiotics and then to begin chemotherapy. (Hr'g Tr. at 82:24-84:24, 87:16-19).

Dr. Ramsdale was so concerned about Ms. Daley's condition upon her arrival at the UVA Hospital on July 2, 2014 that she contacted the UVA Ethics Consult Service with respect to her concerns of medical neglect. Dr. Ramsdale accepted the UVA Ethics' recommendation to declare Ms. Daley an "unsafe discharge" unless FCCW would agree, among other things, to prompt transportation to any appointments, appropriate pain treatment, compliance and follow-through with chemotherapy treatments, and antibiotic treatment of further infections. (Hr'g Tr. at 85:9-87:15). After keeping Ms. Daley at UVA for four or five weeks as an unsafe discharge, Dr. Ramsdale finally agreed to discharge Ms. Daley back to the prison on the condition that they comply with the conditions she had outlined in a letter. Dr. Ramsdale testified that FCCW complied with some of the conditions, but the prison failed to provide appropriate pain medication and other supportive treatments. (Hr'g Tr. 86:12-88:3). Dr. Ramsdale recommended medical clemency and hospice for Ms. Daley, who was granted medical clemency in late November 2014. Ms. Daley died shortly thereafter, in early 2015. (Hr'g Tr. at 89:21-90:2). Dr. Ramsdale testified that Ms. Daley would not have suffered to the extent she did if FCCW had not been indifferent to her symptoms. (Hr'g Tr. at 90:6-13).

Dr. Nicholas Scharff. Dr. Scharff has experience serving as a compliance monitor in another correctional system. (Hr'g Tr. at 45:3-46:21). He is familiar with the provisions of the Settlement Agreement and prepared and able to perform the monitoring required. (Hr'g Tr. at 46:22-47:5). One aspect of Dr. Scharff's job as Compliance Monitor is to ensure that the VDOC Operating Procedures have in fact been rewritten and that they are being complied with as revised. In addition, Dr. Scharff is to monitor the VDOC's performance with respect to a list

12

of specific functions and aspects of care listed in Appendix B to the Settlement Agreement. (Hr'g Tr. at 47:24-49:22). Dr. Scharff's two overarching goals as Compliance Monitor are: (i) to establish systematic practices in the medical care provided at FCCW that meet the constitutional standard of care; and (ii) to change the health care culture at FCCW in ways that will outlast his term and ensure continued constitutionally-adequate care beyond the duration of the Settlement Agreement. (Hr'g Tr. at 47:6-49:3; 53:23-54:9). Dr. Scharff believes that the Settlement Agreement will effectively address each of the problems described by the Named Plaintiffs during their testimony if it is properly followed and implemented with real "buy-in" from all levels of the institution. (Hr'g Tr. at 52:3-20).

### Written Objections to the Settlement

Three class members filed objections to or comments on the settlement agreement prior to the fairness hearing on November 9, 2015, and three class members (including one named Plaintiff) filed comments after the hearing. These submissions, all supporting the need for improved medical care at FCCW, describe the negative experiences the class members had.

Tennaire Durham (Dkt. no. 231). Ms. Durham notes no specific objection to the settlement, but rather recounts facts showing that it is needed by describing her adverse experiences in hopes that "it helps make things better for the future offenders" at FCCW. She writes she is "not asking to be a part of this lawsuit but [] would like to let [the Court] know about [her] personal experiences since arriving on Sept. 8, 2015." She was transferred to FCCW after foot surgery, because FCCW ostensibly is a "medical" prison, but "calling this prison a 'medical' facility [is] laughable at best." She relays that green drainage came from her foot and it became swollen, but there was a delay in treatment. Eventually, she was diagnosed with MRSA. The infirmary, she says, "is not a good place to stay," and she was put in solitary

conditions due to her MRSA infection, but the location was unsanitary. An unidentified doctor informed Ms. Durham that her foot also is fractured and that she should see a specialist at UVA, but in the month afterwards that appointment has not occurred. She also states that she is a diabetic but that her medicine was taken away from her. She confirms that—as Plaintiffs alleged—the "pill line" starts at 2:30 or 3:30 a.m.

Uetta Karen Warner (Dkt. no. 237). Ms. Warner "formally file[s] [her] objection" to the settlement on the grounds that it is "still very weak," largely because she believes that VDOC will not address the known problems with medical care at FCCW. Nevertheless, her filing mainly recounts ongoing problems raised by the named Plaintiffs, thus suggesting that the settlement is needed.

Ms. Warner arrived at FCCW on June 10, 2015. She has "had to continually fight with the medical department to get the proper medications and treatments," and has often received either other inmates' medication or the wrong dosage. She was taken off medicine for high blood pressure, arthritis, migraines, asthma, and thyroid issues. She believes that if the Department of Corrections and staff "were truly concerned and were trying to provide adequate medical care, that they would have already started some means of rectifying these problems." She asks that the Court to take her letter into consideration when making a "final decision" in this case.

Hope McRae Roe (Dkt. no. 234).[2] Ms. Roe makes the most substantive and detailed

---

[2]     Ms. Roe's filing was submitted with a cover page in which "[D]arlene [H]ope [F]ulmer" and "[D]avid [B]ulkley [H]opkins," of Columbia, South Carolina, purport to be representing her as "counsel-in-fact." (Dkt. no. 234 at ECF 1). Elsewhere—*e.g.*, in the body of her objection and in attachments—it is repeated that these individuals are "acting in capacity as counsel-in-fact and exercising power-of-attorney" on her behalf, along with various other contentions about power of attorney and so-called counsel in fact. (*Id*. at ECF 3, 23; dkt. no. 234-2). In the interests of justice, the Court at the fairness hearing allowed these purported representatives of Ms. Roe to

objections to the settlement.  At the fairness hearing, the Compliance Monitor, Dr. Scharff, specifically addressed her objections upon questioning by the Court.  Accordingly, the Court will summarize her objections and Dr. Scharff's responses below.

