**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

CYNTHIA B. SCOTT, *et al.*,    )
                     )
         *Plaintiffs,*    )
                     )    Case No. 3:12-cv-00036-NKM
     v.                )    Sr. Judge Norman K. Moon
                     )
HAROLD W. CLARKE, *et al.*,    )
                     )
         *Defendants.*    )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR ORDER TO SHOW CAUSE WHY
<u>DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT</u>**

Mary C. Bauer, VSB No. 31388
(mary@justice4all.org)
Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Angela Ciolfi, VSB No. 65337
(angela@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Adeola Ogunkeyede (application for
*pro hac vice* admission pending)
(adeola@justice4all.org)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA  22903
(434) 977-0553

Theodore A. Howard (admitted *pro hac vice*)
WILEY REIN LLP
1776 K Street, NW
Washington, DC  20006
(202) 719-7000


Philip Fornaci (application for *pro hac vice*
admission pending)
Elliot Mincberg
WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C.  20036
(202) 319-1000


Attorneys for Plaintiffs

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

     A.     Procedural Background ........................................................................... 1

     B.     The Parties' Settlement Agreement ...................................................... 2

     C.     The Impasse Leading to the Plaintiffs' Motion .................................... 3

STATEMENT OF FACTS ........................................................................................... 4

     A.     Dr. Scharff's Monitoring Reports Document Widespread Non-Compliance ......... 5

     B.     The Plaintiffs' Notice and VDOC's Response ................................... 14

GOVERNING LEGAL STANDARD ........................................................................ 17

ARGUMENT ............................................................................................................. 18

I.     DEFENDANTS HAVE BREACHED THEIR OBLIGATIONS UNDER THE SETTLEMENT AGREEMENT IN VIOLATION OF THE COURT'S CONSENT JUDGMENT ............................................................................................... 18

     A.     A Valid Decree Exists of Which the Defendants Have Full Knowledge ............ 18

     B.     The Decree Was in Plaintiffs' Favor .................................................. 18

     C.     The Defendants Have Violated the Decree's Terms and Have Actual Knowledge of Their Violations ................................................. 19

     D.     The Plaintiffs Have Suffered Resulting Harm ................................... 20

II.     GRADUATED SANCTIONS FOR THE DEFENDANTS' CIVIL CONTEMPT ARE NECESSARY AND APPROPRIATE ............................................................... 38

CONCLUSION ......................................................................................................... 42

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcraft v. Conoco, Inc.*,
218 F.3d 288 (4th Cir. 2000) ...............................................17

*Braggs v. Dunn*,
No. 2:14cv601, 2017 WL 2773833 (M.D. Ala. June 27, 2017) ........................................37, 38

*Buffalo Wings Factory, Inc. v. Mohd*,
574 F. Supp. 2d 574 (E.D. Va. 2008) ...............................................17, 39

*Carbon Fuel Co. v. United Mine Workers of Am.*,
517 F.2d 1348 (4th Cir. 1975) ...............................................39

*Chandler v. Crosby*,
379 F.3d 1278 (11th Cir. 2004) ...............................................37

*Coleman v. Wilson*,
912 F. Supp. 1282 (E.D. Cal. 1995)...............................................41

*Colonial Williamsburg Found. v. Kittinger Co.*,
792 F. Supp. 1397, 1405, *aff'd*, 38 F.3d 133 (4th Cir. 1994) ...........................................17, 39

*Gates v. Cook*,
376 F.3d 323 (5th Cir. 2004) ...............................................37

*In re General Motors Corp.*,
61 F.3d 256 (4th Cir. 1995) ...............................................38, 39

*Helling v. McKinney*,
509 U.S. 25 (1993)...............................................38

*Hoptowit v. Ray*,
682 F.2d 1237 (9th Cir. 1982) ...............................................42

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)...............................................41

*Thompson v. U.S. Dep't of Hous. & Urban Dev.*,
404 F.3d 821 (4th Cir. 2005) ...............................................17

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947)...............................................39, 40, 41

Case 3:12-cv-00036-NKM   Document 266   Filed 09/06/17   Page 3 of 48   Pageid#: 5273

**Statutes**

18 U.S.C. §§ 3626(f)(1), (f)(6)(C) ................................................................................41

**Rules and Regulations**

Fed. R. Civ. P. 23(b)(2).................................................................................................2

Fed. R. Civ. P. 53(a)(1)(C) .........................................................................................41

**Other Authorities**

Fed. R. Civ. P. 53, Advisory Committee's Note.........................................................41

Plaintiffs Cynthia Scott, *et al*., by their attorneys, submit this Memorandum of Law in support of their Motion seeking the entry of an Order to Show Cause as to why Defendants Harold W. Clarke, *et al*., as representatives in their official capacities of the Virginia Department of Corrections (VDOC), should not be held in civil contempt for their failure to provide constitutionally-adequate medical care.

The Plaintiffs and other women incarcerated at the Fluvanna Correctional Center for Women (FCCW) continue to suffer from woefully inadequate health care in clear breach of the obligations the Defendants assumed under the Consent Judgment entered by this Court on February 5, 2016. As a direct result of VDOC's failure to implement the Settlement Agreement and Consent Judgment, women at FCCW continue to experience severe medical consequences described in this brief and attached Declarations, such as severe untreated pain, preventable amputations, and the realized risk of premature deaths.

## INTRODUCTION

### A.    Procedural Background

Ms. Scott and four other original named plaintiffs initiated this case as a proposed class action on July 24, 2012, seeking declaratory and injunctive relief on behalf of a putative class of women similarly situated. The prisoners charged that the medical care at FCCW violated constitutional minimum standards embodied in the Eighth Amendment to the Constitution of the United States. Specifically, the Plaintiffs asserted that the substandard medical care FCCW provided women incarcerated at FCCW reflected the Defendants' deliberate indifference to the women's serious medical needs on a systemic basis.

Following extensive discovery and briefing, this Court issued an Order on November 20, 2014, certifying a class consisting of "all women who currently reside or will in the future reside at FCCW and have sought, are currently seeking or will seek adequate, appropriate medical care

for serious medical needs, as contemplated by the Eighth Amendment," pursuant to Rule 23(b)(2), Fed. R. Civ. P. *See* ECF Docket No. 188. On November 25, 2014, this Court granted the Plaintiffs' Motion for Partial Summary Judgment and denied the Defendants' Motion for Summary Judgment in its entirety. Pertinent holdings included, *inter alia*, that: (i) the many and varied adverse health conditions and problems of which the Plaintiffs complained constituted "serious medical needs" under settled Eighth Amendment jurisprudence; (ii) the VDOC has a non-delegable duty under the Eighth Amendment to provide constitutionally-adequate medical care to all prisoners within its custody, including the Plaintiffs; and (iii) based on all of the evidence presented, a reasonable fact-finder could find the VDOC liable, as a matter of law, for providing inadequate medical care or failing to provide appropriate medical care under circumstances in which such care was due, reflecting "deliberate indifference" to the Plaintiffs' and class members' serious medical needs. *See generally* ECF Dkt. No. 201.

### B.   The Parties' Settlement Agreement

In November 2014, shortly before trial was scheduled to begin, the parties agreed on a structure to settle the case under a Memorandum of Understanding that broadly outlined the terms for settlement and described a process by which the parties would reach a final agreement. Thereafter, the parties—assisted by their attorneys, their respective correctional medical experts/consultants, and the proposed Settlement Compliance Monitor, Nicholas Scharff, M.D.— engaged in protracted negotiations leading finally to a comprehensive Settlement Agreement that they jointly presented to the Court on September 15, 2015. *See* ECF Dkt. Nos. 221, 221-1.

The Settlement Agreement submitted for this Court's approval features the following essential elements:

1.    Agreed-upon revisions to the wording of a host of pre-existing VDOC
      Operating Procedures relating to the provision of medical care at FCCW

2

to enhance the prospects for an improved level of care that would meet applicable constitutional standards;

2.     Adoption of additional FCCW-specific guidelines and standards and the crafting of two new Operating Procedures tailored to address particular deficiencies in the manner in which FCCW provides medical services to women with disabilities and to establish an adequate Continuous Quality Improvement program;

3.     Agreement to allow the parties' jointly-designated Compliance Monitor—Dr. Scharff—to establish a set of Performance Measuring Tools to utilize in his ongoing evaluation of VDOC's performance of its obligations under the Settlement;

4.     Guidelines for Dr. Scharff to perform his duties as Compliance Monitor;

5.     Provisions for procedures to enforce the terms of the Settlement Agreement in the event of an actual or perceived breach; and

6.     Provisions for resolution of the Plaintiffs' claim for an award of attorneys' fees and court costs incurred in bringing this action and securing a favorable settlement.

*See generally* ECF Dkt. No. 221-1.

Following the Court's entry of an Order granting preliminary approval (ECF Dkt. No. 222), notice to the class and an appropriate period for the filing of comments and/or objections, the Court held a Fairness Hearing on November 9, 2015 and heard testimony from four of the named Plaintiffs and the Compliance Monitor. Thereafter, this Court entered an Order granting final approval to the Settlement Agreement as a Consent Judgment on February 5, 2016. *See* ECF Dkt. No. 262.

### C.     The Impasse Leading to the Plaintiffs' Motion

As will be discussed more fully below, the Plaintiffs notified the VDOC, by letter dated April 20, 2017, of the Plaintiffs' numerous and substantial concerns regarding continuing substandard medical care at FCCW, and requested that VDOC undertake prompt remedial

measures. The VDOC responded by letter dated May 22, 2017, rejecting the Plaintiffs'

assertions and position in their entirety, leaving the parties at an impasse.

Section V.2. of the Settlement Agreement provides, in pertinent part, as follows:

> In the event that a problem of constitutionally-deficient medical care on the part
> of the Defendant, and brought to the Defendant's attention by . . . Plaintiffs'
> counsel pursuant to the provisions of Section IV.2.c. of this Settlement
> Agreement, has not been cured or otherwise resolved to the satisfaction of the
> Plaintiffs . . . upon expiration of the 30-day period following the provision of such
> notice to the Defendant, the Plaintiffs, by and through their counsel, may initiate
> proceedings before the Court seeking specific performance of the terms of the
> Settlement Agreement, contempt sanctions against the Defendant, or both.

