**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

| | | |
|---|---|---|
| **CYNTHIA B. SCOTT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:12-cv-00036-NKM** |
| | ) | |
| | ) | |
| **HAROLD W. CLARKE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDENTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT

## INTRODUCTION

The Plaintiffs initiated a class-action lawsuit on July 24, 2012, alleging constitutionally-deficient medical care and deliberate indifference on the part of Virginia Department of Corrections (VDOC) defendants at the Fluvanna Correctional Center for Women (FCCW). The Court granted the plaintiffs' Motion for Class Certification on November 20, 2014, and certified as a class "all women who currently reside or will in the future reside at FCCW and have sought, are currently seeking or will seek adequate, appropriate medical care *for serious medical needs*, as contemplated by the Eighth Amendment."[1] On November 25, 2014, the Court entered an Order of Partial Summary Judgment recognizing that VDOC defendants have a non-delegable duty pursuant to the Eighth Amendment to provide

---
[1] See ECF 188, emphasis added

1

constitutionally-adequate medical care. [2]  The Settlement Agreement entered by the Court on February 6, 2016, provided that the quality of medical care administered to prisoners at FCCW would **"meet or exceed** constitutional requirements under the Eighth Amendment."  VDOC agreed to be in compliance with the Operating Procedures, Guidelines and Standards set forth in the Settlement Agreement in order to insure that the medical care received by prisoners is adequate, appropriate and timely. [3]  The Settlement Agreement is consistent with VDOC's mission to provide quality health-care.

The Statement of Purpose is aspirational to the extent that it references exceeding constitutionally-adequate healthcare and this is seen in the remaining sections of the Settlement Agreement.  The section entitled Additional Guidelines and Standards in the Settlement Agreement also refers to the Eighth Amendment and the provision of constitutionally-adequate medical care.[4]  The section entitled Enforcement notes that if there is a "problem of **constitutionally-deficient medical care** on the part of the Defendant, and brought to the Defendant's attention by the…Plaintiffs' counsel…upon expiration of the 30-day period…" counsel may initiate proceedings seeking specific performance of the terms of the Settlement Agreement, contempt sanctions, or both. [5]  Thus, while the stated purpose of the Settlement Agreement is for Virginia Department of Corrections (VDOC) to meet or exceed constitutional standards, the ability to enforce the document pursuant to civil contempt proceedings is dependent upon care that is constitutionally-deficient.  The tension between the aspirational Statement of Purpose and the constitutionally-adequate standard in the Additional Guidelines and Standards section and Enforcement section may account for the conflation of inmates'

---

[2] ECF 201, 202
[3] ECF 221-1, page 5, Section III.1, emphasis added
[4] ECF 221-1, page 6, Section III.2.b
[5] ECF 221-1, page 23, Section V.2, emphasis added

2

desires and perceptions and the constitutional standard regarding adequate healthcare. The Plaintiffs' Motion for Show Cause refers to their intention to enforce the Settlement Agreement for "actual or **perceived** breach."[6]

The misguided focus on the perception of the inmate rather than the constitutionally adequate standard of care is evident throughout the Plaintiffs' Declarations and in the Notice of Noncompliance. [7] The Notice of Noncompliance was very general without the detail and length of the Plaintiffs' Declarations that are attached to the Plaintiffs' Motion for Show Cause. A chart that lists the number of sick call visits for each inmate with a Declaration is attached for reference.[8] The permissible length and time constraints afforded VDOC to respond to Plaintiffs' Motion for Show Cause do not permit answering each and every allegation in the almost 500 pages of Plaintiffs' Declarations, but as an example of the perceptions versus reality of constitutionally adequate care, a review of April Deeds' Declaration is instructive.[9] Ms. Deeds insists that in her opinion she should have begun dialysis sooner than she did and that FCCW and the doctors employed by Armor were deliberately preventing her from getting dialysis for a malign purpose. She wrote to the Settlement Monitor about the issue and he researched and responded to her on July 3, 2016. He stated, "I cannot really say whether it would be appropriate to begin dialysis at this time. Usually patients with BUN in this range **feel better off of dialysis than on it**, though eventually you may be better on it than off." (emphasis added). It is clear from the exchange with Dr. Scharff and the emails between Dr. Scharff and Dr. Gable that Ms. Deeds disagrees with her doctors.[10] Ms. Deeds' Declaration reads as if her own medical opinion is dispositive and the document makes conclusions about the dialysis

---

[6] (emphasis added) ECF 266, p. 3.
[7] See for example ECF 266-2, p. 2, ECF 266-17, pp. 2-4.
[8] Exhibit (Exh.) 9
[9] To that end the Defendants agree and join in Plaintiffs' request for discovery and an evidentiary hearing.
[10] Exh. 5.

3

treatment of nameless other inmates.  Currently, Ms. Deeds is receiving dialysis.  Her many complaints in her Declaration about the fistula, the port through which dialysis is accomplished, certainly prove Dr. Scharff's point that patients may feel better off dialysis before it is absolutely required.   Citizens who are not incarcerated do not get to decide when they begin dialysis without the input of their doctors and insurance companies.  Constitutionally adequate care does not mean that inmate patients decide when and how they receive treatment for their diseases.

