```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF VIRGINIA
 2                      CHARLOTTESVILLE DIVISION

 3  CYNTHIA B. SCOTT, ET AL.,  ) 3:12-CV-00036
                               )
 4           PLAINTIFFS,       ) Charlottesville, Virginia
                               ) June 15, 2018
 5      v.                     ) 9:00 a.m.
                               )
 6  HAROLD W. CLARKE, ET AL.,  )
                               )
 7           DEFENDANTS.       )

 8
                              VOLUME 7
 9                    TRANSCRIPT OF BENCH TRIAL
                  BEFORE THE HONORABLE NORMAN K. MOON
10                  UNITED STATES DISTRICT JUDGE

11  APPEARANCES:

12  For the Plaintiffs:
        ANGELA A. CIOLFI
13      SHANNON MARIE ELLIS
        BRENDA ERIN CASTANEDA
14      MARY CATHERINE BAUER
        Legal Aid Justice Center
15      1000 Preston Avenue, Suite A
        Charlottesville, VA  22903
16      (434) 977-0553

17      THEODORE AUGUSTUS HOWARD
        Wiley Rein, LLP
18      1776 K Street N.W.
        Washington, DC  20006
19      (202) 719-7120

20  Court Reporter:          Tracey Aurelio, CRR, RDR
                             1101 Court Street, Suite A66
21                           Lynchburg, Virginia 24504
                             (434)847-5722
22
        Proceedings recorded by mechanical stenography,
23  transcript.

24

25
```

```
 1                    APPEARANCES (Continued)

 2  For the Plaintiffs:

 3  ADEOLA OGUNKEYEDE
         Legal Aid Justice Center
 4       123 East Broad Street
         Richmond, VA  23219
 5       (804) 643-1086

 6  For the Defendants:
         EDWARD J. McNELIS, III
 7       RUTH THOMAS GRIGGS
         ELIZABETH MARTIN MULDOWNEY
 8       Sands Anderson, PC
         1111 East Main Street, Suite 2400
 9       Richmond, VA  23218-1998
         (804) 648-1636
10
         KATHERINE CABELL LONDOS
11       NATHAN HENRY SCHNETZLER
         Frith Anderson & Peake, PC
12       29 Franklin Road, SW
         Roanoke, VA  24011
13       (540) 772-4600

14       DIANE MARIE ABATO
         Office of the Attorney General - Richmond
15       202 North Ninth Street
         Richmond, VA  23219
16       (804) 786-8191

17

18

19

20

21

22

23

24

25
```

1                    I N D E X

2  JAMES HATCHER
     Direct Examination (MR. McNELIS)                     6
3   Cross-Examination (MS. CASTANEDA)                    27
     Redirect Examination (MR. McNELIS)                  27
4  BARBARA SEABERT
     Direct Examination (MS. GRIGGS)                     29
5   Cross-Examination (MS. ELLIS)                        53
   DAVID SCOTT DODRILL
6    Direct Examination (MR. SCHNETZLER)                 58
     Cross-Examination (MS. BAUER)                       78
7    Redirect Examination (MR. SCHNETZLER)               83
   DR. ALFRED JOSHUA
8    Direct Examination (MR. McNELIS)                    85
     Cross-Examination (MR. HOWARD)                     111
9    Redirect Examination (MR. McNELIS)                 123
   N.H. "COOKIE" SCOTT
10   Direct Examination (MS. LONDOS)                    125
     Cross-Examination (MS. CIOLFI)                     176
11   Redirect Examination (MS. LONDOS)                  206
     Redirect Examination (MR. McNELIS)                 211
12   Recross-Examination (MS. CIOLFI)                   212
   JACKIE CLARKE
13   Direct Rebuttal Examination (MS. CASTANEDA)        217
     Cross-Rebuttal Examination (MR. McNELIS)           226
14 MELISSA ATKINS
     Direct Rebuttal Examination (MS. ELLIS)            234
15   Cross-Rebuttal Examination (MS. GRIGGS)            240

16                    DEFENDANT EXHIBITS
                               MARKED   RECEIVED
17        32                     16        16

