```
 1                UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF VIRGINIA
 2                   Charlottesville Division

 3   CYNTHIA B. SCOTT, et al.,      )     3:12-cv-00036
                                    )
 4            Plaintiffs,           )     Lynchburg, Virginia
                                    )     June 8, 2018
 5            v.                    )     3:30 p.m.
                                    )
 6   HAROLD W. CLARKE, et al.,      )
                                    )
 7            Defendants.           )

 8
                   TRANSCRIPT OF MOTIONS HEARING
 9            BEFORE THE HONORABLE NORMAN K. MOON
                   UNITED STATES DISTRICT JUDGE
10
     APPEARANCES:
11
     For the Plaintiffs:
12            ANGELA A. CIOLFI
              SHANNON M. ELLIS
13            BRENDA E. CASTANEDA
              Legal Aid Justice Center
14            1000 Preston Avenue, Suite A
              Charlottesville VA 22903
15
              THEODORE A. HOWARD
16            Wiley Rein, LLP
              1776 K St. N.W.
17            Washington D.C. 20006

18   Court Reporter:     Sonia Ferris, OCR
                         116 N. Main St.  Room 314
19                       Harrisonburg VA 22802
                         540.434.3181  Ext. 7
20

21

22

23

24

25   Proceedings recorded by mechanical stenography.
```

```
 1   APPEARANCES (Continued):

 2   For the Plaintiffs:
              ADEOLA OGUNKEYEDE
 3            Legal Aid Justice Center
              123 E. Broad St.
 4            Richmond VA 23219

 5   For the Defendants:
              EDWARD J. MCNELIS, III
 6            RUTH T. GRIGGS
              ELIZABETH M. MULDOWNEY
 7            Sands Anderson, PC
              1111 E. Main St.  Suite 2400
 8
              KATHERINE C. LONDOS
 9            NATHAN H. SCHNETZLER
              Frith Anderson & Peake, PC
10            29 Franklin Rd., SW
              Roanoke VA 24011
11
              DIANE M. ABATO
12            Office of the Attorney General
              202 N. Ninth St.
13            Richmond VA 23219

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT:  Good afternoon.

2          Call the case, please.

3          THE CLERK:  Cynthia B. Scott, and others vs. Harold

4   W. Clarke, and others, case No. 3:12cv36.

5          THE COURT:  Plaintiff ready?

6          MR. HOWARD:  Yes, Your Honor.

7          THE COURT:  Defendants ready?

8          MS. LONDOS:  Yes, Your Honor.

9          THE COURT:  First thing we'll take up -- you have the

10  schedule we sent out, I think.  First thing will be the

11  motions in limine, I believe.

12          (Court conferred with law clerk.)

13          MS. OGUNKEYEDE:  If I may proceed, Your Honor?

14          THE COURT:  You may.

15          MS. OGUNKEYEDE:  Adeola Ogunkeyede on behalf of the

16  plaintiffs.

17          Based on the Court's order yesterday, I understand

18  Your Honor would like to first or primarily deal with

19  plaintiffs' motion in limine number 6.  That motion in limine

20  seeks the court to establish a time period for the contempt

21  at issue in this case, as well as set out the legal standard

22  applicable to determining the plaintiffs' motion for order to

23  show cause.

24          The first part of that motion in limine seeks to

25  address the question of what time period of facts will the

1    Court consider to determine contempt.  The question arises

2    because the Court expressed a preference for determining the

3    prima facie issues of the show cause at the same time it

4    considered the ultimate issue of contempt.  It's a clarifying

5    question so as to streamline the presentation of evidence at

6    next week's hearing.  It is not, as defendants suggest, a

7    dispositive question in this case.

8        Our position is that noncompliance should be judged

9    from February 20, '16 through September 2017.  That is the

10   period from the entry of this Court's consent judgment

11   incorporating the settlement agreement through the time the

12   plaintiffs filed our motion to the Court to show cause.  Any

13   facts regarding defendants' progress towards compliance

14   between September, 2017, through the present should go only

15   to the remedy.  The time period that plaintiffs are asking

16   the Court to institute is appropriate from the standpoint

17   that it tracks the provisions of the settlement agreement

18   through the obligation of the defendants as well as the

19   obligations of the plaintiffs and the compliance monitor to

20   the extent that it tracks the settlement's sense of how

21   progress, appropriate progress, was to be evaluated.

22       It's also an appropriate time period from an

23   equitable standpoint, considering that defendants' actions to

24   remedy any violations of the settlement agreement from

25   September, 2017, through the present, can still be considered

1  by the Court.  So it doesn't bar the Court from considering

2  those actions, but we'd ask that those actions go only to the

3  question of remedy, should a contempt finding issue.

4         Per the settlement agreement, the defendants were

5  required to implement all provisions of the settlement

6  agreement within 30 days of the effective date.  That's found

7  in section 6, paragraph 2, on page 24 of the Court's

8  settlement agreement.  That effective date was February 5,

9  2016.  Within 30 days of compliance, the monitor in this

10  case, Dr. Scharff, began making visits to Fluvanna to track

11  compliance and to document in his reports that would produce

12  for both sides his assessment of the Department of

13  Corrections' progress towards complying with their settlement

14  obligations.  The compliance monitor continued to make visits

15  and produce quarterly written reports to which both sides had

16  access and had an ability to comment on before finalization.

17         As the plaintiffs reviewed those written reports, we

18  were dismayed at the Department of Corrections' noncompliance

19  as demonstrated through the documentation provided to both

20  sides by the compliance monitor.  Those areas of

21  noncompliance were found over several months in several key

22  areas under the provisions and standards of the settlement

23  agreement.  Fourteen months into the compliance period that

24  plaintiffs are asking the Court to find as at issue for

25  contempt, plaintiffs put defendants on notice that they were

1    not abiding by the terms of the settlement agreement.  That

2    is a notice that plaintiffs are allowed to put defendants on,

3    separate and apart from any notice that the compliance

4    monitor may or may not issue.  You can find the authorization

5    for the plaintiffs that issue such a notice to the defendants

6    on page 19 of the settlement agreement.

7            Thereafter, plaintiffs waited five months to file --

8            THE COURT:  Well, I can answer this pretty quickly,

9    but I'll let the defendant speak to the same issue.  I mean,

10   I don't need any further argument on this -- that's what I'm

11   saying -- unless the defendant wishes to respond.

12           If you have something to say --

13           MS. LONDOS:  Certainly, Your Honor.  Would you like

14   me to use the podium?

15           THE COURT:  I think it helps the court reporter.

16           MS. LONDOS:  Thank you.

17           Good morning, Your Honor.  Katherine Londos with

18   Frith Anderson & Peake in Roanoke, on behalf of the

19   defendant.

20           On the timing issue, we have prepared a highlighted

21   copy of the settlement agreement that has certain provisions

22   electronically highlighted in yellow.  With the Court's

23   permission, if we could hand one to Your Honor and the -- and

24   your law clerks, would that be acceptable?

25           THE COURT:  Well, I didn't really want argument.  I

```
 1    think the prima facie case has to be made as of the date of

 2    filing the suit, filing this action, this show cause -- which

 3    is September; right?

 4            MS. LONDOS:  Yes, sir.  It was filed in September.

 5            The only point that the defense would make on the

 6    issue of the timing, Your Honor, is on pages 19 -- I'm

 7    sorry -- 17 of the settlement agreement on the issue of the

 8    compliance monitor's ability to reduce the frequency of his

 9    visits -- and again, it's on page 17 of docket 221-1, wherein

10    the provision reads:  "If the monitor in the exercise of his

11    discretion on the basis of application of the guidelines,

12    standards and PMTs set forth referenced herein determines

13    that appropriate progress has been demonstrated toward the

14    goal of constitutionally adequate medical care on a

15    consistent basis by the end of the second year" -- which

16    would be February, 2018.

17            And then the next sentence continues -- I'm sorry.

18    One sentence after that.

19            "If the monitor in the exercise of his discretion as

20    described above determines that appropriate progress has been

21    demonstrated towards the goal of constitutionally adequate

22    medical care on a consistent basis during the third year,"

23    which would be February, 2019, "then the compliance monitor

24    may reduce his visits."

25            We would respectfully argue that the timing of the
```

```
 1    plaintiffs' filing of the contempt motion cannot trump the

 2    language of the settlement agreement --

 3          THE COURT:  You mean, nothing could -- nothing that

 4    went on contrary to the agreement could be brought up before

 5    then?

 6          MS. LONDOS:  No.

 7          Certainly, Your Honor, the next aspect that is

 8    important is on page 26 of the settlement agreement,

 9    paragraph 10, which says:  "The settlement agreement shall

10    terminate as of the date on which the defendants have

11    achieved substantial compliance with all elements of

12    performance of its obligations to provide constitutionally

13    adequate medical care under the Eighth Amendment."

14          And then it says further down that sentence:  "The

15    termination may not take effect less than three years from

16    the effective date."

