## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

CYNTHIA B. SCOTT, *et al.*,                    )
                                               )
                    *Plaintiffs,*              )
                                               )    Case No. 3:12-cv-00036-NKM/JCH
v.                                             )    Sr. Judge Norman K. Moon
                                               )
HAROLD W. CLARKE, *et al.*,                    )
                                               )
                    *Defendants.*              )
                                               )

## PLAINTIFFS' POST-TRIAL BRIEF

Angela Ciolfi, VSB No. 65337
(angela@justice4all.org)
Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Adeola Ogunkeyede (admitted *pro hac vice*)
(adeola@justice4all.org)
Kimberly A. Rolla, VSB No. 85625
(kim@justice4all.org)
Shannon M. Ellis, VSB No. 89145
(shannon@justice4all.org)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553

Philip Fornaci (admitted *pro hac vice*)
(phil_fornaci@washlaw.org)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

Kristi C. Kelly, VSB No. 72791
(kkelly@kellyandcrandall.com)
Andrew Guzzo, VSB No. 82170
(aguzzo@kellyandcrandall.com)
Casey S. Nash, VSB No. 84261
(casey@kellyandcrandall.com)
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7576

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION AND STATEMENT OF THE CASE ............................................................. 1

ARGUMENT ............................................................................................................................... 3

I. THE PLAINTIFFS HAVE ESTABLISHED BY CLEAR AND CONVINCING
EVIDENCE ALL OF THE ELEMENTS REQUIRED TO SUPPORT
A FINDING OF CIVIL CONTEMPT .............................................................................. 3

    A.     The Defendants Knowingly Breached Their Obligations
    Under The Settlement Agreement And Thus Violated The
    Consent Order ....................................................................................................... 3

    B.     The Plaintiffs Have Been Harmed By The Defendants'
    Non-Compliance .................................................................................................. 8

II. THE DEFENDANTS' CLAIMS OF "GOOD FAITH" AND "SUBSTANTIAL
COMPLIANCE" ARE UNSUPPORTED ........................................................................ 11

III. THE SETTLEMENT AGREEMENT DID NOT PROVIDE VDOC WITH
AN OPEN-ENDED TIME PERIOD WITHIN WHICH TO ACHIEVE
COMPLIANCE WITH ITS REQUIREMENTS ............................................................. 13

IV. THE MULTI-FACETED REMEDIAL MEASURES PROPOSED BY THE
PLAINTIFFS ARE NECESSARY AND APPROPRIATE ............................................. 15

CONCLUSION .......................................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Carbon Fuel Co. v. United Mine Workers of Am.*,
  517 F.2d 1348 (4th Cir. 1975) .............................................................................................. 16

*Colonial Williamsburg Found. v. Kittinger Co.*,
  792 F. Supp. 1397 (E.D. Va. 1992), *aff'd*, 38 F.3d 133 (4th Cir. 1994) .................................. 16

*In re General Motors Corp.*,
  61 F.3d 256 (4th Cir. 1995) .................................................................................................. 16

ii

Plaintiffs Cynthia B. Scott, *et al.*, by their attorneys, hereby submit their Post-Trial Brief in accordance with this Court's Order entered July 2, 2018 (ECF Docket No. 519), as modified by oral Order entered on August 2, 2018 (ECF Dkt. No. 532).

## INTRODUCTION AND STATEMENT OF THE CASE

The Plaintiffs, a certified class of prisoners incarcerated at the Fluvanna Correctional Center for Women (FCCW), a facility operated by Defendant Virginia Department of Corrections (VDOC), initiated this proceeding by the filing of a Motion for Order to Show Cause Why The Defendants Should Not Be Held In Contempt and supporting papers on September 6, 2017. *See* ECF Dkt. Nos. 265, 266. By their Motion, the Plaintiffs sought a ruling from this Court that the VDOC has failed to comply, or even make significant progress towards compliance, with many of the critical requirements for meeting its obligation to provide constitutionally-adequate medical care at FCCW under the provisions of a Settlement Agreement reached by the Parties in September 2015 and enforced by this Court by Consent Order entered February 5, 2016. *See* ECF Dkt. No. 221-1 (Settlement Agreement); ECF Dkt. No. 262 (Consent Order).

