# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| CYNTHIA B. SCOTT, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:12-cv-36 |
| | ) | |
| HAROLD W. CLARKE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 1 -

# TABLE OF CONTENTS

I. PROPOSED FINDINGS OF FACT .................................................................................. 4

   A. Procedural History of Court's Approval of the Settlement
Agreement........................................................................................................................ 4

   B. The Terms of the Settlement Agreement ................................................................ 6

      i. Substantive Standards/Guidelines ................................................................ 6

      ii. The Compliance Monitor ................................................................................ 8

      iii. Timeline for Compliance .............................................................................. 9

      iv. Dr. Scharff *Must* Issue Written Notice of Constitutionally
Inadequate Care. ................................................................................................ 11

   C. Virginia Department of Corrections and FCCW ................................................. 13

   D. Investigation, Analysis, and Conclusions of Compliance Monitor.......................... 16

      i. Dr. Scharff's Execution of Duties as Compliance Monitor........................ 16

      ii. Dr. Scharff's Expectations in February 2016 of Timeline for
the Settlement Agreement ................................................................................ 17

      iii. Dr. Scharff Has Never Issued Written Notice  of Constitutionally
Inadequate Care as Mandated by the Settlement Agreement ................................. 19

      iv. Dr. Scharff's Analysis in June 2017 ........................................................... 19

      v. Dr. Scharff's Opinion in June 2018 that VDOC's Progress Toward
Completion of the Settlement Agreement Has Been "Substantial"........................ 21

      vi. Dr. Scharff's Current Expectations for Further Progress ...................... 23

      vii. Dr. Scharff's Impressions of VDOC Personnel ....................................... 24

      viii. Dr. Scharff's April 23, 2018 Deposition Testimony ............................. 24

   E. VDOC's Compliance with the Settlement Agreement ....................................... 27

      i. VDOC Deputy Director Scott's Oversight  of Implementation of
the Settlement Agreement in February 2016 ................................................. 27

      ii. VDOC Deputy Director Scott's Anticipated Timeline for Completion
of the Settlement Agreement in February 2016............................................. 27

      iii. Hiring of VDOC's Director of Health Services, Dr. Stephen Herrick, PhD
in Early 2016................................................................................................... 30

      iv. VDOC's Implementation of the Settlement Agreement February 2016 .......... 34



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

**v. VDOC's Continued Implementation of the Settlement Agreement and Evaluation of Armor — March, April, May 2016** ...........................................................37

**vi. Dr. Herrick's Leadership in VDOC's Ongoing Execution of the Settlement Agreement** ...........................................................39

**F. VDOC's Analysis in Summer 2017** ...........................................................44

**G. Current Status of FCCW's Compliance with Settlement Agreement** ...................46

**H. FCCW CQI and ADA Policies** ...........................................................50

**I. VDOC's Response to Specific Issues Raised by Plaintiffs' Experts** ...........................51

**J. VDOC's Strategies for Addressing the Unique Staffing Challenges at FCCW** ...........................................................52

**i. Nurse and Physician/Provider Recruitment at FCCW** ...........................................52

**ii. VDOC and Armor's Recruitment Efforts for an Onsite Medical Director** .........54

**iii. Staffing Sick Call with LPNs** ...........................................................56

**II. DEFENDANTS' PROPOSED CONCLUSIONS OF LAW** ...........................................................58



629.0303\KCL
4825-8414-4750 .v5

# I. PROPOSED FINDINGS OF FACT

## A. Procedural History of Court's Approval of the Settlement Agreement

1.      On September 15, 2015, Plaintiffs filed a Consent Motion for Preliminary Approval of Settlement, ECF 220, and Memorandum of Law in Support of Plaintiffs' Consent Motion for Approval of Settlement, ECF No. 221, which attached a proposed Settlement Agreement, ECF No. 221-1. The Court held a Fairness Hearing on December 1, 2015. ECF No. 251. On February 5, 2016, the Court issued Findings of Fact and Conclusions of Law, ECF No. 261, and a Final Judgment Order, ECF No. 262.

2.      In 2015, Dr. Nicholas Scharff, M.D., M.P.H ("Dr. Scharff"), the former Chief of Clinical Services of the Commonwealth of Pennsylvania Department of Corrections from 2006 to 2013, agreed to serve as the Compliance Monitor for the Settlement Agreement. ECF No. 220, at 6; ECF No. 221-1, at 52.[1]

3.      Dr. Scharff testified at the December 1, 2015 Fairness Hearing as to the manner in which he intended to fulfill his obligations as Compliance Monitor, including his intent to develop Performance Measuring Tools for purposes of evaluating Defendants' compliance with the Settlement Agreement.

4.      The Court approved the Settlement Agreement in its February 5, 2016 Final Judgment Order. ECF No. 262.

5.      In the Court's February 5, 2016 "Findings of Fact and Conclusions of Law," ECF No. 261, the Court summarized the testimony from Dr. Scharff as follows:

> Dr. Scharff has experience serving as a compliance monitor in another correctional system. **He is familiar with the provisions of the Settlement Agreement** and prepared and able to perform the monitoring required. . . . **Dr. Scharff's two overarching goals as Compliance Monitor are: (i) to establish systematic practices in the medical care provided at FCCW that meet the constitutional standard of care; and (ii) to change the health care culture at FCCW in ways that will outlast his term and ensure continued constitutionally-adequate care beyond the duration of the Settlement Agreement**. Dr. Scharff believes that the Settlement Agreement will effectively address each of the problems described by the

---

[1] Pincites to documents filed on CM/ECF refer to the Court's page number as it appears in the electronic stamp in the document's footer.

629.0303\KCL
4825-8414-4750 .v5

Named Plaintiffs during their testimony if it is properly followed and implemented with real "buy-in" from all levels of the institution.

<u>See</u> ECF No. 261, at 12–13 (emphasis added).

6.      The Court also noted that Dr. Scharff had been involved in the discussions surrounding the negotiations of the Settlement Agreement. <u>See</u> ECF No. 261, at 27.

7.      While the Settlement Agreement did not include any admission by the VDOC of the Plaintiffs' allegations, the Court's February 5, 2016 Findings of Fact and Conclusions of Law contained numerous passages whereby the Court stated that the Settlement Agreement was designed to elevate the level of care at FCCW to meet constitutional standards, including:

❖   " . . . the various remedies in the Parties' Settlement Agreement are directly linked to and designed to effectively address—and redress—the Eighth Amendment violations alleged in the Plaintiffs' pleadings and reflected in their evidentiary submissions." ECF No. 261, at 30.

❖   "They agreed upon extensive revisions to the FCCW Operating Procedures in order to enhance the prospects for improved medical care that will meet standards for constitutional adequacy." <u>Id.</u> at 30.

❖   "The provisions of the Settlement Agreement are specifically geared to modifications of the Defendants' constitutionally-deficient medical care with the objective of raising the level of the overall quality and quantity of medical care at FCCW to meet the constitutional standards under the Eighth Amendment on a consistent, ongoing basis." <u>Id.</u> at 33.

❖   "Defendants are charged with the obligation to embrace and implement all of the various remedial measures in the Agreement, pursuant to which the medical care at FCCW will be raised to a level satisfying the Eighth Amendment." <u>Id.</u>

❖   "Accordingly, given the breadth of the constitutional violations that Plaintiffs have alleged and for which they have provided substantial evidence, as well as the scope of the need for significant remedial measures to be undertaken, the Court concludes that the Settlement Agreement constitutes the least intrusive means necessary to correct the violations at issue." <u>Id.</u> at 34.


FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

❖ "Furthermore, given the extent of the affirmative relief that must be undertaken and implemented by Defendants under the provisions of the Settlement Agreement in order to raise the quality and quantity of medical care at FCCW to a level satisfying Eighth Amendment standards, the Court has no difficulty concluding that the compromised fee award is proportionate to the results obtained by Plaintiffs' attorneys in this action as contemplated by 42 USC 1997e(d)(1)(B)." <u>Id.</u> at 35.

### B. The Terms of the Settlement Agreement

8.      The Settlement Agreement, ECF No. 221-1, has four fundamental features relevant to the Plaintiffs' Motion:

**Substantive Standards/Guidelines**: The Settlement Agreement imposes a multitude of mostly subjective requirements upon FCCW/VDOC with regard to the operation of FCCW to "meet or exceed constitutional requirements" (Section III "Substantive Provisions");

**Compliance Monitor**: The Settlement Agreement appoints Dr. Nicholas Scharff, M.D., MPH, as the Compliance Monitor and vests in Dr. Scharff significant (i) powers to investigate and (ii) responsibilities and duties to evaluate FCCW/VDOC's compliance with the Settlement Agreement (Section IV "Monitoring");

**Timeline for Compliance**: The Settlement Agreement expressly and implicitly contemplates that the "substantial compliance with all elements of performance" under the Settlement Agreement will not be immediate and will require time to accomplish (Section VI, ¶10). The Settlement Agreement expressly acknowledges and contemplates that there will be a period of ". . . progress . . . toward the goal of constitutionally adequate medical care on a consistent basis . . . ." (Section IV.2.a);

**Written Notice from Compliance Monitor**: The Settlement Agreement requires Dr. Scharff to issue a Written Notice if Dr. Scharff "identifies a deficiency in any aspect of the medical care provided by the Defendant at FCCW that [Dr. Scharff] deems to involve constitutionally adequate care . . . ." (Section IV.2.c).

### i. Substantive Standards/Guidelines



629.0303\KCL
4825-8414-4750 .v5

9.      Section III of the Settlement Agreement sets forth a multitude of "Operating Procedures, Guidelines and Standards." ECF No. 221-1, at *6–7. While certain of these are specific and objective (i.e., "guideline regarding treatment of Urinary Tract Infections shall be modified to provide a physician visit within 72 hours of diagnosis absent an indication of a need for greater urgency"), the vast majority of the "Standards" are subjective and require the Compliance Monitor to investigate, evaluate, and assess FCCW's compliance with the "Standard." For example, the "Standards" for staffing and "diagnosis and treatment" provide no objective criteria:

> "Provider Staffing levels. Standard: FCCW shall establish and maintain a ***sufficient number*** of health staff of varying types or ***adopt such other measures as shall be necessary*** to provide inmates with ***adequate and timely evaluation and treatment***, including continuity and coordination of care."

> "Diagnosis and Treatment. Standard: Prisoners should have ***unimpeded access to timely medical care at an appropriate level***, including, among other things, adequate pain management for acute and chronic conditions."

Id. at *9–10 (emphasis added).[2] The subjective language of the vast majority of the Standards in the Settlement Agreement necessarily requires the Compliance Monitor— who is empowered to investigate and provided access to all aspects of FCCW's medical operations—to thoroughly analyze, using his medical/correctional medicine expertise, FCCW's progress towards compliance with the "Substantive Provisions" of the Settlement Agreement.

---

[2] Other "Standards" that contain subjective language include, but are not limited to:

> ii. Intake screening of offenders. "Receiving screening shall be performed on all inmates upon arrival at the intake facility as soon as possible to ensure that emergent and urgent health needs are met and to protect staff and prisoners from unnecessary exposure to communicable disease."

> vii. Response to Medical Emergencies/Emergency Medical Care. "Response to medical emergencies should be timely and should conform to appropriate standards of care. …."

> xi. Utilization Management. "The quality of care can be enhanced by effective care management. Quality can be diminished by underuse of appropriate health care services, overuse of services (e.g., unnecessary testing that lead to unnecessary interventions) and misuse of resources. The UM program shall work to enhance quality of care by providing timely access to an appropriate level of care."

Id. at *8, *11; see also id. at *11–12, *13 (Standards viii (Infirmary Conditions), ix (Chronic Care), x (Infectious Disease), xii (Continuity in Supply and Distribution of Medicine), xiii (Continuity in Supply and Distribution of Medical Equipment/Supplies), and xix (Care/Release of Terminally Ill Offenders)).



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 7 -

629.0303\KCL
4825-8414-4750 .v5

10.     Because the standards in Section III of the Settlement Agreement are primarily subjective, the Settlement Agreement required Dr. Scharff to develop "Performance Measuring Tools" in order to evaluate Defendants' compliance with the Settlement Agreement. ECF No. 221-1, at *16, *49. The Settlement Agreement provides no explanation as to what the "Performance Measuring Tools" specifically will assess or what quantitative or qualitative data the "Performance Measuring Tools" will evaluate. Instead, the Settlement Agreement provides only general subject areas for assessment (e.g., "provider staffing levels," "intake screening of offenders," "comprehensive health assessments," and "offender's co-pay policy"). Defendants must rely on Dr. Scharff to interpret the Settlement Agreement, develop Performance Measuring Tools, and assess Defendants' compliance with those Performance Measuring Tools before it is clear what specific acts the Settlement Agreement requires.

### ii. The Compliance Monitor

11.     The Settlement Agreement vests significant responsibility and power in the Compliance Monitor to investigate FCCW's medical operations and to "*review, **evaluate and report to the Parties concerning the Defendant's performance of its obligation to provide constitutionally-adequate medical care to the members of the Class . . . .*" ECF No. 221-1, at 18 (emphasis added). The Settlement Agreement mandates that the "*purpose and focus of the Compliance Monitor's periodic visits to FCCW shall be to observe, **evaluate and analyze** the nature and extent of all aspects of the Defendant's performance of its obligation to provide constitutionally adequate medical care . . . .*" Id. at *18 (emphasis added).

The Settlement Agreement expressly grants significant authority and power to the Compliance Monitor to carry out his duties, including:

> . . . the Compliance Monitor shall have liberal and prompt access upon request to all areas within FCCW in which medical care services or accommodations for disabilities are provided; to all medical and security personnel employed at FCCW; to all prisoners residing at FCCW; and to all medical grievance records and medical records maintained by FCCW and/or the Defendant pertaining to prisoners residing at FCCW. . . . The Defendant shall instruct all VDOC and Contractor employees to cooperate fully with the Compliance Monitor. The Defendant shall provide documents to the Compliance Monitor upon his request (e.g. census summaries, incident and



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

compliance reports involving medical issues, grievances, etc.) within 7 days of the date of the request.

Id. at *21. In sum, the Settlement Agreement grants Dr. Scharff full access to all of FCCW's medical operations so that Dr. Scharff can evaluate FCCW's operations, including physical access to the facility, access to patient medical records, and "*other relevant documents to accurately evaluate current conditions,*" and the ability to interview "*all necessary medical personnel and correctional staff*" and prisoners. Id. at *20 (emphasis added).

12.     As further outlined in Dr. Scharff's resume, attached as Appendix C to the Settlement Agreement, Dr. Scharff (unlike Plaintiffs' experts) has extensive hands-on clinical and administrative experience in correctional medicine. Dr. Scharff's significant clinical experience in correctional medicine is precisely what made Dr. Scharff agreeable to both parties and to the Court to serve as Compliance Monitor.

### iii. Timeline for Compliance

13.     The Settlement Agreement—both explicitly and implicitly—contemplates that full compliance or satisfaction with the "Guidelines, Standards and Performance Measuring Tools" is not immediately expected or required. On this point, the Settlement Agreement expressly provides:

> If the Monitor, in the exercise of his discretion, on the basis of application of the Guidelines, Standards and Performance Measuring Tolls set forth or referenced herein, determines that **appropriate progress** has been demonstrated **toward** the **goal of constitutionally-adequate medical care on a consistent basis** by the end of the **second** year that this Settlement Agreement is in effect, he **may** reduce the frequency of his visits to FCCW to at least once during each four-month period, for a total of three annual visits in the third year. Otherwise, the number of annual visits in the third year shall be no fewer than the number of annual visits during the second year.