### Consideration of Objections at the Fairness Hearing

At the fairness hearing, the Court invited anyone present who objected to the settlement to be heard.  Mr. David Hopkins came forward, allegedly on behalf of Objector Hope McRae Roe, and was accompanying by a reticent woman who Mr. Hopkins represented to be Ms. Roe's mother, Darlene.  (Hr'g Tr. 64-65; *see also supra* footnote 2).  Some of Mr. Hopkins' concerns involved matters outside the scope of this case—for instance, segregated housing (*id*. at 68-69)— but others repeated or amplified those expressed in Ms. Roe's written objections.  (*Id*. at 65-66, 70).  In any event, Mr. Hopkins was afforded the opportunity to make a full presentation to the Court.  (Hr'g Tr. 64-71).

In addition to Dr. Scharff's direct and cross-examination, the Court asked him to respond to several of Mr. Roe's written objections.   Ms. Roe objected that the term "medical staff" as used in the Settlement Agreement is not defined and should be clarified so that no one without appropriate medical training, experience, and qualifications should be deemed medical staff.  (Dkt. no. 234 at 11-12).   In response, Dr. Scharff testified that the term "medically trained personnel" was the subject of considerable discussion in the context of the revising the Operating Procedures, and that he considers it important as Compliance Monitor to determine exactly what training the medical staff received, in order to determine that they are adequately trained and capable of providing effective levels of care.  (Hr'g Tr. at 55-56).

---

make a substantial oral presentation.  The Court also questioned the compliance monitor about Ms. Roe's written concerns.  *See infra*.

Ms. Roe objected that the timely evaluation and treatment of medical needs, as referred to in the settlement agreement, is undefined, and should be clarified to mean within 24 hours, and that timely emergency care should be within 12 hours or less. (Dkt. no. 234 at 12, 17). In response, Dr. Scharff testified that he believes that the timeliness of an emergency response must be adequate to the circumstances of each situation, and nationally-recognized medical standards govern the timelines for response to various categories of medical need. He expects to review all of those time intervals in the course of his monitoring activities at FCCW. (Hr'g Tr. at 56).

Ms. Roe stated that the Settlement should contain a provision requiring documentation of medical events. (Dkt. no. 234 at 12). In response, Dr. Scharff stated that if there were a systematic practice of failing to properly document certain elements of medical care, he would consider that failure to fall short of a constitutional level of care. (Hr'g Tr. at 57).[3]

Ms. Roe wrote that co-pays should be suspended for nine months rather than six months under the settlement. (Dkt. no. 234 at 14). In response, Dr. Scharff indicated that the important factor is that when the co-pay system is reinstated, it should be fair and equitable. (Hr'g Tr. at 58).

Ms. Roe stated that MRSA and hepatitis treatment guidelines should be adopted. (Dkt. no. 234 at 15). In response, Dr. Scharff observed that those guidelines are addressed by the settlement. (Hr'g Tr. at 58). Dr. Scharff made the same point regarding when and under what conditions the morning pill line begins, another concern raised by Ms. Roe. (Dkt. no. 234 at 16; Hr'g Tr. at 58-59).

---

[3] Plaintiffs' counsel also responded that the settlement and Dr. Scharff's duties as compliance monitor contemplate "regular review of medical records" and grievances.

Ms. Roe believes that chronic care patients should be monitored every month rather than every six months when stable, as provided in the Settlement.   (Dkt. no. 234 at 16-17).  Dr. Scharff disagreed, stating:

> I think that—you know, that—anything that we decide to do for patients is really something else we're deciding not to do for patients.  It is not—even if you take all of the money out of it, the truth is people only have so much time and attention.  And I think it is really important to make sure that people really do get everything they do need.
>
> And in my practice for decades and in correctional practice, people with chronic illnesses don't want to be seen every month. It is a pain in the neck. They have to stop doing what they are doing. When they need to come every month, they have to come every month. And when they don't need to come every month, I think twice a year is actually a little bit more frequent than the usual standard outside of corrections.

(Hr'g Tr. at 59).   Similarly, as to Ms. Roe's objection that outside referrals should be accomplished within 14 days rather than 30 day (Dkt. no. 234 at 18), Dr. Scharff stated that the timing should depend on the urgency of the referral, but that routine referrals could be handled within 30 days.  (Hr'g Tr. at 60).[4]

Ms. Roe thinks the settlement should include a requirement that reports logging and summarizing grievances be issued every three months.  (Dkt. no. 234 at 19).  Dr. Scharff stated that he would be reviewing grievances and the manner in which FCCW responds to them as part of his monitoring process and that he anticipated making frequent reports on the grievance process, at least initially.  (Hr'g Tr. at 61).