*See* ECF Dkt. No. 221-1 at 23. The Plaintiffs bring the instant Motion in accordance with this

provision.

## STATEMENT OF FACTS

Defendants' deficiencies in complying with the Settlement Agreement are global, as

described and reflected in this brief and in the accompanying Declarations by class members. *See*

Ex. 1, comparing Defendants' deficiencies under the Settlement Agreement as reflected in Dr.

Scharff's most recent Report and in Declarations attached hereto (preserving each of these issues

for purposes of the requested contempt order). Because of the broad scope of VDOC's non-

compliance with the Settlement Agreement, facts related to each issue in contest are covered in

the Declarations of the class members. *See generally* Exs. 10 through 54. Plaintiffs gave VDOC

notice about each of these issues on April 20, 2017, as referred to above and described below on

page 14 and in Exhibit 2. For illustrative purposes, many of the deficiencies are described in

more detail in this brief.[1]

---

[1] Under the Settlement Agreement, the Plaintiffs and their counsel have independent authority to
bring issues concerning constitutionally-deficient medical care to the attention of both the
Defendants and this Court, separate and apart from the Compliance Monitor's duty to evaluate
the Defendants' performance. *See* ECF Dkt. No. 221-1 at 19, 23. Accordingly, the observations
and experiences of the class members as recounted in their Declarations establish both violations

4

## A.    Dr. Scharff's Monitoring Reports Document Widespread Non-Compliance

In the year and a half since the final order, Nicholas Scharff, M.D., the Compliance Monitor selected by the parties and approved by this Court, has continually found that VDOC and FCCW have failed to comply, or even make significant progress toward compliance, with respect to many of the central requirements for constitutionally-adequate medical care contemplated by the Settlement Agreement.   In fact, in the Monitor's most recent Report, he found that for several measures in which VDOC had previously progressed to at least partially compliant, it has now regressed to non-compliant.

### 1.    March 2016 Report

Dr. Scharff made his initial visit to FCCW on March 7-10, 2016, a little more than one month after final approval of the Agreement.[2]  His March 25, 2016 Report pointedly criticized the medical care at FCCW, finding no signs of positive change in many aspects of the medical care that had been targeted by the lawsuit.  *See, e.g.*, Ex. 4, Scharff Mar. 2016 Rpt. at 2.  His audit of nurse sick call "demonstrated it was of almost no value, serving most commonly only to delay any meaningful evaluation of patients' problems." *Id.*  His chart audits indicated that consultation and off-site visits to specialists were delayed, and that delays between ordering and first administration of prescribed medications were "not acceptable." *Id.* at 2-3.  Dr. Scharff found that FCCW's responses to prisoners' Regular Grievances focused on medical care "were almost all inadequate, were in fact non-responses. . .  Only 8 [out of 53] were referred for

_____

of the Settlement Agreement and their resulting harm.  To avoid redundancy, however, the facts described in the Plaintiffs' Declarations are not recounted here, but illustrative examples are set forth in the section of the Argument describing the harms they have suffered as a result of Defendants' failure to comply. *See, infra*, pp. 20-38.

[2]      But nearly a full six months after the parties reached consensus on the terms for settlement that they jointly submitted to the Court in mid-September 2015, subject to an expectation on both sides that their Settlement would be approved.

services.  Among those not referred were 3 with potentially serious disease which could deteriorate significantly in the 30-45 days after the initial grievance before a new informal Complaint might be filed and read.  *This clearly is a circumstance requiring revision*." *Id.* at 7 (emphasis in original).

At the time of this first visit, Dr. Scharff maintained an optimistic viewpoint, suggesting that "by the time of my next visit[,] inmates will have noticed improvement in the areas of medication administration and sick call...." *Id.*

## 2.      September 2016 Report

Unfortunately, Dr. Scharff's hopes and expectations for substantial early improvement proved unfounded.  Dr. Scharff's September 19, 2016 Report, summarizing his second monitoring visit at FCCW, from July 11-14, identified on-going grave deficiencies in VDOC's performance in many areas. *See generally* Ex. 5, Scharff Sept. 2016 Rpt.

With respect to staffing, for example, Dr. Scharff commented that:

[N]o real progress has occurred in permanent nursing staffing, and there remains a large dependency on agency nurses[.]  . . . What hiring has occurred has been balanced by departures.  . . . [T]his is likely related to the generally unhappy atmosphere in an institution where so many patients feel un-cared for and/or institutional or contractor policies appear to frustrate the needs of patients and providers, including nurses.

*Id*. at 2-3.  Dr. Scharff also found continuing problems in medication administration:

[M]edication orders are missing for the EMAR [computer medications tracking system], likely because they were not transcribed or were transcribed to the wrong chart, since several of the [patient] group have been offered medications that had not been prescribed for them.

In visiting housing units during the week, I learned that at least many nurses, possibly agency nurses, do not know how to re-order medications when nearing the end of a given supply.  This is a simple procedure in the electronic pharmacy record, and it really should never be a problem. . .

Patients are not informed of changes in medication—starts, stops, changes. . . [T]hey cannot tell whether a new medication is appropriate for them, and they

6

have no opportunity to ask about risks, adverse effects, and benefits, or to discuss or understand the rationale behind therapeutic decisions. *This is inconsistent with acceptable medical practice.*

*Id*. at 5 (emphasis in original).

Dr. Scharff's September 2016 Report also identified failures on the part of VDOC in a host of other areas of performance including, among others, the process for responding to medical grievances. Again he leveled strong criticism at VDOC for failing to use grievances as the foundation for measures to improve care. "Unless the Warden and Senior Management are committed to supporting a meaningful grievance process to find and address real problems, the terms of the Settlement Agreement are unlikely to be satisfied." *Id*. at 11 (emphasis in original omitted).

Dr. Scharff also found that patients' whose outside medical referrals were delayed beyond 30 days were not monitored as required by the Settlement Agreement, and noted that "[t]his failure contributes significantly to patients' anxiety and the sense that they are not cared about, especially when the study is to help diagnose or exclude malignancy." *Id.* at 12. He noted similar delays and deficiencies in FCCW's dental care, which appeared "seriously back-logged; the wait for restorations appears long enough to cause the loss of otherwise salvageable teeth, and that for extractions in the presence of pain is quite possibly of [unconstitutional] magnitude." *Id.*at 14.

Five months after the Settlement Agreement's final approval, Dr. Scharff found VDOC compliant in only four of the 23 "compliance indicators" specifically identified by the Agreement. *See* ECF Dkt. No. 221-1, Sec. IV.2.c. at 18 & Appendix B thereto; Scharff Sept. 2016 Rpt. at 14 & Appendix 3. *See also* Ex. 3, compiling the compliance ratings from each Scharff Report.

### 3. January 2017 Report

Dr. Scharff conducted his next monitoring visit to FCCW from October 3-6, 2016, and submitted his findings to the parties in a Report issued on January 10, 2017.[3] Ex. 6. Although the January 2017 Report identified some areas of improved medical care performance, Dr. Scharff raised serious concerns regarding continuing deficiencies in such areas as staffing, medication administration, chronic pain control, co-payment policy administration, response to medical grievances and management of outside referrals. Dr. Scharff reported that "[n]urse staffing remains a problem," and noted the still-vacant Health Services Administrator (HSA) and site Medical Director positions.

He again criticized FCCW's ongoing failure to accurately chart medication administration, writing that "[i]t is difficult to believe this problem cannot be resolved, since the current practice is contrary to pertinent regulations[.]" Ex. 6, Scharff Jan. 2017 Rpt. at 4-5. This critique substantially echoed the findings in Dr. Scharff's September 2016 report. With respect to pain control, Dr. Scharff described FCCW's need for staffing and pain management programs that provide "sufficient time, and compassion, for repeated discussion [with patients]." *Id.* at 5. He expressed his uncertainty as to "whether providers at FCCW are sufficiently knowledgeable about chronic pain and its control to provide this kind of service." *Id.* He also noted the barriers to timely off-site medical consultations presented by FCCW's "inadequate supplies of vehicles or security personnel." *Id.* at 18.

---

[3]     Dr. Scharff's January 2017 Report, *see* Ex. 6, is incorrectly dated November 10, 2016. That was the earlier date upon which a *draft* of the Report was forwarded to the parties for their preliminary review and comment in accordance with the procedure in the Settlement Agreement. *See* Sec. IV.2.c. at 18 (ECF Dkt. No. 221-1). Dr. Scharff inadvertently failed to change the date when the document was converted from draft to final form.

Dr. Scharff reviewed FCCW's grievance system for the fourth time, and once again identified continued problems with bureaucratic "non-responses," which, he found, "only strengthen the impression that FCCW and VA DOC would rather prevail on a technicality than try to understand and resolve the patient's problem." *Id.* at 13. He criticized the lack of formal medical input into grievance responses as "senseless and counter-productive," and found the process overall still unsatisfactory. *Id.*

On a broad level, Dr. Scharff noted that, despite some improvements on the part of Armor, the contractor, VDOC's performance of its obligations was lacking:

> For its part, VA DOC has not addressed any of the most troublesome problems at FCCW: co-payment policy, an ADA policy, the grievance process, and dental backlog and utilization tracking. Whether this is institutional inertia or simply lack of concern is not clear to me. In either case, VA DOC's level of performance and involvement is not adequate in the setting of so many problems and so much patient dissatisfaction, nor is it consistent with its obligations under the Settlement Agreement.

> The lack of movement on the DOC side contrasts with the gradual progress on the part of the contractor. I hope to discuss these findings with VA DOC central office personnel early in January and to see clear evidence of improvement during the first quarter. *Failing such improvement, the Court should consider whether this Settlement is, in fact, working effectively.*

Scharff Jan. 2017 Rpt. at 20 (emphasis added). Dr. Scharff found FCCW to be compliant with 4 of 23 indicators based on the Settlement Agreement, Appendix B.

### 4. March 2017 Report

Dr. Scharff's first monitoring visit of 2017 to FCCW occurred from January 23-26, and was the subject of a Report dated March 17, 2017. *See generally* Ex. 7, Scharff March 2017 Rpt. Dr. Scharff noted some further improvements in the quality of FCCW's performance, but also recognized serious ongoing deficiencies in many areas. He re-audited FCCW's grievance system for the fifth time and once again concluded that "[t]he frequency of inadequate and/or unhelpful responses . . . remains far too high." *Id.* at 7.