Another example of Plaintiffs' perceptions of medical diagnosis being presented as an applicable standard of care is the Declaration of Wanda Turner.[11]  Ms. Turner describes the medical diagnosis of an unnamed doctor at University of Virginia (UVA) and describes what she believes to be the diagnosis of a psychiatrist at FCCW. "I have been diagnosed with a number of mental health problems, including diagnoses from UVA doctors of seasonal affective disorder, schizophrenia, paranoia, and bipolar disorder.  The psychiatrist at FCCW only diagnosed me with paranoia, but I think the UVA doctors know more than him and that he is missing the other problems."[12]   After proclaiming that the unnamed doctor at UVA is correct and the doctor at FCCW is incorrect she goes on to complain about her disagreement with the prescription that she is provided.  Ms. Turner also complains that she sees more than one doctor in the clinic at FCCW, as if there is a constitutional right to see the same doctor each time one visits a practice.[13]   The Declaration of Cynthia Scott echoes this demand that patients see the same doctor at each visit wrongfully focusing on the provider versus the quality of medical services provided.[14]   The discussion should be on constitutionally adequate care.

---

[11] ECF 266-37.
[12] ECF 266-37, p. 8.
[13] ECF 266-37, p. 9.
[14] ECF 266-13, p. 8.

4

The Declaration of Taylor Gilmer was signed on June 19, 2017, and includes a letter written by counsel that is dated April 21, 2017. In it she describes having diabetes since she was a child and complains that FCCW is not addressing her needs.[15] Prior to the creation of the Declaration, her counsel contacted Dr. Scharff and inquired about her care at FCCW. The Settlement Monitor looked into the matter and responded, "…I believe the patient is being seen and cared for."[16] This is another example of the inmate's perception being conflated with constitutionally adequate standards.

As a final example, Margaret Grant's Declaration begins chronologically with symptoms that she describes occurring in November 2016, and complaining that FCCW did not appropriately address her health care needs. What she fails to report is that on October 25, 2016, she refused any treatment at UVA including a renal ultrasound and insisted that she would only go to MCV. Dr. Scharff wrote her a letter indicating that she cannot demand treatment at certain facilities and refuse treatment elsewhere.[17] This demand does not come under the umbrella of constitutionally adequate care.

Plaintiffs seek to take over management of FCCW and include demands in its Notice of Noncompliance like, "VDOC must hire a project manager at the highest level of the agency whose sole job it will be to oversee the implementation of the terms of the Settlement Agreement," and "Prisoners should not be asked or required to clean up spills," and "VDOC must also perform a weekly audit and write a report on the dental backlog and quality of dental care."[18] All of these things are beyond the Settlement Agreement.

---

[15] ECF 266-16.
[16] Exh. 7.
[17] Exh. 8.
[18] ECF 266-2, pp. 16,10,6.

5

Along those lines Plaintiffs seek to dictate the distribution of medication. Pills are crushed by health care staff before dispensing them to inmates so that inmates cannot hoard, sell or trade their medication. Crushing the pills ahead of time saves time during the process of passing out medication. Dr. Scharff has made clear his approval of this process in response to an email questioning the procedure from Plaintiffs' counsel in which he states, "Every correctional institution I have known crushes medications with potential for abuse, diversion, or hoarding for suicide. I am not aware of a provision in the Settlement prohibiting the practice, and I'd be grateful if you would direct me to it. If that's really what it requires, I will have to consult with the Court, since I could not agree to that provision." [19] Plaintiffs demand, "VDOC must ensure that FCCW staff crushes medication, if medically appropriate at all, in the presence of the patient to whom it is to be given."[20] At the same time, Plaintiffs complain that the pill pass line takes too long, a process that would take much longer if pills were crushed in front of inmates as is demanded. ECF 266-2, p. 11. [21]

The standard of proof is clear and convincing evidence as is stated in applicable case law.[22] The Settlement Agreement mistakenly references preponderance of the evidence.

**STATEMENT OF FACTS**

VDOC agreed to settle the case which reflected VDOC's continuing commitment to providing constitutionally-adequate medical care to all the inmates at FCCW and in all VDOC facilities. The Settlement Agreement's Statement of Purpose indicates that the Agreement intends that VDOC shall meet or exceed constitutional requirements under the Eighth

---

[19] Exh. 6, p. 2.
[20] ECF 266-2, p. 5.
[21] Courts "should not become enmeshed in the minutiae of prison operations." *Lewis v. Casey*, 518 U.S. 343, __ (1996) quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979). Certainly, Plaintiffs' attorneys are not more qualified than courts to direct the minutiae of prison operations. VDOC is most qualified to direct the operations of FCCW in complying with the Settlement Agreement.
[22] ECF 221-1, page 23, *Colonial Williamsburg Foundation v. Kittinger Co.* 792 F. Supp. 1397, 1406 (E.D. Va 1992); *Stotler and Co. v. Able,* 870 F.2d 1158 (C.A.7 (Ill.), 1989).

6

Amendment.  The Settlement Agreement includes a list of Subjects for Settlement Monitor's Performance Measuring Tools (Performance Tools) to be used by the Compliance Monitor to evaluate the Defendant's performance in providing constitutionally-adequate medical care at FCCW.[23]

The Settlement Monitor visits FCCW and spends several days meeting with inmates, staff at FCCW and the Plaintiffs' counsel and then produces a report.  The Settlement Monitor has produced five final reports prior to the filing of the Plaintiffs' Motion to Show Cause and one final report for the most recent visit beginning on August 7, 2017. [24]  In those reports, he evaluates the Performance Tools and FCCW's progress in each category.