18        33                     23        23

19        34                     59        59

20        35                     91        91

21        36                     92        92

22        37                     92        92

23        38                    103       103

24        39                    174       174

25        40                    175       175

```
 1              DEFENDANT EXHIBITS (Continued)
                                    MARKED   RECEIVED
 2         41                        242       242

 3         42                        242       242

 4         43                        243       243

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings commenced at 9:00 a.m.)

2          MR. McNELIS:  Good morning, Your Honor.

3          THE COURT:  Good morning.  Okay.  Ready to call the

4    first witness?

5          MR. McNELIS:  Your Honor, the defense calls James

6    Hatcher.

7          THE COURT:  I might suggest that one way to save a

8    little time is all of these people -- unless somebody thinks

9    someone is not qualified, it seems to me I've read all the

10   qualifications in the papers you've already handed up

11   previously.  I don't think it's necessary to spend so much

12   time just on the qualifications of a witness unless there is

13   some question about whether he's qualified.

14         MR. McNELIS:  Your Honor, I anticipated what the

15   Court just said, and what I was going to do -- we have two

16   experts.

17         THE COURT:  You don't have to explain it to me.  I'm

18   just making a suggestion.

19         MR. McNELIS:  I was going to put the CV in, if no one

20   objected for Dr. Joshua, and have him talk five minutes about

21   his qualifications.  Not even that.

22         THE COURT:  Okay.  That's fine.

23         MR. McNELIS:  Mr. Hatcher is not an expert.  He is a

24   fact witness, Your Honor.

25

1          **JAMES HATCHER, DEFENDANT'S WITNESS, SWORN**

2                      **DIRECT EXAMINATION**

3   BY MR. McNELIS:

4   Q    Good morning, Mr. Hatcher.

5   A    Good morning.

6   Q    Could you please state your full name and professional

7   address?

8   A    Willy James Hatcher, 717 Villa Drive, Chester,

9   Pennsylvania.

10  Q    Okay.  And Mr. Hatcher, you will probably need to get a

11  little closer to the microphone so everyone can hear your

12  testimony.

13          Mr. Hatcher, how are you currently employed?

14  A    Through Armor Correctional Health Services.

15  Q    And what is your position with Armor Correctional Health

16  Services?

17  A    Senior -- senior regional vice president.

18  Q    Okay.  And what region are you the senior vice president

19  for?

20  A    Virginia.

21  Q    How long --

22  A    And Virginia only.

23  Q    Virginia only?

24  A    Yes.

25  Q    And for how long have you been the senior regional vice

1 president for Virginia?

2 A    October 2014.

3 Q    Now, how many facilities as the regional vice president

4 do you currently oversee?

5 A    14.

6 Q    Now, just to be clear, are you a clinical person or are

7 you an administrative person?

8 A    I'm administrative, but I also have a BSN in nursing.

9 Q    Mr. Hatcher, let me focus you on Fluvanna.  Is Fluvanna

10 one of the facilities that you are the regional vice president

11 for?

12 A    Yes, sir.

13 Q    And just briefly describe for the Court what your

14 responsibilities are with the different facilities that you

15 oversee in Virginia.  What generally are your

16 responsibilities?

17 A    Generally, at the facilities we would have a regional

18 manager.  And that regional manager would be in charge of

19 maybe three, four, potentially five facilities.  They would

20 report directly to me.  The site administration would report

21 to them.

22 Q    Is among the responsibilities you have at the different

23 facilities, including Fluvanna, providing staff?

24 A    Yes, sir.

25 Q    Does that include both nursing staff and medical doctor

1  staff, physician staff?

2  A    Yes, sir.

3  Q    Let me ask you a little bit about Fluvanna.  Were there

4  times at Fluvanna after you took over the contract when the

5  VDOC would ask you to provide staff above and beyond that

6  which the contract called for?

7  A    Yes, sir.

8  Q    And what was Armor's response to those requests?

9  A    We would provide the extra staffing that was required, or

10 questioned or asked of us by VDOC.

11 Q    And did you -- well, let me ask you a couple of specific

12 examples.  Can you give the Court a few examples of additional

13 staff that Armor was requested to provide that you provided at

14 Fluvanna?

15 A    Physical therapy.  We provided a physical therapy person

16 who worked exclusively at Fluvanna.  We brought on two

17 additional PT assistants to provide care at Fluvanna.

18     They requested that we bring on an HR person that

19 would be on the ground at Fluvanna to help with recruitment.

20 We did that.  We provide extra NP, meaning nurse practitioner,

21 hours, as well as medical doctor hours.

22 Q    Did Armor, to your knowledge -- well, first of all, would

23 you be the person to talk to the VDOC about contract issues?

24 A    Yes.

25 Q    Okay.  Did you ask the VDOC to increase their payments

1  under the contract for the additional staff they requested?

2  A    No, we did not.

3        MS. CASTANEDA:  Your Honor, I would just like to say

4  that the plaintiffs have an objection to any line of

5  questioning about pricing, profit and loss, risk-reward, or

6  liquidated damages, if I can just take a minute to sort of

7  explain the basis of that.

8        So in this case, we noticed Armor Correctional for a

9  30(b)(6) deposition.  Mr. McNelis is counsel for Armor as well

10 as VDOC.  They objected and filed a motion to quash our

11 notice, which the Court denied in part.  Ordered the parties

12 to meet and confer; we did that, narrowed the topics down to

13 26, I think, six of which we agreed to accept written

14 responses.  So then there became an issue over Topics 1 and 2,

15 which is the substance, including pricing, of Armor's contract

16 with VDOC for health care at FCCW to be performed at any time

17 during the period from February 5, 2016, to the present,

18 including any risk-reward or other provisions contemplating

19 cost savings achieved by the contractor in performance of the

20 contract; and then the second one was standards and criteria

21 by which Armor evaluated the profitability of the contract,

22 and the identity and location of all documents referring,

23 relating, or reflecting such evaluation.

24        And at one point, Mr. Hatcher was designated as the

25 person to answer those questions, to be deposed on June 1.

1          On May 30, I heard from counsel, who said in trying

2    to prepare Mr. Hatcher it's become abundantly clear that he

3    has nothing to do with the contracting process or pricing, or

4    determining profits or losses on the VDOC contract.  It is

5    further abundantly clear that only Bruce Teal can field the

6    money questions.  And thus, we did not depose Mr. Hatcher on

7    those topics, and in fact, nobody was ever made available to

8    answer those questions.

9          So on the one hand, plaintiffs would object because

10   it doesn't appear that the witness is qualified under Rule 602

11   to answer those questions from personal knowledge; or on the

12   other hand, if he is qualified, then we would object under

13   Rule 37 because Armor failed to provide somebody to answer

14   those questions under Rule 30(b)(6).

15          MR. McNELIS:  Your Honor, I'm trying to keep this

16   brief because this is a really complicated situation, but this

17   is what happened.  We objected to their 30(b)(6) notice.  It

18   was filed two and a half weeks before the close of discovery.

19   And Judge Hoppe said, That's a little late.  That's quite

20   late.  Why don't you meet and confer and see if you can

21   whittle that down?

22          Mr. Bennett -- Lynn Bennett, who is not here -- and I

23   met in his office.  I drove to his office and we met for an

24   hour.  And we whittled the 30(b)(6) notice down somewhat.

25   Probably two-thirds is what we gave them.

1          That specific topic, originally the agreement was we

2   would produce financial records, and then we would provide a

3   telephone interview with the CEO, Bruce Teal, who is also the

4   financial guy.  And we offered a date for Mr. Teal, and they

5   said that date is too late.  Mr. Teal was on a vacation.  So

6   they said, no, that's too late.  That's not going to work.  So

7   then I said, well, let me see if I can get James Hatcher to

8   cover so we don't have to go and raise the issue again.

9          In prepping Mr. Hatcher, he is not the, you know,

10  profit-and-loss numbers guy.  Those subjects are specific

11  numbers-type questions, accounting questions.  He's not an

12  accountant.  So I said, he is not the guy to do it.  We can

13  offer Bruce Teal on that same day.  And it -- you know, it

14  went back and forth and it just didn't work out.  No one

15  refused to provide a witness on that.  We were trying to --

16          THE COURT:  Well, if he didn't know then, how does he

17  know today?

18          MR. McNELIS:  Well, he is not going to talk about

19  that.  I'm not going to have him talk about detailed

20  accounting stuff.  He doesn't know that.  No, sir, I'm not

21  going to get that from him.

22          I'm asking him, when Armor -- the question is, when

23  VDOC asked for additional personnel, did Armor provide it?

24  Did you ask for more money?  Now, that is not what subjects 1

25  and 2 of that VDOC notice is.  And even if it is within the

1  ambit of that 30(b)(6) notice, just because he wasn't tendered
2  as a corporate representative on the subject doesn't mean he
3  can't have some knowledge about it.  I mean, that's not -- to
4  my knowledge, that's not how 30(b)(6) works.

5        We are trying to put forth the person who has the
6  best knowledge of the corporation.  He is not the person who
7  has the best knowledge for Armor about pricing, profits and
8  loss.  That's not -- because he is not an accountant.

9        THE COURT:  Well, will you ask for someone who would
10  know it?

11        MR. McNELIS:  We had a deal, Mr. Bennett and I, that
12  I would provide the financials, which I did.  I gave him the
13  financials.  They were going to have a telephone interview
14  with Bruce Teal, the CEO, who is also the chief financial
15  officer, and then they were going to submit written questions
16  after the telephone interview.  It broke down when I said
17  Mr. Teal is available for a telephone interview on June 6.

18        All these negotiations were going on in late in May,
19  Your Honor.  Everything was pushed way back.  And they said,
20  no, that's too late.  We don't want that date.

21        THE COURT:  Well, let's go with this witness and what
22  he knows.  I don't --

23        MR. McNELIS:  Yes, sir.  I'm not going to ask him
24  what he doesn't know, sir.

25        THE COURT:  You can object to it later.  Move to just

1  strike his evidence if it's not proper.

2  BY MR. McNELIS:

3  Q    Mr. Hatcher, you were explaining to the Court the

4  specific examples of when the VDOC requested additional

5  staffing in the Fluvanna contract.

6        I believe my question was:  Did Armor ask the VDOC

7  for additional money under the contract to provide that

8  staffing?

9  A    No, we did not.

10       THE COURT:  Well, why not?  I mean, you are in

11 business.  Why would -- and you have got a contract.  Why

12 wouldn't you be -- expect compensation for what you do?

13       THE WITNESS:  Because we had been a partner of the

14 DOC for quite some time, since 2006, and we valued that

15 partnership.  So we were so concerned about care, about health

16 care.  We wasn't as concerned about money.  We wanted to do a

17 good job.

18       THE COURT:  Okay.  Go ahead.

19 BY MR. McNELIS:

20 Q    And Mr. Hatcher, you mention -- I believe you said you

21 have 14 facilities in Virginia that you manage?

22 A    Yes, sir.

23 Q    And do you manage 14 facilities now?

24 A    Yes, sir.

25 Q    Over the past four years, of those 14 facilities, which

1  one has occupied the majority of your time, sir?

2  A    Fluvanna.

3  Q    Why is that?

4  A    It has been the most challenging one.

5  Q    How so?  How has it been the most challenging one?

6  A    In terms of staffing, in terms of recruiting, in terms of

7  retention, Fluvanna by far has been the most challenging one

8  of the other 13.

9  Q    Now, let me ask you:  You were explaining how additional

10  staffing had been requested and was provided.  Have you, in

11  your position with Armor, received any resistance to assisting

12  with additional staffing or providing other resources to

13  Fluvanna?

14  A    I don't understand your question, sir.

15  Q    I'm saying, within Armor, when the VDOC has requested,

16  for example, additional staffing, and you indicated that the

17  staffing was provided, have you encountered -- you, sir, in

18  Armor's chain of command -- resistance to doing that?  No, we

19  don't want to do that?

20  A    No, not at all.

21  Q    From your perspective as the regional vice president of

22  the Virginia contract, has Armor tried to cooperate as best

23  that you can to assist the VDOC to provide good care at

24  Fluvanna?

25  A    Yes, we have.

1 Q    Now, let me ask you:  There has been a lot of testimony

2 about difficulties hiring a medical director.  Do you have any

3 involvement, sir, in hiring medical staff at Fluvanna?

4 A    Yes, sir.

5 Q    What is your responsibility or role within that process?

6 A    We have a full-time recruiter on the ground on-site at

7 Fluvanna who would assist in that process as well.  We have a

8 regional recruiter whose responsibility it is to recruit.

9 Between the two of them, they would use various means of

10 advertisement to attract people to apply.

11       Once someone applied and we got into the interview

12 state -- and usually that would happen on the phone first, we

13 would do a phone interview -- when that happened, I would be

14 involved with that process.

15 Q    Can you tell the Court what types of recruiting efforts

16 were undertaken to find a medical director at Fluvanna?  How

17 did y'all go about that?

18 A    What we would do, we would get a listing from the

19 Virginia medical licensing board of physicians that were

20 licensed in Virginia in that immediate area.  And then we

21 would do cold calling.  We would do mailings.  We would do

22 things of that sort to let them know that we had a position

23 available.

24 Q    Did you hire recruiters to assist you?  Did you have

25 recruiters that assisted you in --

DIRECT EXAMINATION OF HAMES HATCHER

1  A    Yes.

2  Q    Can you tell the Court about that, about the recruiters

3  and what they would do for you?

4  A    The recruiters would then screen those applicants.  And

5  once they got a CV, once that applicant appeared to be

6  interested, then we would set up a phone interview.

7  Q    Did you do any national recruiting using the Internet or

8  anything of that nature?

9  A    Yes, we did.

10  Q    Can you tell the Court about that?

11  A    We advertised through MD, ZipRecruiter, Craigslist.

12  Virginia, through Fluvanna County; they allowed us to do a

13  posting with them.  CareerBuilder.  Social media, to include,

14  Facebook, LinkedIn.  We also advertised through the Virginia

15  Council of Nurse Practitioners, *Family Physician* magazine in

16  Virginia, Doximity.  So we attempted to hire a physician

17  through many different sources.

18          MR. McNELIS:  Your Honor, if I may approach, I'm

19  going to ask the court reporter to mark this as Defendant's

20  Exhibit 32 for identification.

21      (Defendant Exhibit Number 32 was marked and received.)

22          MR. McNELIS:  May I approach the witness, Your Honor?

23          THE COURT:  You may.

24  BY MR. McNELIS:

25  Q    Mr. Hatcher, I'm going to show you what's been marked as

1  Defendant's Exhibit 32 for identification.

2        Mr. Hatcher, do you recognize Defendant's 32 for

3  identification?

4  A    Yes, sir.

5  Q    Can you please tell the Court what it is?

6  A    It's a listing of physicians that we in some way or the

7  other have been in contact with since early '16, 2016, that we

8  attempted to get to work for us at Fluvanna.

9  Q    And how many physicians are listed on Exhibit 32 for

10 identification?

11 A    There's 21, but one is listed twice.  So in essence there

12 would be 20.

13 Q    Did you have a role in reviewing these 20 candidates in

14 some fashion for potentially filling the spot of full-time

15 medical director at Fluvanna?

16 A    I did not interview or personally get involved with all

17 of them.  Some of them never made it to a phone interview.

18 Q    Why is that, to your knowledge?

19 A    Some never got back to us after several requests for CVs.

20 Some, when they got back to our recruiters, they said they

21 wasn't interested in relocating.  They wasn't licensed in

22 Virginia.  So there was a combination of reasons why several

23 of them never made it to the interview process.

24 Q    Did some of them make it to the interview process?

25 A    Yes, sir.

1 Q    And of the ones who made it to the interview process, did

2 any of them accept the position of regional medical

3 director -- or were any of them offered the position of

4 regional medical director?

5 A    Yes.  Yes.

6 Q    Did any of them accept?

7          MS. CASTANEDA:  Your Honor, I just want to say that

8 plaintiffs do have an objection to this exhibit.  We did

9 object on the basis of the defendant's mischaracterization of

10 that document, on the basis of relevance and unfair prejudice,

11 and on the basis of hearsay.  Of course, if he is just using

12 it to refresh his recollection, that's --

13          MR. McNELIS:  I haven't offered it yet, Your Honor.

14 BY MR. McNELIS:

15 Q    Mr. Hatcher, the question I asked you before we had the

16 objection was:  Did any of the physicians to whom you offered

17 the job of regional medical director accept the job?

18 A    We had one that accepted the assistant or acting or

19 medical director-in-training position, yes.  We had one.

20 Q    And who was that?

21 A    His name was -- we called him Dr. K, because it was

22 somewhat hard to pronounce.

23 Q    Is it Dr. Kwiatkowski?

24 A    Yes.

25 Q    Now, there's been some testimony about

DIRECT EXAMINATION OF HAMES HATCHER

1  Dr. Kwiatkowski -- well, strike that.

2          Dr. Kwiatkowski is currently employed at Fluvanna.

3  Correct?

4  A    Correct.

5  Q    And what is his current position?

6  A    You mean what is his title?

7  Q    Yes, what's his title?  Yes, sir.

8  A    He is the medical director-in-training.

9  Q    And we understand that the full-time medical director is

10  Dr. Gable; is that correct?

11  A    That is correct.

12  Q    Now, Dr. Kwiatkowski, did you have involvement in his

13  hiring?

14  A    Yes.

15  Q    Now, there has been testimony that -- well, first of all,

16  is Dr. Kwiatkowski a UVA medical school graduate?

17  A    That is -- yes.  According to his CV.

18  Q    And is he an AOA, Alpha Omega Alpha, UVA medical

19  graduate?

20  A    Yes, it is our understanding that he came in at the top

21  10 percent of his class, yes.

22  Q    After he graduated in the top 10 percent of his class at

23  the University of Virginia, did he go to the University of

24  North Carolina Chapel Hill and complete a three-year residency

25  program in family practice?

1  A    That is my understanding, that he was licensed in two

2  states.

3  Q    Okay.  And he went on to become board certified in family

4  practice.  Correct?

5  A    That is my understanding.

6  Q    And to your knowledge, is he still board certified in

7  family practice?

8  A    That is my understanding.

9  Q    And is he licensed, to your knowledge, actively licensed,

10 in North Carolina and the Commonwealth of Virginia?

11 A    That is my understanding.

12 Q    And is Dr. Kwiatkowski currently -- I think you said he's

13 currently working at the facility?

14 A    Correct.

15 Q    Has he -- as I understand, you are not a clinical person.

16 Have you heard good things about his provision of health care?

17        MS. CASTANEDA:  Objection.  Hearsay.

18 BY MR. McNELIS:

19 Q    Is Dr. Kwiatkowski a good physician?

20        MS. CASTANEDA:  Objection.  Calling for opinion

21 testimony.

22 BY MR. McNELIS:

23 Q    All right.  Let me rephrase it this way.  Have you had

24 any problems or complaints, to your knowledge, as -- if a

25 physician is not doing their job right at Fluvanna and there

1  is a complaint, is that something you would be aware of?

2  A    Yes.

3  Q    Okay.  Have there been complaints about Dr. Kwiatkowski's

4  clinical practice?

5  A    No, sir.

6  Q    All right.  Is Exhibit 32 for identification a summary,

7  an accurate summary, of the interactions you had with the 20

8  doctors who you considered for the medical director position

9  at Fluvanna?

10  A    Yes.

11         MR. McNELIS:  Your Honor, I would like to offer

12  Defendant's Exhibit 32 for identification, as Defendant's

13  Exhibit 32 is a summary of efforts to hire a medical director,

14  under Federal Rule of Evidence 1006.  That's my basis.

15         MS. CASTANEDA:  Plaintiffs, as stated, have

16  objections on the basis of relevance, unfair prejudice, and

17  hearsay, and also foundation.

18         THE COURT:  Well, it's relevant to show how many

19  people they talked to looking for a medical director, so I

20  will admit it.

21         MR. McNELIS:  Thank you, sir.

22  BY MR. McNELIS:

23  Q    Now, let me ask you about nursing staff, Mr. Hatcher.

24  Were you also involved as the regional vice president for the

25  Virginia contract in recruiting nursing staff?

1  A    Yes, I was.

2  Q    Let me ask you:  Were there challenges -- well, strike

3  that.

4          Was it difficult to hire nursing staff at Fluvanna?

5  A    Yes, it was.

6  Q    Was it difficult to hire nursing staff at the other 13

7  facilities that you were the regional vice president for?

8  A    Not as challenging as Fluvanna.

9  Q    Can you tell the Court what challenges you had at

10  Fluvanna?

11  A    One example:  We had a job fair in Fluvanna.  Only one

12  person showed up.  We had folk who would accept -- they would

13  interview, they would accept the position, and at some point

14  before they even started they would call us back and say that

15  they had changed their mind.

16  Q    Did they say why they had changed their mind?

17  A    When we did the interview --

18          MS. CASTANEDA:  Objection.  Hearsay.

19          THE COURT:  Sustained.

20          MR. McNELIS:  Okay.  Yes, sir.

21  BY MR. McNELIS:

22  Q    Any other challenges that you can recall with regard to

23  hiring nursing staff at Fluvanna?

24  A    When we did the interview, we would let them know that

25  Fluvanna was under a settlement agreement.  We wanted to be

1  very up front and candid with them.  And many of them at some

2  point -- not that they all said that they wasn't coming as a

3  result of that, but some at that point did not.

4          MS. CASTANEDA:  Objection.  Hearsay.

5          THE COURT:  Sustained.

6  BY MR. McNELIS:

7  Q    Let's not talk about what they said, but what did they

8  do?

9  A    They did not come to work for us at Fluvanna.

10 Q    Did you at some point -- or strike that.

11         Did you offer incentives?  Did Armor offer incentives

12 to try to hire nurses at Fluvanna that were unique to

13 Fluvanna?

14 A    Yes, we did.

15         MR. McNELIS:  Let me have marked as Defendant's

16 Exhibit 33 for identification this document.

17     (Defendant Exhibit Number 33 was marked and received.)

18         MR. McNELIS:  May I approach, Your Honor?

19         THE COURT:  Yes.

20 BY MR. McNELIS:

21 Q    I'm going to present to you what I have had marked as

22 Defendant's Exhibit 33 for identification.

23         Mr. Hatcher, have you seen Defendant's 33 for

24 identification before?

25 A    Yes, I have.

1  Q    Can you tell the Court what Defendant's Exhibit 33 for

2  identification is?

3  A    It's a posting that -- of the advertisement that we used

4  in order to attract a medical director as well as nurses at

5  Fluvanna.

6  Q    And what type of financial incentives did Armor offer

7  at -- to hire nursing staff at Fluvanna?

8  A    For an LPN, we offered $1,800; for RNs, we offered 2,000.

9  Q    1,800 for what?  When you're saying 1,800, 1,800 --

10 A    $1,800.

11 Q    A sign-on bonus?

12 A    Yes, a sign-on bonus.

13 Q    And for RNs, you said 2,000?

14 A    2,000 as a sign-on bonus.  And as a medical director,

15 10,000 as a sign-on bonus.

16 Q    And did you offer, from time to time, other incentives,

17 other than what are reflected on Defendant's Exhibit 33 for

18 identification?

19 A    Yes.

20 Q    And is Defendant's Exhibit 33 for identification in fact

21 a description of an incentive hiring program that you had at

22 Fluvanna?

23 A    In addition to this, we also gave the nurses at Fluvanna,

24 LPNs, a $2-per-hour raise.  We gave the RNs a $1-an-hour

25 raise.

1   Q    Mr. Hatcher, despite those incentives -- well, did those

2   incentive programs fix the problems you were having hiring

3   staff at Fluvanna?

4        MS. CASTANEDA:  Your Honor, can we have a time frame

5   on this?

6        MR. McNELIS:  Absolutely, Your Honor.

7   BY MR. McNELIS:

8   Q    Do you remember approximately when the incentive hiring

9   program took place, or over what period of time, Mr. Hatcher?

10  A    I think it would have started in January of 2016, and

11  they are ongoing.

12  Q    First of all, let me ask you again:  Is Defendant's

13  Exhibit 33 for identification, is that an accurate description

14  of an incentive program that Armor offered during the time

15  frame that you just identified?

16  A    Yes.

17       MR. McNELIS:  I would like to move Defendant's

18  Exhibit 33 into evidence -- for identification into evidence

19  as Defendant's 33.

20       THE COURT:  All right.  It will be admitted.

21       MS. CASTANEDA:  No objection.

22       MR. McNELIS:  Thank you.

23  BY MR. McNELIS:

24  Q    Mr. Hatcher, can you tell us -- you mentioned earlier

25  that Armor's providing a full-time physical therapist at

1  Fluvanna?

2  A    Yes.

3  Q    And there were also physical therapy assistants at

4  Fluvanna?

5  A    Yes.

6  Q    At the other 13 facilities that you manage, to your

7  knowledge, in those facilities -- do you provide a full-time

8  physical therapist at any other facility?

9  A    No, we do not.

10  Q    How about the human resources director?  Do you have one

11  at Fluvanna?

12  A    Yes.

13  Q    Do you have those at all the other 13 facilities that

14  you --

15  A    No, we do not.

16  Q    Are there any other extra staff that you have at Fluvanna

17  that you don't have at the other 13 facilities?

18  A    We provide more hours for some of the staff that is

19  outside of the contract at Fluvanna than we do at any other

20  facility.

21  Q    What is Armor's purpose in providing additional staff

22  above and beyond the contract, not requesting additional

23  compensation?  What is Armor's purpose in doing that at

24  Fluvanna?

25  A    Because we want to provide good health care.

1          MR. McNELIS:  Thank you, sir.  Those are the

2    questions I have this morning.

3                        **CROSS-EXAMINATION**

4    BY MS. CASTANEDA:

5    Q    Mr. Hatcher, is Armor a for-profit corporation?

6    A    Yes.

7    Q    Armor didn't meet the staffing requirements of the VDOC

8    contract for the months of February and April through December

9    of 2017; is that correct?

10   A    Correct.

11   Q    And Armor had to pay penalties for not meeting the

12   staffing requirements; is that right?

13   A    Correct.

14   Q    Armor also paid penalties for not meeting the staffing

15   requirements in January and February of 2018; is that right?

16   A    Correct.

17   Q    Is Armor's contract with VDOC scheduled to end in October

18   of this year?

19   A    Yes.

20          MS. CASTANEDA:  No further questions.

21          THE COURT:  All right.  Thank you.

22          MR. McNELIS:  Can I ask just one redirect, Your

23   Honor?

24                       **REDIRECT EXAMINATION**

25   BY MR. McNELIS:

1  Q    With regard to penalties for staff, from -- is it less

2  expensive to provide somebody, or is it less expensive to pay

3  a penalty?

4         MS. CASTANEDA:  Your Honor, I would just restate our

5  objection under Rule 37, and also --

6         THE COURT:  Sustained.

7         You haven't provided -- they requested all this

8  financial information.  It wasn't provided, is my

9  understanding.

10        MR. McNELIS:  No, sir, it was provided.  I personally

11 provided it.  Yes, sir, it was provided.

12        THE COURT:  Well, who is the witness that's missing

13 that has the information?

14        MR. McNELIS:  Your Honor, we are not putting on a

15 financial case.  That's not my case.

16        THE COURT:  Okay.

17        MR. McNELIS:  That's not my case, Your Honor.

18        THE COURT:  Well, then, don't ask the question.

19        MR. McNELIS:  Well, she opened the door to penalties.

20 I didn't bring it up on direct, Your Honor.

21        THE COURT:  Well --

22        MR. McNELIS:  That's why I asked it.

23        THE COURT:  That didn't -- go ahead.  Let's go.

24        MR. McNELIS:  Okay.  I have nothing further, Your

25 Honor.

1          THE COURT:  Thank you, sir.  You may step down.

2          Next witness.

3          MS. GRIGGS:  She is coming in sworn.

4               **BARBARA SEABERT, DEFENDANT'S, SWORN**

5                    **DIRECT EXAMINATION**

6  BY MS. GRIGGS:

7  Q    Could you state your name for the record, please?

8  A    Barbara Jean Seabert.

9  Q    Good morning, Ms. Seabert.  Can you tell us, are you

10 currently employed at Fluvanna Correctional Center for Women?

11 A    No.

12 Q    When were you last employed there?

13 A    April 1, 2018.

14 Q    And what was your position at that time?

15 A    Director of nursing.

16 Q    And when did you become director of nursing at Fluvanna

17 Correctional Center for Women?

18 A    December 2016.

19 Q    And had you been at Fluvanna before you became director

20 of nursing?

21 A    Yes.

22 Q    What was your position before you were the director of

23 nursing?

24 A    I was a supervisor for building two.

25 Q    And when did you first come to be employed at Fluvanna

DIRECT EXAMINATION OF BARBARA SEABERT

 1  Correctional Center for Women?

 2  A    End of May 2016.

 3  Q    Are you a licensed health care provider?

 4  A    I am.

 5  Q    What type of license?

 6  A    I'm a registered nurse.

 7  Q    I want to ask you a little bit about your background

 8  before we start to talk about Fluvanna, if I could.

 9        When did you first become a licensed nurse?

10  A    2005.

11  Q    And what were you doing prior to 2005?

12  A    I was in the military for the National Guard.  I did 25

13  years there.  And I also was an aircraft mechanic before I

14  became a nurse.

15  Q    Were you a health care provider any of that time while

16  you were in the military?

17  A    I was.

18  Q    What type of health care provider?

19  A    I was a medic on a UH-1 helicopter, and then I became a

20  nurse once I -- in 2005.

21  Q    And as a nurse from 2005 on, can you give us just a

22  little bit of your background?

23  A    I was -- I went right into emergency medicine, so I was

24  an ER nurse.  And I did that all the way up until 2013, and

25  then I went into management when I got my master's.

1  Q    So you have a master's in nursing?

2  A    I do.

3  Q    Okay.  And then from your master's you went straight to

4  Fluvanna?

5  A    I had -- actually was an ER nurse in management in two

6  different ERs for Corovion.  And then when I moved up to

7  Charlottesville, I went to Fluvanna.

8  Q    I want to talk to you a little bit about how nursing

9  generally was provided at Fluvanna Correctional Center for

10 Women when you got there.

11      We've heard some testimony so far about nurses in

12 buildings and sick call and things like that.  Can you tell us

13 sort of where was health care provided at Fluvanna when you

14 first got there?

15 A    The LPNs were in all the outside buildings, which were

16 one, two, three, five, six, and eight.  The RNs were the

17 supervisors.  And they were also in acute, and they were also

18 in the infirmary.

19 Q    And those buildings where the LPNs were located, were

20 those residential housing units?

21 A    Yes.

22 Q    And then building two, was that sort of the central

23 medical facility for Fluvanna?

24 A    That's correct.

25 Q    Okay.  What were the services that LPNs were providing in

DIRECT EXAMINATION OF BARBARA SEABERT

1  those residential units when you started at Fluvanna?

2  A    They gave the pills during our pill line.  They did

3  treatment lines.  And then they were -- kind of like, if the

4  offenders came to them and had a complaint, they would write

5  that down, and then they would call the provider and get

6  further treatment.

7  Q    Did they have any role in sick call, the LPNs in the

8  individual buildings?

9  A    They would actually do vitals and they would write down

10  the complaint.  If it was something that was in their scope of

11  practice, then they would give out, like, let's say, anything

12  that you would take at home, Pepto Bismol.  But they had to

13  have, you know, that order for it.  If not, they would call

14  the provider.

15  Q    So the LPNs were providing that care in each of the

16  individual buildings.  And then what care was being provided

17  in building two?

18  A    The infirmary, acute care, the sick call, and then also

19  for the clinic for the providers.

20  Q    And then -- so sick call that was in building two, what

21  type of a provider was providing that when you started at

22  Fluvanna Correctional Center for Women?

23  A    For sick call?

24  Q    Yes, in building two.

25  A    An LPN.

1 Q    Okay.  And then there were providers in the clinic?

2 A    Correct.

3 Q    When you started at Fluvanna Correctional Center for

4 Women, did you tell us that you were a nurse supervisor?

5 A    Yes.

6 Q    What did that mean?  What were you doing?

7 A    So I was in building two.  So I was making sure that the

8 infirmary, for people that were coming back from their

9 appointments were getting the vitals and were okay to go back

10 to the buildings.  Was, you know, supervising the LPNs, the

11 RNs.  I was actually on the floor helping them if they needed

12 help.  I was giving them lunch breaks.  I would go back to

13 acute and make sure that those nurses were doing okay, because

14 there was just one RN back there to provide for those acute

15 care inmates.

16        Chronic care was there.  So I was always making sure

17 she was on time, and then that the sick call was running well,

18 and then also that the doctors were still running, you know,

19 on time.  And if they were late, then I would stay and help

20 them or make sure the LPNs could stay and help.

21 Q    When you were in the private practice of nursing in

22 emergency rooms and things like that, did nursing supervisors

23 provide similar sorts of support?

24 A    Yes.

25 Q    So you were familiar with this before you got to

1    Fluvanna?

2    A    Yes.

3    Q    Okay.  After -- let's talk a little bit about some of the

4    actual services that were provided by the LPNs.  Can you

5    describe for us pill call or pill distribution?

6    A    We went off of a time that the DOC, you know, gave us.

7    So we would have pill line ready right at 5:30.  We would have

8    a diabetic line first so they could go get breakfast, and then

9    we would start the regular pill line.

10        We did that pill line for morning.  We did a pill

11   line again at noon.  We did a pill line again at 4:00.  And

12   then we did another pill line at night, about 8:30, 9:00.

13   Q    Was there more than one diabetic stick during the day?

14   A    Yes.  We had diabetic stick in the morning, noon, and

15   then dinnertime, and then at night.

16   Q    And then talk to me a little bit, please, about

17   treatments that were done by the LPNs.

18   A    Treatments were twice a day.  They were usually around

19   10:00 or 11:00, and then again at night, 8:30.

20   Q    When you first came to Fluvanna, was it your

21   understanding that this format of LPNs in the buildings

22   providing this care had been in place for a number of years?

23   A    Yes.

24   Q    After you had been at Fluvanna for a period of time, did

25   you reach any conclusions about that form of providing nursing

1  care?

2  A    Yes.  I had noticed that those nurses were isolated.

3  They were -- in the buildings, they seemed like they were -- I

4  felt like I was running around trying to keep them up and

5  helping them any which way I can, and I was only one person.

6        So I would be in building three, and there would be a

7  problem in building eight.  And we were, you know, trying to

8  run back and forth to help them, to keep them up to date, you

9  know, because things would happen.  You know, medical

10 emergencies, or somebody would get burned in the kitchen or

11 something like that.  So we would have to stop our treatment

12 lines or pill lines, and that made us behind.  And a lot of

13 the nurses would complain and say, I'm just isolated.  I feel

14 like, you know, we are not a team.  We need to be together.

15       And then I was having a hard time knowing if they

16 were on time to work, unless -- every time I came to work, I

17 would, you know, have to run to all those buildings and make

18 sure that everybody was there.

19       Trying to get everybody lunch breaks was difficult,

20 because it was just me trying to run around and help them.  So

21 we did have some supervisors later on that would help me.  But

22 they didn't stay but maybe two or three months at a time.

23 Q    Did you come to some conclusion about -- recommend any

24 changes for this form of providing nursing care?

25 A    I did.  It took me a while.  When I first got there, I

1  was just trying to learn my role.  And then after a while I

2  noticed the nurses coming to me with the complaints, and

3  saying, hey, I'm just behind all the time, I need help.

4         It's when I went to our HSA at the time and kind of

5  just brainstormed and said, you know, maybe this would help if

6  we brought everybody together in building two.  And it took me

7  time to brainstorm it, write it out on paper, get meetings

8  together, and just get everybody, you know, understanding what

9  I was trying to form.  And it took a while to -- you know, but

10  after meetings and we kind of put everything on paper, went to

11  the warden, and there was just a -- we finally decided that

12  everybody needs to be a team and be in one building.

13  Q    When did you first start this process of trying to

14  analyze how to make the system work better?

15  A    I would say -- I would say August of 2016.

16  Q    Did you at any point in time discuss your thoughts on

17  this with Dr. Scharff?

18  A    I did.  Pretty much after I had everything on paper and

19  we had, you know, the coming together as a management team and

20  then we passed it on to him.  And he -- you know, he said,

21  Well, I think it's a good idea, but you need to give me more

22  details.  So that's why we had to go back to the drawing board

23  and really draw it out for him.

24  Q    Okay.  So you worked with him on it for a period of time?

25  A    At least four or five months.

1  Q    Did you consider this to be a fundamental change in the

2  way nursing care was provided at Fluvanna?

3  A    I did.  I thought it would be better.  I thought it would

4  be a team effort.  I would know if, you know, people needed

5  breaks or were sick or -- you know, it would be better care

6  for the inmates.  I just thought it was a better form instead

7  of everybody being isolated out in the buildings by

8  themselves.

9  Q    And has that change ultimately come to pass at Fluvanna,

10 with the nurses out of the individual buildings?

11 A    Yes.  It seemed like it stopped all the call-ins and it

12 stopped a lot of negativity.

13 Q    While you were at Fluvanna, was there also a change to

14 the provider process for sick call?

15 A    Yes.

16 Q    What happened there?

17 A    I felt that we were putting our nurses into -- out of

18 their scope of practice.  I felt that the nurses needed to be

19 closer to the doctors if there was any problem, and not trying