17          This motion, Your Honor, by the plaintiff on the

18    timing of the -- the time period that the Court should

19    consider, we would argue, and the defense argues that the

20    language of the settlement agreement is -- trumps the date

21    the plaintiff files their motion.  What is important is what

22    is in the settlement agreement; and the settlement agreement

23    contemplates that there is going to be a period of time

24    towards which the defendants -- again, turning back to page

25    17 -- are working towards appropriate progress has been
```

demonstrated towards the goal of constitutionally adequate

medical care. That is an important provision.

Under plaintiffs' theory on this motion, the

plaintiff would have -- would set the timing for what the

Court considers, simply by the date they filed, when the

language of the settlement agreement contemplates that there

is going to be a period of time towards which appropriate

progress is being demonstrated towards the goal of

constitutionally adequate care.

Under plaintiffs' theory --

THE COURT: Under your theory, no matter what you did

up until the date you say the plaintiff could file, you could

do anything or not do anything that the agreement calls for

you to do and the plaintiff would have no right to raise the

issue.

MS. LONDOS: Certainly they have a right to raise the

issue. The question is: What evidence should the Court

consider in evaluating the merits of plaintiffs' motion?

THE COURT: I think the Court can consider any issue

that you're not complying with the agreement, and, of course,

it can have effects on any of the inmates in the institution.

I mean, the agreement was designed to improve the medical

care of those people; bring it up, at least, to a

constitutional standard. We have these things that you were

supposed to do, and I don't see why the Court shouldn't

1    consider the whole -- everything to determine whether or not

2    you're in compliance.

3         MS. LONDOS:  Absolutely, through today, Your Honor.

4         The point on these two provisions, on paragraph --

5    I'm sorry -- page 17 and page 26 of the settlement agreement

6    is implicit in this language.  Implicit in these provisions

7    is that there will be a period of time towards which the

8    defendant is working towards compliance with all of the

9    provisions of the settlement agreement.

10        THE COURT:  But it contemplates that you will be

11   working toward it, that you don't get a free pass to do what

12   you were doing before the agreement.  It didn't give you a

13   "get out of jail free card" for the next two years or more.

14        MS. LONDOS:  Absolutely, and the defense intends to

15   present evidence next week of the actions taken by the VDOC

16   during this period of time that they were working towards

17   full compliance.

18        The defense believes that Your Honor should consider

19   all the evidence, both before and after filing the contempt

20   motion in evaluating.

21        THE COURT:  That's what I intend to do.

22        MS. LONDOS:  Thank you.  Thank you, Your Honor.

23        THE COURT:  Maybe we're two ships passing in the

24   night, but my idea is to hear the evidence from the beginning

25   until -- even anything that's happened after the filing.

1          MS. LONDOS:  Thank you, Your Honor.

2          THE COURT:  All right.  The prima facie showing would

3   be as of the filing of this contempt proceeding, show cause

4   proceeding.

5          MS. OGUNKEYEDE:  If I may, Your Honor.

6          THE COURT:  Yes.

7          MS. OGUNKEYEDE:  Very quickly on that issue.

8          As to the Court's considering everything that has

9   happened since the filing of the contempt motion through

10  today, plaintiffs have no objection to that.  Our request is

11  that for determining whether or not defendants were in

12  contempt, getting this free pass that Your Honor referenced,

13  that the Court simply evaluate any actions past the filing of

14  the motion for order to show cause as going to remedies if

15  the Court does find that the defendants were in contempt.

16         THE COURT:  It's time to argue that at the end of the

17  evidence.  I mean, we'll parcel that out then.

18         MS. OGUNKEYEDE:  Your Honor, the issue of the

19  presentation of plaintiffs' evidence may well be streamlined

20  by a finding from the Court at this juncture that the Court

21  will consider all of the evidence between the filing and

22  through present, but that which is relevant to contempt is

23  only from the consent judgment in February through the filing

24  of plaintiffs' motion for the order to show cause.

25         THE COURT:  That's what I say.  You have to make your

1   prima facie case out as of that day.

2          MS. OGUNKEYEDE:  Yes, Judge.  And plaintiffs agree

3   that our prima facie case would be under consideration from

4   February, 2016, through September, 2017.  However, defendants

5   should not be able to get the benefit of the Court's

6   preference for adjudicating both the prima facie --

7          THE COURT:  Y'all say my preference.  Lawyers do this

8   stuff all the time.  They call in here, "How do you want to

9   do this?"  I recall the clerk told me, "You got this call.

10  Do you want to hear the -- all of it at one time, or do you

11  want to hear the contempt thing first?"

12          You know, it's not my case.  You all decide how

13  you're going to make your motions and decide how you want to

14  proceed.  Don't call me and ask me about the case because I

15  don't know what the lay of the land is.  I gave you an answer

16  then, and I stand by that answer.

17          It's too late to change -- if I knew this was going

18  to be a problem, I may have decided to do it the other way.

19          MS. OGUNKEYEDE:  Respectfully, Your Honor, I do

20  believe -- and I was not on the call in January --

21          THE COURT:  It doesn't matter who was on the call.

22  That's water over the bridge and we're here today.  I hope

23  I'm clear about how I want to proceed.

24          MS. OGUNKEYEDE:  I believe Your Honor is clear, but

25  plaintiffs' position on the call in January was that we were

1   concerned that adjudicating both the prima facie issue as

2   well as the ultimate issue at the same proceeding would put

3   us in the untenable position that we then have to defend

4   against --

5           THE COURT:  I didn't realize you were opposing

6   anything.  Maybe something was not presented to me.

7           MS. OGUNKEYEDE:  That was our position, Your Honor,

8   in January, on the call.

9           THE COURT:  Okay.

10          MS. OGUNKEYEDE:  Which is why we again raised the

11  issue in the motion in limine.

12          THE COURT:  Now we've got a trial starting on Monday

13  and I'm going to hear it all; and I'll hear these arguments

14  about what I consider when, at the end of the case.

15          MS. OGUNKEYEDE:  Okay, Your Honor.

16          If the Court will then leave this issue open as to

17  what is the relevant period for the finding of contempt,

18  plaintiffs will renew their argument that the relevant period

19  for the finding of contempt is from February, 2016, through

20  September, 2017.

21          THE COURT:  Okay.

22          MS. OGUNKEYEDE:  As to the second part of the motion

23  in limine No. 6, the legal standard by which to decide the

24  motion, plaintiffs' motion for order to show cause, from our

25  perspective, the legal standard is clear.  First, the Court

1   must determine the prima facie issue.  Should our prima facie

2   burden be met and the show cause issued, liability for

3   contempt turns on four elements that must be proven by clear

4   and convincing evidence.  Defendants do not dispute the four

5   elements of contempt; instead, they seek to read into the

6   contempt standard the additional requirement that plaintiffs

7   must prove deliberate indifference in addition to any

8   violation of the obligations of the settlement agreement.

9   However, the settlement agreement does not contemplate

10  deliberate indifference as being part of the specific

11  obligations.

12          In fact, page 5 of the settlement agreement clearly

13  rejects that.  It obligates, and I'm quoting, Defendants to

14  achieve and maintain compliance with the operating

15  procedures, guidelines and standards governing the provision

16  of medical care at Fluvanna.  The Department of Corrections'

17  failure to follow those operating procedures, guidelines and

18  standards are, therefore, the violations of their

19  court-ordered obligations.  They're more than mere technical

20  violations.  They are the exact measure of the Department of

21  Corrections' compliance.  For instance, standard one,

22  staffing levels.  Where Department of Corrections fails to,

23  and I quote from that standard, maintain a sufficient number

24  of health staff of varying types to provide patient with

25  adequate and timely evaluation and treatment, they are in

1    noncompliance.

2         Similarly, for standard seven, with respect to

3    emergency response, whenever Department of Corrections fails

4    to timely respond to medical emergencies or maintain the

5    medical supplies and equipment necessary to respond to

6    medical emergencies, they were in noncompliance.  To prevail

7    in the current posture, which is a contempt proceeding,

8    plaintiffs need only provide clear and convincing evidence

9    that those failures occurred and that the Department of

10   Corrections knew about them.  Nothing in the defendants'

11   response to our motion in limine No. 6 undermines that.

12        In fact, where defendants read into the settlement

13   agreement the idea that plaintiffs must also prove deliberate

14   indifference, they are simply mistaken.  And I quote from

15   plaintiffs' pretrial brief at page 44:  Their mistake is

16   because the violation of the obligations imposed by the

17   settlement agreement amount to a violation of the Department

18   of Corrections' constitutional duties as it has defined them,

19   without any need for de novo adjudication of deliberate

20   indifference.

21        Plaintiffs have never been confused about the

22   standard that is applicable to this contempt proceeding.  And

23   as such, we raised this issue in our motion in limine only

24   because we apprehended and recognized that defendants were

25   adding in an additional element to contempt that is not

1     there, nowhere to be found in the case law.  So we wanted to

2     bring it to Your Honor's attention that at issue is solely

3     clear and convincing evidence of violations of the terms of

4     the settlement agreement.

5              THE COURT:  Okay.

6              Did you wish to respond?

7              MS. LONDOS:  Your Honor, the terms of the settlement

8     agreement, this Court's approved settlement agreement, under

9     the enforcement provision, paragraph 2, page 23 --

10             THE COURT:  What about paragraph 1?  Does that have

11    anything?

12             MS. LONDOS:  Under enforcement, Your Honor; yes.

13             THE COURT:  I mean --

14             MS. LONDOS:  Certainly the Court has jurisdiction

15    over the parties for purposes of ensuring the implementation

16    of the settlement agreement.  But paragraph 2 of the

17    settlement agreement requires that there be, in the event of

18    a problem of constitutionally deficient medical care on the

19    part of the defendant -- then an enforcement action can be

20    filed.  But the first clause of paragraph 2 requires that

21    there be a problem of constitutionally deficient medical care

22    brought to the attention by either the compliance monitor or

23    plaintiffs' counsel pursuant to the provisions of section

24    42(c) of the settlement agreement.

25             Section 42(c) of the settlement agreement is

contained on page 19 of the settlement agreement, Your Honor.

And on page 19 of the settlement agreement, that contains the

two provisions that we refer to as the written notice

provision.  The first full paragraph is if the compliance --

and this is on page 19, Your Honor.  If the compliance

monitor during the time periods in which a settlement

agreement is in effect identifies a deficiency in any aspect

of the medical care provided by the defendant at Fluvanna

that he deems to involve constitutionally inadequate medical

care, he, Dr. Scharff, shall promptly bring the problem to

the defendants' attention through written notice, which has

never happened.

The next paragraph is a paragraph the plaintiffs

implicated -- and this is the middle paragraph, second full

paragraph on page 19, Your Honor.  If the plaintiffs during

the time period in which the settlement agreement is in

effect identifies a deficiency in any aspect of the medical

care provided by the defendants at Fluvanna, that they, the

plaintiffs, believe involves constitutionally inadequate

care, then the plaintiffs may bring that to the defendants'

attention through written notice.  So the first two

paragraphs on page 19 are what we're calling "the written

notice paragraphs."  If the compliance monitor gives written

notice or if the plaintiffs give written notice -- and

written notice can only be given of a deficiency in the

1    medical care involving constitutionally inadequate care.  So

2    this would be after the settlement agreement is in effect,

3    post February, 2016.  If either the compliance monitor or the

4    plaintiffs deem a problem involving constitutionally adequate

5    care, they issue a written notice.  Dr. Scharff didn't, but

6    the plaintiffs did.

7           That brings us over then, procedurally, to page 23,

8    the enforcement provision, and section -- I'm sorry.

9    Paragraph 2 on page 23 under the enforcement provision says:

10   In the event of a problem of constitutionally deficient

11   medical care on the part of the defendant and brought to the

12   defendant's attention by either the compliance monitor or the

13   plaintiffs pursuant to section 42(c), the written notice

14   section, then plaintiffs may institute proceedings before the

15   court.

16          So implicit, expressly stated in the settlement

17   agreement is that this legal action before the court, the

18   motion to show cause, could only be filed if there's a

19   problem of constitutionally deficient care after February,

20   2016, when the Court entered the settlement agreement.  For

21   that reason, there needs to be a finding by this Court under

22   a clear and convincing evidence standard that there has been

23   constitutionally inadequate care provided post February,

24   2016.

25          I'd also point the Court to multiple other provisions

of the settlement agreement that indicate both implicitly and
expressly that the relief sought must be -- can only be
predicated on a constitutionally deficient care.  Page 4 of
the settlement agreement defining the compliance monitor
talks about -- and this is the very last line that flows over
to page 5, concerning defendants' performance of its
obligations to provide constitutionally adequate medical
care.  Page 5, under the statement of purpose says:  In order
to ensure the quality and quantity of medical care provided
by the defendant to prisoners at Fluvanna, as of and
following the effective date of the settlement agreement,
defendant shall meet or exceed the constitutional
requirements under the Eighth Amendment.

        And then, perhaps most significantly, Your Honor, on
page 27, the PLRA findings, which is the very last provision
before the signatures on page 27 of the settlement agreement:
The parties agree that the prospective relief established by
the settlement agreement is narrowly drawn, extends no
further than is necessary to address and remedy the
violations of federal rights alleged by the plaintiffs in
their pleadings and this action.  And that sentence
continues.

        So under the procedure set out in the settlement
agreement, plaintiffs can only prevail if at a minimum they
show constitutionally insufficient medical care.  There are

```
1    other requirements, other legal requirements.  That's not

2    enough to get them the relief they seek.  But they cannot get

3    the relief they seek without there being a showing of post

4    February, '16, when Your Honor entered the order of

5    constitutionally inadequate care.

6         Thank you.

7         MS. OGUNKEYEDE:  Your Honor, I understand the Court

8    wants to focus on motion in limine No. 6, but I think as to

9    motion in limine No. 2, the admission of documents produced

10   by the Department of Corrections and their agent, Armor,

11   there may, in fact, be an issue that would require the Court

12   to make an advanced ruling at this stage, given that

13   defendants have opposed that motion in limine No. 2, based on

14   conversations between the defendants and the plaintiffs, as

15   well as a joint stipulation signed in April of this year,

16   wherein both parties agreed to the authenticity of the

17   documents produced by the Department of Corrections as well

18   as its agent, Armor.  At this juncture, plaintiffs, in

19   reliance --

20        THE COURT:  You're anticipating what the defendants

21   going to do; right?  Is that what you're doing?

22        MS. OGUNKEYEDE:  The issue, Judge, specifically, is

23   that at this point, in reliance on conversations that have

24   been had, plaintiffs have removed from their witness list any

25   custodians of record with respect to medical records,
```

1   grievance reports, et cetera, that were produced by the

2   defendants to plaintiffs in this matter.

3       Plaintiffs -- I'm sorry -- defendants are opposing

4   the admission of those documents based on their response to

5   our motion in limine No. 2; and we believe that at this

6   juncture, Your Honor may need to make an advanced ruling on

7   their admissibility, given that the parties have already

8   stipulated as of April of this year to the authenticity of

9   those documents as well as conversations wherein defendants

10   represented that they didn't intend to undergo or have this

11   contempt proceeding proceed through the usual trial tedium of

12   needing to call custodians and the like to admit records that

13   are at issue in this case in evidence.  Here, we have

14   defendants actually opposing motion in limine No. 2, and we'd

15   ask the Court to make an advanced ruling, short of an

16   agreement from defendants, which plaintiffs have sought that

17   the documents they themselves produced to us are admissible

18   in this proceeding.

19       THE COURT:  I think the plaintiffs -- I don't think

20   the Court is limited under the enforcement paragraph.  It

21   just didn't enforce in this agreement.  I don't think you can

22   just sit back and not do anything that you've agreed to do

23   and not have it enforced.  The whole idea of the agreement

24   was to set up a system where people were not constitutionally

25   deprived of adequate medical care.  That's where all these

```
1    things that you agreed to do -- that's why they're in there.

2    I think defendants' position would be that you don't have to

3    do hardly any of the things you did.  You just don't get

4    caught deliberately indifferent to someone's medical care.

5          I believe that I'm going to try this case based on

6    the fact that the plaintiffs have a right to show that you

7    have not complied with the terms of the agreement.  At the

8    end of the case, we'll sort it all out.  But I don't think

9    paragraph 5, section 5 of the agreement says, "in the event

10   of a problem of constitutionally deficient medical care."  It

11   doesn't say only in the event of constitutionally deficient

12   medical care.  So I propose to hear whatever evidence you've

13   got about whether there was compliance, and make the

14   defendant to respond to it.

15         MS. OGUNKEYEDE:  Thank you, Your Honor.

16         As to the issue of motion in limine No. 2, regarding

17   the admission of the documents produced by the defendants,

18   those being Department of Corrections records, medical

19   records, as well as grievance records, as well as medical

20   records from the University of Virginia health system and

21   records kept by defendants' contractor, Armor, the plaintiffs

22   are, at this juncture, seeking an advanced ruling from the

23   Court on their admissibility, given the failure of

24   negotiations between defendants and plaintiffs as to getting

25   those or allowing those documents into evidence through
```

1    agreement.  Plaintiffs do not currently have on our witness

2    list custodians of records, and we removed them in reliance

3    on conversations we had with the defendants.  We are glad

4    that Your Honor will hear all of our evidence.  Part of that

5    evidence will rely on records.  At this point, there's no

6    agreement as to the admissibility of those records, and it

7    could cause significant delay in this proceeding if as to

8    each record --

9         THE COURT:  What's the defendants' position on the

10   record?

11        MS. LONDOS:  Your Honor, there is a stipulation that

12   has been entered in this case signed by both parties that my

13   colleague is pulling up that all of the records are authentic

14   and there is not a need to bring records custodians in, and

15   that has always been our position in this case.  The parties

16   started out a week or two ago with a much larger potential

17   exhibit list, and we have been narrowing it down on both

18   sides, and talking and collaborating.  There are hearsay

19   within hearsay issues on some of these.  We have always

20   maintained -- maintain today, maintained in previous

21   conversations, we are not requiring records custodians to

22   come; we have taken that position.  But given the plethora of

23   documents with some hearsay within hearsay issue or documents

24   admitted for one purpose or not the other, there are some --

25   there may be some outstanding issues.

1       There are a lot of moving parts with a lot of

2   attorneys on both sides who have been having discussions

3   here, but any suggestion that we have done anything other

4   than be completely transparent, we need to completely dispel.

5   We have said there don't need to be custodians and that's the

6   case.

7       THE COURT:  It seems that you don't have to have

8   those witnesses.  They stipulate to the authenticity of the

9   documents, but either side, I mean, can object to anything in

10  those documents that they may consider not admissible.

11      MS. OGUNKEYEDE:  Your Honor, we agree with that

12  position.  However, there are a multitude -- voluminous

13  amount of records.  To the extent that the plaintiffs have

14  attempted to seek an agreement with defendants as to the

15  admissibility beyond just authenticity, but also as to the

16  meeting of particular hearsay exceptions, at this point,

17  there has not been such an agreement based off of records

18  such as medical records that are kept by the defendants

19  themselves in the course and scope of the business of

20  operating the Fluvanna prison and the medical facility there,

21  as well as the conversations that those records document.

22      THE COURT:  People don't have to agree to anything.

23  You just have to bring your evidence to court.

24      MS. OGUNKEYEDE:  Yes, Your Honor.

25      At this point, plaintiffs are merely stating that the

1   admissibility of those records -- the institutional records

2   provided to plaintiffs by the Department of Corrections as

3   well as University of Virginia medical records and the

4   records kept by the defendants agent, Armor, should we need

5   to go through each and every one of those documents on a

6   case-by-case basis, even without a custodian of record, will

7   significantly delay -- could significantly delay the

8   proceeding.  At this point, plaintiffs would argue that those

9   records meet appropriate hearsay exceptions and should be

10  admitted and where there may be individual objections, we can

11  go through those; but on the main, those records should be

12  admitted but for objections that Your Honor finds to be

13  meritorious as the case proceeds.

14          THE COURT:  I'm not sure what you're asking me to do

15  right now.  They'll be just as voluminous at this hour as

16  they're going to be next week.  I can't go through them, I

17  don't think, today.

18          MS. OGUNKEYEDE:  We're asking the Court at this point

19  to find that the records -- the institutional records kept by

20  the Department of Corrections as well as the UVA medical

21  records and the records kept by the defendants agent, Armor,

22  be deemed admissible as they meet the specific hearsay

23  exceptions of the business record exception as well as if

24  there is an issue as to hearsay within hearsay specific to

25  the medical records.