Following the completion of briefing on the Plaintiffs' Motion and the establishment of a procedural schedule culminating in a June 11, 2018 trial date, the Court conducted a Status Conference by telephone on January 29, 2018, at which time it advised the Parties that the threshold question of whether a Show Cause Order should issue would be addressed and resolved at trial before proceeding, if necessary, to the Plaintiffs' contempt claim on its merits. Thereafter, the Parties engaged in extensive document and deposition discovery, significant discovery-related motions practice, and an unsuccessful mediation before appearing before the Court for a bench trial conducted from June 11 through June 15, 2018. At the close of the

evidence, the Court requested post-trial briefing, in response to which this submission is provided.[1]

As is exhaustively detailed in their Proposed Findings of Fact, the Plaintiffs submit that VDOC's provision of medical care under the terms of the Settlement Agreement was destined to fail, *ab initio*, because VDOC simply did not take the obligations it assumed under the Agreement seriously. Despite the voluminous evidence the Plaintiffs had provided the Court prior to settlement concerning the consistently egregious and occasionally deadly failures of FCCW to provide constitutionally-adequate medical care due to deficiencies in the performance of VDOC's private for-profit medical care contractor, VDOC *failed to impose any changes on the terms of the contract or to change the identity of the contractor in November 2015*, nearly two months *after* the Parties completed the Settlement Agreement and tendered it to this Court for approval, despite this Court's clearly-articulated concerns with respect to both. Beginning in February 2016, when the Settlement Agreement was approved and the Consent Order was entered, VDOC has consistently been informed and admonished by its own employees, the Plaintiffs and their counsel and, perhaps, most critically, by the Court-designated Compliance Monitor, that serious problems and deficiencies in the provision of medical care at FCCW persisted. With full knowledge of this serious (and unlawful) course of conduct and its results, including *12 deaths* of FCCW women between the date the Consent Order was entered and the time of trial, VDOC stuck with its contract and contractor, and effectively endorsed the ongoing substantial risk of serious harm to FCCW prisoners posed by the improper acts and omissions that were clearly implicated in the contractor's continuing involvement in the provision of

---

[1]    This Post-Trial Brief is submitted concurrently with Plaintiffs' Proposed Findings of Fact and Conclusions of Law, the entirety of which are incorporated herein by reference. Citations to Plaintiffs' proposed Findings will have the following format: "FoF, No. __". Citations to the Plaintiffs' proposed Conclusions will have the following format: "CoL, No. __".

2

medical care at the site. VDOC's failure to implement or affirmatively insist upon the adoption

of meaningful and effective corrective actions to significantly enhance the quality and quantity

of medical care at FCCW, as the Settlement Agreement expressly required, warrants the finding

of civil contempt that the Plaintiffs have requested.

## ARGUMENT

## I. THE PLAINTIFFS HAVE ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE ALL OF THE ELEMENTS REQUIRED TO SUPPORT A FINDING OF CIVIL CONTEMPT

In order to establish grounds for a determination that VDOC's failure to meet the

obligations it assumed pursuant to the Parties' Settlement Agreement warrants a finding of civil

contempt, the Plaintiffs had the burden to show, by clear and convincing evidence, the following

elements:

- (i) a valid decree of this Court of which VDOC had actual or constructive knowledge:
- (ii) that the decree was in Plaintiffs' favor;
- (iii) that VDOC violated the terms of the decree with actual or constructive knowledge that it had done or was doing so; and
- (iv) that Plaintiffs were harmed as a result.

COL, Nos. 3-7. Only the third and fourth of these elements were seriously contested as of the

commencement of trial -- *see* FoF, No. 6 -- and, as to each of them, the evidence presented over

the course of the five-day proceeding overwhelmingly demonstrates that the Plaintiffs have

satisfied their burden under the heightened "clear and convincing" standard of proof.

### A. The Defendants Knowingly Breached Their Obligations Under The Settlement Agreement And Thus Violated The Consent Order

Under the plain terms of the Parties' Settlement Agreement, as implemented and made

enforceable under this Court's Consent Order, VDOC assumed the obligation

3

Case 3:12-cv-00036-NKM-JCH   Document 534   Filed 08/06/18   Page 6 of 25   Pageid#: 12863

to achieve and maintain compliance with the Operating Procedures, Guidelines and Standards governing the provision of medical care that are set forth [below] or incorporated by reference [herein]. These provisions . . . are intended to insure that prisoners incarcerated at FCCW receive adequate, appropriate and timely medical care to protect them from substantial existing, ongoing and/or imminent physical injury, illness, chronic pain and undue risk of worsening health or premature death.

Pls. Trial Ex. 1, ECF Dkt. No. 221-1, Settlement Agreement, Sec. III.1.; *see* CoL, No. 10.