> If the Monitor, in the exercise of his discretion as described above, determines that **appropriate progress** has been demonstrated **toward** the **goal of constitutionally-adequate medical care on a consistent basis during the third year** that this Settlement Agreement is in effect, he **may** reduce the frequency of his visits to FCCW to at least once during each six-month period, for a total of two annual visits in the fourth year. Otherwise, the number of annual visits in the fourth year shall be no fewer than the

- 9 -



FRITH
ANDERSON
+ PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

number of annual visits during the third year. The Monitor, in his discretion, may determine that it is necessary to visit FCCW more frequently than the minimum number of visits prescribed for any year during the time period that this Settlement Agreement is in effect.

Id. at *18 (emphasis added). This language expressly contemplates that in February 2018 (i.e., "*the end of the second year that the Settlement is in effect*"), Dr. Scharff was empowered to reduce his visits to FCCW from 4 to 3 annually if Dr. Scharff "*in the exercise of his discretion, on the basis of application of the Guidelines, Standards and Performance Measuring Tools as set forth or referenced herein, determines that **appropriate progress has been demonstrated toward the goal** of constitutionally adequate medical care on a consistent basis ....*" Id. (emphasis added).

The use of the phrase "may reduce" signals that Dr. Scharff may continue visiting FCCW four times a year ***even if*** "appropriate progress has been demonstrated toward the goal of constitutionally adequate medical care on a consistent basis." Id. That Dr. Scharff did not decrease his visits is not indicative of a lack of appropriate progress. Dr. Scharff has never, however, ***increased*** the frequency of his visits as permitted under Section IV.2.a of the Settlement Agreement.

This same language in the Settlement Agreement further permits Dr. Scharff in February 2019 (at the end of the third year of the Settlement Agreement) to reduce his visits to just two per year for the fourth year of the Settlement Agreement if Dr. Scharff concludes that "*appropriate progress has been demonstrated toward the goal of constitutionally adequate medical care on a consistent basis.*" Id. (emphasis added). This language would be unnecessary and illogical if the Settlement Agreement mandated full compliance with the the of the Settlement Agreement, just over two years after its approval.

In addition to the above cited language, the Settlement Agreement also contains the following provision regarding termination:

This Settlement Agreement shall terminate as of the date on which the Defendant has achieved substantial compliance with all elements of performance of its obligations to provide constitutionally-adequate medical care under the Eighth Amendment, subject to the Compliance Monitor's evaluation under this Settlement Agreement, and has consistently maintained such substantial compliance for a period of one year, provided, however, that the termination may not take effect less than three years from the Effective Date unless the Parties, by and through their respective counsel, mutually agree to termination within a shorter period of time.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 10 -

629.0303\KCL
4825-8414-4750 .v5

Id. at *27 (emphasis added). Again, this provision also necessarily contemplates a period of time wherein FCCW would be working towards "substantial compliance with all elements of performance of its obligations . . . ." Id.

14.     The Settlement Agreement requires Dr. Scharff to "develop Performance Measurement Tools for utilization in evaluating Defendant's performance and satisfaction of its obligation to provide constitutionally-adequate medical care at FCCW." ECF No. 221-1, at *49. The process of developing Performance Measuring Tools implies a passage of time.

15.     As of the Fairness Hearing, Dr. Scharff had not yet developed the Performance Measuring Tools. ECF No. 251, at 50:13–51:21.

### iv. Dr. Scharff *Must* Issue Written Notice of Constitutionally Inadequate Care.

16.     The Settlement Agreement mandates that Dr. Scharff "*shall*" provide the Defendants with "written notice" if Dr. Scharff "identifies a deficiency in any aspect of the medical care" that Dr. Scharff deems to involve constitutionally inadequate care:

> If the Compliance Monitor, during the time period in which this Settlement Agreement is in effect, <u>identifies a deficiency in any aspect of the medical care</u> provided by the Defendant at FCCW <u>that he deems to involve constitutionally-inadequate care</u>, <u>he shall</u> promptly bring the problem at issue to the Defendant's attention <u>by written notice</u>. The date of receipt of such notice by the Defendant shall trigger the running of a 30-day time period within which the Defendant may determine and implement a cure of the problem identified, or attempt to otherwise resolve the problem through negotiations with the Compliance Monitor.

Id. at *20 (emphasis added). Thus, Dr. Scharff is *required* (not merely permitted) to issue a written notice if he "*identifies a deficiency in any aspect of the medical care . . . that he deems to involve constitutionally-inadequate care.*"

17.     Dr. Scharff has never issued a notice that any aspect of the medical care at FCCW was constitutionally inadequate, as ***required*** by the Settlement Agreement.

18.     These four fundamental features of the Settlement Agreement: the Standards, Compliance Monitor, Timeline for Compliance, and Written Notice provisions are



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 11 -

symbiotic and interconnected. First, the "Standards" in the Settlement Agreement are largely subjective and require a physician with correctional-medicine expertise to investigate, analyze, interpret, and evaluate FCCW's operations.

Second, in order to accomplish this purpose, the Settlement Agreement appoints Dr. Scharff, whom the parties and the Court expressly found possessed the necessary correctional-medicine qualifications and expertise, to conduct the necessary investigation, analysis, interpretation, and evaluation of FCCW's operations vis-à-vis the Settlement Agreement. Dr. Scharff is uniquely empowered by the Settlement Agreement to access documents, witnesses (including prisoners and FCCW staff), the physical site, and other information to enable him to carry out his evaluative duties and obligations under the Settlement Agreement.

Third, the Settlement Agreement defines the "term" or timeline for completion of the obligations under the Settlement Agreement to make clear that full compliance with and satisfaction of the "Standards" is not immediately expected or required from the Defendants. Rather, it obligates the Defendants to make progress towards full compliance with the terms of the Settlement Agreement. The Settlement Agreement expressly instructs that Dr. Scharff is empowered to determine if there is "***appropriate progress*** *. . . . demonstrated toward the* ***goal*** *of constitutionally adequate medical care on a consistent basis.*" <u>Id.</u> at *18 (emphasis added).

Fourth, Dr. Scharff is mandated to provide written notice to the Defendants if he "*identifies a deficiency in any aspect of the medical care . . . that he deems to involve constitutionally-inadequate care.*" Dr. Scharff has never issued any such written notice.

Defendants are not in violation of the Settlement Agreement so long as they are making progress towards full compliance with its terms.



629.0303\KCL
4825-8414-4750 .v5

**<u>C. Virginia Department of Corrections and FCCW</u>**

19.     VDOC operates 44 correctional facilities, including FCCW, throughout the Commonwealth of Virginia, with a total average daily population of approximately 30,000 prisoners state-wide. VDOC provides a continuum of health care for prisoners, including out-patient primary care, infirmary care, a secure unit at VCU Medical Center, dialysis, assisted living care, nursing home care, and palliative care. Trial Tr., Vol. 5, 88:15–25.

20.     Harold W. Clarke was appointed Director of VDOC in November 2010, having previously served as the Commissioner of the Massachusetts Department of Corrections. Trial Tr., Vol. 7, 138:6–9; 140:1–3.

21.     Under Director Clarke's leadership, VDOC has achieved the lowest recidivism rate in the country for the past two years. Trial Tr., Vol. 7, 138:12–139:25.

22.     Since his arrival at VDOC in 2010, Director Clarke has focused on changing the culture within VDOC to promote a healing environment for prisoners, which in turn facilitates reentry into the community. Trial Tr., Vol. 7, 138:6–9; 140:1–3. As VDOC Deputy Director N.H. Cookie Scott testified:

> A:  Reentry, from our perspective, is helping the offenders learn what they need to learn, develop skill – both interpersonal skills, learn job skills, learn ways of dealing with conflict, learn those ways that will make them successful when they return to the community; that they can access a legitimate economy; that they know how to deal with the public safety arena.
>
> Many of them are going to be under supervision. There will be expectations for their behavior and their performance under supervision. But what we want to do is ensure that they do not return to the Department of Corrections. And having said that, that's one of the things that we have been achieving some success with in the Department of Corrections.
>
> We are number one in the country for the second year in a row in terms of recidivism. Our recidivism is 22.4 percent. There are states in the country that their recidivism – meaning those people who are returning to incarceration – is as high as 60, 62 percent. But we are at 22.4 percent. And that's because we are preparing offenders to reenter society.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

Q: Can you tie that into health care, and specifically health care at Fluvanna, as a component of reducing the recidivism and enhancing reentry into the community?

A: Again, I think it's much the same thing. It's helping people learn to take care of themselves. It's helping them learn to access the process.

We're holding people accountable. That's one of the things that's very important in looking at how we are helping people to reenter society, having that healing environment in our institutions. We are asking people to be ethical. We're asking to be respectful. We ask that. And if you read the definition of our healing environment, you will see that it says helping people do this. So it's not just the offender, but it's our staff as well.

So it really is helping that engagement with people in authority. It's helping that engagement to learn how that engagement occurs. And we need to do that with offenders. They do not need to see us as the bad guys.

Trial Tr., Vol. 7, 138:12–139:25.

23. FCCW's average daily population is approximately 1,200 women. Trial Tr., Vol. 5, 107:23–25. Since February 2016, approximately 3,000 women have been incarcerated at FCCW. Trial Tr., Vol. 5, 108:1–3.

24. FCCW is designated a maximum security prison. Trial Tr., Vol. 6, 7:11–16.

25. Within the VDOC system, female prisoners are housed at four VDOC facilities. Female prisoners throughout the state with more significant medical needs are transferred to FCCW. Trial Tr., Vol. 5, 108:18–109:1. Additionally, Virginia jails often transfer females with any continuing medical needs to FCCW. Trial Tr., Vol. 5, 109:2–7.

26. FCCW administers approximately 30,000 medications each week; this far exceeds the amount administered at all other VDOC facilities. Trial Tr., Vol. 5, 109:9–13; 120:8–13. Trial Tr., Vol. 6, 58:3–4. During the week of October 28, 2016, FCCW dispensed approximately 6,900 pills each day. Def. Ex. 12, Tab 5, Bates RFP900000137. During the week of May 13, 2018, FCCW dispensed approximately 4,700 pills each day. Def. Ex. 12, Tab 76, RFP900003105.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

27.     FCCW processes approximately 15,000 lab tests every year (Trial Tr., Vol. 5, 109:9–13) and transports on average 10–14 women to other health care facilities each day for medical treatment. Trial Tr., Vol. 5, 109:14–24.

28.     At least 60% of the FCCW population has a chronic illness or serious health care needs. 75% of the FCCW population is on some type of psychotropic medication. Over 40% receive between 7 and 33 administrations of meds per day. Trial Tr., Vol. 7, 213:10–214:14; Def. Ex. 12, Tab 74, Bates RFP900003044; Def. Ex. 12, Tab 75, Bates RFP900003066; Def. Ex. 12, Tab 76, RFP900003105.

29.     In late 2015 and continuing into 2016, VDOC experienced an unexpected influx of sick and ill prisoners as transfers from jail systems after a death at the Tidewater Regional Jail, resulting in an increase in the number of medically compromised prisoners at FCCW. Trial Tr., Vol. 7, 164:9–165:4.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 15 -

### D. Investigation, Analysis, and Conclusions of Compliance Monitor

30.    As set forth herein, Dr. Scharff testified that:

    a.  He has not interpreted the language of the Settlement Agreement to require full satisfaction of all its terms in September 2017 or at this stage;

    b.  He expected and anticipated that the process to complete the terms of the Settlement Agreement would take four or five years;

    c.  As of June 2017, the Defendants had made substantial progress towards satisfaction of the Settlement Agreement;

    d.  As of June 2018, the Defendants had made substantial progress towards satisfaction of the Settlement Agreement;

    e.  In June 2018, he opined that it is reasonable to expect that VDOC will continue to make additional progress towards completion of the Settlement Agreement;

    f.  The key VDOC personnel assigned to oversee the execution of the Settlement Agreement are committed to successful satisfaction of the Settlement Agreement; and

    g.  ***He does not believe that the Settlement Agreement has failed***.

### i. Dr. Scharff's Execution of Duties as Compliance Monitor

31.    Dr. Scharff has (i) an extensive active clinical practice in the field of correctional medicine; (ii) experience in addressing institutional and systemic issues in correctional facilities similar to the Settlement Agreement; (iii) the requisite medical and corrections expertise to evaluate and monitor progress under the Settlement Agreement; and (iv) extensively inspected, monitored, and evaluated FCCW's medical and health care operations.

32.    Dr. Scharff has spent 39 days over ten separate visits onsite at FCCW examining, inspecting, auditing, researching, and evaluating FCCW's medical operations and compliance with the Settlement Agreement. See generally, Pl. Exs. 34, 35.

33.    In addition to his quarterly visits to FCCW as mandated by the Settlement Agreement, Dr. Scharff has exchanged hundreds of emails with the parties' counsel related to the issues in the Settlement Agreement. Dr. Scharff has also received, investigated, and responded to over 400 letters from Fluvanna prisoners regarding their medical care at FCCW. Trial Tr., Vol. 5, 6:9–23.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

34.     As mandated by the Settlement Agreement, Dr. Scharff conducted quarterly visits and inspections at FCCW, and prepared written reports rating Defendants "compliant," "partially compliant," or "non-compliant" with the Standards in Section III of the Settlement Agreement. Plaintiffs' Exhibit 4, titled "Historical Review of Scharff Performance Indicators," catalogs Dr. Scharff's charting of FCCW's substantial progress towards full satisfaction of the Settlement Agreement. Trial Tr., Vol. 5, 30:20–31:2.

| DATE | NOT RATED | NON-COMPLIANT | PARTIALLY-COMPLIANT | COMPLIANT |
|---|---|---|---|---|
| July 2016 | 8 | 6 | 9 | 2 |
| October 2016 | 5 | 4 | 12 | 4 |
| January 2017 | 2 | 3 | 15 | 5 |
| April 2017 | 1 | 6 | 13 | 5 |
| August 2017 | 1 | 3 | 12 | 9 |
| November 2017 | 0 | 7 | 10 | 8 |
| February 2018 | 0 | 6 | 13 | 6 |
| May 2018 | 0 | 3 | 16 | 6 |

See Pl. Ex. 4. Plaintiffs' chart also shows that Dr. Scharff did not evaluate all 22 standards of the Settlement Agreement each visit.[3]


ii. Dr. Scharff's Expectations in February 2016 of Timeline for the Settlement Agreement

35.     After the Court approved the Settlement Agreement in February 2016, Dr. Scharff anticipated that compliance with the Settlement Agreement "would likely take something in the range of four years or a little longer." Trial Tr., Vol. 5, 7:2–20. When Dr. Scharff first reviewed the proposed Settlement Agreement in 2015, he recognized that the terms of the proposed Settlement Agreement required changes in policy, procedure, and staffing, all of which required, in his view, a "long time to turn around." Trial Tr., Vol. 5, 7:12–20.

36.     Dr. Scharff's opinion in February 2016 that it would take "four years or a little longer" to achieve compliance with the terms of the Settlement Agreement was based in part on his experience with two large correctional institutions, both of which had been under court-ordered settlement decrees: the Pennsylvania Department of Corrections and the Philadelphia prison system. Trial Tr., Vol. 5, 8:7–10:9, 21:9–11 ("I thought that I would probably be working on this for about four or five years, give or take").



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[3]  As Dr. Scharff continued developing his Performance Measurement Tools, he began breaking some of the 22 Standards into subparts for purposes of judging "non-compliant" "partially compliant," and "compliant." See Pl. Ex. 36, at 4–5 ("xi. Utilization Management").

629.0303\KCL
4825-8414-4750 .v5

37.     Dr. Scharff's expectations in February 2016 were that at the end of two years (February 2018), VDOC would be making substantial progress, and that by the end of three years (February 2019), VDOC would "have things maybe pretty well in hand." Trial Tr., Vol. 5, 21:2–7.