### Objections and Comments Filed After the Fairness Hearing

Additionally, after the fairness hearing, two class members sent letters or noted

---

[4]      Likewise, upon questioning about when test results should be competed and communicated, Dr. Scharff observed that tests results should be received by FCCW within 72 hours but the timeline of communication with the patient about the results depends upon the nature of the test, the result, and corresponding urgency.  (Hr'g Tr. at 60-61).

objections to the settlement agreement, and Karen Powell, one of the class representatives, also sent a letter directly to the Court. (Dkt. nos. 245, 246, 250). All of these letters discussed the death of a prisoner, Ines Ford (known to some at FCCW as "Wheels") on November 10 or 11, 2015. They underscored the need for improved medical care and effective monitoring at FCCW.

Jennifer Lynn McGuire (Dkt. no. 245). Ms. McGuire states that she objects to the settlement "because [the conditions at FCCW] just keeps getting worse[.]" She relays that a Ms. Ford died on November 10 or 11, 2015. She asserts that the "Compliance Monitor is failing on their part of the job." (Of course, the Compliance Monitor has not yet commenced his duties because the settlement had not been given approval.) She asks the Court to "please make the right decision."

B.D. Williams (Dkt. no. 250). Like Ms. McGuire, Ms. Williams also relays the passing of Ms. Ford and states her belief that it was a preventable death.

Named plaintiff Karen Powell (Dkt. no. 246). As with Ms. McGuire and Ms. Williams, Plaintiff Powell shared with the Court Ms. Ines' death, and stated that she was young, relatively health, and died of pneumonia because she was not supplied with needed medication. Plaintiff Powell does not have objections to the settlement, but wrote the Court to appraise it of Ms. Ines' death and to share her concerns with the state of care at FCCW.

## CONCLUSIONS OF LAW

The claims of a certified class can only be settled with the Court's approval "after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991). "As the Fourth

18

Circuit has explained, the district court must engage in a two-level analysis in evaluating a settlement's 'fairness'and 'adequacy.'" *Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 472 (W.D. Va. 2011). "The court also must determine whether the class was given reasonable notice of the settlement." *Id*.

> A class settlement is *fair* if it "was reached as a result of good faith bargaining at arm's length, without collusion." *In re Jiffy Lube Sec. Litig.,* 927 F.2d at 159. In making this determination, a court should consider "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of ... class action litigation." *Id.*

> Whether a settlement is *adequate* depends upon "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.*

*Bicking v. Mitchell Rubenstein & Associates, P.C.*, No. 3:11CV78-HEH, 2011 WL 5325674, at *4 (E.D. Va. Nov. 3, 2011) (emphasis in original); *see also Scardelletti v. Debarr*, 43 F. App'x 525, 528 (4th Cir. 2002) (reviewing factors); *Domonoske*, 790 F. Supp. 2d at 473-74 (same).

## I.     The Proposed Settlement is Fair

### A.     Case posture

In evaluating the first fairness factor, the Court must assess "how far the case has come from its inception, since a settlement in an immature case might point towards collusion, while a mature case will point in the opposite direction." *Domonoske*, 790 F. Supp. 2d at 473. This factor strongly favors approval because the case settled in principle on the precipice of a multi-week trial after (a) two rounds of motions to dismiss, (b) extensive discovery, and (c) briefing on cross-motions for summary judgment. Nine months of exhaustive settlement negotiations were needed to finalize the agreement and present it for preliminary approval. It is difficult to

19

conceive of a case more "mature" for settlement.  Much like the situation in *Beaulieu v. EQ Industrial Services, Inc.*, "[this] case was being actively litigated when the settlement was reached.  Indeed, the case ha[d] been aggressively prosecuted and defended since its inception." No. 5:06-cv-400-BR, 2009 WL 2208131, at \*24 (E.D.N.C. July 22, 2009); *see also Mills Corp.*, 265 F.R.D. at 254.  ("[I]n cases in which discovery has been substantial and several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement." (citation omitted)); *Clark*, 2004 WL 256433, at \*7 ("[I]t is clear from the docket . . . that this matter was hard fought from its initiation through contentious class certification proceedings.").

### B.    Extent of discovery

This factor "requires the court to determine whether the case was well-enough developed for [the parties] to appreciate the full landscape of their case."  *Domonoske*, 790 F. Supp. 2d at 473.  Clearly, extensive discovery characterized this case and likewise favors approval.  The parties even needed occasional intervention from the Court to resolve discovery disputes.  (*E.g.*, dkt. no. 88).   And as the parties observe, they:

> conducted and completed some 27 depositions, including depositions of the four original Named Plaintiffs, expert witnesses for each side, VDOC officials, and numerous VDOC and medical care contractor fact witnesses.  Full discovery had been completed well before settlement negotiations began, "thereby facilitating an informed decision by the parties regarding settlement."  *Beaulieu*, 2009 WL 2208131, at \*24; *see Jiffy Lube*, 927 F.3d at 159 ("We have held that a reasonable judgment on the possible merits of the case is best achieved when all discovery has been completed and the case is ready for trial." (dictum) (Citation omitted.)); *Mills Corp.*, 265 F.R.D. at 254 ("Where . . . 'discovery was largely completed as to all issues and parties,' the second [fairness] factor militates toward approval of settlement." (Citation omitted)).

(Dkt. no. 255 at 21).

### C.    Circumstances surrounding settlement negotiations

The objective of this factor is to ensure that counsel entered into settlement negotiations on behalf of their clients after becoming fully informed of all

pertinent factual and legal issues in the case. This requires an examination of the negotiating process by which the settlement was reached in order to ensure that the compromise is the result of arm's-length negotiations necessary to effective representation of the class's interests.