9

He re-examined FCCW's sick call procedure and found continuing delays in referrals to providers and in medication ordering. *Id.* at 9. Dr. Scharff concluded that sick call examinations were adequate in only 51% of cases. *Id.*

More than six months after the departure of Dr. Morton-Fishman, the former Medical Director, Armor still had not hired a full-time replacement. *Id.* at 4-5. Dr. Scharff also noted the "fundamental problem" of FCCW's ongoing failure to provide sufficient programming for long-term Infirmary residents: "[a] brief infirmary stay without programming or commissary for short-stay patients is reasonable and usual in corrections; but those conditions for patients in long-term care are simply not acceptable." *Id.* at 8.[4]

Dr. Scharff particularly focused on FCCW's failure to adopt and implement an overall Continuous Quality Improvement ("CQI" or "QI") program, one of the cornerstones of the Settlement Agreement. He stated as follows:

> QI *requires* intimate and insistent participation of management at the highest level as well as participation of workers at every level. If senior management is not involved, everyone else will "go through the motions" at most, and no meaningful change will occur in the culture of the organization.
>
> The Settlement Agreement …requires such a QI program and the involvement of VA DOC senior management. . . . But there is no unifying QI mechanism, no committee to coordinate these efforts and to allow for collaboration among all the interested parties, and (to my knowledge) no reporting either to senior management or to workers at FCCW concerning problems and progress. It is the reporting that motivates change in practice and culture.

*Id*. at 15 (emphasis in original). To the Plaintiffs' knowledge, a CQI program still has not been developed or implemented.

---

[4]     The Performance Indicators Appendix to the March 2017 Report reflects Dr. Scharff' findings that, as of late January, FCCW was compliant with the standards in the Settlement Agreement on 4 indicators; partially-compliant on 14 indicators; and non-compliant on 3 indicators—co-pay policy; offender access to medical information; and development of a CQI program. One indicator was designated as "not yet assessed." Ex. 7.

5.      **June 2017 Report**

Dr. Scharff's next monitoring trip to FCCW occurred from April 24-27, 2017, and is the subject of a Report dated June 25, 2017. *See generally* Ex. 8, Scharff June 2017 Rpt. Again, the Report recognizes some areas of improvement in the provision of medical care. But overall, the number of Performance Indicators in regard to which FCCW was non-compliant *doubled* in comparison to his prior evaluation – from three non-compliant indicators to six. Some indicators, such as patient access to medical information, have never been found compliant.

Dr. Scharff's analyses illuminate his conclusions. For example, concerning FCCW's co-pay policy, he stated in pertinent part:

> For sick call, the Warden says they are following policy. The policy, however, allows co-payment charges for any visit except those on a specific, limited list of chronic conditions. We discussed the senselessness of such a designation. . . .
>
> The copayment policy as currently enforced is both patently absurd and in violation of the terms of the settlement agreement. The prisoners, their attorneys, and I all see it as arbitrary and unfair.

*Id.* at 3.

Once again, Dr. Scharff sharply criticized the sick call process conducted by Licensed Practical Nurses (LPN's). His firsthand observation of sick call for five patients indicated that not a single patient had all of her medical issues adequately addressed, and his review of additional charts indicated that only 44% of medical issues were adequately addressed. [5]

Dr. Scharff reported:

> Both my direct observations and the chart audit support allegations in my patient correspondence and in many grievances that the process of nurse sick call serves little purpose. In most instances, it serves only to delay evaluation by a provider. . . Until [sick call is] provided primarily by personnel qualified by

_____

[5] This percentage declined from 51% in the January 2017 sick call evaluation. Ex. 6, Scharff Jan. 2017 Rpt. at 9.

11

training and experience to evaluate patients and prescribe medications . . . DOC must be considered non-compliant in this area.

Ex. 8, Scharff June 2017 Rpt. at 5-6.

Despite Dr. Scharff's repeated criticisms about the process by which FCCW responds to medical grievances, VDOC has steadfastly declined to adopt effective remedial measures. The June 2017 Report states:

> As I have previously stated, a functioning grievance system is critically important in correctional health care systems, with their inevitable complexities and barriers to care related to restrictions on patient movement and communication with caregivers and custodial imperatives. In such settings, the grievance system is a critical failsafe for discovering errors in practice and unattended emergent conditions. *Returning 75-97% of grievances unread for seemingly arbitrary reasons communicates simply and clearly that the system just doesn't care about the grievances*. Clinically, this is shortsighted, dangerous, and likely negligent. In terms of the Settlement Agreement, it is unacceptable. If and when there should be an adverse event related to the "rejection" of one of these grievances, there is a great risk it would be considered deliberate indifference.

*Id*. at 14 (emphasis added).[6]

More than eighteen months after the Settlement Agreement was consummated, FCCW had yet to implement a hospice and palliative care program. Although a policy was finally developed as of April 2017, to Plaintiffs' knowledge, it is not yet operational. Scharff June 2017 Rpt. at 10 (program "scheduled to become operational shortly"). In addition, despite having almost a year and a half to develop a CQI program, the most notable progress, per Dr. Scharff's June report, that FCCW has made in this area is to plan a conference call and visit with the Philadelphia Department of Corrections to "learn in detail about the operation and effect of a true

---

[6]     Besides Sick Call, the Co-Pay Policy and the Medical Grievance Process, the June 2017 Report also reflects findings of non-compliance with the Settlement Agreement in the administration of Medical Equipment and Supplies; offender access to medical information; and development of a CQI program. Ex. 8 at 2, 8-9 and Performance Indicators Appendix thereto.

12

program of CQI." *Id.* at 3. If Defendants have created a new, adequate draft for a CQI program it has yet to be shared with Plaintiffs.

These findings from Dr. Scharff demonstrate that VDOC has failed to provide effective leadership in implementing the Settlement Agreement. VDOC knew what its duties were and the widespread changes needed in September 2015 at the time the parties submitted the Settlement Agreement to the Court for approval. Its officials knew or should have known that the prior practice of allowing its for-profit contractor to muddle along providing sub-standard health care on a broad scale could not bring about the drastic improvements to which VDOC had appropriately agreed. This Court admonished the parties at the November 2015 Fairness Hearing to see to it that the changes agreed upon by the parties were made to protect the members of the class. Almost two years later, VDOC has failed completely to provide oversight and direction and to hold medical, management and correctional staff accountable for compliance. Instead VDOC's complacency or deliberate indifference has resulted in compliance in only 4 of 23 indicators.

### 6. VDOC's Failure in Leadership to Change Culture of Medical Care

Beginning in July 2016, Dr. Scharff has encouraged VDOC and its contractor, Armor, to exert effective leadership to change the culture of the institution and to creatively address the "unhappy atmosphere" where patients feel that staff lack compassion for them and unhappy staff leave FCCW. Ex. 5, Scharff Sept. 2016 Rpt. at 2-3. He described a troubled institutional culture in a meeting with VDOC's Director of Health Services and top Armor management and implored them to lead a transformation in the culture. Ex. 5, Scharff Sept. 2016 Rpt. at 9.

In the same report Dr. Scharff called upon the Warden for effective leadership to repair the grievance system. *"Unless the Warden and Senior Management are committed to supporting a meaningful grievance process to find and address real problems, the terms

13

of the Settlement Agreement are unlikely to be satisfied." *Id.* at 11. (Emphasis in original).

In summary, after five multi-day visits to FCCW over a 13-month time period, Dr. Scharff has found that the VDOC has yet to approach, even remotely, full compliance with the obligations it agreed to assume. Indeed, at no point has the VDOC achieved compliance with *even half* of the 23 specific Compliance Indicators enumerated in Appendix B to the Settlement Agreement. Meanwhile, VDOC's performance deficits continue to have devastating impacts on the women dependent upon the facility's medical care.

### B.     The Plaintiffs' Notice and VDOC's Response

Seriously disappointed by VDOC's lack of meaningful progress in improving the quality and quantity of constitutionally-adequate medical care at FCCW as expressly contemplated by the Settlement Agreement, the Plaintiffs served the VDOC with a Notice Letter on April 20, 2017, pursuant to Section V.2. of the Agreement. *See* Ex. 2.

The Plaintiffs' letter drew upon the first-hand accounts of women at FCCW continuing to suffer substandard care on an ongoing basis, as well as Dr. Scharff's critical findings. The letter highlighted particular aspects of VDOC's performance, as identified by the Settlement Agreement, for which remedial measures are required. Where appropriate, the Plaintiffs also suggested concrete courses of action that the VDOC might take in order to address the problems described.

As but one example, Plaintiffs focused on the clearly defective and inadequate manner in which FCCW responds to medical grievances submitted by the facility's residents. *See* Ex.2 at 13-14. After highlighting the various ways in which FCCW's established practices and procedures for addressing and resolving grievances failed to fulfill the obligations under the Settlement Agreement to respond to each grievance "in a timely and meaningful way" and to

14

"perform quantitative and qualitative analysis of grievance data as part of [FCCW's] quality management program," the Plaintiffs prescribed remedial measures as follows:

> VDOC should take grievances seriously, both for the individual grievant and as a part of the quality management program. Grievances should be reviewed individually by staff with clinical backgrounds. In many cases, it is appropriate and productive to meet with the person grieving. Further, grievances should be categorized and analyzed on an ongoing basis as a source of problem identification in the quality management program, as the Settlement Agreement expressly contemplates. A competent senior supervisor independent of FCCW might oversee the grievance process, with clinical input in every case, including medication management.

*Id.* at 14.

Based on this and analogous critiques of other elements of the VDOC's deficient medical care at FCCW, the Plaintiffs requested "that VDOC cure the areas of noncompliance outlined above, including implementing the specific remedies we have noted for many of the areas of noncompliance." *Id.* at 16.