During the pendency of the Settlement Monitor's evaluations, he has added several subjects to the Settlement Agreement without any written change to the Agreement.  Dental care, which is not contemplated by the Settlement Agreement was added by the Settlement Monitor as an area of evaluation.[25]  The thickness of the mattresses has been an area of discussion that the Settlement Monitor has added to the areas of concerns.  Most recently, programming for drug and alcohol abuse disorders have been added to the list of areas that are being monitored pursuant to the Settlement Agreement.[26]  The report from the visit of August 7-11, 2017, notes that "it seems unproductive not to provide remedial programing.  [Dr. Scharff asks] for a detailed description of VA DOC's drug and alcohol programming at FCCW and will include it later in this report."

The Settlement Agreement delineates the governing standards to be used when assessing FCCW's compliance with the Settlement Agreement and to evaluate progress toward the reforms

---

[23] ECF 221-1, Appendix B
[24] The August, 2017, visit is the first visit during which the Settlement Monitor met with counsel for VDOC.
[25] ECF 266-7
[26] See Exh. 1, page 3

Case 3:12-cv-00036-NKM-JCH   Document 286   Filed 10/10/17   Page 7 of 28   Pageid#: 5946

mandated in the Settlement. Of the almost two dozen performance measures, only three remain listed as non-compliant. The first of those is provider staffing levels.

**Provider staffing levels:** The standard requires that FCCW shall establish and maintain a sufficient number of healthcare staff of varying types or adopt such other measures as shall be necessary to provide inmates with adequate and timely evaluation and treatment.

The report from the visit on January 20-21, 2016, makes reference to staffing including a "large share of agency nurses" but does not make any reference to inadequacy of coverage.[27] The report from the March 7-10, 2016 visit does not mention staffing. The doctor does note, "I have no reason to question [VDOC's and Armor's] commitment or ability to make these changes." The report from the inspection on July 11-14, 2016, notes with approval that Dr. Thomas Gable is the Medical Director. Deborah Beltzer became the acting Health Services Administrator (HSA). Dr. Scharff notes, "I believe these changes indicate a genuine commitment on Armor's part to both technical improvement and culture change at the institution." [28] The report goes on to describe the recruiting strategies used by Armor to replace agency nursing staff with permanent employees and the difficulties in hiring permanent staff. This report shows disapproval of heavy reliance on agency nursing staff. Agency nursing staff is the term used to describe nurses hired from temporary employment services. The chart that the Doctor Scharff appends to his report notes that the staffing levels performance indicator was last assessed in March, 2016.

The report for the October 3-6, 2016, visit states that the interim acting medical director and the acting HSA "have been energetic, responsive and done [sic] commendable work." [29] The settlement monitor continues to disapprove of reliance on agency nurses. It seems that this

---

[27] Exh. 2
[28] ECF 266-5, page 2
[29] ECF 266-5, page 20

8

issue of using agency nurses is the reason that the compliance monitor finds that VDOC is only partially compliant with this performance measure.

The report for the January 23-26, 2017, visit notes that, "Nurse staffing has improved with less reliance on per diem nurses."[30] The report notes that a nurse practitioner being present in nursing sick call would improve efficiency. The report continues to grade VDOC as partially compliant noting that the Medical Director, Dr. Gable, is on-site every other week. The report leaves out the fact that another attending doctor is physically on site in this position during the weeks that Dr. Gable is not physically present.[31] Additionally, Dr. Gable is available by telephone daily during his absence and this is acknowledged most recently in the report from visit of the August 7-11, 2017.[32]

The report refers to nursing vacancies.[33] With respect to the word "vacancies" it is important to note that the positions are not vacant in the sense that no one is filling the post. The word vacancy is used to denote positions that are filled by agency nurses rather than permanent staff. The report notes, "A recent excellent candidate said she had reversed her decision to accept the position [for Medical Director] after reading adverse coverage in a local newspaper. The salary offer does not appear to be a factor in the inability to hire a permanent medical director."[34]

The August report indicates that staffing has improved. The report notes with approval that the HSA position is filled and a full time physician was added. The report concludes,

---

[30] ECF 266-7, page 1
[31] See Exhibit 4, paragraph 5
[32] ECF 266-7, page 6, See Exhibit 4, paragraph 5
[33] ECF 266-7
[34] ECF 266-7

9

"Progress is evident in staffing, but the contractor has been unable to hire a medical director and nursing turnover remains problematic – particularly with the loss of both RN supervisors." [35]

This draft report notes that nursing "vacancies" have decreased substantially. The report notes with approval that a Nurse Practitioner (NP) is now involved in sick call. The report complains that the Medical Director is still Dr. Gable who is on-site two weeks per month and available by phone on the other days. "During this session and at several times during my visit, we discussed alternative recruiting and hiring strategies for a medical director. More than one physician has experienced hostility from patients, and hiring is problematic." [36] The staffing performance measure is listed as non-compliant, with an acknowledgement from the Settlement Monitor that recruitment of permanent staff is made difficult by hostility from patients and adverse coverage in the media.