20 to call them or actually, you know, leave the building and

21 that kind of thing.  It just seemed like it was just better

22 all around.

23 Q    And has that now changed as well?

24 A    Yes.

25 Q    Do you know who Distarti Whitehead is?

DIRECT EXAMINATION OF BARBARA SEABERT

1  A    Yes.

2  Q    Can you tell us what your understanding of

3  Ms. Whitehead's role was?

4  A    She worked for the state.  And what she did was she

5  monitored us every month and looked at all of our paperwork,

6  everything that we were doing, physicians and nurses, and kind

7  of giving us feedback on what we could do better.

8         And I talked to her all the time about our settlement

9  agreement.  Some things I didn't understand in the settlement

10 agreement, and I would go to her and she would just, you know,

11 help me out and understand where things were at and policies,

12 or -- she was my go-to person to try to do better for

13 Fluvanna.

14 Q    And then what would you do with the information you got

15 from Ms. Whitehead?

16 A    Well, of course, it helped me understand, so then it

17 helped me be better as a leader, to go back to my nurses and

18 say, you know, we are doing this wrong.  Let's, you know,

19 correct this.  You know, like, they would miss dates and

20 times, and I was like, you know, you have to make sure you

21 have dates and times and that kind of thing.

22 Q    Were you at any point in time during your period at

23 Fluvanna responsible for training of nurses?

24 A    I was.

25 Q    Can you tell us a little bit about how that training

1  would work?

2  A    When I first started there, we didn't really have a

3  system of who was going where.  So I actually made a chart,

4  and I had everybody's name on there, when their BLS was

5  needed -- was due, if they've had Sapphire training, if they

6  had Phase 1 and Phase 2 training, if they even had nursing

7  training that is called Nursing Skills that the state had

8  provided.

9        Once I did that chart, every week I sent it to the

10 warden and actually even made a list of who was going to go to

11 classes and when.  And I stuck to that, to that regimen.  And

12 a lot of times I worked 80, 90 hours a week to make sure those

13 nurses went to that training.  I worked days, I worked nights,

14 just to get my nurses trained.

15 Q    Did you have times where, due to staffing needs, you had

16 to postpone training for periods of time?

17 A    I did, because the warden, the new warden that came in,

18 he was like, I would like to see everybody go through Phase 2.

19 Phase 2 was nine days long.  It really didn't have anything to

20 do with nursing.  It was more just how the state ran.  And

21 that was nine days that we just didn't have.

22        We didn't have PRN nurses.  We didn't have any

23 backup.  It was just the nurses that were there.  So it was

24 very hard for me.  So a lot of times we did have to postpone

25 that Phase 2, but it really wasn't anything with nursing.

DIRECT EXAMINATION OF BARBARA SEABERT

1  Q    Can you tell us a little bit about what was Phase 1 of

2  training?

3  A    Phase 1 was more policy and procedures and a lot of the

4  roles that would go on with DOC; security, just how the prison

5  ran.  There was some training in there with BLS, but we did

6  our own training.

7  Q    What is BLS?

8  A    Basic Life Skills.  It's CPR.

9  Q    Was there PREA training for the nurses?

10 A    There was PREA training for the nurses.  And they had to

11 do that before they came into the building.

12 Q    What is PREA?

13 A    PREA training is if the inmates say that they are

14 sexually abused or harassed.

15 Q    And it teaches the nurses how to deal with that?

16 A    Correct.

17 Q    Any other training that they had to have before they

18 could start?

19 A    They had a key class, which was how to have your keys

20 secured; you know, not just dangling on your side or, you

21 know, leaving them where somebody could pick them up.  And

22 then it also had to do with security.

23 Q    We were talking a little bit ago about Distarti Whitehead

24 and how you were meeting with her.  Over what period of time

25 were you meeting with Ms. Whitehead?

DIRECT EXAMINATION OF BARBARA SEABERT

1  A    Pretty much the whole time I was there.  As a manager, I

2  didn't understand some of the settlement agreement.  So I

3  would go to her.  And then definitely I picked it up more when

4  I was DON, just always asking her for help.

5  Q    So this started in May of 2016 and continued up through

6  shortly before you left?

7  A    Correct.

8  Q    And then when you were managing this training, creating

9  this training chart, when was that happening?

10  A    I started that, like, January of 2017, right after I

11  became DON.

12  Q    And you maintained that up through the time until right

13  shortly before you left?

14  A    I did.

15  Q    Did you ever have to fire people?

16  A    As DON I would always contact HR to make sure that I did

17  the appropriate steps, and I would always go through the HSA.

18  And then I would also call Mr. Hatcher, and we would as a team

19  decide what was the best disciplinary action.

20  Q    Were there some nurses who came and this just wasn't the

21  right environment for them?

22  A    Yes.

23  Q    Do you remember --

24          MS. GRIGGS:  Your Honor, may I have a moment?

25  BY MS. GRIGGS:

1  Q    I'm just going to ask you if you remember a nurse.  I'm
2  not going to use her name.

3        Do you remember a nurse who where you were called to
4  the warden's office to discuss some incidents that happened
5  related to her care?  She was an agency nurse.

6  A    Your.

7  Q    Can you tell us a little bit about that incident?

8  A    She was an agency nurse that had only been there for a
9  couple weeks, and we had put her down in building six, which
10 was -- it was a very difficult building.  There was a lot of
11 drug distribution down there.  There were a lot of inmates who
12 had disciplinary.  And it was just -- it was a building that
13 needed a strong nurse.

14       She had past experience in, you know, inmates in
15 prisons.  But this just kind of took her a little bit over the
16 edge.  She couldn't get the computer going well.  She kind of
17 fumbled.  The inmates were very rude and disrespectful to her.
18 And I think it just made her very nervous.

19       So when I came in that morning, as soon as I found
20 out that she had just had a lot of difficulties -- you know,
21 passing pills, trying to get on the computer -- I went down
22 there right away and helped her and got her up to speed.

23       Unfortunately, she had almost given the wrong dose of
24 insulin to an inmate, and that inmate caught it, and then of
25 course, you know, started screaming and yelling at her.  And

1  then we had went to the warden, you know, and we sat down with

2  her.  And she explained herself, but she basically said right

3  to the warden, This isn't for me.  It's just too chaotic.

4  Q    And did she leave after that day?

5  A    She did.  She never came back.

6  Q    As a supervisor, did you ever monitor activities of your

7  nurses on the Internet or any of the electronic access that

8  they had through the prison?

9  A    I did.  You know, inmates like to tell on each other.

10  And so, you know, I would always have my ears open and listen.

11  And if I had an inmate come to me and say, She is, you know,

12  on the computer and she is not helping me or that kind of

13  thing, I would go to that nurse.  And I would say, What's

14  going on?  You know, did something happen last night?

15           And I noticed it was continuous.  So I had just

16  emailed and had asked people that monitor and said, you know,

17  Can you just -- here's four names.  Can you tell me what they

18  are doing at night?  And it came back that, you know, they

19  were watching Netflix and that they had YouTube on.

20           So I went back to those nurses and I said, Explain to

21  me.  I have evidence.  So they basically said -- one of the

22  nurses said, I watch Netflix because I'm ADHD, so I have to

23  have background noise, not just music because that gets on my

24  nerves, but if I have a movie playing, that helps me.  And I

25  let it continue.

1    I did block Netflix, but I let YouTube go on.  So

2 YouTube had music and that kind of thing.  Because sometimes

3 at night, it just helps, the stimulation, because it's not as

4 active as during the day.

5 Q    And what sorts of things -- at nighttime, are they

6 starting to prepare sometimes for the next day?

7 A    They work hard all night long.  So as soon as they get

8 in, they take turnover, they do -- right away, it's pills and

9 treatment line, diabetic line.  And then throughout the night,

10 you know, we have inmates that are, you know, saying they have

11 sinus colds or, you know, my ankle hurts, or something.  And

12 so those nurses are always doing that.  But then they are also

13 preparing the pills for 5:30 in the morning.

14 Q    Let's talk a little bit about pill distribution.  If a

15 nurse prepared the pills, who gave the pills?

16 A    That nurse.  We were very strict.  If you pulled it, you

17 gave it.  Even if they were sick, if they just had to leave in

18 the middle of their 12-hour shift, you know, for an emergency

19 or sickness or whatever, but -- and it would delay pill line

20 because, you know, we wanted to pull our own meds.

21    And sometimes what we would do if we didn't have time

22 to go back and repull them, so we would live pull, is what

23 it's called.  We'd open up the door -- the inmate was in front

24 of us -- we would just pull them out and give them.

25 Q    Did the live pulls move as fast as the prepulled?

DIRECT EXAMINATION OF BARBARA SEABERT

1  A    Absolutely not.  It took multiple hours.

2  Q    To distribute to each inmate live took multiple hours?

3  A    Yes, and they complained about that.

4  Q    Tell me a little bit about crushing the meds.

5  A    Well, we started noticing a lot of overdoses and a lot of

6  people being caught cheeking their meds, which means that

7  they'll put the pills up on their top cheek or underneath

8  their tongue or whatever they can to get those pills back out,

9  for whatever reason.  I don't know.  So we came together as a

10 management team for psych, and then also our management, our

11 providers, and we just said, We have to do something.  We

12 don't want these ladies to hurt themselves or even die.  So we

13 decided that we would go through the individual meds and we

14 would crush the ones that the providers told us to.

15         It was a pushback.  The inmates didn't want that.

16 They wanted their meds not crushed, for reasons, but we stayed

17 strong and we said, No, we will crush the pills.

18 Q    So you mentioned that you became director of nursing

19 December of 2016; is that right?

20 A    Correct.

21 Q    How was staffing at that time?

22 A    It was staffed.  We had -- we were fully staffed.

23 Q    But you still thought there were some of these morale

24 issues related to having the nurses out in the individual

25 units?

DIRECT EXAMINATION OF BARBARA SEABERT

1  A     Absolutely.

2  Q     Do you recall the L-card system?

3  A     I do.

4  Q     Can you tell us a little bit about the L-card system?

5  A     Well, we had DOC always monitoring our meds, and they

6  were always trying to help us, you know, to reorder them

7  correctly and on time.  And because we had so much in and out

8  of our nursing with people quitting or new people coming in or

9  agency nurses, they had suggested the L-card system.

10          So the L-card system basically is if they got 60

11  days' worth of meds, that second card, you would actually

12  circle when it needs to be reordered.  And then you would put

13  up their, you know, reorder, basically.  And that really

14  helped.  It reminded the nurses that, hey, these ladies are on

15  this type of whatever medication, and to reorder.

16  Q     When did that go into place?  Do you remember?

17  A     In the summer of last year.

18  Q     And who was responsible for putting that in place?

19  A     Pretty much Armor did, and then our pharmacy lady who had

20  been there 20 years.

21  Q     Is that Ms. Wood?

22  A     Ms. Wood.

23  Q     Do you know a Nurse Sapen?

24  A     I do.

25  Q     Who was Nurse Sapen?

DIRECT EXAMINATION OF BARBARA SEABERT

1  A    Nurse Sapen was hired last year, early last year, to look

2  at our grievances.  We had a tremendous amount of grievances,

3  and she would go through every single one of them, pull their

4  charts.  And if it was something significant, she would either

5  give it to me or the HSA or even the provider.

6  Q    So she was hired early in 2017?

7  A    Correct.

8  Q    And then the L-card went in in the summer of 2017?

9  A    That's correct.

10 Q    At some point in time, were there changes made to -- and

11 I'm going to use the wrong word for this -- there were sort of

12 emergency pill boxes that you keep at the facility?

13 A    We started noticing on Fridays, UVA would discharge a lot

14 of people back that we had sent out, and they would want an

15 antibiotic or they would want a Lortab or Percocet, which was

16 a narcotic, and they would send them back at 9:00 or 10:00 at

17 night.  Well, nothing is open.

18       So we started to have pill boxes so when they came

19 back they could get their antibiotics or their narcotics.  And

20 then we tweaked it along the way, and we started doing

21 emergency boxes for all the overdoses and -- for all the -- so

22 we would do Narcan and things like that, put it in the boxes

23 to help.

24 Q    And when did those changes start to take place?

25 A    We did that early on.  We started noticing that, I would

1  probably say -- well, actually, it started right when I came

2  in in 2016, May of 2016.

3  Q    If you -- you mentioned that if an inmate came in at 9:00

4  at night, everything was closed.  Where would you go if you

5  didn't have meds in the facility at night?  Where was your

6  backup pharmacy where you would go?

7  A    Well, Walmart, usually.  Walmart closed at 9:00.  And

8  then if not, we would -- as soon as they opened up that

9  morning, I would call the nurses.  And on their way to work,

10 they would be waiting for it to open and bring that med.

11 Q    Okay.  What are man-down drills?

12 A    Man-down drills were something that DOC had said twice a

13 year that we need to do.  So, basically, that person would be

14 a trauma or near death.  And they would make a skit and they

15 would do a drill.  And so our nurses would go out and we would

16 find that patient and we would triage them and bring them back

17 and just go through that role of a trauma or a death.

18         When I became DON, I decided we needed more than just

19 twice a year.  So I decided anytime that we had an emergency

20 overhead, that we would do that.  But then I would make that

21 nurse go through that drill, that drill paperwork.  And we got

22 better, how to make sure that we had oxygen go in there and

23 our bags were packed and full and our stretchers -- everybody

24 knew how to do the stretchers.  So over time, our nurses were

25 fluent, and we weren't just doing it twice a year.

DIRECT EXAMINATION OF BARBARA SEABERT

1  Q    You've mentioned a couple of times medical emergency.

2  Can you tell us what you mean by that?

3  A    So a medical emergency is when an inmate feels like they

4  cannot -- it's an emergency.  They cannot wait for the

5  provider.  They do not want to put in a sick call.  They want

6  to be seen right now by a licensed person.

7         So when that happened, we would have four minutes to

8  get to that inmate and assess and decide if they needed to go

9  back to the infirmary, provider, that kind of thing.

10 Q    Did you monitor responses to medical emergencies?

11 A    All the time.  I couldn't go to every one of them, but I

12 would at least go to one every day.

13 Q    And when you say you couldn't go to every one of them,

14 why wouldn't you go to every one them?

15 A    Because sometimes we would have 10, 15 a day.  And

16 sometimes the inmates felt like, let's call medical emergency

17 during shift change, or let's do it right before pill line.

18 Q    As a nursing supervisor, did you ever come across

19 personality disputes between nurses?

20 A    I did.

21 Q    How would you handle that?

22 A    First, it was an oral.  I would bring them into my office

23 and say, you know, What's going on?  Sometimes it was

24 something they didn't realize, and sometimes they realized,

25 you know, I'm starting to get jaded.  The inmates are

1  screaming at me constantly, and I just can't take it.  So I

2  would try to say, Would you like to go to another building?

3  And sometimes that would work.  I would put them in another

4  building and it was not so chaos, and it was a better fit for

5  them.

6  Q    Did you see a lot of your job as being morale?

7  A    Morale, and it really helped when I was out there, not

8  just in my office, but just out there helping the nurses any

9  way I could.

10  Q    In addition to switching nurses in cases of personality

11  disputes, did you also move nurses around in other ways?

12  A    I did.  Once I started getting an idea of my job and

13  started to get to know my nurses, I started to see that some

14  nurses would do better in intake or discharge than sitting

15  behind a desk doing something else.  Sometimes I had stronger

16  nurses.  So I would put them in building three or building six

17  where it was a difficult building.

18  Q    Did you end up, as part your role as director of nursing,

19  communicating with Dr. Scharff?

20  A    All the time.

21  Q    About what sorts of things?

22  A    He would want to know -- he would ask me to go get charts

23  for him.  So we would go get charts.  He really was interested

24  in the infirmary.  And I was in the infirmary all the time.

25  So he would ask me about certain inmates and if they were

DIRECT EXAMINATION OF BARBARA SEABERT

1  taking their pills on time or if they were -- you know, that

2  kind of thing if they were not doing the regimen that we asked

3  them to do.

4  Q    Over the summer of 2017, what happened to nursing

5  staffing?

6  A    Our vice president had resigned.  My HSA resigned right

7  before her.  I had two supervisors that got their bachelor's

8  degree and wanted to go into hospitals and do more nursing

9  than just prison.  And so that took a huge blow.

10           I tried to keep it together, but I realized that I

11  needed to go to nights to keep night shift going.  So in

12  August of 2017, I went to night shift and took over nighttime.

13  And I did that all the way up until I left.

14  Q    So did that have any impact on efforts you had been

15  making to improve things for nursing at Fluvanna?

16  A    I think so.  Because nobody during the day ever saw me,

17  and it just seemed like there was no management there to help

18  them.  We did bring in some other people, but they didn't stay

19  long.

20  Q    Okay.  So there were continuous efforts to bring in more

21  management so you could go back to your --

22  A    All the time.

23  Q    But they were unsuccessful?

24  A    Correct.

25  Q    We've heard some talk about a nursing crisis by

DIRECT EXAMINATION OF BARBARA SEABERT

1  Dr. Scharff.  Was that the nursing crisis that you're -- your

2  understanding of what he was referring to as a nursing crisis?

3  A    He sat down with me one-on-one and told me that I would

4  burn out, that I couldn't continue what I was doing, which was

5  80, 90 hours a week.

6  Q    Did you ever talk to Dr. Scharff about CQI?

7  A    He is actually the one that said he didn't like how

8  Ms. Whitehead was doing that.  He felt like we were behind.

9  He wanted CQI to where we were ahead, we could see things in

10  the forecast.  And the way DOC had it, we were looking at

11  things afterwards.  So he said that we needed to start a

12  committee, which we did.  And then we also -- DOC had hired a

13  full-time CQI guy.

14  Q    And when did that happen?

15  A    Summer, summer of 2017.

16  Q    During the nursing crisis, did you ever have any

17  discussions about expanding the agencies from whom DOC was

18  seeking nursing support?

19  A    Yes, and we did.  We only had three agencies, and by the

20  time we -- when I left, we were up to, like, eight or nine.

21  Q    And this would give you other opportunities to recruit

22  nurses to help out?

23  A    Yes.

24  Q    By the time you left, were you still working nights?

25  A    Yes.

1  Q    So there hadn't been -- they hadn't been able to find

2  management staff to get you back to your director of nursing

3  activities?

4  A    That's correct.

5  Q    What was your reason for leaving Fluvanna?

6  A    It was more of a family issue.  It was putting a lot of

7  toll on my family, working 80, 90 hours a week and always on

8  nights.  I have two small kids, and so it took a toll on them.

9  And when they started saying, Mom, we never see you, their

10  grades started going down, I needed to find something else.

11  Q    Where are you working now?

12  A    I'm working at Martha Jefferson Hospital as a cath lab

13  nurse.

14        MS. GRIGGS:  Court's indulgence, Your Honor.

15        That's all the questions I have at this time,

16  Ms. Seabert.  They may have some questions for you.

17                    **CROSS-EXAMINATION**

18  BY MS. ELLIS:

19  Q    Good morning, Ms. Seabert.  It's nice to see you again.

20  A    Good morning.

21  Q    I only have a few questions for you today.  You have

22  described your very intense work schedule during the last six

23  months of your time at Fluvanna.

24  A    It was actually the whole time I was there.  I would

25  stay, come in at midnight, 2:00 in the morning, whatever it

1  took.

2  Q    So you covered a lot of shifts for nurses that didn't

3  show up.  Correct?

4  A    Not show up; more like call-ins.

5  Q    Call in to say that they weren't going to come to work

6  that day?

7  A    That's correct.

8  Q    Okay.  And I believe you worked numerous 16-hour shifts

9  while you were at Fluvanna?

10 A    It could go up to that.  I would work nine hours, go

11 home, eat dinner, get a shower, and come back in.

12 Q    And there were other nurses that worked similar shifts at

13 times?

14 A    I had a lot of my nursing staff that were just right

15 along with me.  Once they seen that I was doing that, they

16 picked up and started doing it, too.

17 Q    You talked about your recommendation that Fluvanna look

18 beyond the three nurse agencies.  And I believe you said you

19 made that recommendation back in August 2017?

20 A    I can't remember the exact time, but I do know that we

21 were constantly looking for other agencies.

22 Q    And you said that Fluvanna did end up going to additional

23 agencies.  But that didn't happen until early 2018.  Correct?

24 A    With all the management changes, that did set us back.

25 Q    And you talked about your recommendation that -- for

1  reorganizing how the nurses were moving them from the

2  buildings back to building two.  And I believe you said you

3  recommended that in August 2016.  Correct?

4  A    It was about that time.

5  Q    And that change did happen, but like with the other one,

6  it took a while.  Right?

7  A    Correct.

8  Q    In fact, that relocation did not happen until early 2018?

9  A    Actually, until we got the state ladies in there, and

10 they thought it was a fabulous idea.

11 Q    And that happened around January or February of 2018?

12 A    Correct.

13 Q    During the time that you were working night shifts from

14 around August 2017 to February 2018, your duties really

15 changed from being able to supervise the nurses and have that

16 managerial role to more of the role of, like, a line nurse.

17 Correct?

18 A    No, I actually did both.  I was still doing emails.  I

19 was still trying to make meetings in the morning.  I was still

20 doing the staff meetings every month.  I was still trying to

21 make sure that everybody got their CPR every month and never

22 had expired.

23      I also kept in contact with the lady that did all the

24 drugs, drug testing.  And I got emails weekly of people with

25 Suboxone overdoses or Suboxone in their urine.  So I would

1   have to go through their charts and look at all their

2   medications and make sure that wasn't a false positive.

3   Q    And I -- let's see.  I'm pulling it in here, but this is

4   not showing up.

5        I apologize.  During the time that you were working

6   nights, you weren't present at the facility during the day.

7   Correct?

8   A    Correct.

9   Q    And so you stopped participating in interviewing

10  candidates for nursing positions at Fluvanna?

11  A    I did.  I turned that over to the lady that was working

12  during the day.

13  Q    And before you went to the night shift, you interacted

14  with the warden almost daily.  Correct?

15  A    In passing, saying hi, seeing him at lunch.  But he would

16  only have meetings with us weekly.

17  Q    And after you went to nights, that fairly regular contact

18  dropped off?

19  A    I was still making sure I said good morning to him as I

20  left work.  But yes, those meetings with him did -- I turned

21  that over to another nurse -- well, another manager.

22  Q    I'm sorry.  The Court's indulgence for just a moment.

23       Ms. Seabert, do you recall coming to Legal Aid?  I

24  believe you actually had to come twice to conduct your

25  deposition in this case?

1  A    Correct.

2  Q    And do you remember describing the difference between

3  your duties when you were on day shift and you were on night

4  shift and saying, "While I was on day shift, I was just a

5  manager or the director.  I wasn't in patient care; I was

6  actually their boss.  But when I went nights, I was actually

7  just -- I was the nurse"?

8  A    That's the way I felt when I talked to you, because I

9  felt like I had lost a lot of my -- what I was hired for.

10        But now that I look back on it, I was actually doing

11  supervisor manager work at night also as being a health care

12  provider for the inmates.

13        MS. ELLIS:  Thank you very much, Ms. Seabert.

14        MS. GRIGGS:  We have no redirect, Your Honor.

15        THE COURT:  All right.  Thank you.  Appreciate it.

16        We will take about a ten-minute recess.

17        THE MARSHAL:  All rise.

18     (Recess taken from 10:11 a.m. until 10:20 a.m.)

19        THE COURT:  All right.  Call your next witness.

20        MR. SCHNETZLER:  Your Honor, the defendants call

21  Scott Dodrill.

22        MS. BAUER:  Your Honor, Mary Bauer for the

23  plaintiffs.  The plaintiffs just merely want to restate that

24  we had filed a motion to exclude this witness, and we won't

25  reargue that here, but we wanted to just establish that we

1  have an ongoing objection to that.

2  **DAVID SCOTT DODRILL, DEFENDANT'S WITNESS, SWORN**

3  **DIRECT EXAMINATION**

4  BY MR. SCHNETZLER:

5  Q    Good morning.

6  A    Good morning.

7  Q    Mr. Dodrill, would you please state your name for the

8  record.

9  A    David Scott Dodrill, D-O-D-R-I-L-L.

10  Q    And Mr. Dodrill, how are you currently employed?

11  A    I'm self-employed.  I retired from my old job at the end

12  of 2010.

13  Q    And in your self-employment, what do you do?

14  A    I run a consulting business.  I do -- I have contracts

15  with different agencies or companies to provide services as

16  far as prison management or auditing purposes for different

17  facilities.

18  Q    And, Mr. Dodrill, how did you first get involved in the

19  field of corrections?

20  A    I have been in and out of prison since I was three years

21  old.

22  Q    What do you mean by that?

23  A    When I was three years old, my father was named deputy

24  warden at the maximum security prison in Moundsville, West

25  Virginia.  And his apartment, the apartment for the deputy,

1 was the third and fourth floor of the administration building.

2 So my bedroom literally looked out on the main yard.  I could

3 see the basketball court, the little bandstand, the laundry;

4 even the execution chamber, even though I didn't know that's

5 what it was at the time.

6 Q    And did you have interactions with the offenders during

7 that time?

8 A    Inmates cooked for me, baby-sat me, taught me how to play

9 baseball.

10        MR. SCHNETZLER:  May I approach the witness, Your

11 Honor?

12 BY MR. SCHNETZLER:

13 Q    Mr. Dodrill, I have just handed you a document that I

14 would like to mark for identification purposes as Defendant's

15 Exhibit 34.

16        Mr. Dodrill, can you tell me what that document is?

17 A    That's my CV.

18 Q    Okay.  And is that current up to today?

19 A    Yes.

20        MR. SCHNETZLER:  Your Honor, we would like to move

21 Mr. Dodrill's CV into evidence.

22        MS. BAUER:  No objection, Your Honor.

23        THE COURT:  It will be admitted.

24     (Defendant Exhibit Number 34 was marked and received.)

25 BY MR. SCHNETZLER:

DIRECT EXAMINATION OF DAVID DODRILL

1  Q    Mr. Dodrill, I would like to briefly go through your

2  experience leading up to your current self-employment.

3         What was your first position in the field of

4  corrections?

5  A    I joined the Federal Bureau of Prisons in January of 1978

6  at the federal correctional institution in Memphis, Tennessee,

7  as a corrections officer.

8  Q    And did you eventually move up the ranks in the Bureau of

9  Prisons?

10 A    Yes.  I moved 13 different times when I was with the

11 federal prison system and each time getting more

12 responsibility in my positions.

13 Q    Mr. Dodrill, after you served as a correctional officer,

14 what other management positions did you hold within the

15 Federal Bureau of Prisons?

16 A    I went up into correctional services to the lieutenant,

17 captain, which is chief of security.  And then I went to a

18 regional office as the correctional services administrator for

19 that region in Atlanta, which means I had the training and

20 oversight for the -- or guidance to the correctional services

21 department of the 15 institutions that were in that region.

22        Then I became AW at a couple of institutions, and I

23 became warden at two facilities, and I became regional

24 director in the northeast region in Philadelphia.  There were

25 18 institutions in that region.  And then I was named

DIRECT EXAMINATION OF DAVID DODRILL

1  assistant director of the correctional programs division in

2  Washington, DC, and that's where I retired from.

3  Q    And I want to step back to your time serving as a warden.

4  Could you tell the Court the first facility you served as a

5  warden?

6  A    It was at a LSCI, Butner, North Carolina.  It's a low

7  security correctional institution in Butner, North Carolina.

8         Butner is a complex.  There is a hospital there.

9  There's two medium security institutions and a low.  At the

10 time I was there, the medium wasn't there, but there is a

11 medium now.  The low and the medium served as

12 step-up/step-down facilities for the hospital.  As offenders

13 were getting ready to go in for some type of procedure, they

14 would come to our institutions, depending on their security

15 level, and when they got done they would come down and

16 recuperate in our facilities.

17 Q    You've mentioned a hospital.  What kind of interactions

18 did you have with staff in the hospital at Butner?

19 A    Well, it was daily.  The three wardens, we met.  We were

20 in constant contact with each other, and our staffs were going

21 back and forth.  In fact, we shared associate wardens.  If

22 they had responsibility for medical, they had responsibility

23 for medical in all three facilities.  And if they had

24 responsibility for education, for example, they had

25 responsibility at all three facilities.  So all the staff was

1  kind of wandering back and forth at all times.

2  Q    And about how many offenders were housed at the low

3  security facility at Butner when you were there?

4  A    1,000.

5  Q    After you were warden at Butner, which facility did you

6  move to?

7  A    To the United States penitentiary in Lewisburg,

8  Pennsylvania.

9  Q    Could you just briefly explain to the Court what the --

10 sort of the number of offenders at the facility at Lewisburg

11 are?

12 A    Lewisburg was maximum security.  We had 2,000 offenders

13 there.  Some of those were out in the outside camp, but the

14 majority were inside.

15 Q    Were there any type of medical facilities at Lewisburg?

16 A    We had the basic infirmary that every other institution

17 would have.

18 Q    And how does the Bureau of Prisons deliver medical care

19 inside the facilities?  Do they use outside contractors?

20 A    No.  The Bureau of Prisons has their own medical at all

21 the facilities.  There is no contract medical.

22 Q    They are federal employees?

23 A    Federal employees, full-time employees.  Now, they do

24 contract out specialties at the different institutions, but

25 most of the time they have full-time staff at their

1 facilities.

2 Q    After you served as a warden at Lewisburg, I believe you

3 mentioned that you became a regional director.  Could you sort

4 of describe for the Court what your main roles were as a

5 regional director for the northeast region for the Bureau of

6 Prisons?

7 A    In Philadelphia -- that's the northeast region -- I was

8 responsible for ten states.  That's Ohio, Pennsylvania, and

9 New Jersey, and everything north.  In those states, there's 19

10 federal institutions ranging from penitentiaries down to low

11 security.

12        We had one major hospital.  That was in Fort Devens,

13 Massachusetts.  We had one full female institution that was in

14 Danbury, Connecticut.  We had three metropolitan detention

15 centers, and they would have females in those as well.  Those

16 were offenders waiting for trial or just going back for

17 sentencing.

18        In the region, there was 19 institutions.  I was

19 responsible for 6,200 employees; about 35,000, 36,000 inmates.

20 I had a budget of $850 million a year.

21 Q    And what were your primary duties as a regional director?

22 A    I supervised the wardens.  We also had a regional office

23 in Philadelphia; 100 employees there.  We also had halfway

24 houses throughout the -- throughout those ten states in

25 different areas.

DIRECT EXAMINATION OF DAVID DODRILL

1  Q    Did you also conduct any inspections or audits of the
2  facilities under your supervision?
3  A    I wouldn't do audits.  I would -- I would tour each
4  facility at least annually, going through and meeting staff
5  and observing the institutions.
6       Every three years, we did what we called an
7  institution character profile, and that's where I took about
8  ten staff from the region and we went down in there in the
9  institution and did the deep dive into all aspects of it.  As
10 long as it was good, it was every three years; if it was not
11 good, we would come back sooner.
12      Audits were done out of the central office, and they
13 were on a different time frame, from one to three years,
14 depending on how the audits were.
15 Q    You mentioned a deep dive into the facility.  What did
16 you mean by that?
17 A    Institution character profile.  We interviewed offenders
18 while we were in the facility.  We interviewed staff.  We went
19 into each area of the facility and looked down to see exactly
20 how it was operating.  You know, if they -- it wasn't the
21 basic audit steps.  We were going down at the basic level and
22 seeing how the operations were, checking on the attitude of
23 the facility, interaction between staff and offenders, all
24 aspects of it.
25      In fact, we even went into the community and talked

1  to the community leaders about the relationship that they had

2  with the facility.

3  Q    And I believe you mentioned that some facilities you

4  would only need to visit once every three years, but would you

5  have to visit others multiple times?

6  A    No.  We would go to every facility at least once every

7  three years with this deep dive.  I was in every facility

8  annually, at least annually.  Some of them, unfortunately,

9  were closer to me.  I had a detention center three blocks down

10  the street.  So they were unfortunate enough to see me more

11  often than some of the others.

12  Q    All right.  Thank you.  And after you served as a

13  regional director, you stated you became the assistant

14  director of correctional programs.  What were the

15  responsibilities in that position?

16  A    That was the -- at the time, that was basically the

17  number two position in the agency, because it's the one that

18  had most of the bulk of what occurs in the institution.  All

19  the security in all the 116 institutions at the time I left

20  fell under me.  Programs, substance abuse, mental health,

21  psychology, counterterrorism, gangs, all that fell -- reentry,

22  all that fell under the correctional programs division.  So I

23  had a large impact on the institutions.

24         In my position, we wrote policies for those areas.

25  We also developed training and saw that that training was

1  conducted.  Things of those natures -- things of that nature.

2  Q    And were you still going into facilities at that time?

3  A    Yes, but I didn't have any real responsibilities for any

4  facility except for the administrative max out in Colorado,

5  which is the supermax for Bureau of Prisons.  I had to go out

6  there quarterly to have hearings on offenders that were in

7  there to see if they could be cut loose or we were going to

8  keep them in there longer.

9  Q    And I believe you said you were the number two position.

10  Does that mean you were directly under the director of the

11  Bureau of Prisons?

12  A    I was directly under the director.  It was basically

13  number two.  We had several assistant directors, but that one

14  was always considered more important and was designated as the

15  number two position.  Now they have a deputy director.  So

16  that position is number two.

17  Q    And in your role of -- in your current role as a

18  consultant, what types of consulting -- in terms of working

19  with facilities, how will you go about doing your consulting?

20  A    I have a small contract with a management and training

21  corporation which runs some private prisons.  I do some work

22  for them; regularly, actually, I do some work for them.  They

23  have 24 or 25 private prisons they operate in right now.  So I

24  do audits for them or different things that they would like to

25  have looked at.  I go into those different facilities.  They

1 have some federal contracts.  They have some immigration

2 contracts.  They have contracts with Mississippi, Ohio, Idaho,

3 Arizona, Texas, off the top of my head, Florida.

4 Q    And you've also worked in some state-run facilities as

5 well?

6 A    Those are all state.  The states I mentioned were

7 state-run facilities that had been contracted out for

8 management by MTC.  The federal contracts are with the Bureau

9 of Prisons, Marshals and ICE.

10 Q    And are you still going into those facilities in your

11 role as a consultant?

12 A    Yes.

13 Q    About how many facilities do you think you have been

14 inside in your entire career in the field of corrections?

15 A    I have been in hundreds of facilities, not only in this

16 country but in other countries.

17        MR. SCHNETZLER:  Your Honor, at this time I would

18 like to offer Mr. Dodrill as an expert in the field of

19 corrections operations and administration.

20        MS. BAUER:  Your Honor, as we have argued, we don't

21 doubt that Mr. Dodrill has expertise, but we do contest that

22 any of the opinions that he has listed in his report are

23 appropriate as an expert.

24        THE COURT:  All right.

25 BY MR. SCHNETZLER:

1  Q    Mr. Dodrill, you have given some opinions in this case

2  regarding the operations and administration of Fluvanna

3  Correctional Center for Women; is that correct?

4  A    That's correct.

5  Q    What did you base your opinions on?  What did you do to

6  arrive at those opinions?

7  A    I toured the facility in March.  I think it was the 26th

8  and 27th.  I looked at their policies that I was asked to look

9  at.  And I reviewed the settlement agreement.

10 Q    Did you have any meetings with staff while you were

11 visiting the facility in March of this year?

12 A    Yes.

13 Q    Who all do you remember meeting with during your visit to

14 the facility?

15 A    I remember I met with the warden.  I met with

16 Mr. Wilkinson, who was the CQI at the time.  A couple people

17 in the hospital or infirmary.  There were other people I can't

18 remember at this time.  There was a bunch of attorneys.