```
 1          THE COURT:  Do I have enough in front of me to make
 2     that ruling right now?
 3          MS. OGUNKEYEDE:  I believe, based on the facts that
 4     the parties have stipulated as to the authenticity of those
 5     records being kept and produced by the defendants, that that
 6     is enough as to those categories of records:  Institutional
 7     records kept by the Department of Corrections, institutional
 8     medical records kept by UVA health system as well as business
 9     records kept by the defendants agent, Armor.
10          MS. LONDOS:  Your Honor, on April 18th -- so over a
11     month ago -- the parties entered a stipulation that it is
12     hereby stipulated and agreed that the following categories of
13     documents are authentic and shall not require extrinsic
14     evidence of authenticity in order to be admitted as evidence
15     in this action:  All documents produced by the parties and
16     third parties such as Armor, UVA, VCU; all documents produced
17     by the parties pursuant to the settlement agreement; and all
18     medical institutional file records provided by VDOC pursuant
19     to records request.
20          I would agree with Your Honor, there's certainly not
21     enough before the Court to make a blanket ruling.  There are
22     going to be hearsay within hearsay objections on some, some
23     documents submitted for one purpose but not another purpose;
24     but we have stood by this stipulation since it was entered on
25     April 18th that we are not going to require evidence of
```

1    authenticity.

2            Thank you, Your Honor.

3            MS. OGUNKEYEDE:  Your Honor, simply as a matter of

4    law, plaintiffs cannot lay the foundation for business

5    records, such as the institutional records kept by the

6    defendant and UVA and Armor, without custodian of records.

7    So it's more than just the stipulation of authenticity.  If

8    we then have to lay the foundation as to those categories of

9    documents without a custodian of record --

10            THE COURT:  If you have a document you want to offer

11   in evidence, why can't you just offer it in evidence, and if

12   the defendant objects, I mean, I can rule fairly quickly, I

13   think.

14            MS. OGUNKEYEDE:  If, categorically, those records,

15   institutional records are admissible in that way, then Your

16   Honor can rule at this juncture and take individual

17   objections as they arise.

18            THE COURT:  Records at the hospital, for the most

19   part, come in.

20            I've tried enough automobile accident cases, a doctor

21   will put in there:  A patient came in and said someone ran

22   the red -- she had the green light and another car had a red

23   light and the guy with the red light ran through the

24   intersection and hurt her and she broke her ankle.

25            Well, you don't let in the fact of the accident in

1  the medical record.  I mean, that's just gratuitous

2  information.

3         I don't know what's going to be in there.  We'll just

4  have to go through it.  I don't see why it has to be a real

5  big problem.

6         MS. OGUNKEYEDE:  As long as to lay the foundation for

7  those records the Court is not requiring us to provide a

8  custodian of those records --

9         THE COURT:  I think that you've agreed they don't

10  need the custodian, don't you?

11         When they stipulate the authenticity --

12         MS. LONDOS:  Yes, sir.

13         MS. OGUNKEYEDE:  They were also objected as to the

14  foundation of those documents.  They've objected to

15  foundation in total, which is not simply authenticity.  And

16  so to establish --

17         THE COURT:  Are you objecting, like, the records are

18  not kept in the ordinary course of business?  Is that part of

19  the objection?

20         MS. LONDOS:  Anything that a records custodian would

21  need to do to authenticate the document, that's what we

22  wanted to avoid for the sake of everyone's convenience,

23  including the Court's, not having one more person in the

24  courtroom.

25         Thank you.

1          THE COURT:  There's no way -- I came over from the

2    state courts about 20 years ago, and there was an expression

3    that we followed "the Weymouth rule," and that was Judge

4    Weymouth down in Norfolk, and that's that he didn't decide

5    the case until he heard the evidence.

6          I don't see how I can rule on what's admissible in

7    these records until they're presented to me to rule.

8          MS. OGUNKEYEDE:  That is fair, Your Honor, to the

9    extent that plaintiffs will not be required to meet the

10   foundational elements beyond authenticity that would require

11   a proper witness.  Sometimes those witnesses will need to be

12   custodians of record; sometimes it could be brought in

13   through the current witnesses designated by both sides, but

14   not all the time.  We're fine with that.

15         THE COURT:  You're asking me to do something you

16   couldn't get the defendant to agree to, is the way it sounds.

17   I don't know whether, without seeing the records -- whether

18   the defendant is right or wrong.  The way the Court decides

19   these things is for the record to be presented, or whatever

20   the evidence you wish to have read from the record, come in

21   and defendant can make an objection and the Court rules on

22   it.

23         MS. OGUNKEYEDE:  As we approach the hearing next

24   week, Your Honor, and the documents that are relevant to this

25   current argument come before the Court, we may seek leave to

1    renew this argument solely for the sake of keeping time of

2    the Court, reviewing document after document, at a minimum.

3            THE COURT:  Well, you know, I don't understand.

4    Whose fault is it -- if this is a problem, whose fault is it

5    from the Court's standpoint that we're in this position?  It

6    would be the plaintiffs.  You're the one that wants the

7    evidence to be admitted and the defendant doesn't.  They've

8    got their side of the case.  They don't have to agree.  Maybe

9    they should have agreed.  I don't know.  But I'm not in a

10   position to decide, you know, who's right or wrong in this

11   thing.  When you can't get the plaintiff to agree, you

12   summons everybody and his brother who you need to get your

13   evidence admitted.

14           MS. OGUNKEYEDE:  Noted, Your Honor.

15           If needs be, we will reach out to the defendants as

16   to supplementing our witness list at this point.

17           THE COURT:  Okay.

18           MS. GRIGGS:  Good afternoon, Your Honor.  Ruth Griggs

19   from Sands Anderson, on behalf of the VDOC defendants, Your

20   Honor.  I believe we're next on your list for the motion

21   regarding Dr. Greifinger.

22           As an initial matter, Your Honor, it's my

23   understanding from plaintiffs' brief and response that one of

24   the issues has been resolved.  I understand their opposition

25   memorandum -- that they have agreed to withdraw

Dr. Greifinger's opinions and testimony regarding Sherry
Richburg.  I won't argue that because that matter has been
resolved.

I'm mindful of the Court's notes in the order sent
regarding the qualifications of Dr. Greifinger, so I will
address those for only a moment.

In their opposition brief and repeatedly throughout
documents that have been submitted by Dr. Greifinger and his
articulations at his deposition, he continually maintains
that he has been engaged for 30 years in the practice of
correctional medicine.  Yesterday, we submitted to the Court
the language from the laws of the State of New York regarding
what constitutes the practice of medicine.  We used New York
State laws because we also submitted the affidavit by
Dr. Greifinger where he acknowledged that he is licensed by
the State of New York.  There is no way, based on the
information he has provided, that he is, in fact, engaged in
the practice of medicine.

We recognize that the gatekeeping role in a bench
trial is different from the gatekeeping role in a jury trial.
It might be more appropriate for me to say, in terms of a
qualification question, that we believe none of the opinions
he seeks to offer in this case can be -- should even be
considered by the Court, given his lack of qualification.  I
would say that's because this is the practice of medicine.

Dr. Greifinger, based on his representation, possibly

practiced medicine for a total of 14 years.  He has been not

practicing medicine for 23.  He never practiced medicine in a

correctional facility in the last 30 years -- and the

practice of medicine is so evolving and so constant.  I know

that the statutes for the Commonwealth of Virginia for

qualification of an expert don't apply, but I think they're

particularly instructive in this case because the

Commonwealth has recognized that someone who's done the

procedure at issue as we refer to it in Virginia, 5 and

10 years ago, may have no knowledge of how it's done today.

Therefore, their opinion is not considered valid.  We would

argue that would be the case for Dr. Greifinger.

        He has, in his deposition, as we noted in our brief,

specifically acknowledged that he hasn't treated some of the

illnesses he wants to talk about; for example, Viviana

Anselme, who has Takayasu's arteritis.  He said flat out in

his deposition he has never treated that.  He wants to opine

regarding Viviana Anselme that she should have been placed

immediately on methotrexate, While he acknowledges that there

are other treatments that could be proper, and he doesn't

know if she's on any better treatments that could be proper,

and he doesn't know the side effects of methotrexate.  These

are things that are outside the scope of his knowledge by

virtue of the fact he has not engaged in the practice of

1    medicine for 23 years.

2        So our qualification question takes two parts, Your

3    Honor. We believe wholly he is not qualified for these

4    opinions, but should the Court allow Dr. Greifinger to come

5    to speak on his opinions in this case, we would say that they

6    should be narrowly tailored, where we would argue he cannot

7    offer an opinion about the appropriate way to treat a woman

8    who has an illness he's never in his professional career

9    treated. It's just not possible he's qualified to render an

10    opinion on those things he's never treated.

11        Regarding some of the other cases -- and I'm mindful

12    of the discussion the Court just had about deliberate

13    indifference and the standard to be applied. In the case of

14    Ashely Carr, who's one of the inmates that Dr. Greifinger

15    seeks to opine about, he talks about whether or not the --

16    she had a hearing loss and apparently did not show up for an

17    appointment to check whether she was suffering from an actual

18    hearing loss and/or needed any type of equipment to

19    facilitate her needs. Dr. Greifinger's opinion is VDOC had

20    to follow up with her to make sure she didn't show up for

21    that appointment simply because she didn't hear her name

22    called. He acknowledged he has no idea whether that is a

23    factor in the case, that she didn't show up because her name

24    was called. He just speculates that if her name was not

25    called -- if she didn't hear her name being called, then she

1  has suffered some injury.  But he has no idea whether that

2  has happened in any event.

3          He similarly discusses grievances of four women.

4  They were emergency grievances that were filed.  And he says

5  if to the extent -- and he qualifies his own opinions.  He

6  says to the extent these women were left in harm's way on

7  purpose by the way that these emergency grievances were

8  answered, this is unacceptable.  He has no idea if, in fact,

9  based on his own deposition testimony, any of these women

10 were ever in harm's way, let alone allowed to remain in

11 harm's way based on the response that was made.  He did not

12 look at any of their records.  He has no idea whether the

13 nurse who responded to the emergency grievances looked at

14 their records, and basically said in his deposition, I don't

15 care.  I just think the language that they used is mean to the

16 extent that these women were allowed to stay in harm's way

17 for an extended period of time, based on the response of

18 these women.

19         That can't be the standard for admissibility, Your

20 Honor, to say simply that because Dr. Greifinger thinks

21 something was mean, that that constitutes deliberate

22 indifference.

23         I'd like to return just briefly to the conversation

24 that the Court was having earlier regarding how you're going

25 to be looking at this case, Your Honor.

```
 1            If we look at the standards in the settlement

 2    agreement, if they were criminal law, they would be

 3    unenforceable because they are so broad and vague, no one

 4    could really tell what action violates any of those.

 5            For example, you look at the standards for staffing.

 6    To say that you must have sufficient staffing to timely

 7    provide care doesn't tell anyone what's that threshold limit

 8    that requires you to provide certain care and treatment.  We

 9    would argue that you have to go from the standards, which are

10    articulated beginning on page 8 of the settlement agreement,

11    back to page 6, which specifically articulates that those

12    standards are developed to achieve constitutionally adequate

13    medical care so that when Dr. Scharff is coming to look and

14    evaluate --

15            THE COURT:  What is "constitutionally adequate

16    medical care"?

17            MS. GRIGGS:  Well, that's part of what Dr. Scharff is

18    tasked with doing, Your Honor, because these are so vague

19    that on their face, they don't provide --

20            THE COURT:  Why did you all agree to them?

21            MS. GRIGGS:  Your Honor, we agreed to them in the

22    context of the paragraph on page 6 which says:  These

23    standards are designed to move towards constitutionally

24    adequate --

25            THE COURT:  You mean, there's no doctor, anybody in
```

1  the prison system, who can tell what's adequate staffing,

2  nursing staff?

3        MS. GRIGGS:  We absolutely maintain that they did,

4  Your Honor, and that they're doing that at this time, and we

5  maintain that's what our expert, Jim Welch, looked at when he

6  was there.  He looked at the staffing service, and he said,

7  What services are you offering?  How do you intend to offer

8  them?  And let me see the staff that you intend to put

9  forward to get that done, and I'll see if I believe that

10 that's consistent with the requirements of the settlement

11 agreement.  That's what Dr. Scharff does to a certain degree,

12 Your Honor.  VDOC has conversations with him when they have

13 questions about, What do you mean we need to do in this

14 direction?  What do you mean we need to do in that direction?

15 But otherwise, those standards are very general, Your Honor.

16 To say something has to be done in a timely fashion doesn't

17 lay down a specific enough standard for someone to say, I

18 know enough by reading this exactly what I have to do.  And

19 that's how these standards are distinguished from the cases

20 that were cited by the defendants out in California.  In the

21 California cases, the standards are very explicit, Your

22 Honor.  They say, if people have been judged to have -- need

23 a certain type of consult, they must go out within 24 hours.

24 If these people have been found to need this type of consult,

25 they must go out in 14 days.  Those are explicit standards.