However, before the Settlement Agreement was even approved by this Court, VDOC took an initial step that would make its fulfillment of that obligation nearly impossible by entering a renewed contract with medical contractor Armor Correctional Healthcare (Armor) that was based on the same pricing and staffing models that had already proven inadequate to support the provision of a constitutionally-adequate level of medical care at FCCW. The Court, in its pre-Settlement decision denying VDOC's Motion for Summary Judgment, previously expressed its grave concerns with the "capitated financing" approach to compensation of the contractor. The Court observed that a system that provides the contractor an incentive to minimize care in order to maximize its profit margin makes "a reduced level of medical care . . . the virtually inevitable result" of a contract framed upon this premise. Yet, VDOC, already fully aware of the Court's articulated criticisms and the alleged systemic deficiencies characterizing the care provided to the women at FCCW, chose to commit to a new agreement with Armor -- two months after the Settlement Agreement was consummated -- based on the same financing scheme. *See* FoF., Nos. 6-9; CoL, Nos. 11-13.[2] These VDOC decisions, in blatant disregard of this Court's clearly-stated

---

[2] Notably, the amount of Armor's successful bid to obtain the November 1, 2015 contract to continue providing medical care at a host of VDOC correctional facilities including FCCW -- $8.8 million -- was *$11 million less* than the amount it bid, as the then-incumbent in 2012, for the contract that VDOC awarded to Corizon Health in 2013. At the time of its bid in 2012, Armor's Chief Executive Officer, Bruce Teal has testified, Armor believed that $93 million was as low as Armor could realistically go in bidding for the VDOC contract while maintaining the capacity to meet the actual costs of providing care. FoF, No. 9; CoL, No. 13.

4

concerns, seemingly made a continuation of the provision of substandard medical care at FCCW a foregone conclusion. CoL, No. 13.

In any event, within a matter of only a few months after the new contract incepted, VDOC officials knew that the care that Armor was providing at FCCW was inadequate; indeed, in the immediate aftermath of the Court's entry of the Consent Order, Ms. Cookie Scott, the VDOC Deputy Director for Administration, who was entrusted by the Department with responsibility for overseeing implementation of VDOC's obligations under the Agreement, was told by her senior advisors that medical care at FCCW was "not working" and "sinking fast". FoF, Nos. 11, 12. Ms. Scott was urged that VDOC needed to "take [an] aggressive approach" in order to effectively address the deficiencies characterizing Armor's provision of medical care at FCCW, which might include taking over direct responsibility for the provision of care at the prison in Armor's place. VDOC had one of its most highly-regarded medical providers, Marsha Stanford, R.N., who at that time was serving as the Health Services Administrator at another VDOC facility, conduct an audit of critical medical care functions at FCCW. Nurse Stanford found significant problems, made recommendations for improvements, and offered to transfer to FCCW to oversee their implementation, but VDOC never responded to her offer. Instead, in May 2016, VDOC -- for reasons neither clearly articulated nor supported with evidence in the record -- decided to stay the course with Armor. FoF, Nos. 13-15, 40-45, 85-86; CoL, Nos. 14, 45-46.

VDOC's Health Services Director, Steven Herrick, Ph.D., confirmed that there continued to be "many problems" with the medical care at FCCW from May 2016 to the Summer of 2017. In late June 2017, then-FCCW Warden Jeffrey Dillman, in a memorandum addressed to some of his superiors, expressed his view that the VDOC's efforts to comply with the Settlement

5

Agreement were "destined to fail" because FCCW had neither the resources nor the expertise to comply with the Agreement's requirements. FoF, Nos. 47-49; CoL, No. 20. Meanwhile, throughout this time period, VDOC's own Contract Monitor, Distarti Whitehead, found and documented on-going shortcomings in Armor's performance on a monthly basis, including problems that she had observed in 2016 that were still recurring as of the time she was deposed prior to trial in February 2018. She conceded that a number of these ongoing deficiencies in the provision of care could pose significant risks to patients' health and well-being. FoF, Nos. 53-60; CoL, Nos. 18, 19. Significantly, VDOC did virtually nothing to hold Armor accountable for its poor performance, even in the face of the Court's pointed criticism, in its pre-Settlement ruling, of VDOC's failure to meaningfully penalize the contractor for its prominent role in FCCW's default on its obligation to provide constitutionally-adequate care. *See* FoF, Nos. 21-34.

VDOC was clearly aware, from the observations and feedback provided by its own personnel, that its obligations to the Plaintiffs under the Settlement Agreement were not being met. However, the most direct and important source of advice in this regard was the Court-designated Compliance Monitor, Nicholas Scharff, M.D., who catalogued for VDOC, in detail, the specifics of its deficient performance commencing with an initial monitoring Report in March 2016 and on a more-or-less quarterly basis thereafter through May 2018 as of the time of trial.

Subject to the provision of the Settlement Agreement governing his reporting obligations, Dr. Scharff, beginning in July 2016, graded VDOC as non-compliant, partially compliant or fully compliant on each of 22 key performance indicators identified in Appendix B to the Agreement. *See* Pls. Trial Ex. 1, ECF Dkt. No. 221-1, Settlement Agreement, Sec. IV.2.c. & Appx. B thereto.