38.     Dr. Scharff explained the rationale for his expectation in February 2016 that satisfaction of the terms of the Settlement Agreement would require at least four to five years based on his prior experience:

> A:     I had two experiences, two large experiences, in Pennsylvania. One was with the Department of Corrections, where I was the chief clinical officer for ten years. And the other was with the Philadelphia prison system, which is a large prison system, where I was -- well, both institutions had been under a court-ordered settlement decree. And in both cases the decree had expired.
>
> The one in Pennsylvania, I believe, ran for ten years. And the one in the Philadelphia prison system, I'm not sure, but it ran for several years. . . .
>
> And so in both cases when I came to those situations, they were fairly far along already, but it -- but a number of years had been required before all of the things that were ordered in those settlement agreements actually could be designed and put in place, because in each instance staffing is required, procedures are required, that fit the individual institutions. So that even though the solutions in different settings may have a lot in common, they all have to be individualized, just like the treatment of any patient, say.
>
> If you could think of these things as sick patients, the institution is a sick patient. So these -- and so managing the relationships in the institution takes longer than actually putting solutions in place. And it also complicates putting solutions in place, because it affects the working conditions of the staff that you want to change things. So they don't stay.
>
> So in the beginning -- typically, in the beginning there is a great deal of -- before the beginning, there's a lot of staff turnover, as there was in Fluvanna. In the beginning, there's a lot of staff turnover, and then as situations improve a little bit and patients become more confident in the health care system, working conditions improve for the staff, and the staff have a much longer retention. So you may be able to design what you



FAP
FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 18 -

629.0303\KCL
4825-8414-4750 .v5

think are going to be the solutions or the ways in which you are going to satisfy each of the requirements in a settlement agreement fairly quickly, but actually getting them in place and verifying that they are working and that they are sustainable, that they are going to continue to work, takes a number of years.

Trial Tr., Vol. 5, 8:7–10:9.

39.     Dr. Scharff explained that satisfaction of the Settlement Agreement is not like fastening a seat belt but instead is a process that "requires trial and error and it requires time and it requires refinement." Trial Tr., Vol. 5, 10:16–19.

40.     Dr. Scharff expected and anticipated that progress towards completion of the Settlement Agreement would ebb and flow over his anticipated four-to-five year timeline for completion. Dr. Scharff explained that "it is a mistake to expect progress to be even." Trial Tr., Vol. 5, 74:24–25.

### iii. Dr. Scharff Has Never Issued Written Notice of Constitutionally Inadequate Care as Mandated by the Settlement Agreement

41.     Dr. Scharff has never issued a "written notice," as mandated by Section IV.1.c of the Settlement Agreement identifying a deficiency in any aspect of the medical care provided by Defendants at FCCW that Dr. Scharff deemed to involve constitutionally-inadequate medical care. See Pl. Exs. 34, 35, 36.

### iv. Dr. Scharff's Analysis in June 2017

42.     In June 2017—just 16 months after the Court's Order approving the Settlement Agreement—Dr. Scharff characterized VDOC's progress in accomplishing the terms of the Settlement Agreement as "substantial." Specifically, Dr. Scharff stated in a June 15, 2017 email to Plaintiffs' counsel that:

> **I've been thinking about the progress at FCCW to date, and, while in most of the specifics it has been substantial**, I see little improvement in the tenor of the relationships between the plaintiffs and the institution or the providers. Frankly, I no longer expect to see any under the present circumstances. I doubt whether you do, either. Something must change.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

The **contractor is by all measures at least as good as any in the business, and they have poured resources into the contract far beyond the terms of their contract. They have offered an outrageous salary for a prospective medical director, and they have nearly hired at least 3**. In all cases, however, as the candidates googled the institution, each decided that it just would not be worth the pain and suffering. The same is true of nursing personnel - as you have just read, both nursing supervisors resigned in April, and while most RN positions are filled, turnover remains high.

I believe the reason for this is that the institution was allowed to become fundamentally unhappy due to the lack of compassion, and possibly justice, on the part of the DOC, as you demonstrated in Court. However, restoring the institution, winning the peace, is an entirely different and more difficult matter. As has been demonstrated in every place and time throughout human history, hatreds are easy to ignite but extremely difficult to extinguish. Unless we can do something about the relationships at Fluvanna, I anticipate (my own speculation) that Armor will simply not renew the contract at its expiration, leaving the DOC to find another or staff it themselves. I don't think either alternative will improve matters.

I believe the present state is worsened, rather than improved, by the relationship between the plaintiffs' lawyers and the staff at FCCW. I recognize that representing a client in this sort of situation is tricky if the goal is anything beyond simply beating the other side. But you've already taken that hill, and I don't think continuing as simple adversaries is now in the best interest of the client. What they now need is a well-functioning medical system, including a permanent medical director, and they are themselves the greatest obstacle. **Fluvanna is as hard a place to work as I've ever seen.** To whatever extent you might be fanning the flames, you may be a part of that problem.

Trial Tr., Vol. 5, 13:22–14:16, Def. Ex. 11 (emphasis added).

43.     At the June 2018 hearing, Dr. Scharff confirmed that he believed as of June 2017 that (1) VDOC had made "substantial progress in many areas" of the Settlement Agreement and (2) Armor, VDOC's medical contractor, was at least as good as any in the business, had poured resources into the contract far beyond its requirements, and had offered an outrageous salary for a medical director and nearly hired three. Trial Tr., Vol. 5, 74:2–4; id. at 16:7–22.

- 20 -



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

<u>v. Dr. Scharff's Opinion in June 2018 that VDOC's Progress Toward Completion of the Settlement Agreement Has Been "Substantial"</u>

44.     Dr. Scharff testified at the June 2018 hearing that VDOC is "making progress and I think the progress has been substantial." Trial Tr., Vol. 5, 73:19–20; Trial Tr., Vol. 5, 25:14–16. Specifically, Dr. Scharff explained:

> Q:  In your opinion, has Fluvanna been making appropriate progress towards the goal of completing the settlement term – the settlement agreement on a timeline that you generally anticipated when you started this, globally?

> A:  I did not have a very – I did not try to form a very clear idea of the timeline, because I don't think that's how these things work.

> I thought the progress was a little slow in the first year, although not surprisingly slow, but I think it took a certain amount of trial and error and trying some things that didn't work before they began to try to find some things that did work. I think in the past several months, really, they have embarked on a new management structure, a new model for the staffing and supervision, which I think is very promising. It shows some good early results in terms of hiring and retention.

> So, yeah, I mean, I think that they are continuing to make progress. It's not as fast as – well, it's never fast enough, but **I do think that they are making progress, and I think the progress has been substantial**. I mean, there have been times during the course of this settlement when I was -- when it was difficult for me to feel optimistic. I have more confidence now in the ability of DOC to be able to achieve these goals and the overall goals of a high level of health care services for their patients.

Trial Tr., Vol. 5, 73:1–23 (emphasis added).

45.     Dr. Scharff explained in his June 2018 testimony that: "And so all of the movement is not forward. You lose a bunch of staff for whatever – which is what happened at the end of the summer in 2017. And, you know, it was – so the situation was – in many areas, the situation was really critical at that time. Now, at the same time, for example, the physical therapy operation was really making progress all during that. They were not affected by



FRITH ANDERSON + PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

that. And – but this is a complex system with a lot of parts and with problems in a lot of parts." Trial Tr., Vol. 5, 74:14–24.

46.    Dr. Scharff currently believes that his quarterly reports chart VDOC's progress and forward movement on the Settlement Agreement on the "four-plus-year timeline" that he originally anticipated in February 2016 when the Court first approved the Settlement Agreement. Trial Tr., Vol. 5, 72:17–25.

47.    Dr. Scharff explained that FCCW's revision of the sick call process required the recruitment of higher-level medical personnel and an institutional culture change. Trial Tr., Vol. 5, 83:16–84:19. In explaining that this process requires time to complete, Dr. Scharff testified: "[S]ick call is a really good example . . . it's something that you would think you could just say that's it, today; you know, buckle your seatbelt right now, but it's always harder than that." Trial Tr., Vol. 5, 84:16–19.

48.    Dr. Scharff opined that "there has been an enormous amount of reform [to the grievance process]. [VDOC] reconfigured it. . . . [VDOC has] an institutional ombudsman who is a new person and who, in my opinion, is wonderful. But all of the medical grievances at any level—emergency grievances, informal complaints, regular grievances—everything is reviewed by a medical provider who is competent to do that, to make a medical assessment." Trial Tr., Vol. 5, 84:20– 85:3.

49.    Dr. Scharff opined that "actually running a quality improvement program requires trial and error. It requires a certain amount of training. But mainly it requires doing it and seeing what works and what doesn't work." Trial Tr., Vol. 5, 42:2–4. Dr. Scharff described CQI—continuous quality improvement—as a program or process adopted by organizations with the goal of "find[ing] practices that need to be changed and change them . . . ." Trial Tr., Vol. 5, 42:4–8. He further explained that CQI "focus[es] on areas where [the organization] thought there might be a problem and trying to learn to analyze that, and then to do something about it." Trial Tr., Vol. 5, 40:4–8. Dr. Scharff testified that the shift from traditional "quality assurance" which only involves gathering data to CQI is still occurring in the field of correctional medicine. Trial Tr., Vol. 5, 41:2–15.

50.    Dr. Scharff does not believe that the Settlement Agreement has failed. Trial Tr., Vol. 5, 75:11–13. Dr. Scharff explained:

> I would believe the settlement agreement had failed or was failing if I believed you were not going to get what you said you wanted to get and what you required in the settlement agreement. And that's a lot. And I think if –



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 22 -

you know, if there is a lack of commitment on the part of the DOC, you can't get it.

**The time and talent and money that have to be devoted to repairing a system like this are very substantial, and it's a lot for anyone to swallow. And if they don't do it, it doesn't get better. So it's quite possible to imagine a situation in which it just wouldn't, it would not be adequate, <u>but I don't believe that's the case here.</u>**

But I think the amount of time and talent and money which the DOC has learned they actually have to direct to this is – has been astonishing for them. And I can't say it's been astonishing to me, but it's a lot. And you can't really anticipate those things in advance. **You have to work on a problem like this and see what is working and what isn't working, and what isn't working may have to be reworked. I think that's what they're doing.**

Trial Tr., Vol. 5, 75:17–76:25 (emphasis added).

<u>vi. Dr. Scharff's Current Expectations for Further Progress</u>

51.     Based upon the totality of his monitoring of FCCW in his role as Compliance Monitor, Dr. Scharff believes that VDOC can successfully complete the terms of the Settlement Agreement. Trial Tr., Vol. 5, 80:2–6; 82:3–8. Dr. Scharff has "more confidence now in the ability of DOC to be able to achieve these goals and the overall goals of a high level of health care services for their patients." Trial Tr., Vol. 5, 73:22–25.

52.      Dr. Scharff's most recent visit to FCCW was April 29 to May 3, 2018, two years and three months after the Court's order approving the Settlement Agreement. In connection with this visit, he prepared a 17-page written report, with exhibits, dated May 31, 2018. <u>See</u> Pl. Ex. 35. Dr. Scharff's final sentence of this report reads: "However, with the most critical problems in nurse staffing and clinical leadership now in hand, I believe it is reasonable to expect to see, and measure, substantial progress during the coming months." <u>Id.</u> At the end of two years, as Dr. Scharff expected, FCCW was making substantial progress. <u>See</u> Trial Tr., Vol. 5, 21:2–7.

53.     At the June 2018 hearing, Dr. Scharff further stated that "it's reasonable to expect" that VDOC will continue to make additional progress towards completion of the Settlement Agreement based upon his observations at his April 2018 inspection of FCCW. Trial Tr., Vol. 5, 25:8–11.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 23 -

### vii. Dr. Scharff's Impressions of VDOC Personnel

54.     In his role as Compliance Monitor, Dr. Scharff has interacted with Dr. Steve Herrick, former FCCW Warden Jeff Dillman, and current FCCW Warden Eric Aldridge. Dr. Scharff confirmed that Dr. Herrick, VDOC's Director of Health Services, is "entirely committed to satisfying the settlement agreement" and "is also entirely committed to the improvement of the health care system, beyond the Settlement Agreement and outside of the points that are specifically described in the Settlement Agreement." Trial Tr., Vol. 5, 11:14–21. Dr. Scharff's testified that Warden Dillman (FCCW's Warden from the fall 2016 to the fall of 2017) and current FCCW Warden Aldridge both endorsed the goals of the Settlement Agreement and have been committed to working toward satisfying the terms of the Settlement Agreement. Trial Tr., Vol. 5, 11:22–12:15. Dr. Scharff believes that Dr. Herrick, VDOC Director of Health Services, is committed to the success of the Settlement Agreement. Trial Tr., Vol. 5, 75:7–10.

55.     Dr. Scharff believes that Dr. Steve Herrick and the VDOC personnel working under Dr. Herrick have worked hard and been committed to reaching full compliance with the terms of the Settlement Agreement. Trial Tr., Vol. 5, 20:13–19.

### viii. Dr. Scharff's April 23, 2018 Deposition Testimony[4]

56.     In his April 23, 2018 deposition, Dr. Scharff explained both his interpretation of the Settlement Agreement and his belief that the Settlement Agreement had not been breached:

> I agree that expecting DOC to accomplish all of those 22 items [in the Settlement Agreement] on a particular timeline is unrealistic and unproductive, **but I don't agree that the settlement agreement does require that**. ...
>
> The settlement requires that the DOC go to work on it and the -- and **the settlement anticipates that the time to comply with these things is unknown, which is why it says if there is substantial progress in the opinion of the settlement monitor,** he may reduce his visits in the second year to every -- I think it's the second year to -- it's the third year -- to every



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

4  Plaintiffs' designated portions of Dr. Scharff's April 23, 2018 deposition. ECF No. 477-3at 12. Defendants counter-designated the entirety of Dr. Scharff's April 23, 2018 deposition. ECF No. 477-6 at 12.

629.0303\KCL
4825-8414-4750 .v5

four months and then the fourth year to every three months and so forth. **But it doesn't say, you know, if this isn't done within four years, you're out. It doesn't say if this isn't done within two years, you're out of compliance. It just doesn't say that**. And <u>what I have interpreted that to mean is that I should try to make a judgment as to whether this is really proceeding or not</u> . . . .

Scharff Dep., 150:11–151:10, Apr. 23, 2018 (emphasis added). Dr. Scharff also explained when questioned about specific passages in his reports critical of aspects of FCCW's medical operations that "[w]hat I'm referring to is the lack of progress in a couple of critical areas. I'm not referring to the -- to the -- everything not being done and complete. **I don't think that that's an indication of failure at all, it's just an indication of the process**." <u>Id.</u> at 320:22 –321:5 (emphasis added).[5]

57. Dr. Scharff also testified on the issue of whether VDOC/FCCW has shown "buy in" to Dr. Scharff's comments and observations:

Q: Is there now buy-in to a quality improvement process?

A: I think there has been buy-in all along, but – and the most important buy-in is the buy-in at the top. Now, I don't know the whole top, but everyone at the institution, you know, the, you know, the warden, the assistant wardens, they really understand that the former warden is really running the QI operation for the –

Q: Is that Dillman?

A: - Department of Corrections.

Q: Is that Dillman?

A: Yes, Mr. Dillman. I don't think buy-in with the process is a problem.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[5] Continuing this theme of explaining his analysis of FCCW's efforts to comply with the Settlement Agreement and address the issues that he raised, Dr. Scharff further testified that:

❖ "…if this were easy, they would have done it all on day one. I just don't think it's like that. I think it's hard to do." <u>Id.</u> at 145:17-20.

❖ "I think expecting large changes for most kinds of things to occur between quarterly reports is not entirely realistic." <u>Id.</u> at 146:12-15.

- 25 -

<u>Id.</u> at 126:4–18.