*In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 255 (E.D. Va. 2009) (internal citations and quotations omitted). As explained above, a settlement in principle was reached after hard-fought litigation of this case. Even then:

> The Parties took a full nine months thereafter to complete [the settlement] process, during which their representatives – counsel and medical experts for both sides – and VDOC officials – engaged in extensive negotiations by telephone conference, written communications and three lengthy in-person meetings to hash out and agree upon specific terms and conditions. These efforts were protracted and, according to the Parties' counsel, occasionally contentious.

(Dkt. no. 255 at 21-22). As counsel for Plaintiffs understandably observed at the fairness hearing, the settlement process included "sometimes difficult negotiations and accommodations on both sides." (Hr'g Tr. at 92; *see id.* at 94 (speculating that the length and extent of the parties' negotiations "probably tried the Court's patience"); *id.* at 53 (explaining Compliance Monitor's participation in settlement process that was "[l]onger than we thought")). This factor also heavily favors approval. *Mills Corp.*, 265 F.R.D. at 255 ("this settlement was not entered into haphazardly with an undeveloped understanding of the merits of the case. . . . Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of [the Parties'] decision to enter into the settlement"); *Beaulieu*, 2009 WL 2208131, at *25 ("The settlement negotiations also appear clearly to have been adversarial. Indeed, plaintiffs represent that they were not only at arm's length and without collusion, but contentious and sometimes heated. . . . These representations are consistent with the tenor of counsel's filings and in-court presentations on contested matters, which have demonstrated zealous pursuit of their respective clients' interests.").

21

### D. Views and experience of counsel

Knowledgeable and experienced counsel on both sides of this dispute have expressly endorsed the Settlement Agreement as fair, adequate and in their respective clients' best interests. (*See* dkt. no. 221 at 9-10; Hr'g Tr. at 93-94). The Court finds no basis to disagree. Furthermore, in granting the Plaintiffs' motion for class certification, the Court already recognized the experience and qualifications of Plaintiffs' counsel in this matter.

> Plaintiffs are represented by experienced and qualified counsel who are competent to conduct this action and fairly represent the interests of plaintiffs and the class as a whole. The Legal Aid Justice Center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs are well-known public interest legal services organizations with substantial experience with respect to and involvement in civil rights litigation, including class actions, in Virginia and, as regards to the Washington Lawyers' Committee, other jurisdictions. Those two organizations are joined as co-counsel by the Washington, D.C. law firm of Wiley Rein LLP, which is representing the Plaintiffs in a pro bono capacity. Wiley Rein is a firm of more than 275 attorneys that handles complex civil litigation matters, and its lead counsel in this case has significant experience in prisoners' civil rights cases and class actions.

(Dkt. No. 188 at 30; *see also* Hr'g Tr. at 96 (recognizing and expressing gratitude of efforts by all parties' attorneys for working to remedy "this situation"). The Court likewise notes that the Assistant Attorneys General representing Defendants specialize in prisoners' civil rights litigation and are fully informed with respect to the matters at issue here.

Based on the foregoing, the Court finds that the settlement meets the four fairness factors, all of which "indicate that the settlement here falls within the range of . . . final approval." *Beaulieu*, 2009 WL 2208131, at *25.

## II. The Proposed Settlement is Adequate

In evaluating the five adequacy factors, "[e]ssentially, the court should weigh the benefits of the settlement to the class against the strength of the defense, and the expense and uncertainty of the litigation while accounting for class objections." *Domonoske*, 790 F. Supp. 2d at 474.

"The most important factor to be considered in determining whether there has been such a clear abuse of discretion is whether the trial court gave proper consideration to the strength of the plaintiffs' claims on the merits." *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975).

### A. Strength of Plaintiffs' case

Plaintiffs' case on the merits here is strong, especially after the Court's rulings on class certification and on summary judgment. As of the time they reached an agreement with the Defendants to settle this action, Plaintiffs had defeated the Defendants' threshold motion to dismiss, prevailed on their own motion for class certification, and were anticipating a favorable disposition from the Court on the parties' cross-motions for summary judgment, which the Court issued on November 25, 2014, granting the Plaintiffs' motion for partial summary judgment, and denying the Defendants' motion for summary judgment in its entirety. Regarding the latter, the Court determined, on the basis of a comprehensive summary judgment record, that "a fact-finder could reasonably determine that the VDOC is deliberately indifferent to the serious medical needs of the Plaintiffs and the entire class of women residing at FCCW." (Dkt. no. 201 at 40; *see also* dkt. no. 222, ¶ 4 at 2 ("The Plaintiffs have presented ample evidence in their filings supporting class certification, their Motion for Partial Summary Judgment, and their response in opposition to the VDOC's Motion for Summary Judgment, enabling a fact-finder to reasonably conclude that the VDOC Defendants are or have been deliberately indifferent to the serious medical needs of the Plaintiff class[.]")). These considerations suggest that, at a minimum, the Plaintiffs presented a viable case capable of being sustained by a judgment on the merits after trial.[5]

### B. Potential hindrances to success at trial

---

[5] Consistent with their position, Plaintiffs have extracted a detailed settlement agreement that provides much-needed relief to the class