VDOC, by counsel, responded to the Plaintiffs' Notice Letter on May 22, 2017. *See* Ex. 9. The VDOC response employed a variety of approaches to address the Plaintiffs' array of charges concerning ongoing substandard care at FCCW. In some instances, the VDOC flatly denied the existence of a problem described by the Plaintiffs.[7] In other instances, the VDOC acknowledged the existence of an issue raised by the Plaintiffs, but denied the adverse consequences attributed to the issue.[8] As to other concerns, the VDOC asserted that any problem that may have existed had already been effectively addressed as a result of remedial measures it

---

[7] *See, e.g.*, Ex. 9 at 5 (VDOC rejects as "untrue" assertions made in Plaintiffs' Notice Letter regarding unhygienic conditions in the FCCW Infirmary).
[8] *See id.* at 1-2 (VDOC acknowledged chronic staffing shortages at FCCW, but "strongly denies that the staffing levels have caused prisoners to not receive adequate and timely evaluation at treatment.").

15

claimed to have adopted and implemented.[9]  In a few instances, the VDOC appeared to try to

shift the blame for deficiencies back upon the Plaintiffs themselves.  For example, in responding

to the Plaintiffs' charge that "VDOC fails to provide patients with chronic illnesses continuous or

coordinated care,"[10] the VDOC responded, in part, as follows:

> To the extent that your concern is generated by use of temporary medical
> personnel, it is important to note that the unsubstantiated and exaggerated claims
> of medical failure at [FCCW] substantially hinder the hiring and retention of
> quality medical professionals.  This in turn results in the back filling of positions
> with temporary workers.

Ex. 9 at 6; *see also id.* at 1 ("… Armor has been actively attempting to recruit high level medical

professionals.  It has been difficult however and many potential candidates and departing

employees express concern at the negative publicity that this case has generated.").  Lastly,

despite the VDOC's effort to convey the appearance of a point-by-point rebuttal to the Plaintiff's

contentions, its response completely failed to address, in any fashion, numerous matters of

concern flagged by the Plaintiffs.[11]

In sum, the VDOC flatly rejected the core premise of the Plaintiffs' Notice Letter,

declaring that "FCCW is not in breach of the settlement agreement with any of the provisions

that you cite."  *Id.* at 10.  VDOC likewise declined the Plaintiffs' invitation to meet for purposes

of discussing how any of the concerns set forth by the Plaintiffs might be "effectively addressed"

---

[9] *See, e.g., id,* at 2 (describing alleged changes to FCCW's Sick Call process, purportedly making
it more responsive to prisoners' needs); *id*. at 8-9 (claiming that the system for responding to
medical grievances has been "completely revamped").

[10] Notice Letter, Ex. 2 at 9.

[11] In regard to, for example, the Plaintiffs' stated concern that FCCW residents often must
schedule multiple Sick Cell visits for the same health problem, each subject to a co-pay charge,
before being referred to a medical care provider – a problem Dr. Scharff has also noted and
criticized – the VDOC Response Letter is silent.  Likewise with respect to efforts by FCCW
correctional staff to coerce or intimate prisoners into withdrawing medical grievances they have
filed – another practice complained of by the Plaintiffs and challenged by Dr. Scharff – the
VDOC has failed to respond.

16

(*see* Ex. 9 hereto), thereby leaving the Plaintiffs no viable alternative to the filing of the instant Motion.

## GOVERNING LEGAL STANDARD

This Court's jurisdiction to address and resolve the Plaintiffs' Motion is based upon the Consent Judgment (*see* ECF Dkt. No. 262 at 2, ¶ 3), the express provisions of the parties' Settlement Agreement concerning enforcement of its terms (ECF Dkt. No. 221-1, Sec. V.2 at 23), and "the long recognized, inherent jurisdiction of federal courts to protect and enforce their orders and judgments." *Colonial Williamsburg Found. v. Kittinger Co.*, 792 F. Supp. 1397, 1405 (E.D. Va. 1992) (citing authorities), *aff'd*, 38 F.3d 133 (4th Cir. 1994); *see generally Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 833 (4th Cir. 2005) ("'Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."' (*quoting Frew v. Hawkins*, 540 U.S. 431, 440 (2004)).

"To establish civil contempt, each of the following elements must be shown by clear and convincing evidence:

> (1) The existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that [the] movant suffered harm as a result."

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000), *citing Colonial Williamsburg Found.*, 792 F. Supp. at 1405-06; *accord Buffalo Wings Factory, Inc. v. Mohd*, 574 F. Supp. 2d 574, 577 (E.D. Va. 2008).

As demonstrated below, the Plaintiffs satisfy each of the applicable criteria required to support a civil contempt finding against the VDOC here.

17

I. **DEFENDANTS HAVE BREACHED THEIR OBLIGATIONS UNDER THE SETTLEMENT AGREEMENT IN VIOLATION OF THE COURT'S CONSENT JUDGMENT**

A. **A Valid Decree Exists of Which the Defendants Have Full Knowledge**

Subject to and in accordance with Findings of Fact and Conclusions of Law submitted by the Plaintiffs with the Defendants' express consent, this Court "ordered, adjudged and decreed" that the parties' Settlement Agreement was approved and became legally effective on February 5, 2016. *See* Final Judgment Order at 1-2, ¶ 1 (ECF Dkt. No. 262). Accordingly, a valid and fully enforceable Consent Judgment is in effect. No question exists about the Defendants having actual knowledge of the decree.

B. **The Decree Was in Plaintiffs' Favor**

It is likewise not open for debate that the Settlement Agreement made enforceable by the entry of this Court's February 5, 2016 Consent Judgment was in favor of the Plaintiffs. *See* Findings of Fact and Conclusions of Law at 23 (ECF Dkt. No. 261):

> As of the time they reached an agreement with the Defendants to settle this action, Plaintiffs had defeated the Defendants' threshold motion to dismiss, prevailed on their own motion for class certification, and were anticipating a favorable disposition from the Court on the parties' cross-motions for summary judgment, which the Court issued on November 25, 2014, granting the Plaintiffs' motion for partial summary judgment, and denying the Defendants' motion for summary judgment in its entirety. Regarding the latter, the Court determined, on the basis of a comprehensive summary judgment record, that a "factfinder could reasonably determine that the VDOC is deliberately indifferent to the serious medical needs of the Plaintiffs and the entire class of women residing at FCCW."

Citing ECF Dkt. No. 201 at 40; *see also* ECF Dkt. No. 222 at 2, ¶4 ("The Plaintiffs have presented ample evidence . . . enabling a fact-finder to reasonably conclude that the VDOC Defendants are or have been deliberately indifferent to the serious medical needs of the Plaintiff class[.]"). Moreover, the Settlement Agreement is replete with provisions obligating the

18

Defendants to undertake a host of specific remedial measures to improve the quantity and the quality of the medical care provided to women incarcerated at FCCW. The Consent Judgment awarded the Plaintiffs attorneys' fees and court costs in recognition of their status as the prevailing parties in the litigation. In sum, it is beyond challenge that the Consent Judgment entered by the Court favored the Plaintiffs.

### C. The Defendants Have Violated the Decree's Terms and Have Actual Knowledge of Their Violations

The expressly stated purpose of the Settlement Agreement is to make clear what is required of the VDOC Defendants.:

> In order to insure that the quality and quantity of medical care to be provided by [VDOC] to prisoners residing at FCCW . . . shall meet or exceed constitutional requirements under the Eighth Amendment, [VDOC] shall be obligated to achieve and maintain compliance with the Operating Procedures, Guidelines and Standards governing the provision of medical care that are set forth [below] or incorporated [herein] by reference. The provisions included in this Section, expressly or as incorporated by reference, are intended to insure that prisoners incarcerated at FCCW receive adequate, appropriate and timely medical care to protect them from substantial existing, ongoing and/or imminent physical injury, illness, chronic pain and undue risk of worsening health or premature death.

ECF Dkt. No. 221-1, Sec. III.2 at 5.

Regrettably, the factual record regarding the medical care provided at FCCW since the Settlement Agreement came into effect establishes that the commitments that the VDOC willingly assumed have been honored, for the most part, only in the breach. Both the findings and conclusions reported by the Compliance Monitor, Dr. Scharff, and the accounts set forth in the sworn Declarations submitted by the named Plaintiffs and additional class members as referenced below demonstrate FCCW's ongoing failure to provide constitutionally adequate care. As a result, the class members continue to experience worsening health, undue pain and suffering and remain subject to the continuing—and, in some instances, realized—risk of

19

premature death.  The promise of enhanced, improved medical care at FCCW embodied in the Settlement Agreement remains unfulfilled.

Defendants have actual knowledge of their noncompliance with the Settlement Agreement and of the ongoing deficient care through Plaintiffs' Notice Letter (Ex. 2), the Compliance Monitor's Reports noting the areas of deficient compliance (Exs. 4-8), and the grievances written by Plaintiffs and class members.

        **D.**       **The Plaintiffs Have Suffered Resulting Harm**

The continuing deficiencies in the VDOC's provision of medical care identified by Dr. Scharff are not an abstraction; on the contrary, the real-world consequences of those deficiencies are being experienced on a daily basis by the women whom the Settlement Agreement was supposed to benefit.  Illustrative examples, supported by the sworn Declarations of those affected, follow.[12]

        **1.**       **Sick call access to health services (Settlement Agreement, § III.2.b.iv)**

Submitting a sick call request is the first step for prisoners to access health care and to see a doctor. FCCW's sick call process remains ineffective and inefficient.  Often, prisoners must submit multiple sick call requests before being referred to a provider. Some patients report waiting as long as ten days for a sick call exam.  Ex. 10, Decl. T.H., ¶ 23.  *See also* Ex. 12, Decl. E.S., ¶ 6-12 (patient requested sick call four times before seeing a doctor.); Ex. 13, Decl. C.S., ¶ 21.

Sick call continues to be staffed by LPNs, who are not qualified to make medical diagnoses. *See* Ex. 8, Scharff June 2017 Rpt. at 5-6. When sick call LPNs fail to conduct

---

[12] These examples are intended to be illustrative of some of the class members' serious concerns, and do not comprise a comprehensive list of Defendants' failures in complying with the Settlement Agreement.  Many more such examples are described in the Declarations.

adequate examinations of patients' complaints, patients often suffer further deterioration in their health. One patient, experiencing serious heart and pulmonary symptoms, had to go to sick call three times in one month before she got to see a doctor. The long delay allowed her condition to worsen to the point that only two days after she saw the doctor an emergency developed and she was rushed to the University of Virginia hospital. Ex. 12, Decl. E.S., ¶¶ 7-8. *See also* Ex. 15, Decl. T.G., ¶¶ 21-23 (describing repeated visits to sick call before obtaining provider appointments). These failings demonstrate that Defendants are not screening requests for care for urgency within 24 hours, nor are physician referrals occurring within 72 hours for urgent or deteriorating chronic conditions, as required by the Settlement Agreement.