Much is written by the Settlement Monitor about the use of agency nurses. It is significant to note that nowhere in the Settlement Agreement is the use of agency nurses prohibited. The relevant portion of the agreement is as follows:

> Standard· FCCW shall establish and maintain a sufficient number of health staff of varying types or adopt such other measures as shall be necessary to provide offenders with adequate and timely evaluation and treatment, including continuity and coordination of care. Nurse practice shall be performed within the scope of nursing licenses, and neither registered nurses (RNs) nor licensed practical nurses (LPNs) shall make medical decisions beyond the scope of their professional training. Nursing coverage shall be

---

[35] ECF 266-8, page 15
[36] Exh. 1, report, page 6

10

provided around the clock.[37]

Accordingly, VDOC has complied with this requirement, despite the Notice of Noncompliance referencing alleged "staff shortages" and a "**perception** among patients that nurses are simply too busy or too disinterested to care…" (emphasis added)[38] Further, the Settlement Monitor acknowledges that if the Plaintiffs are contributing to the press coverage, "it would seem an unlikely means of advancing the interests of the patients at FCCW."[39]

**Co-Pay Policy, ADA Policy and CQI Protocols**

The VDOC ADA policy was first submitted to Plaintiffs' counsel on June 3, 2016, in order to negotiate a final policy. The Continuous Quality Improvement (CQI) Policy was submitted on the same day. The VDOC ADA/Co-Pay Policy is listed as non-compliant in the April 24-27, 2017, report with a notation that VDOC has no operating policy that has been agreed by the Plaintiffs for the Americans with Disabilities Act (ADA). It is still listed as non-compliant, but has an important note in the chart attached to the report of the visit of August 7-11, 2017. "New policy in draft, to be effective by the end of August 2017, would be compliant."[40] This shows that the failure of Plaintiffs to agree to the policy has held VDOC back and delayed VDOC as they work toward substantial compliance.

The ADA and Co-Pay policies are linked because the ADA policy contains co-payment provisions for durable medical equipment like wheelchairs and prosthetics. While comments were received by and responded to by VDOC on the initial ADA policy; Plaintiffs have never provided comments about the CQI Policy. The ADA policy was resubmitted to Plaintiffs' counsel on August 29, 2016, and March 23, 2017, based on comments by Plaintiffs' counsel.

---

[37] ECF 221-1, page 8
[38] ECF 266-2, page 2
[39] See Exhibit 1, page 6
[40] See Exhibit 1, attached chart page 2

Then on April 20, 2017, Plaintiffs' counsel submitted a Notice of Noncompliance in part faulting VDOC for failing to have an ADA policy.    On August 10, 2017, counsel for VDOC convened a meeting with Plaintiffs' counsel to discuss the languishing policies. [41] No mention was made of the 500 pages of Declarations assembled by Plaintiffs and no agreement was reached regarding the policies.   As of September 8, 2017, no agreement was reached with Plaintiffs regarding the policies and VDOC submitted them to the Settlement Monitor for dispute resolution pursuant to Section I.2.c. of the Settlement Agreement.[42]   VDOC has been judged as non-compliant for lack of finalized policies that by virtue of the Settlement Agreement require either the cooperation of the counsel for the Plaintiffs or resort to the dispute resolution provision.

The Settlement Monitor acknowledges that VDOC's FCCW staff visited a model CQI program in Philadelphia at the behest of the Monitor, which evidences VDOC's earnest effort and financial investment with complying with the Settlement Agreement's standards. [43] Similarly, VDOC has been performing spot checks to evaluate the quality of various performance measures.  For instance, FCCW has completed spot check CQI on medication that will expire in ten days.  Until the report of the visit on the August 7-11, 2017, CQI was one of the Performance Indicators that was consistently listed as non-compliant.  This was in part due to the lack of a policy, which was stalled in the hands of the Plaintiffs since June 2016.

 At this point, the hard work by VDOC and the extensive re-design of the quality improvement program after the visit to Philadelphia has changed the evaluation to partially compliant.[44]  This is an excellent example of the hard work performed by VDOC and one of the reasons that this Motion for Show Cause is unwarranted.

---

[41] Exh. 1, page 4
[42] Exh. 1, page 16
[43] See Exh. 3
[44] Exh. 1, see attached chart page 9

12

**Care/Release of Terminally-Ill Inmates**

The report of April indicated that this performance measure had not been formally assessed, but noted that Armor was working with a palliative care specialist at the University of Virginia. A staff change at the University has delayed the implementation of the policy that VDOC has written and approved.[45] The staff change at the University is a factor beyond the control of VDOC and VDOC is currently looking for another doctor to fill this role. [46] The delay caused by the staff change at UVA is the reason for the non-compliant status of this performance measure.

The performance measures that are listed as compliant or partially compliant are the next group to be discussed.

**Intake Screening of Inmates**

This performance measure has been listed as compliant since the report for the visit of October 3-6, 2016.

**Comprehensive Health Assessments**

This performance measure has been listed as compliant since the report for the visit of October 3-6, 2016.

**Chronic Care**

The report for the April 24-27, 2017, visit lists this performance measure as compliant.

**Conduct of and Follow-Up Regarding Mortality Reviews**

This performance measure is listed as compliant.

**Appropriate Inmate Access to Information**

---

[45] Exh. 1, Chart attached to report, page 8
[46] Exh. 4, paragraph 4

13

This performance measure refers to the communication of test results and recommendations of consultants in a timely fashion that is understandable. The reports of the July 11-14, 2016, and April 24-27, 2017, visits listed this performance measure as non-compliant. The August report notes that VDOC is compliant in this performance measure.