19 Q    Did you meet with anybody in charge of scheduling or

20 transporting offenders to off-site medical treatment?

21 A    Ms. Shiflett, who was in the medical department.  April

22 Shiflett, I believe.  I did have a meeting with her.

23 Q    And did you meet with any correctional staff that were

24 involved in transportation for off-site medical visits?

25 A    I met with Lieutenant Burrows.

1 Q    In addition to the settlement agreement and the

2 Department of Corrections policies and procedures that you

3 mentioned you reviewed, did you review any other documents in

4 coming to your opinions in this case?

5 A    There are some logs I looked at from different areas,

6 transportation logs, as well as some grievance logs.

7 Q    Did you also review the reports of the compliance monitor

8 in this case?

9 A    I did.

10 Q    And did you review the reports of the experts that were

11 retained by the plaintiffs in this case?

12 A    Not all of them.  I read Dr. Scharff and -- the name

13 escapes me.  It starts with a G.

14 Q    Dr. Greifinger?

15 A    Dr. Greifinger.  I read his reports.

16 Q    All right.  Thank you.  And in coming to your opinions in

17 this case, did you base those on your 40 years of experience

18 serving in the -- for the Bureau of Prisons?

19 A    I served with the Bureau of Prisons for 33.  But I have

20 been doing correctional stuff since then.  So that's, yeah, 40

21 years.

22 Q    Thank you for correcting me.  I apologize.

23         And in arriving at those opinions, could you explain

24 to the Court how that experience in the field of corrections

25 helps you arrive at an opinion of the operations of a

1  correctional facility?

2  A    Would you say that again, please?

3  Q    Sure.  When you are arriving at your opinions based on

4  your experience in the field of corrections, is that based on

5  your interactions with offenders over the last 40 years?

6  A    Yes.  Interaction with offenders; interaction with staff;

7  going into various kinds of facilities at all times of the

8  day.

9  Q    Is that also based on your role as a supervisor in

10  dealing with facilities that have run into issues in terms of

11  their operations?

12  A    Yes.

13  Q    Would you -- are you familiar with a federal correctional

14  facility in Talladega, Alabama?

15  A    Yes.

16  Q    Was that a facility that experienced some issues while

17  you were a supervisor with the Bureau of Prisons?

18  A    Yes.  Talladega opened in the early '80s, about, and had

19  problems from the get-go of not having the right combination

20  of staff, not trending well.  All their audits were not good.

21  They were poor.  They had two inmates escape through their

22  rear gate, and escapes from federal custody is rare.  They had

23  an inmate starve to death in restrictive housing, an inmate

24  that died on one of their buses because of misconduct by their

25  staff.

DIRECT EXAMINATION OF DAVID DODRILL

1          It's just -- everything was always happening at

2   Talladega.  This was going on for several years even though

3   the Bureau of Prisons was trying to send in new supervisors,

4   new administration, trying to get it right to where it would

5   straighten itself out.  But that takes years, and through this

6   time, staff didn't want to go in there.  You didn't want to be

7   promoted in there.  You didn't want to lateral in there.  You

8   didn't want to go in there and work, because it had a cloud

9   over its head.  People thought it would be bad for their

10  career to go in there.

11         So it takes -- you have got to get good

12  administration in there who can convince some midline

13  supervisors and department heads that are good ones to go in

14  there, and then they start training the staff right.

15         If you just throw staff and money at a problem, if

16  it's going bad now, all those bad staff are just going to

17  train other staff on how to do bad things.  So you've got to

18  start at the top and work your way down and get it right.  And

19  it took until the mid-'90s before they were able to get that

20  right.

21         The institution finally turned around and all their

22  audits were going well.  Their character profiles were fine.

23  They haven't had any issues, as far as I know, since then,

24  since that time.  But it takes a long time to do that.  You've

25  got to convince staff to get on board with the program of

1  doing things the right way.

2  Q    And do you recall when about that time frame was when you

3  were dealing with those issues?

4  A    It was -- it opened in the early '80s.  I don't know

5  when.  And I was in the regional office from '90 to '94.

6  Q    And were you dealing with those issues throughout your

7  time in the regional office?

8  A    Yes.

9  Q    And what was it that eventually turned Talladega around

10 while you were in the regional office?

11 A    I think it was just getting the right staff.  They got a

12 good warden in there, and they got my old boss to go in there

13 as associate warden.  He had a lot of credibility with staff

14 in the field, and he was able to convince some midline

15 supervisors to go in.  And then they started training the

16 staff to do things the proper way.

17 Q    There has been a lot of testimony so far in this case

18 about the -- changing the culture within a facility.  And I

19 believe you have used an analogy about changing the culture.

20 What's that analogy?

21 A    It's like driving a cruise ship.  I don't care how hard

22 and fast you turn that steering wheel, it takes a while before

23 that boat -- before it starts making the move in the right

24 direction.  And that is like doing an institution.

25       Management isn't -- there is no all-encompassing,

1  perfect way of managing anything.  If there was, there

2  wouldn't be all these books out there.  Every time you go to

3  the bookstore, there's a book on how to be a better manager or

4  more effective manager or more cost-effective manager.

5          It's a -- you make a decision, and that decision

6  isn't always right.  And you have got to make changes from

7  that decision.  And eventually, you get it going in the right

8  direction to where you want it.

9  Q    In that cruise ship analogy, does the ship ever go

10 off-course while it's trying to turn?

11 A    The ship is already off-course, and you are trying to get

12 it back on the right direction.  It doesn't -- when you turn,

13 it doesn't go straight back that way.  It slowly makes a turn,

14 as long as you keep turning the steering wheel.  If you let

15 off that steering wheel, it's liable to go back the wrong way

16 again.

17 Q    Looking back again -- I know we have talked about your

18 experience with Talladega and turning that facility around.

19 When there are issues at a facility, do things tend to -- when

20 things start going bad, does it -- do they go bad quicker than

21 it takes to course-correct, so to speak?

22 A    I think it gets out of line slowly.  And that's a big

23 responsibility of doing audits and getting in the institution

24 and reviewing it, because when things are going smoothly, it's

25 like this.  They're going by policy and everything is going

DIRECT EXAMINATION OF DAVID DODRILL

1  along fine.

2         But then when they start deviating from doing things

3  the right way, they start getting off-line, and if you let

4  them get too far off-line, it takes a long time to get them

5  back to where they are supposed to be.

6         If it goes along like this and they start getting off

7  and you're doing your audits and your proper stuff and you're

8  monitoring the institution, you just knock them back down to

9  where they are supposed to be.  It's like playing

10  whack-a-mole.  When they get off-line, you knock them back

11  down and do it in a line.  If they get off again, you knock

12  them back down.  You get them to do it the right way at the

13  right time.

14  Q    And I believe you have mentioned getting the right people

15  in the right place.  Would you talk about your experiences in

16  hiring in the field of corrections?

17         THE COURT:  Look, we're almost 30 minutes into this

18  witness, and if he has opinions about this case, I'd like to

19  get to them.

20         MR. SCHNETZLER:  Your Honor, they've continued their

21  objection on the basis of the 703 issue, Rule 703, that

22  whether or not it's proper experiential expert testimony.  I'm

23  just trying to lay the foundation for that.

24         MS. BAUER:  Your Honor, that is not accurate.  We

25  accept that Mr. Dodrill has expertise.  We contend that none

1  of the opinions in his report are true opinions that an expert

2  can render.

3          MR. SCHNETZLER:  I misunderstood their objection,

4  Your Honor.  Excuse me.  I will move it along.

5  BY MR. SCHNETZLER:

6  Q    Mr. Dodrill, you have offered an opinion.  Could you

7  please talk about the interplay between security and other

8  components of running a facility?

9  A    All components in a facility have to work together.  They

10 are all intermeshed.  You know, there's still -- just like a

11 small city, a prison is just like a small city.  It has the

12 same problems as a small city.  It has the same things going

13 on.  It has a church.  It has a store.  It has education.  It

14 has a hospital.  All that goes on.  But because it's a prison,

15 you have to have the -- the security aspect is always there.

16 Security is always involved in everything.

17 Q    Mr. Dodrill, with respect to that, how does security

18 interplay with the medical at Fluvanna Correctional Center?

19 A    The same way it does at every other correctional

20 facility, in that you have staff in the medical, in the

21 infirmary, checking people in and out.  It was mentioned

22 earlier that somebody is going to have to check to make sure

23 they are taking their medication, and they're not --

24         THE COURT:  Excuse me.  This is not the first day of

25 this trial.  I mean, this case goes way back.  A lot of this

1  stuff, I mean, is not unknown.  I mean, I have toured prisons,

2  too, but -- I have some familiarities.  But the question right

3  here -- we are looking at this prison, and in the time -- in a

4  certain time frame.  And that's --

5         MR. SCHNETZLER:  Yes, sir, Your Honor.  Right to it,

6  then.

7  BY MR. SCHNETZLER:

8  Q    Mr. Dodrill, are you familiar with the practice of a

9  centralized pill pass at Fluvanna Correctional Center for

10 Women?

11 A    Yes.

12 Q    In your opinion, is that an appropriate way to pass

13 medication in a correctional facility?

14 A    Yes.

15 Q    Why is that appropriate?

16 A    It keeps the medication in one location for

17 accountability and for consistency and documenting what's been

18 taken and what's not.

19 Q    And Mr. Dodrill, is a centralized pill pass a process

20 used by the Federal Bureau of Prisons?

21 A    Yes.

22 Q    Okay.  Thank you.  Mr. Dodrill, are you aware of how

23 medications are administered to inmates that are in segregated

24 housing at Fluvanna Correctional Center for Women?

25 A    Yes.

DIRECT EXAMINATION OF DAVID DODRILL

1  Q    How is that done, typically?

2  A    They take the medication from centralized pill line over

3  to restrictive housing and dispense it there.

4  Q    Mr. Dodrill, do you have an opinion as to whether it is

5  proper to administer medication through the food port to an

6  inmate in segregated housing?

7  A    It's not the optimal way do it, but it is acceptable.

8  Q    Why is it acceptable?

9  A    You only have so many staff.  You start opening every

10  door, you have to restrain every inmate and open every door,

11  that staff member is there with you.  And he is not getting

12  his recreation done.  He's not getting his showers done.  He's

13  not getting hearings done.  He's not getting the place cleaned

14  up.

15          So if you had plenty of staff where you could escort

16  every inmate to a triage area and dispense the medication,

17  that would be great, but that doesn't happen in any facility I

18  know.  It's always done through the pills -- the food slot.

19  Q    Do you hold that same opinion with respect to diabetic

20  sticks through a food port?

21  A    Again, that's not the optimum way to do it, but yes.

22  Q    Is that a practice that is used by the Federal Bureau of

23  Prisons?

24  A    Yes.

25  Q    Mr. Dodrill, are you familiar with the grievance

1 procedure at Fluvanna Correctional Center for Women with

2 respect to rejected medical grievances?

3 A    Yes.

4 Q    What is your opinion with respect to that procedure?

5 A    I think they have gone the extra mile when they are

6 responding to rejected grievances.  I have never seen

7 anybody -- once an administrative remedy is rejected, it's

8 gone.  I have never seen anybody go back and pull them out and

9 still address them.

10 Q    So it is your testimony you're not aware of any other

11 facility in the country that is using that type of grievance

12 procedure?

13 A    I have never seen it.

14 Q    Would you characterize that as cutting-edge with respect

15 to grievance procedures and policies?

16 A    It's going the extra mile.

17        MR. SCHNETZLER:  Thank you, Your Honor.  No further

18 questions.

19                    **CROSS-EXAMINATION**

20 BY MS. BAUER:

21 Q    Nice to see you again, Mr. Dodrill.

22 A    You too.

23 Q    I want to go through briefly the basis for each of the

24 objections -- each of the opinions that you rendered in your

25 report.

1     You had an opinion with regard to whether corrections

2 and security were interdependent.  On what did you rely to

3 render that opinion?

4 A    My experience of being in and out of institutions for 40

5 years.

6 Q    You didn't rely on any documents to render that opinion,

7 did you?

8 A    No.

9 Q    And when asked what degree of certainty your opinion is

10 based upon, you indicated simply that you were adamant; is

11 that correct?

12 A    Yes, I did.

13 Q    Okay.  You also -- I'll skip that.  Excuse me.

14     You spoke about the pill line and the food port.  You

15 have no medical training, do you, Mr. Dodrill?

16 A    I do not.

17 Q    And you are not rendering any opinion as to whether those

18 processes at Fluvanna are medically appropriate, are you?

19 A    I am not.

20 Q    In rendering the opinions that you wrote in your report,

21 you based this on a review of documents and conversations with

22 a handful of staff.  Correct?

23 A    Correct.

24 Q    You did not speak with medical staff.  Correct?

25 A    Ms. Shiflett was in medical.  I talked to her.  There was

1  one other person.  I don't remember what her name was.  No

2  extensive conversation.

3  Q    And you did not rely on any conversations with

4  incarcerated women.  Correct?

5  A    That's correct.

6  Q    Okay.  You looked at the grievance system, as I

7  understand it, by reviewing some summary records of the

8  grievance system.  Correct?

9  A    Yes.

10  Q    And you looked at six to eight individual grievances.

11  Correct?

12  A    Recent grievances.  Correct.

13  Q    Is the number correct?

14  A    Yes.

15  Q    And that is despite the fact that you knew that there are

16  thousands of grievances filed at Fluvanna in any given year.

17  Correct?

18  A    Yes.

19  Q    And you said you reviewed about half regular and half

20  emergency grievances.  Correct?  That would have been about

21  three to four each; is that correct?

22  A    That's correct.

23  Q    And you did not review any informal complaints.  Correct?

24  A    That's correct.

25  Q    And you know that filing an informal complaint is a

1  prerequisite to filing a grievance.  Correct?

2  A    That's correct.

3  Q    And you knew that Dr. Scharff had written about a

4  practice of people being pressured to withdraw informal

5  grievances.  Correct?

6  A    I knew there was an allegation.

7  Q    And you did not investigate that in any way.  Correct?

8  A    I talked to the warden about it.

9  Q    And the warden told you that he was looking into it.

10 Correct?

11 A    The warden said he had heard the same allegation and he

12 was looking into it.

13 Q    And based on the warden's representation, you did no

14 further investigation.  Correct?

15 A    That's correct.

16 Q    When I showed you several individual grievance responses

17 in the deposition, you found many of the responses

18 inappropriate; isn't that correct?

19 A    Lacking, yes.

20        MR. SCHNETZLER:  Objection, Your Honor.  This is

21 getting beyond the scope of direct.  We didn't ask him about

22 the responses.  We asked him about the procedure in general.

23        THE COURT:  Overruled.

24 BY MS. BAUER:

25 Q    And you were fully aware that in report after report,

1  Dr. Scharff had indicated that there were significant problems

2  over time with the grievance system at Fluvanna.  Correct?

3  A    He said it was improving.  At the last, the March report

4  I saw, he said there was good improvement in that area.

5  Q    I don't believe you answered my question, Mr. Dodrill.

6  Were you aware that Dr. Scharff had repeatedly stated that

7  there had been problems with the grievance system?

8  A    Yes.

9  Q    And yet you continue to this day to believe that

10 reviewing six to eight grievances is a thorough investigation

11 of that system?

12 A    It is an investigation, yes.

13 Q    Thank you.

14       MS. BAUER:  May I have a moment, Your Honor?

15 BY MS. BAUER:

16 Q    Dr. Dodrill, there was a --

17 A    I'm not a doctor.

18 Q    Excuse me.  I am aware of that.  I'm sorry.

19       Mr. Dodrill, in your report and in your deposition

20 you stated that you believe all offenders are dangerous; is

21 that correct?

22 A    All offenders need to be treated as being dangerous.

23 Q    You didn't say that, did you, Mr. Dodrill?  You did not

24 say they are potentially dangerous.  You didn't say they had

25 the capacity to be dangerous.  You said that all offenders are

1  dangerous; isn't that correct?

2  A    That's correct.

3  Q    And you said that was true even if women were bedridden;

4  isn't that correct?

5  A    That's correct.

6  Q    And that is true even if they're in a wheelchair and

7  unable to walk?

8  A    That's correct.

9  Q    And that is true even if they have multiple sclerosis and

10  cannot move; is that correct?

11  A    That's correct.

12  Q    Is it true if a woman has already been pronounced dead?

13  A    No.

14        MS. BAUER:  I have no other questions, Your Honor.

15        THE COURT:  Thank you.  Any redirect?

16        MR. SCHNETZLER:  I have redirect, Your Honor.

17                    **REDIRECT EXAMINATION**

18  BY MR. SCHNETZLER:

19  Q    Mr. Dodrill, you were asked just a few moments ago about

20  your opinion as to the interconnectedness of security in all

21  the components of a correctional facility?

22  A    Yes.

23  Q    And you said that was based on your experience?

24  A    Yes.

25  Q    And when counsel asked you if that was based on any

1  documents, in your experience have you interviewed hundreds of

2  policies and procedures dealing with operations in

3  correctional facilities?

4  A    Yes.

5  Q    So is that part of your experience in coming to your

6  conclusion that security is interconnected with all components

7  of a correctional facility?

8  A    Yes.

9  Q    All right.  And you were just asked a few moments ago,

10 are all offenders dangerous.  Why are offenders dangerous?

11 A    They have been convicted of a crime.  So they have that

12 on their resume, so to speak.  And the purpose of prisons is

13 to protect the community.  So you have to treat them as if

14 they are dangerous to the community.

15 Q    Does that also apply to other offenders?

16 A    Yes.

17 Q    And to facility staff?

18 A    Yes.

19       MR. SCHNETZLER:  Thank you.  No further questions.

20       THE COURT:  All right.  Thank you.  Is that all?

21       MS. BAUER:  No.

22       THE COURT:  All right.  Next witness.

23       MR. McNELIS:  Your Honor, the defense calls

24 Dr. Alfred Joshua.

25       MS. ABATO:  Judge, just a brief housekeeping matter.

1  I just wanted to let the Court know that Director Clarke and

2  Chief of Operations Robinson are here in the courtroom today.

3  　　　　　THE COURT:  All right.  Thank you.

4  　　　**DR. ALFRED JOSHUA, DEFENDANT'S WITNESS, SWORN**

5  　　　　　　　　**DIRECT EXAMINATION**

6  BY MR. McNELIS:

7  Q    Dr. Joshua, can you please state your full name and

8  professional address for the record?

9  A    Sure.  My name is Dr. Alfred Alexander Joshua -- last

10  name is J-O-S-H-U-A -- and I live in San Diego, California.

11  Q    Dr. Joshua, what kind of a doctor are you?

12  A    I'm a board certified emergency room physician.

13  Q    If you could, just briefly tell the Court about your

14  education and training as an emergency room physician.

15  A    Yes.  So I'm a board certified emergency room physician.

16  Did four years of residency at University of California

17  San Diego.  I went to a seven-year med program, graduated AOA,

18  or Alpha Omega Alpha, top 10 percent of my medical school at

19  SUNY Syracuse.

20  　　　　　I also have a two-year hospital administrative

21  fellowship at UC San Diego.  I have an MBA from the UC Irvine,

22  and I'm also certified as a Certified Correctional Health

23  Professional from the National Commission on Correctional

24  Health Care.  And I also have the Physicians specialty

25  designation -- one of only 70 physicians in the country with

1  that designation -- from National Commission on Correctional

2  Health Care.

3  Q    And Dr. Joshua, just to back up, you mentioned you did a

4  fellowship in hospital administration.  Can you tell the Court

5  what means?

6  A    So a hospital administrative fellowship is similar to

7  other fellowships for medical specialties on the

8  administrative side.  The hospitals at many hospitals like

9  UCLA, Harvard, Cleveland Clinic, offer a hospital

10 administrative fellowship.  UC San Diego offered it for MBA

11 and MPH graduates.

12       So you work with the executive team.  You learn the

13 regulatory environment, the financials, the clinical

14 operations, as well as the clinical environment.

15 Q    Dr. Joshua, what is your current position, sir?

16 A    So I'm currently the chief medical officer for the

17 San Diego County Sheriff's Department.

18 Q    Can you tell the Court what the -- what your

19 responsibilities are at the San Diego County Sheriff's

20 Department?

21 A    Absolutely.  So I oversee one of the largest jails in the

22 country.  We have about 5,800 inmates a day, and of those

23 5,800 inmates, about 1,200 inmates are women at a facility

24 called Las Colinas.

25       We have about 90,000 bookings a year, which

1  translates to about 230 people a day.  I oversee a budget of

2  about $75 million for all the inmate care.  I oversee 225

3  nurses, 171 RNs, or registered nurses, and 54 LPNs.  I also

4  oversee pharmacists, mental health clinicians, administrative

5  staff, and have 19 contracts which span physicians,

6  psychologists, psychiatrists, and nurse practitioners.  So I

7  provide all the clinical oversight for medical, mental health,

8  and dental programs in San Diego.

9  Q    So you also employ contractors for various aspects of

10  health care within your medical system?

11  A    Yes.  So in our system, we have a hybrid model.  So we

12  have about 307 medical employees, which the bulk of it is our

13  nursing staff.  But we also have 19 contracts with probably

14  over another hundred contractors.

15  Q    And how long have you been in that position with the

16  San Diego Sheriff's Department?

17  A    Close to five years.

18  Q    And how many individual facilities are -- do you oversee

19  the health care in?

20  A    So I oversee, in San Diego, seven facilities.  And

21  San Diego's county size is about the size of Connecticut.

22  It's about 4,500 square miles.

23  Q    And you mentioned that there was a facility that was a

24  women's facility within your system.  Can you tell us about

25  that?

DIRECT EXAMINATION OF DR. ALFRED JOSHUA

1  A    Yes.  So we -- actually, it's a brand-new facility as of

2  a couple of years ago.  It's called the Las Colinas Detention

3  Facility.  It has a capacity of about 1,200 inmates, and our

4  census is typically about 1,000 inmates.

5  Q    Let me ask you:  Have you published in the area of

6  correctional health care?

7  A    Yes, I have.  I have published in -- related to

8  correctional health care, as well as emergency medicine.

9  Q    And have you published textbooks in emergency medicine?

10  A    Yes, I have.

11  Q    And have you given lectures as an expert in correctional

12  medicine?

13  A    Yes.  So I have done a number of presentations at the

14  conferences for the National Commission on Correctional Health

15  Care.  I'm frequently invited in San Diego, and other parts of

16  California as well, to speak on issues on mental health,

17  medical, but those are predominantly the areas.

18  Q    Are you frequently sought out by the media to speak to

19  issues in correctional health care?

20  A    Yes.

21  Q    When is the last time you were approached by the media

22  about that issue?

23  A    So just about two weeks ago I did, basically, a story for

24  CBS, the local news.  But I also was on the newspapers for

25  *Union Tribune* on the reduction of opiates in our jails by

1 98 percent.

2 Q    Let me ask you about consulting with respect to

3 correctional health care systems.  Have you been retained as a

4 consultant to evaluate a correctional health care system?

5 A    So as a result of some of presentations I've done and

6 some of the work I have published, I have been sought out by

7 various counties and even some states.

8         And one of the most recent work was with the County

9 of San Luis Obispo.  Basically, they wanted to have someone

10 come in and do an independent assessment of their medical and

11 mental health operations and to provide a future model on how

12 to provide that care.

13 Q    And did you provide those services?

14 A    Yes, I did.

15 Q    Have you been consulted on correctional health care

16 outside of the State of California?

17 A    Yes.

18 Q    Other than this case, obviously?

19 A    Yes.

20         MR. McNELIS:  Dr. Joshua, I would like to show you

21 what I will have marked as Defendant's Exhibit Number 35 for

22 identification.

23         Your Honor, I'm just trying to short-circuit the

24 foundation.  Your Honor, may I approach the witness?

25         THE COURT:  All right.

DIRECT EXAMINATION OF DR. ALFRED JOSHUA

1          Did you have something?

2          MR. HOWARD:  Your Honor, I just wanted to note,

3   similar to our approach with regard to Mr. Dodrill, that we

4   did file a motion to exclude Dr. Joshua's testimony not

5   because he is not qualified in general, but because we don't

6   believe he applied the particular methodologies employed by

7   experts in formulating his opinions in this matter.

8          THE COURT:  All right.

9          MR. McNELIS:  I would just like a chance to lay that

10  foundation, Your Honor.

11  BY MR. McNELIS:

12  Q    Dr. Joshua, I'm going to show you what's been marked as

13  Defendant's Exhibit 35 for identification.  Can you tell the

14  Court what that document is?

15  A    That's my CV.

16  Q    Is that a current and accurate curriculum vitae?

17  A    I think everything -- let me just make sure.  Everything

18  except for the media stuff from just two weeks ago.

19  Q    So with -- other than the media stuff from two weeks ago

20  it's complete, accurate, and up-to-date?

21  A    Yes.

22          MR. McNELIS:  Your Honor, I would like to offer

23  Dr. Joshua's curriculum vitae into evidence as Defendant's

24  Exhibit 35.

25          MR. HOWARD:  No objection.

DIRECT EXAMINATION OF DR. ALFRED JOSHUA

1     THE COURT:  It will be admitted.

2     (Defendant Exhibit Number 35 was marked and received.)

3     MR. McNELIS:  Dr. Joshua, I'm going show you -- if I

4  could have two more documents marked.

5     In an effort to move things along, Your Honor, I'm

6  going to mark some exhibits instead of asking lots of

7  questions.

8     I would like to have this document marked as

9  Defendant's Exhibit 36 for identification.  And if I could

10  have this document marked Defendant's 37 for identification.

11     Approach, Your Honor?

12     THE COURT:  All right.

13  BY MR. McNELIS:

14  Q    Dr. Joshua, I'm going to present to you what I have had

15  marked as Defendant's Exhibits 36 and 37 for identification.

16  Are Defendant's Exhibits 36 and 37 for identification a

17  complete and comprehensive list of the materials that you have

18  reviewed to form your opinions in this case, sir?

19  A    In terms of the materials, yes.  In terms, I guess, of

20  the case, the *Clarke vs. Scott* deposition should be listed.

21  Q    So you would add to what is on Exhibits 36 and 37?

22  A    The deposition that was done.

23  Q    Your deposition?

24  A    Yes.

25  Q    Okay.

1    MR. McNELIS:  Your Honor, I would like to move into

2  evidence Exhibits 36 and 37 as the factual and informational

3  predicate for Dr. Joshua's opinion.

4    MR. HOWARD:  No objection as to 36, Your Honor.  As

5  to 37, I believe the record will reflect that a very

6  significant amount of information on this exhibit was reviewed

7  by Dr. Joshua after he rendered his report.

8    THE COURT:  Okay.

9    (Defendant Exhibit Numbers 36 and 37 were marked and

10  received.)

11  BY MR. McNELIS:

12  Q    Dr. Joshua, after you rendered your report, did

13  information in this case continue to come in?

14  A    Yes, it did.

15  Q    On a regular basis?

16  A    Yes, it did.

17  Q    On a daily basis sometimes?

18  A    Yes.

19  Q    And was it your understanding from looking at the

20  information that discovery in this case was ongoing every day

21  and there were depositions being taken on a regular basis?

22  A    Yes.

23  Q    And those materials that were sent to you that are on

24  Exhibit 37, sir, were those materials, to your knowledge, that

25  were actually available before you wrote your report?

DIRECT EXAMINATION OF DR. ALFRED JOSHUA

1  A    They were not available before the report.

2         MR. McNELIS:  I would like to offer Exhibit 36 into

3  evidence, Your Honor.

4         THE COURT:  All right.  Let's go.

5  BY MR. McNELIS:

6  Q    Dr. Joshua, do you believe the information you have been

7  provided is sufficient for you to render opinions that you

8  prepared to offer in this case?

9  A    Yes.

10 Q    Are all of the opinions you are prepared to offer in this

11 case opinions you hold to a reasonable degree of medical

12 probability?

13 A    Yes.

14 Q    Could you please tell the Court how you came -- do you

15 have opinions about whether -- if Fluvanna Correctional Center

16 for Women, the folks there are complying with the terms of the

17 settlement agreement?

18 A    Based on the review of everything I've seen, as well as

19 the standards from the National Commission on Correctional

20 Health Care, Fluvanna is meeting the standards of the

21 compliance agreement.

22 Q    And do you base that opinion, sir, in addition to the

23 materials that you reviewed, on your education, training, and

24 experience in correctional health care?

25 A    Yes, I do.

1  Q    And your experience in consulting in correctional health

2  care?

3  A    Yes, I do.

4        MR. McNELIS:  Your Honor, I would like to offer

5  Dr. Joshua as an expert in correctional medicine -- oh, let me

6  back up.

7  BY MR. McNELIS:

8  Q    Dr. Joshua, in addition to your duty at the San Diego

9  County Sheriff's Department as the chief medical director, do

10 you have an active -- chief medical officer, excuse me -- do

11 you have an active clinical practice in emergency medicine?

12 A    Yes.  I'm still a board certified emergency room

13 physician that practices, actually every Sunday, at the VA

14 hospital in San Diego.  So I provide medical care at the

15 emergency department as an ER physician.  And my last shift

16 was Sunday.

17 Q    And in your -- as part of your clinical duties as an

18 emergency medicine physician at the VA in San Diego, do you

19 treat adult women patients?

20 A    Yes.

21 Q    On a regular basis?

22 A    Yes.

23       MR. McNELIS:  Your Honor, I would like to offer

24 Dr. Joshua as an expert in correctional medicine, emergency

25 medicine, and correctional health care administration and

 1 delivery systems.

 2          THE COURT:  All right.

 3          MR. HOWARD:  Subject to our prior objection.

 4          THE COURT:  Okay.

 5 BY MR. McNELIS:

 6 Q    Dr. Joshua, based on the materials you reviewed which are

 7 identified in Exhibits 36 and 37, do you believe to a

 8 reasonable degree of medical probability that the Fluvanna

 9 Correctional Center for Women is complying substantially with

10 the settlement agreement?

11 A    Yes, I do.

12 Q    Can you tell the Court why you believe that is the case?

13 A    So based on all the materials I've reviewed, it looks to

14 me that Fluvanna has made substantial improvements on a number

15 of areas that was first identified in the settlement

16 agreement; areas such as staffing, areas such as scope of

17 practice, areas such as sick call, areas such as the

18 equipment, as well as the medical leadership and the overall

19 direction of the facilities.

20 Q    Now, as part of your assessment of the care -- I'm sorry.

21 As part of your assessment of the systemic compliance or

22 noncompliance in this case, did you actually visit the

23 Fluvanna Correctional Center for Women?

24 A    Yes, I did.  So on March 21, 2018, I did a site visit to

25 Fluvanna.

DIRECT EXAMINATION OF DR. ALFRED JOSHUA

1  Q    Can you just tell the Court briefly about that?

2  A    So during that day -- started early.  At the beginning of

3  the day, I met with Warden Aldridge, assistant warden, medical

4  leadership, Marsha and Ellen, as well as other members of the

5  team to really understand what the culture was and what was

6  going on at the facility.

7        And then throughout the day we went to different

8  housing areas, to the medical areas, observed the pill line,

9  and even in the afternoon I was able to witness the offender

10  advisory group.

11  Q    Prior to arriving at Fluvanna, Dr. Joshua, what were your

12  expectations, if any, about what you would find when you

13  arrived at that facility and conducted your site visit?

14        MR. HOWARD:  Objection.  Relevance.

15        THE COURT:  Overruled.  Go ahead.

16  A    So I think there's a -- so when I first read all the

17  materials, I had a very, very different picture in my mind of

18  what the facility would look like.  I thought it was going to

19  be very dirty, very loud, very chaotic, as well as a lot of

20  the deficiencies from the clinical care piece on what I read.

21        When I went to the facility, it was a very different

22  picture.  It was a very clean facility.  It was very quiet.

23  It was orderly.  The inmates were very respectful.  The

24  deputies staff and the sworn staff were very respectful to the

25  inmate patients.  And I saw a real collaboration of leadership

1  among them, especially the medical leadership, especially

2  Marsha and Ellen.

3         MR. McNELIS:  Could you pull up the photographs?

4  BY MR. McNELIS:

5  Q    Dr. Joshua, while you were conducting your site visit

6  this past March, did you instruct people to take pictures at

7  various -- of various parts of the facility as you toured it?

8  A    Yes, I did.

9         MR. McNELIS:  We are pulling those pictures up right

10 now, Your Honor.  I hope.

11 BY MR. McNELIS:

12 Q    Dr. Joshua, I'm going to show you a series of photos, and

13 then I guess at the end we will identify it as an exhibit and

14 try to move it into evidence.

15         Can you tell the Court, is this one of the photos

16 that was taken during your site visit?

17 A    Yes, it was.

18 Q    And what does this depict, sir?

19 A    So this is the triage area in the infirmary area of the

20 jail -- I mean, of the prison.

21 Q    And is that how it appeared during your visit in March of

22 this past year?

23 A    Yes, it was.

24 Q    Could you just comment on the general condition of that,

25 based on your expertise in correctional health care?

1   A    So, again, you could see how clean it was, how organized

2   it was.  And I was able to speak with the staff there.  At the

3   time there was no one that required a triage, but it was very

4   kept, very organized and clean.

5   Q    Is this area that's depicted in this photograph the area

6   where, to your understanding, inmates who filed emergency

7   grievances would be taken to be triaged?

8   A    Yes.

9   Q    Next photo, please.  And is this also a picture of that

10  same triage area?

11  A    Yes.

12  Q    Next photo, please.  Can you tell the Court what is

13  depicted in this photograph?

14  A    So based on some of the reports of some of the

15  plaintiffs' experts about the equipment, I wanted to look at

16  the equipment and see, were they in good working order, and

17  what condition they were.

18        As you can see in the picture, the wheelchairs are

19  fairly brand-new.  The medical gurneys and the crash cart were

20  all in fairly good working condition and look like they're

21  actually on the newer side.

22  Q    How would you describe, based on your experience in

23  correctional health care and running one of the largest jail

24  systems in the country, the level of quality and maintenance

25  of the equipment depicted in this photograph?

1  A    So the quality is actually much higher than what I was

2  expecting.  I was expecting equipment that was going to be 15,

3  20 years old, based, again, on many of the reports and many of

4  the allegations from some of the plaintiffs' side.  So I

5  really wanted to look at much of the equipment, and it looked

6  very in good working order and on the newer side.

7  Q    Next photo, please.  And is this also a picture of the

8  same wheelchair?

9  A    Yes.

10 Q    Next photo, please.  Can you tell the Court what is

11 depicted in this photograph?

12 A    So I went -- and this is, again, in that infirmary-type

13 area.  So I went down the halls and looked at some of the

14 individual rooms, and this is a medical-grade bed.

15 Q    And you say -- what type of room is this that's depicted

16 here, if you can describe to the Court?

17 A    So it was in the infirmary area for patients that had

18 medical conditions.

19 Q    Next photograph.  And you were talking about the type of

20 bed.  Can you explain to the Court what type of bed this is

21 that you saw on your visit?

22 A    So this is a medical-grade bed similar to what you would

23 see at a hospital.

24 Q    Next photograph.  Could you please tell the Court what is

25 depicted in this photograph?

1  A    So this is the dental room with the dental equipment that

2  the inmates get.  And it was actually a really nice area, and

3  many of the equipment looked like it was on the fairly new

4  side as well.

5  Q    Is this equipment of the caliber that you have seen in

6  other correctional facilities, or better?

7  A    I would actually say better than a lot of other

8  facilities.

9  Q    Next photograph.  Can you please tell the Court -- go to

10  the next photograph after this one.  I think it might be

11  better.

12          Can you please tell the Court what this photograph

13  depicts?

14  A    So this is where the dialysis machines and where the

15  dialysis was taking place.  And as you can see from the

16  machines, and the room actually -- the picture doesn't really

17  give justice to it, but it's nice and clean, well-lit, and a

18  pretty fairly nice room.

19  Q    How would you describe the caliber and quality of the

20  dialysis equipment depicted in this photograph?

21  A    So, again, I didn't see a person doing the dialysis

22  machine, but basically, the equipment looked like it was in

23  good working order.

24  Q    Next photograph.  Could you tell the Court what's

25  depicted in this photograph?

1  A    An X-ray machine.

2  Q    And can you describe the quality or -- is that a -- how

3  would you describe that X-ray machine?

4  A    So the X-ray machine was in fairly good working order.

5  The reason I specifically looked in this area was there was an

6  allegation in one of the expert reports on the plaintiffs'

7  side that the certificate for this X-ray machine had expired.

8  So I wanted to look and see if that certificate was expired.

9  Q    Next photo.  Did you take a look at the certificate?  Is

10 that a picture of the certificate?

11 A    Yes.  I specifically asked for this picture.

12 Q    What does the certificate indicate, Dr. Joshua, with