```
 1        THE COURT:  Y'all really put one over on the

 2   plaintiff.  Y'all got all this stuff that means nothing.  Is

 3   that what you're saying?

 4        MS. GRIGGS:  We believe it means that you have to

 5   look at each of these in terms of the context of

 6   constitutionally adequate care, and that that's an evolving

 7   process that goes along with Dr. Scharff.  And the reason we

 8   say that, Your Honor, is because the settlement agreement

 9   specifically directs Dr. Scharff to come up with some of

10   these standards.  Even though it says be implemented, it

11   sends the contract monitor off to create a measuring

12   mechanism, so it acknowledges that is not there in the

13   standards and settlement agreement and that Dr. Scharff will

14   have to create that; and he has, over time, created it.  I

15   confess I don't possess a copy of it.  We have looked to see

16   if we can get exactly what it is Dr. Scharff is monitoring;

17   but the settlement agreement specifically acknowledges its

18   own vagueness and sends him off to set those standards.

19   That's why we believe you can't just say, I looked at an

20   emergency grievance form and I thought the language was mean

21   and that means you're in violation of the settlement

22   agreement, without something more than that, Your Honor.

23   There has to be --

24        THE COURT:  What did Dr. Scharff say anything about

25   -- did he establish what the nursing -- what was adequate
```

1    nursing care?

2          MS. GRIGGS:  I believe he's established it.

3    Actually, he has, Your Honor.  He has looked at it in

4    conjunction with Fluvanna over time as they've worked on

5    things to get people in.  He has pointed out things that he

6    thought they would need help with, and these will be

7    discussed, Your Honor, with -- the absence of a medical

8    director is something he raised over time.  And he talked

9    about senior staffing.  Over time, they have worked with Dr.

10   Scharff to find out what does he think is needed and how will

11   we get to there.  Those are clearly not in the settlement

12   agreement on day one.  The settlement agreement anticipates

13   that he will go out and create those, Your Honor.  That was

14   his whole purpose to it.

15         So for purposes of Dr. Greifinger, Your Honor, his

16   opinions, these vague opinions that have no basis of fact,

17   other than he thinks things sound mean, but he's never

18   actually investigated whether there was any risk of harm to

19   anyone, can't possibly be admissible opinions such as the

20   ones that he offers about some of the ladies that filed

21   emergency grievances.

22         We would also offer, Your Honor, as we noted in our

23   record that unlike the providers at Fluvanna who send a lot

24   of these women out for specialty treatment, Viviana Anselme

25   being one of them -- and he acknowledges she goes out for

specialized treatment to a rheumatologist. He, nonetheless, as a man with a pediatrics background, who has not provided care in a correctional facility for a few years, feels that he can opine about what's the correct care for a woman who he acknowledges needs to be sent out of Fluvanna to see a specialist. How can he maintain both of those opinions in the same report and be offering an opinion that's consistent and available to this Court to consider?

The other point that we made in our record is that Dr. Greifinger repeatedly claims that the defendants are breaching standards of care. That's not the standard that's applicable here, Your Honor; that's a negligence standard. A negligence discussion is a discussion for another day. The key here is deliberate indifference. And I would offer, to the extent he's explicitly stating standard of care, we know that's inconsistent with what the settlement agreement directs as the appropriate standards for measuring whether people are in compliance or not. And he repeatedly says that about their morbidity and mortality reports: These are noting deviations from the standard of care. We don't acknowledge that that's what they're noting; but to the extent that's his opinion, that's not an opinion that's valid in this context because this is a context that's concerned with the constitutionally deficient healthcare. Are they providing constitutionally deficient healthcare?

1    So we would maintain any opinions that discuss

2 breaches of the standard of care are not relevant, not

3 helpful to the Court, given the ultimate inquiry is:  Are

4 they providing constitutionally adequate care?

5    THE COURT:  You say.  "Constitutionally adequate

6 care," but really, it seems like what you're saying is:  We

7 don't have to provide anything except other than to be -- not

8 to be deliberately indifferent.

9    MS. GRIGGS:  I'm glad the Court brought that up.  We

10 absolutely do not maintain that.

11    THE COURT:  That's the way it sounds.

12    MS. GRIGGS:  No, no.  We're saying to the extent that

13 they're going to say we're breaching the settlement

14 agreement, that's the standard.  That's not the burden we

15 place on ourselves.

16    You will hear from Dr. Stephen Herrick, who's one of

17 the highest-ranking people at VDOC associated with overseeing

18 this process, and he will tell you they are striving for

19 greatness, Your Honor.  But they're humans.  Are there going

20 to be things that go awry?  There absolutely are going to be

21 things that go awry.  But they are striving for greatness.

22 The issue, though, is:  To find them in violation of the

23 settlement agreement, there needs to constitutionally

24 inadequate healthcare.

25    The other issue that we raised in our motion, Your

```
1    Honor, is that almost two weeks late and on the last day of

2    identification of exhibits and witnesses, Dr. Greifinger

3    provided a rebuttal report.  The rules are clear about

4    whether a rebuttal report should be provided.  Plaintiffs

5    say, well, there was no specific notation in the order as to

6    when rebuttal opinions must be provided.  Then the rules

7    would provide the guidance.  And the rules say that a

8    rebuttal opinion must be provided within 30 days of the

9    opinions it's designated to rebut.  This was not timely

10   provided.  It discussed all new women.  They were not women

11   discussed -- whose care was discussed in any detail in our

12   initial expert report, Your Honor.  And it was at a time

13   when, A, we were out of time to identify any other experts

14   that could respond to these because it was the last day for

15   identification of exhibits and witnesses, and we could not

16   have submitted additional reports; and B, it was provided

17   only -- less than three weeks before the start of this trial

18   when we finally got his rebuttal opinions, Your Honor.  So we

19   would ask they be stricken as untimely so that he cannot

20   provide them in this case.

21          I'll undertake any questions the Court has.

22          THE COURT:  Okay.

23          MR. HOWARD:  Good afternoon, Your Honor.  Ted Howard

24   for the plaintiffs.

25          Your Honor, with regard to Dr. Greifinger, I'm sure
```

1    that you will recall that in ruling on both the motion for

2    class certification, which was granted, and in ruling on the

3    parties' cross-motions for summary judgment, in which the

4    Court denied the defendants' motion in its entirety and

5    granted the plaintiffs' motion with respect to two threshold

6    issues, that in both of those opinions, the Court made

7    reference to and, in effect, credited the opinions of

8    Dr. Greifinger as an appropriate expert for the plaintiffs

9    with regard to the area of medical care in the correctional

10   setting.  The idea that Dr. Greifinger, because he hasn't

11   specifically laid hands on a particular patient in a

12   correctional facility in a while, is not somehow qualified

13   within the parameters of Rule 702, contemplating knowledge,

14   training and experience, et cetera, I don't want to be

15   disrespectful, but we, frankly, find that to be absurd.

16        Dr. Greifinger has been the consultant for the

17   Department of Justice with regard to correctional medical

18   issues.  He has been the consultant with regard to the

19   Department of Homeland Security Office of Civil Rights and

20   Civil Liberties with regard to medical care in correctional

21   settings.  He is currently the court-appointed monitor for

22   Miami Dade County Jail, for Orleans Parish Jail in New

23   Orleans, and for the Albuquerque Metropolitan Correctional

24   Facility.  Quarterly, he goes to these various facilities.

25   He interacts with the court.  He undertakes investigations

1    with regard to the way the care is being provided with

2    respect to the same sorts of issues that are involved in this

3    case.  And he has been doing it for quite some time to the

4    satisfaction of your counterparts on the federal bench in a

5    number of jurisdictions.  So we would respectfully submit

6    that he is imminently qualified to provide opinions in this

7    case with respect to the issues he will be addressing.

8            Secondly, Your Honor, we object quite strenuously to

9    this collateral attack on the settlement agreement.  Your

10   Honor knows better than any of us on the basis of the

11   two-and-a-half years of proceedings that went before the

12   settlement agreement how seriously the concerns were with

13   regard to the medical care at Fluvanna to the point of

14   holding, quote, In the findings of facts supporting the final

15   order.  Plaintiffs have presented ample evidence in their

16   filings enabling a factfinder to reasonably conclude that the

17   VDOC defendants are or have been deliberately indifferent to

18   the serious medical needs of the plaintiffs' class.  Although

19   the case did not proceed to trial and was never fully decided

20   on the merits, the voluminous evidence supplied by the

21   plaintiffs over four years of litigation would have been

22   sufficient to prove an actual violation of the plaintiffs'

23   Eighth Amendment rights.

24           That is the context in which this settlement

25   agreement was negotiated and entered into on a consensual

basis by the Virginia Department of Corrections, with full

knowledge and understanding that the elements of the

settlement agreement would embody the constitutional standard

of care. So to have them now running away from their own

settlement agreement, in effect, saying, Oh, well, you still

have to prove deliberate indifference de novo -- that's not

the way it works. That's what the settlement agreement did.

It essentially replaced the obligation to have to show on a

case-by-case basis deliberate indifference.

Thirdly, Your Honor, with regard to Dr. Greifinger's

opinions concerning the treatment of particular women that he

used to illustrate his broader opinions that things have not

changed nearly as much as the defendants would like to

portray in terms of the care at Fluvanna, it's not just

specific injuries relating to particular care or lack of

care. Helling v. McKinney, which has been cited frequently

in the papers over the course of this entire litigation,

makes it clear from the perspective of the U.S. Supreme Court

that it's not just harm but also a substantial risk of

serious harm that violates the Eighth Amendment. So when Dr.

Greifinger looks at the response to an emergency grievance

asserting a serious problem, and he finds the response

deficient because it just dismisses the fact that the woman

is claiming an emergency, that is presenting to her a

substantial risk of serious harm; and that is the point of

his illustrative paragraphs in both his initial report and

his rebuttal report. And we're quite confident of Your

Honor's capacity to determine what weight to give those

opinions, but they don't go to admissibility.

When he talks about breaching standards of care, he's

talking about the standards in the settlement agreement, and

that goes back to my point of a minute ago. He's not talking

about a negligence standard that would apply in a state court

proceeding concerning medical malpractice.

Finally, with regard to the rebuttal, Your Honor, as

you will hear, to the extent that the witnesses are all

permitted to testify, the experts on both sides, you'll hear

from the defense witnesses, A, that they didn't look back

very far beyond March of 2018 to determine what the problems

were prior to that time; and secondly, they regard things

since March, 2018, to be up to standard as they define it.

And so in order to provide a response to the sort of

general clean bill of health, if you will, that the

defendants' experts are giving the facility at this point,

Dr. Greifinger has pointed out, A, shortcomings within the

opinions of the defendants; and B, illustrations from March,

2018, forward in regard to particular women that we believe

illustrate that things are not all well and good at Fluvanna.

And we believe the rebuttal report should be accepted.

Thank you.

1          MS. GRIGGS:  Thank you, Your Honor.

2          As an initial matter, regarding whether

3    Dr. Greifinger has been credited by other federal courts, we

4    provided as an exhibit to our reply brief yesterday, a copy

5    of his affidavit in this case.  I would postulate that he has

6    undoubtedly represented to those courts as he has to this one

7    that he is engaged in the practice of correctional medicine,

8    and I believe the statute we provided from the State of New

9    York makes it clear that's a misrepresentation.  To the

10   extent he's been credited by other courts based on that

11   misrepresentation, that's an issue that needs to be

12   considered by those other courts.

13          Secondly, Your Honor, regarding the issue of the

14   collateral attack on the settlement agreement, I ask the

15   Court to take notice of page 47 of plaintiffs' bench brief in

16   this matter.  Plaintiffs are asking for changes to the

17   settlement agreement, Your Honor.  So we're not -- to the

18   extent we are, quote/unquote, making collateral attacks on

19   the settlement agreement, they are as well.  They want it

20   changed in their bench brief.  They have said if they get the

21   remedy that they wish, the defendant shall convene within 15

22   calendar days of this order a collaborative meeting with the

23   plaintiffs and selective healthcare experts and come up with

24   more specific standards for the provision of healthcare at

25   the Fluvanna Correctional Center for Women on the topics

below, which are all the topics in the settlement agreement.
So they are essentially rearming what we have just said,
which is they are so general right now that they are not
self-executing.  It's not possible to say that you can look
at these and say I understand the behavior that is required
of me.  They are acknowledging that in their bench brief,
Your Honor.  So to the extent we are being accused of a
collateral attack on the settlement agreement, they are
making it as well.

        Third, Your Honor, what our experts have advocated,
we have advocated to subject ourselves to a national
recognized standard for correctional healthcare; namely, the
NCCHC standards.  And I apologize because I cannot remember
exactly what that acronym stands for, but it is a nationally
recognized standard that even Dr. Greifinger, plaintiffs'
expert, says it's a great standard for measuring the quality
of correctional healthcare.  We have said because of the lack
of specificity in these standards and because of this
continual push back about what exactly constitutes a breach
of these standards, why don't we adopt the national standards
that have been applied all over the country that
Dr. Greifinger is familiar with, that both our experts are
familiar with, and use those as a measure and strive to
accomplish that measurement so we all know what it is that
we're actually trying to achieve here?