6

In the eight Reports issued by Dr. Scharff including grades for VDOC on the performance indicators from July 2016 until May 2018, at no time did he find FCCW fully "Compliant" on even one-third of the subjects graded. FCCW never achieved a "Compliant" grade on more than 7 of the 22 performance indicators under scrutiny in any of these Reports and, as of May 2018, just prior to trial, it was "Compliant" on only 3 of 22 indicators. *See* CoL, No. 25. Dr. Scharff's findings correspond with the systemic deficiencies identified by VDOC's Contract Monitor for FCCW, VDOC's own medical care advisors, the Plaintiffs and Plaintiffs' experts regarding the lack of clinical leadership at FCCW, its critically low levels of staffing, poor responses to medical grievances, chronic problems with medication administration, lackadaisical responses to medical emergencies, and the like. *See generally* FoF, Nos. 79-157.

Moreover, grading aside, Dr. Scharff regularly explained to VDOC in his Reports the significance of the changes in approach to the provision of care that were needed and the implications of its failures to implement changes *vis-à-vis* its duty to comply with the Settlement Agreement. For example, in his Report based upon his monitoring visit to FCCW in April 2017, Dr. Scharff -- reprising prior complaints he had made concerning the inadequacy of FCCW's system for review and disposition of prisoners' medical grievances -- stated as follows:

[A] functioning grievance system is critically important in correctional health care systems, with their inevitable complexities and barriers to care related to restrictions on patient movement and communication with caregivers and custodial imperatives. Returning 75-97% of grievances unread for seemingly arbitrary reasons communicates simply and clearly that the system just doesn't care about the grievances. Clinically, this is shortsighted, dangerous, and likely negligent. In terms of the Settlement Agreement, it is unacceptable.

FoF, No. 74.

In a similar vein, regarding FCCW's chronic staffing shortages among qualified nurses and its void in clinical leadership, Dr. Scharff advised VDOC in his November 2017 Report that it "seems increasingly unlikely that services will improve in the near future to an acceptable level

7

under this Agreement." Dr. Scharff noted that the "continuing, worsening shortage of nursing staff and the failure to recruit a full-time on-site medical director seem to me to be fatal failures which have reached critical proportions," and further stated that he expected the "absence of adequate clinical leadership and the shortage of nursing personnel to exacerbate each other, producing clinical and procedural error and continuing to risk patient injury, including serious injury." He concluded by suggesting that the Court "reconsider whether the Settlement Agreement can succeed in repairing the deficiencies it cites." FoF, No. 75.

These examples establish, beyond any reasonable basis for question, that the VDOC knew that it was not complying with the Settlement Agreement. CoL, Nos. 25, 26. *See also* FoF, Nos. 68-73, 76-78 (referencing additional concerns consistently -- and in many instances, repeatedly -- articulated by Dr. Scharff to VDOC from March 2016 to May 2018). VDOC offered nothing at trial to challenge the accuracy of the Compliance Monitor's findings and conclusions as referenced here, choosing instead to rely upon the dubious theme, addressed hereinafter, that it is simply too soon for compliance with the Settlement Agreement to be demanded.

In sum, the VDOC's knowing violation of the Settlement Agreement was established by the Plaintiff beyond any reasonable doubt, much less "clear and convincing evidence."

## B.  The Plaintiffs Have Been Harmed By The Defendants' Non-Compliance

Because of the intrinsically *systemic* nature of the deficiencies in the provision of medical care at FCCW that the Plaintiffs have demonstrated, both prior to the Settlement as found by this Court and at trial, a conclusion that the provisions of the Settlement Agreement intended to give rise to significantly improved and enhanced care have been breached necessarily implicates a finding that the Plaintiffs have been harmed. Under the Eighth Amendment, *the substantial risk of serious harm* to which the Plaintiffs are subjected as a result of VDOC's deficient

8

performance of its obligations is actionable in itself. *See* CoL, No. 27. Importantly, however, the Plaintiffs went further, to provide evidence showing that class members have experienced *actual harm* attributable to the Defendants' breaching acts and omissions. Of many available examples, the harm experienced by prisoner Andrea Nichols as a result of incompetence on the part of FCCW medical staff, which delayed the colonoscopy it was acknowledged that she needed, from January 2015 to March 2018, by which time metastatic colon cancer was in effect, is illustrative. *See* FoF, Nos. 176-177; CoL, No. 29. Likewise, the case of Kathleen Ganiere. Ms. Ganiere was confronted with the risk of potentially fatal blood clots due to FCCW's failure to follow her longstanding prescription for anticoagulating medication. FoF, No. 178; CoL, No. 30.