> Q: And do you think that there has been real buy-in from all levels of the Department of Corrections?

> A: I can't speak to the highest levels because I have not been in contact with them, but they have created a lot of apparatus and funded it, they've created positions. I am inclined to believe there is real buy-in.

> Q: And has there been buy-in from the beginning, from February 2016 throughout?

> A: Certainly at the level of everyone I have dealt with there has been buy-in. The meeting that I had with [VDOC Deputy Director] Ms. Scott took place I think at my second visit to Fluvanna, which was in probably April of 2016, and she was very emphatic about her level of buy-in, so I - so I – I really have no reason to believe that there is no buy-in.

<u>Id.</u> at 328: 8–3.



629.0303\KCL
4825-8414-4750 .v5

**E. VDOC's Compliance with the Settlement Agreement**

**i. VDOC Deputy Director Scott's Oversight
of Implementation of the Settlement Agreement in February 2016**

58.     In February 2016, VDOC Deputy Director for the Division of Administration, N.H. "Cookie" Scott, had primary responsibility within VDOC for implementation and oversight of the Settlement Agreement. Trial Tr., Vol. 7, 145:20–146:4; 125:19–21.

59.     Deputy Director Scott was the first African-American graduate of Longwood University with a degree in sociology with a concentration in social welfare. Trial Tr., Vol. 7, 126:1–3. Her career prior to joining the VDOC included employment on the psychiatric ward at the University of Virginia Medical Center and as a probation officer and probation supervisor in Charlottesville. She then worked as the VDOC Human Resources Manager until her promotion in 2002 to her current position as the VDOC Deputy Director for the Division of Administration. Trial Tr., Vol. 7, 126:1–21.

60.     Deputy Director Scott assumed responsibility for oversight of VDOC health services in November 2014, the same month the parties agreed in principle to settle the original lawsuit, when VDOC Director Clarke transferred the health services department into the Division of Administration and under Deputy Director Scott's supervision. Trial Tr., Vol. 7, 126:22–127:16. Deputy Director Scott was first involved in the oversight of healthcare within VDOC in the fall of 2014. Trial Tr., Vol. 7, 127:15–16.

**ii. VDOC Deputy Director Scott's Anticipated Timeline for Completion of the Settlement Agreement in February 2016**

61.     Deputy Director Scott was involved in the negotiation of the Settlement Agreement. During this process, she participated in numerous discussions with Dr. Scharff concerning the terms and conditions of the Settlement Agreement and the anticipated process for executing the Settlement Agreement. Trial Tr., Vol. 7, 131:20–132:23.

62.     During the negotiation and drafting of the Settlement Agreement, Dr. Scharff shared with Deputy Director Scott his expectation that completion of the Settlement Agreement would take "four-to-five years." Trial Tr., Vol. 7, 136:4–22; see also Trial Tr., Vol. 7, 157:14–20.



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 27 -

63.    Based upon Deputy Director Scott's involvement in the negotiation of the Settlement Agreement and her numerous discussions with Dr. Scharff during this process, Deputy Director Scott anticipated and expected that it would take three-to-four years for VDOC to complete the Settlement Agreement. Deputy Director Scott based her anticipated timeline of 3-4 years to achieve compliance with the Settlement Agreement on her numerous conversations with Dr. Scharff during the negotiation and drafting of the Settlement Agreement, and Dr. Scharff's expectation that total compliance with the Settlement Agreement "was going to take some time." Trial Tr., Vol. 7, 132:24–134:7. Deputy Director Scott explained that:

> Partly because I think staffing is an issue. Attracting staff is a major issue. We were looking at several different areas. I think as we look at compliance with the settlement agreement, there were 22 areas that we were to work on. We knew that all of those things were not going to happen in one day, one week, overnight. We recognize that as staff turns over, things change. And so we were looking at processes, assessing processes, and fully expected that that was going to take some time. And we didn't expect that everything that got fixed one day would remain fixed forever. When you are dealing with people and you are dealing with personalities, things change. As we bring on different people, the training process is important. And so those things can have an impact on how we implement processes.

Trial Tr., Vol. 7, 132:24–133:22. Additionally,

> [T]here were parts of the settlement agreement that required staffing. So we needed to look at having the right people in the right places making decisions about how we move forward with the settlement agreement. There were 22 other requirements. Those were things that we knew we needed to work on over time. And as I mentioned, I think before we recessed, is that people do not remain in one place all the time. And so we are always training. We are always trying to ensure that our expectations are communicated to all staff.

> Given the size of Fluvanna, we can expect turnover in security, expect turnover in our health care staff, expect turnover in administration. We're having to go back time and again to ensure that everybody understands what the expectations are of them. And so those – some of the things that we looked at also would require money. So we were looking at whether or not we were going to have to go back to legislature to ask for additional monies.



629.0303\KCL
4825-8414-4750 .v5

So it's not a thing that I think happens immediately. We work on those things. We take some steps forward. Some things get sidetracked because of staffing. So it really is a long haul. And as we look at what happens in our other facilities, it's very similar. It's that everything is not perfect every day. Everybody who is supposed to be there is not there every day. So it does take some time for things to get accomplished.

Trial Tr., Vol. 7, 135:3–136:3.

64.     Deputy Director Scott viewed the Settlement Agreement as necessitating VDOC "to look at our engagement with offenders as it relates to their health care. That absolutely impacts how that's a healing environment. And not healing just in terms of health care, but healing in terms of engagement." Trial Tr., Vol. 7, 140:1–10. Deputy Director Scott explained the rationale for her expectation that completion of the Settlement Agreement would take years:

I've been around in corrections for 40, 45 years. And we're talking about an organization that is statewide. It – we have today about 12,000 employees. We were a law-and-order organization for a long time. And that needed to happen. That's not a criticism of our department. We need to get control to make things change.

Once we establish that, we understand what it is we need to accomplish in terms of security, then I think we have an opportunity to have a culture change. And with Director Clarke's appointment, we started looking at reentry. We started looking at a different Department of Corrections. Director Clarke started talking about a healing environment.

We started looking at evidence-based practices, so really looking at the science of corrections, not just doing the things that feel good or doing the things that somehow in our gut we think work. We are looking at: Is there true evidence out there? Are there things that we have seen working? Is there data to support that? And so that takes time.

And it takes time to – particularly at Fluvanna, we had adversarial relations. We have an adversarial relationship. And we understand that offenders are going to need to trust us. We need to give them a reason for doing that. We are going to need to trust them. We can make changes with them. And making that happen takes time. That does not happen immediately.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 29 -

Trial Tr., Vol. 7, 137:5–138:5. Deputy Director Scott explained that "[a]s you look at culture change, it takes time. It is not something that happens overnight. Certainly, we've seen it with other things that we've attempted to accomplish in the department. But I think, just looking at my management background – I mean, we have tried to do some other things in the department, and they just take time. It takes time because of distance, it takes time because of numbers, and it takes time just because we are a public safety organization." Trial Tr., Vol. 7, 140:16–25; <u>see also</u> Trial Tr., Vol. 7, 165:5–166:5.

### iii. Hiring of VDOC's Director of Health Services, Dr. Stephen Herrick, PhD in Early 2016

65.     The VDOC Director of Health Services is responsible for oversight of the healthcare system within VDOC, which includes 44 facilities throughout the Commonwealth, an average daily population of 30,000 prisoners, and approximately 1,000 healthcare providers. Trial Tr., Vol. 5, 88:9–12.

66.     In late 2015 and early 2016, VDOC Deputy Director Scott was in the process of hiring a new VDOC Director of Health Services due to the retirement of the previous VDOC Director of Health Services. Deputy Director Scott intended that the newly hired VDOC Director of Health Services would also assume primary responsibility for oversight of the Settlement Agreement. Trial Tr., Vol. 7, 146:5–147:17.

67.     After an initial round of advertisements and interviews of multiple candidates, Deputy Director Scott concluded that none of the candidates were appropriate for the position. VDOC then undertook a national search, including engaging the American Correctional Association, for a new VDOC Director of Health Services. Id. at 146:5–15. VDOC upper-level management had knowledge of Dr. Stephen Herrick's success and accomplishments at other Virginia institutions with similar challenges and requested that Dr. Herrick apply for the position of VDOC Director of Health Services. Trial Tr., Vol. 5, 101:23–25. After investigating the responsibilities of the position of VDOC Director of Health Services, Dr. Herrick believed that his prior experience qualified and prepared him for the duties and responsibilities of VDOC Director of Health Care Services, and he applied for the position. Trial Tr., Vol. 5, 102:10–19.

68.     Upon receiving his Ph.D. in psychiatry from the Virginia Commonwealth University in 1994, Dr. Herrick joined the faculty the University of North Carolina-Chapel Hill for two years as an Assistant Clinical Professor. While on faculty at UNC Chapel Hill, Dr. Herrick managed the Behavioral Psychiatric Unit at the John Umstead Hospital in North Carolina, which housed the most violent psychiatric patients and employed a staff of sixty. Trial Tr., Vol. 5, 91:21–93:1.



FRITH
ANDERSON
+ PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 30 -

Thereafter, Dr. Herrick was hired, pursuant to a faculty position with VCU Medical Center, to manage the 250–300 bed Maximum Security Psychiatric Unit at Central State Hospital in Petersburg, Virginia, which provided forensic treatment to felons from throughout Virginia. Trial Tr., Vol. 5, 93:1–17; 95:2–4. During this period, Central State was under a United States Department of Justice settlement agreement similar to the instant Settlement Agreement. Trial Tr., Vol. 5, 93:18–94:6. At Central State, Dr. Herrick was responsible for implementing the USDOJ Settlement Agreement, including the hiring of 13 doctor-level psychologists and instituting a new treatment model of behavioral interventions and the elimination of restraints. Trial Tr., Vol. 5, 94:7–20. Under Dr. Herrick's management, Central State satisfied the terms of the USDOJ Settlement Agreement in five years. Trial Tr., Vol. 5, 95:17–20.

Following the completion of the USDOJ Settlement Agreement at Central State Hospital, Dr. Herrick became the Director of Psychology at the Piedmont Geriatric Hospital, a 134-bed facility in Burkeville, Virginia. Following an initial promotion to Clinical Director, Dr. Herrick was then asked by the Commissioner of the Virginia Department of Behavioral Health to apply for the CEO position at Piedmont Geriatric Hospital based upon his accomplishments at Central State Hospital. He was then promoted to CEO of the Piedmont Geriatric Hospital. During Dr. Herrick's tenure at Piedmont Geriatric Hospital, he also became a Virginia-licensed nursing home administrator in order to satisfy federal guidelines for the operation of a nursing home within the Piedmont Geriatric Hospital. Dr. Herrick participated in at least five or six Joint Commission surveys at Piedmont Geriatric Hospital. He also received his Master's Degree in Health Care Administration from VCU during his tenure at Piedmont Geriatric Hospital. Trial Tr., Vol. 5, 96:1–2; 98:2–17; Trial Tr., Vol. 5, 96:4–98:17.

During Dr. Herrick's tenure at Piedmont Geriatric Hospital, the Commissioner of Virginia's Department of Behavioral Health requested that Dr. Herrick assume the additional position of Acting Director of the Virginia Center for Behavioral Rehabilitation (VCBR), Virginia's maximum security violent sexual predator facility in Nottaway County. The VCBR housed 300 violent sexual predators. At that time, VCBR was under an Inspector General Plan of Correction to address systemic issues related to the treatment and civil rights of the 300 sexually violent predators housed at VCBR. For approximately one year, in addition to his ongoing duties as CEO of Piedmont Geriatric Hospital, Dr. Herrick also served as the Acting Director of VCBR for the purpose of executing the Inspector General's Plan of Correction for VCBR. Under Dr. Herrick's direction and supervision, VCBR successfully completed the requirements of the Inspector General's Plan of Correction, which mandated specific treatment and outcome measures. Trial Tr., Vol. 5, 99:4–101:4.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

69.     Following VDOC's national recruitment search headed by Deputy Director Scott, Dr. Stephen M. Herrick, Ph.D. was hired as the VDOC Director of Health Services. Trial Tr., Vol. 7, 146:5–148:5.

70.     Dr. Herrick commenced his employment with VDOC as Director of Health Services in March 2016, one month after the Court's February 6, 2016 Order approving the Settlement Agreement. Trial Tr., Vol. 5, 87:17–88:5. In this position, Dr. Herrick assumed responsibility for the oversight of the entire VDOC healthcare system. Trial Tr., Vol. 5, 88:9–12.

71.     Dr. Herrick's prior professional experience uniquely qualified him to assume the position of VDOC Director of Health Services and specifically to assume primary responsibility for oversight of the Settlement Agreement. VDOC Deputy Director Scott based her decision to hire Dr. Herrick for the position of VDOC Director of Health Services on Dr. Herrick's professional background, including his significant experience in implementing settlement agreements/plans of correction similar to the Settlement Agreement and accolades from his superiors at his prior employment. Trial Tr., Vol. 7, 146:5–148:5.

72.     Accordingly, at the time of VDOC Deputy Director Scott's decision to hire Dr. Herrick as the VDOC Director of Health Services with primary responsibility and oversight for the Settlement Agreement, Dr. Herrick had both a PhD in psychology and a Master's Degree in Health Care Administration, and he had held upper-level healthcare management positions at multiple large public/governmental facilities (including correctional facilities); and had been responsible for successfully implementing and completing institutional settlement agreements/plans of correction similar to the instant Settlement Agreement at multiple institutions. Trial Tr., Vol. 5, 101:4–17.

73.     Upon offering Dr. Herrick the position of VDOC Director of Health Services, VDOC Director Harold Clarke and Deputy Director Scott instructed him that the Settlement Agreement was to be his top priority. Trial Tr., Vol. 5, 104:1–4. Deputy Director Scott further instructed that she would take the lead for his first 30–60 days in the position during which time they would work side-by-side. Thereafter, he would be primarily responsible for oversight of the implementation of the Settlement Agreement. Trial Tr., Vol. 5, 104:4–7. Upon his hiring, VDOC Director Clarke stressed to Dr. Herrick the mission statement that VDOC is in the business of helping people be better with the goal of breaking the chain of incarceration to become productive citizens to take care of the next generation. Director Clarke told Dr. Herrick that he had unlimited resources to satisfy the requirements of the Settlement Agreement. Trial Tr., Vol. 5, 101:8–23.

- 32 -



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

74.     At the time Dr. Herrick commenced his position as VDOC Director of Health Services in March 2016, Dr. Herrick, based upon his prior experience in executing the USDOJ Settlement Agreement at Central State Hospital and the Inspector General's Plan of Correction at the Virginia Center for Behavioral Health, anticipated it would take "a couple of years at least and probably more" to complete the Settlement Agreement. Trial Tr., Vol. 5, 116:1–113, 117:20–118:20. Dr. Herrick concurred with Dr. Scharff's assessment that institutional settlement agreements of this type necessitate a culture change, including the promotion of a culture of critical self-evaluation that requires years to complete. Trial Tr., Vol. 5, 116:23–117:3; Trial Tr., Vol. 5, 117:20–118:16.



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 33 -

<u>iv. VDOC's Implementation of the Settlement Agreement February 2016</u>

75.     In February 2016, VDOC, under the direction of Deputy Director Scott, implemented the Settlement Agreement.

76.     In February 2016, VDOC Deputy Director Scott convened 30–35 VDOC senior and executive staff for purposes of implementing the Settlement Agreement. Under Deputy Director Scott's direction, this group of senior and executive VDOC staff met on February 3, February 10 and February 23, 2016 to implement the Settlement Agreement and to undertake a critical review of the issues implicated by the Settlement Agreement to ensure that VDOC satisfied its obligations under the Settlement Agreement. Trial Tr., Vol. 7, 148:9–149:3. In conjunction with these February 2016 meetings, Deputy Director Scott dispatched senior VDOC clinical personnel to FCCW to implement the terms of the Settlement Agreement, including VDOC's Chief Pharmacist and VDOC regional nurses. Trial Tr., Vol. 7, 157:21–158:11.