23

Nevertheless, the confidence of Plaintiffs' counsel in prevailing on the merits was necessarily tempered by the uncertainty and unpredictability inherent in trial. Also taken into consideration was their belief—supported no doubt by their own experiences with prison reform litigation, as well as by cases and the observations of practitioners and scholars of civil rights law—that prisoners' civil rights cases premised upon the establishment of the deliberate indifference of governmental actors to unconstitutional conditions of confinement are difficult to win as a general matter.[6] Moreover, "no matter how confident one may be in the outcome of litigation, such confidence is often misplaced.'" *Mills Corp.*, 265 F.R.D. at 256. Thus, even absent any specifically identified or anticipated proof problems or compelling defenses at trial from the Plaintiffs' perspective, a settlement offering the prospect of substantial affirmative relief was clearly an attractive proposition. Conversely, the Defendants were confronted with the prospect of a bench trial on the heels of the Court's rejection of their potentially case-dispositive defenses as a matter of law and the Court's pronouncement that it, as the fact-finder, could reasonably find that the VDOC was deliberately indifferent to the Plaintiffs' serious medical needs in violation of the Eighth Amendment. Accordingly, both Parties faced uncertainty and "'[w]hen viewed against the substantial and certain benefits that a settlement would provide, these considerations support approval of the proposed . . . settlement.'" *Id.* (*citing In re Global Crossing Securities and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004)

### C. Potential expense and delay caused by continued litigation

---

[6]    *See, e.g., Barnard v. Piedmont Reg. Jail Auth.*, No. 3:07CV566, 2009 WL 3416228, *4 & n.4 (E.D. Va. 2009) (noting "the undesirability of prisoner litigation in general"); *Qandah v. Lombardi*, No. 12-04213-CV-C-HFS, 2013 WL 684189, at *2 (W.D. Mo. Feb. 25, 2013) (reviewing "negative attitudes" and "special skepticism" sometimes held about prisoner litigation); dkt. no. 228, Exhs. 7-9 (Declarations of Victor Glasberg, David Fathi and Benjamin Spencer, respectively, supporting Plaintiffs' Petition for Attorneys' Fees and Litigation Costs and attesting to the generally difficult and undesirable nature of prisoners' civil rights cases).

24

The time, expense, and effort to obtain a judgment on the merits—both after trial and after the appellate process—did provide incentive for settlement. The parties' agreement-in-principle to settle this case was reached on the eve of what was scheduled to be at least a two-week trial. The additional expenses that both sides would have necessarily incurred in trying the case, on top of the large sums that had already been incurred before trial, would have been substantial. In addition, the trial itself would have almost certainly been followed by extensive post-trial proceedings and a likely Fourth Circuit appeal by whichever side received an adverse judgment from this Court. The avoidance of the demands of further litigation—time, effort, and expense—to the parties weighs strongly in favor of approving the settlement agreement. *See Mills Corp.*, 265 F.R.D. at 256-57.[7]

> **D.**     **Solvency of Defendants and likelihood of recovery**

Because this case involves injunctive relief against a state agency and not a claim for damages, this factor is not implicated.

> **E.**     **Degree of opposition to the settlement**

The fact that relatively few class members filed objections supports a settlement's adequacy. *Domonoske*, 790 F. Supp. 2d at 474 (objections from only 0.04% of class members supported finding of adequacy); *Smith v. Res-Care, Inc.*, No. CV 3:13-5211, 2015 WL 6479658, at *7 (S.D.W. Va. Oct. 27, 2015) (holding that lack of objections weighed in favor of approval); *Mills Corp.*, 265 F.R.D. at 257 (same). Here, only six of the approximately 1,200 class members (or 0.5%) filed objections to or statements regarding the settlement. This factor supports approval of the settlement. The Court discusses the substance of the objections below, which it

---

[7]     Taking the second and third adequacy factors together, it is clear that Plaintiffs understandably abided by the aphorism that "a bird in the hand is worth two in the bush." By settling the case on the eve of trial, they forewent the opportunity for some marginally-increased, costly, and uncertain relief in exchange for a substantial, guaranteed, and immediate quarry.

finds do not counsel against approval of the settlement.

## III.    The Class Received Reasonable Notice of the Settlement

The Court's Order granting preliminary approval (dkt. no. 222) contained specific notice provisions to the class members.  Notice is not mandatory in class actions certified pursuant to Rule 23(b)(2)—*see* Fed. R. Civ. P. 23(c)(2)(A)—but the Court agreed with the parties' determination that the provision of such notice was appropriate under the circumstances of this case.  *See* Dkt. 222, ¶ 2(a)-(d) at 3.  The notice procedures were reasonable, and Defendants filed a notice and accompany affidavit recounting their compliance with them (dkt. nos. 224, 224-1), a fact borne out by the Court's receipt of objections from class members.  The Court concludes that the Class Notice provided in this case was comprehensive and fully appropriate to meet the requirements of Rule 23(c)(2)(B), Rule 23(h)(1), and any relevant due process considerations. *See Domonoske*, 790 F. Supp. 2d at 472-73; *Clark*, 2004 WL 256433, at *4 n.22

## IV.    Objections Do Not Undermine the Settlement, and Most Actually Support It

The Court received six comments or objections to the settlement, all of which have been considered.  (Dkt. nos. 231, 234, 237, 245, 246, 250).  Far from undermining the settlement, these filings overwhelmingly affirm the need for the relief that the settlement provides.  The objections of Ms. Durham and Ms. Warner recount the trying conditions they have experienced at FCCW, conditions that the settlement is designed to remedy.  The three comments filed after the fairness hearing notifying the Court of the death of Ms. Ines further highlight the importance of this settlement.