FCCW's failure to establish a compliant sick call system drives patients to resort to seeking services from medical providers outside the sick call process, often through medical grievances. Ex. 13, Decl. C.S., ¶ 21; *see also* Ex. 17, Decl. A.D. ¶ 28 (dialysis patient in urgent need of bottom bunk profile resorted to grievance system instead of sick call due to lengthy sick call waits). Dr. Scharff's January 2017 report observed that prisoners' abandonment of the sick call process "should be expected" given FCCW's failure to provide a "timely and effective" process. Ex. 6 at 3-4.

## 2. Staffing Levels (Settlement Agreement, §§ III.2.b.i)

Medical staff shortages undermine the ability adequately to diagnose and treat patients. At FCCW, not only is the staff inadequate in numbers but in experience. Moreover, FCCW's institutional culture of indifference towards patients frequently results in delay or outright denial of appropriate diagnosis and treatment for suffering patients.[13] The current Acting Medical

---

[13] The Settlement Agreement, § III.2.b.i., requires "FCCW shall . . . maintain a sufficient number of health staff of varying types . . . to provide inmates with adequate and timely evaluation and treatment, including continuity and coordination of care."

Director, Dr. Gable, works part-time, traveling to the prison only every other week. Scharff Jan. 2017 Rpt. at 3. Nurse shortages exist at all levels. VDOC stated in its May 22, 2017 letter in response to Plaintiffs' Notice Letter that in April 2017, the vacancy rate for Registered Nurses (RN's) was 54% and 13% for LPN's. Ex. 9 at 2. FCCW does not employ enough qualified, appropriately-trained nurses to conduct on-time pill lines, resulting in erratic administration times. *See, e.g.*, Ex. 17, Decl. A.D., ¶ 52; Ex. 15, Decl. T.G., ¶ 9; Ex. 16, Supp. Decl. T.G., ¶¶ 3 and 11. This is extremely problematic for patients taking medications which are prescribed for very specific intervals, and complicates medication administration for patients who work or take classes on a rigid schedule. Ex. 18, Decl. J.B., ¶ 27; Ex. 20, Decl. M.H. ¶¶ 13, 29-31; *see also* Ex. 21, Decl. M.G., ¶¶ 11, 21; Ex. 22, Decl. C.R., ¶ 14.

### 3.     Diagnosis and treatment (Settlement Agreement, §§ III.2.b.vi)

**<u>Inadequate diagnosis and treatment.</u>** Patients see doctors and nurse practitioners in "clinics" which are small cubicles without privacy for consultations. Ex. 30, Supp. Decl. B.G. ¶ 16. Dr. Scharff has noted his concerns about the lack of enough skilled diagnosticians. *See* Ex. 8, Scharff June 2017 Rpt. at 5-6. Defendants are out of compliance with the Settlement Agreement, which requires that prisoners be provided "unimpeded access to timely medical care at an appropriate level, including, . . .adequate pain management for acute and chronic conditions." Instead, women at FCCW find their access to vitally necessary care impeded, if not obstructed, at almost every turn.

Examples of inadequate diagnoses and deficient treatment abound. One prisoner, who has Stage IV melanoma cancer, suffered debilitating and painful side effects from immunotherapy after Dr. Kamal misdiagnosed her symptoms as a sinus infection and simply ordered a nasal spray. By the time FCCW rushed the patient to UVA on October 9, 2016, she was septic and seriously dehydrated. Just four days after she returned to FCCW, the FCCW

doctors again failed to diagnose the very same symptoms and she was rushed to UVA a second time. Ex. 19, Decl. T.M., ¶¶ 10-20 and 24.

Unable to keep her eyes open, another patient with a seizure disorder fell asleep in her wheelchair many times daily during the fall of 2016. She complained to medical that she felt "drunk" much of the time. In late November 2016, she stood up to do laundry, "tumbled over and blacked out." Dr. Gable examined her and immediately sent her to the UVA Emergency Room. Ex. 10, Decl. T.H., ¶ 10-12. The UVA doctors determined that FCCW was overdosing the patient: instead of 200mg she was receiving 300mg, and she had a toxicity level of 37.6. Ex. 11, excerpts from UVA medical records of T.H. dated November 25, 2016 and November 28, 2016.

Another patient returned to FCCW after having a femur transplant removed from her leg and replaced with cement. FCCW failed to provide her mobility assistance, and shortly after her return, she fell getting on the toilet and shattered the cement in her leg, causing agonizing pain and vomiting. FCCW sent the patient back to UVA for another surgery to have steel rods placed in her leg. The patient suffered permanent harm and remained bed-ridden when she was released in early February 2017. Ex. 24, Decl. S.R., ¶¶ 7-9; Ex. 25, Supp. Decl. S.R. ¶ 2. Due to the mismanagement of her condition, S.R.'s leg had to be amputated following her release. Ex. 26, 2nd Supp. Decl. S.R. ¶ 9.

**Pain Management**. Many patients are allowed to suffer extreme chronic pain without adequate pain medication, and FCCW's indifference to patients' pain can border on cruelty. Dr. Kamal gave one patient no pain medication prior to the removal of her kidney stent. The patient screamed in pain as he pulled out the stent. Ex. 29, Decl. B.G., ¶ 18. Another patient, who fractured her back in July 2016 and required continuous use of a back brace, broke the back

23

brace in early December 2016. FCCW refused to replace the brace. Without it, the patient was in constant pain. Ex. 20, Decl. M.H., ¶¶ 26, 34-36; *see also* Ex. 23, Decl. T.M., ¶ 26 (pain medications for cancer routinely delayed for hours, leaving her in pain and suffering withdrawal symptoms).

Dr. Scharff has encouraged FCCW to use a more diverse set of modalities to treat pain: "non-pharmacologic pain management at FCCW is one of the essential elements to reforming both medical practice and the relationships between patients and providers." Ex. 8, Scharff June 2017 Rpt. at 10. There is no tangible evidence that the Facility is acting on this advice.

**Dental.** FCCW fails to provide basic, timely dental care. Dr. Scharff has reported major deficiencies in FCCW's dental care, which is provided directly by DOC and not through the contractor, Armor. Dr. Scharff reported that in July 2016, a woman who needed an extraction or restoration on site would have to wait several months. During such delays, "dental disease would be expected to advance and restorable teeth to become un-restorable." *See* Ex. 5, Scharff Sept. 2016 Rpt. at 10.

Prisoners wait for months or years, often in pain, for routine procedures such as fillings. A patient waited years to have two cavities filled. When she finally got an appointment in June 2017, the dentist did not know which teeth to fill and demanded that the patient tell him. The dentist refused to examine her and sent her away without a new filling. Ex. 19, Supp. Decl. J.B., ¶¶ 4-7; *see also* Ex. 32, Decl. M.T., ¶ 13; Ex. 12, Decl. E.S., ¶ 25.

**Preventable Fatalities.** Nowhere are the consequences of FCCW's failure to comply with the Settlement Agreement more drastic, or tragic, than in the recent deaths of two women in July 2017. Carolyn Liberto, a 70-year-old woman suffering from hypertension and a history of congestive heart failure, died on July 21, 2017. In the months leading up to Ms. Liberto's death

from cardiopulmonary failure, FCCW repeatedly allowed her "self-med" (keep on person) blood pressure medications to run out, and failed to recognize the seriousness of her repeated episodes of extremely high blood pressure and refer her for specialized treatment. *See* Ex. 33, C. Liberto Medication Administration Records for August 2016-July 2017 *and* Ex. 34, Notes from C. Liberto's FCCW Medical Chart dated March 21, 2017 and June 25, 2017.

Two days before Ms. Liberto's death, two prisoners in her same building witnessed Ms. Liberto complaining of high blood pressure, saw or heard Ms. Liberto's blood pressure measured at extremely high levels, and observed that the building LPNs offered Ms. Liberto no treatment except a dose of Clonidine. Ex. 36, Decl. B. Gowen, ¶ 6; Ex. 38, Supp. Decl. W.T., ¶¶ 3-4. On the day before her death, another prisoner observed Ms. Liberto complaining of chest pain and overheard a medical staff person tell Ms. Liberto that her vitals were fine and she should return to her cell. Ex. 39, Decl. K.Rader, ¶ 5. The night of her death, when Ms. Liberto pleaded for emergency help because she could not breathe, no oxygen was available in her housing unit. Neither was a stretcher/backboard to facilitate emergency transport. Ex. 35, Liberto Death Report (under seal); *see also* Ex. 41, Decl. V.K. ¶ 7.

Within four days after Ms. Liberto's death another prisoner, Deanna Niece, a 38-year-old woman due to be released in less than three weeks, died under frighteningly similar circumstances. Ms. Niece complained of shortness of breath throughout the day of her death, and on at least once occasion fell to the ground, unable to walk, due to her breathing problems. Ex. 40, Niece Death Report (under seal); *see also* Ex. 42, Decl. R.M. ¶¶ 4-7; Ex. 31, 2nd Supp. Decl. B.G. ¶ 3. On no occasion did the building LPNs to whom Ms. Niece complained refer her to medical for further evaluation. That night, Ms. Niece began to convulse, vomit and cough up blood. No suctioning equipment was readily available to assist in clearing her breathing

passages; nor was any oxygen available in her building. Neither was a stretcher immediately available. Ex.40, Niece Death Report (under seal); *see also* Ex. 42, Decl. R.M., ¶¶ 10-13; Ex. 31, 2nd Supp. Decl. B.G., ¶¶ 4-8.