**Diagnosis and Treatment**

This refers to timely access to medical care at an appropriate level, including adequate pain management, acute and chronic. The report from the August 7-11, 2017, visit notes that the offsite visits have improved to the point that element of this performance measure is now listed as compliant. The August report continues to list the pain management element of this performance measure as non-compliant. FCCW was working with a palliative care specialist at University of Virginia who then left his university position. FCCW is working on finding another specialist with whom to collaborate. [47] The Monitor's report from the April 24-27, 2017, visit notes that this category was last assessed in October of 2016, and that it is partially compliant. The August report also lists the performance measure as partially compliant and refers to the pain management program as "suboptimal."[48]

**Infectious Disease Control**

This is listed as "not yet assessed" and also as "partially compliant" in all of the reports including the April 24-27, 2017, report. The August 7-11, 2017, report lists it as "probably compliant."[49]

**Utilization Management**

Utilization Management reviews four standards including timely access to care, timely referral to outside providers, timely compliance with consultant recommendations and the

---

[47] Exh. 4, paragraph 6
[48] Exh. 1, Chart attached to the report, page 3
[49] Exh. 1, Chart attached to report, page 4

14

procedure to waive formulary restrictions. Each of these standards is treated separately by the Settlement Monitor. The report for the April 24-27, 2017, that VDOC is partially compliant for the first two standards, and compliant for the third standard. The fourth standard, the procedure to waive formulary restrictions, had not been assessed until the visit of August 7-11, 2017. The report for the August visit changes the first two standards from partially compliant to compliant. The fourth standard is listed as compliant in the August report.[50]

**Continuity in Supply and Distribution of Medication and Medical Equipment**

This performance measure requires that medication services, the passing out of medication to the inmates, is clinically appropriate, timely, and safe. The Settlement Monitor has dictated that the line for medication in the morning shall not be earlier than 5:30 am. The report from the July 11-14, 2016, visit found VDOC non-compliant in this performance measure. The April 24-27, 2017, report declared VDOC substantially improved. The August 7-11, 2017, report lists it as partially compliant and notes that the program "shows substantial improvement."[51]

The second portion of this performance measure refers to medical equipment and in that VDOC is listed as compliant during the August visit with any deficiencies found in during the April 24-27 visit addressed.[52]

**Sick Call Process**

The report for the visit of April 24-27, 2017, indicates that the sick call process is non-compliant as it is performed by LPNs and RNs. The August 7-11, 2017, report indicates that

---

[50] *Id.*, page 4-5
[51] Id., page 5
[52] *Id.*, page 6

Case 3:12-cv-00036-NKM-JCH   Document 286   Filed 10/10/17   Page 15 of 28   Pageid#: 5954

this performance measure is now partially compliant. FCCW sick call has the addition of a

Nurse Practitioner as directed by the Settlement Monitor. [53]

**Response to Medical Emergencies**

This is listed as partially compliant for the October 3-6, 2016, visit and as partially

compliant in the report for the from the April 24-27, 2017, visit. The report from the August 7-

11, 2017, visit notes that each housing unit must have a stretcher or gurney in it, and lists this

performance measure as partially compliant. The applicable industry standard is not mentioned

in the report. VDOC has added oxygen to each building as a result of the request from the

Settlement Monitor.

The report for the August 7-11, 2017, visit reports, "Addressing the patients' sadness,

frustration, and the feeling that providers and staff simply don't care about them must be an

urgent priority at FCCW. Until this can be assuaged, meaningful improvement should not be

expected." [54] This seems to tie the perception and feelings of the inmates to the evaluation of this

standard. This is found in other reports, most notably in the report from the July 11-14, 2016,

visit which notes that "unkindness" is a critical factor in the evaluation of VDOC's compliance

with the Settlement Agreement.[55] The Settlement Agreement makes no mention of the

perception of inmates in the Enforcement Section. These comments may be aimed at the

Statement of Purpose that calls for meeting or exceeding constitutionally adequate standards.

The August report does tie the inmates' perceptions to their attorneys, "It will also likely require

the help of those the patients most trust, their attorneys." [56]

**Infirmary Conditions & Operations**

---

[53] *Id.*, page 2
[54] Exh. 1,
[55] ECF 266-5, page 8
[56] Exh. 1, page 2

16

This performance measure is listed as partially compliant in the report of the visit of April 24-27, 2017. The report notes that Plaintiffs' attorneys insist that neither nurses nor correctional officers respond consistently to the call bell and patients are not provided with blankets. There are no specific instances or dates provided. This report refers to perception, "The impression remains of inadequate concern and care in the infirmary."[57] It goes on to say in the chart that is appended to the report that mattresses were replaced, staffing appears stable, a new recreation yard was completed and most of the long-term patients have been released to population.

**Physical Therapy**

This performance measure is listed as partially compliant in the August report. The Settlement Monitor describes the physical therapy services as excellent but refers to a need to increase staffing to address the need. VDOC is addressing the need for additional physical therapy services and has hired another physical therapist.[58]

**Medical Grievance Process**

The August report notes that the medical grievance process was re-designed in early summer and now is highly responsive. The report indicates that this performance measure is "at least partially compliant, but will await fuller development of tracking and analysis of grievance data." The Monitor acknowledges that the "Grievance process [was] re-designed in early summer, [and is] now highly responsive to matter of each grievance…"[59]

**Appropriate Accommodations for Prisoners with Special Needs**

---

[57] ECF 266-8, page 6
[58] Exh. 1, paragraph 6
[59] Exh. 1, Chart attached to report, page 6

17

The July report lists this performance measure as non-compliant. The April and August reports list the performance measure as partially compliant, noting that the Medical Director has been reviewing the profile exceptions but has not completed his work.