13 respect to when the certification expires?

14 A    That the certification was active.

15 Q    Next photograph.  And what is this a picture of, sir?

16 A    Still part of that X-ray room.

17 Q    Next photograph.  Can you please tell the Court what that

18 is?

19 A    So that's a mammogram machine.

20 Q    There's been some testimony -- well, strike that.

21       Is that mammogram machine dated or out of date?

22 A    It looks on the fairly newer side.

23 Q    Next photograph.  And these are photographs of what, sir?

24 A    The library.  I wanted to look at, you know, where the

25 inmates were getting recreational or other type of activities

1  as well on my site visit.  And this was actually a really nice

2  library that they had.

3  Q    Next photo.  Is that another picture of the library?

4  A    Yes.

5  Q    Next photo.  Is this -- what is this a picture of?

6  A    Still part of that.

7  Q    The library.  Next photo.  That's also the library.

8       Can you tell the Court what is depicted here if the

9  Court can't figure it out?

10 A    So it's -- they have a pretty nice size gym.  The gym was

11 actually very clean, well-lit, and exercise machines, as you

12 can see, against the wall.

13 Q    Next photo.  Is that also a picture of the gym?

14 A    Yes.

15 Q    Next photo.  Same thing?

16 A    Yes.

17 Q    And what is this a picture of?

18 A    So when I was observing the pill line, this was basically

19 for the diabetic checks.  This was in that central location,

20 and the inmates were lined up to basically receive medications

21 and diabetic finger-stick glucose checks.

22       MR. McNELIS:  At this point, Your Honor, I would like

23 to offer the series of -- I believe it's 21 photographs as

24 Defendant's Exhibit Number 48.

25       MS. MULDOUNEY:  38.

1     MR. McNELIS:  38.  I'm sorry.

2     MR. HOWARD:  No objection, Your Honor.

3     THE COURT:  They will be admitted.

4     (Defendant Exhibit Number 38 was marked and received.)

5     MR. McNELIS:  And Heidi, we will have to put that

6  together and give it to you during a break.  You can take that

7  down.

8  BY MR. McNELIS:

9  Q    Dr. Joshua, based upon your review -- your personal site

10  visit of the facility, was it your -- what is your opinion

11  about how they performed pill pass, for example?

12  A    So it was very orderly.  The nurses, especially Marsha,

13  the HSA, as well as Ellen, the director of nursing, really

14  implemented real change in the sense of from a cultural

15  standpoint, and then also from the other nurses and the

16  providers that were there.  The inmates were lined up on that

17  day.  And basically, it was very orderly.

18  Q    What about with respect to the medical leadership?  Did

19  you have access to various people when you were at the

20  facility?

21  A    Yes, I did.

22  Q    Tell us about some of the people you got to interact

23  with.

24  A    So I got to interact with the health services

25  administrator, Marsha Stanford, who really has not only a

1  great attitude but also has great rapport with the inmate

2  patients.  She was really personable to a lot of the inmates.

3  And actually, if there was an issue with them, she would

4  personally go and talk to them about those issues and really

5  tried to alleviate a lot of potential grievances at the line

6  level.

7          She also instructed many of her nurses in terms of

8  the vision and direction of how they should go and really

9  spoke to her previous experience to do that.

10  Q    Did you meet with other members of the administration?

11  A    Yes, I did, with Ellen Katzman, the director of nursing,

12  and then heard about the recruitment efforts that was being

13  had.

14          MR. HOWARD:  Your Honor, I'm going to object to some

15  of this as hearsay.

16          THE COURT:  Well --

17          MR. McNELIS:  I'm not offering any of this for the

18  truth.  I mean, I don't think he has quoted anybody on

19  something we're offering for the truth.

20          MR. HOWARD:  It's clearly offered for the truth, Your

21  Honor.  Otherwise, it's irrelevant.

22          THE COURT:  Well, but he --

23          MR. McNELIS:  He is talking about verbal conduct.

24  Your Honor, verbal conduct.

25          THE COURT:  He expressed an opinion and he's talking

1  to people to form his opinion.  That's all.  Go ahead.

2          MR. McNELIS:  Okay.  Thank you, Your Honor.

3          THE COURT:  Overruled.

4  BY MR. McNELIS:

5  Q    You met with Ms. Katzman as well?

6  A    Yes.

7  Q    Did you have occasion to meet Warden Aldridge?

8  A    Yes, I did.

9  Q    Based upon your site visit, do you believe that the

10 health care services that are being provided at Fluvanna

11 appear to be appropriate?

12 A    Actually, I felt it was above what I was even expecting.

13 And one of the really surprising things to me was as we were

14 doing the site visit, the warden was with me walking around.

15 Many of the inmates would come up to the warden and to Marsha

16 and basically say how good the care was they were getting and

17 how things have improved.  And so I was surprised to hear that

18 from a number of inmates as I was passing by.

19          MR. HOWARD:  Your Honor, we are going to object to

20 this line of questioning.  We had attempted to resolve a

21 matter involving the fact that attorneys from the defendants

22 were present and -- during the interaction between --

23          THE COURT:  All of that goes to the weight of the

24 evidence.  I mean, obviously why people come up and say things

25 at different times, you know, could be influenced by any

1  number of things.

2        MR. HOWARD:  But specifically with regard to the

3  ethical issue regarding the presence of the attorneys during

4  these communications, we thought we had made an arrangement

5  whereby what the inmate said would not be mentioned during

6  testimony.

7        MR. McNELIS:  I was getting ready to move on to

8  another area, Your Honor.  I'm not --

9        THE COURT:  I mean, I will take that -- I think still

10  it all goes to the weight.

11        MR. HOWARD:  Thank you, Your Honor.

12        THE COURT:  Go ahead.

13  BY MR. McNELIS:

14  Q    Let me shift gears with you, Dr. Joshua.  As part of your

15  review of this case, did you review the clinical medical

16  records of Ms. Liberato?

17  A    Yes, I did.

18  Q    Did you also review the clinical medical records of

19  Ms. Niece?

20  A    Yes.

21  Q    First of all, let's focus on Ms. Liberato.  Based upon

22  your review of the clinical medical record of Ms. Liberato, do

23  you believe to a reasonable degree of medical probability that

24  the care she received at Fluvanna was appropriate care?

25  A    Yes, I do.

1   Q    Could you please tell the Court why you believe that?

2   A    So Ms. Liberato is a 70-year-old female with a history of

3   high blood pressure, diabetes diagnosed in 1991, has a history

4   of heart failure, and has had two heart attacks in 1989 and

5   2000.  So she has a lot of co-morbid conditions.

6         She was on a number of cardiac medications.  She was

7   on diuretic medications.  And while she was at Fluvanna, she

8   was actively seen by the medical staff.  So it's unfortunate,

9   but when you have some of these co-morbid conditions, it does

10  increase your risk of having death.

11        And some of it is from long-term damage such as high

12  blood pressure, diabetes, heart attacks that weaken your

13  heart.  So there is also the component where a person has to

14  also have dietary compliance.  She was put on a low-sodium

15  diet.  But obviously the commissary can be outside of it.  And

16  then medication compliance, because there was a report after

17  her death that some of her medications she wasn't taking and

18  storing in her cell.  So those two aspects also do have a role

19  in it.

20        But looking at her entire clinical condition, it

21  would have seemed, even if she was in the community, because

22  of those risks factors she would have succumbed to the same

23  fate.

24  Q    But, Dr. Joshua, you are aware that Ms. Liberato had a

25  weight gain right before she passed away.  Right?

1  A    So in the past -- I have reviewed her records extensively

2  of the past two years while she was at Fluvanna.  There have

3  been times even prior to that, even a year ago, where she

4  would gain, you know, 20-plus pounds in one direction and then

5  20 pounds in the other direction.  There were issues with her

6  legs where she had chronic edema.  She had infections.  So the

7  medical staff were actively involved in her care and was

8  constantly dealing with certain issues.

9        But with something like congestive heart failure, you

10  will have your good days and you will have your bad days.

11  There isn't a point where you are going to be cured of

12  congestive heart failure.  There's not a point where you're

13  cured of diabetes.  And so these things over time do build up,

14  and there aren't -- you know, it's unfortunate, but regardless

15  of a prison setting or in a community setting, or even in a

16  hospital setting, people do succumb to the risk factors over a

17  long period of time.

18  Q    And do you believe that Ms. Liberato had advanced

19  congestive heart failure?

20  A    Yes.

21  Q    And do patients with advanced congestive heart failure,

22  Doctor, tend to have times when they retain more fluid and

23  don't retain more fluid; they have weight fluctuations like

24  she had?

25  A    Yes.  And that's why she was prescribed the medication

1    called Lasix.  That is -- essentially, you pee out the excess

2    fluid of the body.  But one of the areas, looking at it, if

3    she wasn't taking that medication or her heart medications, it

4    could have created a worse exacerbation of those conditions.

5    Q    Now, let me ask you to focus on Ms. Niece.  Can you tell

6    the Court whether you believe, based upon your review of

7    Ms. Niece's clinical medical records, whether the care that

8    was provided to her at Fluvanna was appropriate?

9    A    Yes.

10   Q    And you believe that to a reasonable degree of medical

11   probability?

12   A    Yes.

13   Q    Can you please tell the Court why you hold that opinion?

14   A    So Ms. Niece died of a saddle pulmonary embolus.  And

15   this is a large blood clot that basically, 99 percent of the

16   time, will kill somebody right there and then.

17          The reports colloquially is somebody gets off an

18   airplane, they collapse, die.  Those are what typically

19   happens is a saddle pulmonary embolus.

20          So in this type of situation, Ms. Niece didn't have

21   any risk factors that would show that she had pulmonary

22   embolus.  She didn't have a previous deep vein thrombosis or

23   blood clot in the leg.  She didn't have a previous PE or was

24   put on any anti-coagulation medication.  No recent

25   immobilization, travel, or surgery, or on hormone replacement.

1    She did have a history of multiple sclerosis, but

2  that just marginally increases the risk.  But based on all of

3  her symptoms and conditions, when she was complaining of

4  shortness of breath and saying that it was really hot and her

5  heart rate was elevated, the reasonable conclusion would have

6  been maybe she was a little dehydrated.  And they actually did

7  recommend to drink plenty of fluids.

8    But as an emergency room physician, I can say

9  pulmonary embolus is one of the hardest diagnoses to make.  It

10  is up there with -- similar to aortic dissection, and with a

11  reason being that the symptoms are very, very vague.  And you

12  really -- the way to make the diagnosis in the emergency

13  department is to get a CAT scan of the chest.

14    And unfortunately, even if she got to the emergency

15  department, many times physicians might not order the CAT scan

16  of the chest because you have to have a high level of

17  suspension, because ordering a CAT scan also exposes a young

18  person like her, 39, to radiation which is a significant

19  amount of radiation.  So they have to make that decision.

20    And with a saddle pulmonary embolus, even if she was

21  just put on anti-coagulation and the clot broke off, she still

22  could have surpassed to a sudden cardiac death in the

23  hospital.

24    So even with all the symptomology and all the

25  conditions, the care was appropriate.  It's unfortunate what

1  happened, but this was a very difficult diagnosis.

2         MR. McNELIS:  Dr. Joshua, those are all the questions

3  I have at this point.  Thank you very much.

4         THE WITNESS:  You're welcome.

5         THE COURT:  All right.  You may cross.  Go ahead.

6                    **CROSS-EXAMINATION**

7  BY MR. HOWARD:

8  Q    Good morning, Dr. Joshua.

9  A    Good morning.

10 Q    Could you look at Exhibit 37, please?  That's the list of

11 your supplemental materials.

12 A    Yes.

13 Q    What's the first item listed there?

14 A    Contract letters to Armor and Mediko.

15 Q    And those are letters that were sent by DOC to those two

16 contractors.  Correct?

17 A    Yes.

18 Q    Are you aware that the date on those letters was

19 September 27, 2017?

20 A    I would have to review it again.

21 Q    So assuming that I'm correct, it's not true, is it, that

22 all the materials on the supplemental list were not available

23 when you first wrote your report?

24 A    So it was when it was sent to me.  So everything in my

25 actual report from 1 through 35 was what was sent to me by

1  email by counsel.

2  Q    That's not what I asked you, sir.  I asked you if it was

3  true that all the materials listed on this supplemental list

4  were unavailable at the time that you did your initial report?

5  A    So to my understanding, from 1 through 35 was what was

6  available to me.

7  Q    I didn't ask what was available to you.  I asked about

8  what was available.  Similarly --

9         MR. McNELIS:  Objection.  How could he possibly know

10  what was available?

11         THE COURT:  Well, you asked him that first.

12         MR. HOWARD:  Yes, you did.

13         THE COURT:  And he answered it.

14         THE WITNESS:  Again, to my understanding, 1 through

15  35 was all that was available.

16  BY MR. HOWARD:

17  Q    So DOC and Armor analysis of April 20, 2017, plaintiff

18  attorney letter, that was unavailable to you?

19  A    I -- if I don't know about it.  I mean, 1 through 35 is

20  what I knew about based on the emails that were sent to me.

21  Q    Okay.  You have made your point.

22         With regard to the equipment photos, do you have any

23  idea when those items actually got to Fluvanna?

24  A    I do not.

25  Q    Okay.  Would it come as a surprise to you if the facility

1   was in pristine condition and all the equipment was all shiny

2   and everything like that for purposes of your visit on

3   March 21?

4   A    I would find that very hard to believe, that they would

5   just do it for one day and just dress up the entire facility

6   for one day.

7   Q    You would find that hard to believe?

8   A    I would find that hard to believe.

9   Q    You made reference to cultural changes that you

10  attributed to Ms. Stanford and Ms. Katzman.  You don't have

11  any idea what the culture was like before March 21, do you?

12  A    The culture that I got was from reading all of --

13  everything from the settlement agreement and from all the

14  documents that I reviewed from 2012 and what all of the

15  allegations were.  So I had the picture in my head of what

16  that environment would be like and what the culture was.

17          And also with the problems with the retention in

18  staffing that there would have to be, just based on my own

19  experience at my own facility -- I do oversee 225 nurses --

20  and I do understand the challenges with recruitment and

21  retention of nursing staff, that similar issues could

22  potentially be there.

23  Q    Are you aware that Fluvanna was considerably understaffed

24  with regard to nursing as recently as January of 2018?

25  A    So I saw that in the reports, yes.

1  Q    And are you aware of Ms. Katzman's testimony yesterday

2  that they went from significantly understaffed in terms of

3  nursing to overstaffed in a period of five months?

4  A    Yes.  I saw that.

5  Q    Is there any reason, to your knowledge, why that couldn't

6  have been done sooner?

7  A    So again, I put this in my actual report, that there is a

8  fallacy in terms of even the staffing numbers.  It's really,

9  are the functions and the care provided to the inmates, is

10  that adequate and is it being done and are inmates having

11  access to care?  And so you could have these numbers, but it

12  really is, are those functions being done?

13        And so the way that the medical leadership under

14  Marsha and -- and I can only speak under their leadership

15  because my site visit was March 21.  It appeared that not only

16  was there significant changes with the way the culture was,

17  but also in terms of the processes and also continuous daily

18  improvement.

19  Q    Have you read Dr. Scharff's compliance monitor reports

20  from March 2016 through the present?

21  A    Yes, I did.

22  Q    And do you have any reason to conclude on the basis of

23  reading those reports that the staffing was adequate to meet

24  patient needs prior to very recently?

25  A    So based on how that was structured and based on

1 everything that was stated in the documents, he did state that

2 it was being understaffed.

3 Q    And as of the time that you rendered your report and were

4 deposed in this matter by Ms. Castaneda, my colleague, you had

5 only read the February 2018 report by Dr. Scharff.  Correct?

6 A    Yes.

7 Q    Was there any reason why you hadn't read the others prior

8 to that?

9 A    So I thought I read all of it.  The one -- I just got the

10 recent one where it was a draft form of Dr. Scharff's report.

11 So that was the only new report since the deposition.

12 Q    That, I don't believe, was what I asked you.  Is there

13 any reason why the reports between March 2016 and

14 February 2018 hadn't been reviewed by you in preparing your

15 report?

16 A    So I believe I reviewed all of them.

17 Q    You think that was your deposition testimony?

18 A    Yeah.  I believe that was.

19 Q    You made reference to -- oh, before I leave the photo

20 issue completely:  Have you seen the photos taken at Fluvanna

21 during Nurse Clark's visit?

22 A    No, I have not.

23 Q    Regarding Ms. Liberato's medical record review and your

24 opinions with regard to the sufficiency of her treatment, have

25 you seen the mortality review report prepared by Dr. Gable?

CROSS-EXAMINATION OF DR. ALFRED JOSHUA

1  A    Yes, I have.

2  Q    And you are aware, are you not, that there is a list of

3  points addressed under the topic "Discussion" at the end of

4  that report that, per Dr. Gable's testimony, identify matters

5  that he believes were opportunities for self-critical analysis

6  and improvement on the part of Fluvanna medical staff?

7  A    Yes, I am.

8  Q    Okay.  So you basically just discount or disregard

9  Dr. Gable's opinions with regard to the sufficiency of

10 Ms. Liberato's care?

11 A    So I think Dr. Gable spoke pretty well yesterday related

12 to that.  And I think this is the unfortunate part with

13 quality assurance.

14       In a hospital setting, quality assurance is pretty

15 protected.  Like, you have an M&M review and many of this

16 discussion happens.  But in a jail or prison setting, it's not

17 confidential.  So much of that quality assurance is now open

18 to the public.  So he is looking for ways on how to improve

19 the system, and that's how the system improves.  But you can't

20 say that there is no, let's say, quality assurance mechanism

21 in place, and then say because they are offering

22 recommendations on how to improve it, that basically that's --

23 you know, that the care is really bad.

24       That's part of the responsibilities of a physician

25 leader, to basically do that quality assurance.  So he was

1  doing his job.  And I think he eloquently said it yesterday in

2  terms of that respect.

3  Q    But it's not either/or, necessarily, is it?  I mean,

4  there can be opportunities for improvement, but there are also

5  problems or he wouldn't have identified them; isn't that

6  correct?

7  A    So based on that rationale, I think you can have a

8  settlement agreement at the Cleveland Clinic, the Mayo Clinic,

9  even Mass General, because basically all of that similar

10  information is being discussed in the hospital on any given

11  day.  And so based on that same logic, you would say there are

12  so many problems at every organization, every institution.

13        The real question is, is there systemic issues?  And

14  at Fluvanna, there wasn't systemic issues, based on my review.

15  Q    Dr. Joshua, you have expressed some opinions regarding

16  the "prescriptive" nature of some of the compliance standards

17  set forth in the settlement agreement; is that correct?

18  A    Yes.

19  Q    And it's your opinion that those provisions, because of

20  the way they are formulated, may hinder rather than actually

21  help the goals of the settlement agreement.  Right?

22  A    Yes.

23  Q    Okay.  Are you familiar with the Prison Litigation Reform

24  Act, Dr. Joshua?

25  A    Can you just explain what you are talking about?

1  Q    It's a federal statute that governs both the nature of

2  agreements that can be reached by parties with governmental

3  entities relating to corrections conditions and imposes

4  limitations on what federal courts can approve with regard to

5  types of agreements.

6        Do you have any knowledge of that?

7  A    So I have -- I have a general understanding, but I'm

8  not -- like, I haven't read it to that tee.

9  Q    So in critiquing the settlement agreement and its

10 provisions, you are not attempting to collaterally attack this

11 Court's view that the settlement agreement was appropriately

12 approved under the terms of the PLRA, are you?

13 A    So I'm not attacking that point.  What I'm stating is if

14 the goal is to improve the quality and care at Fluvanna for

15 the inmates, then you have to look at it in a very different

16 light.  You have to empower the leadership, provide them the

17 autonomy, and actually have -- I would say space out the

18 intervals for even when people are coming to do the checks,

19 because every three months is a very, very short period of

20 time.  And in the settlement agreement, there is no -- what

21 the timeline is to achieve certain things, there's no

22 priorities.  And I listed all of that in my report.

23        If this was any kind of other private entity, you

24 would go bankrupt, because you need to have priority, you need

25 to have timelines, and then you need to have reasonable checks

1  on what that timeline looks like.

2  Q    You've endorsed and would prefer the National Commission

3  on Correctional Health Care, NCCHC, standards to the standards

4  set forth in the settlement agreement.  Correct?

5  A    Yes.

6  Q    But didn't you acknowledge in your deposition that the

7  standards set forth in the settlement agreement with regard

8  to, for example, grievance procedure and the standards

9  articulated by the NCCHC are basically the same?

10 A    So there were aspects of the settlement agreement that

11 actually --

12 Q    It's a yes-or-no question, Doctor.

13 A    Well, I have to explain it, because it's not a --

14 Q    I'm sorry, you don't have to explain.

15        THE COURT:  Just answer the question.  Then explain

16 it.

17        THE WITNESS:  Okay.

18        So can you repeat that again?

19 BY MR. HOWARD:

20 Q    Yeah.  So the question was whether in your deposition you

21 didn't acknowledge, with regard to several standards set forth

22 in the settlement agreement, that you regarded to as quoted,

23 "prescriptive," that in fact the language is virtually

24 identical to the NCCHC standard?

25 A    Yes.

CROSS-EXAMINATION OF DR. ALFRED JOSHUA

1    Q    Okay.

2    A    So to clarify.

3    Q    You have answered my question.  Thank you.  If your

4    counsel would like to ask you to explain further, he may do

5    so.

6    A    Okay.

7    Q    And you also criticized Dr. Scharff for interpreting

8    compliance provisions in the settlement agreement in a

9    "arbitrary manner."

10         Do you recall that?

11         MR. McNELIS:  I'm going to object to this as beyond

12   the scope of direct.  He didn't levy one criticism against

13   anything in his direct examination, so I don't know how I've

14   opened the door to this.

15         THE COURT:  Well, he has expressed the broad opinion

16   that everything is going well, that everything is as good as

17   it could be.  So I think he can ask questions concerning how

18   he formulated his opinion.

19         MR. HOWARD:  Thank you, Your Honor.

20   BY MR. HOWARD:

21   Q    At your deposition, the example you provided with regard

22   to illustrating the arbitrariness of Dr. Scharff's analysis

23   was not anything said in his reports, but rather something you

24   were told at the prison during your visit about Dr. Scharff's

25   comment about the need for hot water in the laundry.  Correct?

1  A    Yes.

2         THE COURT:  Do stick to his testimony.  If he is not

3  offering opinions on a subject here today, there is no need to

4  try to cross-examine him about those.

5  BY MR. HOWARD:

6  Q    I guess my point, Dr. Joshua, was that on Exhibit 36,

7  which is the materials that you reviewed as of the time --

8  A    Yes.

9  Q    -- that you did your report, you list Dr. Scharff's

10 report for February 2018.

11        Do you see that?  That's Number 11, item 11 on that

12 Exhibit 36.

13 A    Yes.

14 Q    But Dr. Scharff doesn't say anything about hot water in

15 the laundry in that report, does he?

16 A    He does not.

17 Q    You also have expressed an opinion criticizing

18 Dr. Scharff for failing to recognize the significance of

19 American Correctional Association accreditation of Fluvanna in

20 December of 2017.  Correct?

21 A    Yes.

22 Q    Okay.  But you also acknowledged in your deposition

23 testimony that ACA accreditation does not say anything in

24 particular about either the appropriateness or timeliness of

25 medical care for patients; isn't that correct?

1  A    So that's why I stated that the NCCHC accreditation with

2  the ACA would fulfill many of what was really required in the

3  settlement agreement.

4  Q    So is that a yes with regard to the fact that ACA

5  standards don't say anything in particular about

6  appropriateness or timeliness of treatment for patients?

7  A    It is not particularly focused on medical care.

8  Q    Okay.  So why should Dr. Scharff have given credit to

9  Fluvanna for ACA accreditation?

10 A    Because -- so the medical areas in a jail or any prison

11 doesn't operate in silo.  They work with the support staff and

12 the security component.  So you also want a standard there

13 with the correctional staff to basically be able to have the

14 environment so that an effective medical program can be in

15 effect, in terms of access, in terms of the resources.

16        And so ACA provides baseline level resources, but --

17 actually, baseline level standards on the correctional side

18 that significantly impact medical.  So NCCHC is much more

19 focused on medical and mental health, and that's why I felt

20 the collaboration between the two and having both would

21 actually significantly improve and create objective standards

22 going forward.

23 Q    Do you know how long Fluvanna has been ACA accredited?

24 A    I believe in the 2000s is when they started.

25 Q    Okay.  So that was before this lawsuit started in 2012.

1  Correct?

2  A    Yes.

3  Q    And before Judge Moon rendered his opinions with regard

4  to deliberate indifference to medical care in 2014.  Correct?

5  A    Yes.

6  Q    And before the settlement agreement was reached.

7  Correct?

8  A    Yes.

9  Q    Okay.  With regard to NCCHC accreditation, are you aware

10  of any correctional institutions around the country that are

11  NCCHC accredited, but nevertheless have been found by courts

12  to have engaged in the provision of unconstitutional medical

13  area?

14  A    Not that I'm aware of.  I know of a number of places that

15  they've gone into a consent decree and then they subsequently

16  have gotten the accreditation.

17         MR. HOWARD:  I have nothing further, Your Honor.

18         THE COURT:  All right.

19                    **REDIRECT EXAMINATION**

20  BY MR. McNELIS:

21  Q    Real quickly, the ACA accreditation is broadly focused on

22  the overall mission of correctional facilities.  Correct?

23  A    Yes.

24  Q    There is a medical component to that accreditation?

25  A    There is, but the surveyors are not medically trained.

1  Q    Now, with the NCCHC that you are talking about, that is a

2  medically focused certification looking solely at the medical

3  aspects of the facility?

4  A    The medical, mental health, and dental.  Yes.

5  Q    And Dr. Joshua, just to respond to a comment the Court

6  made, it is not your testimony, is it, sir, that everything is

7  as good as it could be at Fluvanna, is it?

8  A    No.  There were significant improvements made from the

9  time of this settlement agreement.

10  Q    And based upon your review of all the evidence in this

11  case having sat through several days of this trial, is it your

12  belief to a reasonable degree of medical certainty that

13  improvements will continue?

14  A    Agree.

15  Q    And do you believe that the timetable that they are on is

16  appropriate, given the terms of the settlement agreement?

17  A    Yes.

18        MR. McNELIS:  Thank you very much.

19        THE COURT:  All right.  Thank you, Doctor.  You may

20  step down.

21        We will take about a ten-minute recess.

22        MS. CIOLFI:  Your Honor, if I may, there is just one

23  quick thing.  The plaintiffs had asked that Ms. Tina Miller be

24  transported this morning in anticipation of calling her in

25  rebuttal.  And the plaintiffs have since concluded she will

1  not be needed for rebuttal.  And we would ask with Your

2  Honor's permission, if she -- she's been in the holding cell

3  all morning -- if she could come into the courtroom for the

4  remainder of the day.

5          THE COURT:  All right.

6          MR. McNELIS:  She's not a witness, you said?

7          MS. CIOLFI:  She's not going --

8          MR. McNELIS:  Certainly no objection on our part.

9          MS. CIOLFI:  Thank you, Your Honor.

10         THE MARSHAL:  All rise.

11     (Recess taken from 11:48 a.m. until 11:59 a.m.)

12         THE COURT:  Your next witness.

13         MS. LONDOS:  The defense calls Deputy Director Scott.

14     **N.H. "COOKIE" SCOTT, DEFENDANT'S WITNESS, SWORN**

15                    **DIRECT EXAMINATION**

16 BY MS. LONDOS:

17 Q    Please state your full name for the record, please.

18 A    It's N.H. "Cookie" Scott.  That's S-C-O-T-T.

19 Q    And your current position with the Virginia Department of

20 Corrections, please?

21 A    I'm deputy director for the division of administration.

22 Q    Could you please recite your educational history,

23 starting in college, and your professional history through

24 today to give the Court an understanding of what brought you

25 to this position today?

1  A    I am actually the first African-American graduate of

2  Longwood University.  I graduated with a degree in sociology

3  with a concentration in social welfare.

4         After college, I went to work at the University of

5  Virginia Medical Center.  I worked on the psychiatric ward for

6  about 13 months, at which point I was hired as a probation

7  officer with the 16th Judicial District here in

8  Charlottesville.  I worked from '73 to '76 as a probation

9  officer, and I was promoted to probation supervisor with the

10  Court.  In '77, I became acting director for the Court, and

11  then promoted to court service unit director in 1978.  And I

12  worked in Charlottesville.

13         I was responsible for the City of Charlottesville and

14  eight surrounding counties for probation services, domestic

15  relations issues.  And then I was promoted to human resources

16  manager for the Department of Corrections.  I moved to

17  Richmond to our headquarters building.  I remained in human

18  resources until 2002, at which point I was promoted to deputy

19  director for the division of administration.

20  Q    And that was in 2002?

21  A    That was in November of 2002.

22  Q    Did there come a time when the division of health

23  services for the Virginia Department of Corrections came under

24  your line of supervision?

25  A    Yes.  In November of 2014, the director had been doing --

1  Director Clarke was appointed director.  At that point in

2  Virginia in 2010, he began his assessment of the department,

3  how the operations worked in the agency, and in 2014 decided

4  that health services would be placed under the division of

5  administration.

6          Prior to that, it had been under the division of

7  administration until 2002.  When the then-deputy decided to

8  move to operations, he wanted to take health services with him

9  because he had a particular interest.  That remained with that

10 deputy until he retired, and then Director Clarke did his

11 assessment of the agency and decided that health services

12 should have been under administration because it manages the

13 support functions for the organization.  And so it was

14 returned to the division of administration.

15 Q    And that was in November 2014.  Correct?

16 A    That is correct.

17 Q    Thank you.  Deputy Director Scott, I would like to ask

18 you some questions about the 2015 Armor contract.  Are you

19 familiar with that contract?

20 A    Yes, I am.

21 Q    Okay.  And do you have personal knowledge as to how the

22 staffing component of that contract was crafted?

23 A    Yes, I do.

24 Q    Can you -- and let me begin:  That Armor contract has

25 been discussed.  Is that simply for Fluvanna, or is it for

1  multiple facilities in Virginia?

2  A    That was for, at one point, 17 facilities in Virginia.

3  Powhatan was one of those.  We changed the process -- I'm

4  sorry.  That was for 17 facilities.  We changed that process,

5  and now I think there are 16 that are covered by the contract.

6  Q    How was the staffing component at Fluvanna of the Armor

7  contract in 2015, how was that crafted and arrived at?

8  A    Fred Schilling, who was our health services director at

9  that time, led the process for looking at the staffing.  It

10  was his responsibility to do the staffing component of the

11  contract.

12       He did a task analysis, which is normally what one

13  would do when looking at how to staff a unit.  Based on that

14  task analysis, he brought in some -- well, he brought in some

15  other folks.  He brought in some other health professionals,

16  some nurses, some senior nurses in the department.  They were

17  a part of the process, and they looked at other facilities.

18  They looked at male facilities but certainly are aware that

19  women have much different health care needs.  And so I knew

20  that that was just the basis of comparison, that certainly

21  we're not going to staff a female facility in the same way

22  that they staffed the male facility.

23       So they looked at ratio also, looked at how many

24  people would be offering services to a particular group of

25  people.  They looked at the tasks.  They looked at sick call.

1  They looked at chronic care.  They looked at med pass, how

2  those things are impacted by staffing.

3  Q    And are you familiar with Mr. Schilling's credentials in

4  terms of his experience in doing these similar type analysis?

5  A    Mr. Schilling, Fred Schilling, came to the Department of

6  Corrections from a nursing home -- with a nursing home

7  administrator background.  So he had a great deal of knowledge

8  regarding staffing.  But at that point, he had also been with

9  corrections for 20 years, so also had experience with staffing

10  in corrections.

11  Q    Do you know if the analysis that went into crafting the

12  staffing component of the -- for staffing in the Armor

13  contract for Fluvanna also considered trends in health care

14  and those types of issues?

15  A    So, yes.  It looked at -- task analysis is certainly a

16  big component of looking at staffing.  So he was looking at

17  how many people we needed to do what, but also he's projecting

18  for the future.  So he looks at what the national trends are.

19       I know that we had a discussion at one point

20  regarding drug issues.  We talked about heart disease, cancer.

21  I think the script had flipped.  Cancer had been the leading

22  cause of issues among women, with heart disease second.  We

23  considered that that had actually flipped, and heart disease

24  became the number one issue, health issue, facing women, and

25  cancer second.

1     We looked at what's happening in our own agency.  I

2  mean, that's an indication of what we can anticipate in other

3  facilities as well.  So all of those things came into play as

4  we were talking about staffing.

5  Q    And the settlement agreement at issue in this hearing was

6  also in play at that time.  Correct?

7  A    Fred Schilling was a major player in our discussions on

8  the settlement agreement.  Certainly aware of that, aware that

9  we were going to need to look at staffing somewhat differently

10  just based on the settlement agreement because we were going

11  to be asked to do certain things.

12  Q    Could you address briefly the issue of liquidated damages

13  under the contract and the relationship between full-time

14  employees versus agency employees?  Because I think that's

15  been a little -- that's been, perhaps, lost in some of the

16  conversation this week.

17  A    And it's really sort of an interesting situation, because

18  under the contract, the full-time employees need to be on

19  their payroll.  However, with Armor, I know that they staffed

20  with agency nurses because they had some difficulty attracting

21  full-time staff.  They can be penalized for the agency nurses.

22  Despite the fact that they may be fully staffed, they may be

23  penalized because there are not full-time employees on their

24  payroll.

25  Q    On Armor's payroll?

1  A    On Armor's payroll.  Correct.

2  Q    As deputy director in 2015 when this Armor contract went

3  into effect, what was your belief, what was your opinion, as

4  to the adequacy of the staffing in the Armor contract at the

5  time it was entered in the fall of 2015?

6  A    I absolutely believe that it was adequate, because I

7  believe that Mr. Schilling had looked at not only what was

8  going on with the Department; I think he had taken into

9  account the settlement agreement.  I think he had looked at

10 what was going on nationally in terms of health care.

11       And the contract is structured such that it is

12 minimum staffing.  This is what we minimally need to do to

13 address health care needs.  That does not mean that Armor

14 could not bring on other people if they needed to do that, but

15 it also did not mean that they could not come back to us at

16 some point to say that it was inadequate and that they wanted

17 more staff.  That's the side part of a contract modification.

18 They can come back and modify or request to modify the

19 contract.

20 Q    Were you involved in the discussions and the drafting and

21 the crafting of the settlement agreement at issue before the

22 Court today?

23 A    I was a part of that process, yes.

24 Q    Can you expand on that what your involvement was?  For

25 instance, did you have conversations with Dr. Scharff?

1  A    We had conversations with Dr. Scharff.  Dr. Kohl, who I

2  believe is a practicing physician in Nebraska, was a part of

3  that process.  We had discussions regarding whether or not we

4  would comply with ACA standards, whether or not it would be

5  NCCHC standards, looking at our own policies and procedures.

6  So a number of discussions regarding the process.

7  Q    Would you say you were part of the VDOC team that was

8  involved in the drafting of the settlement agreement?

9  A    Yes, I was.

10  Q    Okay.  And your involvement -- or your communications

11  with Dr. Scharff during the process of drafting the settlement

12  agreement and the VDOC, learning and kind of having an

13  understanding of what the settlement agreement actually meant,

14  were you involved in those discussions?

15  A    Yes, I was.