```
 1          Plaintiffs have said the experts for the defendants
 2   have decided to look for March 1st on, and not look back at
 3   all.  Your Honor, we ask that you look at Dr. Greifinger's
 4   report and also Nurse Clark's report for the plaintiffs.
 5   Several of the ladies' care that Dr. Greifinger addressed in
 6   his report has occurred after the date that they say is
 7   relevant; namely, September of 2017.  Lots of that care is
 8   after that period of time.  I think virtually his entire
 9   rebuttal opinions address only care after that period of time
10   and would be inadmissible under their theory that that's not
11   a relevant period of time for care.  So to the extent he
12   complains that our experts address what is happening now or
13   has been happening in recent months, the same is true for the
14   experts for the plaintiffs, Your Honor.
15          We are not running away from the settlement
16   agreement.  We are seeking clarity.  As I said before, this
17   is a facility that is striving for greatness, acknowledging
18   that's not going to happen in a minute, that's not going to
19   happen in a day, that's not going to happen in a week.  We
20   don't believe the settlement agreement anticipated it would
21   happen in a week as well, but we are by no means not taking
22   this seriously or striving to make this happen, Your Honor.
23          THE COURT:  I think the witness -- certainly, he's an
24   expert, so I think most of the objections go more to the
25   weight to be given to his testimony than through its
```

```
1    admissibility.  I would say that these probably not -- I do
2    take the rebuttal report as being untimely seriously, and he
3    shouldn't be discussing patients brought up -- new patients
4    brought up on rebuttal.
5            I think I'm going to allow him to testify, but you
6    can make objections during his testimony that are more
7    specific.
8            MS. GRIGGS:  Thank you, Your Honor.
9            THE COURT:  What's next?
10           Generally, I don't think a doctor has to necessarily
11   have treated every disease, just -- I think it's not that
12   great a high standard.  If you're a medical doctor, you might
13   -- you can testify rather broadly about medical diseases and
14   things.  It goes to the weight more than to the actual
15   admissibility of the evidence.
16           MS. GRIGGS:  Thank you, Your Honor.
17           We will have Dr. Gable, who's the medical director
18   there, and he will come and speak on a variety of illnesses.
19           MS. CASTANEDA:  Your Honor, I'm Brenda Castaneda with
20   the plaintiffs.  I'm the next item on the Court's order, the
21   motion -- plaintiffs' motion to strike Scott Dodrill as an
22   expert for the defendants, and I'm going to argue that.
23           As this Court knows and as this Court has held in
24   other opinions where it was judging Daubert matters, Daubert
25   requires the opinions rendered by experts be reliable and
```

1    relevant.  Kumho Tire obviously extends that to other types

2    of experts beyond scientific experts and the Fourth Circuit

3    has said the qualification should be liberally judged.  Of

4    course, Rule 702 is the guiding principle here and it

5    requires the expert's scientific, technical or other

6    specialized knowledge will help the trier of fact to

7    understand the evidence or determine a fact in issue; the

8    testimony is based on sufficient facts or data; the testimony

9    is the product of reliable principles and methods; and the

10   expert has reliably applied the principles and methods to the

11   facts of the case.

12          So plaintiffs here are not challenging all of those

13   elements.  Plaintiffs are not challenging, for example, that

14   Mr. Dodrill has some kind of specialized knowledge through

15   experience and through running prisons.  I think he's run

16   both federal and state prisons so that is not at issue here.

17   What is at issue in terms of Mr. Dodrill's opinions is

18   whether he actually applies the facts, applies methods or

19   knowledge to the facts of the case in a way that will help

20   the trier of fact -- the Court in this case -- to understand

21   the evidence or to determine a fact in issue.

22          Now, Mr. Dodrill's report contains what he lists as

23   six different opinions that he plans to testify to in court.

24   Opinion one is that corrections and all of its components are

25   interdependent of each other -- and I'm paraphrasing and this

1   is in his report.

2        Now, it's plaintiffs' contention that that opinion is

3   not based on sufficient facts or data.  In fact, in his

4   deposition he stated that that opinion is based on his

5   experience and knowledge of how prisons work.  It was not

6   based on any specific document in this case and it's not

7   actually tied to any facts of the case.  So under _ePlus v. _

8   _Lawson_, the Eastern District of Virginia quoting _Kumho Tire_,

9   says that nothing in _Daubert_ or in the Federal Rules of

10   Evidence requires the district court to admit opinion

11   evidence that is connected to existing data only by the ipse

12   dixit of the expert. In other words, it is so because I say

13   it's so.

14        In this case, that opinion is, I think, classic ipse

15   dixit and it's just like saying components of corrections are

16   interpolated.  There's nothing tying it to the facts of this

17   case and, thus, it's not relevant.

18        Two, he states that all the medical trips are

19   scheduled expeditiously.  In his testimony, deposition

20   testimony, on page 27, he says this conclusion is based on

21   Ms. Shifflett's logs; she's an employee at the prison.  No

22   other documents.  He talked to the warden.  He talked to

23   Lt. Burroughs, who both said security doesn't cancel trips.

24   So again, in this case, he admits that he didn't investigate

25   any of the underlying causes as to why somebody might have

1　been listed as a refusal for transport.  When asked if he had

2　reviewed the adequacy of staffing for transport, he just said

3　that he talked to Lt. Burroughs.  And so in this case, there

4　is nothing in this opinion that requires the application of

5　any specialized facts or knowledge.  He's merely repeating

6　that medical trips, based on him talking to employees at the

7　prison, are scheduled expeditiously.  Thus, it's not relevant

8　to the case because it will not help the trier of fact

9　understand the evidence or determine a fact in issue by

10　application of his particular knowledge or expertise.  He's

11　merely restating what some fact witnesses could come in and

12　testify to if the defendants wish to put those witnesses on.

13　　　　　Third opinion is that all the medical grievances are

14　receiving response.  Likewise, he bases this opinion on the

15　triage program as explained to him by people at the prison;

16　namely, Mr. Wilkinson, who's an employee who I believe has

17　now left the prison.  He states in his testimony that he

18　reviewed six to eight grievances; that's page 61 of his

19　deposition.  But he's aware there's thousands of grievances.

20　He also did not list any of those grievances he allegedly

21　reviewed on his list of materials in his opinion.

22　　　　　So again, whether medical grievances are receiving

23　response is something that does not require or does not

24　utilize Mr. Dodrill's expertise in order to inform the Court

25　about that, and thus it's not an element that will help the

trier of fact understand a fact or determine a fact in evidence. Therefore, it's irrelevant under the Daubert standard.

Under opinion four, he says correctional staff are not violating the privacy rights of prisoners. The plaintiffs have argued that he is impermissibly applying or opining on a legal standard that's really up to the Court to determine whether privacy rights are violated. Furthermore, his testimony is not based on sufficient facts or data. On page 86 of the deposition, he says the basis for this opinion is his experiences, that he talked to Lt. Burroughs about the transportation, he read the policies on transportation and he said he knows how transportation works because of his experience. He admits he didn't go on any trips at Fluvanna, and he admits he's basing the opinion on page 88 that that's the way it's supposed to be and that he's assuming they're following their policies. Thus, he's, again, not basing that testimony or that opinion on sufficient facts or data, and it's not something that will help the Court to understand the evidence in this case.

Fifth, he says that correctional staff are not making medical decisions. He says on page 94 of his deposition that that's not based on any documents, although he did read the plaintiffs' expert Jackie Clark's report with regard to security decisions. He says he talked to staff, either

Ms. Shifflett or Mr. Ong in the infirmary unit about how

things were going.  And so, again, this testimony is not

based on sufficient facts or data and in fact, he testified

in his deposition there was a question -- so you're forming

an opinion about Fluvanna based on an understanding of how

you believe it works at another facility?  He goes on to

answer:  I'm putting Fluvanna in with the other institutions.

        So, again, this is not an opinion that's based on

sufficient facts or testimony -- I'm sorry -- sufficient

facts or data and, therefore, it's not something that's going

to be relevant to help the Court decide the evidence or

determine a fact in issue.

        Lastly, his sixth opinion is that FCCW meets the

mandatory accreditation requirements accorded by the ACA.

Again, he stated in his deposition at page 108, that's just

based on the ACA certificates and the reports of the ACA that

accompany those audits.  Again, he's merely stating a fact.

Fluvanna has been accredited by the ACA.  It was accredited

before this lawsuit was instituted in 2012, and it's not a

fact or opinion that is going to assist the Court in

determining the evidence or determining a fact in issue.

        So in summary, none of -- Mr. Dodrill may have

experience in corrections; none of the opinions he's offered

in this case in his report are things that are going to help

the trier of fact understand the evidence, and furthermore,

1    his opinions are not based on sufficient facts or data.

2         MR. SCHNETZLER:  Good afternoon, Your Honor.  May it

3    please the Court.  Nathan Schnetzler from the law firm of

4    Frith Anderson & Peake in Roanoke on behalf of the

5    defendants.

6         Your Honor, Scott Dodrill has been offered as an

7    experiential expert in the field of correctional operations

8    in this case.  The relevance of that information is key.

9    This is a case about operating a prison, and Mr. Dodrill's

10   experience, from what I've just heard, is not being

11   challenged.  His qualifications as an expert in the

12   operations of a correctional institution are not being

13   challenged by the plaintiffs.  That's important for the

14   Court's analysis, given plaintiffs' motion to exclude him,

15   because as an experiential expert, the analysis under Daubert

16   is, as the courts have said, opaque.  It's a little bit

17   nebulous.  All the factors may not particularly come into

18   play and the Court needs to take into account how the expert

19   is using his experiences and whether or not those experiences

20   are being applied to reliable principles and reliable

21   methods.  Given that how important the experience is of the

22   expert -- for an experiential expert on the Rule 702, it's

23   important for the Court to consider Mr. Dodrill's experience.

24   He has amazing experience or -- excuse me -- an astounding

25   amount of experience with correctional institutions.  He

started out as a corrections officer with the Federal Bureau

of Prisons and worked his way up to become assistant warden.

Afterwards, promoted eventually to the warden of Lewisburg

and also served as a warden at Butner.

So, Your Honor, I don't think -- with that, he has a

significant amount of direct interaction both with offenders

as well as managing those offenders as well as dealing with

correctional staff and policies and procedures within a

correctional institution.

After that tenure as a warden, he was then promoted

to become a regional director being over several Federal

Bureau of Prisons correctional facilities and eventually

promoted to the assistant director of programs within the

Bureau of Prisons.

So it's with that experience that it's important for

the analysis here to understand how he is applying that

experience to the experience his investigation -- or visits

to Fluvanna Correctional Center For Women, to understand how

he is coming to his opinions.

Your Honor, I will address this a little bit out of

order. I know that the plaintiffs on brief addressed the

relevance issue after addressing whether or not the

principles and methods are reliable, but I think the Court

needs to make a determination that it's relevant before

getting into his principles and methods. As I've said, the

subject matters of operations of corrections are not within the common knowledge of jurors, and I think the courts have been pretty clear that they have left to the expertise of correctional administrators how to operate prisons. What may seem innocuous to a lay person may actually present a significant security concern in the context of a prison facility. So it is important; it is relevant to this case to understand how a gentleman with a significant amount of experience in operating -- dealing with security issues inside of a correctional facility would look at those issues, how they impact every single piece and component of the day-to-day life inside of a prison facility.

So, Your Honor, we would submit that this is absolutely relevant and it's absolutely helpful to the Court, particularly given that we are here on a bench trial and the gatekeeping function is a little bit less onerous, given the Court can make its own determination whether or not to accept the testimony or not of Mr. Dodrill.

That brings us then, Your Honor, into whether or not Mr. Dodrill's principles or methods are reliable. Again, because this is an experiential expert, you have to look at this in a different lens than you would a traditional scientific expert or engineer, a specialized doctor. In fact, we have to look at how he's applying his experiences to the principles that he sets forth in his opinions and the

1    methods he's using.

2           The principles, Your Honor, are that security is of

3    paramount concern inside of a correctional facility.  It is

4    interwoven with every piece of every bit of operations within

5    the institution.  It's not, just as he says -- it's not just

6    the practice of medicine; it's the practice of correctional

7    medicine.  It's not just education; it's correctional work.

8    It's not just work; it's correctional work.  What that means

9    is that you need to consider how security issues may impact

10   some of the, what we would consider innocuous issues

11   regarding either the delivery of medical care, a person going

12   to the commissary.  Having the additional knowledge of what

13   sort of issues may come to bear in those situations inside a

14   facility are very important.

15          The other principle, Your Honor, is that based on his

16   experiences, Fluvanna Correctional Center's policies and

17   procedures are following standard correctional policies,

18   based on his experiences with the Federal Bureau of Prisons

19   as well as working as a consultant, working with state and

20   international facilities, as he notes in his report, working

21   with hundreds of correctional institutions, and that these

22   are sound correctional practices in terms of the operations

23   of security inside the facility.

24          When you look into what he is basing his method on,

25   Your Honor, it's clear that he visited Fluvanna himself and

1    interviewed staff, spent quite a bit of time meeting with the

2    warden of Fluvanna, meeting with medical staff inside of

3    Fluvanna, looking at documents, looking at policies and

4    procedures that affect the operations of Fluvanna; so he has

5    done a significant amount of research and review of

6    information in order to make a determination in his opinion

7    whether or not Fluvanna is following sound correctional

8    practices.

9        When he -- what he has done is taking his review of

10   those materials, his reflection upon those interviews and

11   conversations with staff, and given his experience working

12   with other facilities, working with other corrections

13   officers, working with other offenders, making in his opinion

14   a determination of whether or not a facility is following

15   sound correctional practices.  So what he knows about other

16   correctional facilities is how he is applying that experience

17   in coming to a determination.

18       So, Your Honor, with that, we note that in various

19   circumstances, the Fourth Circuit has allowed analogous

20   testimony in terms of drug code, experiential expert

21   testimony.  We mentioned the shake and bake method of making

22   methamphetamine where law enforcement officers are allowed to

23   testify as experts, even though they're not giving scientific

24   technical knowledge regarding those issues.  But also in some

25   of the cases cited by the plaintiffs -- particularly, I note

1    the case that was cited out of the District of Maryland --

2    and I apologize I don't have it in front of me at this

3    moment.  But in that very case, Your Honor, one of the

4    parties was moving to exclude a proposed expert and the Court

5    denied the motion to exclude.  The circumstances in that case

6    was the expert was being presented to opine on the cause of

7    basically what caused a pipe to freeze inside of the wall of

8    a building.  The expert went, took a look, inspected the

9    site, determined what he thought, based on his experience in

10   the construction industry what should have been done, and

11   came up to an opinion based on his experience and then based

12   on his actual investigation of going to the site and seeing

13   for himself what was happening, and the Court deemed that was

14   admissible as an experiential expert testimony.

15        Your Honor, with that, we believe Mr. Dodrill is

16   absolutely qualified to testify in this matter.  He is basing

17   his opinions on reliable principles and methods, and the

18   information is absolutely relevant to this case.

19        THE COURT:  All right.

20        MS. CASTANEDA:  Your Honor, while plaintiffs do not

21   contest that experts can be experts on the basis of their

22   experience, and that may be the case with Mr. Dodrill, that's

23   not where the Court's inquiry ends.  As the Eastern District

24   found in the ePlus v. Lawson case, the Court still must

25   engage in inquiry as to whether the opinion is based on

```
 1    sufficient facts and data and whether the application of any

 2    principles or methods are reliable.  And in that case, there

 3    was a Dr. Mangum, who was doing some evaluations as to the

 4    values of some royalties.  It was an intellectual property

 5    case, and the Court said that under the Supreme Court

 6    precedent of Joyner and Kumho that nothing in the Federal

 7    Rules of Evidence requires the Court to admit opinion

 8    evidence that is connected to the existing data only by the

 9    ipse dixit of the expert.  Thus, it is a proper consideration

10    of the Court to consider what documents, what information Mr.