Instances of actual harm are also reflected in the unexpected deaths, within a four-week period in the Summer of 2017, of prisoners Carolyn Liberato, Deanne Niece and Marie Johnson. Ms. Liberato, a 70-year old woman with congestive heart failure, died on July 21, 2017. In the weeks leading up to her death, she gained 14 pounds over a 13-day period, a development that FCCW medical staff charted but otherwise failed to address or treat. This drastic weight gain was likely a sign that her heart disease was advancing, and should have been recognized and treated as a potential medical emergency. If FCCW had done so, Ms. Liberato's life might have been prolonged. When Ms. Liberato began to experience severe chest pain and shortness of breath on July 21 in her housing unit, no oxygen was available with which to treat her. Also, no suction device, backboard or stretcher were available, all of which were needed to respond to her emergency. When oxygen was brought from another building, the amount in the container was insufficient to address Ms. Liberato's need. FoF, Nos. 273-274.

9

Ms. Niece, a 38-year old with multiple sclerosis, died on July 25, 2017, just three days after Ms. Liberato and, tragically, only three weeks before her scheduled release from FCCW. After collapsing in the prison yard earlier in the day and complaining of shortness of breath throughout the remainder of the day, for which she was examined by an LPN but never seen by a medical provider, Ms. Niece began violently vomiting in her cell on the evening of July 25. Again, neither suction equipment, oxygen nor a stretcher were available in her housing unit, and FCCW nurses were slow to respond to the emergency call. Ms. Niece died on the floor of her cell. FoF, Nos. 277-279.

Ms. Johnson died on August 22, 2017. In the six months just prior to her death, Ms. Johnson lost 50 pounds. Despite this dramatic weight loss, FCCW medical staff failed to document any observations or concerns about it, and sometimes failed to even record Ms. Johnson's weight when taking her vital signs. On a visit to UVA Medical Center during which Ms. Johnson complained of severe pain, the UVA doctors attributed her complaints to possible "malingering" to avoid being sent back to the prison, and FCCW apparently accepted this diagnosis without further reevaluation. Ms. Johnson was eventually diagnosed with acute demyelinating polyneuropathy (AIDP) at VCU shortly before her death. Dr. Gable's Mortality Review admits that "the signs and symptoms were there and we missed an opportunity to make the diagnosis sooner." FoF, Nos. 284-288.

These fatalities, by the admission of Armor's own then-Acting Medical Director, implicated a host of problematic issues including inadequate (or inaccessible) emergency equipment; inadequate response to medical emergencies; insufficient charting of patients' medical problems; improper failure by nurses to consult with medical providers with respect to serious patient complaints or observed symptoms; and inadequate diagnosis and treatment, all of

10

which are of a systemic nature and either caused harm to the decedents or reflect a substantial risk of serious harm to other prisoners unless corrected. *See generally* FoF, Nos. 275, 281, 289-290; *see* CoL, Nos. 34-38.

In sum, the presence of actual harm, as well as a substantial risk of serious future harm to the Plaintiffs, is not in doubt on the basis of the evidence introduced at trial.

## II.    THE DEFENDANTS' CLAIMS OF "GOOD FAITH" AND "SUBSTANTIAL COMPLIANCE" ARE UNSUPPORTED

Although the Defendants do not seriously contest -- at least with evidence -- the proposition that they have consistently fallen short of meeting the obligations imposed on them under the Settlement Agreement during the two-plus years since the Consent Order was entered, they do appear to seek findings by the Court that they have pursued compliance with the Settlement Agreement "in good faith" and that such measures as they have undertaken thus far constitute "substantial compliance" sufficient to avoid a ruling of civil contempt. *See* CoL, No. 42. They are mistaken.

Under the governing Fourth Circuit case authorities, a "good faith" defense to a claim of civil contempt, to the extent cognizable at all, tends to turn on the same standard as a "substantial compliance" defense. Under either (or both) formulation(s), the alleged contemnor must establish that it exhausted "all reasonable steps" available to it to achieve compliance, even if it fell short in the attempt. *See* CoL, Nos. 43,44.

Simply stated, VDOC cannot satisfy the "all reasonable steps" standard as a matter of law because, as the evidence of record clearly demonstrates, it would be more accurate to say that VDOC *rejected* all steps that might have reasonably allowed it to accomplish some semblance of compliance with the requirements imposed by the Settlement Agreement.

- • Presented with the opportunity to craft and enter into a new and different kind of contract with a different contractor in light of the grave concerns

11

articulated by the Court in its pre-Settlement ruling on summary judgment -- a reasonable step -- VDOC instead chose to renew the same form of contract with the same offending contractor. FoF, Nos. 6-9; CoL, Nos. 11-13.