77.     On February 3, 2016, Deputy Director Scott convened a meeting of the VDOC and FCCW senior clinical and executive staff to evaluate and assess Defendants' obligations under the Settlement Agreement upon its approval by the Court. Trial Tr., Vol. 7, 148:16–154:24. The substance of this February 3, 2016 meeting, as documented in a 15-page meeting minutes (Def. Ex. 14, Tab 1, Bates RFP400000831–845), involved a comprehensive discussion and analysis of the issues implicated by the Settlement Agreement, including staffing, transitioning from LPNs to RNs, recruitment, hiring, partnerships/contracts, training, supplies, nurse education, auditing, informal complaints, pill line, sick call, medication administration, chronic care, charting, and infirmary care. Def. Ex. 14, Tab 1, Bates RFP400000831–845.

        The February 3, 2016 meeting minutes further document VDOC's assessment of the potential for "taking over medical" at FCCW. Trial Tr., Vol. 7, 149:4–151:6. The meeting minutes show that Deputy Director Scott was not satisfied with Armor's performance under the contract, and that VDOC would give Armor until May 1, 2016, to improve its performance at FCCW. Def. Ex. 14, Tab 1, Bates RFP400000831.

Deputy Director Scott described this February 3, 2016 meeting of 30–35 VDOC and FCCW senior and executive staff:

    A:  We had the operations manager at Fluvanna capture the essence of the
        meeting we had on February 3, 2016. What I asked people to do is talk
        about what we needed to do to implement the settlement agreement, to
        talk about what our deficiencies are, what our strong points are. Do we
        need to continue exactly as we were going? Did we need to do something



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 34 -

different? I think we began the discussion at that point. Do we want to take over Fluvanna? That was part of the discussion. Do we want the Commonwealth to provide health care at Fluvanna? Do we want to continue with Armor and continue with Armor as-is?

I think we began the discussion at that point of a hybrid model as well so that we are the responsible parties on the ground—we are the responsible parties overall, but on the ground at Fluvanna—and use Armor as a staffing agency. So we were looking at all the—what's in the best interest of Fluvanna at this point that gets us to accomplishing the things that are in the settlement agreement.

Q: And did that involve a self-critical analysis?

A: It absolutely did. We not only criticized ourselves, we criticized Armor. We were looking for, what are those things that are going to create issues for the Department of Corrections? What are those things that are going to create issues for the delivery of health services?

Q: Is it fair to say that the point of this document, documenting the meeting of February 3, 2016, was to try and put down everything that was working less than perfectly?

A: It was not just what wasn't working, but what is working. What can we build on? So it's a number of things. It's looking – it's also looking at, how do we implement some things? What do we need to do?

Q: And if we could just flip through and – let me ask you: You said how many people were involved in this meeting, these meetings? Ballpark, not exact.

A: 30 to 35 at any given time.

Trial Tr., Vol. 7, 149:22–151:6; see also id. at 154:4–5. At this February 3, 2016 meeting, Deputy Director Scott assigned senior-level VDOC personnel with responsibility for various aspects of the Settlement Agreement, such as staff training, staff recruitment, and staff compensation. Trial Tr., Vol. 7, 153:6–17; Def. Ex. 14, Tab 1, Bates RFP400000831–845.

78.    On February 9, 2016, Deputy Director Scott met with Armor executives to discuss VDOC's obligations under the Settlement Agreement and Armor's obligations as VDOC's



629.0303\KCL
4825-8414-4750 .v5

contractor. Def. Ex. 14, Tab 2, Bates RFP400000848. Thereafter, Deputy Director Scott met with Director Clarke and VDOC Chief of Corrections Operations David Robinson wherein they decided to continue with the Armor contract at least through October 2016. These events were documented in the February 10, 2016 minutes:

> Deputy Director, Cookie Scott opened the meeting by sharing she met with Jim Hatcher and Dwayne Phillips on February 9, 2016. She stated the Department is committed to Armor being successful however; if they cannot make it work, we will have a responsibility to provide adequate medical care. If we have to remove Armor away, we must have pieces and parts in place to do it. It was further discussed that June 30 could be a problematic date. Therefore, Ms. Scott met with Chief of Corrections Operations (CCO), Dave Robinson and Director, Harold Clarke wherein all agreed to continue the contract through October 31, 2016. They are not willing to change the May 1 deadline for significant improvement as Armor needs to show urgency and positive changes. If they make changes, we will continuously monitor and the October 31 deadline may be eliminated. Armor has to demonstrate they are going to be successful. Ms. Scott shared with them things they needed to do (reviewed "Problem Areas Identified" with them).

Def. Ex. 14, Tab 2, Bates RFP400000848. The referenced "Problem Areas Identified" were: "informal complaints, pill line, sick call, mediations not being received, chronic care, not documenting at all/or properly; information not reaching charts, scifi updated, charts not being used to write orders, filing up to date, nurses don't know policies, equipment checks, oxygen equipment not being done (weekly, daily, monthly) as required, infirmary not being up to 80%, audit files not being maintained)." Def. Ex. 14, Tab 1, Bates RFP400000845.

79.    On February 10, 2016, Deputy Director Scott again convened this group of senior level VDOC officials and clinical staff. Tr., Vol. 7, 154:25–158:11; Def. Ex. 14, Tab 2, Bates RFP400000846–864. A 16-page summary of this meeting was documented in minutes. Def. Ex. 14, Tab 2, Bates RFP400000846–864. These 19-page minutes—titled "Fluvanna Health Care Plan, February 10, 2016"—document that VDOC was proceeding with the "Implementation Phase," id. at Bates RFP40000846, and contained VDOC's timeline for VDOC's implementation for February, March and April 2016. Id. at Bates RFP40000862–863.

Additionally, as outlined in these February 10, 2016 meeting minutes, VDOC was actively addressing the key elements in the Settlement Agreement including: staff recruitment and training, pharmacy, sick call, pill line, mental health, chronic care, and clinical leadership, as well as discussions with Dr. Scharff on all these topics. On the issue



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 36 -

of staff recruitment, these minutes outline VDOC's strategy for filling leadership positions, identifying employees targeted to be retained, networking with nursing schools to target upcoming graduates, identifying specific FCCW human resources staff to support recruitment, preparing recruitment literature for use at job fairs, financial bonuses, utilizing social media (LinkedIn, Twitter, Facebook) and online job boards. Def. Ex. 14, Tab 2, Bates RFP400000856, BATES00000862.

80.　　On February 23, 2016, Deputy Director Scott convened a third meeting of senior VDOC personnel regarding the ongoing implementation of the Settlement Agreement. Trial Tr., Vol. 7, 158:12–160:5; Def. Ex. 14, Tab 3, Bates RFP400000865–873. VDOC prepared a 9-page summary of the discussion of this meeting. Def. Ex. 14, Tab 3, Bates RFP400000865–873. The minutes from this February 23, 2016 meeting document VDOC's ongoing implementation efforts on the issues implicated by the Settlement Agreement, including sick call, chronic care, staffing, analysis of a potential hybrid management model, leadership, pharmacy, medications, pill pass, and medical records. Def. Ex. 14, Tab 3, Bates RFP400000865–879. Notably, as Dr. Scharff expected and anticipated, the 9 pages of notes from this February 23, 2016 meeting are an example of the critical self-analysis, trial-and-error evaluation, and attention to the culture of FCCW by VDOC officials.

81.　　On the afternoon of February 23, 2016, Deputy Director Scott met again with eight Armor management officials in continued implementation of the Settlement Agreement, including issues of medications, pharmacy, staffing, staff recruitment, training, clinical leadership, sick call, and strategies for addressing the Settlement Agreement. Def. Ex. 14, Tab 3, Bates RFP400000874–879.

<u>v. VDOC's Continued Implementation of the Settlement Agreement and
Evaluation of Armor — March, April, May 2016</u>

82.　　In March, April and May 2016, Deputy Director Scott continued to oversee the Settlement Agreement. In March 2016, Dr. Herrick, the newly-hired Director of Health Services began working side-by-side Deputy Director Scott with the understanding that primary responsibility for execution of the Settlement Agreement would transition to Dr. Herrick. Trial Tr., Vol. 5, 104:2–7; Trial Tr., Vol. 7, 162:17–22.

83.　　On March 1, 2016, VDOC nurse staff held a training meeting to formulate additional training for the FCCW on-site nursing staff. Def. Ex. 14, Tab 5, Bates RFP400000801–802; Tab 6, Bates RFP400000811–812.



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 37 -

629.0303\KCL
4825-8414-4750 .v5

84.     In the spring of 2016, Armor transferred management level personnel from outside of Virginia to FCCW to address the requirements of the Settlement Agreement. Trial Tr., Vol. 7, 208:6–9. As documented in the March 23, 2016 meeting minutes, Def. Ex. 14, Tab 6, Bates RFP400000805, Armor transferred staff from New Jersey, Florida and other sites in Virginia to FCCW to address staffing at FCCW.

85.     Armor also transferred Gale Gargiulo, a registered nurse and Armor Vice President, to work full time at FCCW as the Health Services Authority, the on-site administrator for all health care. Trial Tr., Vol. 5, 113:11–25, 114:1–4. Nurse Gargiulo had previously worked in the Philadelphia system, so she was generally familiar with system that Dr. Scharff had instituted in Philadelphia. Trial Tr., Vol. 5, 114:8–17. Dr. Herrick was highly impressed with Nurse Gargiulo's competency and abilities to serve as the FCCW Health Services Authority overseeing the operation of health services at FCCW. Trial Tr., Vol. 5, 113:11–23, 114:22–115:1.

86.     From February to May 2016, Deputy Director Scott conducted an extensive review of Armor's performance as the medical contractor at FCCW. Trial Tr., Vol. 5, 111:6–13. This review involved analysis and input from the VDOC clinical department heads, including the VDOC Medical Director, VDOC Director of Nursing, VDOC Chief Dentist, VDOC Chief Psychiatrist, and VDOC Chief of Mental Health, as well as the VDOC contract monitor and the FCCW contract monitor, both of whom are registered nurses. Trial Tr., Vol. 5, 112:21–113:4. Deputy Director Scott also directed the VDOC nursing professionals to conduct a survey of Armor's performance at FCCW. 112:15–16.

87.     In March 2016, VDOC identified a list of "measurable goals" related to the key provisions of the Settlement Agreement, including staffing, nurse training, medication administration, sick call, chronic care, and medical charting. On March 23, 2016, Deputy Director Scott convened another meeting of high-level VDOC personnel for the purpose of assessing Armor's performance as the FCCW medical contractor. Armor's improved performance on key issues in the Settlement Agreement, including sick call, medication administration and documentation, infirmary care, and pill line, were evaluated and documented. Def. Ex. 14, Tab 6, RFP400000805.

During this March 23, 2016 meeting, a list of 14 "measurable goals" for Armor were documented and conveyed to Armor that these 14 measurable goals must be met by April 30, 2016 in order for Armor to remain the FCCW medical contractor. As documented in the March 23, 2016 meeting minutes, VDOC determined that "if Armor does not improve by May 2016, DOC will plan to assume the medical care and responsibilities at FCCW in October 2016" and "as of April 30, 2016, if Armor is not performing as expected,



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 38 -

we will begin transitioning. By mid-April, we will need an idea of whether or not it's working." <u>See</u> Def. Ex. 14, Tab 6, Bates RFP400000803–815; Trial Tr., Vol. 7, 160:6–161:8.

Following the March 23, 2016, meeting of VDOC personnel, Deputy Director Scott met with Armor executives to advise that if Armor did not meet these "measurable goals" to VDOC's satisfaction by April 30, 2016, VDOC would remove Armor as the FCCW medical contractor. Trial Tr., Vol. 7, 161:13–20; <u>see</u> Def. Ex. 14, Tab 8, Bates RFP400000817.

88.     On April 14, 2016, Deputy Director Scott again convened the VDOC clinical chiefs and other high-level VDOC personnel to evaluate and assess Armor's progress as the medical contractor at FCCW for purposes of determining if Armor would remain the FCCW medical contractor. Trial Tr., Vol. 7, 161:–162:9; <u>see</u> Def. Ex. 14, Tab 8, Bates RFP400000817–820. During this meeting, Deputy Director Scott stated that if VDOC was not satisfied with Armor's progress and satisfaction of the "measurable goals" within the next 10 days, VDOC would commence plans to resume direct management of the health care operations at FCCW. <u>See</u> Def. Ex. 14, Tab 8, Bates RFP400000819.

89.     In May 2016, based upon the analysis and recommendations of the VDOC clinical management team that Armor had made satisfactory progress to address VDOC's concerns at FCCW, Deputy Director Scott made the decision that Armor would remain as the FCCW medical contractor. Trial Tr., Vol. 7, 162:5–16; 207:9–17. Deputy Director Scott based her decision to retain Armor as the medical contractor at FCCW upon the installation of Nurse Gargiulo as the FCCW Health Services Authority at FCCW, Armor's performance in satisfying the criteria VDOC had demanded and upon the advice and recommendation of the VDOC clinical department chiefs and Dr. Herrick, VDOC's new Director of Health Services. Trial Tr., Vol. 5, 113:5–114:7, 115:2–8.

90.     Following Deputy Director Scott's May 2016 decision that Armor would continue as the FCCW medical contractor, Dr. Herrick assumed primary responsibility for oversight of the Settlement Agreement. Trial Tr., Vol. 5, 115:2–8; Trial Tr., Vol. 7, 15–22.

### vi. Dr. Herrick's Leadership in VDOC's Ongoing Execution of the Settlement Agreement

91.     From March 2016 when he became VDOC Director of Health Services to the present, Dr. Herrick has spent between 50–75% of his professional life—including evenings and weekends—working on the Settlement Agreement. Dr. Herrick regularly apprised his supervisors, including Director Clarke and Deputy Director Scott, on the progress of the Settlement Agreement, including during the VDOC weekly executive leadership team meetings. Trial Tr., Vol. 5, 106:18–107:13. Deputy Director Scott



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 39 -

continued to monitor the ongoing status at FCCW through frequent discussions with Dr. Herrick and her own personal visits to FCCW. Trial Tr., Vol. 7, 165:5–166:5, 166:19–167:13. As Deputy Director Scott testified, "the conversation was ongoing about what [VDOC] did at Fluvanna." Trial Tr., Vol. 5, 166:4–5.

92.     Dr. Herrick has never been denied by VDOC any request that he has made for the purpose of accomplishing the terms of the Settlement Agreement. Trial Tr., Vol. 5, 107:14–22. Similarly, VDOC Director Clarke agreed to every request made by Deputy Director Scott regarding the Settlement Agreement. Trial Tr., Vol. 7, 164:3–8.

93.     In the spring and into the summer of 2016, Dr. Herrick, tasked with oversight and implementation of VDOC's compliance with the Settlement Agreement, conducted a comprehensive review of the healthcare operations at FCCW, including directing the VDOC clinical chiefs—including the VDOC Medical Director, Director of Nursing, Director of Pharmacy, Director of Dentistry, Chief of Mental Health, and Chief of Psychiatry, Trial Tr., Vol. 5, 89:1–13—to perform onsite evaluations of the healthcare operations at FCCW. This process included, *inter alia*, the VDOC Chief Psychiatrist working at FCCW one-to-two days a week and the VDOC pharmacist evaluating the FCCW pill pass. Trial Tr., Vol. 5, 115:9–24. During the spring and summer of 2016, Dr. Herrick was attending to the Settlement Agreement on a daily basis, including the review and revision of the grievance process, recruitment of clinical staff, and medication administration. Trial Tr., Vol. 5, 118:24–121:22.