Only Ms. Roe has submitted detailed objections to terms of the settlement.  She objects, for example, that:

- "Medical staff" is undefined and allows for unqualified or untrained personnel to continue giving treatment (dkt. no. 234 ¶ 35);

26

- "timely" treatment and evaluation of medical needs is undefined, and should be clarified to mean within 24 hours (*id*. ¶ 35a; *see also id.* ¶ 43 ("timely" emergency case should be defined as 12 hours or less));

- Additional provisions requiring documentation of medical events should be added (*id*. ¶¶ 36-38);

- Rather than being suspended only 6 months, co-pays should be suspended 9 months (*id*. ¶ 38);

- MRSA and Hepatitis treatment guidelines should be adopted (*id*. ¶ 39);

- The Pill Line should not occur outside during bad weather or before 5:30 A.M. (*id*. ¶ 40);

- Chronic care patients should be monitored every month rather than every 6 months when stable (*id*. ¶ 41);

- Referrals to specialists should occur within 14 days, not 30 days (*id*. ¶ 45);

- "Timely" receipt of written lab or testing results should be defined as within 72 hours (*id*. ¶46);

- Reports on the grievance process should be issued every 3 months (*id*. ¶47).

Many of these objections are simple disagreements with terms that were negotiated over several months with the input of the parties, their lawyers, medical experts, and Dr. Scharff, the compliance monitor. The Court will not lightly second-guess these choices, which are well-informed by medical judgment and clearly the result of arms-length negotiations.

Furthermore, several of Ms. Roe's concerns are allayed by the complete terms of the settlement. For instance: there are detailed provisions providing for a compliance monitor who visits FCCW four times a year and submits a corresponding compliance report (dkt. no. 221-1 at ECF 17-24); RNs and LPNs must only act within the scope of their medical training (*id*. at ECF 9; *see also id*. at ECF 34, 38); there will never be a co-pay for medicine for chronic conditions, emergency care, or treatment of communicable disease (*id*. at ECF 10); specific policy changes are implemented regarding diabetes and Hepatitis patients, among other conditions (*id*. at ECF

8); and any changes to FCCW's Operating Procedures must be accompanied by 20 days advanced notice (*id*. at ECF 7 n.2).

Finally, as shown in the Findings of Fact, the Court extensively questioned the Dr. Scharff about Ms. Roe's objections. Dr. Scharff discussed each of them, and the Court concludes that his answers and explanations fully assuage any concerns about approval of the settlement that class members could maintain.

## V. The Requirements of the PLRA Are Satisfied

The Settlement Agreement must also be evaluated under the specific requirements of the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1)(A), as it concerns prospective relief from prisoners' conditions of confinement. In particular:

> The PLRA states that no prospective relief shall issue with respect to prison conditions unless it is narrowly drawn, extends no further than necessary to correct the violation of a federal right, and is the least intrusive means necessary to correct the violation. When determining whether these requirements are met, courts must "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system."

*Brown v. Plata*, __ U.S. __, 131 S. Ct. 1910, 1939 (2011), *citing* 18 U.S.C. § 3626(a); *accord Plyler v. Moore*, 100 F.3d 365, 369 (4th Cir. 1996); *Etters v. Young*, No. 5:09-CT-3187-D, 2012 WL 1950415, *2 (E.D.N.C. May 30, 2012); *Couch v. Jabe*, 737 F. Supp. 2d 561, 573 (W.D. Va. 2010). A court "shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in" 18 U.S.C. § 3626(c)(1). *Etters*, 2012 WL 1950415, at *2.

Here, the Parties' Settlement Agreement expressly reflects their shared consensus that the resolution they have reached satisfies the requirements of the PLRA. *See* dkt. no. 221 at 14; *see also* dkt. no. 221-1 at 27 ("The Parties agree that the prospective relief established by this Settlement Agreement is narrowly drawn, extends no further than is necessary to address and remedy the violations of federal rights alleged by the Plaintiffs in their pleadings in this action, is

the least intrusive means necessary to correct these alleged violations and will not have any adverse impact on public safety or the operation of the criminal justice system.").  The Parties have requested that the Court, upon its own independent review and evaluation of the Settlement Agreement, reach a conclusion in accordance with their Stipulation.  *Id*.  For the reasons set forth below, the Court so concludes.

Plaintiffs' original and amended pleadings in this action are premised upon allegations of constitutionally-deficient medical care of a systemic nature at FCCW, as manifested in a host of particular aspects such as, without limitation:  inadequate staffing levels; deficient intake screening of offenders upon arrival at FCCW; deficient performance of comprehensive health assessments; inadequate sick call process and inappropriate denial of access to medical services; excessive offender co-pay policy enforcement; insufficient diagnostic and treatment practices; inadequate responsiveness to medical emergencies; deficient and unsanitary infirmary conditions; inadequate chronic care practices; inadequate infectious disease control practices; deficient practices with respect to timely referral to outside medical specialists; deficient practices with respect to timely and appropriate adherence to outside specialists' treatment recommendations; refusal to provide prescribed non-formulary medications; inadequate and inconsistent continuity in supply and distribution of prescribed (and in some instances, life-sustaining) medications; inadequate and inconsistent continuity in supply and distribution of medical equipment and supplies; unresponsive medical grievance process; denial of appropriate and timely offender access to medical information including diagnostic testing results; denial of prescribed and needed physical therapy; inadequate (or non-existent) accommodations for prisoners with disabilities; insufficient training of correctional staff with respect to medical care matters; deficient policies and/or practices with respect to treatment of chronic pain, provision of

29

palliative care and release of terminally-ill prisoners; inadequate mortality reviews; inadequate monitoring by VDOC of its medical contractors; and deficient policies and practices for fostering continuous quality improvement in the provision of medical care at FCCW. The Plaintiffs, throughout the course of the litigation, have supported these allegations with substantial admissible and persuasive evidence. *See supra*; *see also* dkt. nos. 132 & 138.