4. **Chronic care (Settlement Agreement, § III.2.b.ix)**

The preceding sections reflect the lack of coordination and continuity of treatment for patients with chronic care needs. Dr. Scharff has rated the chronic care program at FCCW as compliant, but his findings and patients' experiences cast serious doubt on the correctness of that rating. Defendants' employment of a restrictive conception of chronic conditions, and their failure to properly treat many chronic conditions violate the Settlement Agreement, which requires that "[o]ffenders shall have continuity and coordination of care for chronic conditions . . .such as hypertension, diabetes, cancer and other diseases that require periodic care and treatment."

**Narrow conception of chronic conditions.** FCCW often fails to classify patients' conditions as chronic. Advantages of chronic care include periodic appointments for checkups with the chronic care nurse and no co-payments for medicines to treat conditions declared to be "chronic." Dr. Scharff reported that FCCW is narrowly defining the scope of what falls within "chronic" conditions and limits this status exclusively to those conditions specifically named in the revised operating procedure, VDOC O.P. 720.4.

> Patients complained that they are charged [co-payments] for visits related to chronic illnesses not included in the list of examples in O.P. 720.4. I have seen this complaint in my correspondence and have discussed this with Warden Dillman and Dr. Herrick, who agree that this practice is in error.

Ex. 8, Scharff June 2017 Rpt. at 7. Yet, class members report that FCCW continues to exclude from chronic care all patients whose disease or condition is not specifically listed.

Nurse Hylton told one patient who suffers from degenerative disc disease that her disease is "not chronic". Ex. 43, Decl. D.R., ¶ 12. Another patient, whose abdominal wound has remained open for four years, suffers constant pain and repeated serious infections, but is not designated as a chronic care patient. Ex. 32, Decl. M.T., ¶¶ 8-9. One woman wrote multiple grievances asking to receive chronic care for her frequently recurring migraine headaches. FCCW replied that VDOC recognizes only the limited conditions specifically mentioned in the Settlement Agreement as chronic care conditions. Ex. 44, T.B. Level 1 Grievance Response dated Mar. 1, 2017.

Another woman who is a breast cancer survivor and needs preventive medications states that her chronic care status is occasionally ignored; staff charge her co-pays for breast cancer medications and she has to file grievances to get the amounts refunded. Ex. 46, Decl. L.R. ¶ 15; *see also* Ex. 17, Decl. A.D. ¶ 53.

**Lack of continuity of care.** Even when patients are designated for "chronic care" treatment, medical staff treatment too often ignores their need for "continuity and coordination" of care. Chronic care patients are not assigned to a single doctor who can monitor their care and ensure continuity; instead, they see a random assortment of practitioners, who provide varied diagnoses and treatments. *See, e.g.*, Ex. 13, Decl. C. S. ¶ 38; Ex. 30, Supp. Decl. B.G ¶¶ 9-10.

A patient designated for chronic care as part of her intake had suffered repeated fungal infections. A UVA Medical Center report included in her FCCW medical intake documents stated that she needed to receive "fluconazole for lifelong suppression" of the infections. Ex. 27, faxed medical records of S.R. from UVA from VDOC file. After the pills which the patient brought from Blue Ridge jail ran out, FCCW did not renew the medicine. The fungal infections returned. The patient had two painful surgeries in the Fall of 2016 at UVA and the infections

27

were never brought under control. Ex. 24, Decl. S.R. ¶¶ 3-8; Ex. 25, Supp. Decl. S.R. ¶¶ 3-9. Her leg was amputated after her release from FCCW. *See* Ex. 26, 2ⁿᵈ Supp. Decl. S.R. ¶ 9.

A patient on dialysis for a serious autoimmune disease which can lead to kidney failure developed a blood clot in her fistula in early June 2017. Nurses in the Infirmary told her it was "just blood sitting there in the tissue," and Dr. Kamal ordered treatment over the telephone to "just elevate it and put some ice on it." The patient was never examined by a doctor and waited in fear and pain for a full day as the swelling grew. The next day Dr. Kamal sent her to the UVA emergency room. Ex. 17, Decl. A.D. ¶¶ 31-33.

Another patient suffers from Takayasu's Arteritis (TA), a rare arterial disease first diagnosed during an earlier imprisonment at Virginia Correctional Center for Women. Shortly after she returned to DOC and arrived at FCCW in early January 2017, both Dr. Gable and Dr. Behi told her that they had never treated her disease before. The patient was placed in Administrative Segregation, and, despite frequent episodes of dangerously high blood pressure, did not see a specialist for evaluation of her disease for almost three months. Ex. 47, Decl. V.A., ¶¶ 13-21.

Patients with diabetes qualify for chronic care but often deteriorate once at FCCW due to the disjointed and haphazard care it provides. Several FCCW nurses do not understand how to treat Type 1 diabetes and frequently pressure patients to take incorrect doses of insulin. *See, e.g.*, Ex. 15, Decl. T.G. ¶¶ 11, 16-18. In sum, chronic care status fails to ensure the consistent, coordinated treatment for women with serious diseases at FCCW that is mandated by the Settlement Agreement.

### 5.      Referral to outside providers (Settlement Agreement, § III.2.b.xi(a))

FCCW fails to refer patients to outside providers in a timely manner, and sometimes fails to refer them at all. Such failures can be life-threatening. One patient's March 2017

28

mammogram at UVA showed an "area of concern" needing further evaluation. She waited more than two months for a follow-up appointment, only to learn she had a malignancy. Ex. 46, Decl. L.R., ¶¶ 16-19.

Another patient suffered heart palpitations at FCCW for years without any treatment, despite a series of abnormal EKGs showing Atrial Fibrillation (AFib). An FCCW doctor referred her to a cardiologist in early 2016, but she never saw one. In September 2016, she could not walk due to shortness of breath and slurred her words as if she had suffered a stroke. The patient requested sick call three times before getting to see Dr. Gable. Dr. Gable initially told her she had "a lot of gunk" in her lungs, and prescribed an antibiotic. However, after an overnight observation, Dr. Gerban diagnosed AFib and pneumonia. He ordered emergency transport to the Medical Center of Virginia (MCV). After a subsequent emergency transport, doctors at MCV warned the patient that she had so much fluid in her lungs she could have had a stroke and been disabled for the rest of her life. Ex. 12, Decl. E.S., ¶¶ 6-12.

**Failure to follow outside experts' orders.** Although Dr. Scharff has rated FCCW as compliant with respect to following of outside consultant recommendations and documenting the reasons for any refusal to follow such recommendations in the medical records, for many women the failure to follow consultants' orders has had severely negative health results. Thus, Plaintiffs dispute the "compliant" rating.

One patient arrived at FCCW in 2015 with a rare autoimmune disease in remission because of treatment she received from a rheumatologist while incarcerated at the Harrisonburg Regional Jail before transfer to FCCW. She did not see a rheumatologist again until May 2017, after Plaintiffs' counsel wrote a demand letter to VDOC on her behalf. At UVA, the rheumatologist confirmed that her disease was no longer in remission. He recommended a swift

29

referral to a gastroenterologist (GI) and even offered to get her an appointment that very day. FCCW declined. The patient did not see the gastroenterologist until almost three months later. *See* Ex. 17, Decl. A.D. ¶¶ 26-27.

Another patient's UVA gallbladder doctor said in October 2016 that she should be referred back to UVA if she vomited. She has vomited several times since then, but as of June 2017 had not been referred back to UVA. Ex. 48, Decl. M.M. ¶ 29. A woman recovering from kidney stones surgery developed fever and infection.. FCCW delayed so long in recognizing the severity of the problem, the patient required emergency transport to UVA and three days' hospital stay. Ex. 29, Decl. B.G., ¶¶ 19-26.

One patient with diabetes suffered serious deterioration of her vision due to FCCW's failure to control her diabetes. Her eye doctor recommended surgery almost a year ago, but for many months FCCW refused to schedule the surgery. After a demand letter from plaintiffs' counsel FCCW scheduled T.G. for the eye surgery, but the appointments were set for after her release. Ex. 15, Decl. T.G., ¶¶ 18-19; Ex. 16, Supp. Decl. T.G. ¶ 14. *See also infra,* Ex. 15, Decl. T.G., ¶ 11 (nurses refuse to follow orders of MCV endocrinologist regarding sliding scale insulin dosages).

The repeated failure of FCCW to follow outside consultants' orders has threatened the continued health and well-being of women residing there, in contravention of the Settlement Agreement and in contradiction of Dr. Scharff's "compliant" finding.

### 6. Continuity in supply and distribution of medication (Settlement Agreement, § III.2.b.xii)

Terminating medicines that serve as patients' lifelines reflects a failure in sufficient clinical oversight and a lack of commitment to safe practices at FCCW. These failures have drastic results for patients. The Defendants are not complying with Settlement Agreement

requirements that "[m]edication services shall be clinically appropriate and . . . provided in a timely, safe, and sufficient manner, including continuity of medication on intake and renewal of prescriptions whenever clinically appropriate . . . [M]edication administration shall . . . relate . . . to the timing of meals, where medically appropriate."

One patient went to FCCW in May 2016 following a femur transplant; her medical history was sent to FCCW for intake and appears in her medical records. The UVA records showed her UVA doctors' orders for life-long suppression antibiotics to manage severe fungal infections. FCCW doctors failed to renew the antibiotics during the summer of 2016, and caused the patient unbearable pain. An infection took hold and she had an emergency return to UVA in September 2016, after her foot turned gray and Dr. Gable could not detect a pulse. UVA doctors diagnosed the patient with a rampant infection necessitating the removal of the femur transplant. Ex. 24, Decl. S.R. ¶¶ 2-7. But this and subsequent surgeries in the fall of 2016 were too late. *Id.* After her release from DOC on February 13, 2017, the infection became so virulent that the UVA doctors amputated her leg up to her hip on April 14, 2017. Ex. 28, Excerpts from UVA medical records of S.R., Mar. and Apr. 2017.

Medication administration for women with diabetes is systemically flawed and can be dangerous. One patient, diagnosed with Type 1 diabetes at age 9 and insulin dependent, was under the care of a VCU/MCV endocrinologist whose orders included the amounts of each type of insulin she was to receive and the frequency of blood sticks that were to be administered to monitor her blood sugar levels. The amount of Novolog, a fast-acting insulin, the patient gets depends on her blood sugar readings. In January 2017, the patient felt as if she had low blood sugar and she asked Nurse Crawford to test her blood sugar. Nurse Crawford told the patient to go through sick call and threatened her with a disciplinary charge. *See* Ex. 15, Decl. T.G., ¶ 9.