**Guidance and Training of Correctional Staff**

This performance measure refers to training security staff on first aid and recognizing the need for emergency care. The reports have listed this as "not yet assessed" until the August report when it was listed as partially compliant with indications that the Warden has begun training the security staff. Then the report states, "Almost all correctional employees have now been trained at least once by Warden Dillman, with an emphasis on the necessity of promoting medical care at all times, as opposed to obstructing it. He considers that there has been progress, but that room remains for improvement. At present, there are relatively few security-related grievances."[60]

**Performance Evaluation and Quality Improvement**

This performance measure refers to quality improvement committee meetings as part of contractor oversight. It has been listed as non-compliant until the August report. The Settlement Monitor lists this as partially compliant in the August report and notes regular management meetings between senior FCCW staff and contractor staff. The August report acknowledges that VDOC has hired new staff for the quality improvement program. The Settlement Monitor seems pleased with the progress that VDOC has made.

"Since my last visit, personnel from senior management at VA DOC, FCCW, and Armor visited the Philadelphia Prison System to view a model quality improvement program. Subsequent to that visit, VA DOC has expanded QI activities for FCCW. There is a new policy in draft and presented to the Plaintiffs' attorneys for comment and/or approval, 2

---

[60] Exh. 1, Report, page 4

permanent QI staff have been added at DOC central office, and 1 has been added at

FCCW…The QI Plan is comprehensive and provides a significant degree of detail with

regard to areas of interest and indicators or outcomes to be studied. There is a detailed

schedule for data collection through the year, both from the health records and of

individual systems (e.g. emergency care, sharps and tool count, infection control,

complaints and grievances)."[61]

While this is listed as partially compliant, it is clear from the comments that VDOC worked

toward providing a quality improvement program that satisfies the Settlement Monitor.

## **Argument**

### **Standard of Proof in Contempt Proceedings**

The standard of proof in civil contempt cases is clear and convincing evidence. *Cromer v.*

*Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004); *Colonial Williamsburg Foundation*

*v. Kittinger Co.* 792 F. Supp. 1397, 1406 (E.D. Va 1992) aff'd, 38 F.3d 133, 136 (4th Cir. 1994).

The function of a standard of proof, as that concept is embodied in the Due Process Clause and

in the realm of fact finding, is to "instruct the factfinder concerning the degree of confidence our

society thinks he should have in the correctness of factual conclusions for a particular type of

adjudication." *In re Winship*, 397 U.S. 358, 370 (1970)  (Harlan, J., concurring). The standard

serves to allocate the risk of error between the litigants and to indicate the relative importance

attached to the ultimate decision.  The intermediate standard, which usually employs some

combination of the words "clear," "cogent," "unequivocal" and "convincing," is less commonly

used, but nonetheless "is no stranger to the civil law."  *Woodby v. INS*, 385 U.S. 276, 285 (1966).

One typical use of the clear and convincing standard of proof is in civil cases involving

---

[61] Exh. 1, Report, page 17

allegations of fraud or some other quasi-criminal wrongdoing by the defendant. The interests at stake in those cases are deemed to be more substantial than mere loss of money and some jurisdictions accordingly reduce the risk to the defendant of having his reputation tarnished erroneously by increasing the plaintiff's burden of proof. This is particularly apt in contempt proceedings. Similarly, this Court has used the "clear, unequivocal and convincing" standard of proof to protect particularly important individual interests in various civil cases. *Addington v. Texas*, 441 U.S. 418, 423-24 (1979). See, e. g., *Woodby v. INS*, *supra*, at 285; *Chaunt v. United States*, 364 U.S. 350, 353 (1960); *Schneiderman v. United States*, 320 U.S. 118, 125 (1943). The standard of proof illustrates the importance that society places on the subject matter in dispute. *Maryland v. Tippett*, 436 F.2d 1153, 1166 (4th Cir. 1971) (Sobeloff, J., concurring in part and dissenting in part), cert. dismissed *sub nom*. The standard of proof should be clear and convincing and the portion of the Settlement Agreement that incorrectly cites the standard of proof should be declared invalid pursuant to Section VI.8 of the Settlement Agreement. See ECF 221-1, p. 27.

### Civil Contempt

The judicial sanction of civil contempt is designed to enforce the rights and administer the remedies which a court has found a party entitled to in an order or decree. Contempt represents more than a delay in performance or lack of perfection; it is, instead, the failure to accomplish what was ordered in meaningful respects. *McComb v. Jacksonville Paper Co*., 336 U.S. 187, 191 (1949)(attempts to circumvent court's order and Fair Labor Standards Act using fraudulent employee classifications are punishable by civil contempt); *Glover v. Johnson*, 199 F.3d 310 (6th Cir. 1999)(contempt fines a measure designed to force the Department finally to comply with the court's lawful orders, beginning in 1977, after 19 years of defiance and

delay);.*Nelson v. Collins,* 659 F.2d 420 (4th Cir. 1981)("good faith" efforts of the Maryland State Prison System to comply with the Court's deadline held not to be contempt).  Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. See *Maggio v. Zeitz*, 333 U.S. 56, 68 (1948); *United States v. United Mine Workers*, 330 U.S. 258, 303, 304, (1947); *Penfield Co. v. Securities & Exchange Commission*, 330 U.S. 585, 590 (1947).

To establish civil contempt Plaintiffs must prove:  (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) ... that the decree was in the movant's "favor"; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) . . . that [the] movant suffered harm as a result.  Each of these elements must be shown by clear and convincing evidence. *See Ashcroft v. Conoco, Inc.,* 218 F.3d 288, 301 (4th Cir. 2000) *(citing Colonial Williamsburg Foundation v. Kittinger Co.* 792 F. Supp. 1397, 1405-6 (E.D. Va 1992), aff'd, 38 F.3d 133, 136 (4th Cir. 1994)).