16  Q    Based upon your involvement in the crafting of the

17  settlement agreement, the drafting of the settlement agreement

18  and all of the -- and let's just back up.

19        There were a fair number of meetings that went into

20  that process.  Correct?

21  A    That is correct.

22  Q    Okay.  Is that perhaps an understatement?

23  A    Yes, that's an understatement.

24  Q    Okay.  Based upon your involvement in the crafting of the

25  settlement agreement and specifically your communications with

1 Dr. Scharff, what was your expectation as the deputy director

2 of VDOC as to how long it would likely take for Fluvanna to

3 come into total compliance with the terms of the settlement

4 agreement?

5 A    From my perspective, I thought it would be three to four

6 years that it would take to do that.  Part of the --

7 Q    I was going to say:  Please explain why.

8 A    Okay.  Partly because I think staffing is an issue.

9 Attracting staff is a major issue.  We were looking at several

10 different areas.  I think as we look at compliance with the

11 settlement agreement, there were 22 areas that we were to work

12 on.  We knew that all of those things were not going to happen

13 in one day, one week, overnight.

14       We recognize that as staff turns over, things change.

15 And so we were looking at processes, assessing processes, and

16 fully expected that that was going to take some time.  And we

17 didn't expect that everything that got fixed one day would

18 remain fixed forever.

19       When you are dealing with people and you are dealing

20 with personalities, things change.  As we bring on different

21 people, the training process is important.  And so those

22 things can have an impact on how we implement processes.

23 Q    Can you speak to how your communications and your

24 discussions and conversations with Dr. Scharff during the

25 settlement process -- not specifics, but generally -- how that

1  played into your expectation that this would be a multiyear

2  process?  I think you said three to four years?

3  A    Yes.  Well, I think both -- just from conversations with

4  Dr. Scharff and Dr. Kohl, the expectation was that this was

5  going to take some time.  And so as we were talking about

6  that, we looked at:  Are you making progress?  Are things

7  happening?

8         MS. CASTANEDA:  Your Honor, can we just pause the

9  Court for a minute?

10        THE COURT:  If she needs to be removed, that's okay.

11 Take your time.

12        I think what we will do now is just take our lunch

13 break right now and try to come back at 20 minutes after 1:00,

14 if possible.

15     (Lunch recess taken from 12:15 p.m. until 1:19 p.m.)

16        THE COURT:  All right.  You may resume.

17        MS. LONDOS:  Thank you, Your Honor.

18 BY MS. LONDOS:

19 Q    Ms. Scott, just before lunch, you were beginning to

20 testify about the rationale for your expectation that it would

21 take three to four years for Fluvanna to meet total compliance

22 with the settlement agreement.

23        Do you recall that testimony?

24 A    Yes.

25 Q    Okay.  And could you explain why that was your thought

1  process in February 2016 when the settlement agreement was

2  accepted by the Court?

3  A    Yes.  As I started to mention, there were parts of the

4  settlement agreement that required staffing.  So we needed to

5  look at having the right people in the right places making

6  decisions about how we move forward with the settlement

7  agreement.  There were 22 other requirements.  Those were

8  things that we knew we needed to work on over time.  And as I

9  mentioned, I think before we recessed, is that people do not

10 remain in one place all the time.  And so we are always

11 training.  We are always trying to ensure that our

12 expectations are communicated to all staff.

13        Given the size of Fluvanna, we can expect turnover in

14 security, expect turnover in our health care staff, expect

15 turnover in administration.  We're having to go back time and

16 again to ensure that everybody understands what the

17 expectations are of them.  And so those -- some of the things

18 that we looked at also would require money.  So we were

19 looking at whether or not we were going to have to go back to

20 the legislature to ask for any additional monies.

21        So it's not a thing that I think happens immediately.

22 We work on those things.  We take some steps forward.  Some

23 things get sidetracked because of staffing.  So it really is a

24 long haul.  And as we look at what happens in our other

25 facilities, it's very similar.  It's that everything is not

1  perfect every day.  Everybody who is supposed to be there is

2  not there every day.  So it does take some time for things to

3  get accomplished.

4  Q    Can you speak to the conversations that VDOC had with

5  Dr. Scharff during the drafting of the settlement agreement

6  that related to the concept or idea that this was going to be

7  a multiyear process to reach full compliance?

8  A    Well, throughout the discussion, there were conversations

9  with Dr. Scharff, Dr. Kohl, about how long some of this would

10 take.  And I think they were talking in the four- to

11 five-year --

12           MS. CIOLFI:  Objection.  This is hearsay.  Hearsay,

13 Your Honor, what they said about how long it would take.

14           THE COURT:  No, she is talking about her thought

15 process and what went into it.  So with that --

16           MS. CIOLFI:  Okay.

17           THE COURT:  -- purpose, it's admissible.

18           MS. CIOLFI:  Including the conversation with

19 Dr. Scharff about --

20           THE COURT:  Well, if that went into her thought

21 process, anything that might have happened around her, if it

22 had an effect on it.

23 BY MS. LONDOS:

24 Q    Ms. Scott, you also mentioned before lunch -- and I don't

25 think you expanded on it, so I'm asking you to expand on this

1  testimony now -- the concept of the time it takes to change

2  culture.  And can you also, in your answer, discuss your

3  experiences with change in culture at VDOC over the decades

4  that you have been there?

5  A    Okay.  Well, I've been around in corrections for 40, 45

6  years.  And we're talking about an organization that is

7  statewide.  It -- we have today about 12,000 employees.  We

8  were a law-and-order organization for a long time.  And that

9  needed to happen.  That's not a criticism of our department.

10 We need to get control to make things change.

11        Once we establish that, we understand what it is we

12 need to accomplish in terms of security, then I think we have

13 an opportunity to have a culture change.  And with Director

14 Clarke's appointment, we started looking at reentry.  We

15 started looking at a different Department of Corrections.

16 Director Clarke started talking about a healing environment.

17        We started looking at evidence-based practices, so

18 really looking at the science of corrections, not just doing

19 the things that feel good or doing the things that somehow in

20 our gut we think work.  We are looking at:  Is there true

21 evidence out there?  Are there things that we have seen

22 working?  Is there data to support that?  And so that takes

23 time.

24        And it takes time to -- particularly at Fluvanna, we

25 had adversarial relations.  We have an adversarial

## DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

1  relationship.  And we understand that offenders are going to

2  need to trust us.  We need to give them a reason for doing

3  that.  We are going to need to trust them.  We can make

4  changes with them.  And making that happen takes time.  That

5  does not happen immediately.

6  Q    When did Director Clarke join the VDOC?

7  A    In November of 2010.

8  Q    Okay.  And he came from Massachusetts.  Correct?

9  A    He came from Massachusetts, yes.

10  Q    You used the term "reentry."  So the record is clear,

11  what is reentry?

12  A    Reentry, from our perspective, is helping the offenders

13  learn what they need to learn, develop skill -- both

14  interpersonal skills, learn job skills, learn ways of dealing

15  with conflict, learn those ways that will make them successful

16  when they return to the community; that they can access a

17  legitimate economy; that they know how to deal with the public

18  safety arena.

19         Many of them are going to be under supervision.

20  There will be expectations for their behavior and their

21  performance under supervision.  But what we want to do is

22  ensure that they do not return to the Department of

23  Corrections.  And having said that, that's one of the things

24  that we have been achieving some success with in the

25  Department of Corrections.

DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

1    We are number one in the country for the second year

2  in a row in terms of recidivism. Our recidivism is

3  22.4 percent. There are states in the country that their

4  recidivism -- meaning those people who are returning to

5  incarceration -- is as high as 60, 62 percent. But we are at

6  22.4 percent. And that's because we are preparing offenders

7  to reenter society.

8  Q    Can you tie that into health care, and specifically

9  health care at Fluvanna, as a component of reducing the

10 recidivism and enhancing reentry into the community?

11 A    Again, I think it's much the same thing. It's helping

12 people learn to take care of themselves. It's helping them

13 learn to access the process.

14    We're holding people accountable. That's one of the

15 things that's very important in looking at how we are helping

16 people to reenter society, having that healing environment in

17 our institutions. We are asking people to be ethical. We're

18 asking people to be respectful. We ask that. And if you read

19 the definition of our healing environment, you will see that

20 it says helping people do this. So it's not just the

21 offender, but it's our staff as well.

22    So it really is helping that engagement with people

23 in authority. It's helping that engagement to learn how that

24 engagement occurs. And we need to do that with offenders.

25 They do not need to see us as the bad guys.

1  Q    That culture change that you're discussing was a part of

2  what Director Clarke brought in when he came to VDOC?

3  A    That is correct.

4  Q    Okay.  And did you consider that a significant element to

5  the settlement agreement?

6  A    Absolutely.  Absolutely.  The settlement agreement asks

7  us to look at our engagement with offenders as it relates to

8  their health care.  That absolutely impacts how that's a

9  healing environment.  And not healing just in terms of health

10 care, but healing in terms of engagement.

11 Q    When you arrived at the conclusion in your mind in

12 February 2016 when the Court entered the settlement order that

13 this would be a three- to four-year process, was that based

14 upon what you had seen in the Department of Corrections over

15 the past -- since Director Clarke's arrival?

16 A    Well, I think it's the history of -- it's not just the

17 Department of Corrections.  As you look at culture change, it

18 takes time.  It is not something that happens overnight.

19 Certainly, we've seen it with other things that we've

20 attempted to accomplish in the department.

21      But I think, just looking at my management

22 background -- I mean, we have tried to do some other things in

23 the department, and they just take time.  It takes time

24 because of distance, it takes time because of numbers, and it

25 takes time just because we are a public safety organization.

1  Q    And I'm not going to ask you for specific numbers, but

2  sort of what -- the size of the Fluvanna population, is that

3  one of the -- where does that fit in VDOC, the 44 facilities,

4  in terms of the -- it's the women's prison?

5  A    We are responsible for more than 30,000 offenders at any

6  given time.  Fluvanna represents 1,200 of those.  So we are

7  responsible for health care for 30,000 people.  We have 1,300

8  or so leaving or -- pardon me, 13,000 leaving at any one time.

9  So we are dealing with a lot of offenders, a lot of facilities

10 who have very complex health systems as well.

11 Q    And the Court has heard a fair amount of evidence this

12 week about Fluvanna.  There are three things I don't think the

13 Court has heard of, and if you could give just sort of a brief

14 explanation for what's going on at Fluvanna with the wellness

15 program, the yoga program, and the horticulture program?

16 A    Well, I -- and I have to give kudos to our warden there.

17 Warden Aldridge has really tried to change the culture in ways

18 that are very different than we have been in the past.  He is

19 looking at -- in fact, he did a presentation, as a matter of

20 fact, as a part of a training program for the Department of

21 Corrections looking specifically at women's issues,

22 recognizing that women offenders are very different than men

23 and how we interact with those offenders should be very

24 different than how we interact with men.  And so he has looked

25 at wellness programs.

1    In fact, he talked with me one day about providing

2  additional funding so that he could make sure that they have

3  recreation.  I have not seen the finished product, but he

4  revamped the gym so that it's not just basketball.  That's

5  something that's probably more important to men than it is to

6  women; to get some exercise equipment in there.

7    He also had a volunteer who was teaching yoga there.

8  He lost that person and spoke with me about additional

9  funding, which I absolutely supported, so that we can continue

10 that process for women.

11 Q  The Court has heard a fair amount of evidence this week

12 about the difficulty in recruiting staff at Fluvanna.  And I

13 don't want to rehash what the Court has already heard, but

14 there are some different angles I would like you to discuss.

15    And that is the location of Fluvanna being in between

16 Charlottesville and Richmond.  Has that been an impact on

17 recruiting for really any staff, including medical staff,

18 vis-a-vis or in comparison to some of your more rural

19 institutions?

20 A    Well, let me begin with, before talking about

21 geographically where it's located, just talking about

22 recruitment for corrections specifically.  It takes a very

23 specific personality, a personality who wants to come work for

24 corrections.  Giving up your freedom when you walk inside that

25 facility, when the doors start to lock and you're not the one

1   in control of the doors, that's a very different environment.

2   And so it takes a very -- the right individual, the right

3   personality, to want to do that.

4        One of the things that we found with younger people

5   who are very engaged with their electronics, with their cell

6   phones, with their iPads, with their laptops, they are not as

7   interested in coming into a place now where those things,

8   essentially, they don't have access to.  That impacts how we

9   are able to recruit people.

10        I will talk specifically about health care.  Anywhere

11  around the country as you are looking at health care, they are

12  having difficulty recruiting nurses, recruiting physicians.

13  And we are certainly no different in corrections.  In fact, my

14  perspective is that it's even more difficult in corrections

15  because it's not the ideal work environment.  So we have those

16  issues.

17        And in terms of geography, at Fluvanna in particular,

18  we are competing with two hospitals.  We are competing with

19  doctors' offices.  We are competing with folks who have the

20  opportunity to offer greater compensation.  They have the

21  opportunity to offer greater benefits; not just salary, but

22  even more than that.  They can offer different scheduling.

23  And we compete with some places that will allow you to work

24  over the weekend and you get paid for a week, will allow you

25  to work 32, 36 hours and get paid for 40 hours of work.  Those

1  are -- some of those things are not things that we are able to

2  do in the Commonwealth, because we don't control those

3  internally in the Department of Corrections.

4         THE COURT:  Well, but the Commonwealth controls

5  those.  Right?

6         THE WITNESS:  The Commonwealth does control those.

7         THE COURT:  The Commonwealth runs this prison.

8         THE WITNESS:  Yes.  And they have been the -- well,

9  the Department of Corrections is one of the agencies of the

10  Commonwealth; that is correct.  And so we have been making our

11  case with the agencies of the Commonwealth to try and change

12  things.

13         In fact, one of the things that we have been able to

14  convince the Department of Human Resource Management -- that's

15  an agency outside the Department of Corrections -- is that we

16  needed to offer more money to attract a medical director.  So

17  we have the highest salary for a state compensation for a

18  medical director.  We have been asking them to provide

19  supplements for our nursing staff that are over and above what

20  most other nurses are earning in the Commonwealth.  So some

21  changes are happening.

22         We have talked with the legislature.  We have talked

23  with the Department of Planning and Budget.  And the director

24  continues to make his case to the legislature that some things

25  need to change in terms of funding, and they are listening.

DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

 1          So, yes, that is controlled by the Commonwealth and

 2   some things are changing.  It's just not controlled internally

 3   to the Department of Corrections.

 4          THE COURT:  Okay.

 5          THE WITNESS:  Yes, sir.

 6   BY MS. LONDOS:

 7   Q    Are private contractors like Armor able to be more

 8   creative in some of the compensation packages?

 9   A    They are not only able to be more creative, they can

10   offer higher salaries than we can.  They can bring on staff

11   much more quickly than we can.  We have some approval

12   processes in the Commonwealth for filling positions.

13          Again, it is a way to control budgeting, but we have

14   to get approvals before we can fill some positions.  We have

15   to advertise.  It has to be a competitive process.  So we

16   cannot have any process that looks on its face to be

17   discriminatory.  So we have to advertise for a certain period

18   of time.  And those things are different than a private

19   contractor who can bring on people as they choose.

20   Q    Thank you.  Ms. Scott, I would like to bring us back to

21   February 2016 when the Court entered the order approving the

22   settlement agreement.  And I think we have established earlier

23   you were very much a part of that process.  Correct?

24   A    Yes.

25   Q    Am I correct that you were designated immediately thereon

1  for being responsible for taking the immediate steps to

2  implement the settlement agreement?

3  A    Because health services reported to me, yes, I was

4  responsible.

5  Q    Okay.  And then you were involved in the national search

6  for a new director of health services.  Correct?

7  A    Back in 2015, when I received notice that Fred Schilling,

8  who was the health services director, was retiring, I

9  advertised the position.  I interviewed several people for the

10  position, decided that they were not what I was looking for in

11  terms of qualities to both manage the settlement agreement but

12  manage health care across the department.

13        I readvertised the position, did a nationwide search,

14  engaged the American Correctional Association as well, seeking

15  candidates for that position.

16  Q    And that position was director of health services.

17  Correct?

18  A    That position is director of health services.

19  Q    And was it your intention when that position was filled,

20  that person would be tasked with implementing the settlement

21  agreement, or being the point person, I should say?

22  A    That was one -- that was a major function.  And it's

23  something that I asked about in the interview, what the

24  background and skills were of the person who would take over

25  that position.

1   Q    And after a national search and then readvertising for

2   it, did you have a candidate?

3   A    Yes.  We hired a Virginian at that point, Dr. Steve

4   Herrick, who at that point was working at Piedmont.

5   Q    And in hiring -- was hiring Dr. Herrick part -- one

6   aspect of what VDOC was doing to implement the settlement

7   agreement?  Hiring somebody competent with experience to

8   execute?

9   A    Yes, it absolutely was.  In fact, I asked, as I said,

10  specific questions about implementing the requirements of the

11  settlement agreement.  Dr. Herrick testified to his --

12  testified; pardon me -- interviewed.  And he answered

13  questions related to the Department of Justice working with

14  issues at Central State Hospital and how he had managed that

15  process.  So his background and his skills were very much what

16  we were looking for to manage the settlement agreement at

17  Fluvanna.

18  Q    Did you talk to references and others in the community

19  about Dr. Herrick to establish his credentials and his skills

20  before hiring him?

21  A    Yes, I did.  In fact, for -- our background unit usually

22  does the background study for candidates for positions.   In

23  this case, I made the reference checks myself for

24  Dr. Herrick's position.

25  Q    And the response was?

DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

1 A    They were excellent.  I talked with an assistant

2 commissioner at Piedmont who had excellent things to say for

3 him.  In fact, I have folks on my staff in the Department of

4 Corrections who actually worked for and with Dr. Herrick, who

5 also had excellent things to say about his background.

6 Q    Now, Dr. Herrick didn't arrive at VDOC until March 2016.

7 Correct?

8 A    March 25 was his hire date.

9 Q    So before he arrived, were you the, for lack of a better

10 term, point person for the settlement agreement?

11 A    I was the point person for the settlement agreement.  We

12 did have an acting health services director, who is

13 Dr. Fuller, who was responsible really for managing

14 administrative processes, but I took responsibility for the

15 settlement agreement at Fluvanna.

16 Q    And did you have a series of meetings from February to

17 May 2016, so for the first, say, about four months after the

18 Court entered the order, laying out the VDOC plan for

19 executing the settlement agreement?

20 A    Actually, the first meeting was before the Court entered

21 the order.  And I took a team of our unit heads, so had senior

22 and executive staff of the Department of Corrections.  There

23 were 30 to 35 of them at any given time.

24        It was my plan to ensure that everybody understood

25 what the settlement agreement said.  Looking at -- critiquing

1  our agency, looking at what we needed to do, how we needed to

2  function, to ensure that we accomplished what was required in

3  the settlement agreement.

4  Q    Now, Ms. Scott, I have put in front of you, or it has

5  been put in front of you, Exhibit 14 that has already been

6  entered into evidence.  And I'm going to ask you a few

7  questions about the documents.

8         And Exhibit 14 is a series of meeting minutes that

9  stretch for a long period of time.  I'm going to start with

10 Exhibit 14.  It's under Tab 1, RFP 4-831.

11 A    Yes.

12 Q    Do you see that document?

13 A    Yes, I do.

14 Q    Okay.  And are you familiar with that document?

15 A    Yes I am.

16 Q    Okay.  And is that a 15-page document?

17 A    Yes.

18 Q    Okay.  And we are not going to go through all 15 pages,

19 but I will again reference for the record it's Exhibit 14.

20 It's under Tab 1.  It begins at RFP 4-831.

21        What is this document?

22 A    We had the operations manager at Fluvanna capture the

23 essence of the meeting we had on February 3 of 2016.  What I

24 asked people to do is talk about what we needed to do to

25 implement the settlement agreement, to talk about what our

1  deficiencies are, what our strong points are.  Do we need to

2  continue exactly as we were going?  Did we need to do

3  something different?  I think we began the discussion at that

4  point.  Do we want to take over Fluvanna?  That was part of

5  the discussion.  Do we want the Commonwealth to provide health

6  care at Fluvanna?  Do we want to continue with Armor and

7  continue with Armor as-is?

8          I think we began the discussion at that point of a

9  hybrid model as well so that we are the responsible parties on

10 the ground -- we are the responsible parties overall, but on

11 the ground at Fluvanna -- and use Armor as a staffing agency.

12 So we were looking at all the -- what's in the best interest

13 of Fluvanna at this point that gets us to accomplishing the

14 things that are in the settlement agreement.

15 Q    And did that involve a self-critical analysis?

16 A    It absolutely did.  We not only criticized ourselves, we

17 criticized Armor.  We were looking for, what are those things

18 that are going to create issues for the Department of

19 Corrections?  What are those things that are going to create

20 issues for the delivery of health services?

21 Q    Is it fair to say that the point of this document,

22 documenting the meeting of February 3, 2016, was to try and

23 put down everything that was working less than perfectly?

24 A    It was not just what wasn't working, but what is working.

25 What can we build on?  So it's a number of things.  It's

1  looking -- it's also looking at, how do we implement some

2  things?  What do we need to do?

3  Q    And if we could just flip through and -- let me ask you:

4  You said how many people were involved in this meeting, these

5  meetings?  Ballpark, not exact.

6  A    30 to 35 at any given time.

7  Q    And the Court heard earlier from Marsha Stanford.  Was

8  she involved?

9  A    Yes, she was.  We invited her as one of our really

10  productive nurses, high-performing nurses, to give some

11  critical feedback to us about what the processes were at

12  Fluvanna.  So she was critiquing service delivery.  She was

13  critiquing documentation.  She was looking at our processes to

14  make recommendations, yes.

15  Q    And she was HSA, health services authority, at Wallens

16  Ridge?

17  A    At Wallens Ridge State Prison, yes.

18  Q    And Wallens Ridge is located where?

19  A    It's located in Big Stone Gap.

20  Q    Okay.  And it has close to 900, 1,000 offenders?

21  A    Off the top of my head, I don't remember, but yes.  It's

22  a significant male institution.  It's one of our maximum

23  security facilities.

24  Q    Did you discuss -- and I'm looking on page 3 of that

25  report.  Was there a discussion about transitioning from LPNs

1  to RNs?

2  A    Yes.

3  Q    And so that was a discussion early on.  Correct?

4  A    That's correct.

5  Q    Was there a discussion about recruitment and hiring on

6  pages 4 and 5?  And again, I'll -- just to give the Court an

7  idea of the issues that were discussed.

8  A    Yes.  And those were specifically related to how we were

9  going to provide service under the different models.

10          So if we were to take over delivery of -- direct

11  delivery of services at Fluvanna, what did we need to do to

12  make that happen?  And so we looked at, how do we draw people

13  into corrections?  So we looked at job fairs, advertisements.

14  We looked at if we were going to do some contracts and not

15  others so that -- I mean, we have individual contracts, some

16  with physicians, some for dialysis, some for imaging.  Those

17  sorts of things.  So we started looking at what the issues

18  were.

19          You'll see we talked about sign-on bonuses and

20  referrals.  Can we entice some people to our agency by paying

21  them to come work for us?  Can we entice other people to

22  recruit for us by paying sign-on bonuses?

23          We talked about bringing in community stakeholders,

24  so looking at those people in and around Fluvanna County to

25  see what impact they would have on bringing people to the

1  facility.  We realized we had an image issue at Fluvanna, and

2  bringing in the stakeholders would help us do that.  So we

3  were exploring lots of different ways to make that happen.

4  Q    And on page 9, was there a discussion about a plan for

5  training?

6  A    Yes.  And what happened with this group of 30 is once we

7  start identifying those things that we would need to look at

8  if we were going to take over, but look at also in terms of

9  how we implement the settlement agreement.  Certain people

10 were given responsibilities for looking at some things.

11       Training was one.  We looked at recruitment.  We

12 looked at compensation.  So we looked at a number of things,

13 and there were leaders from that group who had subcommittee

14 meetings and making recommendations to us for how we proceed.

15 Q    So these meetings generated other action plans and groups

16 of people in their various areas of expertise?

17 A    That is correct.

18 Q    Okay.  And if I could direct your attention to page 13,

19 this is sort of, again, another summary of the different

20 strategies that -- and ideas that VDOC was exploring, I think

21 even --

22 A    That is correct.  Joe Walters is our human resources

23 director, and he and his staff were a part of this, along with

24 the human resources staff at Fluvanna.

25 Q    And the -- the final page of this report was -- well, can

1  you explain the final page of this report?

2  A    Okay.  What we wanted to do was identify those things

3  that we were concerned about.  And we got feedback from a

4  number of people.  The executive staff for Fluvanna was a part

5  of this process as well.  And so as we had the experts -- we

6  had the Marsha Stanfords of corrections.  We had the warden

7  from Fluvanna.  We had our regional nurses there who provide

8  some oversight in other areas.  So they were bringing

9  knowledge from other facilities about what was going on.  We

10 have a contract monitor there.

11        Those people were engaged in that discussion.  And

12 they were suggesting that we need to look at informal

13 complaints.  In fact, I did some specific training with staff

14 myself in that regard, because we did not like the way some of

15 the staff were responding to offender complaints.  It was not

16 creating a healing environment.  It was also not very helpful.

17 And so that was one of the areas that we wanted to address.

18        We wanted to address the pill line.  We tried

19 different things to address that.  Sick call, medications not

20 being received, chronic care; we knew we had issues in those

21 areas.  And we were talking about how we were going to address

22 those and talking with Armor.  Those are the things that we

23 wanted to address with Armor as we were moving forward in the

24 process as well.

25 Q    And then was the next time the group gathered on

DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

1    February 10?

2    A    That's correct.

3    Q    And just for the record, this is again Exhibit 14, Tab 2,

4    beginning at RFP 4-846.  And the document generated in

5    connection with that meeting was 18 pages long.  Correct?

6         I think the record will show it's 18 pages long.

7    A    Yes, that's correct.

8    Q    Thank you.

9    A    I had to get through 18.

10   Q    Right.  And this document, is it a continuation of the

11   meeting last week, identifying areas and coming up with action

12   plans for attacking each of those areas?

13   A    That is correct.  I asked people at the end of the

14   meeting on the 3rd to start thinking about how we do some of

15   the things that we talked about doing, what more information

16   we needed on some of the things that we had mentioned in that

17   meeting on the 3rd.

18   Q    Okay.  There is another reference to the LPN issue.  And

19   you are familiar with that issue.  Correct?

20   A    Yes, I am.

21   Q    You've had discussions, or you are aware of discussions,

22   with Dr. Scharff about the issues of LPNs doing certain tasks?

23   A    Correct.

24   Q    Okay.  I want to be very clear:  Can you advise or

25   testify to VDOC's position on that and then VDOC's reaction to

1  Dr. Scharff's recommendation that LPNs not be permitted to do

2  certain tasks?

3  A    Well, like all health care agencies, we were having

4  difficulty, or Armor -- I said "we," but Armor is part of us.

5  We certainly accept that we are collaborative in this process.

6  But they were having difficulty attracting RNs, just as we in

7  the Department of Corrections in the sites that we are

8  responsible for had difficulty attracting RNs to the

9  Department of -- to health services in the Department of

10  Corrections.

11         And so there were some things that LPNs were -- some

12  services that LPNs were providing services for in our

13  institution that Dr. Scharff took issue with.  He thought that

14  there were some things that RNs should be responsible for.

15  And in fact, I asked Dr. Herrick to investigate that issue,

16  because there was some question about whether or not nurses

17  were practicing beyond their licenses as LPNs.

18         And from the research that we had -- now, we

19  certainly don't think -- as the licensing agency, we don't get

20  to make that call, but our research indicated that they could

21  do what we had asked them to.  However, our position, which is

22  your question, is:  Then what do we do with that information?

23         We certainly did not get into any dispute with

24  Dr. Scharff about that.  If his position was that he wanted

25  RNs doing it, then that's what we were directing our people to

1  do.

2  Q    Okay.  And was that in your ongoing efforts to reach

3  total compliance with the settlement agreement?

4  A    That is correct.

5  Q    And that was your goal.  Correct?

6  A    Yes.  That is correct.

7  Q    As you were having these first few meetings that you've

8  discussed, did you continue to believe that this was going to

9  be a three- to four-year process to reach complete compliance?

10 A    Yes, I did.

11 Q    If I could direct your attention to page 15 of that

12 document.  That's RFP 4-861.  I just note -- I will wait.

13 A    Yes.

14 Q    The heading is "Incremental Process."  Is that consistent

15 with --

16 A    It's consistent with my thinking that this was going to

17 take some time.  But, again, it's my belief just based on my

18 history that things don't change overnight.  And we were

19 looking at, what things did we need to see to suggest to us

20 that things were changing and things were improving?

21 Q    Okay.  And I just -- the efforts in these early months to

22 address the terms of the settlement agreement, were they just

23 getting together every few weeks and have a meeting, or were

24 there people taking action and investigating and moving

25 forward on the items identified in these documents?

1  A    Absolutely.  And we continued some engagement with Armor

2  in this process.  So we were making recommendations to them

3  for things that we wanted to see, things that we suggested

4  change.  We were looking at ourselves as an agency about

5  things that we needed to do as well.

6           We got our senior staff out.  We had Dr. Fuller, who

7  is our chief pharmacist at Fluvanna, offering assistance.  I

8  think we asked for some additional training from Sapphire for

9  managing meds and documenting that information.  We had our

10  regional nurses, as I indicated.  They were there on the

11  ground offering suggestions.

12  Q    If I could turn your attention to the Tab 3 in

13  Exhibit 14.  That reflects your meeting of February 23, 2016?

14  A    Yes.

15  Q    That's the third formal meeting of this large group of

16  people that you had convened?

17  A    That is correct.

18  Q    And if you will turn on the second page of that document,

19  there's discussions about hybrid, and then at the bottom of

20  page 3, the hybrid and taking over.  Can you explain what the

21  analysis was or what the discussion was at that time near the

22  end of February, February 23 in particular?

23  A    Again, we were still talking about what makes sense in

24  terms of accomplishing what we wanted to accomplish at

25  Fluvanna.

1    We had subcommittees meeting after the meeting on the

2   3rd.  They were reporting back about things that they saw.

3   And we had not made any decision at that point, but we were

4   still looking at what the possibilities were.  So looking at,

5   is there a combination of Armor and us working together to

6   deliver health services, armor providing health services

7   alone, or again, corrections taking over completely?

8   Q    And if I could direct your attention to page 10 of that

9   report.  And I'm going to -- does that reflect a meeting that

10  was held on that same day with Armor?

11  A    That's correct.  We met at the gym.  I believe that was

12  the meeting at the gym.  And we shared with them what our

13  discussions had been, talking with them about what our

14  expectations are, and talking about the settlement agreement.

15  Q    And -- well, your expectations vis-a-vis the settlement

16  agreement?

17  A    Right.  Correct.

18  Q    Correct.  And how would you characterize Armor's reaction

19  to the requests and, really, demands made by VDOC throughout

20  this process?

21  A    In this meeting on the 23rd and at every meeting

22  afterwards, every engagement that I have had with Armor, they

23  have been very collaborative.  All of our meetings have -- I

24  mean, we have been critical about some processes, and they

25  have been responsive.

1      When we said we didn't have enough staff, they

2  started looking at how to address that.  When I asked them to

3  meet with us, there was never any question about that.  I

4  found our relationship collaborative.  And until today they

5  continue to work with us when we are raising issues.

6  Q    If I could direct your attention to the sixth tab, which

7  is -- reflects the meeting of March 23, 2016.  And that's at

8  RFP 4-803.  Are you there?

9  A    I am there, yes.

10  Q    Okay.  And if you could turn to page 2 of that document,

11  can you tell the Court what this document is?  And for the

12  record, it's RFP 4-805.

13  A    Those were the goals that we were looking at.  These were

14  the things that we were evaluating as an agency.  So looking

15  at staffing, looking at the nurses' training, looking at desk

16  procedures.

17      One of the things that we wanted was to be sure that

18  our nurses understood how they operated inside of our

19  facility.  So wanting desk procedures documented so anybody

20  who comes in -- again, as I think I testified earlier, we had

21  a lot of agency nurses there.  Wanted to be sure that

22  everybody understands what the expectations were in terms of

23  their provider.

24      Let's see.  Charts.  Documentation was one of the

25  things that we looked at.  Medications had been an issue.  So

1  we looked at ordering medications and ensuring that

2  medications were available.

3          Sort of generally, those are the kinds of things that

4  we said we wanted to see -- we wanted to see some substantial

5  improvements on, substantial accomplishments in terms of

6  whether or not we were going to remain with Armor or we were

7  going to do something else in terms of providing health care

8  at Fluvanna.

9  Q    Was there another meeting -- and I'm directing your

10 attention to Tab 8 at RFP 4-817.  Was there another meeting on

11 April 14?

12 A    Yes.

13 Q    Okay.  And was there a discussion with Armor about -- in

14 fact, I think it may have been before this meeting, but about

15 expectations and a deadline for elevating performance?

16 A    That is correct.  And we -- the deadline, I think -- back

17 on the measurable -- was April 30 that we wanted to see

18 substantial improvement.

19 Q    And that was conveyed to Armor?

20 A    Yes.

21 Q    And what was the result of that?

22 A    It was our assessment at the end of the process -- we had

23 those folks who were involved in the meeting, but basically

24 the clinical staff were, I think, the leaders in this process,

25 giving feedback on what they saw and whether or not they

1  believed that Armor was moving in the right direction.  And it

2  was our expectation that by April 30 they would complete their

3  assessments and share with us what their thinking was about

4  how they were moving forward.

5  Q    And just to be clear:  While you were a deputy director,