11    Dodrill relied upon in forming his opinions, if any.

12    Certainly, in the case of opinion No. 1, he admits he didn't

13    base it on anything but his experience, and then whether he's

14    connected that to the facts of the case -- connected his

15    experience or opinions or methods to the facts of the case

16    and whether that is an opinion that will help the Court

17    understand the evidence.

18         In the ePlus case, the Court said Mr. Mangum hadn't

19    fully -- didn't have a good explanation for how he had

20    calculated all these factors.  They say that's quintessential

21    ipse dixit.  It is so because the experts say it is so.  It's

22    the plaintiffs' contention that's essentially what

23    Mr. Dodrill's opinions amount to.  It is so because I say

24    it's so.  Systems are interdependent because I say they're

25    interdependent.  And that the other -- some of the other
```

1    opinions that he renders are simply restating of facts

2    without any application of opinion or method, such as

3    Fluvanna meets the ACA standards and that the Court's --

4    there's nothing about those opinions that will help the Court

5    understand the evidence in a way that it couldn't simply by

6    hearing from fact witnesses.

7        THE COURT:  Well, he is an expert, I think, in

8    correctional medicine, and certainly his opinions on

9    constitutional rights and so forth, privacy matters, might

10   not be helpful to the Court, but -- this is a bench trial.

11   The rules are a little different.  The jury is not going to

12   be contaminated by any of these opinions.  The Court will

13   have to make findings of fact at the end of the case.  To the

14   extent that the Court relies upon an expert's testimony, the

15   Court will have to explain why the Court relies upon that

16   testimony.  It will have to be -- fit the Daubert test or the

17   Court cannot rely upon it.

18       So I think this is -- he will be permitted to

19   testify, and we'll sift it out when he does.

20       Let's take about a ten-minute recess.

21       (Recess at 3:07 p.m. to 3:18 p.m.)

22       I have Dr. Joshua next.

23       MR. HOWARD:  Your Honor, if I may, just as a point of

24   clarification:  At the end of your comments concerning

25   Dr. Greifinger, you made some statements about his rebuttal

report.  I think we're a little bit unclear on whether it is

stricken or whether you will be, shall we say, open and

amenable to arguments by the defendants in connection with

any testimony he offers based on the rebuttal report.

THE COURT:  The things he brings up in the rebuttal

are something that the defendant didn't have time or

opportunity to -- if it would be prejudicial, I don't think

it should be admitted.

MR. HOWARD:  And you'll so rule at the time?  Is that

fair?

THE COURT:  Right.  I would rule at that time.

I'm sorry.  Sometimes I look at the screen when I

don't understand the question.  When I'm looking away, I'm

looking at the realtime trying to be sure I understand.

MR. HOWARD:  I understand.

Secondly, Your Honor, we are certainly listening with

great care to your commentary and we are open to the, at

least, implication of your comments that you're more inclined

to entertain challenges to the admissibility and/or relevance

of some of these experts' testimony in realtime at the trial

as opposed to ruling peremptorily today.

THE COURT:  Basically, it looks to me they're all

marginally qualified, and it's a question of what weight to

give to their testimony.  And if they have no basis for it,

obviously, you just exclude it all together.

1           MR. HOWARD:  Yes, Your Honor.

2           We certainly do not want to unduly take up the

3    Court's time.  We, as plaintiffs, on the plaintiffs' side,

4    would be prepared to address our concerns with regard to the

5    defendants' experts as to whom we haven't argued yet in the

6    context of our questioning at trial.  Of course, that would

7    be subject to the understanding that the defendants would do

8    likewise.

9           THE COURT:  I can't settle it for you.

10          MS. GRIGGS:  Your Honor, we are happy to proceed in

11   that fashion for essentially 90 percent of all the arguments.

12          THE COURT:  I would prefer to do that.  It's much

13   easier.

14          MS. GRIGGS:  There was only one issue that we were

15   hoping to take up with the Court today, and it has to do with

16   our ability to cross-examine a witness.

17          When RN Clark has an expert report, and the Court has

18   an opportunity to see that, and the report is laced with

19   "this patient, that patient, this patient, that patient" --

20   dozens of those.  They are not identified; none of them

21   identified.  We sent a deposition notice for her to bring the

22   documents upon which she relied to the deposition so we can

23   ask her about those patients.  She could not identify any of

24   them at the deposition.  The closest we got was someone that

25   she could say, It was one of the 14 women I met with at the

jail, but she couldn't tell us which one -- but she couldn't

tell us at all.  There was one she thought was one of the 14,

and she later decided it wasn't.  So we can't cross-examine

her on that.  We don't know.

     The other issues are she asserted violations of the

Virginia Code regarding nursing, Virginia Code regarding

pharmacy, and I believe it's one other section of the

Virginia Code and could not point out to any of those

sections, so we don't know what section she's saying we

violated.  She didn't bring it with her.  We gave multiple

breaks during her deposition to let her go look online and

find it; she never found it.  She listed -- her list of

documents that she brought that she reviewed VDOC emails.

Your Honor, there have been maybe 30,000 pages of emails and

she didn't identify them anymore than to say, I reviewed VDOC

emails.  She did not bring them with her to the deposition,

and could not identify them there.  So our problem for

purposes of RN Clark is we can't prepare to cross-examine

her.  We don't know her opinions.  They're not identified in

a report.  Granted, she will say, I talked to a patient and

they told me this, but she can't tell us who that patient is,

so we can't go through that patient's records.  There are a

whole section where she lists six patients and says, I looked

at these records and this is what I found.  But she can't

tell us who any of those patients are.  So we can't look at

1    those records and we can't cross-examine her on that.  It's

2    not a qualification issue.  It's a prejudice to us that we

3    are unable to prepare to cross-examine her due to fundamental

4    deficiencies in her expert report, none of which she could

5    procure at her deposition.

6            As we stand here today, we do not know who these

7    women are, other than some of them were among the 14 she

8    talked to, and she can't tell us that.  We can't look at

9    records.  We can't prepare to a significant degree, Your

10   Honor, because we don't know who those people are.  So that's

11   our problem with RN Clark.

12           We'll set aside the qualification issues we raised.

13   That's an impediment that impedes our ability to

14   cross-examine her.

15           MS. CASTANEDA:  Your Honor, if I may just respond to

16   the representations about Nurse Clark.

17           I think there's no question that Ms. Clark is a

18   qualified expert.  She's got many years of experience running

19   correctional -- healthcare for correctional facilities in

20   California, including at San Quentin.  At Pelican Bay, she

21   currently runs healthcare for the County of LA, which is the

22   largest jail system in the country, including 18,000 inmates,

23   some of whom, due to California laws, are serving out

24   sentences as long as ten years.  Ms. Clark is a expert on

25   nursing systems, systems of healthcare in correctional

1    facilities.

2        As to the allegations that defendants have been

3    unable to prepare, I believe those are not well taken.

4    Ms. Griggs and I engaged in an email exchange prior to --

5    several weeks prior to Ms. Clark's deposition with regard to

6    the patients referred to, which were patients that Ms. Clark

7    spoke with at her visit for which counsel for the defendants,

8    including Ms. Griggs and Ms. Abato, were present for the

9    entire visit.  There was a list of prisoners with whom she

10   spoke that was provided before the visit, during the visit

11   and then also during our email exchange, and also at the

12   deposition, which was attached, as, I believe, Exhibit 3 or 4

13   to the deposition.  So that's just not a point well taken.

14       There was one point in the report where she did refer

15   to a patient who was not identified by name.  At that point,

16   she referred to some lines in her medical record and we had

17   already, before the deposition, agreed to withdraw those

18   lines, so that should be moot.

19       Then, it is clear from Ms. Clark's report that she is

20   an expert on systems of care, nursing systems, and that she

21   is able to draw on the evidence that she was able to

22   personally observe at the visit.  For instance, she spoke --

23   Ms. Ellis with Ms. Cairns, who's one of the patients in the

24   infirmary, who's largely bedridden with MS.  She was able to

25   speak with Ms. Cairns.  Ms. Cairns, in her own de bene esse

1    deposition, has testified that it was cold in her room.  Ms.

2    Clark felt Ms. Cairns's hands.  They were cold to the touch.

3    She put her joints through passive range of motion and found

4    them stiff.  The medical records of Ms. Cairns reflect the

5    nurses are not recording they're putting her through passive

6    range of motion to prevent her from losing range of motion in

7    her joints.  So she has reviewed, for instance, the death

8    records.  In her report she speaks about the records of Ms.

9    Johnson and Ms. Liberto and talks about how the failures in

10   nursing care -- for instance, LPNs not informing providers

11   about the condition of a patient -- can lead to systemic

12   failure and lead to substantial risk of harm, which is the

13   standard here.

14        I think that the plaintiffs just don't agree that the

15   defendants are unable to identify the patients with whom

16   Ms. Clark spoke.  And again, this Court has indicated, and

17   you've said today, that, you know, you're going to consider

18   this evidence as it comes out at trial and, you know, the

19   Daubert qualifications of the various experts and incorporate

20   that into any ruling you may give.  Plaintiffs are prepared

21   to abide by that.

22        THE COURT:  Am I right these particular patients are

23   not going to testify?

24        MS. CASTANEDA:  Some of them may.  One of them has by

25   deposition in lieu of trial testimony already.

1          MS. GRIGGS:  Just very briefly, Your Honor.

2          I was, in fact, at the facility that day, but Ms.

3     Abato and I, obviously, were not in the room when any of

4     these women spoke, so of those 14 women, we don't know what

5     any of them said.  We brought them to the plaintiffs'

6     attorneys, they met with the expert, but we weren't

7     physically there.  So we can't say of the issues that Nurse

8     Clark can say one of those 14 people told me.  We don't know

9     about it either.  We were not in the room.  We're not

10    complaining.  It's attorney/client.

11         The others, though -- there's six listed records and

12    she didn't even maintain that those are among those 14 women.

13    They could be any of the 1,200 women at Fluvanna, and she

14    couldn't tell us that.  Similarly, she can't tell us what

15    portion of the Code of Virginia she's going to say we

16    violated.  We're at a real loss what emails she claimed she

17    read.

18         Regarding inmate records she reviewed, she listed

19    45,000 pages without a single -- she later acknowledged she

20    didn't actually review 45,000 pages, but it's very difficult

21    to prepare for that, not knowing what any of these are, Your

22    Honor.

23         I think it's particularly egregious because we sent a

24    deposition notice that said, Please bring the documents you

25    relied on to the deposition so that maybe we could clarify it

there.  She not only didn't bring them, but she could not

qualify it there.

I'm setting aside all the _Daubert_ questions and just

saying we're hampered in our ability to cross-examine her,

given her inability to identify the individuals with whom she

spoke.  She did acknowledge Alice Cairns, ultimately.  Ms.

Liberto and Ms. Johnson discussed just now, this is the first

I've known of the two ladies whom she's going to discuss.

This is a limitation --

THE COURT:  You have to establish hearsay that the

expert relies upon is that type of hearsay that other

similarly situated experts would rely upon in arriving at an

opinion, not just for a trial, but I guess in the ordinary

course of their --

MS. GRIGGS:  Absolutely, Your Honor.

But the rule goes on to state, however, if queried,

we have a right to know what that hearsay is so that we can

challenge it.  The expert can't testify to it on trial on

direct.  However, they can be challenged on cross to say what

is the basis for it.  We attempted to prepare for that by

challenging her at her deposition:  Who is this patient with

whom you spoke that told you this?

I'll give you an example.  One of the things she says

is the patients told me -- the ladies told me that the other

night there was a medical emergency where a woman attempted

1    to kill herself, and the nurses looked like Keystone Cops

2    when they came to take care of the emergency.

3            So I said to her, Do you know if the inmate with whom

4    you spoke personally saw this happen, or is she relating to

5    you information she got from another inmate?

6            I don't know.

7            Do you know who the inmate is that told you this in

8    the first place?

9            I don't know.

10            Do you know if it's three or four people removed from

11    the person who actually witnessed this thing happen?

12            I don't know.

13            I mean, it's kind of hard to get to the bottom of

14    that when we can't identify any of the people.  I guess

15    that's to say she's basing this on experiential, which we've

16    heard a bit about.  We can't test the experience because we

17    don't know if her entire opinion is based on inmates.  We

18    want to know:  Is this an inmate who actually has personal

19    knowledge or got it from another inmate, who got it from

20    another inmate, who got it from another inmate?  I think

21    that's valid to say to the Court:  Is that really the type of

22    information and expert that we can rely on?

23            And there were numerous circumstances like that where

24    we'd say, Who is this person who saw this, so we can even

25    find out if they have firsthand knowledge so we can bring to

1  the Court as a question -- this person couldn't possibly have

2  seen it.

3        And I will tell you, the place they said the suicide

4  attempt happened, the only one we know of that happened that

5  night did not happen where they say it happened.  It was in a

6  different building than the building where Nurse Clark says

7  it happened.  We're significantly hampered because we can't

8  get to the bottom of this and bring to the Court information

9  that says, This didn't happen.

10        This is not a prima facie and should be excluded

11 because we can't get to the bottom of that, Your Honor.

12        MS. CASTANEDA:  Your Honor, if I may, I just want to

13 respond because I think there's been some representations

14 that are just not accurate.

15        As to the six listed women that Ms. Griggs says

16 weren't listed, in fact, those were all references to Ms.

17 Johnson and Ms. Liberto -- I did tell her that --

18        THE COURT:  She gets the last word on this.

19        When this comes up, we'll treat this witness like the

20 others.  Her testimony will have to fit, you know, within the

21 rules of evidence.  She'll have to have a proper basis for

22 any opinion.  If she's offering these things for the truth,

23 she'll have to have some pretty strong basis.

24        I take it she's just not going to recount a lot of

25 different incidents, is she?  Is she coming up with an

1  opinion or what?  What's her -- what is her opinion?

2        MS. CASTANEDA:  Your Honor, Ms. Clark has a number of

3  opinions.  She goes into depth in her report, in her rebuttal

4  report, about models of care.  And in her testimony, she

5  talks about models of care in prisons.  She talks about

6  nursing standards, whether the nurses she observed were

7  meeting nursing standards and whether the failure to meet

8  those standards can cause a risk of harm to the patients.

9        THE COURT:  You answered my question.

10        I will give you the last word.

11        MS. GRIGGS:  I think you've heard as much as you need

12  to hear from me, Your Honor.  Thank you.

13        THE COURT:  Anything else we need to take up now?

14        MS. CIOLFI:  Yes, Your Honor.  There are a couple

15  other matters on the order.

16        Were you referring to the experts?  I think we have

17  agreed to move on from the experts; is that correct?

18        THE COURT:  I think so.

19        MS. GRIGGS:  Yes, Your Honor.

20        MS. CIOLFI:  Your Honor, I believe the next thing on

21  the Court's order was the plaintiffs' motion to strike the

22  correspondence with the compliance monitor.  If I may, my

23  name is Angela Ciolfi with the Legal Aid Justice Center, for

24  the plaintiffs.

25        The defendants seek to admit thousands of pages of

correspondence between the monitor, Dr. Scharff, and either

women at Fluvanna, the plaintiffs' attorneys or the medical

staff at Fluvanna.  So in keeping with the Court's order, I

will spend my time today addressing the 402 and 403 issues.

But I would like to just note that the plaintiffs object on

the additional basis that compelling production and seeking

admission is not in keeping with the -- either the letter or

spirit of the settlement agreement provisions regarding ex

parte communications or the class notice, which indicated

that such communications would be confidential.

Turning to the relevancy and 403 issues; first, let

me address the correspondence between Dr. Scharff and the

women at Fluvanna.  The evidence that defendants seek to

admit is voluminous.  Exhibit 29 to the motion for summary

judgment, which is just one among many exhibits that

defendants seek to admit -- it, alone, is over 3,000 pages,

including 424 separate letters from almost 200 individual

women.  Defendants say that these are relevant to show the

incredible number of unsubstantiated medical complaints

raised by the women.  But these are only relevant if, in

fact, a significant proportion of the complaints turn out to

be wrong, and not just wrong, but so obviously wrong as to be

frivolous or malicious in their inception so as not to even

warrant any investigation.  The only way to determine that is

for the Court to sift through all 424 complaints, possibly

1    accept extrinsic evidence, even expert evidence regarding

2    each complaint, and essentially to have a minitrial on each

3    of these complaints.  Plaintiffs submit this is a needless

4    waste of time, especially when Dr. Scharff will be here to

5    testify and the defendants can simply ask him about the

6    number and volume and investigation of their complaints.

7         Defendants also say that these complaints somehow

8    undermine plaintiffs' claim that the grievance system is

9    ineffective.  But the plaintiffs' claim about the grievance

10   system is not based on what the women say.  It's based on the

11   defendants' grievance responses themselves and Dr. Scharff's

12   independent review of the grievance system and based on the

13   not fewer than 5 times over the course of nearly 16 months

14   that Dr. Scharff told the defendants to fix their grievance

15   system.

16        Similarly, the communications between Dr. Scharff and

17   the defendants' medical staff should be struck because they

18   are simply hearsay.  Again, Dr. Scharff will be here to

19   testify and the defendants can call their own medical staff

20   to testify.

21        Finally, the communications with plaintiffs'

22   attorneys should be excluded because they are irrelevant.

23   Our opinions, as much as we strongly hold them, are simply

24   not -- about whether the settlement agreement has been

25   violated are simply not relevant.  Ultimately, the only

1    opinion that really matters about that is the Court's.  To

2    the extent that the Dr. Scharff's opinions are relevant, the

3    defendants are entitled to ask him about those on the stand.

4         The defendants have offered no case law to support

5    the position or the notion that the conduct of the lawyers

6    has any relevance whatsoever to this contempt action.  The

7    case they do cite, Chesapeake Bank v. Berger, merely says

8    that the defendant in that case, a contempt action, was an

9    attorney; and that because of that, the Court did not find

10   credible his protestation that he did not understand the

11   Court's order.  The case just simply doesn't speak to any one

12   of the attorneys impeding compliance with the settlement

13   agreement.  The defendant's relentless focus on discrediting

14   plaintiffs and their attorneys is a distraction.  The women's

15   actions are not on trial here; neither are plaintiffs'

16   attorneys.  It's defendants' actions that are at issue.  It

17   seems this is more of an attempt to embarrass the plaintiffs

18   for being unsophisticated about their medical care and to

19   attack the attorneys for their advocacy -- advocacy this

20   Court praised in 2014 and specifically asked us -- and not

21   only us, but also the Attorney General's Office to do -- to

22   continue monitoring the situation so that it never happened

23   again.

24        MS. LONDOS:  Your Honor, next week at the hearing,

25   the defendants intend to lay a proper foundation for any