- Presented with the opportunity to follow the recommendations of trusted advisors that VDOC needed to "take [an] aggressive approach" to the problem of ongoing deficient medical care at FCCW and to hand over supervision of the remediation effort to a trusted provider who had audited the problems and was conversant with proposed solutions (Martha Stanford, R.N.), VDOC instead chose to stick with Armor. FoF, Nos. 12-15, 40-45, 84-85; CoL, Nos. 14, 45-46.

- Given the opportunity to attend to and adopt measures to effectively address the concerns articulated, sometimes repeatedly, by the Compliance Monitor, Dr. Scharff, regarding remedial measures that FCCW needed to implement in order to repair the defects in critical medical care functions such as Sick Call and the Medical Grievance review process, VDOC instead dragged its feet or dug in its heels against making necessary and appropriate changes to its processes and procedures, prolonging the substantial risk of serious harm to patients attendant to its existing protocols. FoF, Nos. 43, 95-101, 107-112; CoL, Nos. 48-49; *see also* Plaintiffs' Demonstrative Exhibit, Number of Times Recommendations Were Made By Monitor from March 2016 to February 2018 (copy attached hereto as Exhibit A).

- Adequacy of nurse staffing, deficiencies in medication administration, lack of clinical leadership and deficiencies in emergency response are additional areas of concern as to which Dr. Scharff urged prompt corrective measures, only to be met with an apathetic or disinterested response from FCCW. FoF, Nos. 146-153 (staffing issues); Nos. 115-127 (medication administration); Nos. 81-92 (lack of clinical leadership); Nos. 138-149 (poor emergency response); CoL, No. 50.

Illustrative of the pattern of conduct characterizing VDOC's failure to meet its obligations under the Settlement Agreement is the manner in which it responded (or, more precisely, failed to respond) to Dr. Scharff's admonitions concerning the performance of the Sick Call triaging process at FCCW by underqualified LPNs. Dr. Scharff testified that "practically the first thing that came out of the [his] mouth" when he commenced monitoring of the medical care at FCCW in March 2016 concerned FCCW's need to eliminate LPN-administered Sick Call. VDOC's Deputy Director, Ms. Scott, conceded that she was made aware of Dr. Scharff's

12

concerns regarding this practice even before his March 2016 Report was issued.  Yet, *as of November 2017*, LPNs were still conducting Sick Call at FCCW.  Dr. Scharff noted that LPN-administered Sick Call might well be characterized as deliberate indifference "where you have a procedure that is ineffective, potentially injurious to women's health, and you have been told that and you still don't change it."  During Dr. Scharff's testimony, the Court asked:  "What would it take to remedy the Sick Call process?  I mean, why isn't that something that couldn't be done in 30 days if someone decided [to] dedicate[ ] the time to it?"  Defendants never offered a response to these questions, but the Plaintiffs' expert, Nurse Clarke, testified that transitioning away from the practice of utilizing LPNs to conduct Sick Call should have been a measure that FCCW could accomplish "in less than 60 days."  *See* FoF, Nos. 44, 100-105; CoL, No. 48.  There is no evidence in the record to the contrary.

These examples wholly foreclose any possible finding, based on the evidentiary record before the Court, that VDOC could evade a civil contempt finding on the grounds that it identified and exhausted "all reasonable steps" to achieve compliance with the Settlement Agreement, even if its efforts fell short.  If anything, the evidence presented and admitted at trial proves the converse.

## III.    THE SETTLEMENT AGREEMENT DID NOT PROVIDE VDOC WITH AN OPEN-ENDED TIME PERIOD WITHIN WHICH TO ACHIEVE COMPLIANCE WITH ITS REQUIREMENTS

As the Court expressly observed in the Findings of Fact and Conclusions of Law it issued in support of the entry of the Consent Order adopting and enforcing the Settlement Agreement, the critical purpose of the Agreement was to remedy constitutional violations.  *See* ECF Dkt. No. 261 at 20 ("[T]he voluminous evidence supplied by the Plaintiffs over four years of litigation would have been sufficient to prove an actual violation of Plaintiffs' Eighth Amendment rights.  Further, the various remedies in the Parties' Settlement Agreement are directly linked to and

13

designed to effectively address -- and redress -- the Eighth Amendment violations alleged by the Plaintiffs' pleadings and reflected in their evidentiary submissions.").