94.     During the spring and summer of 2016, Dr. Herrick was creating "a system that acknowledged errors and tries to improve them. It's a long process of one step forward, two steps back sometimes. Sometimes I use the analogy of trying to repair a car engine while it's going down the road. There's times you have got to crawl back into the driver's seat because something urgent comes up and you have to address it, and there's other times where you have the ability to work on improving." Trial Tr., Vol. 5, 126:3–16. Deputy Director Scott explained that during this process, VDOC was "criticizing our functions. We were looking at where the problems are, where the warts are, what we needed to do to comply with the Settlement Agreement . . . ." Trial Tr., Vol. 7, 207:2–8.

95.     Dr. Herrick spoke daily with the Armor personnel at FCCW, including Nurse Gargiulo, to monitor the progress and healthcare operations at FCCW. Trial Tr., Vol. 5, 121:3–6.

96.     In the spring of 2016, one of Dr. Herrick's primary focuses at FCCW for purposes of accomplishing the Settlement Agreement was instituting a CQI—continuous quality improvement—process at FCCW based both upon his prior experience at other



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 40 -

healthcare institutions and in consultation with Dr. Scharff. Dr. Herrick's goal and purpose of CQI at FCCW involved identifying systemic concerns or problems, and "picking apart" every step of the process for the purpose of improving the delivery of care. Trial Tr., Vol. 5, 126:17–127:20. At the suggestion of Dr. Scharff, Dr. Herrick and other members of the VDOC healthcare management team traveled to Philadelphia to observe the Philadelphia system and specifically the Philadelphia CQI system. Trial Tr., Vol. 5, 24–25.

97.     In conjunction with Dr. Herrick's global attention to the Settlement Agreement, Dr. Herrick and other VDOC personnel working in consultation with Dr. Herrick made numerous changes to the operations of FCCW relevant to the Settlement Agreement. For example, he and Deputy Director Scott ordered that the doors to the individual cells in the regular housing units remain open/unlocked to permit the prisoners to access the restrooms, which were located outside the cells. Trial Tr., Vol. 5, 123:20–124:8. As the cells at FCCW are "dry" and do not contain sinks or toilets, the prisoners did not have unrestricted access to the toilets prior to this change in policy. Id. VDOC also built a recreation yard for the infirmary. Trial Tr., Vol. 5, 125:3–7. Dr. Herrick personally reviewed the credentials of all of Armor's medical providers. Trial Tr., Vol. 5, 125:20–23.

98.     Dr. Herrick reviewed weekly reports from the FCCW electronic medication administration record to permit Dr. Herrick and the VDOC Chief Pharmacist to evaluate the medication administration process, as the volume of medications administered daily at FCCW—30,000 medications passed each week—far exceeded any other VDOC facility. Trial Tr., Vol. 5, 120:8–121:2.

99.     Dr. Herrick also undertook a review of the grievance process based upon the concerns that both he and Dr. Scharff had with the FCCW grievance process. Trial Tr., Vol. 5, 121:13–123:19. Following this review, Dr. Herrick instituted a new policy at FCCW whereby all regular medical grievances would be investigated. Trial Tr., Vol. 5, 123:12–19. Dr. Herrick engaged the VDOC "electronic health records" staff to assist him in evaluating and revamping the FCCW grievance system resulting in a more streamlined, efficient, and effective process. Trial Tr., Vol. 5, 143:11–148:9. In the spring and summer of 2016, Dr. Herrick began reviewing samples of informal grievances for the purpose of achieving a baseline understanding of the issues and process. Dr. Herrick created and instituted a new grievance process at FCCW in which every medical grievance is classified into three categories. The first category consists of grievances that have been resolved and the prisoner receives a letter explaining the resolution; for the second category the prisoner receives a letter advising either that she has an appointment or how the grievance is otherwise being addressed; and the third category provides a face-to-face interview between the prisoner and a clinician to have a problem-solving session. These new



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 41 -

grievance policies instituted under the direction of Dr. Herrick are depicted in Defendants' Exhibit 13. See also Def. Ex. 15.

100. In the fall of 2016, VDOC installed Jeffrey Dillman as the FCCW Warden. Warden Dillman had a Master's degree in public administration and had previously served as the Health Authority at another VDOC correctional facility. Warden Dillman had also worked at the VDOC Powhatan Deep Meadow facility, which provided staff and oversight for the VDOC secure unit at the Virginia Commonwealth University Medical Center. Trial Tr., Vol. 5, 131:18–132:9.

Warden Dillman replaced Warden Tammy Brown and continued Warden Brown's practice of formal meetings for the purpose of monitoring, discussing, and strategizing the ongoing efforts to reach full compliance with the terms of the Settlement Agreement. Warden Dillman also began preparing detailed minutes of these meetings. See Def. Ex. 12 (Tabs 1–76). These weekly meetings, which are ongoing through the present, generally included Dr. Herrick, the FCCW Warden and his staff, VDOC regional administrative staff, VDOC Deputy Director Robinson, the VDOC clinical chiefs and, at times, Director Clarke. Trial Tr., Vol. 5, 132:15–133:9; see also Def. Ex. 12.

The approximately 600 pages of weekly meeting minutes from September 2016 through the present document in detail the progression of VDOC's global efforts to address the elements of the Settlement Agreement, including the areas of accomplishment and the issues that continued to require additional efforts to reach full compliance, as well as the ongoing and continuous dialogue with Dr. Scharff. Def. Ex. 12, Tabs 1–76. While these weekly meeting minutes evolved in form and style and became more detailed and comprehensive over time, each of the weekly meeting minutes from September 2016 to the present documented the status of compliance on the elements of the Settlement Agreement. The minutes detail both the successes and areas of needed improvement and VDOC's actions and strategies for accomplishing total compliance with the elements of the Settlement Agreement including staffing, intake screening and health assessments, sick call, co-pay policy, grievances, diagnosis and treatment issues, infirmary operations, supply and distribution of medications and medical equipment, utilization management, offender access to information, ADA accommodations, mortality reviews, CQI, and all of the other elements of the Settlement Agreement. See Def. Ex. 12, Tabs 1–76.

By way of example, these weekly meeting minutes document the ongoing efforts to recruit and hire nursing and medical personnel, including


FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 42 -

- ❖ participation at job fairs: Def. Ex. 12, Tab 1, Bates RFP900000148; Tab 5, Bates RFP900000137, Tab 6, RFP900000289; Tab 7, RFP900000280; Tab 23, Bates RFP900000312;
- ❖ the Warden meeting personally with the nurses to enhance retention: Def. Ex. 12, Tab 3, Bates RFP900000134;
- ❖ the hiring of a recruiter: Def. Ex. 12, Tab 4, Bates RFP900000135; Tab 6, Bates RFP900000289; Tab 38, Bates RFP900000258;
- ❖ providing financial incentives for new hires: Def. Ex. 12, Tab 5, Bates RFP900000137; Tab 7, RFP900000280; and
- ❖ Armor's hiring of a "head hunter" to locate a permanent on-site medical director: Def. Ex. 12, Tab 14, Bates RFP900000303; Tab 19, RPF900000145.

As documented in the weekly meeting minutes, VDOC monitored, evaluated, strategized, and pursued the hiring of additional nursing and medical staff for FCCW on an ongoing and constant basis. <u>See</u> Def. Ex. 12, Tabs 1–76.

Dr. Herrick characterized the totality of these 600 pages of weekly meeting minutes, Def. Ex. 12, as documenting that progress on the elements of the Settlement Agreement had been made and that there was still work to be done to reach full compliance with the terms of the Settlement Agreement. Trial Tr., Vol. 5, 142:21–143:2.

101.   In addition to the "weekly meeting minutes", VDOC and Armor also convened separate "medical meetings," which also document VDOC's and Armor's ongoing actions to reach full compliance with the Settlement Agreement. Def. Ex. 12, Tabs 1–29 and Tabs 1–25. These 600+ pages of VDOC's and Armor's "medical meeting minutes" similarly document VDOC's and Armor's actions—including areas of success and those areas requiring additional attention—in reaching full compliance with the Settlement Agreement.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

**F. VDOC's Analysis in Summer 2017**

102.    Into 2017, VDOC witnessed unexpected turnover in the Armor management positions prompting Dr. Herrick and Deputy Director Scott to again re-visit the idea that VDOC would assume direct management of FCCW's medical operations. Trial Tr., Vol. 7:166:6–18, 167:14–173:23.

103.    In the summer of 2017, Dr. Herrick became concerned with a change in the Armor clinical leadership at FCCW and a decline in performance indicators at FCCW. In response to his concerns, Dr. Herrick began discussion with Deputy Director Scott throughout June, July and August 2017 to specifically evaluate Dr. Herrick's concerns with the status of the medical operations at FCCW and formulate a solution to these concerns. At this time in the summer of 2017, Deputy Director Scott and Dr. Herrick revisited the idea of VDOC resuming direct management of FCCW's healthcare operations or adopting a hybrid management model under which VDOC and a medical contractor would share direct management responsibility. Trial Tr. 159:9–163:13; Trial Tr., Vol. 7: 167:14–172:25.

104.    As a result of Deputy Director Scott's and Dr. Herrick's analysis in June and July 2017, Deputy Director Scott requested and obtained authority for an additional $3,000,000 to be spent on healthcare operations at FCCW. Trial Tr., Vol. 7, 204:6–14 ("We decided that in June of 2017.") Deputy Director Scott's recommendation to add $3,000,000 to the healthcare budget in the summer of 2017 was based in part on the feedback from Dr. Scharff and Dr. Scharff's interpretation of the subjective language in the Settlement Agreement related to "adequate staffing." As Deputy Director Scott testified, ". . . we were reading his reports. We were considering his criticisms of us. We were considering what he said was positive. And we considered him the authority on the settlement agreement in terms of what his expectations were in terms of corrections." Trial Tr., Vol. 7, 170:8–17.

105.    At the direction of Deputy Director Scott, on September 27, 2017, VDOC formally requested proposals from Armor and a second medical contractor, Mediko, PC, seeking creative and innovative ideas and solutions to the challenges of providing healthcare services at FCCW and specifically requesting that the proposals address strategies for hiring of a medical director, executing medication administration, executing the terms of the Settlement Agreement, executing a CQI plan, and addressing clinical staffing. See Def. Ex. 25; Trial Tr., Vol. 7, 167:14–172:25.

106.    Both Armor and Mediko submitted proposals to VDOC, but VDOC was not impressed by either proposal. Director Clarke, based upon the advice and recommendations of Deputy Director Scott and Dr. Herrick, decided instead to use the



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 44 -

additional $3,000,000 in funding for FCCW health care to create eleven VDOC positions at FCCW and for VDOC to resume the direct management of health care at FCCW using a hybrid management model. This hybrid management model uses state employees for the top-level clinical managers and contract clinical employees for lower-level clinicians. Trial Tr., Vol. 5, 165:6–18.

107.    Additionally, VDOC created a new position under Dr. Herrick's supervision to provide further assistance with accomplishing the terms of the Settlement Agreement. In the fall of 2017, Eric Aldridge became the new FCCW Warden, and Jeff Dillman transitioned into this new VDOC position under Dr. Herrick's supervision to provide additional assistance with accomplishing the Settlement Agreement. Trial Tr., Vol. 5, 159:9–160:2.

108.    In December 2017, VDOC began transferring clinical staff from other VDOC facilities to FCCW, including RNs Marsha Stanford and Ellen Katzman. On March 1, 2018, VDOC assumed direct management of FCCW's health care. RN Stanford was selected by VDOC for reassignment to FCCW based upon her 20+ years of experience as a VDOC Health Services Administrator, and RN Katzman was selected for reassignment to FCCW from the Nottoway VDOC facility based upon her personal connections to nursing schools, her recruitment skills, and her proven abilities during a crisis at that facility. Trial Tr., Vol. 5, 156:1–167:16.

109.    Currently at FCCW, the upper-level healthcare management staff are directly employed by VDOC, and the lower-level nurses are directly employed by Armor and staffing agencies. Trial Tr., Vol. 7, 171:17–172:11.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

**G. Current Status of FCCW's Compliance with Settlement Agreement**

110.    Echoing Dr. Scharff's optimism as to the current status of FCCW's compliance with the Settlement Agreement, Dr. Herrick—who has unquestionably embraced the strategy of critical self-analysis to create culture change—explained that:

> In my experience with these kind of settlement agreements, these large-scale philosophical changes, you have these fits and starts at the beginning. We had -- when I was at Central State, in the first year or two, there were five acting directors of the hospital during the first year of the settlement agreement. It is difficult to find the right person in the position. And it was finally, it was the person who ultimately became the commissioner of mental health that was the one who could turn it around. I think we're in that same phase of trying to find the right person, the right medical director to run the place. I also feel like you get over a mountain. It's kind of like you are pushing the cart up the hill. And once you get to a certain place, the momentum takes off, and I feel we're there. The nurses have told the agency that they want to stay, that they're enjoying it, that they feel supported. So I see all of that as the culture change occurring and people wanting to work there.

Trial Tr., Vol. 5, 171:6–25.

111.    Similarly, Dr. Herrick described the systemic changes that have occurred at FCCW since February 2016:

> I agree very strongly with Dr. Scharff that you have to get people in there that have the ability to be self-critical. And they're unique individuals. The type of people that we need to recruit and we have, I think -- I actually don't know yet, but I'm hoping that [Stanford] and [Katzman] have accepted. We have offered them full-time positions, and they are very interested in staying at this point. So we have the right people. Those are the -- those two people, I have faith in. And at the top, you need that tone and that -- and I believe they are going to be testifying -- but you need that tone and mission and drive that is caretaking both for the offenders and caretaking for the staff. That's what it takes to get a facility turned around and the philosophy turned around. Then you need a system in place where people are openly critical, able to take feedback, and not be afraid to speak up when we do something wrong. We need to speak up and say when things fail and try to improve them.

Trial Tr., Vol. 5, 174:22–175:17.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 46 -

629.0303\KCL
4825-8414-4750 .v5

112.   In its ongoing efforts to promote a healing environment and complete the Settlement Agreement, FCCW has implemented several unique programs available to the women at FCCW designed to foster a culture change, including wellness, yoga, and horticulture programs. Trial Tr., Vol. 7, 141:11–142:10.

113.   VDOC has spent additional funds at FCCW notwithstanding the criticism VDOC has received for spending too much money on prisoner healthcare. Trial Tr., Vol. 7, 183:12–17.

114.   Marsha Stanford, RN, began working at FCCW in early January 2018, and she is the current Health Services Authority at FCCW. Trial Tr. Vol. 6, 55:25–56:24.

115.   Upon her arrival at FCCW in January 2018, she undertook numerous improvements to the FCCW operations including instituting a centralized pill line to improve nurse accountability and support, id. at 58:19–59:3, revamping the waiting room to mimic the feel of an outside clinic, id. at 61:2–15, and developing a plan for long-term care housing in anticipation of its aging population, id. at 62:12–16.

116.   Nurse Stanford testified that FCCW is currently well over the contract number of staff, id. at 95:9–13, and with the improvement in morale, the agency nurses are renewing their contracts. Id. at 63:4–17.

117.   Ellen Katzman, RN, transferred to FCCW from another VDOC facility in January 2018. Trial Tr. Vol. 6, 100:15–22. She is currently employed at FCCW as the Nurse Administrator. Trial Tr. Vol. 6, 99:21. Since arriving at FCCW in January 2018, Nurse Katzman has focused her efforts on staffing, including contacting nursing agencies with whom she had a prior relationship to recruit nurses. Trial Tr. Vol. 6, 102:1–14.

118.   She has also worked to phase out nurses that were not up to par with facility expectations, id. at 104:25–105:12, and implemented longer-term contract nurses to facilitate nursing staff continuity and consistency, id. at 106:24–107:19.