The Court earlier concluded that "[t]he Plaintiffs have presented ample evidence in their filings supporting class certification, their Motion for Partial Summary Judgment, and their response in opposition to the VDOC's Motion for Summary Judgment, enabling a fact-finder [*i.e.*, the Court] to reasonably conclude that the VDOC Defendants are or have been deliberately indifferent to the serious medical needs of the Plaintiff class[.]" Dkt. no. 222, ¶ 4 at 2. Although the case did not proceed to trial and was never fully decided on the merits, the voluminous evidence supplied by the Plaintiffs over four years of litigation would have been sufficient to prove an actual violation of Plaintiffs' Eighth Amendment rights. Further, the various remedies in the Parties' Settlement Agreement are directly linked to and designed to effectively address—and redress—the Eighth Amendment violations alleged in the Plaintiffs' pleadings and reflected in their evidentiary submissions.

### A.     Changes to VDOC Operating Procedures for FCCW

The Parties, with the assistance of correctional medical experts of their choosing and, at times, the designated compliance monitor, comprehensively reviewed the existing VDOC Operating Procedures governing or closely related to the provision of medical care at FCCW. They agreed upon extensive revisions to the FCCW Operating Procedures in order to enhance the prospects for improved medical care that will meet standards for constitutional adequacy.

30

### B. Adoption of Additional Guidelines and Standards

Beyond the revisions to the established VDOC Operating Procedures, the parties negotiated and reached agreement regarding an additional set of medical Guidelines and Standards to address specific issues and problem areas revealed by the Plaintiffs' evidentiary submissions. Adherence to these Guidelines and Standards is deemed necessary to assure that constitutional standards are met at FCCW going forward with respect to such matters as staffing levels, the medical intake process, comprehensive health assessments, the sick call process, the co-pay policy, diagnosis and treatment practices, responses to medical emergencies, infirmary conditions, chronic care practices, infectious disease control, utilization management, medication administration, physical therapy, response to medical grievances, provision of diagnostic testing and course of treatment information, correctional staff training, care for and release of terminally-ill prisoners and mortality review practices.

### C. Establishment of Other Necessary Policies

The Settlement Agreement provides that the Parties will collaboratively develop two new Operating Procedures with the assistance of their respective consulting correctional medical experts and the compliance monitor. These Operating Procedures will ensure that: (i) FCCW meets its obligations to disabled prisoners under both Eighth Amendment standards and the requirements of the Americans With Disabilities Act, 42 U.S.C. §§ 13131, *et. seq*., and its implementing regulations; and (ii) that the improved, enhanced level of medical care that the Defendants have committed to provide under the Agreement (thereby meeting their constitutional obligations) will continue beyond the expiration of the Agreement as a result of implementation of recognized and accepted Continuous Quality Improvement principles.

31

### D.　　Performance Monitoring Tools and Monitoring

The Parties have agreed that the compliance monitor, Dr. Scharff, will develop a set of Performance Measuring Tools focused on each of the major subjects and issues in regard to which the Defendants' performance must be improved in order to satisfy constitutional requirements.　Dr. Scharff will utilize these Tools as the basis for his monitoring activities to ensure that Defendants are meeting their obligations to provide constitutionally-adequate medical care at FCCW for the duration of the effective period of the Settlement Agreement.　For these purposes, Dr. Scharff will conduct periodic visits to FCCW.　During these visits, he will interview prisoners, medical staff and correctional personnel; review facilities; review medical grievances and medical records; and undertake such other activities as he deems necessary or appropriate to assess the quality and quantity of medical care that is being provided at the Facility.　He will report in writing to the Parties following each visit, and will advise the Defendants in the event he determines that they are not in compliance with constitutional standards and/or the provisions of the Settlement Agreement.

In *Brown v. Plata*, the Supreme Court addressed and elaborated upon the "narrow tailoring" requirement imposed by the PLRA as follows:

> Narrow tailoring requires a "'fit' between the remedy's ends and the means chosen to accomplish those ends." *Board of Trustees of State Univ. of N.Y. v. Fox*, 482 U.S. 469, 480 (1989).　The scope of the remedy must be proportional to the scope of the violation, and the Order must extend no further than is necessary to remedy the violation.　This Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution.　*Lewis v. Casey*, 518 U.S. 343, 357 (1996).　But the precedents do not suggest that a narrow and otherwise proper remedy for a constitutional violation is invalid simply because it will have collateral effects.

131 S. Ct. at 1939-40 (parallel citations and internal quotations omitted); *see also Fox*, 482 U.S. at 480 (Narrow tailoring requires "a 'fit' that is not necessarily perfect, but reasonable; that

represents not necessarily the single best disposition, but one whose scope is 'in proportion to the interest served[.]'" (citation omitted.)).

Here, Plaintiffs have alleged, and their voluminous evidentiary presentation supports, systemic violations of the Eighth Amendment in the provision of medical care to prisoners residing at FCCW, as reflected in a host of deficient policies, practices and procedures employed by Defendants and their medical care contractors. The provisions of the Settlement Agreement are specifically geared to modification of the Defendants' constitutionally-deficient medical care with the objective of raising the level of the overall quality and quantity of medical care at FCCW to meet the constitutional standards under the Eighth Amendment on a consistent, on-going basis. The Court concludes that the "fit" between the objective of constitutionally-adequate medical care at FCCW and the means chosen by the Parties to meet that objective as embodied in their Settlement Agreement is both reasonable and appropriate under all the circumstances of this case. Accordingly, the Court holds that the prospective relief contemplated by the provisions of the Settlement Agreement is narrowly drawn and extends no further than necessary to correct the violations of federal rights alleged by Plaintiffs and supported by the evidence they have submitted.