31

**Timely ordering and renewals.**  Patients whose medications have not been reordered and refilled in a timely manner often have to request a sick call to address this serious, potentially life-threatening problem.  They may have to wait "up to 2 weeks for nurse sick-call, followed by a second delay of up to 2 weeks to see a provider." Ex. 6, Scharff. Jan. 2017 Rpt. at 7.  When the medicine issue is resolved, "there may be a delay of 2 or 3 days or more until the medication is ordered, shipped, received and brought to the housing unit."  *Id.* at 9.  This delay can have very negative and grave consequences for patients. Ex. 12, Decl. E.S., ¶ 14. (blood thinner drugs not refilled on time); Ex. 29, Decl. B.G., ¶¶ 10-14 (delays in pain medication while patient passing kidney stones).

### 7.    Infirmary conditions and operations (Settlement Agreement, § III.2b.viii)

FCCW fails to provide an acute treatment infirmary staffed with experienced medical personnel, equipped appropriately and maintained in a sanitary condition.  The most seriously ill patients suffer substandard medical care, uncaring providers and isolation.  Contrary to the Settlement Agreement, Defendants are not providing appropriate infirmary care meeting the serious medical needs of patients, including, *inter alia,* "infectious disease control; sanitation and hygiene; privacy… functioning medical equipment; and staffing. . . [and] access to recreation and programming."

VDOC fails to provide critical diagnoses and treatments to the patients who need high-level care. One patient is blind and arrived at FCCW in extreme pain from a broken back.  She fell several times in a slippery shower and further seriously injured her back until VDOC's Disability Coordinator ordered her moved to a ward in the Infirmary.  Ex. 20, Decl. M.H., ¶¶ 10-12,16; *see also* Ex. 24, Decl. S.R., ¶ 8 (patient with temporary femur replacement fell and shattered replacement while trying to use bathroom in Infirmary).

32

Another patient suffers from progressive multiple sclerosis and cannot control her bodily functions. FCCW staff do not change her diapers frequently enough, causing her buttocks to develop rashes and sores. Ex. 49, Decl. A.C., ¶ 15; *see also* Ex. 50, Decl. K.R., ¶ 16. She will go for many days without a shower because of nurse shortages or nurses' unwillingness to assist her. *See* Ex. 49, Decl, A.C., ¶ 16; Ex. 23, Decl. T.M., ¶¶ 47-48; Ex. 17, Decl. A.D. ¶¶ 50-51. She has lost grip strength in her hand and most of the time she is unable to feed herself neatly; she often spills food onto her hospital gown and sheets. The nurses do not change her clothes or sheets when this happens, and ants come into the patient's bed. To sit up she needs an electrical Hoyer to lift and move her, but the lift available will not fit under her bed. Ex. 49, Decl. A.C. ¶ 19.

A very frail patient was confined to her bed because a hip prosthesis became infected. More than once, nurses left her lying on a bedpan for several hours. Another nurse left an intravenous drip in her arm for hours after the drip finished in one hour. Ex. 25, Supp. Decl. S.R., ¶¶ 7-8.

FCCW unnecessarily isolates the sickest women in conditions resembling punitive solitary confinement. Several women have been confined to single cells in the Infirmary for almost 20 hours per day since mid-January 2017. Infirmary patients are not allowed to communicate with loved ones using JPay, the DOC email system. This isolation can lead to loneliness and depression. Ex. 23, Decl. T.M., ¶¶ 45-46. One woman with multiple sclerosis only gets to go outside when she gets a legal visit or goes to the hospital, because staff refuse to take her to the recreation yard. Ex. 49, Decl. A.C. ¶ 25.

### 8. Prisoners' co-pay policy (Settlement Agreement, § III.2.b.v)

FCCW continues to levy inappropriate co-pay charges against patients. Prisoners at FCCW can earn only $0.25-$0.80 per hour, and that much only if they are able-bodied and have

a job.  Thus, prisoners continue to face co-pays that are simply unaffordable.  Ex. 18, Decl. J.B.,

¶ 20; Ex. 19, Decl. C.S., ¶ 34.  FCCW's deliberate use of the co-pay policy to discourage

patients' access to health care is further evidenced by the practice of nurses in Building 6, who,

for several months in late 2016 and early 2017, told patients that they would be charged a $5.00

co-pay if they asked *any* health-related questions.  The nurses even hung a sign outside the

nurse's station to this effect.  Ex. 18, Decl. J.B., ¶ 23.

Patients continue to incur multiple co-pay charges at sick call for repeat visits stemming

from the same illness, visits to request medication refills, visits to determine the results of tests,

and follow-up visits requested in physician instructions.  One patient, who suffers numerous

infections while awaiting surgery to close an open abdomen wound, is charged $5.00 each time

she is seen for wound care.  Over four weeks in April and May 2017, FCCW charged her $20.00

in co-pays for wound care.  Filing "grievance after grievance" to try to get the money refunded

does not resolve the underlying problem.  Ex. 32, Decl. M.T., ¶ 8. *See also,* Ex. 46, Decl. L. R. ¶

15 (cancer patient repeatedly charged co-pays even though cancer makes her eligible for chronic

care and free cancer medications).  Defendants are not in compliance with the Settlement

Agreement, which provides that:

> There will be no co-payments for medications with chronic conditions,
> emergency care, or treatment of communicable diseases. . .  Co-payments shall
> not be charged until the service is performed or . . the first dose of ordered
> medication is provided.  Under no circumstances will there be co-payments for . .
> . medical equipment (*e.g.*, crutches, walkers, canes, etc.) [for] reasonable
> accommodations in regard to disabilities . . .  Co-payments will not be charged for
> providing prisoners with an initial copy of the results of diagnostic or laboratory
> tests ordered by the practitioners.

In August 2016, without consultation with or notice to Plaintiffs' counsel, VDOC

arbitrarily reinstated the same co-pay rates as were in effect before settlement, despite comments

from Dr. Scharff questioning the amounts charged.  The reinstated co-pay policy included

payment sharing for medical equipment for prisoners with disabilities, despite the fact that the VDOC Operating Procedure on reasonable accommodations remained in negotiation.

### 9. Continuity in supply and distribution of medical equipment (Settlement Agreement, § III.2.b.xiii)

Medical staff often deny patients even the most basic medical supplies. The patient with an open wound on her abdomen suffers repeated staph infections and simply needs gauze and hypoallergenic tape to keep the wound covered. But these items are not available. Ex. 32, Decl. M.T., ¶¶ 5, 14. *See also,* Ex. 48, Decl. A.C. ¶ 19 (unable to sit up because Hoyer lift to move her will not fit under her bed).

FCCW also fails to provide patients with functioning basic equipment that can ease their suffering. Cynthia Scott needed a walker with wheels after surgery on both hips in September 2017. When UVA medical staff offered her one, the escorting officer said FCCW had plenty of such walkers. Back at FCCW, she was provided one with no wheels and had to struggle to walk, placing extra pressure on her hips. In January 2017, her wheelchair broke with no replacement available. She fell three times and her hip pain measurably increased. Ex. 13, Decl. C.S., ¶¶ 7-9.

A woman's back brace broke in early December 2016. A nurse said it would be repaired and took it away. On January 3, 2017, before being transferred for a court hearing, the patient asked for the brace, which had not been repaired. When a nurse gave it to the patient, a guard objected that it was dangerous because she could use the broken piece as a weapon. So the nurse broke the T-bar completely off. The patient's back hurt constantly; she could hardly get up out of bed. Ex. 20, Decl. M.H., ¶¶ 26, 36. *See also*, Ex. 51, Decl. D.S., ¶ 13 (after hemorrhoid surgery no seat cushion or "donut," available for days); Ex. 29, Decl. B.G., ¶ 29 (Dr. Kamal denied patient suffering knee pain a knee brace, explaining that the "problem is just that you are getting old.").

Colostomy bags are regularly in short supply. FCCW staff tell the women to improvise with trash bags and maxi-pads which invariably leak feces and burn the women's flesh. Ex. 21, Decl. M.G., ¶¶ 12-15; Ex. 22, Decl. C.R., ¶¶ 6-9. *See also* Ex. 48, Decl. M.M., ¶¶ 21 (patient with dementia who cannot control her bowels provided adult diapers in such limited supply that she wears the same soiled diaper for days).

### 10.     Non-Responsiveness To Medical Grievances

Dr. Scharff's assessment of FCCW's dysfunctional grievance system, described in detail above, is well-supported by the Plaintiffs' accounts.

A blind patient in the Infirmary filed two grievances in September 2016 regarding the ongoing lack of functioning call bells and her need for a safe, functioning shower chair. Both were returned the next day with a box checked reading "Expired Filing Period" and no further explanation. *See* Ex. 52, M.H. Regular Grievances dated Sep. 20, 2016. Another patient, who suffers sudden, severe elevations in blood pressure, wrote a detailed informal complaint in January 2017 explaining her medical needs; the complaint was returned unanswered because she wrote below the center line. When she rewrote the complaint, the response simply said, "Per the medical director, your health concerns are being address [sic] . . ." and offered no elaboration. *See* Ex. 46, attachment D, V.A. Informal Complaints dated Jan. 30, 2017.

Often, patients do not receive responses to their grievances until past the appropriate appeal deadline, making the process of timely, proper appeal difficult if not impossible. *See, e.g.,* Ex. 45, T.B. Regular Grievance (response received three weeks after response was due).

Patients are also frequently dissuaded from filing grievances, sometimes through intimidation. *See, e.g.*, Ex. 15, Decl. T.G., ¶ 24 (patient waiting for dental work offered an appointment if she withdrew her grievance); Ex. 20, Decl. M.H. ¶ 21 (blind patient threatened

with disciplinary charge for going to day room to write grievances); Ex. 53, Decl. C.G., ¶¶ 18-20

(patient directly asked by Health Services Administrator to withdraw grievances).

In summary, the harms suffered by Plaintiffs run the gamut in terms of both severity and

duration. *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) ("the Eighth Amendment is

concerned with both the severity and the duration [of the harm] . . . a condition which might not

ordinarily violate the Eighth Amendment may nonetheless do so if it persists over an extended

period of time") (internal citation omitted). FCCW's multiple failures to comply with the

Settlement Agreement across the board mutually reinforce each other, creating a "totality of the

circumstances" that deprives prisoners of adequate healthcare. *Gates v. Cook*, 376 F.3d 323, 333

(5th Cir. 2004) (conditions of confinement can violate the Eighth Amendment "in combination,"

even where each would not do so alone, "when they have a mutually enforcing effect that

produces the deprivation of a single, identifiable human need such as food, warmth, or

exercise"); *see also Braggs v. Dunn*, No. 2:14cv601, 2017 WL 2773833, *11 (M.D. Ala. June

27, 2017) (liability opinion and order) (identifying mental-health care as a "single, identifiable

human need").

Much of Plaintiffs' suffering tracks the harms recognized by a recent decision against the

Alabama Department of Corrections on the basis of its flawed mental health care. *Braggs v.

Dunn*, *supra*. That decision noted, *inter alia*, harms caused by failures to identify patients in

need of treatment (specifically noting the inappropriate use of LPNs for judgments that require

clinical assessment), 2017 WL 2773833, at *19*; caused by failures to identify, treat and monitor

patients at risk of suicide (noting the need for such clinical judgments to be made "by a high-

level provider or a mid-level provider with high-level supervision"), *id.* at *33*; by "haphazard"

treatment planning which creates "a risk of different providers having an inconsistent approach

or course of treatment for the same patient," *id.* at *22*; by inadequate health and corrections staffing, resulting in delays and short, hurried appointments lacking appropriate clinical judgments and overall assessments of the patients, *id.* at *23-24*; by lack of confidentiality between patients and counselors (including, as is the case at FCCW, clinical settings where conversations are audible by guards and other prisoners), *id.* at *24*; and by failures to provide adequate recreation and programming for the most seriously ill patients, *id.* at *25-27*. In addition, VDOC's ongoing failure to comply with the Settlement Agreement continues to subject Plaintiffs to an undue risk of serious future harm. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("the Eighth Amendment protects against future harms to inmates").

## II.    GRADUATED SANCTIONS FOR THE DEFENDANTS' CIVIL CONTEMPT ARE NECESSARY AND APPROPRIATE

The foregoing analysis satisfies the Plaintiffs' burden to establish by clear and convincing evidence their entitlement to a finding of civil contempt against the VDOC. The Plaintiffs have definitively shown that a valid Consent Judgment exists as to which the VDOC has actual knowledge; that the Consent Judgment was in the Plaintiffs' favor; that the VDOC, by breaching its obligations under the Settlement Agreement, has violated the Consent Judgment and has actual knowledge of the violation through Dr. Scharff's Reports and the Plaintiffs' Notice Letter, as well as the class members' numerous grievances; and that the Plaintiff class has suffered and continues to suffer harm as a result. Notably, "[w]illfulness is not an element of civil contempt," *In re General Motors Corp.*, 61 F.3d 256, 258 (4th Cir. 1995), *citing McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949).

Section V.2 of the Settlement Agreement authorizes the Plaintiffs to initiate enforcement proceedings, seeking the imposition of Court-mandated "specific performance of the terms of the [Agreement], contempt sanctions against the Defendant, or both." ECF Dkt. No. 221-1 at 23.

38

While the Plaintiffs would be happy with the VDOC's *actual* "specific performance" of its obligations assumed under the Settlement Agreement, their experience over some 18 months suggests that the VDOC's compliance will not happen without compulsion. Absent the VDOC's immediate adoption and implementation of focused and effective remedial measures, the imposition of civil contempt sanctions will be both necessary and appropriate.

"'A sanction imposed on a party held to be in civil contempt generally may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past non-compliance.'" *Colonial Williamsburg Found.*, 792 F. Supp. at 1407, *quoting Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 673 F.2d 53, 56 (2d Cir.), *cert. denied*, 459 U.S. 832 (1982); *accord In re General Motors*, 61 F.3d at 258; *Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1350 (4th Cir. 1975); *Buffalo Wings Factory*, 574 F. Supp. 2d at 577-78; *see generally United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947). The courts are invested with broad discretion to "'fashion a remedy based on the nature of the harm and the probable effect of alternative sanctions.'" *Colonial Williamsburg Found.*, 792 F. Supp. at 1407, *quoting Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir. 1988) (other citations omitted); *In re General Motors*, 61 F.3d at 259 ("The appropriate remedy for civil contempt is within the court's broad discretion." (Citations omitted.)); *Buffalo Wings Factory*, 574 F. Supp. 2d at __ ("[C]ourts have broad discretion in fashioning remedies for civil contempt[.]"). Finally, as relevant here, "[c]ivil contempt is conditional or contingent in nature, terminable if the contemnor purges himself of the contempt." *Carbon Fuel*, 517 F.2d at 1349 (citation omitted). Consistent with the principles set forth in these authorities, the Plaintiffs propose the imposition

of a graduated set of sanctions, designed to "coerce [VDOC] into complying in the [immediate] future" with this Court's Consent Judgment.

Specifically, the Plaintiffs submit that this Court should find Defendants in Contempt of the February 5, 2016 order with respect to each of the Performance Indicators set forth in Appendix B to the Settlement Agreement in regard to which the VDOC's performance has never advanced beyond "partially compliant" as rated by Dr. Scharff in his monitoring Report, as well as the two categories of chronic care and referrals to outside providers, with regard to which Plaintiffs respectfully disagree with Dr. Scharff's determination that Defendants are compliant. *See* Ex. 1.  If VDOC is unable to demonstrate that it has achieved fully compliant status, as defined by the Court and/or articulated by Dr. Scharff, within fifteen (15) days after the date on which an Order granting the Plaintiffs' instant Motion, the Court shall impose civil contempt sanctions in the form of daily fines, in an amount to be determined.  VDOC  shall be obligated to remit these fines to the Court until such time as full compliance is reached with respect to all Performance Indicators in regard to which the VDOC's current performance is considered to be deficient by this court.

Where the purpose of a civil contempt fine is "to make a defendants comply with a court order," the Court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."  *U.S. v. United Mine Workers*, 330 U.S. at 304.  Here, as demonstrated above, the "character and magnitude of the harm" posed by the woefully deficient medical care that FCCW continues to provide in disregard of the obligations that VDOC assumed and this Court decreed are of the most serious nature—*i.e.*, continued deterioration of treatable illnesses, continued suffering attributable to severe chronic pain, and unnecessary exposure to, and in some

40

instances the realization of, the risk of preventable, premature death. Under these circumstances, civil fines "designed to compel future compliance with [the court's Consent Judgment] are considered to be coercive and avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994). Consistent with these principles, Plaintiffs submit that, following discovery and the conduct of an appropriate evidentiary hearing, the imposition of substantial fines to compel the VDOC's fulfillment of its obligation to provide constitutionally-adequate care at FCCW is clearly warranted.[14]

Thereafter, if, within thirty (30) days of the date on which the imposition of civil fines commences, VDOC still has not achieved full compliance with all applicable Performance Indicators under which its provision of medical care at FCCW is evaluated, the Court shall designate and appoint a Special Master to oversee and ensure that the medical care at FCCW is brought up to and maintained at constitutionally-adequate levels. *See* Fed. R. Civ. P. 53(a)(1)(C) & Advisory Committee's Note ("Courts have come to rely on masters to assist in . . . enforcing complex decrees. . . . Amended Rule 53 authorizes appointment of post-trial masters for these and similar purposes. . . . Reliance on a master is appropriate when a complex decree requires complex policing, particularly when a party has proved resistant or intransigent."); 18 U.S.C. §§ 3626(f)(1), (f)(6)(C) (PLRA provisions authorizing appointment of special masters pursuant to Rule 53 "to assist in the development of remedial plans"); *see Coleman v. Wilson*, 912 F. Supp. 1282, 1324 & n.63 (E.D. Cal. 1995) (in Eighth Amendment action challenging inadequate

---

[14]     The Court "must, in fixing the amount of a fine to be imposed . . . as a means of securing future compliance, consider the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *U.S. v. United Mine Workers*, 330 U.S. at 304.

mental health care, district court approved magistrate judge's recommendation to appoint a

special master delegated the responsibility "to provide expert advice to the defendants to aid in

ensuring that their decisions regarding the provision of mental health care to class members

conform to the requirements of the federal constitution, and to advise the court concerning issues

relevant to assessing the defendants' compliance with their Constitutional obligations" (*following*

*Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982)).

**CONCLUSION**

For all of the foregoing reasons, the Plaintiffs' Motion for an Order to Show Cause

Regarding Civil Contempt Based Upon the Defendants' Breach of the Consent Judgment of

February 5, 2016 should be granted.

DATED: September 6, 2017

        Respectfully submitted,

        Mary C. Bauer, VSB No. 31388
        (mary@justice4all.org)
        Brenda E. Castañeda, VSB No. 72809
        (brenda@justice4all.org)
        Angela Ciolfi, VSB No. 65337
        (angela@justice4all.org)
        Abigail Turner, VSB No. 74437
        (abigail@justice4all.org)
        Adeola Ogunkeyede (*pro hac vice*
        admission pending)
        (adeola@justice4all.org)
        LEGAL AID JUSTICE CENTER
        1000 Preston Avenue, Suite A
        Charlottesville, VA  22903
        (434) 977-0553

          and

        Philip Fornaci (*pro hac vice*
        admission pending)
        (phil_fornaci@washlaw.org)
        Elliot Mincberg
        WASHINGTON LAWYERS'

42

COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C.  20036
(202) 319-1000

and

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

By:_____*/s/Brenda E. Castañeda*_____
Attorneys for Plaintiffs

43

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September 2017, a true and correct copy of the

forgoing Plaintiffs' Memorandum in Support of Motion for Order to Show Cause Why

Defendants Should Not be Held in Contempt was served electronic mail upon the following:

> Diane Abato, Esq.
> Senior Assistant Attorney General/Chief
> Office of the Attorney General
> 202 North 9th Street
> Richmond, Virginia 23219
> dabato@oag.state.va.us
> Attorney for Defendants

*/s/**Brenda E. Castañeda***
Brenda E. Castañeda

14136433.2