A good faith attempt to comply is a defense to a civil contempt order.  *Chesapeake Bank v. Berger*, No. 4:14cv66, 2014 U.S. Dist. LEXIS 153996, at *8 (E.D. Va. Oct. 30, 2014)(citing *Consolidation Coal Co. v. Mineworkers of Am.*, 683 F.2d 827, 832 (4th Cir. 1982)); *Nelson v. Collins,* 659 F.2d 420 (4th Cir. 1981).  Other defenses include substantial compliance or the inability to comply. *Washington Metro. Area Transit Auth. v. Amalgamated Transit Union*, 531 F.2d 617 (D.C. Cir. 1976)

A sanction may issue only if the relevant court decree is clear and unambiguous, *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76 (1967).  This requirement is analogous to the Federal Rule

regarding injunctions and restraining orders. The Federal Rules of Civil Procedure provide that "every order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail . . . the act or acts sought to be restrained." Fed. R. Civ. P. 65(d). This provision has been interpreted as a bar to the enforcement of decrees too vague to inform the burdened party "what the court intends to require and what it means to forbid." *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76 (1967).

"Civil contempt is an appropriate sanction if [the court] can point to an order of [the court] which set[s] forth in specific detail an unequivocal command which a party has violated." *In re General Motors. Corp*., 61 F.3d 256, 258 (4th Cir. 1995) (citations and internal quotation marks omitted). In the *General Motors* case, the Court ordered that certain portions of its recusal order be stricken and not used as authority as they were the subject of attorney work-product or attorney client privileges. Opposing counsel went on to quote the stricken language in direct violation of the order. This is a clear and unequivocal command that was violated by counsel. *Id*.

In *Cobell v. Norton*, the Court found the government in civil contempt when, after eighteen months, the government had done no more than publish a sham notice in the Federal Register after having been ordered to comply with the court's prior order to initiate a Historical Accounting Project. The Court also found that the government committed a fraud on the court by concealing the Department of the Interior's true actions regarding the Historical Accounting Project for almost a year, and by failing to disclose the true status of the Trust Asset and Accounting Management System (TAAMS) project. *Cobell v. Norton*, 226 F.Supp. 2d 1, 11

(D.D.C. 2002). Actions cannot be considered violations that support a finding of contempt if they do not violate an "unequivocal command."

The Plaintiffs have not described an "unequivocal command" that the Defendants have disobeyed. The Section of the Settlement Agreement entitled Construction, Implementation and Termination describes termination as coming after a year of substantial compliance **but in no case less than three years from the Effective Date,** unless by agreement. (emphasis added).[62] This indicates that all parties negotiated the time at which they believed it was reasonable for VDOC to meet the standards delineated in the Court-approved Settlement Agreement. February 6, 2019, is the earliest that the Agreement contemplates FCCW to be in compliance such that the Agreement may be terminated. When the prerequisite of one year of substantial compliance is subtracted from the three years, February 6, 2018, is the earliest date of substantial compliance that is contemplated by the Agreement. There is not a "clear and unequivocal command" as to the date by which FCCW must demonstrate substantial compliance that is earlier than February 6, 2018. Nothing in the Agreement references September 6, 2017, as a date by which compliance must be achieved. The Settlement Agreement is clear on what VDOC must demonstrate to be relieved of the Settlement Agreement and does not contemplate operation under the Settlement Agreement after substantial compliance is demonstrated for a year. The earliest date that the parties foresaw that it would be possible to be in compliance with the Settlement Agreement was three years after the effective date of the agreement.

And in fact, VDOC has worked diligently to comply with the terms of the Settlement Agreement. In the *Nelson v. Collins* case, The Maryland State Prison System was given a date

---

[62] "This Settlement Agreement shall terminate as of the date on which the Defendant has achieved substantial compliance with all elements of performance of its obligations to provide constitutionally-adequate medical care under the Eighth Amendment, subject to the Compliance Monitor's evaluation under this Settlement Agreement, and has consistently maintained such substantial compliance for a period of one year, provided, however, that the termination may not take effect less than three years from the Effective Date…" ECF 221-1, page 26, Section VI.10

certain by which certain changes must be made.  Maryland did not fulfill the terms of the Court's order by that date, however, the Court took into account the Defendants' "energetic" attempts to address the "unforeseen setbacks" that they encountered while attempting to obey the Court's order.  The Court noted when it vacated the finding of civil contempt and the award of sanctions that, "the test is reasonable diligence." *Nelson* at 422.

Unlike the Department of the Interior in *Cobell v. Norton*, VDOC has made much progress toward its goal of meeting or exceeding constitutionally adequate standards in the eighteen months between the Effective Date of the Settlement Agreement and the filing of the Plaintiffs' motion to show cause.  And unlike the defendant in *Cobell*, VDOC has obligated tax payer monies in the amount of $3,984,945 to comply.[63]  Nine of the standards are now listed as compliant, three that are non-compliant are due in part to actions or inactions of others that are at least partially out of the control of VDOC.  The remaining standards are partially compliant.

Unlike the Department of Corrections in *Glover v. Johnson*, VDOC has been working toward reaching compliance with the aspirational standard of the Settlement Agreement for 19 months.  The Michigan Department of Corrections in the *Glover* case was under the court's supervision for 19 years before the court sought to sanction the Department for contempt. *Glover v. Johnson*, 199 F.3d 310 (6th Cir., 1999); *Glover v. Johnson*, 931 F. Supp. (E.D. Mich., 1996).  VDOC continues to improve and show progress.  Diverting money from the budget to the Plaintiffs' counsel will simply divert funds from the goal of providing quality healthcare to the inmates of FCCW.

The Plaintiffs include many Declarations which opine about medical issues and which contain hearsay and legal conclusions.  The Plaintiffs seek to prove that the perceptions and dissatisfaction of the inmates outweighs VDOC's continued progress and commitment to

---

[63] Exh. 3

24

dedicate more than $3,000,000 at FCCW for the health care of the Plaintiffs.[64]  In moving for

contempt sanctions, Plaintiffs ask that money be diverted from the health care at FCCW and

instead paid as fines or attorneys' fees.  This case does not involve a business that operates at a

profit that can be diverted in part to pay Plaintiffs, but rather involves tax payer dollars which

come from a finite source.

### Deliberate Indifference

In order to prove that the Defendants violated the Settlement Agreement the Plaintiffs

must prove that the Defendants violated the standards of the Eighth Amendment by being

deliberately indifferent to Plaintiffs' health care needs.  It is well established that a prison

official's deliberate indifference to an inmate's serious medical needs violates the Eighth

Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).  Objectively, the need must be

"sufficiently serious" and require medical treatment and subjectively the prison official must

have acted with a sufficiently culpable state of mind.  *Farmer v. Brennan*, 511 U.S. 825, 834

(1994); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *Brice v. Virginia Beach Corr.

Ctr.*, 58 F.3d 101, 104 (4th Cir. 1995).  A medical need is sufficiently serious "if it is one that has

been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention."  *Iko v. Shreve*, 535 F.3d

225, 241 (4th Cir. 2008).  The second prong is satisfied if the defendants know and disregard the

risk to inmate health and safety.  *Farmer*, 511 U.S. at 837.  An inmate's disagreement with a

medical professional's decisions does not state a claim for which relief can be granted, as

questions of medical judgment are not subject to medical review.  *Jackson v. Sampson*, 536 Fed.

Appx. 356, 357 (4th Cir. 2013)(unpublished); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir.

1985); *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).   Negligence or medical

---

[64] Exh. 3

malpractice will not establish a sufficiently culpable state of mind. *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003); *Grayson v. Peed*, 195 F. 3d 692, 695 (4th Cir. 1999).

The Declarations of the Plaintiffs have been collected since January 2017. The Declarations contain conclusory allegations, without any factual support, and in some cases ignore the opinion of the Settlement Monitor that the medical care provided by VDOC is appropriate. The earliest Declarations are well before the Plaintiffs' Notice of Noncompliance and seem to be a plan to create a case for sanctions.[65] For reasons previously stated the Declarations cannot all be addressed in this Response and addressing each and every one would require an evidentiary hearing and discovery.

WHEREFORE, for the reasons state above, Defendants respectfully request that this Court deny Plaintiffs' Motion for a Show Cause, award costs and attorney's fees, and grant any other relief deemed just.

Respectfully submitted,

HAROLD W. CLARKE, A. DAVID
ROBINSON, FREDERICK SCHILLING,
and PHYLLIS A. BASKERVILLE

By: s/_____Diane M. Abato_____
Diane M. Abato, SAAG/Chief, VSB 31892
Office of the Attorney General
Public Safety & Enforcement Division
202 North Ninth Street
Richmond, Virginia 23219
Phone: (804) 786-8191
Fax: (804) 786-4239

---

[65] This may explain Plaintiffs' failure to respond to VDOC's request to send comments on its Continuous Quality Improvement (CQI) program and policy while still complaining bitterly about the lack of a policy. The Settlement Agreement requires that VDOC work with Plaintiffs to develop the CQI policy, but the Plaintiffs simply haven't responded to the policy except to complain that VDOC has not "implement[ed] an overall quality improvement program." The Plaintiffs' failure to respond to VDOC's request to review the policy is not mentioned or explained in this Notice. See ECF 266-2, p. 16.

Dabato@oag.state.va.us

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of October, 2017, I electronically filed the foregoing

Response in Opposition to Plaintiffs' Motion for Order to Show Cause Why Defendants Should

Not Be Held in Contempt with the Clerk of the Court using the CM/ECF system, which will send

a notification of such filing (NEF) to the following:

      Mary C. Bauer, Esquire
      mary@justice4all.org

      Brenda E. Castaneda, Esquire
      brenda@justice4all.org
      Angela Ciolfi, Esquire
      angela@justice4all.org
      Abigail Turner, Esquire
      abigail@justice4all.org
      Adeola Ogunkeyede, Esquire
      adeola@justice4all.org
      Ivy Ann Finkenstadt
      ivy@justice4all.org
      Kimberly Anne Rolla
      kim@justice4all.org

      LEGAL AID JUSTICE CENTER
      1000 Preston Avenue, Suite A
      Charlottesville, VA 22903

      and


      Theodore A. Howard, Esquire
      WILEY REIN LLP
      1776 K Street, N.W.
      Washington, D.C. 20006
      thoward@wileyrein.com

      and

Philip Fornaci, Esquire
Phil_fornaci@washlaw.org
D.C. PRISONERS PROJECT OF
THE WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
(*Attorneys for Plaintiffs*)

And I hereby certify that I have mailed by United States Postal Service the documents to

the following non-CM/ECF participants:  N/A.

By: s/ Diane M. Abato
Diane M. Abato, SAAG/Chief, VSB #31892
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North 9th Street
Richmond, Virginia 23219
Phone:  (804) 786-8191
Fax:  (804) 786-4239
E-mail: dabato@oag.state.va.us