6  you were relying upon the clinical management team employed by

7  VDOC to advise you on that?

8  A    That is correct.

9  Q    So the decision was made approximately when to continue

10  with Armor and not either take over or adopt the hybrid model?

11  When was --

12  A    It was made after the 30th, because the clinical reports

13  were due to me after April 30.  And their recommendations were

14  due at that point.

15  Q    So in May of 2016 is when that decision was made?

16  A    That is correct.

17  Q    And at that time, did you transition the primary

18  responsibility for overseeing implementation of the settlement

19  agreement to Dr. Herrick?

20  A    Yes, I did, because from March 25 on, he was a part of

21  that planning process at Fluvanna.  And when we decided to

22  continue with Armor, the reins were turned over to him.

23  Q    Okay.  Now, I would like to talk generally about the one

24  year or so from when the reins turned over to Dr. Herrick

25  in May of 2016 until the summer of 2017, so generally that

1  period.

2           Did you still stay involved in monitoring the status

3  and the progress of implementation of the settlement

4  agreement?

5  A    Yes, I did.  And just to provide a little bit of

6  background on that, of course, as we have mentioned,

7  Dr. Herrick joined the department on March 25, 2016.  I'm his

8  supervisor.  I had a responsibility to ensure that his

9  orientation happened to the Department of Corrections.  And I

10 think as I mentioned earlier, while we have those 1,200 women

11 that we are responsible for at Fluvanna, he had a

12 responsibility for providing health care to 30,000 offenders

13 who are in the Department of Corrections.  And so we spent

14 time on the road together.

15          We were traveling to Big Stone Gap and to Grundy and

16 to central Virginia, to southside Virginia.  We were

17 investigating what was happening at our other facilities as

18 well.  And we spent a lot of time in a vehicle together, and

19 we were talking about Fluvanna a good bit of that time.  But

20 during the process, we were always meeting about Fluvanna.

21 That was the priority on our list, because that's where the

22 settlement agreement was.

23          We don't have those other -- we don't have a

24 settlement agreement anyplace else.  We have some issues other

25 places, and we are addressing those issues as well, but we

1  don't have a settlement agreement anyplace else.  So Fluvanna

2  definitely got the attention.

3  Q    How would you describe the support that Director Clarke

4  gave to you in your role in implementing the settlement

5  agreement?

6  A    He was very supportive.  There's not anything that I

7  asked of him in terms of resources that he did not agree to

8  allow.

9  Q    Were there any developments generally in late 2015

10 that -- into 2016 that impacted the VDOC offender population

11 in terms of acuity levels of some of the offenders?

12 A    I think what you are alluding to there is in August of

13 2015 was the death of Jamycheal Mitchell in the Tidewater

14 jail.  And as a result of that, what we saw was the jails

15 asking very specifically for us to move the sicker offenders

16 from their jails into the Department of Corrections, those

17 state-responsible offenders.

18        So our numbers went up in terms of the offenders with

19 illnesses coming into the Department of Corrections.

20 Q    So just so we are clear:  You saw an influx of sick

21 offenders from jails coming into the VDOC system?

22 A    Yes.  Well, they were coming in sooner.  These were

23 state-responsible offenders.  So at some point in time they --

24 I'm sure some of them would have come to the Department of

25 Corrections.  But with the scrutiny that jails were getting,

1  those sicker offenders came to us much more quickly.  We got

2  requests, and we responded to those and we brought them in.

3  Q    And that included at Fluvanna?

4  A    That included at Fluvanna.

5  Q    How were you keeping updated with the progress of the

6  settlement, the implementation of the settlement agreement,

7  over that year from the summer of '16 to the summer of '17?

8       You have discussed that you had -- you were

9  communicating on a regular basis with Dr. Herrick.  Correct?

10 A    That's correct.  So a number of things were going on to

11 keep me updated.  There were regular meetings.  There were

12 minutes of those meetings.  Dr. Herrick and I engaged on a

13 regular basis.  I visited Fluvanna.

14 Q    Overall in that year, summer of 2016 to summer of 2017,

15 you were aware that there were -- continued to be some issues

16 with staffing.  Correct?

17 A    Yes, I was aware of that.

18 Q    And with some of the clinical issues.  Correct?

19 A    Correct.

20 Q    How did you view that year in terms of the timetable that

21 you discussed earlier of the three- to four-year process to

22 get there?  Did you feel like that was part of the process?

23 A    I did not expect everything to be perfect.  So did I

24 expect that there were going to be setbacks?  Yes, I did.  But

25 we were evaluating those along the way.  And I think you

DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

 1   will -- you will see from some of the things that we did, we

 2   were trying to offer some assistance.  And we continued to

 3   talk about, what do we do at this stage?  Should we do

 4   something different?  So the conversation was ongoing about

 5   what we did at Fluvanna.

 6        We started to notice some turnover in management

 7   positions.  That was something that was clearly on our radar,

 8   and eventually it got us to the point in '17 that we thought

 9   we needed to be in charge of management of the clinical staff

10   at Fluvanna, or the nursing staff.

11   Q    So I think you are referring to some developments or some

12   discussions in the summer of 2017?

13   A    That is correct.  There had been turnover in some -- in

14   the nursing -- the nursing supervisor's position to the point

15   that we were no longer comfortable that we could maintain that

16   leadership there, and we knew we needed to have leadership

17   staff there.  And Dr. Herrick and I started talking about how

18   we'd make that happen.

19   Q    And let me just back up for one minute.  You are familiar

20   with what have been called the weekly meeting minutes.

21   Correct?

22   A    Yes.

23   Q    And I think that's in as Defendant's Exhibit 12.  And I

24   believe the Court earlier heard Warden Aldridge sort of show

25   some examples of those meeting minutes.

1           Would you get those?

2    A    Yes.

3    Q    Every week?

4    A    I received those minutes.

5    Q    And would you read those every week?

6    A    Yes, I would read those minutes.

7    Q    Would you read them closely?  Would you study those?  You

8    kept engaged with the status of Fluvanna through those

9    minutes.  Correct?

10   A    And let me say there that most of that was not any

11   surprise.  As I said, Dr. Herrick was keeping me up-to-date.

12   So I was not reading minutes to be surprised about what

13   happened.

14   Q    Okay.  So let's bring us to the summer of 2017.  Can you

15   tell us what happened, the discussions that happened, in the

16   summer of 2017?  I think you were beginning -- beginning

17   there.

18   A    Yes.  Dr. Herrick had come to me because of the inability

19   to maintain the leadership, particularly for the nursing staff

20   at Fluvanna, and said, It's time for us to look at doing

21   something differently.  And I certainly concurred with that

22   thinking, and we started to think about what that looks like.

23   Q    And was there a change in or a departure of some

24   leadership at Armor at Fluvanna around that time?  Did that

25   prompt that discussion?

1  A     There was some turnover.  That's correct.

2  Q     Okay.  So continue with your discussions with Dr. Herrick

3  about what the options were.

4  A     Well, one of the things that we talked about was whether

5  or not -- well, we had talked about whether or not we would

6  take over, but we eventually said, Let's look at whether or

7  not we should be doing things differently.  And we talked

8  about --

9          MS. ELLIS:  Your Honor, if I may:  This is cumulative

10 of what Dr. Herrick testified about on Wednesday.

11         THE COURT:  Okay.  But overrule your objection if it

12 is one.

13         Go ahead.

14 A     Okay.  And so what we started thinking was, taking over

15 the leadership is one thing, but are there other things out

16 there that we had not considered?  And so we were talking

17 about creative ideas.  Are there other ways to provide health

18 services at Fluvanna that we have not considered?

19         And we started talking about offering some incentive

20 to change the thinking, to look at how we provide services

21 there.  And we met with our -- my financial staff to talk

22 about what we could offer in terms of a financial incentive to

23 do that.  And we settled on the $3 million that I think has

24 been testified to as a way to get people to think differently,

25 to think creatively.

1      We have two contractors; we have Armor and Mediko.

2  We can change their contracts.  We can expand their contracts

3  with the way that they have been structured to do some things

4  without going back to do another RFP.  And so we offered to

5  both of them at that point the $3 million:  Come back to us,

6  suggest if there are things that we can do more or differently

7  at Fluvanna.

8  BY MS. LONDOS:

9  Q    Okay.  And just to be clear, when you are saying

10 "$3 million," that's $3 million additional that would be put

11 into health care at Fluvanna beyond the amount already being

12 spent?

13 A    That is correct.

14 Q    And those discussions where you arrived at the $3 million

15 figure, those occurred in June of 2017?

16 A    We began that -- now, we -- again, we have been talking

17 about what we've seen at Fluvanna in terms of staffing.  We

18 have been talking about what we have seen in terms of -- what

19 we had seen in terms of things that we want to change.

20     We started talking about the dollars that we wanted

21 to set aside at that point.  So that was certainly not the

22 beginning of a discussion about changing, because that

23 discussion has continued.

24 Q    Has Dr. Scharff's analysis and Dr. Scharff's

25 interpretation of some of the more subjective language in the

1  settlement agreement played a role in the ongoing analysis?

2  A    Yes.   There are things in the settlement agreement that

3  are not specific.  Staffing is one of them.  It says "adequate

4  staffing."  His notion of adequate staffing and ours aren't

5  necessarily the same.  And so we are engaging all the time in

6  what it is he expects to see so that he thinks that we are in

7  compliance with the agreement.

8  Q    Could you speak to, just briefly, the -- expanding on

9  that, that the evolution of VDOC's thought process on the

10  settlement agreement relied in part on the feedback that

11  Dr. Scharff was giving over time?

12  A    Yes.  I'm not sure what more I would say about that, but

13  we were reading his reports.  We were considering his

14  criticisms of us.  We were considering what he said was

15  positive.  And we considered him the authority on the

16  settlement agreement in terms of what his expectations were in

17  terms of corrections.

18  Q    And did you approach Director Clarke for his approval of

19  this idea of adding $3 million?

20  A    Yes.

21  Q    And the response?

22  A    And he did approve it.  As I said, he has not denied

23  anything that we have requested.

24  Q    And that was in June and July of 2017?

25  A    That is correct.

1  Q    So letters -- and they are in evidence, Your Honor --

2  letters went to Armor and Mediko?

3  A    That's correct.  We drafted those letters on September 8.

4  I think they were actually delivered on September 27.

5  Q    And the letters are in the file.  But generally, what was

6  being requested of Armor and Mediko?

7  A    We asked them to make some recommendations to us for

8  providing services at Fluvanna.  And we were specifically

9  vague about that, because we did not want to taint what they

10  were saying.  We wanted some creative ideas about providing

11  services.

12  Q    And what was the response, or what was the ultimate

13  decision after receiving a response from Armor and Mediko?

14  A    We decided that they were not creative ideas that had not

15  been considered.

16  Q    So what did you do then?

17  A    We decided -- at that point, Dr. Herrick was starting to

18  talk about taking over the leadership of Fluvanna.  And he

19  came up with a model.  Off the top of my head I don't remember

20  that date, but he came up with a model for leadership for

21  corrections to take over the leadership of the clinical staff.

22  Q    And so to be clear, the upper level health care

23  management at Fluvanna would be VDOC employees?

24  A    That is correct.

25  Q    And then the -- more of the charge nurses, the line

DIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

1    nurses, would be from agency and from Armor?

2    A    There were actually three layers of supervision that

3    would have been Department of Corrections employees.  And we

4    were essentially talking about using Armor as a staffing

5    agency.

6         And we had shared that information with Armor and

7    with the Armor staff there.  In fact, Armor leadership met

8    with us when we met with the employees to tell them what we

9    were thinking.

10   Q    And is that where Fluvanna stands today?

11   A    Yes, it is.

12   Q    So today, who is your warden at Fluvanna?

13   A    Mr. Aldridge, Eric Aldridge, is our warden.

14   Q    And the health authority and the upper level nurses are?

15   A    Are Marsha Stanford and Ellen Katzman.

16   Q    They have all testified today.

17        As the deputy director of VDOC with oversight of

18   health services, including health care at Fluvanna, what are

19   your feelings today about the leadership at Fluvanna?

20   A    I think we have excellent people in place to lead

21   Fluvanna.  But as I said earlier, staff turns over.  These are

22   excellent, excellent nurses.  And I can imagine people

23   recruiting them.  So, I mean, we are doing things.  We are

24   thinking about how we can keep them engaged at Fluvanna.

25   We're offering supplemental salary to keep them at Fluvanna.

1      But in terms of the team that we have there now, we

2 are very pleased with them, and they are able to bring in some

3 additional staff that we have been struggling to do before.

4 Q    Do you today, based upon your involvement in overseeing

5 the settlement agreement at Fluvanna, have an expectation that

6 Fluvanna will reach full compliance with the settlement

7 agreement under the leadership of Warden Aldridge and Marsha

8 Stanford and Ellen Katzman on the timetable you anticipated

9 back in February 2016 of the three to four years?  Is that

10 your --

11 A    It is certainly my expectation, with the caveat that I do

12 not expect perfection.  Perfection does not happen in health

13 care.  And if one looks at the University of Virginia, that I

14 think is sort of the flagship in providing health care, you

15 look at their patient response to services, and they are not

16 high on the list of patient satisfaction with them either.  I

17 think it's what happens in health care.  People are not

18 totally satisfied.  So I do not expect perfection.

19      I expect to have the right staff engaged.  I expect

20 to have the qualifications that we are looking for.  I expect

21 us to be working hard to do that.  But if I expected

22 perfection, I would be in the wrong place, because that's not

23 going to happen.

24      MS. LONDOS:  The Court's indulgence.

25      At this time, I would simply like to show the witness

1  the Commission on Accreditation for Corrections standards

2  dated December 11 through 13, 2017, from the ACA, ask her

3  to -- unless there is no objection, to confirm that this is

4  the ACA accreditation, and move this into evidence.

5          Is there any objection?

6          MS. CIOLFI:  No objection, Your Honor.

7          MS. LONDOS:  Okay.  Thank you.  And so this will be

8  Defendant's 39.

9          THE COURT:  It will be admitted.

10          THE CLERK:  I'm sorry, what number?

11          MS. LONDOS:  39.

12          (Defendant Exhibit Number 39 was marked and

13  received.)

14          MS. LONDOS:  I would also like to move into evidence

15  a notebook of emails that were exchanged on the ADA policy

16  issue between the Office of the Attorney General and

17  plaintiffs' counsel.

18          As Your Honor knows, the settlement agreement

19  required there to be an ADA policy that was collaboratively

20  agreed on and worked on, and this is simply evidence of that

21  effort on both sides.  It was disclosed previously.

22          MS. CIOLFI:  And Your Honor, we do object to that.

23  The ADA has not been a subject of this hearing this week.  We

24  informed defendants prior to the hearing that we would not be

25  calling Mr. Marono, who is their ADA expert, and we did not

 1  intend to put on evidence of violations of the ADA policy.

 2          MS. LONDOS:  Yeah.  We simply want it into evidence

 3  as evidence of the defendants' efforts to comply with the

 4  settlement agreement, as Exhibit 40.

 5          THE COURT:  Well, can't the witness just say that?

 6  Do we need --

 7          MS. LONDOS:  Well, it was a fairly extensive process

 8  with fairly extensive effort on the defendants' part.  And

 9  the -- this notebook --

10          THE COURT:  Is that one of the problems in the case?

11  I don't recall that being one of the issues.

12          MS. LONDOS:  No, certainly, but to the extent the

13  Court is being asked to hold the defendants in contempt, it is

14  evidence of the efforts made by the defendants on an element

15  of the settlement agreement.

16          THE COURT:  Well, how many pages is that?  Am I

17  supposed to read it?  How many pages is it?

18          MS. LONDOS:  It looks to be an inch and a half.  It's

19  simply the evidence of the emails back and forth.

20          THE COURT:  Normally, we call that smoke.  Okay.  But

21  it will be admitted.

22          (Defendant Exhibit Number 40 was marked and

23  received.)

24          MS. LONDOS:  Thank you, Your Honor.  No further

25  questions for Ms. Scott.  Please answer any questions by the

1  plaintiffs.

2        THE COURT:  How did the patients -- I mean, the

3  inmates at Fluvanna, how many are these sort of medical

4  patients, medical inmates who wouldn't be there except that

5  they meet the criteria for needing more medical care than the

6  average prisoner in the general population?

7        THE WITNESS:  You mean the number?

8        THE COURT:  Yes.

9        THE WITNESS:  Your Honor, I'm sorry.  I don't know

10 the number off the top of my head.  But for -- the sickest

11 inmates get moved from other -- we have three other -- four

12 other female facilities.  And if they are sick, they all get

13 moved to Fluvanna.  So they do -- the sicker ones get moved to

14 Fluvanna.

15       THE COURT:  Well, there are other inmates there who

16 could be out in the general prison population?

17       THE WITNESS:  That is correct, yes.

18       THE COURT:  And you don't know the percentage?

19       THE WITNESS:  I'm sorry.  I do not know that off the

20 top of my head.  I would not like to testify to that.

21       THE COURT:  Okay.  Go ahead.

22       MS. CIOLFI:  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24 BY MS. CIOLFI:

25 Q    Good afternoon, Ms. Scott.  Now, you have been with the

1    Department of Corrections since 1973?

2    A    That is correct.

3    Q    And you have been in your current position as deputy

4    director for the division of administration since 2002?

5    A    Correct.

6    Q    And so you were in this position in 2012 when the lawsuit

7    was filed?

8    A    Correct.

9    Q    And you -- and health care services had been moved under

10   your chain of command by November 2014 when the lawsuit was

11   settled?

12   A    Correct.

13   Q    And indeed, you participated in at least one of the

14   meetings regarding the settlement?

15   A    With attorneys, yes.  I participated in other meetings

16   with Dr. Scharff and Dr. Kohl, but yes, that is correct.

17   Q    And you were also one of the deciders when Armor got the

18   2015 comprehensive health services contract?

19   A    Correct.

20   Q    And you were in this position in 2016 when the consent

21   order was entered?

22   A    Correct.

23   Q    And you were in this position in 2017 when the show cause

24   was filed?

25   A    Yes.  That's correct.

1  Q    And do you oversee health services?  Do you oversee

2  health services?

3  A    Yes.  I'm sorry.  I thought there was more to the

4  question.  Yes, I do.

5  Q    And do you also oversee budget and finance?

6  A    Yes, I do.

7  Q    And the responsibility for ensuring that DOC complies

8  with the settlement agreement is yours?

9  A    That is my responsibility.

10 Q    And even at the beginning, as you testified earlier, you

11 were the point person on it?

12 A    That's correct.

13 Q    You supervise Dr. Herrick?

14 A    I do.

15 Q    And you report directly to Director Clarke?

16 A    Correct.

17 Q    And you are peers in the hierarchy with Mr. Robinson?

18 A    Correct.

19 Q    Now, earlier, before lunch, I believe you and Ms. Londos

20 talked a little bit about task analysis?

21 A    Yes.

22 Q    And task analysis is what the department does to create a

23 staffing plan?

24 A    Yes.

25 Q    And I believe you described all the things that went into

1  task analysis at the time of the 2015 RFP.

2  A    That is correct.

3  Q    And you recall that you were -- that you were deposed as

4  a designation by the Department of Corrections as their

5  30(b)(6) designee.  Correct?

6  A    That is correct, yes.

7  Q    And do you know that Mr. Schilling was also deposed on a

8  variety of topics?

9  A    Yes.

10 Q    And Mr. Schilling was actually designated to talk about

11 the 2015 RFP.  Correct?

12 A    That is correct.

13 Q    And that's because he was actually the person who was

14 creating the RFP and developing the contract at the time.

15 Correct?

16 A    I did not have any participation in the creation of the

17 RFP.  It really was the contract.

18 Q    So that was Mr. Schilling?

19 A    Yes.  That's correct.

20 Q    And he was also designated for the creation of staff

21 planning at Fluvanna?

22 A    That's correct.

23 Q    And that's because he is the one who oversaw the creation

24 of a staffing plan for Fluvanna since it was opened?

25 A    He was the health services director.  That is correct.

1  Q    And so he is the one who, since it was open, was

2  responsible for overseeing the creation of a staffing plan?

3  A    Correct.

4  Q    Okay.  And so we would expect what he says about the

5  staffing plan and the task analysis in 2015 to be

6  authoritative.  Correct?

7  A    I'm sorry.  I didn't understand.

8  Q    We would expect what Mr. Schilling says about the

9  creation of a staffing plan for Fluvanna in the 2015 RFP to be

10 authoritative.  Correct?

11 A    Correct.

12        MS. LONDOS:  Counsel, could you tell me what

13 deposition and what page?

14        MS. CIOLFI:  This is Mr. Schilling's 30(b)(6)

15 deposition at page 39.

16 BY MS. CIOLFI:

17 Q    So when I deposed Mr. Schilling, I asked him:

18        "Question:  Do you remember the last time that the

19 task analysis and comparative analysis was done for Fluvanna?

20        And his answer was, "Probably 2010, somewhere along

21 there."  And I asked him:

22        "Question:  Well, was it done in -- so can I assume

23 it wasn't done before this RFP in 2015?"  And his answer was:

24        "Answer:  Yes.  We did not do it then."  And I asked:

25        "Question:  Did the staffing plan change between the

1  2015 RFP and the previous RFP for Fluvanna?" And he said:

2  "Answer: Probably some, a little bit." And then

3  later I asked him:

4  "Question: Do you recall if any changes were made to

5  the staffing plan in light of the Fluvanna lawsuit? And his

6  answer was:

7  "Answer: None, to my knowledge."

8  And so, in fact, a task analysis was not done in the

9  creation of the 2015 RFP. Correct?

10 A  When I talked with him about it, he indicated that it had

11 been done. So I can't speak to that testimony, other than if

12 he was talking about -- I mean, I can't speak to it.

13  I know that we had done an emergency RFP when we

14 would have looked at staffing. Was it -- I can't answer that.

15 But when I talked with him specifically, he talked about the

16 task analysis being done.

17 Q  And so his testimony at the 2015 RFP was in error when he

18 was the designee, the corporate designee, for the Department

19 of Corrections?

20  MS. LONDOS: Objection. Foundation. There is no

21 foundation. She showed him one line out of the deposition.

22  THE COURT: Excuse me?

23  MS. LONDOS: There is no foundation to ask if

24 Mr. Schilling's testimony as a whole is --

25  THE COURT: Well, she didn't ask it as a whole. She

1  was talking about a specific question and answer.

2          MS. CIOLFI:  Your Honor, I'm ready to move on.

3          THE COURT:  I don't see why you need to ask her about

4  his testimony.

5          MS. CIOLFI:  I'm ready to move on.

6          THE COURT:  Okay.

7  BY MS. CIOLFI:

8  Q    Now, Ms. Scott, you have been high up in DOC for long

9  enough that you sometimes get to interact with the general

10  assembly.  Correct?

11  A    Correct.

12  Q    And you are aware of -- that there are budget pressures

13  on the Department of Corrections?

14  A    Yes, I am.

15  Q    And DOC, in fact, is feeling a lot of cost pressures,

16  such as addressing a major shortage in correctional staff; is

17  that correct?

18  A    We have been making requests to the legislature for

19  compensation for our staff.  Numbers, we asked for years, but

20  a major shortage -- I would not testify to that, but certainly

21  we have made several requests for compensation specifically

22  for our corrections officers.

23  Q    And that's compensation to attract and retain

24  correctional staff?

25  A    Yes, correct.

CROSS-EXAMINATION OF N.H. "COOKIE" SCOTT

1  Q    And you asked for extra money for Fluvanna to be included

2  in the governor's introduced budget for this year; is that

3  right?

4  A    That's correct.

5  Q    But it was -- and that was so that you would not have to

6  eat that amount permanently?

7  A    Yes.

8  Q    But it was not included in the governor's --

9  A    It was not included.

10  Q    And so that money has to come from elsewhere in DOC?

11  A    That is correct.

12  Q    Now, the cost of the health care at the department has

13  been a topic of conversation with the legislature.  Correct?

14  A    It has been.

15  Q    And the legislature has been critical of the cost of

16  health care at DOC?

17  A    Yes, it has.

18  Q    And in your deposition, you said "indicted" was too

19  strong a word.  Right?

20  A    Yes, I did, but -- yes.

21  Q    What word would you use?

22  A    We have been criticized, yes.

23  Q    And, in fact, the department has been directed by a

24  number of legislators to look at being more cost-efficient in

25  providing health services to offenders, to the women at

1  Fluvanna?

2  A    There have been several studies.  A couple have been done

3  by VCU.  Certainly one was done internally.  I think there was

4  at least one other.  But, yes, we have been asked to look at

5  how we provide services and whether or not what we are doing

6  is sufficient.  That is correct.

7  Q    And whether you could provide them at lower cost?

8  A    Yes.  That is correct.

9  Q    On direct, Ms. Scott, you said you wanted to create -- or

10  you wanted to follow Director Clarke's vision of creating a

11  healing environment.  Correct?

12  A    Yes.

13  Q    And that the women at Fluvanna need to trust you; is that

14  right?

15  A    Need to trust our -- if the "you" is the Department of

16  Corrections you are mentioning, yes.  Absolutely.

17  Q    And they don't need to see DOC as the bad guys?

18  A    That is correct.

19  Q    And you want them to see that DOC wants to do right by

20  them?

21  A    Yes, I do.

22  Q    And you don't want them to suffer?

23  A    I do not.

24  Q    And you don't want them to die?

25  A    I certainly don't want them to die.

1  Q    And you knew in 2016 that this was an urgent matter.

2  Correct?

3  A    This -- I'm not sure what the "this" is.

4  Q    That the medical issues at Fluvanna was urgent.  That's

5  why you convened the 2016 meetings.  Correct?

6  A    I convened it because we needed to comply with the

7  settlement agreement.  Yes.

8  Q    And so the first one was on February 3.  Correct?

9  A    That is correct.

10  Q    And somebody at the meeting notes that Fluvanna is under

11  the gun from the courts?

12  A    Correct.

13  Q    And that was three days before the Court entered the

14  order.  Correct?

15  A    That is correct.

16  Q    And you thought you might terminate Armor's contract as

17  of June 30?

18  A    That was one of the possibilities.  Again, we were

19  exploring possibilities at that point, yes.

20  Q    And there were four to five other meetings that spring

21  that you and Ms. Londos talked about?

22  A    Correct.

23  Q    And you actually led these meetings?

24  A    Yes, I did.

25  Q    And they were your meetings?

1  A    They were my meetings.

2  Q    And you convened your top people at Fluvanna?

3  A    Yes, I did.

4  Q    The warden, the contract monitor; all of them were there?

5  A    The regional nurses, our chief physician, our chief

6  psychiatrist, our chief psychologist.  We had our budget

7  people.  We had our human resources people.  We had our

8  procurement staff.  We had the executive staff of Fluvanna.

9  Q    And so you brought in your top people, not just from

10  Fluvanna, but all over the state?

11  A    Correct.

12  Q    Marsha Stanford?

13  A    Yes.

14  Q    And Bonita Blodgett [sic]?

15  A    Badgett, yes.

16  Q    Badgett.  And they actually identified for DOC the

17  problems with the health care processes at Fluvanna as run by

18  Armor.  Correct?

19  A    That is correct.

20  Q    And I'm showing you the February 10 meeting, page 2.  And

21  your top people told you that there were problems with the way

22  Armor was responding to informal complaints?

23  A    Yes.  They told me that.

24  Q    And they told you there were problems with how Armor was

25  running pill line?

1  A    That is correct.

2  Q    And they told you there were problems with the way Armor

3  nurses were doing sick call?

4  A    That is correct.

5  Q    And they found Armor committing medication errors?

6  A    That is correct.

7  Q    And they told you Armor was not updating the charges

8  correctly?

9  A    That is correct.

10 Q    And they told you Armor was mismanaging patients in the

11 infirmary?

12 A    That's not the way I would characterize that, but they

13 did say that the infirmary was not up to 80 percent, the

14 standard that they set for the infirmary, yes.

15 Q    Is -- and so you would conclude that, because we are

16 identifying problem areas, that the infirmary was a problem

17 area?

18 A    They identified that as a problem area.  That is correct.

19 Q    And, in fact, there were 13 problem areas?

20 A    Yes.

21 Q    And so you knew at that time that Fluvanna had problems

22 with these areas.  Correct?

23 A    That is correct.

24 Q    And your top people also told you that Armor is good at

25 making plans to fix things, but its execution is the problem.

1  Correct?

2  A    And I think they were talking specifically there about

3  the nursing staff in execution, but yes, that's an accurate

4  statement.

5  Q    And staffing is a major issue, theme running through all

6  these problem areas.  Correct?

7  A    Staffing that's consistent.  Because Armor certainly

8  brought in agency nurses.  So, I mean, there was staff there.

9  We were looking for consistent staffing.  So we wanted

10 staffing on the ground, again, who knew the offenders, who

11 knew what their situations were.  But they certainly had

12 staffing in the facility.

13 Q    And -- but you need staffing to meet all these -- satisfy

14 all these problems.  Correct?

15 A    Yes, that's correct.

16 Q    And they have a problem with execution of staffing; is

17 that correct?

18 A    That's correct.

19 Q    Okay.  And so you were hearing all this from DOC about

20 the problems with Armor.  Correct?

21 A    I was hearing what the problems were because I was asking

22 what the problems were.  Yes.

23 Q    And you were also -- at that same meeting, you learned

24 that Dr. Scharff had had a problem with LPNs conducting sick

25 call?

1  A    That's correct.

2  Q    And that he wanted a plan and he wanted to see progress?

3  A    That is correct.

4  Q    And then you also, at that same or before that same

5  February 10 meeting, you had met with Director Clarke and

6  Mr. Robinson.  Correct?

7  A    That is correct.

8  Q    And then together with them, you decided that June 30 was

9  too soon to fix these problems?

10  A    That is correct.

11  Q    And you would give Armor until October 31, 2016?

12  A    Correct.

13  Q    And then you met again later, in February, February 23.

14  And your top people told you that Armor was sinking fast.

15  Correct?

16  A    And again, this was not censored.  They were making

17  statements that I would not, and no one else challenged them

18  on the language that -- that was being used.  So, yes, that

19  statement -- that statement was made.

20  Q    They were free to tell you the truth about their

21  assessments of that situation?

22  A    They were free to tell me their assessment, which is

23  different.

24  Q    And they're your top people?

25  A    Yes.  That's correct.

1  Q    And they also told you that DOC needs to take an

2  aggressive approach?

3  A    Yes.

4  Q    And they also told you "we," meaning DOC, have to be in

5  charge?

6  A    Yes.  That's correct.

7  Q    And then on page 6, they also told you that Armor was

8  using staffing problems as an excuse?

9  A    That was a comment.

10 Q    And the comment also was, by your top people, that there

11 are no systems in place?

12 A    Again, their judgment.  That's correct.

13 Q    And that "they," meaning Armor, are not managing medical

14 records properly?

15 A    That is correct.

16 Q    And they don't have documentation for what the nurses are

17 doing?

18 A    They didn't have some documentation.

19 Q    And so you knew that there were problems with Armor's

20 documentation and medical record management and systems at

21 that time?

22 A    Yes, I did.

23 Q    And, in fact, you knew that the staff were treating women

24 without their medical records?

25 A    I knew that that was a statement made by the staff, yes.

1  Q    And then later that same day, you met with Armor; is that

2  right?

3  A    That is correct.

4  Q    And you told Armor that your goal was for Armor to

5  succeed?

6  A    That is exactly what I said.

7  Q    And you told them that -- you told Armor that you would

8  not give them directives; you would just give them

9  suggestions?

10  A    Yes.

11  Q    And you gave them a deadline of May 1?

12  A    That is correct -- well, April 30 was actually the

13  deadline, but that's correct.  That's close.

14  Q    April 30 is the deadline?

15  A    Yes.

16  Q    And May 2 was the day you made the decision?

17  A    Yes.

18  Q    And so Armor in response -- this is from the March 23

19  meeting.  Armor, in response, they flew in a bunch of people

20  from New Jersey and Florida and other Armor sites around

21  Virginia; is that correct?

22  A    Yes.  That's correct.

23  Q    And in March, your top people asked what happens when the

24  additional help leaves; is that correct?

25  A    That's correct.

1  Q    And there was no response noted in the records for this

2  meeting?

3  A    There was nothing that's noted on this page.

4         Now, again, I would offer to you that we were

5  identifying potential problems.  We were not looking at what

6  they were doing well.  We were not looking at what was going

7  right.  We were identifying what created issues or potential

8  issues for us.

9         You will also notice that none of that's quantified.

10 So was that two charts?  Was that six charts?  Was that 88

11 charts?  That's not noted there.

12        And I did not try and filter the staff's comments at

13 that point.  So if they saw it as an issue, we put it down as

14 an issue, something that we needed to follow up on.  That is

15 correct.

16 Q    And so your staff is questioning what's going to happen

17 when the additional help leaves.  And --

18 A    And rightly so, yes.

19 Q    And rightly so?

20 A    And rightly so.

21 Q    And is leadership going to be sustainable?

22 A    Yes.

23 Q    And at least as of March 23, no one had a response?

24 A    That is correct.

25        THE COURT:  Let's take about a ten-minute recess.

1        THE MARSHAL:  All rise.

2      (Recess taken from 2:44 p.m. until 2:57 p.m.)

3        THE COURT:  You may resume.

4        MS. CIOLFI:  Thank you, Your Honor.

5   BY MS. CIOLFI:

6   Q    Before the recess, Ms. Scott, we were talking about the

7   February 23, 2016, meeting with Armor wherein your top people

8   are asking questions about what happens when the help leaves,

9   and Armor didn't have a response, according to these notes.

10  Correct?

11  A    That's correct.

12  Q    And they asked, what's the backup plan; is that correct?

13  A    That is correct.

14  Q    And yet when May 2 came, you still -- you decided to

15  stick with Armor?

16  A    And again, I would reiterate, we were asking questions.

17  And this was not quantified.  These statements were not

18  censored.  So I did not ask them to justify what they said.

19  So if they saw it as an issue, we documented it as something

20  that we wanted to follow up on.  And we did that because we

21  were making assessments.

22        So I did not tell staff, if there's only one

23  instance, you can't say it.

24  Q    Ms. Scott, my question was:  On May 2, you decided to

25  stick with Armor?

1  A    That is correct, yes.

2  Q    And you -- these are the people you are relying on to

3  provide you the information to make that decision.  Correct?

4  A    That is correct.

5  Q    And the -- by the way, you have not provided the

6  plaintiffs the minutes of that May 2 meeting.  Correct?

7  A    There were no minutes of the May 2 meeting.  That was a

8  meeting with Armor leadership and myself and I did not write

9  down minutes.

10 Q    So Ms. Scott, by July of 2016, you knew that there were

11 numerous reports in the media and court cases raising issues

12 with the care provided by private, for-profit correctional

13 health care contractors.  Correct?

14 A    I am aware of that.

15 Q    And you were aware of that in July of 2016.  Correct?

16 A    Correct.

17 Q    And you also -- and on direct, you talked about how it

18 would take -- you thought it would take four to five years to

19 be compliant with the settlement agreement.  Correct?

20 A    I said three to four.

21 Q    Three to four years.  But you also knew in July 2016 that

22 if conditions of inadequate care at Fluvanna are identified by

23 the compliance monitor and not addressed within 30 days, DOC

24 can be held in contempt of court.  Correct?

25 A    I remember reading that the compliance monitor could make

1  a report --

2          MS. LONDOS:  Object to the extent that it misstates

3  the settlement agreement.

4          MS. CIOLFI:  Your Honor, let me see if I can clear

5  this up.

6  BY MS. CIOLFI:

7  Q    You recognize this document, correct, Ms. Scott?

8  A    Yes, I do.

9  Q    And this is a report to the general assembly from the

10  Department of Corrections?

11  A    That is correct.

12  Q    And it's written by VCU, but it's DOC's report.  Correct?

13  A    It is DOC's report.

14  Q    And it was prepared on July 1, 2016?

15  A    That is correct.

16  Q    Or submitted?

17  A    Oh, it was submitted.

18  Q    Submitted to the general assembly.

19          And you read this report.  Correct?

20  A    I need to see the report.

21          Yes, that is a report that was completed by VCU,

22  Virginia Commonwealth University.

23          MS. CIOLFI:  And for the record, I'm showing this.

24  This has been admitted as Exhibit 20.

25          MS. LONDOS:  Is there any objection to the witness

```
1   having a copy of the document in front of her?  It's a lengthy

2   document.

3          MS. CIOLFI:  Your Honor, I only have one copy, and

4   I --

5          MS. LONDOS:  Well, I have multiple copies.  I can

6   bring one if that's acceptable, Your Honor.

7          THE COURT:  Okay.  But whatever you are going to ask

8   her, can't you show it on the screen?

9          MS. CIOLFI:  I can.  That's what I was planning to

10  do.

11         THE COURT:  You can give her a copy, too.  I don't

12  mind.

13         MS. ABATO:  If I may approach the witness, Judge?

14         THE COURT:  You may.  If it's on the screen, we can

15  all see it.

16  BY MS. CIOLFI:

17  Q    And Ms. Scott, you not only read this report, but you

18  helped edit it.  Correct?

19  A    That is correct.

20  Q    And you only provided the most accurate and thoughtful

21  information to the general assembly.  Correct?

22  A    I'm sorry?

23  Q    And you only provided -- the department only provides the

24  most accurate and thoughtful information to the general

25  assembly.  Correct?
```

1  A    It is certainly our intent.

2  Q    And if you could look at page 17.  And it starts out

3  discussing the Fluvanna ruling.  Correct?

4       At the first, the top of the paragraph:  "In a blow

5  to the notion that states can shift liability risk through

6  contracting, Federal District Court Judge Norman Moon's ruling

7  noted that although medical care is provided by a private

8  contractor at FCCW, the agency is ultimately responsible for

9  the well-being of the incarcerated population and cannot

10 delegate this responsibility away."

11      And that's what it says.  Correct?

12 A    Correct.

13 Q    And can you read the highlighted portion of the report

14 that's on your screen?

15 A    "If conditions of inadequate care are identified by the

16 monitor and not addressed within 30 days, DOC can be held in

17 contempt of court."

18 Q    And so in July 2016, you were aware that DOC could be

19 held in contempt if it didn't cure problems with inadequate

20 care quickly?

21      MS. LONDOS:  Objection to the extent that she's

22 asking this witness to give a legal conclusion.

23      MS. CIOLFI:  Your Honor, I believe there has been

24 testimony about what the Department of Corrections officials

25 knew and understood about the settlement agreement, and I'm

1  just pointing out --

2          THE COURT:  You can ask her if that was her

3  understanding.

4  BY MS. CIOLFI:

5  Q    Was that your understanding?

6  A    That is -- yes.  That is my understanding.

7  Q    But still, you stuck with Armor in July of 2016?

8  A    And again, when we are looking at the notes that you

9  presented to me, those were statements from senior staff, and

10 that is absolutely correct.  But those statements were not

11 quantified.  They were not censored.  They were not

12 challenged, because what we were trying to do was to get on

13 the table all of those things that may be problematic for the

14 agency.  Once we had those things on the table, then we went

15 back to take a look at them.

16 Q    Ms. Scott, I'm asking you -- I'm not asking you about the

17 meetings anymore.  I'm asking you about after this report

18 documents problems with -- known problems with health care

19 prison contractors all over the country in media releases that

20 you said you were aware of, and after you understood the

21 urgency of complying with the settlement agreement, you still

22 stuck with Armor after July 2016.  Correct?

23 A    I stuck with Armor because this report does not say,

24 Fluvanna, you are inadequate.  It says there are issues with

25 contractors, but I'm working just with Fluvanna.  I'm working

1  with the contractor that we have at that facility.

2  Q    You stuck with Armor?

3  A    Yes, I did.  Correct.

4  Q    And then in August and September of 2016, four women from

5  Fluvanna died.  Correct?

6  A    I don't know that statistic, but we have had deaths at

7  Fluvanna.

8  Q    You don't know about that?

9  A    I know that we have had deaths at Fluvanna.  I can't tell

10 you the number and the date.  So I don't have that in my head.

11 Q    You were reading all those minutes from the weekly

12 meetings, and you don't know about the four deaths over two

13 months in 2016?

14        MS. LONDOS:  Objection.  That's argumentative, and

15 that's not what this witness said.  That misstates her

16 testimony.

17        THE COURT:  Overruled.

18 A    What I said is that off the top of my head, I can't tell

19 you how many women died on what day.  I can tell you that I am

20 aware that there were deaths at Fluvanna.

21 BY MS. CIOLFI:

22 Q    And still, after the summer of summer and fall of 2016,

23 you stuck with Armor.  Correct?

24 A    We have deaths all over the Department of Corrections.

25 And so just that someone died would not suggest that it was

1  the fault of Armor.

2        MS. CIOLFI:  Your Honor, if I could ask that the

3  witness please just answer the question I've asked her.

4        THE WITNESS:  I'm sorry to --

5        THE COURT:  Just answer the question.  The answer is

6  obvious, but go ahead.  Just answer the question.  You stuck

7  with Armor.  Yes, that's --

8        THE WITNESS:  That is correct.

9  BY MS. CIOLFI:

10 Q    And you have also -- you also read the reports from

11 Dr. Scharff identifying problems with sick call?

12 A    Yes, I did.

13 Q    And with pill line?

14 A    Yes, I did.

15 Q    And with bureaucratic responses to grievances?

16 A    Yes, I did.

17 Q    And still you stuck with Armor?

18 A    Yes, I did.

19 Q    And, in fact, you don't think what Dr. Scharff -- all of

20 what Dr. Scharff puts in his reports is valid.  Correct?

21 A    There have been some disagreements that we have noted for

22 him that we did not agree with.  That is correct.

23 Q    And you disagree with his assessment that LPNs should not

24 run sick call?

25 A    I disagree with that assessment, yes.

1  Q    And you also think he gives too much credit to what the

2  women whom you call offenders say to him about their

3  experiences with the health care at Fluvanna?

4  A    I do not believe I have made such a statement.

5  Q    Ms. Scott, can I get you to take a look at this email?

6  This is RFP 3600003377?

7  A    Yes.  I'm looking at that.

8  Q    If you look at the bottom, does this appear to be an

9  email from you on December 9, 2016, to Dr. Herrick?

10  A    That is correct.

11  Q    And in which you say -- you are commenting on a report

12  from Dr. Scharff.  Correct?  A draft report?

13  A    That is correct.

14  Q    And in which you say, "This report is still full of 'the

15  offenders said' or 'I think,' not based on any objective or

16  factual data.  This is concerning.  I don't expect our

17  attorneys will challenge this, but if I were paying an

18  attorney, I would be grossly dissatisfied if he or she allowed

19  these personal opinions.  Just getting this off my chest."

20        So, in fact, you don't regard the women's experiences

21  as factual data?

22  A    That is not what I'm saying.  I'm saying that we have a

23  report from Dr. Scharff that says, "I think the offender said"

24  without any basis for that.  Should we accept everything that

25  someone says -- and it doesn't matter who it is -- without

1  some basis?  No, I would not agree with that.  But that does

2  not mean that I think anything that an offender says is not

3  accurate.

4           And you can see from some of the responses that we

5  make at Fluvanna that we do take those things into

6  consideration.  I mentioned earlier today about grievances,

7  how we responded to grievances.  So, yes, I do consider those

8  things.

9           That was probably made in a moment of frustration,

10 but I stand by that statement, is that if Dr. Scharff is going

11 to write a report about us, there should be some basis for

12 that.

13 Q    It was a moment of frustration about Dr. Scharff's

14 reliance on what the women said in his report.  Correct?

15 A    It does not mean that I do not believe --

16 Q    Is that correct?

17 A    Yes, it is.  Yes.

18 Q    And then in February of 2017, Dr. Herrick sent this

19 letter to Armor.  Correct?

20 A    Can I see the top of that?

21 Q    Certainly.

22 A    Okay.  Yes.

23 Q    And in this letter, he outlined all the problems at

24 Fluvanna and at other sites with Armor's performance.

25 Correct?

1  A     That is correct.

2  Q     And this is Exhibit 24.  And still you stuck with Armor?

3  A     That is correct.

4  Q     And then in July of 2017, David Robinson comes to you and

5  tells you the warden, Jeffrey Dillman, is being transferred

6  from Fluvanna; is that correct?

7  A     That is correct.

8  Q     And he asks you if you would like an extra position in

9  your department; is that correct?

10  A     That is correct.

11  Q     And he does not show you this letter from Jeffrey Dillman

12  to David Robinson.  Correct?

13  A     Correct.

14  Q     And this is the letter in which Mr. Dillman says,

15  "Without such resources and expertise and with the detailed

16  obligations in the settlement agreement, we are destined to

17  fail at adequately addressing the same."

18        Correct?

19  A     I'm sorry.  Could you lower that a little bit?  I would

20  like to read the rest of that.

21  Q     Sure.

22  A     That is correct.

23  Q     And then three women die in the space of four weeks over

24  the summer of 2017.  Are you aware of that?

25  A     Yes.  I'm aware.

1  Q    That was Ms. Liberato, Ms. Niece, and Ms. Johnson.

2  Correct?

3  A    Correct.

4  Q    And still you stuck with Armor?

5  A    Yes, I did stick with Armor.

6  Q    And then in early 2017, the show cause is filed -- I'm

7  sorry.  Early September 2017, the show cause is filed by the

8  plaintiffs.  Correct?

9  A    Correct.

10  Q    And, in fact, that's when you and Dr. Herrick decided to

11  offer them $3 million more -- offer Armor $3 million more if

12  they came up with a plan.  Correct?

13  A    That's -- no, that is not correct.  That's when we put it

14  in writing.  We decided that in June of 2017.

15  Q    So you drafted the letter on September 8.  Correct?

16  A    Correct.

17  Q    And it was sent in September, September 27.  Correct?

18  A    27.  Correct.

19  Q    And the show cause was filed on September 5.  Correct?

20  A    That is correct.

21  Q    And the solution was to offer Armor more money?

22  A    The solution was to offer Armor and Mediko more money.

23  Q    And then you look at Armor's plan and you say, that's no

24  plan at all.  Correct?

25  A    I was looking for creativity, and it did not exist in the

1  documents that I saw.

2  Q    And it was no plan at all.  Correct?

3  A    I was -- again, I was looking for creativity, and it did

4  not exist.

5  Q    And if you recall earlier when we talked about how

6  they -- Armor -- one of the comments from your top people was

7  that Armor could plan but not execute, isn't it the -- do you

8  recall that?

9  A    I recall that, and again, I state that that was a comment

10 from one person and it's not quantified.

11 Q    And it turns out that they couldn't even plan creatively

12 to fix the problems.  Correct?  In the fall of -- in late

13 2017?

14 A    Again, I was asking them for some creative ideas.  They

15 offered a plan.  It was not a plan that I accepted.

16 Q    And that's when you finally decided to do what was

17 suggested to you by your top people back in early 2016, to

18 have DOC take over the health care leadership at Fluvanna;

19 isn't that right?

20 A    That is not correct.  Because the discussion about

21 whether or not we take over Fluvanna actually came from me.

22 It was not from the groups.  So as I'm presenting to the

23 group, I'm the one who said, we should consider whether or not

24 the Department of Corrections takes over Fluvanna, there is a

25 hybrid model, or we stay with Armor.  That discussion was led

1  by me.

2  Q    But my question is about the timing.  My question is

3  about:  It was late 2017 or early 2018, after you got the

4  not-creative plan from Armor, that you finally decided to --

5  that DOC should take over health care leadership at Fluvanna?

6  A    That is correct.

7            MS. CIOLFI:  I have no further questions.

8                    **REDIRECT EXAMINATION**

9  BY MS. LONDOS:

10 Q    Ms. Scott, throughout this process when VDOC has had a

11 respectful disagreement with Dr. Scharff on matters such as

12 the LPN issue, what has VDOC's decision been moving forward

13 vis-a-vis Dr. Scharff's recommendations?

14 A    Whenever there has been any disagreement with

15 Dr. Scharff, we have gone with Dr. Scharff's interpretation.

16 Q    And is that because VDOC intends to make -- has been

17 making progress and intends to make more progress towards full

18 compliance with the settlement agreement?

19 A    And we recognize that Dr. Scharff represents the Court,

20 and so that's what we will do.

21 Q    I would like just to point you to the bottom half of a

22 page that was shown to you by plaintiffs' counsel with regard

23 to the March 23, 2016, meeting minutes.

24            And, in fact, is your team that you put together also

25 noting progress that Armor has made during the spring of 2016?

1  A     Yes, they are.

2  Q     And just so we're clear, the comments that counsel asked

3  you about on cross-examination were comments that you elicited

4  from your top team in an effort to problem-solve.  Correct?

5  A     We were criticizing our functions.  We were looking at

6  where the problems are, where the warts are, what we needed to

7  do to comply with the settlement agreement, but also what to

8  do to provide adequate services.

9  Q     Just so we're clear, the progress of Armor is documented

10  on Bates RFP 4-809.

11        And, in fact, when your entire clinical leadership

12  team came together and you asked them what should we do at

13  this point in the spring of 2016, just before you handed the

14  reins to Dr. Herrick to take over, your clinical leadership

15  team saw improvement from Armor and thought that keeping Armor

16  was the right decision.  Correct?

17  A     Yes, they did.

18  Q     Was your concern at the time -- or was there a concern at

19  the time that if you canceled the Armor contract at that time,

20  that would be a bigger problem on your hands?

21  A     That was the October date that we talked about, because

22  we had said we expect improvement by April 30.  We certainly

23  were not going to remove Armor on April 30, and we were

24  looking at a date that if we removed Armor, when we could

25  actually take over realistically, because we would have to

1  bring on our own leadership.

2      That required advertising.  That required

3  interviewing.  It required bringing people on, establishing

4  salaries, and we could not do that May 1 if we decided to get

5  rid of them.

6  Q   And, in fact, in the spring of 2016 Armor brought in top

7  personnel from outside of Virginia and moved them into

8  Fluvanna to address the settlement agreement.  Correct?

9  A   That is correct.

10     MS. LONDOS:  I would like to move into evidence the

11 document that plaintiffs' counsel questioned Ms. Scott on.

12 It's the -- it is?

13     Counsel tells me it's already in evidence.

14 BY MS. LONDOS:

15 Q   In closing, Ms. Scott, VDOC has been criticized for

16 spending too much money on health care for inmates?

17 A   Yes, we have.

18 Q   And VDOC has moved forward with spending even more money.

19 Correct?

20 A   That is correct.

21     MS. LONDOS:  Thank you.

22     THE COURT:  Just one question.  One of the witnesses

23 mentioned that there was a time when Fluvanna had a great

24 health care program.

25     THE WITNESS:  I'm sorry, I did not --

1    THE COURT:  One of the witnesses remarked that there

2    was a time when Fluvanna had a great health care program.  I

3    was just wondering:  At what point did things turn around and

4    go downhill?

5    THE WITNESS:  I don't know that I can answer that

6    specifically.  We have had -- since Fluvanna has been

7    operational, we have had contractors at the facility.  Only in

8    2012 was I aware that there were problems with the delivery of

9    services by the contractors.  And so I was not supervising

10   health care at that time, but I was certainly aware of the

11   lawsuit and those allegations at that point.  But I was not

12   aware prior to that time of any complaints about the --

13   THE COURT:  When the lawsuit started up, were you

14   involved in the discussions about the conditions?  Were you

15   involved with health care at that time?

16   THE WITNESS:  In 2012?  No.

17   THE COURT:  When did you get involved with health

18   care?

19   THE WITNESS:  It would have been the fall of 2014.

20   THE COURT:  Well, were you all discussing then that

21   there were problems?

22   THE WITNESS:  Yes.  Yes, we certainly were, and we

23   were --

24   THE COURT:  What I'm getting at is:  You are having

25   all these meetings two years later in 2016 trying to identify

REDIRECT EXAMINATION OF N.H. "COOKIE" SCOTT

1    problems, but it looks like you would have been aware of the

2    problems back in 2014 or earlier.

3            THE WITNESS:  Yes.  And we made requirements for

4    changes.  And this is -- it's really not a stagnant process.

5    It's not, you identify a problem, it's fixed, and it goes on.

6    There were highs and some problems.  And so things were

7    working well, and then sometimes there were problems.  But

8    that is not unusual with health care that it's not always

9    going to be at a high level, not in corrections and not in

10   hospitals.

11           THE COURT:  Well, but it didn't get to a high level

12   between 2014 and -- until maybe 2016 or 2017, did it?

13           THE WITNESS:  Yes, there were improvements during

14   that time.  Things were getting better, and then there were

15   some hiccups.  There were some things that did not work.

16   Again, that happens in hospitals.  It happens in other of our

17   correctional facilities with our staff -- so it's not just the

18   contractors.  It happens with corrections staff as well.

19           THE COURT:  Oh, I know, but we're talking about

20   Fluvanna.  I know that there are problems everywhere in every

21   hospital, and you can die in every hospital, and you get

22   mistreated, you get bad medicine, and that sort of thing.

23           THE WITNESS:  And so certainly if I thought --

24           THE COURT:  Anyway, we were talking about the

25   specifics here.

1      THE WITNESS:  Yes, sir.  And there were improvements.

2  And as I said, when I made recommendations to Armor that they

3  bring in additional staff, they always responded.  When we

4  identified a problem, they were addressing those problems or

5  attempting to address those problems.  So they were making

6  efforts.  We worked as a team at Fluvanna --

7      THE COURT:  Okay.

8      THE WITNESS:  -- with the contractors.  Yes.

9      THE COURT:  All right.

10     MS. LONDOS:  Your Honor, could my colleague

11  Mr. McNelis respond?  Because there were issues from -- a fact

12  from earlier in the litigation.

13     MR. McNELIS:  This is about your question, Your

14  Honor.  I think I can ask the witness questions that might

15  help the Court understand what you are asking about.

16     THE COURT:  Okay.

17                      **REDIRECT EXAMINATION**

18  BY MR. McNELIS:

19  Q    I was involved in your earlier litigation representing

20  several companies.  Armor was one of them.  Wasn't there a

21  company called Corizon that had a contract with the Department

22  of Corrections back in the early 2010s?

23  A    Yes, that is correct.

24  Q    And did Corizon have a contract wherein they abruptly

25  pulled out of the contract based on money issues in 2014?

1  A    That is correct.  They were issued the contract based on

2  a lower bid that —— Armor was a vendor at that point.  They

3  got the lower bid and they were providing services to us.

4  They realized they could not provide the services at the

5  amount that they offered, and they gave notice to us and

6  terminated the contract.

7  Q    Now, back before Corizon came and got the contract, I

8  believe it was around 2011, 2012.  Does that sound right?

9  A    I can look.  I have that with me.

10       Let's see.  Corizon got the contract in May of 2013.

11 Q    '13.  Okay.

12 A    Yes.

13 Q    Before Corizon had the contract, who was the contractor?

14 A    Armor.

15 Q    Did Armor have a contract for a fairly extended period of

16 time, a number of years?  Many years?

17 A    For many years, yes.  Now, there were some name changes,

18 but yes, they had it for many years before then.

19       MR. McNELIS:  Thank you.

20       MS. CIOLFI:  Your Honor, may I ask a question in

21 light of counsel's question and your question?

22       THE COURT:  Yes, you may.

23                  **RECROSS—EXAMINATION**

24 BY MS. CIOLFI:

25 Q    Ms. Scott, was there —— has the care at Fluvanna always

1  been provided by a private, for-profit health care contractor?

2  A    Yes, it has.

3  Q    You are sure about that?

4  A    Well, now that you ask me, then -- my understanding is --

5  again, it was not in my division, but my understanding is that

6  it has always been provided by a contractor since the opening.

7          MS. CIOLFI:  Okay.

8          THE COURT:  All right.  Thank you.  You may step

9  down.

10         MR. McNELIS:  Your Honor, we have one more very quick

11 witness to address questions the Court raised with Ms. Scott

12 that she wasn't able to answer, just real quickly on questions

13 you raised, Your Honor.

14         MS. CIOLFI:  Your Honor, this is recalling a previous

15 witness.  And I have already told Mr. McNelis we would be

16 willing to stipulate to the information that he is about to

17 present to the Court.

18         MR. McNELIS:  I don't mind stipulating to it, but I

19 would like to do is make sure I stipulate it right.  The Court

20 was asking about what percentage of the population in

21 Fluvanna --

22         THE COURT:  Oh, okay.

23         MR. McNELIS:  -- is general-type population versus

24 systemic illness.

25         Warden Aldridge, what is the number at Fluvanna

 1  currently of patients who are systemically ill versus, you

 2  know, patients in the general population?

 3          WARDEN ALDRIDGE:  75 percent of the population is on

 4  some type of psychotropic medication.  Over 40 percent receive

 5  between 7 and 33 administration of meds per day.

 6          MR. McNELIS:  So overall, what percentage of the

 7  population?

 8          WARDEN ALDRIDGE:  Over 60 percent.

 9          MR. McNELIS:  Over 60 percent.  If you would be

10  willing to stipulate to that, we don't need to call him to the

11  stand.

12          MS. CIOLFI:  Well, the plaintiffs will stipulate that

13  it's at least 60 percent have chronic illnesses and serious

14  health care needs.

15          MR. McNELIS:  No need to call him.

16          THE COURT:  All right.  Do you rest?

17          MS. GRIGGS:  Your Honor, at this time we would like

18  to move some exhibits into evidence.

19          THE COURT:  Move what?

20          MS. GRIGGS:  At this time we would like to move some

21  exhibits into evidence, if it please the Court.

22          THE COURT:  I think there's -- do you have any

23  rebuttal evidence?

24          MS. CIOLFI:  Yes, we do, Your Honor.

25          THE COURT:  Okay.  Let's call that.  We will get to

1  that.  It's part of your case, but I'd like to get --

2          MS. CIOLFI:  Your Honor, we do have rebuttal

3  evidence.  There are a couple of motions to strike pending

4  regarding Mr. Welsh and Mr. Herrick's testimony, but maybe we

5  can take them after the rebuttal witness, if that's okay with

6  the Court.

7          THE COURT:  All right.  Let's bring the witnesses in.

8          MR. McNELIS:  Your Honor, before -- I'm not going to

9  handle this witness.  Ms. Griggs is.  Can I just make a

10 general objection?

11         I'm unaware of any issue -- there has not been a

12 single nursing expert that we have called in this case.  We

13 put a deposition in, and it was taken a month ago.  A month

14 ago.  There has been no new evidence from any medical expert

15 that was not disclosed before that's come up in the

16 defendant's case that would create the opportunity for

17 rebuttal.  Rebuttal is a new -- we have brought up something

18 new in our --

19         THE COURT:  Let's -- what is the question?

20         MR. McNELIS:  What is the issue that's theirs to

21 rebut, Your Honor?

22         THE COURT:  Well, I'm asking the -- that would be the

23 question.

24         MR. McNELIS:  Yes, sir.

25         THE COURT:  I think, that --

1    MR. McNELIS:  That's the question.

2    THE COURT:  -- you would ask the witness.

3    What is it he is going to rebut, or she?

4    MS. CASTANEDA:  Your Honor, there has been a lot of

5 testimony over the last few days about a number of different

6 issues.  There's been some things that witnesses have said

7 that are different than our previous understanding.

8    I think we would just like to call our expert back to

9 talk about a few of those things, and we will keep it short.

10 And, you know, it's hard to address this objection sort of in

11 a void without the testimony.  So I would ask that the Court

12 hear it and make a decision then.

13    MR. McNELIS:  Your Honor, I can't imagine counsel

14 doesn't know we are going to call her on this point, that

15 point, and that point.  The reason this point is important is

16 because something new came up.

17    THE COURT:  Okay.  Cool it.  If you are going to call

18 a witness on rebuttal, you need to tell me for what purpose.

19    MS. CASTANEDA:  Your Honor, in particular, a lot of

20 the witnesses have testified about timelines for things and

21 how long things have taken or how long things should take or

22 must take.  And our witness really is essentially being called

23 to rebut that.

24    THE COURT:  Okay.  Let's bring the witness on and you

25 can proffer it.

1        MS. CASTANEDA:  And I'm sorry.  We actually have two

2   witnesses.  We have one of our named plaintiffs.

3        THE COURT:  You can call them one at a time.

4        MS. CASTANEDA:  Okay.  First we are calling

5   Ms. Clarke.

6            **JACKIE CLARKE, PLAINTIFF REBUTTAL, SWORN**

7               **DIRECT REBUTTAL EXAMINATION**

8   BY MS. CASTANEDA:

9   Q   Ms. Clarke, we're just going to try to keep this as short

10  as possible.  So I won't belabor things, but I just want to

11  ask --

12       THE COURT:  It's belaboring already.  Ask her the

13  question.

14  BY MS. CASTANEDA:

15  Q   Okay.  I guess you'd agree that you have heard -- you've

16  been sitting here the last couple days.  You have heard the

17  defendants' witnesses testify.  Correct?

18  A   Yes.

19  Q   And you have heard them testify about how long different

20  processes take, or different changes?

21  A   Correct.

22  Q   Right.  And do you have -- you know, based on your

23  experience as a person who has worked in troubled --

24  correctional health care, do you have some experience with how

25  long things can take to change?

1  A    Yes.  I have worked in multiple systems that have been

2  under some type of settlement agreement or consent decree, and

3  again, the amount of time that they are talking about putting

4  things in place again --

5       MS. GRIGGS:  Your Honor, if I may, we would object to

6  this as repetitive of her earlier testimony.

7       THE COURT:  What?

8       MS. GRIGGS:  Ms. Clarke has already testified about

9  this in plaintiffs' case in chief, Your Honor.

10      THE COURT:  Has she?

11      MR. McNELIS:  Yes.

12      THE COURT:  Did she testify as to this?

13      MS. CASTANEDA:  Yes.

14      THE COURT:  I know she testified.

15      MS. CASTANEDA:  I'm just tying to lay a quick

16  foundation for the questions I'm about to ask.

17      THE COURT:  All right.  Go to the specific question.

18      MS. CASTANEDA:  To the specific questions?  Okay.

19  Straight to the specific questions.

20  BY MS. CASTANEDA:

21  Q    Was there some testimony about a CQI process or trying to

22  evaluate and fix things?

23  A    Yes.  It was clear early on what the settlement agreement

24  was, and throughout the last two days, comments that they were

25  evaluating and it took time to put system in place.

1    Again, the length of time that they spent on putting

2  a CQI system in place throughout Scharff's reports -- again,

3  he recommended putting a sick call system in place, not having

4  NPL -- LPNs conduct sick call -- that continued for over two

5  years before they decided not to have the LPNs conduct sick

6  call, which again, they were working them outside the scope of

7  their license.

8    MS. GRIGGS:  Objection.  Move to strike, Your Honor.

9  Assumes facts not in evidence, and is previously covered on

10  direct.  Covered in all of the expert reports in advance of

11  this hearing, Your Honor.

12    THE WITNESS:  I believe both witnesses today --

13  Ms. Seabert mentioned that.

14    MS. GRIGGS:  The Court hasn't ruled on it.

15    THE COURT:  Okay.  Was this not covered earlier?

16    MS. CASTANEDA:  Right.  So the question is the

17  timeline.

18    THE COURT:  Okay.

19  BY MS. CASTANEDA:

20  Q    So how long should that take to fix, could that take to

21  fix?

22  A    It should not take long.  It's something that you put in

23  a policy.  You have a policy to say --

24    THE COURT:  Well, it's not really -- some say it

25  takes a long time, and some say it doesn't take long.  They

1  could both be talking about the same thing, depending on how

2  long they're going to live.  I mean, it's not really -- how

3  long would it take?  I mean, that's not -- you know, "not a

4  long time" doesn't tell me much, and "a long time" doesn't

5  tell me much.

6  BY MS. CASTANEDA:

7  Q    Right.  So how long, a number of days or months?

8  A    I think that's something that they could easily put into

9  place in less than 60 days.

10 Q    All right.  How about fixing the issue of delivering care

11 through food ports?  How long should that take?  A number of

12 days or months?

13 A    Again, that's something that can be a quick seatbelt fix

14 that -- again, a policy decision not to have medication

15 administered through a food port is a quick fix.  It's a

16 policy decision.  It is not allowing the nurses to provide

17 substandard care.  It is a quick fix.

18        MS. GRIGGS:  Your Honor, if I may, we would ask the

19 Court if we could proffer to the Court -- and in it's in

20 evidence already for identification purposes only --

21 Ms. Clarke's initial expert report.

22        All of these issues are in there, Your Honor.  These

23 have been on the table since March 15 of this year, when she

24 wrote her expert report.  She testified about them in our case

25 in chief.  And this is just complete -- it absolutely is

1  bolstering, coming back after our case is rested.

2         THE COURT:  She is not permitted on rebuttal just to

3  repeat what she already testified to.

4         MS. CASTANEDA:  I don't believe she talked about

5  specific timelines, months or days.

6         THE COURT:  I don't recall that she did, either.

7  So...

8         MS. GRIGGS:  But, Your Honor, the issues were

9  addressed.

10        THE COURT:  Okay, but if the witness took the stand

11 and said something contrary to what she has evidence of and it

12 impeaches the witness, this is the time she can testify to it.

13 Whether she testified or could have earlier, the purpose is

14 impeachment.

15        MS. GRIGGS:  If I may, Your Honor -- the only thought

16 I would offer on that, Your Honor, is --

17        THE COURT:  Well, I don't know why this is so

18 critical, but if she has already said it --

19        MS. GRIGGS:  If I may, Your Honor, with all due

20 respect, this is what this case has been about from day one.

21        THE COURT:  Okay.  But if we take -- if we get her

22 off the stand in about five minutes, you know, we won't be

23 here for another week.

24        MS. GRIGGS:  Thank you, Your Honor.  We will just

25 note our objection to this entire line of testimony.

 1            THE COURT:  All right.  Go ahead.  Let's move on.

 2    BY MS. CASTANEDA:

 3    Q    So I believe I was asking you how long and the amount of

 4    time would it take to fix the issue of delivering care through

 5    the food port.  Like days or months?

 6    A    Again, I think that would take 30 days, 45 days.  It's a

 7    policy decision.  You already have the two officers with the

 8    nurses at pill line.  Again, it's a policy decision.  It's a

 9    supervisory issue.

10    Q    There has been some testimony about -- in fact, a lot of

11    testimony, I think, from a lot of witnesses, about staffing

12    levels and how hard it's been to get the staffing in.  How

13    long do you think that should take to fix?

14    A    I think that they have showed over the past two days with

15    the nurses, that they have testified the past few days, that

16    they have been able to increase their staffing.  They have

17    been able to get the registered nurses in.  So, again, they

18    have shown they have been able to do it in the past two or

19    three months.  So, again, that's something that they have been

20    able to do recently but didn't do it in the past.

21    Q    And based on the testimony you have heard, do you have

22    any concerns about their ability to sustain that change?

23    A    The concern that I have is in -- again, in my experience,

24    when you are only relying on registry dollars, registry

25    dollars are not permanent.  They are temporary.

1      I understand that they got approval for this

2  $3 million, six months.  Once that $3 million is gone, unless

3  that 3 million is turned into state positions that they can

4  hire state staff, there is no guarantee that once the pressure

5  is off that those staff will be gone.  So again, the intent of

6  what they are trying to do now, they won't be able to sustain

7  it.

8  Q    There has been some testimony about supplies and

9  equipment and whether that's sufficient or insufficient,

10  whether the supplies and equipment are checked or not, are

11  functional or not.  How long should that take to fix?

12  A    Again, that's something that should be a very quick fix.

13  You need a policy.  You need the expectation.  You need a

14  staff that's assigned to do that to ensure that your par

15  levels are up to a sufficient level, and someone responsible

16  to do it.  And again, that's something that could be a very

17  quick fix.

18  Q    How quick?

19  A    I say that's something that's another 30 days, 45 days to

20  fix.

21  Q    There has been also a lot of testimony about emergency

22  equipment and emergency response.  And, you know, I believe

23  there was an example from Dr. Gable's testimony yesterday.

24      Can you comment on how long -- on what that was and

25  how long that should take to fix?

1  A    Yes.  I believe Dr. Gable mentioned yesterday that

2  April 18th there was still an issue in the infirmary where the

3  nurse -- there was an emergency, and they couldn't find a

4  backboard.

5          I also believe Mr. Herrick sort of attributed the

6  issue of me wanting suction machines out in the housing unit.

7  Again, I was just noting in my report that they weren't there,

8  but it was their staff that had recommended that.  And I was

9  just noting that they weren't there.

10          The issue with emergency equipment -- regardless of

11  what the facility wants, the issue is that everyone needs to

12  know where the emergency equipment is, who is responsible at

13  the time that there is an emergency to bring the emergency

14  equipment, and who is assigned to do it.

15          So, again, as recently as April 18, the staff in the

16  infirmary did not know at the time of an emergency.

17  Q    And there has also been a lot of testimony about

18  medication supply or pill line dispensing medications.  How

19  long should that take to fix?

20  A    I would also like to address the fact that Mr. Herrick

21  questioned, did I know the difference between dispensing and

22  administering medications.  So I would like to clear that up

23  once again, that I know the difference.  And again, maybe the

24  department needs to look at their own regulations.

25          The difference between dispensing medication versus

1  administering medication is the act of taking medication from

2  one container --

3  Q    So you mean like these containers?

4  A    Yes.

5         -- and taking them from one container and putting

6  them into another container, which would be the yellow

7  envelopes that say, then, label with the patient's name, date

8  of birth, housing location.  That act of labeling and

9  packaging is the act of dispensing.

10 Q    And what if they take it and put it directly into the

11 cup?

12 A    The act of putting the medication from the bottle to the

13 cup is perfectly fine.  That's still prepouring, but that is

14 not dispensing.

15 Q    And how long would those issues -- I mean, so there is

16 the dispensing and prepouring.  There was also, I think, maybe

17 some testimony about inaccurate charting.  So how long does

18 that take to fix?

19 A    Again, that could be a training issue.  I believe because

20 they have so many nurses and not adequate training for them to

21 know the system -- I think they said in Gable's testimony just

22 yesterday, the difference between the MARs was the M versus

23 the N.

24         It's clear that there's still some concerns about the

25 medication MARs, and that may be due to insufficient training

CROSS-REBUTTAL EXAMINATION OF JACKIE CLARKE

1  for the nursing staff; they are not being trained because

2  there are so many registry nurses and not enough supervisors

3  to provide adequate training.  So, again, that is a training

4  issue.  That's a supervisory issue.  But, again, that's

5  something that could be fixed with training and supervision.

6  Q    All right.  And how long would it take?

7  A    Again, with the new supervisors they have, probably 60 --

8  30 to 60 days.

9  Q    I believe Dr. Herrick testified on Wednesday about DOC or

10  people at DOC maybe being confused about what the settlement

11  agreement required.  Can you talk about that?

12  A    Yes.  Again, I believe they hired him because he had

13  experience with a settlement agreement.  So they shouldn't be

14  surprised.  When I read the settlement agreement, it's not

15  unclear.  It's clear on what they were required to do.

16        I believe the issue was that they really didn't feel

17  that they really had to do it.  Not until --

18        THE COURT:  These are opinions beyond.

19        THE WITNESS:  Okay.

20        MS. CASTANEDA:  Thank you.  That's all.

21        **CROSS-REBUTTAL EXAMINATION**

22  BY MR. McNELIS:

23  Q    Ms. Clark, we haven't met.  My name is Ed McNelis.

24        You have been here, ma'am, all week?

25  A    Yes, I have.

CROSS-REBUTTAL EXAMINATION OF JACKIE CLARKE

1  Q    What is your regular job?  Where would you be if you

2  weren't here in court?  Would you be working?

3  A    I would be working.

4  Q    Okay.  And what did you do back at work to take care of

5  your absence for a week?

6  A    I'm on vacation.

7  Q    All right.  And, ma'am, how much did you charge the

8  plaintiffs to be here all week?

9  A    Oh, well --

10         MS. CASTANEDA:  Your Honor, I'm not sure why that's

11  relevant.

12         MR. McNELIS:  It goes to bias, Your Honor.

13         THE WITNESS:  Oh, you want me to -- I can answer

14  that.

15  BY MR. McNELIS:

16  Q    Yes.

17  A    I charge 250 an hour.

18  Q    Okay.  You charge -- how many hours a day have you

19  charged?

20  A    Oh, I haven't decided yet.

21  Q    Okay.  Now, after court --

22         THE COURT:  Wait.  Wait.  This is black-letter stuff.

23  I mean, you don't object to this type of thing.

24         Go ahead.

25  BY MR. McNELIS:

1  Q    $250 an hour.  Ma'am, how many hours a day have you been

2  billing while you have been here?

3  A    I haven't added it up yet.

4  Q    Now, after the court is over, there have been meetings at

5  the Omni Hotel in the Preston Room.  And you have been

6  attending those meetings, haven't you, ma'am?

7  A    Yes, I have.

8  Q    And they're dinner meetings; is that correct?

9  A    No, they are not dinner meetings.

10  Q    Are you billing for the time you spend at the Preston

11  Room every night?

12  A    No, I'm not.

13  Q    Okay.  What time do you start billing?  When you get to

14  the courthouse?

15  A    Courthouse.

16  Q    So eight, nine hours a day, times 250?

17  A    Possibly, yes.

18  Q    Ma'am, the food port thing you were just talking about,

19  Dr. Scharff has not found in his reports that providing care

20  for the food port is a noncompliance issue with the settlement

21  agreement, has he?

22  A    I don't know if he has found that that's a noncompliant

23  issue.  I'm telling you that is a substandard of care issue.

24  Q    Dr. Scharff has not cited that --

25              THE COURT:  Well, hurry up and see if it can be fixed

1  in, I don't know, 30 to 60 days.

2        MR. McNELIS:  I'm just trying to make the point --

3  sorry, Your Honor.

4        THE COURT:  It doesn't make any difference.  I mean,

5  we talked about whether it's good or bad --

6        MR. McNELIS:  Yes, sir.

7        THE COURT:  -- or indifferent.  But...

8  BY MR. McNELIS:

9  Q    Now, you got to see the testimony of Nurse Katzman and

10 Nurse Stanford, haven't you?

11 A    Yes.

12 Q    Do you find Nurse Katzman to be an intelligent,

13 thoughtful nurse based on her testimony here in court?

14 A    She seemed very reasonable yesterday.  Yes.

15 Q    Wouldn't it be fair to say she seemed pretty sharp and

16 pretty focused on what she is doing?

17 A    I thought she was very reasonable yesterday, yes.

18 Q    How about Nurse Stanford?  Did you find her to be an

19 intelligent and seemingly knowledgeable nurse?

20 A    She was the best of the two.

21 Q    Okay.  And do you believe that the two of them were being

22 honest when they told Judge Moon that they are working hard

23 and they believe that morale is starting to come around at

24 Fluvanna?

25 A    Oh, I believe they have good intentions and they are

1 trying to fix that facility. I do believe that.

2 Q    And do you believe they are going to succeed?

3 A    I believe that right now, given the resources and

4 attentions that they are being provided now, that they are

5 making progress. The concern is, will they continue to have

6 the resources if there is not court intervention?

7 Q    What evidence -- and this is an open -- I'm on

8 cross-examination. I'm going to ask you this question.

9 A    Okay.

10 Q    Please tell me what evidence you've heard -- you have

11 been here all week in this courtroom -- what evidence have you

12 heard that anyone has been deprived resources?

13 A    Well, I believe that Herrick said that when he took the

14 job, he had carte blanche. He could do whatever he wanted to

15 fix the system. He was never told no, that he can have

16 anything he wants.

17        But when it really came down to it, he had to write

18 letters to say the house is on fire to really get resources.

19 So the reality is, he couldn't get whatever he wanted. So

20 again, that's an example of not being able to get what he

21 wanted.

22 Q    What was he denied?

23 A    Staff.

24 Q    Please tell me what testimony there was that he was

25 denied staff because of resources.

1  A    His email -- I mean, his testimony Wednesday.

2  Q    You are saying -- you are saying -- you sat in this

3  courtroom.  You are saying today in the witness stand that

4  Mr. Herrick testified yesterday --

5  A    Wednesday.

6  Q    -- Wednesday, excuse me, that he was denied -- and

7  "resources" is a euphemism.  Money.  Right?  That's what we're

8  talking about?

9  A    Yes.

10  Q    He was denied money for staffing?  Is that your

11  testimony, ma'am?  That's what you say he said.

12  A    No.  I said that he had to do a purchase order for a

13  contract when he had to put extra stuff in his purchase order

14  to say that he is concerned about the care, the nursing at the

15  facility, that things were getting out of control, all of that

16  in an effort to get the resources that he needed to get the

17  contract for the extra -- I don't know what they called it,

18  but the extra money for the nurses, for the extra contract

19  staff that they are utilizing at the facility now.

20  Q    And did you hear him say that they got the extra

21  $3 million approved?

22  A    Yes, by using those words.

23  Q    So the resources were not denied, were they?

24  A    Right.  But he had to put those type of words in the

25  contract -- in that procurement request to get the contract.

1  Q    You also testified a few minutes ago about how the state

2  ought to get additional state staffing for the facility.  How

3  many state staff positions do you have at the Los Angeles

4  County Jail?

5  A    Oh, my goodness.  Let's see.  Somewhere -- well, they are

6  not state staffed.  They are county staffed.

7          3,200 -- I think about 3,200 positions.

8  Q    Does the California assembly decide county staff

9  positions, or does Los Angeles County decide county staff

10  positions?

11  A    County staff.

12  Q    Medical equipment.  Ma'am, you saw Dr. Joshua's photos of

13  some of the very -- I'll call it -- I won't call it "state of

14  the art" -- very good equipment, as Dr. Joshua described it?

15  A    I didn't see it.

16  Q    I'm sorry?

17  A    I didn't see it.

18  Q    So you weren't in the courtroom for that?

19  A    No one in the court saw that.

20  Q    Oh, they didn't put that out here.  I understand.  You

21  didn't get to see it out here?

22  A    No.

23  Q    I understand.  Okay.  Never mind.  I can't ask you

24  questions about that.

25          Pharmacy dispensing issues.  Dr. Scharff has not

1  found dispensing of medications -- the distinction you are

2  making between passing them out and dispensing them, he has

3  not found that to be a noncompliance issue with the contract,

4  has he -- sorry, with the settlement agreement, has he?

5  A    Pill call has been an issue in every single one of his

6  reports.

7  Q    Ma'am, isn't it fair to say that you are part of the

8  plaintiffs' team?

9  A    No.

10        MR. McNELIS:  Okay.  That's all I got.

11        THE COURT:  All right.  You may step down.  Thank

12  you.

13        MS. ELLIS:  Your Honor, plaintiffs call Melissa

14  Atkins.

15        MR. McNELIS:  Your Honor, can I make the same

16  objection?  Ms. Atkins, as I understand the proffers, is going

17  to come in and talk about bad health care she's received.

18  Now, we have already had a number of plaintiffs speak to that.

19        THE COURT:  Overruled.  If she's going to contradict

20  one of your witnesses, she's permitted to testify.

21        MR. McNELIS:  None of my witnesses ever mentioned her

22  name once except on cross-examination.

23        THE COURT:  Well, whatever.  If she can contradict

24  it, it's okay.

25        **MELISSA ATKINS, PLAINTIFF REBUTTAL, SWORN**

1          **DIRECT REBUTTAL EXAMINATION**

2    BY MS. ELLIS:

3    Q    Please state your name.

4    A    Melissa Faye Atkins.

5    Q    Ms. Atkins, are you incarcerated at Fluvanna?

6    A    Yes, ma'am, I am.

7    Q    When did you arrive at Fluvanna?

8    A    I arrived in Fluvanna in 2001.

9    Q    So you have been there for 17 years?

10   A    Yes.

11   Q    Do you have any chronic medical conditions?

12   A    Yes, ma'am, I do.

13   Q    What are those?

14   A    I have got degenerative rheumatoid arthritis, and

15   recently I was diagnosed with a pyoderma gangrenosum, as well

16   as fibromyalgia.

17   Q    Ms. Atkins, you are a named plaintiff in this action.

18   Correct?

19   A    Yes, ma'am, I am.

20   Q    And have you been in the courtroom most of this week?

21   A    Yes.

22   Q    Did you hear Warden Aldridge's testimony about culture

23   changes at Fluvanna?

24   A    Yes, I did.

25   Q    As a result of your chronic medical conditions, do you

1  interact often with the Fluvanna health care system?

2  A    Yes.

3  Q    In your interactions with the health care system at

4  Fluvanna, have you seen the culture change since 2016?

5  A    I have not really seen a positive change as far as

6  medical.

7  Q    Ms. Atkins, did you file an emergency grievance in

8  April 2018, just a couple months ago?

9  A    Yes.

10 Q    What prompted you to file that emergency grievance?

11 A    I was having shortness of breath, and as the day

12 progressed it was not getting any better and it was hurting up

13 in my chest.  And I was afraid of what was going on.  I mean,

14 I couldn't catch my breath.

15 Q    Were you evaluated by a nurse after filing that emergency

16 grievance?

17 A    Yes, I was.

18 Q    And what was the result --

19        MS. GRIGGS:  Your Honor, we are objecting.  It is not

20 rebuttal to anything that was brought up by any witness on

21 behalf of the defendants.

22        MS. ELLIS:  Your Honor, there was significant

23 testimony from Nurse Stanford, Nurse Katzman, and I believe

24 also Warden Aldridge, about this new emergency grievance

25 system that was very recently put in place.

1          Ms. Atkins has had recent experience with that, and

2    that's what she is -- very briefly, I anticipate --

3          THE COURT:  Limit it to the grievance system.

4          MS. ELLIS:  Yes.  Yes, Your Honor.

5          THE COURT:  Okay.

6    BY MS. ELLIS:

7    Q    So Ms. Atkins, I believe you said you filed an emergency

8    grievance for chest pain and shortness of breath?

9    A    I couldn't -- well, yeah, I couldn't catch my breath.

10   Q    And were you evaluated by a nurse after filing that

11   emergency grievance?

12   A    Yes, I was.

13   Q    And what was the result of that evaluation?

14   A    After she did my triage, I had a fever of, like, 101.

15   And she determined that I was at the beginning of a -- like,

16   an upper respiratory infection or cold, or whatever you want

17   to call it.

18   Q    And so is it fair to say, fortunately, it turned out that

19   this was not a life-threatening circumstance?

20   A    Yes, ma'am.

21   Q    Did you have any way of knowing that before you filed the

22   emergency grievance?

23   A    No.  I mean, I filed it because I wasn't able to breathe

24   as I normally breathe, and that's not something I have ever

25   had problems with, is breathing.  So it scared me.

DIRECT REBUTTAL EXAMINATION OF MELISSA ATKINS

1   Q    Were you charged $5 for filing that emergency grievance?

2   A    Yes, I was.

3   Q    Did you try to get that charge refunded?

4   A    I did.

5   Q    As part of your efforts to get that charge refunded, did

6   you meet with a health care administrator at Fluvanna?

7   A    Yes, I did.

8   Q    Can you describe that meeting?

9   A    When I first went in, he was --

10          THE COURT:  Well, isn't it the policy -- the policy

11  is that they are charged the $5 after, if it doesn't turn out

12  to be an emergency?

13          MS. ELLIS:  Yes, Your Honor, and I believe plaintiffs

14  have put forward that that's a disincentive to women to

15  seeking emergency care, when they can't -- they can't make

16  that determination.

17          THE COURT:  Okay.  Let's go ahead and get it.  I'm

18  sorry.

19  BY MS. ELLIS:

20  Q    Can you please describe that conversation with the

21  administrator?

22  A    Well, when I first went in, he was reading the grievance.

23  And he chuckled to himself.  And to me, I didn't see anything

24  funny over the fact that -- I mean, I sincerely at that point

25  in time when I put it in, I felt like I needed to be seen.

1 And to put in a sick call, that's at least 48 hours until I

2 would be evaluated.

3 Q    Did the administrator say anything to you about when it's

4 appropriate to file an emergency grievance?

5 A    Yes.  Actually, he said that the instances they use to

6 determine whether it's an emergency is if you're bleeding or

7 you are unconscious.

8 Q    Was this interaction typical, in your personal

9 experience, of interactions with the health care system at

10 Fluvanna?

11 A    With the majority of it, yes.

12 Q    Ms. Atkins, you testified you had been at Fluvanna for 17

13 years.  Do you remember when the settlement agreement was

14 implemented?

15 A    I do.

16 Q    Do you have changes that you hope to see as a result of

17 that?

18 A    Yes.

19        THE COURT:  Wait a minute.  Let's stick to -- this is

20 getting out of line.  Rebuttal is rebuttal, not --

21        MS. ELLIS:  Thank you, Your Honor.  I will just ask

22 one more question in rebuttal for Ms. Atkins.

23 BY MS. ELLIS:

24 Q    Ms. Atkins, did you hear Dr. Joshua testify this morning

25 regarding the condition of Fluvanna during his visit?

1  A     Yes, I did.

2  Q     And did you see some of the pictures that he showed?

3  A     I seen a few of them on the monitor there, yes, ma'am.

4  Q     Were you housed in the infirmary for a few months during

5  last year?

6  A     I went in in November, and I left February 21 of this

7  year, 2018.

8  Q     Did you see Dr. Scharff tour the infirmary at some point

9  during that time?

10 A     I did.

11 Q     Was the appearance of the infirmary on the day that you

12 saw Dr. Scharff tour it the same as it was on an average day?

13 A     No, ma'am, it wasn't.

14 Q     How was it different?

15 A     It had been cleaned thoroughly.  I mean, you would know

16 when someone was getting ready to come through, because the

17 cadre workers, or the housekeepers, whatever you want to call

18 them, they would be back there putting in extra hours.

19        A couple of ladies aren't able to take care of their

20 normal hygiene.  And no longer than I was in the infirmary, I

21 learned when something was going on, because you would see

22 both of them being up and being bathed.

23        MS. ELLIS:  Thank you, Ms. Atkins.

24        THE COURT:  All right.  Go ahead.

25                **CROSS—REBUTTAL EXAMINATION**

CROSS-REBUTTAL EXAMINATION OF MELISSA ATKINS

1  BY MS. GRIGGS:

2  Q    Good afternoon, Ms. Atkins.  Ms. Atkins, have you ever

3  had insurance outside of the correctional facility, health

4  insurance?

5  A    Yes, ma'am.

6  Q    Have you ever had to pay a co-pay for any of the health

7  care that you have had?

8  A    Yes, ma'am.

9  Q    Ms. Atkins, have you been transported on numerous

10  occasions to the University of Virginia for care for various

11  illnesses and injuries that you have suffered?

12  A    Not injuries, but illnesses, yes, I have.

13  Q    Well, if I understood correctly, when you were coming to

14  the hearing this week, you were concerned about injury to your

15  leg from --

16        MS. ELLIS:  Your Honor, I'm going to object.  This is

17  outside the scope of what I asked Ms. Atkins about.

18        THE COURT:  Overruled.  Go ahead.

19  BY MS. GRIGGS:

20  Q    Were you concerned about some injury to your leg?  And I

21  might be misunderstanding.

22  A    The -- no.  The injury is actually an ulcer that is

23  healed up, and I was told by UVA to have no trauma at all to

24  it.  So therefore, where the shackles are, it would rub where

25  the ulcer is now healed over.

1   Q     Okay.  So that ulcer did heal?

2   A     Finally, thankfully, yes.

3   Q     Okay.  And you have been taken to UVA for multiple

4   illnesses throughout your time that you have been at Fluvanna?

5   A     I have been treated by rheumatology there, as well as

6   orthopedic, yes, ma'am.

7         MS. GRIGGS:  Those are all the questions I have, Your

8   Honor.

9         THE COURT:  All right.  Thank you.

10        MS. ELLIS:  No redirect.

11        THE COURT:  She may step down.

12        MS. GRIGGS:  Your Honor, we just need to move our

13  evidence in.

14        Your Honor, we would proffer to the Court the

15  de bene esse deposition of James Welsh, the RN, and the

16  exhibits that were associated with it.  My understanding is

17  that the -- Exhibit 1 we would only proffer for

18  identification, because it's his expert report -- all the

19  expert reports in the case have been proffered for

20  identification purposes only -- and the rest of the exhibits

21  are otherwise proffered for admission based on his deposition.

22        It's our understanding that other than Exhibit 1,

23  there was no objection to the exhibits, although there was

24  objection to the de bene esse deposition.  We have prepared it

25  as required by the plaintiffs with our portion of the -- with

1  their objections retained.

2          THE COURT:  Okay.

3          MS. CASTANEDA:  And Your Honor, the plaintiffs would

4  just, as defense noted, renew their objections to the expert

5  testimony of Mr. Welsh.  Again, like the other experts, we

6  don't dispute that Mr. Welsh has qualifications, but we

7  dispute whether his opinions are helpful to the trier of fact

8  and whether they are based on proper information.

9          MS. GRIGGS:  Your Honor, we would move these in as

10 Exhibit 40 and Exhibit 41, if we may.

11         THE COURT:  All right.

12         MS. GRIGGS:  41 and 42, it would be.  I apologize,

13 Your Honor.  41 and 42.  I apologize.

14         (Defendant Exhibit Numbers 41 and 42 were marked and

15 received.)

16         MS. GRIGGS:  Oh, the -- so the -- James Welsh's

17 deposition is on this disk, Your Honor.

18         These are also medical records that are being

19 admitted into evidence based on the medical records that the

20 plaintiffs have admitted into evidence for completeness, Your

21 Honor, under Rule 106.  This is the completeness for -- and

22 it's the same ones -- we will give you a list.

23         It's -- and I'm going to say her name badly --

24 Ms. Ganiere -- I apologize -- Ms. Nichols, Ms. -- let me

25 get -- can I have that list?  Oh, okay.  I apologize.  It's

1  right on here.  Ms. Cairns, Ms. Ganiere, Ms. Nichols, and

2  Ms. Hartlove, whose records were otherwise admitted by the

3  plaintiffs.  And this is for completeness purposes, Your

4  Honor.

5          THE COURT:  All right.

6          MS. GRIGGS:  We can give them to you.  Yes, these are

7  all records that were produced.  They are on our exhibit list

8  with their Bates numbers.

9          MR. McNELIS:  Can you call those numbers out?

10         MS. GRIGGS:  Oh.  This is 43.  43 is the medical

11  records.  42 is the de bene esse deposition.  And 41 is the

12  exhibits to the de bene esse deposition.

13          (Defendant Exhibit Number 43 was marked and

14  received.)

15         THE CLERK:  James Welsh?

16         MS. GRIGGS:  Yes.  Thank you.

17         MR. HOWARD:  Your Honor, we would like to request

18  that the Court accept into evidence the testimony of

19  Dr. Greifinger that was given with respect to the women whose

20  medical records were admitted as a result of Dr. Gable's

21  testimony yesterday afternoon, including Ms. Ganiere, Ms. --

22  I'm sorry, Your Honor -- Ms. Segura, Ms. Nichols, and

23  Ms. Cairns.

24         MR. McNELIS:  May I respond?

25         THE COURT:  Yes.

1          MR. McNELIS:  Your Honor, we made it clear the only

2   reason we had Dr. Gable testify about people in

3   Dr. Greifinger's rebuttal report, which was filed late -- it

4   was filed late -- was as proffer in the event the Court was

5   going to accept it.

6          THE COURT:  Okay.

7          MR. McNELIS:  So to the extent Dr. Gable talked about

8   the four women in -- is it four in Greifinger's rebuttal

9   report?

10          MS. GRIGGS:  There's four, but he was only asked

11   about three of them, as I recall.

12          MR. McNELIS:  Okay.  Those three women, to the extent

13   Dr. Gable testified about them, that was a proffer.  So the

14   Court should not consider it if the Court does not consider

15   the testimony of Dr. Greifinger in his rebuttal report that

16   was late.

17          THE COURT:  Okay.  He's right.

18          MR. HOWARD:  Your Honor, we will also note that -- I

19   think you'll recall the other day, Wednesday afternoon, that

20   we made an oral motion to strike the testimony of Dr. Herrick

21   on the grounds that he had been permitted to offer testimony

22   beyond the scope of a fact witness.  We have filed a written

23   motion after being able to review the transcript.  We will

24   stand on that written motion, and we will accept the Court's

25   ruling as it deems appropriate.

1          THE COURT:  All right.

2          MR. McNELIS:  Your Honor, can I just say that, since

3    they filed a written motion, I assume that the Court would

4    allow us the standard reply time to file the opposition?

5          THE COURT:  At some point, I'm going to ask both

6    sides, of course, to submit proposed findings of fact and

7    conclusions of law.

8          MR. McNELIS:  Yes, sir.

9          THE COURT:  And I'm going -- I want you to detail in

10   the findings of fact, where in the record your position is

11   supported.

12         MR. McNELIS:  Yes, sir.

13         THE COURT:  Now, there is a question regarding a

14   visit to Fluvanna by the Court.  And I'm inclined to do that.

15   And I'm not worried about -- I mean, it's not going to be part

16   of the evidence in the case, but it would help give me

17   background.  Anytime you see the scene of what you have been

18   talking about, it gives you a different -- some slant on how

19   to view some of the evidence.

20         And I mean, I know you are concerned maybe it would

21   be cleaned up or something.  But that's not a -- I'm not going

22   to be taking evidence.  But if one of the attorneys on each

23   side want to go along, we will give you notice.  There's not

24   going to be any surprise visit.  So...

25         MR. HOWARD:  Yes, Your Honor.

1          MR. McNELIS:  Yes, Your Honor.

2          THE COURT:  So we'll schedule that.

3          And what I'm going to ask you to do is next -- say by

4     Tuesday, you have a conference call with my clerk, Mr. Juhan,

5     and work out the time schedule for filing the findings of fact

6     and things that need to be done.

7          You may want to look at how long -- I don't know

8     whether you are going to need the record or not, but you are

9     going to have to find out.

10         MR. HOWARD:  Your Honor, may I offer closing

11    argument?

12         THE COURT:  Well, I don't think it's -- at this time,

13    I don't think it's really appropriate.  I want the findings of

14    fact and conclusion of law.  And if we need any further

15    hearing, then I'll -- we'll do it.  But I don't think I need a

16    closing argument.  I don't think it would be particularly

17    helpful at this point.

18         MR. McNELIS:  Thank you, Your Honor.

19         MR. HOWARD:  Your Honor, I'm awfully disappointed.

20    At 2:30 this morning, I was hard at it.

21         MR. McNELIS:  Here's my outline.

22         THE COURT:  Well, just store up that energy.  You

23    will probably need it another day.

24         MR. HOWARD:  It's all gone, Your Honor.

25         THE COURT:  Okay.  Anything else today?

CROSS—REBUTTAL EXAMINATION OF MELISSA ATKINS

1          MR. McNELIS:  Not from the defense, Your Honor.

2          THE COURT:  Okay.  I appreciate y'all's patience and

3    tolerance of the Court.  And anyway, thank you.  You have been

4    very helpful.

5          THE MARSHAL:  All rise.

6       (Proceedings concluded at 4:07 p.m.)

7

8                    CERTIFICATE

9    I, Tracey Aurelio, certify that the foregoing is a

10   correct transcript from the record of proceedings in

11   the above—entitled matter.

12

13          /s/  Tracey Aurelio   Date:  June 15, 2018

14

15

16

17

18

19

20

21

22

23

24

25