```
1    aspect of and any document from Dr. Scharff's files we intend
2    to put in evidence.  And consistent with what the Court has
3    ruled on earlier motions today, we respectfully request that
4    the Court allow us to lay the foundation for the reason that
5    we are seeking to introduce each item from Dr. Scharff's
6    files.  Let me, though, lay some background for the Court.
7           On April 23rd, about a month-and-a-half ago,
8    plaintiff took a seven-hour deposition of Dr. Scharff in
9    Washington, D.C.  The defendants issued a subpoena to
10   Dr. Scharff to bring his file with him, and he did.
11   Dr. Scharff keeps his records, as he held up his telephone,
12   on his telephone.  He scans and keeps electronic files of
13   everything.  At that deposition, he confirmed that there was
14   no motion to prohibit him from doing so and the evening after
15   giving a seven-hour deposition taken by plaintiffs' counsel,
16   he produced his entire file to both sides, electronically.
17          His files consist of sort of what I'll call two
18   categories of documents.  One are inmate files.  For every
19   inmate that he received correspondence from, he kept an
20   individual file, their name:  Mary Smith, Suzy Jones.  And
21   under that, all correspondence and documents related to his
22   investigation as to each plaintiff, he would receive a letter
23   from the plaintiff or from the plaintiff's counsel about an
24   issue.  He would have documents with his investigation,
25   emailed to our clients, collecting documents, and then
```

1    ultimately his reply.  Four-hundred-twenty-four approximate

2    letters in which he investigated to some degree or another.

3    That is one category of documents from Dr. Scharff's files.

4        The second category from Dr. Scharff's files are what

5    we may call general correspondence that didn't necessarily

6    relate to a single plaintiff, but the back and forth between

7    the counsel to my left and the counsel to my right --

8    predecessors in the case -- about general issues.

9        Suffice it to say, Dr. Scharff has been a thoroughly

10   engaged compliance monitor.  He has not simply shown up

11   quarterly and then shut the book until the next quarterly

12   inspection.  There's a plethora of documents that lay out the

13   history from February, 2016, to the present.

14       Your Honor alluded earlier in this hearing to the

15   defendants couldn't just do nothing since the settlement

16   agreement.  What that body of documents show is everything

17   that was being done:  the back and forth, the constant

18   communication, et cetera, between counsel -- because counsel

19   for both sides and Dr. Scharff and the issues that were

20   discussed and the back and forth was near constant.  We will

21   lay a foundation for those portions of those records that we

22   deem relevant, and we'll lay that foundation next week and we

23   would ask the Court to listen.

24       I will give the Court just a slight preview because

25   this is crucial to the issues in this case and crucial to the

issue that this Court will ultimately be deciding on whether
the settlement agreement was breached.

In June of 2017, just a few months before the motion
for show cause was filed, there was a heavy back and forth
exchange among Dr. Scharff and the parties' representatives,
including counsel, wherein Dr. Scharff told plaintiffs' team
that, I have been thinking about the progress at Fluvanna to
date, and while in most of the specifics it has been
substantial, I see little improvement in the tenor of the
relationships between the plaintiffs and the institution or
the providers.

He said in June of 2017, just a few months before
this show cause, that the progress at Fluvanna in most of the
specifics has been substantial.

His beliefs, his analysis, his investigation that he
brought as compliance monitor, not only the macro during his
quarterly inspection, but the micro on 424 individual patient
complaints, and the back and forth, is important to show this
Court the totality of the situation that was going on from
February, '16 to the present.  It is substantial and it is
important.

Dr. Scharff also says repeatedly to plaintiffs'
counsel, by way of example, To whatever extent you might be
fanning the flames, you may be part of the problem.  The
contractor is, by all measures, at least as good as any in

1    the business, and they have poured resources into the

2    contracts far beyond the terms of the contracts.  They have

3    offered an outrageous salary for the prospective medical

4    director.

5         There is this ongoing history of Dr. Scharff engaging

6    both sides, investigating the plaintiffs, that we learned

7    about in total -- we certainly had an idea there were these

8    communications, there's no doubt; but in total, on April 23rd

9    when Dr. Scharff, with no motion to quash or motion to

10   produce his compliance monitor files.

11        So there is a lot of history here that is relevant to

12   the issue of:  Have the defendants breached a settlement

13   agreement?  What have they been doing?  We will lay that

14   foundation next week for the aspects of Dr. Scharff's files

15   that we deem -- that we believe admissible and ask the Court

16   to accept that evidence at that time.  But this case and this

17   story of what has happened is not complete without an

18   understanding of both the macro investigation and the micro

19   on 424 letters by plaintiffs and their counsel to

20   Dr. Scharff.

21        So we would ask this Court to deny this motion at

22   this time, take it on a case-by-case basis as it comes up.

23   Certainly, in any patient/provider, medical provider

24   relationship, there are two sides to the equation and the

25   settlement agreement implicitly empowers Dr. Scharff to

investigate, and implicitly and explicitly -- excuse me -- to
instruct Dr. Scharff to assess and evaluate the defendants'
progress, which he has done and which will be illuminated by
his files.

Thank you, Your Honor.

MS. CIOLFI:  Your Honor, if I may.

There's simply nothing stopping the defendants from
calling Dr. Scharff and asking him about his investigations,
about defendants' level of engagement, about the progress
made on this case.  There's also nothing stopping defendants
from calling their own people to ask them about the same
things, but it doesn't change the fact that the
communications from defendants back to Scharff and Scharff to
defendants are nothing but self-serving hearsay.

Dr. Scharff, if -- they have the opportunity to use
them for impeachment to the extent what he says is
inconsistent.  But the reality is -- so as to the point about
the motion to quash, the plaintiffs simply didn't think that
would be necessary.  We thought the monitor would honor the
ex parte conditions of the settlement agreement and, quite
simply, we didn't want to further antagonize the monitor,
who's already expressed his extreme distaste for litigation.
But just because the documents were produced doesn't make
them admissible.  And we have not waived our objection.

THE COURT:  They're not admissible just because they

1   were produced.  They'll have to show that they are

2   admissible.

3          MS. CIOLFI:  That's correct.

4          And, Your Honor, the plaintiffs' intent to bring this

5   motion was because of the volume of the evidence, the number

6   of the exhibits, to simply -- they all have the same

7   recurring theme.  And we wanted to bring this motion as a

8   matter of efficiency to deal with them all at once.

9          Dr. Scharff has said lots of things.  He's says lots

10  of things to both sides, and we'll both have an opportunity

11  to ask him about those at trial instead of just bringing in

12  various snapshots of what he's said in the context of one

13  particular time over the course of the more than two years

14  that he's been monitoring the settlement agreement.

15         THE COURT:  He'll be there.  He can testify and the

16  Court will rule at the time on any cross-examination or

17  direct examination of him.

18         Anything else?

19         MR. SCHNETZLER:  Your Honor, Nathan Schnetzler,

20  again, for the defendants.

21         There are two additional motions on the Court's order

22  regarding oral argument today.  Those are the defendants'

23  motion on the disclosure by the plaintiffs of the

24  demonstrative summaries, and the motion for the site visit.

25  I know you've allocated just a small portion of time for

those.  I'll be happy to do them both at the same time.

THE COURT:  Go on.

MR. SCHNETZLER:  With respect to the demonstrative

summaries, as we stated in our motion that we filed, the

summaries were not disclosed until well beyond the deadline

set in the Court's pretrial order for the disclosure of

exhibits.  I know the plaintiffs have taken the position that

they did not need to be disclosed because they were being

used for demonstrative purposes only.  That's not the only

reason we've filed our motion, of course.  We've also

suggested they are not proper summaries to begin with because

the information those charts draw from is not consistent with

the voluminous filings as required under Federal Rules of

Evidence 106, and also, the summaries omit significant

information regarding the compliance monitor's evaluations of

the progress at Fluvanna.  As we have made very clear at this

hearing today and in our briefs that we submitted to the

Court, Your Honor, the defendants' position is that progress

is what the settlement agreement requires and that's what the

defendants have been doing.  So it's important that any of

the evidence that they tend to submit, whether demonstrative

or otherwise, be accurate and portray the full picture of

what the writings are they intend to summarize.

Also, Your Honor, the summaries, for the most part,

reflect mostly what Dr. Scharff himself has already

1    summarized in tables in his reports.  It's now becoming the

2    summary of a summary, and we don't think that's proper under

3    FRE 1006.

4          Your Honor, for those reasons -- that they were

5    untimely disclosed, they do not portray all of the

6    information contained in the writings, and exclude probative

7    information regarding the defendants' progress under the

8    settlement agreement, and the fact they are not proper

9    summaries, we don't believe that they should be permitted.

10   And I understand, again, these are claiming to be

11   demonstratives, but the problem is you can't unring that

12   bell.  So we believe they need to be accurately portrayed.

13         With respect to the site visit, Your Honor, we

14   believe that a site visit would greatly help the Court in its

15   evaluation of the defendants' progress under the settlement

16   agreement, and we think it's interesting that the plaintiffs

17   oppose the Court going and seeing the facility and seeing the

18   progress that's been made since February of 2016.

19         With respect to the progress here, the plaintiffs

20   essentially, in their show cause motion, want the Court to

21   reject the conclusion of the compliance monitor that the

22   Fluvanna Center for Women has made progress in its compliance

23   with the settlement agreement, as it's required to do.  We

24   believe the Court seeing for itself with its own eyes the

25   conditions at Fluvanna will help the Court evaluate whether

1　or not the Department of Corrections has met its obligations

2　under that settlement agreement.

3　　　　As to the issues the plaintiffs have raised with

4　respect to logistics in terms of the Court being able to

5　speak with witnesses or there being a tour guide, we laid out

6　what we thought might be a proper way to do this, by having

7　one attorney from each side present if the Court so desired.

8　To the extent that the plaintiffs' claim it would be scripted

9　or planned, subject to, obviously, Your Honor's security

10　concerns about visiting the prison, I don't think, with

11　respect to this particular motion -- the warden has advised

12　that a mere 24-hour notice would be enough for him to prepare

13　any security concerns that the Court may have if it did make

14　a visit, which makes it a bit tough to sort of script as the

15　plaintiffs claim that the defendants are apt to do.

16　　　　For that reason, Your Honor, we think this is a

17　significant case and it would be extremely helpful for the

18　Court to see the conditions at Fluvanna before making its

19　determination.

20　　　　Thank you.

21　　　　(The law clerk conferred with the Court.)

22　　　　MS. CIOLFI:  Your Honor, Angela Ciolfi, again, for

23　the plaintiffs.

24　　　　I just want to address the issue regarding the

25　demonstratives, and then my colleague, Ms. Ogunkeyede, will

        1    address the site visit.

        2          I just want to make one thing clear at the outset.

        3    These are not summaries of evidence offered under FRE 1006.

        4    Plaintiffs plan to offer as demonstratives only up to four

        5    demonstratives, all of which derive from the compliance

        6    monitor's report or his performance ratings, which both

        7    parties have designated as exhibits and not objected to.

        8    These are not for the purpose of proving a fact.  They are

        9    merely to illustrate the significance of evidence that will

       10    be before the Court; namely, the monitor's 9 reports, each of

       11    which is 10 to 20 pages long, and the 9 accompanying

       12    performance ratings charts.

       13          I brought them with me.  These are the monitor's

       14    reports and the performance ratings summaries on

       15    single-spaced paper.  It is merely and simply to illustrate

       16    the delays, the repeated recommendations, the lack of

       17    progress or changes over time in the ratings by the monitor.

       18    In fact, the reason this is so important is just as

       19    defendants said is to counter that plaintiffs want to reject

       20    the conclusion of the monitor, but that's exactly what we

       21    seek to portray over time in these demonstratives.  They're

       22    intended to be used as an aid in opening, to aid the Court's

       23    understanding and to prepare the Court to receive the

       24    testimony and evidence.  They're not evidence themselves.

       25    They're never intended to be evidence, and the reports

themselves are the evidence.  Since they're not evidence or a

summary of evidence under FRE 1006, they weren't required to

be disclosed.  However, plaintiffs did disclose them; and we

disclosed them nearly a week before trial, which is more than

enough time to review and counter those with their own

illustratives about the lack of progress.

The defendants say they are misleading because they

don't show the partial compliance, but plaintiffs' position

in this case is that full compliance is required and,

ultimately, that's going to be up to the Court.  But the

bottom line is this case is not going to be decided by a

jury.  So the admonitions about not being able to unring the

bell harken back to what the Court said probably an hour ago:

The jury is not going to be contaminated here by these

illustrative aids and the Court can decide if they are useful

to the Court.

THE COURT:  All right.

MS. OGUNKEYEDE:  Your Honor, very briefly as to

defendants' motion for a site visit.

Plaintiffs do not oppose that motion just for

opposition sake.  We simply don't think that it is relevant

to the facts at issue here.  Of course, plaintiffs note that

the Court's order from yesterday indicated that if a site

visit is taken, the Court -- it would not occur until after

next week's hearing.  And plaintiffs stand by the position

1    that after that hearing that it will be apparent to the Court

2    that a site visit is not relevant to the issues that are

3    subject to the Court's consideration.

4           Also, Your Honor, the last point on the Court's order

5    from yesterday said that the parties should be prepared to

6    discuss the allotment of time at trial.  I'm not sure that

7    we've covered that and I believe my colleague, Ms. Ciolfi,

8    has some information to present to the Court on that issue.

9           THE COURT:  We haven't covered it.

10          When you decide to enter demonstrative evidence, do

11   you have a witness?

12          MS. CIOLFI:  No, Your Honor.  The reports will come

13   in -- they are not objected to in the pretrial order, which

14   the Court hasn't entered yet.  The parties have agreed

15   exhibits not objected to come in.

16          THE COURT:  Is there any objection that the numbers

17   on the demonstrative exhibits are not accurate?

18          MR. SCHNETZLER:  To the extent it doesn't include the

19   partial compliance that Dr. Scharff is going to evaluate.

20          MS. CIOLFI:  If I may, the numbers in the exhibit

21   that the Court is holding up pertain to the number of times

22   the monitor made a recommendation particular to the

23   settlement agreement --

24          THE COURT:  I understand.

25          When you offer a demonstrative evidence, it usually

```
1   is to help the witness -- explain the witness's testimony.

2        MS. CIOLFI:  These are simply to illustrate at

3   opening -- to summarize the evidence that -- we had not

4   planned to admit them as evidence.  Simply want to use them

5   to summarize the voluminous evidence that will be admitted.

6        THE COURT:  All right.

7        MS. CIOLFI:  So if I may understand the Court

8   correctly, then I am permitted to use them at opening if they

9   are not being admitted into evidence?

10       THE COURT:  I'll give the defendant the last word

11  before I decide.

12       MS. CIOLFI:  Okay, Your Honor.  Thank you.

13       Do you want me to address the timing issues or wait

14  until defendants have an opportunity to respond regarding the

15  demonstratives?

16       THE COURT:  Go ahead with any argument you've got.

17  This will be your last word on the issue.

18       MS. CIOLFI:  I'm sorry.

19       In the Court's order, the Court asked for --

20       THE COURT:  I was misunderstanding.  My fault.

21       MR. SCHNETZLER:  Your Honor, we would just continue

22  our objection because we believe that these do not accurately

23  summarize the materials that Dr. Scharff has prepared.  We

24  would just maintain that objection.

25       Thank you.
```

 1          THE COURT:  I don't think I'll be misled by it.  It

 2   can be used as a demonstrative exhibit and be subject to

 3   comment by the -- the deficiencies, the defendant can bring

 4   out.  I don't see a problem with it.

 5          With regard to the site visit, I'll make that

 6   decision if I think I need to go there.

 7          With regard to the timing, we've got five days set

 8   aside for trial.  Are y'all going to be able to get your case

 9   in?  You don't get all five days.

10          MS. CIOLFI:  That is the hope, Your Honor.

11          We have worked -- the plaintiffs have worked really

12   hard to tighten our case and condense our evidence.  We have

13   cut our witness list in half, from 17 to 8.  We are

14   submitting a lot of evidence through deposition designations

15   under Rule 32.  We have worked with the defendants and Mr.

16   Juhan to reduce the need to argue over objections about the

17   deposition designations, so it's just to be about the things

18   that actually the parties rely on in our post judgment

19   briefing and the Court relies on in their findings.  We've

20   come in twice to practice the court's technology; though I

21   can't make promises we won't fumble a bit.  We really are

22   aiming to be done with our evidence by midmorning or midday

23   Wednesday, and we'd like to reserve some time for rebuttal.

24   But there are some things, of course, that are not in our

25   control, such as the length of the defendants' cross and the

1    number of objections and arguments over those.

2         So -- but that is our goal, and I wanted to raise one

3    related issue, which is that the Court's reservations about

4    the rebuttal report by Dr. Greifinger may cause us to

5    reevaluate some of the lineup of witnesses if indeed he's not

6    permitted to testify about the women whose care we submit has

7    been in breach of the settlement agreement in this March,

8    April timeframe, in which the defendants are saying

9    everything has been fixed.  So normally, in a normal case, we

10   would just simply call those witnesses to come in to testify

11   about that, and they would be able to deliver themselves to

12   the courtroom.  However, because most of our witnesses are

13   incarcerated, we're somewhat at the mercy of the defendants

14   in bringing them to the courtroom.  So we will reevaluate

15   over the weekend and we would ask this Court's indulgence to

16   be able to move for additional transport orders if that's

17   necessary.

18        Related to that, we had informed the defendants that

19   one of the women who we previously disclosed, Margie Ryder,

20   may be a rebuttal witness, which would normally happen on

21   Friday.  We learned yesterday that she's terminally ill and

22   she has some sort of medical appointment or something on

23   Friday.  We just wonder if at some point during the week, if

24   we believe it's necessary to call her, potentially to take

25   the witnesses out of order so that she does not have to miss

1    a medical appointment on Friday.

2         We just wanted to preview those sort of timing issues

3    for the Court.

4         Then finally, it's my understanding the Court usually

5    starts at 9:30 and we wondered whether the Court would

6    consider starting at 9 as a potential way to fit everything

7    in.

8         Thank you, Your Honor.

9         MS. LONDOS:  Thank you, Your Honor.

10        With the Court's permission or blessing, we would be

11   prepared to start our case Wednesday at lunchtime if they are

12   going to go -- and have our first witness that we would put

13   on be there Wednesday at lunch.

14        We did -- we will certainly be succinct and prompt

15   with our witnesses going forward.

16        We have one housekeeping matter that we haven't

17   addressed with plaintiffs' counsel yet.  There's been so much

18   up in the air with certain things in this case.

19        But three of the named defendants-:  Director Clarke,

20   Mr. Robinson, and Warden Aldridge -- were not going to plan

21   to be at trial unless Your Honor insisted or wanted them

22   there.  Certainly, they are operating the Virginia Department

23   of Corrections, and on behalf of the Commonwealth of

24   Virginia, we would prefer that they be at their jobs.  We

25   certainly want to ensure that the Court doesn't find that in

```
 1   any way unacceptable or disrespectful.  Everyone wants to

 2   keep -- they have not been subpoenaed.

 3         THE COURT:  I wouldn't require them to be there

 4   unless they're going to be called as adverse witnesses or

 5   something.

 6         MS. LONDOS:  We just wanted to make sure that there

 7   was going to be no negative implications by them not being

 8   there.

 9         THE COURT:  We try these cases all the time by people

10   who aren't there.

11         MS. LONDOS:  Thank you, Your Honor.

12         We'll be ready to start our first witness Wednesday

13   at lunchtime.

14         And no objection to taking a witness out of order for

15   medical reasons.

16         Thank you.

17         THE COURT:  Anything else?

18         MS. CIOLFI:  No, Your Honor.  Thank you for spending

19   the afternoon with us.

20         We'll see you next week.

21         THE COURT:  That's my job.

22         MS. CIOLFI:  Oh, I'm sorry.  There's one other thing

23   today.  Counsel just reminded me. With all apologies to the

24   Court.

25         In reviewing the submissions last night, it came to
```

1  the plaintiffs' attention that we misquoted the Court in our

2  pretrial brief, inadvertently.

3       There are seven words that are incorrect and I'm not

4  sure in the flurry and exchange of rounds of editing how that

5  happened, but we would like to submit a corrected pretrial

6  brief correcting the incorrect quote for the Court, if that's

7  all right.

8       Thank you.

9       THE COURT:  Anything?

10      MS. LONDOS:  (Indicating no).

11      THE COURT:  Thank you all.

12      One thing we could do; by Tuesday, if you all would

13  like, we could start at 9, and maybe that will give us a

14  little more time.

15      MS. CIOLFI:  That would be acceptable.

16      THE COURT:  Does that suit everyone?

17      MS. LONDOS:  Absolutely.

18      MS. CIOLFI:  Shall we plan to start at 9 on Monday?

19      THE COURT:  No.

20      MS. CIOLFI:  Tuesday.  Yes, Your Honor.

21      THE COURT:  Recess court.

22      (Proceedings concluded at 4:10 p.m.)

23  "I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

24

25