Given the Court's clear and stated understanding that the Settlement Agreement's intended function was "to effectively address -- and redress" ongoing constitutional violations attributable to the deficient medical care being provided to the women at FCCW on a systemic basis, it is hardly a surprise that the Agreement, on its face, reflects the urgency those circumstances required. *See* Pls. Trial Ex. 1, ECF Dkt. No. 221-1, Settlement Agreement, Sec. VI.2 ("Except to the extent otherwise agreed upon by the Parties under a specific provision set forth herein, *the [VDOC] shall implement all provisions of [this Agreement] within 30 days of the Effective Date*." (Emphasis added.)). *See* CoL, No. 22.

Even if, as a practical matter, satisfaction of this stated objective may not have been attainable on an across-the-board basis, the presence of this plain language on the face of the Agreement wholly undermines the Defendants' cynical attempt to twist other snippets of language in the Agreement in support of the bald proposition that VDOC was provided an open-ended time period within which to achieve compliance with the Agreement's requirements.

Language in the Agreement that, for example, authorizes the Compliance Monitor to adopt certain interim measures to reduce the extent of his oversight activities at FCCW upon a determination that the facility was making satisfactory and consistent progress towards the objective of complete fulfillment of the Agreement's objectives does not, contrary to the Defendants' sophistry, in any way suggest that VDOC's time period for compliance was meant to be open-ended. The fact that the Agreement provides that FCCW could be rewarded for significant progress towards full compliance in the guise of fewer visits from the Compliance Monitor does nothing to suggest that VDOC's *non-compliance* could proceed with impunity.

*See* CoL, No. 39.[3]  The Settlement Agreement cannot be contorted in such manner as to support the interpretation for which the VDOC contends.  Neither the Parties nor the Court intended to establish a framework within which Eighth Amendment violations -- some of which have caused or contributed to premature deaths -- could continue indefinitely.  The Settlement Agreement did no such thing, and the Defendants' baseless argument to the contrary must be rejected.

## IV.    THE MULTI-FACETED REMEDIAL MEASURES PROPOSED BY THE PLAINTIFFS ARE NECESSARY AND APPROPRIATE

If no other conclusion emerges from the evidence presented at trial, the unmistakably clear inference that must be drawn from the voluminous documents and testimony provided to the Court is that *but for the Show Cause Motion filed by the Plaintiffs*, few, if any, affirmative steps would have been taken by VDOC to achieve the objective of constitutionally-adequate medical care at FCCW to which VDOC willingly committed in entering into the Settlement Agreement.  VDOC's steadfast refusal to change its mode of contracting, its unwillingness to sever ties -- at least at FCCW -- with a woefully underperforming contractor or to hold that contractor accountable for better performance, and its clear resistance to undertake remediation of a host of problems in the provision of medical care identified by its own Contract Monitor or by this Court's Compliance Monitor all point to the conclusion that absent both greater incentives to achieve compliance and a greater level of oversight and scrutiny by this Court, further backsliding and recalcitrance on the part of VDOC to meet its obligations are the most likely outcome.  Both of these necessary components are encompassed by the remedial scheme proposed by the Plaintiffs.

---

[3]    Significantly, although empowered by the Settlement Agreement to decrease the number of monitoring visits on an annual basis upon a determination, after the first two years of the Agreement, "that appropriate progress has been demonstrated towards the goal of adequate medical care on a consistent basis," Dr. Scharff has not made this election.  *See* CoL, No. 41.

Courts are invested with broad discretion to "fashion a remedy [for civil contempt] based on the nature of the harm and the probable effect of alternative sanctions." *Colonial Williamsburg Found. v. Kittinger Co.*, 792 F. Supp. 1397, 1407 (E.D. Va. 1992) (*quoting Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir. 1988) (other citations omitted)), *aff'd*, 38 F.3d 133 (4th Cir. 1994); *see generally In re General Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995) ("The appropriate remedy for civil contempt is within the court's broad discretion." (Citations omitted.)). Significantly, "civil contempt is conditional or contingent in nature, terminable if the contemnor purges [itself] of the contempt." *Carbon Fuel Co. v. United Mine Workers of Am.*, 517 F.2d 1348, 1349 (4th Cir. 1975).

Here, VDOC has frustrated and, as of the time of trial, continued to frustrate the Plaintiffs' entitlement to the significantly improved level of medical care they deserve under the Eighth Amendment and which they thought they had achieved by reaching a Settlement Agreement with which VDOC committed to comply. As VDOC has flouted the obligations it assumed in this regard, adoption of the double-barreled remedial scheme devised by the Plaintiffs is entirely warranted and appropriate. *See generally* Plaintiffs' Pretrial Brief at 45-50 (ECF Dkt. No. 426). The monetary sanctions for which VDOC would be obligated under the Plaintiffs' proposal in the event of continued non-compliance can easily be avoided by VDOC by merely bringing itself promptly into adherence with the Settlement Agreement requirements regarding improved medical care without further excuses or delay.[4]

---

[4] It should be noted in this regard that in the event VDOC fails to take the steps required in order to avoid the fines the Plaintiffs' remedial scheme would impose, the amount of the proposed penalty, while possibly appearing substantial in the abstract, is a small fraction of either the compensation that Armor receives for its provision of medical services at FCCW under its contract with VDOC or of VDOC's annual budget for operation of secure correctional facilities. ECF Dkt. No. 426 at 46, ¶ 2.

Meanwhile, by having the Court engage in a significant level of oversight on a regularly-scheduled basis, VDOC's demonstrated tendency to neglect the performance of its obligations under the Settlement Agreement will be deterred. And, as with the provisions regarding civil fines, the VDOC can minimize and, over time, avoid entirely the obligation to appear and participate in the quarterly hearings established by the remedial scheme by simply bringing itself into compliance with the duties it agreed to assume. ECF Dkt. No. 426 at 49, ¶ 6.

At trial, VDOC's Health Services Director, Dr. Herrick, acknowledged in response to a question from the Court that the medical care obligations the Settlement Agreement imposed upon VDOC are, in reality, nothing more than what the law requires of the VDOC in any event. *See* Trial Transcript, Vol. 5 (6/13/18), Herrick Cross, 218:20-219:1. This admission recognizes that such burdens as the Plaintiffs' remedial scheme would impose upon the Defendants should be easily avoided if VDOC simply fulfills the legal obligations its official has acknowledged and thereby purges itself of contempt.

However, given its track record during the first two years of the Settlement Agreement's time in effect, and the many uncertainties associated with State funding, the status of the VDOC's relationship with private contractors as of the impending expiration of the Armor contract, the limited time period during which the nursing contracts pursuant to which FCCW finally brought its staffing in line with the facility's needs will remain in effect (*see* FoF, Nos. 168-173), and related concerns, mere reliance upon VDOC's good-faith commitment to "do better" is no longer an option.

For these reasons, the remedies proposed by the Plaintiffs in order to bring VDOC into prompt compliance with the Settlement Agreement should be adopted and enforced.

17

## CONCLUSION

For all of the foregoing reasons, the Court should hold VDOC in civil contempt for its failure to comply with the obligations it assumed under the Settlement Agreement and impose the remedial scheme proposed by the Plaintiffs to compel VDOC's compliance.

DATED:          August 6, 2018

Respectfully submitted,

Angela Ciolfi, VSB No. 65337
(angela@justice4all.org)
Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Adeola Ogunkeyede (admitted *pro hac vice*)
(adeola@justice4all.org)
Kimberly A. Rolla, VSB No. 85625
(kim@justice4all.org)
Shannon M. Ellis, VSB No. 89145
(shannon@justice4all.org)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553

Philip Fornaci (admitted *pro hac vice*)
(phil_fornaci@washlaw.org)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

Kristi C. Kelly, VSB No. 72791
kkelly@kellyandcrandall.com
Andrew Guzzo, VSB No. 82170
aguzzo@kellyandcrandall.com
Casey S. Nash, VSB No. 84261
casey@kellyandcrandall.com
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7576

By: _Theodore A. Howard_____
        Theodore A. Howard

*Attorneys for Plaintiffs*

19

# EXHIBIT A

## Number of Times Recommendations were Made by the Monitor

| Recommendation | Months of Monitor's Visits | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar. '16 | Jul. '16 | Oct. '16 | Jan. '17 | Apr. '17 | Aug. '17 | Nov. '17 | Feb. '18 |
| Medical review of grievances | 1 | 2 | 3 | 4 | 5 | ☑ | | |
| Ban withdrawal of grievances | | 1 | | 2 | 3 | | 4 | 5 |
| Eliminate LPN sick call | 1 | | | 2 | 3 | 4 | 5 | ☑ |
| Timely fill and re-supply medications | 1 | 2 | 3 | | | | | 4 |
| Hire full-time, permanent, on-site medical director | | | 1 | 2 | 3 | 4 | 5 | 6 |
| Add staff and space to reduce/eliminate physical therapy backlog | | | 1 | 2 | 3 | 4 | 5 | 6 |
| Implement non-pharmaceutical pain control program | | | 1 | | 2 | | 3 | 4 |

Source: Compliance Monitor Reports

Case 3:12-cv-00036-NKM-JCH   Document 534   Filed 08/06/18   Page 24 of 25   Pageid#: 12881

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August 2018, I will electronically file the forgoing

Plaintiffs' Post-Trial Brief with the Clerk of the Court using the CM/ECF system, which will

then send a notification of such filing (NSF) to all counsel of record.

_____

Theodore A. Howard