119.   In the meantime, FCCW overstaffed with agency staff so that underperforming staff could be eliminated without the risk of creating gaps in staff. Trial Tr. Vol. 6, 126:21–127:5; Def. Ex. 41, Tab 106, Bates RFP1400000024–30.

120.   Nurse Katzman has also developed an organizational chart to improve staff accountability, support, and experience. Trial Tr. Vol. 6, 108:23–110:1; Def. Ex. 30.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 47 -

121. She noted that moving nurses into a centralized location has favorably fostered a culture change. Trial Tr. Vol. 6, 111:4–112:3.

122. She echoed the testimony that recruiting nurses has been and continues to be difficult at FCCW. Id. at 112:4–9; 114:1–115:5. So, VDOC implemented crisis rates to improve nurse recruitment. Trial Tr. Vol. 6, 115:15–116:11.

123. Under her supervision, all agency nurses receive 8 hours of VDOC training, as well as two to three shifts of training and may request additional training. Trial Tr. Vol. 6, 132:11–133:13

124. Eric Aldridge became FCCW's Warden in August 2017. Trial Tr. Vol. 6, 6:7; 6:25–7:2. Warden Aldridge was the first male warden at a female VDOC institution, id. at 6:13–21, and has attended training on gender responsivity and trauma-informed care for female offenders. Trial Tr. Vol. 6, 7:7–10.

125. When Warden Aldridge first arrived at FCCW in August 2107, VDOC was already in the process of restructuring staffing of the facility. Trial Tr. Vol. 6, 8:20–25.

126. Continuing the ongoing change in culture at FCCW, Warden Aldridge implemented an offender advisory committee to help, among other things, improve the offender-corrections staff relationship and assess compliance with the Settlement Agreement. Trial Tr. Vol. 6, 10:18–11:11.

127. He also made other changes to FCCW, including installing ice machines in housing units and sponsoring a "fun day," to foster the positive change in culture. Warden Aldridge also relocated the physical therapy department to provide more space. Trial Tr. Vol. 6, 10:1–17; 27:20–28:6.

128. Warden Aldridge has continued the weekly meetings with all medical, mental health, dental, and physical therapy staff to assess FCCW's progress, id. at 14:24–16:4, as well as the weekly conference call with medical staff, counsel, and administrative staff to address VDOC's ongoing efforts to reach full compliance with the Settlement Agreement. Trial Tr. Vol. 6, 16:9–15. Warden Aldridge explained that these weekly meetings and conference calls do not simply rehash data but instead focus on the ongoing issues and concerns, propose solutions to areas that need improvement, and develop action plans to track progress. Trial Tr. Vol. 6, 16:16–23,25:15–25.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

129. Warden Aldridge also revised the format of the weekly meeting minutes, Def. Ex. 12, Tabs 40–76, to provide additional detail on the elements of the Settlement Agreement to assist VDOC in reaching full compliance with the Settlement Agreement.

130. Warden Aldridge revamped the emergency grievance process. When a prisoner files a medical emergency grievance, the prisoner is taken immediately to the triage station to be assessed by a registered nurse. Trial Tr. Vol. 6, 26:1–23; Def. Ex. 27.

131. Warden Aldridge also assisted in creating the emergency triage treatment room in the infirmary, which functions similar to an emergency room. Trial Tr. Vol. 6, 26:24–27:16.

132. Warden Aldridge has never received any resistance from superiors in response to any request he has made to address the terms of the Settlement Agreement. Trial Tr. Vol. 6, 29:13–30:1



FAP
FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 49 -

**H. FCCW CQI and ADA Policies**

133.    On June 3, 2016, VDOC's counsel provided Plaintiffs' counsel with VDOC's proposed CQI and ADA policies as required under the Settlement Agreement and advised that these "procedures will be implemented Department-wide but for FCCW, we will wait on implementation until after you have had an opportunity to review them and provide any input." See Def. Ex. 16.

134.    After receiving no response from Plaintiffs' counsel *for five months* on VDOC's proposed CQI policy, VDOC's counsel again emailed Plaintiffs' counsel on November 2, 2016, requesting a response from Plaintiffs on the proposed CQI policy. See Def. Ex. 16.

135.    Plaintiffs' counsel responded *for the first time* thirteen months later when the parties' counsel met on December 1, 2017, and Plaintiffs declared that "our medical expert was unable to provide meaningful feedback on VDOC's draft CQI because the draft was so deficient that it was difficult to know where to start." See Def. Ex. 17.

136.    Dr. Herrick, who participated in drafting VDOC's proposed FCCW CQI policy that was provided to Plaintiffs in June 2016 and has experience with many other CQI policies (including experience with Joint Commission and Medicare/Medicaid CQI processes) testified that the VDOC CQI policy was "definitely sufficient." Trial Tr., Vol. 5, 148:15–152:14.

137.    Despite receiving no response from Plaintiffs to the VDOC proposed CQI policy, FCCW implemented the CQI policy. Trial Tr., Vol. 5, 153:7–12. VDOC hired a CQI Nurse, Emmett Wilkinson in August 2017. FCCW is the only correctional facility within VDOC to have a dedicated CQI Nurse. Prior to Mr. Wilkinson's hiring in August 2017, Armor completed its own CQI processes. Trial Tr., Vol. 5, 154:1–14.

138.    The parties were unable to reach agreement on VDOC's proposed ADA policy for FCCW, and VDOC submitted its proposed ADA and CQI policies to Dr. Scharff for resolution pursuant to the Settlement Agreement, but the dispute still has not been resolved. Def. Ex. 40 (September 8, 2017 email from Diane Abato to Dr. Scharff).



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

## I. VDOC's Response to Specific Issues Raised by Plaintiffs' Experts

139.    Dr. Herrick testified that it is an acceptable practice in health care in Virginia for LPNs to pass medications to patients in the manner done at FCCW. While only pharmacists, medical doctors and registered nurses can dispense medications from a pharmacy, LPNs are permitted to give (or pass or administer) medications to patients Trial Tr., Vol. 5, 175:21–176:20. Dr. Scharff never reprimanded or criticized Defendants for this practice.

140.    Dr. Herrick explained that in Virginia, both local jails and VDOC facilities pre-pour medications whereby a patient's pills are placed in small envelopes prior to administration to the patient. Every year VDOC facilities, including FCCW, are surveyed and inspected by the Virginia Board of Pharmacy, and the Virginia Board of Pharmacy has never censured any VDOC facility for pre-pouring medications. Trial Tr., Vol. 5, 176:22–177:13. Dr. Scharff never reprimanded or criticized Defendants for this practice.

141.    Dr. Herrick explained that the administration of medication through the food port to prisoners in restrictive housing, particularly when the administration involves needles, is not an uncommon practice and is done for the safety of both the prisoner and the healthcare provider. Trial Tr., Vol. 5, 177:14–23. Defense expert Scott Dodrill also testified that the Federal Bureau of Prisons passes medications and conducts diabetic sticks through food ports. Trial Tr., Vol. 7, 77:4–24. Dr. Scharff never reprimanded or criticized Defendants for this practice.

142.    Dr. Herrick has instructed the staff at FCCW that there are no constraints on the purchase of new medical equipment needed for the care and treatment of the FCCW population. Dr. Herrick spoke personally with Dr. Denise Young, a University of Virginia affiliated OBGYN who treats patients at FCCW, about her need for medical equipment at FCCW. Dr. Young advised that the equipment at FCCW was satisfactory for her needs. Trial Tr., Vol. 5, 177:24–178:6. Dr. Young, who has treated FCCW patients weekly onsite at FCCW since FCCW first opened, testified that the FCCW/VDOC staff have been responsive to her requests and needs in caring for patients on site at FCCW. See Young Dep., 8:20–22, 23:16–24:9, May 22, 2018.

143.    Dr. Herrick explained that the reason FCCW does not store oxygen in the housing units is that OSHA standards do not permit the storage of oxygen in certain areas and around combustible materials. He further explained that under OSHA, oxygen must be stored in a fenced-in, locked area where the professionals can observe the level of oxygen in the tank. For this reason, Dr. Herrick explained, FCCW uses portable oxygen tanks



FAP
FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

which are available to the physicians and first responders as needed. Trial Tr., Vol. 5, 178:7–179:25.

144. Dr. Herrick explained FCCW's rationale for storing suction machines in the medical building and not the housing units. He explained that suction machines are used to remove phlegm and fluids from the throat during emergency procedures and can be dangerous to the patient if used by someone without proper training. FCCW uses portable suction machines that can be provided to an emergency response team. FCCW believes this is safer than storing suction machines on the housing units, which presents a greater potential risk of misuse. Trial Tr., Vol. 5, 181:1–18.

145. Dr. Greifinger criticized FCCW medical staff for not giving UVA's diagnosis of malingering as to Marie Johnson a second thought. Trial Tr., Vol. 1, 59:5-13. But Dr. Gable <u>was</u> suspicious of the malingering diagnosis and had Ms. Johnson seen by a psychiatrist and sent her to MCV for additional evaluation. Trial Tr., Vol. 6, 160:23–161:20.

146. Dr. Joshua and Dr. Gable disputed Dr. Greifinger's critiques of the medical care provided to specific offenders. <u>See</u> Trial Tr., Vol. 6, 146:21–147:3; <u>id.</u> at 149:11–16; <u>id.</u> at 154:11–23; <u>id.</u> at 155:8–14, 156:5–18; <u>id.</u> at 176:14–177:7; Trial Tr., Vol. 7, 105:9–18; <u>id.</u> at 106:21–109:4; <u>id.</u> at 109:5–111:1.

### J. VDOC's Strategies for Addressing the Unique Staffing Challenges at FCCW

#### i. Nurse and Physician/Provider Recruitment at FCCW

147. While nurse recruitment is challenging generally and in the correctional setting specifically, FCCW experienced unique challenges in nurse recruitment. Since February 2016, VDOC adopted multiple strategies to address the nurse recruitment challenges faced by correctional medicine generally and FCCW specifically, including offering shift bonuses, overtime bonuses, extending the new-hire orientation process, pairing new nurses with more experienced nurses, flexible scheduling, and adopting six-month nurse contracts. This process has resulted in doubling the number of LPNs and RNs at FCCW. Trial Tr., Vol. 5, 169:3–171:25.

148. Recruitment for all health care professionals at FCCW has been particularly challenging and difficult. As Deputy Director Scott testified, recruitment of staff in correctional settings is already generally challenging as it requires a unique personality willing to work behind locked doors and without access to personal cell phones. The inability to access personal cell phones for staff in correctional settings makes



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 52 -

recruitment of younger adults in the workforce more challenging. Trial Tr., Vol. 7, 142:11–143:9. Deputy Director Scott further explained that recruitment of health care professionals in corrections across the country is difficult, as most health care professionals do not consider correctional facilities to be the ideal working environment. Trial Tr., Vol. 7, 143:10–16.

149.    Dr. Scharff echoed that the hiring of correctional medical practitioners is difficult. Trial Tr., Vol. 5, 17:11–18:19

150.    FCCW faces unique challenges for hiring health care professionals, as FCCW must compete geographically with two area hospitals, and a multitude of physician office practices in the general geographical area. Trial Tr., Vol. 7, 143:17–22. In response to these recruitment and hiring challenges experienced at FCCW, VDOC has enhanced its compensation packages for FCCW health care providers to include the highest salary for a state compensation package for the medical director position and financial supplements to the nursing staff over and above the salaries of most other nurses in the Commonwealth. Trial Tr., Vol. 7, 144:13–21.

151.    Private medical contractors, including Armor, have advantages over the Commonwealth in hiring medical personnel, as the medical contractors are not bound by the state's salary requirements and can offer salaries in excess of the maximum state salary. Trial Tr., Vol. 5, 117:7–19. Because of Armor's ability to offer salaries in excess of the maximum state salary, Armor is better able to attract quality medical staff. Trial Tr., Vol. 5, 117:15–19. Private medical contractors, such as Armor, are also able to be more creative in compensation packages, offer higher salaries than the Commonwealth, and hire more quickly than the state. Private contractors are not constrained by the state approval process for filling positions and similar hiring restrictions imposed for state positions. Trial Tr., Vol. 7, 145:7–19.

152.    Nurse practitioners are particularly difficult to recruit and hire. When nurse practitioners resign from positions, they typically provide employers with significant notice of their departure. For these reasons, hiring nurse practitioners generally requires a longer timetable. Armor's pay scale was more generous than the state's pay scale for nurse practitioners, and Armor was able to ultimately recruit and hire nurse practitioners to conduct sick call. Trial Tr., Vol. 5, 128:1–130:25.

153.    The 2015 contract between VDOC and Armor provides for sixteen VDOC facilities, including FCCW. Trial Tr., Vol. 7, 127:17–128:5. In crafting the 2015 Armor contract, VDOC evaluated anticipated staffing needs in all the VDOC facilities, considered the differences in health care needs between men and women, evaluated anticipated ratios of



629.0303\KCL
4825-8414-4750 .v5

patients to caregivers, evaluated the various elements of correctional care that impacted staffing, considered national trends in health care, evaluated anticipated prescription costs for the patient population and the national trends in healthcare related to medications, and the Settlement Agreement. Trial Tr., Vol. 7,128:6–130:4.

154.    At the time the 2015 Armor contract went into effect, Deputy Director Scott's professional opinion was that the staffing component of the contract was adequate based upon VDOC's review of its own operations, the Settlement Agreement, and national trends in healthcare. Trial Tr., Vol. 7, 131:2–19. Deputy Director Scott further testified that she believed the 2015 Armor contract's staffing component was appropriate because "the contract is structured such that it is minimum staffing. This is what we minimally need to do to address health care needs. That does not mean that Armor could not bring on other people if they needed to do that, but it also did not mean that they could not come back to us at some point to say that it was inadequate and that they wanted more staff. That's the side part of a contract modification. They can come back and modify or request to modify the contract." Trial Tr., Vol. 7, 131:11–19.

155.    Armor has provided staff above and beyond that required by the contract. Trial Tr., Vol. 7, 8:3–21. Armor has not requested VDOC to increase payments under the contract for the additional staff provided by Armor because Armor valued the partnership with VDOC and wanted to succeed at FCCW. Trial Tr., Vol. 7, 8:24–9:2; 13:6–9, 13:10–17. Armor has never resisted providing additional staffing at FCCW. Trial Tr., Vol. 7, 14:15–20.

156.    Armor Senior Vice President James Hatcher testified that Armor experienced unique challenges to hiring nurses at FCCW. Nurse recruitment has been significantly more difficult than at the other thirteen facilities Armor manages. Trial Tr., Vol. 7, 22:4–15. To address these unique challenges at FCCW, Armor began offering financial incentives to nurses at FCCW in January 2016 and continuing to date. Trial Tr., Vol. 7, 23:11–14; 24:1–25:11; Def. Ex. 33. Armor also provides FCCW with a human resources director to assist with nurse recruitment and staffing, which is unique to FCCW. Trial Tr., Vol. 7, 25:24–26:20.



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

### ii. VDOC and Armor's Recruitment Efforts for an Onsite Medical Director

157.    Dr. Thomas Gable, D.O., became the full-time, acting FCCW Medical Director in July 2016. Trial Tr., Vol. 6, 140:3–10. Dr. Gable was onsite at FCCW every other week and full time during the summers and was in constant communication with FCCW when not

629.0303\KCL
4825-8414-4750 .v5

physically at FCCW. Trial Tr., Vol. 6, 140:11–141:25. He had electronic access to FCCW pharmaceutical records when not physically on site at FCCW. Trial Tr., Vol. 6, 142:1–4.

158.    James Hatcher, Armor's Senior Regional Vice President for Virginia, testified to Armor's extensive efforts to hire an onsite, full time Medical Director for FCCW, including recruiting, cold-calling, and writing to potential candidates. Trial Tr., Vol. 7, 6:18–20, 15:15–16:17. Armor engaged in a nationwide search for a Medical Director and advertised the position through MD, ZipRecruiter, Craigslist, CareerBuilder, Facebook, LinkedIn, the Virginia Council of Nurse Practitioners, <u>Family Physician</u> magazine, and Doximity. <u>Id.</u> at 16:7–17.

159.    Armor had contact with at least 20 potential physician applicants since early 2016, as further documented in Defendants Exhibit 32. Trial Tr., Vol. 7, 17:5–12. Armor successfully hired Dr. Timothy Kwiatkowski, M.D., who graduated in the top 10% of his class at the University of Virginia Medical School followed by a residency at the University of North Carolina-Chapel Hill, as a Medical Director in Training. Trial Tr., Vol. 7, 19:15–20:11.

160.    Armor was able to offer a salary to prospective medical directors far in excess of the state's salary cap. Trial Tr., Vol. 5, 168:19–25. The Commonwealth's annual salary cap for medical director was $255,000 while Armor was offering an annual salary of $350,000. Trial Tr., Vol. 5, 168:19–25. The salary Armor offered is twice that of the Governor of Virginia. <u>Id.</u> at 211:3–11.

161.    In early 2018, VDOC contacted the University of Virginia School of Medicine, Department of Medicine (UVA) to explore the possibility of UVA providing medical direction and direct clinical care to FCCW prisoners. <u>See</u> Pl. Ex. 35 (Exhibit to Scharff Report). In response to the initial discussions between VDOC and UVA, UVA issued a "Non-Binding Letter of Intent to Provide Medical Direction and Clinical Services to Virginia Department of Corrections for the Fluvanna Correctional Center for Women (FCCW)" on April 27, 2018. <u>Id.</u>

In this Letter of Intent, UVA stated that this "letter of intent shall serve as a basis of creating preliminary understanding between DoM and DoC, and shall serve as a good faith basis for negotiating an intergovernmental agency agreement that will contain binding terms and conditions agreed by the parties." This Letter of Intent further documented that the parties' representatives had previously met on two occasions to discuss the potential partnership. <u>Id.</u> On May 11, 2018, just two weeks after the Letter of Intent, the Chief Operating Officer for the University of Virginia School of Medicine, Department of Medicine, sent an email to Dr. Herrick terminating discussions with VDOC with regard to



FRITH
ANDERSON
+ PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 55 -

FCCW. In this letter, the UVA School of Medicine Chief Operating Officer stated in pertinent part:

> We have concluded, in spite of our best assessment for wanting to develop a comprehensive correctional medicine program, that the Department does not have the requisite knowledge, skills and capacity to take on the complexities of managing clinical care for women housed at Fluvanna. Unfortunately, we do not have the operational knowledge and workforce to meet programmatic requirements without jeopardy for our strategic clinical and educational programs. I'm sorry. Members of our department want the best outcomes for women at Fluvanna and we do not honestly believe that this is something we can take on institutionally and maintain our standards of excellence, and provide the level of service that is needed.

Id.

162.    In a testament to the complexities of providing medical care at FCCW, the flagship medical institution and medical school in the Commonwealth of Virginia declared in May 2018 that it does not possess the "knowledge, skills and capacity" to take on the "complexities of managing the clinical care" to the FCCW population.

163.    Following UVA's decision to terminate discussions with VDOC regarding FCCW, Dr. Herrick has continued discussions with individual University of Virginia-affiliated physicians who have continued to express an interest in continuing discussions about a possible future UVA-FCCW relationship, including additional options for telemedicine. Trial Tr., Vol. 5, 173:12–174:7.

164.    In May 2018, Dr. Thomas Gable, D.O., transitioned to being onsite at FCCW fulltime as Medical Director. Trial Tr., Vol. 5, 45:8–10.

### iii. Staffing Sick Call with LPNs

165.    In response to Dr. Scharff's criticism of LPNs conducting sick call at FCCW, Deputy Director Scott instructed Dr. Herrick to investigate Dr. Scharff's concern that LPNs were practicing outside of the scope of their license when conducting sick call. Trial Tr., Vol. 7, 156:23–157:1.

Dr. Herrick reviewed this issue and concluded that the FCCW LPNs had the requisite experience and expertise to conduct sick call, as LPNs are used in similar roles in Virginia assisted living facilities and Virginia jails. Dr. Herrick testified that the Virginia



FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\KCL
4825-8414-4750 .v5

Board of Nursing was aware that FCCW used LPNs for sick call and had approved this practice when done under the supervision of registered nurses. Trial Tr., Vol. 5, 128:1–130:25; Trial Tr., Vol. 7, 155:21–157:4.

Notwithstanding VDOC's respectful disagreement with Dr. Scharff on this issue, Deputy Director Scott and Dr. Herrick accepted Dr. Scharff's recommendation that sick call be conducted by nurse practitioners to improve the efficiency of the sick call process. Trial Tr., Vol. 7, 155:21–157:4. Deputy Director Scott testified: "We certainly did not want to get into any dispute with Dr. Scharff about that. If [Dr. Scharff's] position was that he wanted RNs doing it, then that's what we were directing our people to do." Trial Tr., Vol. 7, 156:23–157:1.

As Deputy Director Scott testified, "[w]henever there has been any disagreement with Dr. Scharff, [VDOC has] gone with Dr. Scharff's interpretation." Trial Tr., Vol. 7:10–20; see also Trial Tr., Vol. 5, 221:2–4, 226:10–228:22.



629.0303\KCL
4825-8414-4750 .v5

## II. DEFENDANTS' PROPOSED CONCLUSIONS OF LAW

**A.**     **Standard for Contempt**

    i.     The moving party bears the burden of establishing by clear and convincing evidence "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's 'favor'; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violation; and (4) that the movant suffered harm as a result." Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC, 887 F.3d 610, 617 (4th Cir. 2018) (quoting United States v. Ali, 874 F.3d 825, 831 (4th Cir. 2017)).

    ii.     If the complaining party satisfies this prima facie burden, the burden of production shifts to the alleged contemnor to show its substantial compliance with the Order, inability to comply, or good faith attempt to comply. United States v. Rylander, 460 U.S. 752, 757 (1983); Chesapeake Bank v. Berger, No. 4:14cv66, 2014 WL 5500872, 2014 U.S. Dist. LEXIS 153996, at *8 (E.D. Va. Oct. 30, 2014) (citing Consolidation Coal Co. v. Local 1702, United Mineworkers of Am., 683 F.2d 827, 832 (4th Cir. 1982)). Upon such a showing, the burden reverts back to the complainant who bears the ultimate burden of persuasion. Rylander, 460 U.S. at 757.

**B.**     **There is no valid decree over which the Court has jurisdiction to enforce.**

    i.     "A provision of a settlement agreement not specifically set forth in a judicial order is not enforceable by contempt," and "merely retaining jurisdiction to enforce the agreement is not enough to transform it into an order enforceable by contempt." Consumers Gas & Oil, Inc. v. Farmland Indus., Inc., 84 F.3d 367, 371 (10th Cir. 1996) (citing H.K. Porter Co. v. Nat'l Friction Prods., 568 F.2d 24 (7th Cir. 1977); D. Patrick v. Ford Motor Co., 8 F.3d 455, 461 (7th Cir. 1993))

    ii.     Rule 65 of the Federal Rules of Civil Procedure requires that an order granting injunctive relief must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).

    iii.     The specificity provisions of Rule 65(d) "are no mere technical requirements" and must be strictly construed. Pashby v. Delia, 709 F.3d 307, 331 (4th Cir. 2013).

    iv.     The Court's Final Order does not set forth the "act or acts restrained or required." The Final Order merely refers to a separate document in violation of Rule 65(d).



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 58 -

629.0303\KCL
4825-8414-4750 .v5

v.       As such, the Court lacks jurisdiction to hold Defendants in contempt.

**C.       The Settlement Agreement is not a consent decree.**
   i.       A consent decree is an "agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." <u>Rufo v. Inmates of Suffolk Cnty. Jail</u>, 502 U.S. 367, 379 (1992).
   ii.      The analysis of a class action settlement and a consent decree is similar, but not identical. <u>United States v. Miami</u>, 664 F.2d 435, 441 (5th Cir. Dec. 1981).
   iii.     The court must confirm that a consent decree "'is not illegal, a product of collusion, or against the public interest.'" <u>United States v. North Carolina</u>, 180 F.3d 574, 581 (4th Cir. 1999).
   iv.      The Court's Final Order approved the settlement for purposes of Rule 23 of the Federal Rules of Civil Procedure, not for purposes of approving a consent decree. ECF No. 261; ECF No. 262.
   v.       The Court did not sign the proposed Settlement Agreement.
   vi.      The Court did not enter an Order deeming the proposed Settlement Agreement as an Order of the Court.
   vii.     As such, Plaintiffs have failed to establish the existence of a valid decree.

**D.       The Settlement Agreement is not clear and unambiguous.**
   i.       To hold a party in civil contempt, the court must be able to point to an order "which 'sets forth in specific detail an unequivocal command' which a party has violated." <u>In re GMC</u>, 61 F.3d 256, 258 (4th Cir. 1995).
   ii.      The order allegedly violated must be "clear and unambiguous." <u>Project B.A.S.I.C. v. Kemp</u>, 947 F.2d 11, 16 (1st Cir. 1991).
   iii.     "[A]ny ambiguities or uncertainties in such a court order must be read in a light most favorable to the person charged with contempt." <u>Id.</u>
   iv.      The "Standards" in the Settlement Agreement are subjective, not objective.
   v.       The Settlement Agreement does not set forth a clear timeline for compliance.
   vi.      The term "implement" used in the Settlement Agreement is ambiguous.
   vii.     The Compliance Monitor believes FCCW has made substantial progress towards complying with the Settlement Agreement, and it may take four to five years to achieve full compliance with the Settlement Agreement's terms.
   viii.    Because the terms of the Settlement Agreement are unclear and ambiguous, the Court should defer to the Compliance Monitor's judgment and resolve any ambiguities or uncertainties in Defendants' favor.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 59 -

      ix.      Because ambiguities must be construed in Defendants' favor, the Settlement Agreement requires appropriate progress towards full satisfaction of the terms of the Settlement Agreement.

      x.      Plaintiffs have failed to establish by clear and convincing evidence that Defendants are not making appropriate progress towards full satisfaction of the terms of the Settlement Agreement.

**E.      Reasonable minds dispute whether the care Plaintiffs put at issue during trial amounted to medical malpractice, much less constitutionally inadequate care.**

      i.      Constitutionally inadequate care means a healthcare provider was so "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Sharpe v. S.C. Dep't of Corr.</u>, 621 F. App'x 732, 733 (4th Cir. 2015).

      ii.      Before Plaintiffs may seek specific performance of the Settlement Agreement or request contempt sanctions, there must exist a problem of constitutionally-deficient medical care at FCCW on a systemic level.

      iii.      The Settlement Agreement does not provide a cause of action for every individual instance of alleged deliberate indifference.

      iv.      Dr. Scharff never issued a notice to Defendants regarding any problem of constitutionally-deficient medical care as required by the Settlement Agreement.

      v.      The experts in this case—licensed medical providers—disagree as to whether the care provided to the offenders that Plaintiffs put at issue during the trial was even negligent, much less deliberate indifference, and disagree that those cases are indicative of constitutionally inadequate care on a systemic level.

      vi.      As such, there is not clear and convincing evidence of constitutionally inadequate care on a systemic level.

**F.      Plaintiffs have not put forth clear and convincing evidence to rebut the Defendants' evidence of their substantial compliance and good faith attempt to comply with the Settlement Agreement.**

      i.      Defendants' substantial compliance, good faith attempt to comply, or inability to comply are available defenses to an Order to show cause. <u>Chesapeake Bank v. Berger</u>, 2014 U.S. Dist. LEXIS 153996, at *8 (E.D. Va. Oct. 30, 2014)(citing <u>Consolidation Coal Co. v. Local 1702, United Mineworkers of Am.</u>, 683 F.2d 827, 832 (4th Cir. 1982)); <u>Dunkin' Donuts, Inc. v. Three Rivers Entm't & Travel</u>, 42 F. App'x 573, (4th Cir. 2002); <u>United States v. Darwin Constr. Co.</u>, 873 F.2d 750, (4th Cir. 1989).



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 60 -

ii.     'Substantial compliance is found where all reasonable steps have been taken to ensure compliance: inadvertent omissions are excused only if such steps were taken.'" <u>United States v. Darwin Constr. Co.</u>, 873 F.2d 750, 755 (4th Cir. 1989) (quoting <u>United States v. Darwin Constr. Co.</u>, 680 F. Supp. 739, 740 (D. Md. 1988)).

iii.    The good faith analysis encompasses a "close inquiry into the defendants['] actions, [but] it is not the court's role to examine every tactical decision made by the defendant[s] or substitute its judgment with the benefit of 20/20 hindsight. <u>NAACP, Jefferson Cnty. Branch v. Brock</u>, 619 F. Supp. 846, 851 (D.D.C. 1985).

iv.     The Compliance Monitor characterized Defendants' progress as "substantial" with respect to the requirements of the Settlement Agreement.

v.      Defendants have taken substantial steps towards complying with the Settlement Agreement including, but not limited to, increased healthcare programming, increased staffing, and instituting positive cultural change in the facility.

**G.      Defendants have demonstrated an inability to comply.**

i.      The inability to comply defense requires evidence of a "present inability to comply with the" Court's Order. <u>SEC v. SBM Inv. Certificates, Inc.</u>, No. 06-0866, 2012 U.S. Dist. LEXIS 28175, at *36 (D. Md. Mar. 2, 2012) (citing <u>United States v. Rylander</u>, 460 U.S. 752, 757 (1983)).

ii.     Defendants relied on Dr. Scharff's interpretation of the timeline for achieving full compliance of the Settlement Agreement. If the Court concludes that Dr. Scharff misinterpreted the timeline for compliance, then Defendants relied on the Court's Compliance Monitor to their detriment.

iii.    Defendants recruited twenty individuals for the medical director position and offered an outrageous salary but were unable to hire anyone for the position.

iv.     Nursing staff shortages are reflective of a national trend coupled with the fact that most nurses do not want to work in correctional healthcare.

v.      Plaintiffs' failed to communicate with Defendants regarding Defendants' proposed ADA and CQI policies.

Respectfully Submitted,

HAROLD W. CLARKE, A. DAVID ROBINSON, STEPHEN HERRICK, AND ERIC ALDRIDGE



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 61 -

/s/ _____

Katherine C. Londos (VSB #: 36848)
John C. Johnson (VSB #: 33133)
Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax:    540/772-9167
Email: klondos@faplawfirm.com
        jjohnson@faplawfirm.com
        nschnetzler@faplawfirm.com

Edward J. McNelis, III
Elizabeth M. Muldowney
Ruth T. Griggs
Sands Anderson PC
1111 East Main Street, Suite 2400
Richmond, VA 23218-1998
Phone: 804-648-1636
Fax:    804-783-7291
Email: emcnelis@sandsanderson.com
        emuldowney@sandsanderson.com
        rgriggs@sandsanderson.com

Diane M. Abato
SAAG/Chief
Office of the Attorney General
Criminal Justice and Public Safety Division
202 North 9th Street
Richmond, VA 23219
Phone: 804-786-8191
Fax:    804-786-4239
Email: dabato@oag.state.va.us

*Counsel for Howard W. Clarke, A. David*
*Robinson, Stephen Herrick, and Eric Aldridge*



629.0303\KCL
4825-8414-4750 .v5

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2018 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all counsel of record.

/s/ Nathan H. Schnetzler
Of Counsel



629.0303\KCL
4825-8414-4750 .v5