The Court also notes that the Settlement Agreement places responsibility for improving the medical care at FCCW squarely within Defendants' control. Defendants are charged with the obligation to embrace and implement all of the various remedial measures in the Agreement, pursuant to which the medical care at FCCW will be raised to a level satisfying the Eighth Amendment. The Agreement does not invest the compliance monitor with coercive powers over Defendants. Rather, he will merely observe and evaluate their performance of the obligations it imposes, work collaboratively with them on the development of additional policies intended to

33

enhance the quality of that performance, and advise them in the event acts or omissions implicating constitutional concerns are observed. This structure affords Defendants an opportunity to choose their own means to effectively address the problems identified. The Court's intervention may be invoked only to the extent Defendants fail or refuse to effectively remedy a constitutional deficiency brought to their attention by Plaintiffs or the compliance monitor under the terms of the Agreement. Accordingly, given the breadth of the constitutional violations that Plaintiffs have alleged and for which they have provided substantial evidence, as well as the scope of the need for significant remedial measures to be undertaken, the Court concludes that the Settlement Agreement constitutes the least intrusive means necessary to correct the violations at issue.

### E.   Attorneys' Fees

On October 19, 2015, Plaintiffs, as the "prevailing parties" in this litigation, filed a Petition for Award of Attorneys' Fees and Litigation Costs Pursuant to 42 U.S.C. § 1988, accompanied by a supporting Memorandum of Law and extensive evidentiary submissions, seeking recovery in the total amount of $2,121,972.95. (Dkt. nos. 226-229). Of this total amount, $2,063,298.82 was sought for attorneys' fees, determined on the basis of a lodestar calculation multiplying the hours that Plaintiffs' attorneys contend that they reasonably expended in litigating this matter times $211.50, the capped hourly rate imposed upon cases of this nature by the PLRA, pursuant to 42 U.S.C. § 1997e(d)(3). Defendants requested a stay of briefing on the motion while the parties finalized a resolution of the matter, and the Court granted the stay. (Dkt. 249). As a result of successful negotiations, an agreement has been reached (and subjected to the requisite authorization of State officials contemplated by Va. Code § 2.2-514) to resolve the Plaintiffs' attorneys' fees and costs by a payment in the amount of $1,500,000.00.

The Court finds and concludes that the fee award agreed upon by the parties as an element of their Settlement Agreement satisfies all of the requirements of the PLRA, as mandated by applicable law.  *See, e.g., Alexander S. v. Boyd*, 113 F.3d 1373, 1380 (4th Cir. 1997); *Duvall v. O'Malley*, Civ. Action No. ELH-94-2541, 2014 WL 1379787, at *8 (D. Md. April 7, 2014).  First, as noted above, the negotiated resolution amount of $1.5 million was based on a fee demand that was calculated utilizing an hourly rate of $211.50 as contemplated by 42 U.S.C. § 1997e(d)(3).  *See generally* Memorandum of Law in Support of Plaintiffs' Petition for Award of Attorneys' Fees at 11-15 & nn. 4-7 (citing authorities) (Dkt. no. 227).  Second, based upon the evidentiary submissions provided to the Court by Plaintiffs in support of their Petition, including the sworn Declarations provided by counsel, counsel's contemporaneous time records and related documentation, as well as this Court's own observations and intimate familiarity with this litigation since its inception, the fees that will be reimbursed under the Settlement Agreement were directly and reasonably incurred in the course of Plaintiffs' efforts to establish the constitutional violations alleged in their pleadings as contemplated by 42 U.S.C. § 1997e(d)(1)(A).  Furthermore, given the extent of the affirmative relief that must be undertaken and implemented by Defendants under the provisions of the Settlement Agreement in order to raise the quality and quantity of medical care at FCCW to a level satisfying Eighth Amendment standards, the Court has no difficulty concluding that the comprised fee award is proportionate to the results obtained by Plaintiffs' attorneys in this action as contemplated by 42 U.S.C. § 1997e(d)(1)(B).   The Court thus concludes that the award of fees and costs mutually agreed upon by the parties fully complies with and satisfies the applicable requirements of the PLRA.

*          *          *

Finally, this Court is unable to identify any way in which the implementation of the Settlement Agreement could have any possible adverse impact on public safety or the operation of the criminal justice system. All requirements for approval of the Settlement Agreement under the provisions of the PLRA are thus satisfied.

## CONCLUSION

The Court having concluded that the Parties' Settlement Agreement is fair, adequate and reasonable to the Class as a whole and that its terms are narrowly drawn, extend no further than necessary to correct the violations of federal rights alleged by the Plaintiffs, and constitute the least intrusive means necessary to correct those violations, the Settlement Agreement will be approved. Furthermore, the Court finds that the requirements of the PLRA are satisfied as to Plaintiffs' fee petition, and that Defendants will be ordered to pay $1,500,000 in attorneys' fees and costs. An appropriate final judgment order will issue.

The Clerk of the Court is directed to send these findings of fact and conclusions of law to all counsel of record.

Entered this  5th   day of February, 2016.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE