CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

01/02/2019

JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CYNTHIA B. SCOTT, *ET AL.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>HAROLD W. CLARKE, *ET AL.*,<br><br>*Defendants.* | CASE NO. 3:12-cv-00036<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW<br><br>JUDGE NORMAN K. MOON |

This is an Eighth Amendment class action concerning the long-term failure to provide adequate medical care to inmates at the Fluvanna (Va.) Correctional Center for Women (FCCW). FCCW is Virginia's primary women's medical prison. The present defendants are officials employed by the Virginia Department of Corrections (VDOC).[1]

After years of litigation, the parties reached a detailed settlement agreement ("Settlement Agreement" or "the agreement") to provide for constitutionally adequate medical care at FCCW. On the parties' request, the Court preliminarily approved the Settlement Agreement. In February 2016, the Court entered a final judgment order that conclusively approved the agreement, declared it operative, and retained jurisdiction to enforce it. The agreement provides similarly.

On September 5, 2017, Plaintiffs moved to hold Defendants in contempt. The Court permitted extensive discovery. A one-week trial was held in June 2018. The parties provided substantial post-trial argument, as well as proposed findings of fact and conclusions of law. The Court finds that, in some respects, Defendants have breached the Settlement Agreement. The Court will therefore enforce its terms, although not through contempt.

---

[1] They are VDOC Director Harold W. Clarke, VDOC Chief of Corrections Operations A. David Robinson, VDOC Director of Health Services Stephen Herrick, and FCCW Warden Eric Aldridge. (*See* dkt. 478). Defendant Dr. Paul C. Ohai was the FCCW medical director, and the position is now held by Dr. Thomas Gable. Plaintiffs are ordered to clarify, within 14 days, whether they believe Ohai remains a proper defendant.

1

## STANDARDS OF REVIEW

To prove civil contempt, a party must show: (1) a valid decree exists that the alleged contemnor has knowledge of; (2) the decree was in the movant's favor; (3) the alleged contemnor violated the decree and knew it was doing so, and; (4) the movant was harmed as a result. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000).

District courts "have inherent authority, deriving from their equity power, to enforce settlement agreements." *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir. 2002). To enforce an agreement, a court must first conclude "that a complete agreement has been reached and determine[] the terms and conditions of that agreement." *Id*. If the court finds those preconditions satisfied, it may reach the merits and "draw[] upon standard contract principles" in enforcing the agreement. *Id*. at 540–41; *Bradley v. Am. Household, Inc.*, 378 F.3d 373, 380 (4th Cir. 2004).

## PROCEDURAL HISTORY

Plaintiffs filed the underlying lawsuit in 2012. (Dkt. 1). Various portions of their complaint survived dispositive motion practice. (*See generally* dkts. 33, 34, 84, 85, 201, 202). The Court also certified a class of inmates seeking medical treatment at FCCW. (Dkts. 188, 189). After two years of litigation and days before a scheduled bench trial, the parties reached a settlement in principle. (Dkts. 203, 204). They spent the next ten months hashing out the details.

On September 15, 2015, the parties jointly filed what the docket reflects as a "consent motion to approve consent judgment." (Dkt. 220). The substance of the filing, however, referred to "preliminary approval of the settlement." (*Id*. at 1). Attached to the brief in support of that motion was Exhibit 1, filed as a 27-page "settlement agreement," (dkt. 221-1 at 1, 3), along with appendices. In a section entitled "**ENFORCEMENT**," the Settlement Agreement provided that the Court "shall retain jurisdiction over the Parties for the purposes of ensuring the

2

implementation of this Settlement Agreement and shall preside over such further proceedings as may be necessary or appropriate to enforce its terms and conditions." (*Id*. at 23).

Also attached to the brief was a proposed consent order granting preliminary approval of the settlement. (Dkt. 221-3). The Court entered the order in substantially similar form to the proposal. (Dkt. 222). The preliminary approval order provided, among other things, that the Court "shall have continuing jurisdiction, during the term of this Settlement Agreement, to enforce the Agreement's terms, and to enforce the Final Judgment." (*Id*. at 5).

After notice to the class, the Court held a fairness hearing where it received testimony about the propriety of the proposed Settlement Agreement, heard comments from objectors, and entertained oral argument. (Dkt. 242). Plaintiffs subsequently filed—with Defendants' approval—proposed findings of fact and conclusions of law urging final approval of the settlement. (Dkts. 255, 259). The parties also submitted a stipulated proposed final order that would (1) approve the Settlement Agreement, (2) declare the Settlement Agreement implemented as of the date of the final order, and (3) retain jurisdiction with the Court to ensure implementation of the Settlement Agreement and the Court's power to preside over "such further proceedings as may be necessary or appropriate to enforce its terms and conditions." (Dkt. 260).

On February 5, 2016, the Court entered findings of fact and conclusions of law. The Court reasoned that the Settlement Agreement was proper under both Rule 23 and the Prison Litigation Reform Act, and it found that the objectors' concerns did not counsel against final approval of the Settlement Agreement. (Dkt. 261 at 25–30). The Court, in summarizing the Settlement Agreement, referenced Plaintiffs' ability to "enforce the settlement, seek contempt sanctions, or both." (*Id*. at 7).

3

That same day, the Court entered its final judgment order. (Dkt. 262). The order granted final approval of the Settlement Agreement. (*Id*. at 1–2). The order further stated that, "[a]s contemplated by the Settlement Agreement, the Court shall retain jurisdiction for purpose of ensuring implementation of the Settlement Agreement and shall preside over such further proceedings as may be necessary or appropriate to enforce its terms and conditions." (*Id*. at 2). No party appealed.

Just over a year-and-a-half later, Plaintiffs filed their motion to show cause why Defendants should not be held in contempt for failing to abide by the terms of the Settlement Agreement—what they called the Court's "consent judgment" of February 5, 2016. (Dkt. 265). The Court set the matter for a week-long bench trial in June 2018. (Dkt. 292). In December 2017, after the parties briefed the motion, the Court adopted the parties' joint request for a discovery plan, which set the discovery deadline at May 1, 2018. (Dkts. 303, 304).

For the next several months, the volume and intensity of discovery rivaled that of the hardest-fought merits litigation. The presiding magistrate judge held several conferences and hearings to resolve various motions and discovery matters, and he provided a few modest accommodations for the May 1st discovery deadline to allow the parties to complete discrete discovery tasks. Meanwhile, the Court, upon inquiry by the parties, indicated it would rule on the motion to show cause after receiving Plaintiffs' *prima facie* evidence at the June trial. (Dkt. 312).

As the trial date approached, the parties submitted numerous *Daubert* motions, motions *in limine*, and trial briefs. (*E.g.*, dkts. 395, 397, 398, 401, 403, 411, 412, 414, 416). Defendants

even filed a motion for summary judgment, less than two weeks before the trial date. (Dkts. 417, 453).[2]

Finally, trial arrived. At the close of Plaintiffs' evidence, the Court granted the motion to show cause, concluding that "the *prima facie* case has been made"—"there's certainly a *prima facia* case of at least to some extent that the settlement has not been carried out." (Dkt. 495; dkt. 521 at 69). At the time, Defendants did not argue that contempt was improper for lack of an operative injunctive order to enforce. (*See* dkt. 521 at 70–77).[3]

## FINDINGS OF FACT[4]

### Internal Assessments about Compliance at FCCW

1. In the weeks and months after final approval of the Settlement Agreement, Defendants, their employees, and others associated with FCCW doubted that the terms of the Settlement Agreement were being, or would be, met. (*See infra* FF ¶¶ 2–11).[5]

2. When he joined FCCW in July 2016, Dr. Thomas Gable, the then-acting medical director, realized that the level of medical staffing at FCCW was inadequate, and that staffing

---

[2]     The Court denied that motion on multiple grounds. (Dkt. 460).

[3]     The Settlement Agreement, in substance, refers to a singular "Defendant," which it defines as the Virginia Department of Corrections, acting through the official-capacity individual defendants. (Dkt. 221-1 at 4). For consistency and simplicity, the Court simply refers to "Defendants" throughout this opinion.

[4]     The "default civil burden, preponderance of the evidence, is the appropriate standard for performance of a Settlement Agreement." *Bile v. RREMC, LLC*, No. 3:15CV051, 2016 WL 4487864, at *5 (E.D. Va. Aug. 24, 2016); *e.g.*, *Jacob's Limousine Transportation, Inc. v. City of Newark*, 688 F. App'x 150, 151, 153 n.2 (3d Cir. 2017). The record in this case would support breach even under a clear and convincing standard used by some courts. *See*, *e.g.*, *Blackstone v. Brink*, 63 F. Supp. 3d 68, 76 (D.D.C. 2014).

[5]     In this opinion, "FF" means the Court's findings of fact. "PTX" means Plaintiff's trial exhibit. "DTX" means Defendants' trial exhibit. "Dkt." means the corresponding docket entry. Commonly, citations to docket entries are references to the trial transcript. "COL" means the Court's conclusions of law.

needs exceeded what VDOC (and its contractor that operated FCCW) previously thought was necessary. (Dkt. 523 at 188, 191–93).

3.      Dr. Gable informed the contractor's CEO, regional vice president, and chief financial officer of his opinion. (Dkt. 523 at 193).

4.      In fact, medical personnel at FCCW had historically been understaffed dating back to at least 2015. (Dkt. 522 at 199–200, 201–02).

5.      On February 10, 2016, VDOC's deputy director Cookie Scott convened a meeting with the "top people" at FCCW, as well as medical personnel from other VDOC facilities. The attendees shared 13 "problem" areas where they believed the contractor was underperforming— *e.g.*, sick call, medication errors, mismanagement of patients. (Dkt. 524 at 185–87).

6.      At a similar session of FCCW's "top people" on February 23, 2016, deputy director Scott was informed that the contractor at FCCW was "sinking fast." (Dkt. 524 at 189).

7.      In the spring of 2016, VDOC officials—including a registered nurse who oversaw medical care at another facility—visited FCCW. The nurse concluded that sick calls were not being responded to immediately. (Dkt. 523 at 56, 67).

8.      As VDOC Health Services Director Dr. Stephen Herrick admitted, from May 2016 to the summer of 2017, FCCW had "many problems" with noncompliance with the Settlement Agreement. (Dkt. 522 at 188–89).[6]

9.      On June 29, 2017—sixteen months after the Court approved the Settlement Agreement—FCCW's warden wrote to VDOC leadership: "We have tried to address the

---

[6]      Plaintiffs moved to strike a different part of Dr. Herrick's testimony. (Dkt. 498). They say portions of Herrick's testimony were expert testimony, but he had not been disclosed as an expert witness and the testimony was not permissible under Fed. R. Evid. 701. Because the Court does not rely upon or adopt Herrick's testimony on the points at issue, (dkt. 522 at 175–76, 177–78, 181), the motion to strike will simply be denied as moot.

6

agreement with existing staff and I believe we will eventually fail . . . .  We do not have the resources to adequately address this settlement agreement.  As well at the institutional level, we don't have the expertise in some of these areas the settlement agreement demands.  Without such resources and expertise and with the detail of obligations in the settlement agreement, we are destined to fail at adequately addressing the same."  (PTX32 at RFP400000585).

10.    The warden continued:  "We do not know what the answers are.  Sometimes when you are in the middle of a crisis, you do not know what you need to get out of it. . . .  Even though we have seen some positive trends, we cannot continue down this path and expect success."  (PTX32 at RFP400000586).

11.    VDOC's annual report of FCCW for the period of July 2016 to July 2017 found that:  staffing shortages remained; timely emergency care transportation was provided barely half of the time; medical staff sometimes failed to provide vaccines or communicate test results showing the presence of disease; and several problems with the grievance system existed.  (PTX72 at 2, 16–17, 22–23, 33–34).

12.    During various monthly reports for 2017, the contract monitor at FCCW found that the compliance rate for various medical tasks was below fifty percent.  These areas included timely completion of referrals (42%), proper patient counseling on the effects of refusing medications (28% and 7%), offering hepatitis vaccines to at-risk patients (0%), HIV counseling (11%), properly charting and documenting emergency issues (50%), timely emergency medical transportation (25%), and the documented return of un-administered medicine (20%).  (PTX70 at RFP400000376, RFP100000049, RFP100000055, RFP3600017432–33).

13.    Neither FCCW's medical director, nor the VDOC official charged with monitoring compliance with the Settlement Agreement, received training on the Settlement Agreement.  (Dkt. 523 at 202; PTX203, Ex. 2 (Whitehead) at 162–63; PTX203 (Herrick) at 70).

14.    FCCW does not provide staff with written training materials on the Settlement Agreement.  (PTX203, Ex. 17 (Aldridge) at 125–26).

### Andrea Nichols's Colonoscopy

15.    Andrea Nichols arrived as a prisoner at FCCW over thirteen years ago, at the age of 46.  (Dkt. 520 at 107).

16.    She began having abdominal cramps in late 2014 or early 2015.  (Dkt. 520 at 107–08).  A nurse informed her she had hemorrhoids, but the cramps did not cease.  (*Id*. at 108).

17.    Nichols began to see blood in her stool and noticed gradual weight loss.  (Dkt. 520 at 109).  A FCCW provider recommended a colonoscopy in both February and April 2015.  (*Id*. at 109).

18.    In July 2015, Nichols was transported to the University of Virginia's medical center for a "digestive health" examination.  (Dkt. 520 at 110).

19.    Nichols was eventually prepped at FCCW in August 2015 for her colonoscopy.  She received a prep solution called GoLYTELY.  (Dkt. 520 at 110–11).  The prep solution caused her to vomit and dry heave.  (*Id*. at 111).  Because she could not drink the prep solution, UVA could not conduct her colonoscopy.  (*Id*.).

20.    During the rest of 2015, FCCW did not attempt to send Nichols for another colonoscopy.  (Dkt. 520 at 111–12).

21.    Nichols's cramping, bleeding, and weight loss continued.  (Dkt. 520 at 112).

8

22.     After filing several grievances, Nichols placed a sick call in February 2017.  (Dkt. 520 at 113–14).

23.     At that February 2017 sick visit, the colonoscopy—originally ordered in February 2015 and unsuccessfully attempted in August 2015—was rescheduled.  (Dkt. 520 at 114–15).

24.     The second colonoscopy was attempted in April 2017.  FCCW provided Nichols with the same GoLYTELY prep solution that made her sick in August 2015.  (Dkt. 520 at 115).

25.     Nichols again threw up the prep solution.  She informed the nurse what had happened and asked for a different prep solution.  (Dkt. 520 at 115).  She had to sign a "refusal" form because she could not keep the prep solution down.  (*Id*. at 115–16).

26.     FCCW rescheduled the colonoscopy for seven months later, in November 2017.  (Dkt. 520 at 116).  In the meantime, no one approached Nichols about her issues with GoLYTELY.  (*Id*.).

27.     Nichols's weight loss continued.  (Dkt. 520 at 116).  She became afraid because her weight continued to drop and she "didn't know what was going on."  (*Id*.).

28.     For the November 2017 colonoscopy, FCCW gave Nichols the GoLYTELY prep solution for a third time.  (Dkt. 520 at 116).

29.     Nichols again could not tolerate the GoLYTELY prep:  She began throwing it up and dry heaving.  (Dkt. 520 at 116–17).  Once again, UVA could not complete the colonoscopy because of the lack of proper prep.  (*Id*. at 117).  UVA recommended using Miralax and Gatorade as a different prep.  (*Id*. at 117; dkt. 527 at 8).

30.     FCCW rescheduled the colonoscopy for January 2018.  (Dkt. 520 at 117).  The appointment was canceled because Nichols was not given any prep solution at all.  (*Id*.).  The colonoscopy was rescheduled again.  (*Id*.).

31.     By March 2018, Nichols began having "a lot of bleeding"—"every time" she had a bowel movement, "the toilet would fill with blood."  (Dkt. 520 at 118).

32.     She showed the blood to prison staff, who took her to the infirmary.  (Dkt. 520 at 118).  Nursing staff asked her to use the bathroom again, and upon doing so there was not as much blood.  (*Id.*).  Medical personnel thus sent her back to her building because "it was not an emergency."  (*Id.*).

33.     By this time, Nichols was "scared," "losing a lot of blood," and felt "helpless."  (Dkt. 520 at 119).

34.     Later in March 2018, FCCW sent Nichols for her colonoscopy.  This time FCCW staff provided Miralax as a prep solution, which Nichols was able to swallow.  (Dkt. 520 at 119).

35.     The colonoscopy was successfully completed.  (Dkt. 520 at 119).

36.     The results showed Nichols had rectal cancer.  (Dkt. 520 at 119).

37.     The cancer was stage 4, *i.e.*, metastatic.  (Dkt. 520 at 119–20).

38.     The cancer had spread to her liver.  (Dkt. 520 at 120).

39.     Nichols was "shocked" and "devastated."  (Dkt. 520 at 120).

40.     As of trial, Nichols was receiving chemotherapy.  (Dkt. 520 at 120).

41.     She is 59 years old.  (Dkt. 520 at 120).

42.     Her release date is September 2020.  (Dkt. 520 at 120).

43.     Nichols appeared gaunt and ashen at trial.  (Observation of the Court).[7]

---

[7]     At trial, Defendants attempted to undermine Nichols's credibility and account of her ordeal by pointing to medical chart notations suggesting she had refused to take the prep solution.  The Court credits Nichols.  First, the Court observed Nichols's testimony and found her credible, and she denied having refused or failed to try to drink the prep.  (Dkt. 520 at 115).  Second, to the extent the charts are accurate, there is nothing inconsistent about characterizing what happened to her as refusing to take the prep solution, in that her body would not tolerate it.  (*See* dkt. 520 at 115–16).

10

**Deanna Niece**

44.     In the morning of July 25, 2017, FCCW prisoner Deanna Niece began having labored breathing and feeling fatigued while outdoors.  (Dkt. 521 at 25).  Niece felt like she would pass out, and she reported that her legs felt like rubber.  (*Id.*; PTX56 at SDT00009924).  A nurse came to her aid with a wheelchair and took her inside.  (Dkt. 521 at 25).

45.     That afternoon, Niece appeared "very pale, tired, [and] worn out" as she sat in a wheelchair.  (Dkt. 521 at 26).  At the evening pill line, medical staff prevented Niece from continuing to use a wheelchair, over her protestations.  (*Id.* at 26–27).

46.     Specifically, "at the continued persistence of Ms. Niece," a nurse "relayed Ms. Niece's wheelchair request to Dr. Kamal," who "felt the patient did not meet the medical necessity requirement for a wheelchair."  (PTX56 at SDT00009924).  Dr. Kamal did not see Niece before making this determination.  (PTX56 at SDT00009925).

47.     At night in her cell, Niece still looked "very pale, very tired-looking," and was "having a hard time breathing."  (Dkt. 521 at 27).

48.     Niece's cellmate awoke that night "to a very strange gurgling throaty sound coming from [Niece's] bed."  (Dkt. 521 at 28).  Niece did not respond to her cellmate's calls.  Niece was "slumped back in the corner of the bunk and had a grayish color to her skin.  And she had blood running out of her mouth."  (Dkt. 521 at 28).

49.     The cellmate "immediately jumped out of [her] bed and went and pushed the call button in the room to get ahold of the officers."  (Dkt. 521 at 28).  She also ran to another room and called for help.  (*Id.*).  An officer arrived and radioed that there was a medical emergency.  (*Id.* at 28–29).

50.     A "few minutes later, two nurses came casually walking in" to Niece's cell.  (Dkt. 521 at 29).

51.     The nurses brought no medical equipment with them.  (Dkt. 521 at 29).

52.     The nurses observed the severity of Niece's condition and needed a stretcher, but the only one available was "all the way across the grounds to building eight."  (Dkt. 521 at 29).  A correctional officer ran to get the stretcher.  (*Id*.).  Although the officer called the medical building for assistance, the nurses did not, and there was no response to the call.  (*Id*. at 29–30).

53.     The nurses attempted to lift Niece when the stretcher arrived, but they could not.  (Dkt. 521 at 30).

54.     Blood continued to run from Niece's mouth.  (Dkt. 521 at 30).

55.     An officer then left to find oxygen, and others performed CPR.  (Dkt. 521 at 30).

56.     Eventually EMTs arrived and tried to save Niece's life.  (Dkt. 521 at 31).

57.     Niece tried to speak but her words were inaudible.  (Dkt. 521 at 31).

58.     Then Niece fell silent.  (Dkt. 521 at 31).

59.     Then the resuscitation machines fell silent.  (Dkt. 521 at 21).

60.     Niece died in the floor of her prison cell, on July 25, 2017.  (Dkt. 521 at 25–26; PTX56 at SDT00009925).

61.     Niece's release date from prison was less than three weeks away:  August 12, 2017.  (Dkt. 521 at 33–34; *see* PTX56 at SDT00009925).

62.     As the incident report and death review stated, neither a suction machine nor oxygen nor a stretcher/backboard were readily available in the unit housing Niece.  (PTX56 at SDT00009925–26; *see* dkt. 522 at 57–58).

12

63.     The court-approved compliance monitor, Dr. Nicholas Scharff, found Niece's death to be "remarkable" because she collapsed in the yard the morning of her death and was sent back to her housing unit without seeing a doctor.  (Dkt. 522 at 58–59).  Indeed, "there was no detailed history or examination" of Niece at all.  (*Id.*).  Instead, Niece was evaluated in passing by a LPN.  (*Id.* at 59).

64.     Niece's death was a symptom of systemic issues with medical care at FCCW— particularly, the failure of an appropriate medical professional to evaluate her and the unavailability of medical equipment.  (Dkt. 522 at 59; dkt. 520 at 55–56).[8]

**Carolyn Liberato**

65.     Carolyn Liberato died at FCCW on July 21, 2017, four days before Deanna Niece.  (PTX56 at SDT00009916–20).

66.     The death report written by FCCW's acting medical director concluded that—as came to be the case with Niece four days later—"oxygen was not initially available in the [h]ousing [u]nit."  (PTX56 at SDT00009920).

67.     Between December 2016 and March 2017, Liberato lost 20 pounds.  (PTX56 at SDT00009918).

68.     On June 25, 2017, Liberato felt dizzy, had left-side chest pain, and broke into a sweat.  (PTX56 at SDT00009919).

69.     FCCW's acting medical director concluded that a "medical provider should have been contacted and an EKG performed" in response to those symptoms.  (PTX56 at SDT00009920).

---

[8]     FCCW's mortality report listed "cardiopulmonary failure" with "possible pulmonary embolus, aspiration or myocardial infarction" as Niece's cause of death.  (PTX56 at SDT0000923).

13

70. Two days later, on June 27, 2017, medical charts revealed that Liberato had gained fourteen pounds in less than two weeks. (PTX56 at SDT00009918).

71. The rapid weight gain "was not addressed" and went unnoticed by medical providers. (PTX56 at SDT00009918; dkt. 520 at 52).

72. On the day of her death a month later, Liberato became short of breath and had chest pains. She developed irregular breathing and then stopped breathing altogether. CPR and other resuscitative techniques were unsuccessful. (PTX56 at SDT00009918).[9]

73. Liberato's death was indicative of systemic problems at FCCW, such as deficient emergency medical care. (Dkt. 520 at 54).

**Marie Johnson**

74. Marie Johnson, formerly an inmate at FCCW, suffered from chest and abdominal pain in 2017. (PTX57 at PL00045447–49).

75. On March 15, 2017, Johnson rated her abdominal pain as 10 out of 10. Her pulse was 138. No EKG was performed and nursing staff did not notify a medical provider of Johnson's issues. (PTX57 at PL00045447, PL00045454).

76. Johnson lost 50 pounds between February and August 2017. (PTX57 at PL00045447–49; *see id*. at PL00045454).

77. The FFCW's medical director later found that FCCW's "medical providers did not document any notes regarding her weight loss." (PTX57 at PL00045454; *see* dkt. 523 at 164 (Dr. Gable: "The documentation on that could have been much better.")).

---

[9]     FCCW's mortality report listed "cardiopulmonary insufficiency possibly secondary to myocardial infarction" as Liberato's cause of death. (PTX56 at SDT00009917; *see* dkt. 520 at 52 (testimony of Plaintiffs' expert that Liberato had "longstanding cardiovascular disease" and that "her chronic congestive heart failure got substantially worse")).

14

78. FCCW's medical director further noted that Johnson "demonstrated an abnormal pulse rate on multiple visits that was not addressed by nursing staff or the medical providers in the progress notes" of her file. (PTX57 at PL00045454).

79. On August 2, 2017, Johnson was transported to an outside hospital in Richmond, Virginia for paralytic symptoms. (PTX57 at PL00045453).

80. Johnson died at the hospital on August 21, 2017. (PTX57 at PL00045453).

81. At the time of her death, Johnson had a neurological auto-immune disorder, internal bleeding, and sepsis. (PTX57 at PL00045453).

82. FCCW's medical director concluded that "the signs and symptoms were there" to diagnose the auto-immune disorder, "and we missed an opportunity to make the diagnosis earlier." (PTX57 at 00045454).

**Arlene Duke**

83. Inmate Arlene Duke reported lower back pain, nausea, and dry heaves during dialysis on September 21, 2016. (PTX51 at RFP3200000036).

84. The next day, September 22, a nurse observed Duke in bed "complaining of nausea, vomiting, and shortness of breath." (*Id*.). Duke stated "it feels like it did last year when my lung collapsed." (*Id*.).

85. The day after that, at 6:00am on September 23, Duke again "complained of increasing chest pain and rated her pain as 8 out of 10." (PTX51 at RFP3200000037). A doctor ordered Tylenol for her. (*Id*.). At 9:30am, Duke still complained her chest hurt. (*Id*.). A nurse observed wheezing in Duke's lungs. (*Id*.). Nonetheless, Duke was permitted to leave the infirmary without seeing a doctor. (*Id*.).

15

86. Exactly a week later, on September 30, 2016, Duke complained of back pain during her dialysis. (PTX51 at RFP3200000036). A nurse left Duke after checking her vital signs, and returned to find her unresponsive. (*Id.*). Attempts to resuscitate Duke failed. (*Id.*). FCCW's medical director later opined that "everything that could be done was done during the" attempt to resuscitate Duke. (*Id.*).

87. In the mortality review of Duke's case, however, there was no analysis or discussion of whether FCCW's actions in response to Duke's complaints leading up to her death were sufficient: There was "not really self-critical analysis." (*Id.* at RFP3200000037; dkt. 520 at 49–50).

88. Multiple mortality reviews of inmates at FCCW conducted by FCCW or VDOC doctors do not contain "self-critical" analysis or commentary. (Dkt. 522 at 62; PTX203 (Amonette) at 55).

### Toni Hartlove's Medication

89. Toni Hartlove is a prisoner at FCCW. She takes medicines known as Phenobarbital and Dilantin to control her seizure disorders. (Dkt. 527 at 31). She has been taking these medicines since 1969. (*Id.*).

90. In November 2016, Hartlove began to feel disoriented and inebriated, and her speech slurred. She reported her symptoms to FCCW medical personnel. (Dkt. 527 at 36–37).

91. She "wasn't treated at all" for them. (Dkt. 527 at 37). Later, though, Hartlove blacked out, fell, and was taken to the infirmary. (*Id.* at 37). She was then transported to the UVA emergency room, where she stayed for five days. (*Id.*).

92. Hartlove suffered from Dilantin toxicity. Her Dilantin levels were well over twice what they should have been. (Dkt. 527 at 38). UVA refused to return her to FCCW until her levels returned to normal. (*Id.*).

93. On April 17, 2017, a FCCW nurse gave Hartlove three times the amount of Phenobarbital that she should have had. (Dkt. 527 at 33–34). Hartlove had to be monitored in the infirmary for six hours. (*Id.* at 35).

94. The next day, Hartlove did not receive her Phenobarbital. (Dkt. 527 at 36).

**Staffing Levels at FCCW**

95. Staffing levels of nurses and other medical professionals were "problematic" in early 2016. (PTX34 (Report of 3/13/2018) at 16).

96. At a February 23, 2016 meeting, VDOC officials shared their view that FCCW suffered from a lack of medical leadership. (Dkt. 523 at 70–72). There was no accountability for staff and no one supervising nurses. (*Id.* at 72).

97. FCCW had no fulltime on-site medical director from July 2016 to April 2018. (Dkt. 523 at 139–40, 188–89; dkt. 522 at 44–45).

98. As of April 2017, "[s]taffing ha[d] improved but remain[ed] an ongoing concern with considerable turnover." (PTX34 (Report of 6/25/2017) at 1).

99. In the summer of 2017, staffing suffered even more due to resignations. (Dkt. 524 at 51). The situation deteriorated to such a degree that FCCW's director of nursing switched to night shifts and began working 80-90 hour weeks. (*Id.* at 29, 51–52).

100. As of November 2017, medical personnel staffing levels remained deficient at FCCW. (PTX34 (Report of 1/9/2018) at 1; *id.* at 22 ("[T]he continuing, worsening shortage of nursing staff and the failure to recruit a full-time on-site medical director seem to me to be fatal

failures which have reached critical proportions."); *see id.* 23 ("[T]he absence of adequate clinical leadership and the shortage of nursing personnel exacerbate each other, producing clinical and procedural error and continuing to risk patient injury, including serious injury.")).

101. As the compliance monitor observed, the medical director position had by then "been vacant for over a year and a half," and the "absence of a full-time, on-site medical director is currently the greatest barrier to FCCW's meeting its obligations under the Settlement Agreement since there is no physician on-site to provide and direct adequate supervision of providers or training of nurses nor to explain and represent medical necessities to administration." (PTX34 (Report of 1/9/2018) at 3; *see id.* at 10 ("The continued absence of a full-time medical director and the nursing shortages are simply not acceptable.")).

102. By early 2018, "the shortage of full-time nursing staff" was "worse" than it was at the start of the Settlement Agreement. (PTX34 (Report of 3/13/2018) at 16; *see id.* (observing "a failure of adequate staffing of nurses")). Nurse staffing remained "critically deficient," causing nurse practices to "deteriorate[] accordingly." (*Id.* at 6). There was "still no on site medical director," nor "even a director of nursing." (*Id.*).

103. Staffing levels have improved somewhat since the addition of Ellen Katzman to the FCCW medical staff. (*Infra* ¶¶ 104–10).[10]

104. Katzman joined FCCW as the registered nurse supervisor in January 2018 and became its nurse administrator/director of nursing in June 2018. (Dkt. 523 at 99–100, 102, 120).

---

[10] The Court found Katzman's testimony notably helpful and credible. Her answers were clear, direct, and specific. She did not rely simply upon generalizations or tout meetings as evidence of progress. Instead, she exhibited a firm command of details and articulated precise actions she and others undertook. She identified discrete problems, took concrete steps to address them, and explained how those steps affected FCCW.

18

105. Katzman observed and examined FCCW's nursing program, and made staffing her "main focus right from the get-go." (Dkt. 523 at 101). She pressed the current contractor to provide more nurses. (*Id*. at 102). She contacted other nurse agencies she had formed relationships with through her work at other Virginia prisons. (*Id*. at 102, 105). To prevent the "quick turnover" often associated with agency or temporary nurses, Katzman brought in only nurses who would commit to at least a 3- or 6-month contract, with the possibility of extension. (*Id*. at 102).

106. Katzman began creating and maintaining detailed organizational records regarding the nursing staff. (Dkt. 523 at 105–06). FCCW created an organizational chart for nursing. (DTX30 at RFP1400000024; dkt. 523 at 108–09). Katzman helped "streamline" and "condense[]" the number of staffing agencies and individuals FCCW works with, thus reducing administrative burdens and providing more stability and consistency. (Dkt. 523 at 106). For instance, nurses are able to "learn their area as well as the patients that they may regularly see," and longer tenures mean nurses receive more training. (Dkt. 523 at 107).

107. Katzman and FCCW "weeded out quite a few nurses" who were "not up to par with nursing standards." (Dkt. 523 at 105, 106, 126).

108. Under Katzman's leadership, in February 2018, nurses were moved into the medical building (they previously "were in a silo in the housing unit and isolated") to create more accountability and *esprit de corps*. (Dkt. 523 at 111).

109. Nurses have since begun staying at FCCW for longer periods of time and extending their contracts. (Dkt. 523 at 111).

110. Katzman and another nurse determined that the equivalent of "78 full-time" nurses are needed to adequately staff FCCW. (Dkt. 523 at 127).

**Sick Call**

111.    In February 2016, a non-FCCW VDOC nurse visited FCCW for the purpose of evaluating its medical processes and suggesting possible improvements in light of this lawsuit. (Dkt. 523 at 67).  The visiting nurse found that LPNs were conducting sick calls and that sick calls were not being immediately answered.  (*Id*. at 68).

112.    As the compliance monitor found, in March 2016, the sick call process "was of almost no value, serving most commonly only to delay any meaningful evaluation of patients' problems."  (PTX34 (Report of 3/25/2016) at 2).

113.    An audit of the sick call process in January 2017 revealed several delays and deficiencies.  (PTX34 (Report of 3/17/2017) at 8–9).  In "many or most cases [] care was delayed by the need for provider referral," and in "some cases, nurses failed to consider or exclude serious or emergent pathology before making a referral for several days later."  (*Id*. at 10).

114.    As of April 2017, "the process of nurse sick call serve[d] little purpose.  In most instances, it serve[d] only to delay evaluation by a provider."  (PTX34 (Report of 6/25/2017) at 5).  "LPN sick call" was "ineffective."  (*Id*. at 15).

115.    As of August 2017, FCCW's "model of LPN sick call remain[ed] ineffective, create[d] redundant visits, and serve[d] substantially to delay care."  (PTX34 (Report of 10/9/2017) at 12).

116.    On January 26, 2018, FCCW's contract monitor, who was also internally in charge of monitoring compliance with the Settlement Agreement, reported that several sick calls had been waiting a week to be triaged, and other sick call patients were not seen by a provider until a month after putting in a request.  (PTX75 (Distarti 1/26/2018 Email)).  She wrote:  "[W]e are currently not abiding by the settlement agreement."  (*Id*.).

## Records, Charting, and Medications

117.    In mid-2016 and early 2017, the charting of medicine doses missed in FCCW's system was "not necessarily reflected" in FCCW's system and was "of uncertain accuracy." (PTX34 (Report of 8/2/2016) at 4; PTX34 (Report of 3/17/2017) at 2).   Patient charting was sometimes minimal and inconsistent.  (*See*, *e.g.*, dkt. 528 at 86–87).

118.    As of late April or early May 2018, when an inmate was referred to an outside provider for treatment, FCCW providers "have no way of knowing even whether the patient was evaluated for the problem for which she was sent," because medical records are not timely placed in inmates' FCCW file.  (PTX35 (Report of 5/31/2018) at 3).

119.    When medicine is not available at the pill line, FCCW documents it as a "no show" in its system, which "creates a false record."  (PTX35 (Report of 5/31/2018) at 9–10).

120.    As of July 2016 and through at least February 2018, medications at FCCW "frequently r[a]n out – i.e., [were] not ordered before a given supply is exhausted, so that doses are missed."  (PTX34 (Report of 8/2/16) at 4; *id.* at 15 ("Nurses often do not know how to request refills; this likely accounts substantially for medications running out so frequently."); PTX34 (Report of 3/13/2018) at 6 ("Nurses still fail to refill medications before they run out, with resultant lapses in providing them."); *see* dkt. 522 at 39 (failure to resupply still existed in February 2018); PTX177 (Segura) at RFP2200042351 ("patient stated her medication had been off and on for the past 3 days")).  FCCW's system also omitted medication orders because "they were not transcribed or transcribed to the wrong chart."  (PTX34 (Report of 8/2/16) at 5).

121.    FCCW staff "pre-pour" medications for distribution out of their original containers into smaller containers; this practice is dangerous because inmates receive the

21

medicines in unmarked containers and cannot ensure that they receive the correct medicine in the correct dose. (*See* dkt. 528 at 63–65, 68–69; *see also* PTX35 (Report of 5/31/2018) at 3).

### Medical Equipment

122. Equipment such as stretchers, wheelchairs, gurneys, braces, and durable medical supplies often were not readily available at FCCW, were on backorder, or both. (PTX34 (Report of 10/9/2017) at 8–9; dkt. 520 at 48–49 (noting lack of emergency medical equipment)). The lack of available stretchers, for example, is a systemic problem. (Dkt. 522 at 60–61; *see* dkt. 520 at 48–49). During one incident, for example, a nurse had to run between buildings to retrieve a backboard for an inmate whose vital signs were failing. (PTX56 (D. Reed Incident Report of 4/16/2018 by LPN Seunbane); *see also supra* FF ¶ 52 (similar occurrence regarding Deanna Niece)).

### Grievance Process

123. A few weeks after final approval of the Settlement Agreement, the medical grievance process at FCCW was inadequate: Almost all responses to grievances—including those recounting potentially serious medical conditions—"were in fact non-responses." (PTX34 (Report of 3/25/2016) at 3; dkt. 522 at 34–35).

124. By October 2016, the grievance system has improved somewhat, but "significant problems and deficiencies remain[ed]"—it was "not clear that either FCCW or [] VDOC ha[d] considered the underlying deficiencies in the grievance system." (PTX34 (Report of 11/10/2016) at 2, 4; *see id.* at 11 (concluding grievances were managed in "relatively defensive, bureaucratic, and un-helpful manner, reinforcing the impression of an adversarial relationship"); 12 (noting failure to interview any grievants); 13 (indicating sense of FCCW trying to prevail on technicality rather than solve grievant's underlying problem)).

125.    An April 2017 audit of the grievance system revealed over 75% of grievances returned "unread for seemingly arbitrary reasons." (PTX34 (Report of 5/25/2017) at 14).

126.    Another audit in November 2017 demonstrated that one-third of responses to grievances were substantively "inadequate." (PTX34 (Report of 1/9/2018) at 19–20; *see*, *e.g.*, dkt. 520 at 60–62). Grievance tracking, though, had improved. (PTX34 (Report of 1/9/2018) at 15).

127.    The failure to adequately respond to grievances is a systemic problem at FCCW. (*See*, *e.g.*, dkt. 520 at 60–62, 74–76; dkt. 522 at 34–36).

## CONCLUSIONS OF LAW

The Court comes to its legal analysis. The Court first considers Defendants' attack on the Court's jurisdiction. Then, the Court addresses whether specific provisions of the Settlement Agreement were violated and examines Defendants' other legal arguments.

**I.    The Court Possesses Jurisdiction to Enforce the Settlement Agreement.**

In their proposed conclusions of law and post-trial briefs, Defendants argue that the Court lacks jurisdiction to enforce the Settlement Agreement.[11]  (Dkt. 535 at 58; dkt. 536 at 4–11). At times Defendants frame this conclusion as flowing from a failure to comply with Rule 65(d), and at other places they base it on the supposed absence of ancillary jurisdiction. The Court holds that Defendants' jurisdictional conclusion does not follow from either contention.

First, Rule 65(d)(1)(C) requires that every injunction must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  The Court assumes for present purposes that the Final Judgment Order entered on

---

[11]    This argument is a *post hoc* one, as Defendants jointly submitted a final pretrial order, which the Court entered, stating that the Court "has jurisdiction over this case." (Dkt. 477 at 2; dkt. 479 at 2). Because jurisdiction is nonwaiveable and may be raised at any time, the Court must consider it.

February 5, 2016 does not comport with that rule. Even so, that would not, *ipso facto*, deprive the Court of all authority over the case.

For one, a "court's failure to comply with the prerequisites in Rule 65(d) as to the proper scope or form of an injunction or restraining order does not deprive it of jurisdiction or render its order void." Wright and Miller *et al*., 11A Fed. Prac. & Proc. Civ. § 2955 (Westlaw 3d ed. Sept. 2018); *e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Wintz Properties, Inc.*, 155 F.3d 868, 874 (7th Cir. 1998) (explaining that Rule 65's requirements are waivable and thus nonjurisdictional, in that failure to comply with the rule does not nullify the injunction); *United States v. McAndrew*, 480 F. Supp. 1189, 1192 (E.D. Va. 1979) (Rule 65's requirements "are not jurisdictional."); *Chicago & N.W. Transp. Co. v. Ry. Labor Executives' Ass'n*, 908 F.2d 144, 150 (7th Cir. 1990) (The "technical violation of Rule 65(d), as we said, did not void the injunction."); *see also Dupuy v. Samuels*, 465 F.3d 757, 759 (7th Cir. 2006) (finding violation for Rule 65(d) did not deprive appellate court of jurisdiction unless would-be injunction was so unclear defendant could not be punished for violating it).[12]

Additionally, the Court possesses jurisdiction over the Settlement Agreement based on the terms of the final judgment order and *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994). *Kokkonen* held that when parties reach a settlement agreement and solicit dismissal of the case without an order reserving jurisdiction, the district court has no jurisdiction to enforce

---

[12]     The parties have not supplied, and the Court has not found, a precedential Fourth Circuit decision on this point, so the Court cites persuasive authority. Defendants' out-of-circuit cases do not stand for the proposition that failure to comply with Rule 65(d) is a jurisdictional defect, as those cases all reached the merits. *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 369–72 (10th Cir. 1996) ("turn[ing] to the merits" and concluding that Rule 65 noncompliance was an issue of enforceability, not jurisdiction); *H. K. Porter Co. v. Nat'l Friction Prod. Corp.*, 568 F.2d 24, 26, 28 (7th Cir. 1977) ("Dismissal should have been on the merits, not for want of jurisdiction."); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 460–62 (7th Cir. 1993) (deciding appeal under heading entitled "Merits of the Contempt Claim").

24

the settlement. *Id.* at 381–82. *Kokkonen* also explained that the opposite scenario provides for jurisdiction:

> The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event, a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist. . . . If the parties wish to provide for the court's enforcement of a dismissal-producing settlement agreement, they can seek to do so. . . . [T]he parties' compliance with the terms of the settlement contract (or the court's 'retention of jurisdiction' over the settlement contract) may, in the court's discretion, be one of the terms set forth in the [dismissal] order.

*Id.* at 381.

That's precisely the situation here. The Settlement Agreement specifically contemplates the Court retaining jurisdiction to enforce it. (Dkt. 221-1 at 23–24). More importantly, the Court's preliminary approval order and the final judgment order both expressly retained jurisdiction to enforce, as well as ensure implementation of, the Settlement Agreement. (Dkt. 222 at 5; dkt. 262 at 2). On those facts, *Kokkonen* squarely provides for jurisdiction.

In sum, the Court has authority to enforce the Settlement Agreement. The current nature and scope of that enforcement, however, is a critical issue.

## II.  The Court Can and Will Enforce the Settlement Agreement, Although It Will Not Do So Through Contempt in This Instance.

Defendants' best argument is not that the Court completely lacks jurisdiction to enforce the Settlement Agreement; rather, it is a contention on the merits that the Court has no authority to enforce the Settlement Agreement *through contempt*. *See supra* footnote 12 (citing cases). Defendants argue that is so because the final judgment order did not comply with Rule 65, which governs the form, content, and scope of injunctions. Therefore, so the argument goes, because

there was not a proper injunction, a necessary element of contempt (the existence of a court order) is missing.

### A.    Strict Compliance with Rule 65 Is Required in This Circuit.

Federal Rule of Civil Procedure 65(d)(1)(C) requires that every injunctive order must explain what it is enjoining or requiring, but "not by referring to the complaint or other document." This is no "mere technical requirement[]," as the Fourth Circuit has repeatedly held it is "mandatory and must be observed in every instance." *CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 459 (4th Cir. 2000) (quoting *Thomas v. Brock*, 810 F.3d 448, 450 (4th Cir. 1987) (quoting *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967))); *see Pashby v. Delia*, 709 F.3d 307, 331 (4th Cir. 2013). The purpose of the rule is to provide "fair notice of what an injunction requires" and to facilitate appellate review. *CPC*, 214 F.3d at 459.

Plaintiffs do not dispute this point of law. (Dkt. 537 at 6). Moreover, they do not dispute its factual application here—*i.e.*, that the final judgment order, by referencing but not itself containing the terms of the 28-page Settlement Agreement, did not conform to Rule 65. (*See id.* 527 at 2–13). Instead, they argue that Defendants have waived (technically, forfeited[13]) the issue by failing, at numerous prior opportunities, to raise the Rule 65(d) nonconformity.[14]

---

[13]    Waiver is the intentional relinquishment of a known right or issue, whereas forfeiture involves the failure to timely assert a right or argument. This situation falls in the latter category. *See Wood v. Milyard*, 566 U.S. 463, 470 n.4 (2012); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 395 n.7 (4th Cir. 2004). The Court here uses the terms interchangeably because several cases cited below do so. (*Infra* COL § II.B).

[14]    Defendants argue that the final judgment order was not a consent decree. The Court agrees. A consent decree—unlike a settlement agreement—is both an injunction and a settlement, approved and entered by the Court at the request of the parties. *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 279–81 (4th Cir. 2002); *Healey v. Spencer*, 765 F.3d 65, 75 (1st Cir. 2014).

**B.     Persuasive Authority Indicates a Challenge to Compliance with Rule 65 Can Be Forfeited, but No Binding Decision Permits Departure from the Fourth Circuit's "Mandatory" Observance of Rule 65(d).**

Several decisions, mostly in the Seventh Circuit, have either found some circumstances where the issue of noncompliance with Rule 65(d) was forfeited, or excused technical noncompliance when the Rule's functional purposes obviously were fulfilled.  *See, e.g., Wintz Properties, Inc.*, 155 F.3d at 874–75 (dismissing as "tardy" and "waived" argument that order did not comply with Rule 65(d), because "parties treated the underling order as an injunction at the time it was entered, and that is how we will treat it here"); *Chicago & N. W. Transp. Co.*, 908 F.2d at 150 (holding "technical violation of Rule 65(d)" acceptable because its "spirit was honored" and order "was in sufficient if imperfect compliance with the rules to be enforceable"); *Szabo v. U.S. Marine Corp.*, 819 F.2d 714, 718 (7th Cir. 1987) (explaining that failure to appeal initial entry of injunction prevented party from arguing at contempt phase that it violated Rule 65(d)); *Kreepy Krauly U.S.A., Inc. v. Sta-Rite Indus., Inc.*, 152 F.3d 949, 1998 WL 196750, at *10 (Fed. Cir. 1998) (finding waiver of Rule 65(d) issue for failure to raise it in opening appellate brief); *Retiree, Inc. v. Anspach*, 660 F. App'x 582, 591 n.4 (10th Cir. 2016) (same).[15]

Plaintiffs' best case is the Fourth Circuit's decision in *United States v. Fuller*. 919 F.2d 139 (Table), 1990 WL 190495 (Dec. 4, 1990).  There, the district court entered a TRO enjoining a strike, and later turned the TRO into a full injunction with only a minor change.  *Id.* at *1. Employing a functionalist approach, the appeals court explained:

> [W]here it gives fair warning of the acts that it forbids, an injunction may not be
> avoided on merely technical grounds. Moreover, the language of an injunction
> must be read in the light of the circumstances surrounding its entry.  In the present

---

[15]     On one occasion, the Fourth Circuit stated that "[f]orfeiture and waiver principles apply with equal force in contempt proceedings."  *In re Under Seal*, 748 F.3d 276, 287 (4th Cir. 2014). But that general proposition has not been developed further or applied to Rule 65(d), and it was uttered in the context of appellate waiver.

27

case, there is very little doubt that all parties familiar with the strike, including the Union, the striking coal miners, and their collaborators, were not only aware of the existence of the temporary injunction but also of the fact that the temporary injunction, like the TRO which preceded it, was intended specifically for the protection of Clinchfield. . . . Under these circumstances, credibility would be strained to accept the proposition that Fuller was not chargeable with knowing that it was Clinchfield the strikers were enjoined against harassing. To accept Fuller's argument would be to elevate flawless draftsmanship of court orders over the substantive concerns underlying Rule 65(d). Such perfection is not required, however, when the twin dangers of uncertainty and uninformed review are absent, as they are in this case.

*Id.* at \*2–3. Unfortunately for Plaintiffs, *Fuller* is an unpublished opinion. It also made no attempt to wrestle with the two then-existing published cases—*Thomas* and *Alberti*—stating compliance with Rule 65 is mandatory. In short, *Fuller* is a nonprecedential outlier.

Yet if ever a case evinced forfeiture of a Rule 65(d) argument, or warranted a functional rather than formalist approach to the rule, it would be this one. The final judgment order— drafted jointly by the parties and entered at their request—specifically ordered that the Settlement Agreement (also a joint product of the parties) was effective as of that date and enforceable by the Court. And of course, the negotiated Settlement Agreement itself contemplated contempt proceedings against Defendant. (Dkt. 221-1 at 23–24).

Defendants, upon entry of the final judgment order, did not raise the Rule 65(d) issue with the Court, and they did not file an appeal. *See Szabo*, 819 F.2d at 718. Twenty months later—when they responded to the motion for a show cause order—Defendants made (seemingly as an afterthought) a solitary mention of Rule 65(d). They did not advance their present contention that the flaw with enforcement via contempt is the final judgment order's extrinsic reference to the Settlement Agreement. (Dkt. 286 at 21–22 ("analog[izing]" Rule 65(d) to case law requiring decree's terms to be "clear and ambiguous," and intentionally omitting portion of Rule 65(d)(1)(C) stating that details of injunction cannot refer to an extrinsic document)).

28

Defendants also claimed to have spent the last year-and-a-half working "diligently to comply with the terms of the Settlement Agreement." (*Id.* at 23). When Defendants filed a 47-page "summary judgment" brief shortly before trial, they did not mention Rule 65 at all, or challenge the existence of a valid decree. (*See generally* dkt. 419). And when they made, at the conclusion of Plaintiffs' trial presentation, an oral motion to deny the request for a show cause order, Defendants again did not press the argument they now advance. (Dkt. 521 at 70–77 (oral argument of counsel)). Only later—after final judgment, after over 18 months of supposedly trying to comply with the Settlement Agreement, after Plaintiffs' moved for contempt, after months of discovery, after Defendants moved for summary judgment, after Defendants orally moved for judgment at trial, and after trial itself—did Defendants raise the argument in post-trial briefing.

Nonetheless, the Court is bound by the Fourth Circuit's clear statements in *CPC*, *Thomas*, and *Alberti* that Rule 65(b) is mandatory. If a trail is to be blazed through or around those precedents, the Fourth Circuit should be the one to blaze it. *See Stop Reckless Econ. Instability Caused by Democrats v. F.E.C.*, 814 F.3d 221, 230 (4th Cir. 2016). Accordingly, the Court holds that it cannot at present enforce the Settlement Agreement through contempt.

### C. The Court Enforces the Settlement Agreement via Standard Contract Principles.

That the Court cannot enforce the Settlement Agreement through contempt does not mean the Court cannot enforce it at all. The Settlement Agreement, the preliminary approval order, and the final judgment order all contemplated that this Court would retain jurisdiction to ensure implementation and enforcement of the Settlement Agreement. Under *Kokkonen*, that is enough for jurisdiction. *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 203 F.3d 291, 299 (4th Cir. 2000). The Court will therefore consider whether the Settlement Agreement has been

29

violated. *See, e.g., Norfolk S. Ry. Co. v. Drummond Coal Sales, Inc.*, No. 7:08CV00340, 2016 WL 4532411, at *4–5, 8–9 (W.D. Va. Aug. 29, 2016).

Enforcing a settlement agreement turns upon "standard contract principles"[16] and can be accomplished, as here, "within the context of the underlying litigation without the need for a new complaint." *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 540 (4th Cir. 2002); *see Bradley v. Am. Household, Inc.*, 378 F.3d 373, 380 (4th Cir. 2004). Before "proceed[ing] on the merits" of enforcement, a court must first ensure that there are no factual disputes (or if there are, resolve them) about the existence of an agreement and what terms are part of it. *See Hensley*, 277 F.3d at 540–41, 542. Indubitably, an agreement was reached and its terms are embodied in a written document.[17] Defendants' arguments instead address the interpretation of those terms and whether the evidence on hand shows a breach—*i.e.*, the merits of whether the Settlement Agreement was violated. Accordingly, the Court analyzes the Settlement Agreement using standard contract principles of Virginia law, explained below when relevant.

### D. A New Eighth Amendment Violation Is Not Required for Defendants to Breach the Settlement Agreement.

Defendants argue that, to be in violation of the Settlement Agreement, Plaintiffs must prove either medical malpractice or "systemic constitutionally inadequate" medical care. (Dkt. 535 at 60–61; dkt. 536 at 16–19). Defendants repeatedly assert "there must exist a problem of constitutionally-deficient medical care at FCCW" before the Settlement Agreement can be enforced. (Dkt. 535 at 60; dkt. 536 at 18).

---

[16] "Under governing Virginia law, settlement agreements are treated as contracts subject to the general principles of contract interpretation." *Byrum v. Bear Inv. Co.*, 936 F.2d 173, 175 (4th Cir. 1991)

[17] The Court notes that, assuming this is a case where a "plenary evidentiary hearing" would have been required on such issues, *Hensley*, 277 F.3d at 541, that requirement was met and exceeded by the months of discovery and a weeklong trial.

30

That argument is incorrect. The foundation of the Settlement Agreement, indeed of the entire case, was that there was already an *ongoing* failure to provide constitutionally adequate medical care at FCCW. The point of the Settlement Agreement was to implement specific practices and standards to remedy that constitutional shortcoming.

The Settlement Agreement itself bears this out. In a section entitled "**SUBSTANTIVE PROVISIONS**," the "**Statement of Purpose**" explains that, to ensure "the quality and quantity of medical care" provided to FCCW prisoners "shall meet or exceed constitutional requirements under the Eighth Amendment," VDOC "*shall be obligated to achieve and maintain compliance with the Operating Procedures, Guidelines and Standards* governing the provision of medical care that are set forth" in Settlement Agreement. In other words, the Settlement Agreement placed specific standards on FCCW, and the *purpose* of those standards was to effectuate constitutionally-adequate medical care. It is the standards themselves that are enforceable and are being violated. (*See infra* COL §§ IV, V).

Defendants' argument against this conclusion rests on one of three paragraphs in the Settlement Agreement's "**ENFORCEMENT**" section. (Dkt. 221-1 at 23–24). Defendants focus on the second paragraph, which provides a procedure (set out elsewhere in the agreement, *id*. at 19) for either Plaintiffs or the compliance monitor to bring before the Court "a problem of constitutionally-deficient medical care." (*Id*. at 23). But paragraph two does not say it is the exclusive method of enforcing the Settlement Agreement, nor does it say the only problem that can be enforced is one of "constitutionally-deficient medical care."

As the Court has explained at length above, the parties, throughout the settlement phrase of this case, made clear that they wished the Court to retain the ability to enforce the entire agreement. Paragraph one of the enforcement section, among other places, makes this explicit.

31

It mandates that the Court "retain jurisdiction over the Parties *for the purposes of ensuring the implementation* of this Settlement Agreement and *shall preside over such further proceedings* as may be necessary or appropriate *to enforce its terms and conditions*." (Dkt. 221-1 at 23 (emphasis added)). Stated differently, paragraph one gives the Court broad authority to enforce the Settlement Agreement's "terms and conditions" generally. In contrast, paragraph two is a special procedure directed at a more targeted problem: constitutionally inadequate medical care. While it covers the higher-order issue of constitutionally deficient care, paragraph two does not make the other terms of the Settlement Agreement unenforceable parchment barriers.

III.    **Pre-February 5, 2016 Actions Are Not the Basis of Liability.**

In portions of their post-trial briefing, Plaintiffs have relied upon or cited to pre-Settlement Agreement actions by Defendants. Many of these citations provide context or background, or show knowledge of the care at FCCW. Defendants ask the Court to rule that they cannot be held responsible for breaches of the Settlement Agreement that took place before February 5, 2016, when the Court approved the Settlement Agreement and retained jurisdiction to enforce it.

The Court agrees. Although the parties entered into the Settlement Agreement prior to February 5, 2016, its obligations did not take effect until the Court approved it. Its effective date was "the date on which the court entered a Consent Order of Judgment granting final approval to this Settlement Agreement." (Dkt. 221-1 at 4). Its implementation was to begin "no later than" the effective date, and—unless otherwise provided—implementation was to be completed

"within 30 days of" the effective date. (*Id*. at 24). The Court therefore does not evaluate whether Defendants' pre-February 5, 2016 conduct conformed to the Settlement Agreement.[18]

## IV. Defendants Are In Violation of the Settlement Agreement.

In addition to other discrete requirements, the Settlement Agreement sets out twenty-two standards governing FCCW. (Dkt. 221-1 at 8–15). The Court concludes that Defendants are in violation of eight of them. Indeed, the record shows that VDOC's and FCCW's *own officials* had—by their *own admission*—actual knowledge that FCCW was not complying with parts of the Settlement Agreement. (*See*, *e.g.*, *supra* FF ¶¶ 2, 8–12, 116)

### A. Defendants Have Not Sufficiently Staffed FCCW's Medical Team.

Standard (i) requires FCCW to "establish and maintain a sufficient number of health staff of varying types or adopt such other measures as shall be necessary to provide inmates with adequate and timely evaluation and treatment, including continuity and coordination of care." (Dkt. 221-1 at 8). The record overwhelmingly demonstrates that nurse staffing at FCCW has been insufficient. It was "problematic" around the time of the Settlement Agreement, and VDOC officials knew then there were leadership deficiencies. (FF ¶¶ 95–96). Nurse shortages continued throughout 2017. (FF ¶¶ 11, 98–101). And by January 2018, staffing was *worse* than it was when the Settlement Agreement took effect. (FF ¶¶ 102). The Court therefore concludes that FCCW has not established and maintained a sufficient number of nurses.

Defendants briefly argue they have been unable to comply due to a general national "trend" of nurse shortages and the fact that correctional nursing is not desirable for most nurses. (Dkt. 535 at 61; dkt. 538 at 20). "The defense of impossibility of performance is an established principle of contract law." *Hampton Roads Bankshares, Inc. v. Harvard*, 291 Va. 42, 53 (Va.

---

[18] Such conduct may be referred to for background, knowledge, motive, intent, or other purposes besides that of showing noncompliance.

2016).  It can apply in several situations, among them when impossibility is due to a "change in the character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance."  *Hampton Roads Bankshares, Inc. v. Harvard*, 291 Va. 42, 53–54 (Va. 2016).  The defense does not apply, however, when "the impossibility was due to" the defendant.  *Id.* at 54.  Nor does a temporary impossibility generally relieve a party of a contractual obligation; it only suspends it until the impossibility is removed.  *Long Signature Homes, Inc. v. Fairfield Woods, Inc.*, 248 Va. 95, 99 (Va. 1994).  "In Virginia, breach of contract is excused only by objective impossibility of performance. . . [I]f performance is rendered merely difficult or burdensome or unprofitable, the promisor is not excused."  *Ballou v. Basic Const. Co.*, 407 F.2d 1137, 1140–41 (4th Cir. 1969); *see Opera Co. of Boston v. Wolf Trap Found. for Performing Arts*, 817 F.2d 1094, 1099 n.8 (4th Cir. 1987).

The defense does not apply here.  Even assuming the truth of Defendants' assertions about the nursing market, the record shows that it is not objectively impossible for FCCW to comply with the Settlement Agreement.  This is demonstrated by FCCW's recent progress with nurse staffing under new leadership since January 2018.  (FF ¶¶ 103–09).  These improvements show that adequate staffing is not impossible.[19]  What has been lacking at FCCW is proper medical leadership and aggressive corrective action, and perhaps also adequate motivation.  (For instance, FCCW did not bring in Katzman and another nurse administrator until several months after Plaintiffs' moved for a finding of contempt, and a month after the Court approved pre-trial discovery.)  Moreover, FCCW already has offered financial inducements to bring in nurses, and it can continue to do so if necessary to meet its staffing obligations.  (Dkt. 523 at 115–16).

---

[19]     Indeed, the trends cited by Defendants—a national nurse shortage and the undesirability of correction nurse—would apply to any prison in the country.

34

Additionally, the defense would not apply because—even if it were objectively impossible for Defendants to adequately staff FCCW—that impossibility was caused by them. *See Hampton Roads d*, 291 Va. at 54. At trial, Defendants adduced testimony that hiring was "tough" (but notably, not *impossible*) because of "the media," bad publicity and attention brought on by this lawsuit, and "the negative light that shines on" FCCW. (Dkt. 523 at 112, 113, 138, 166). However, the bad publicity surrounding FCCW is Defendants' own fault, as it stems from FCCW's original failures and the underlying lawsuit challenging them. (Dkt. 523 at 167–68).[20]

### B. Defendants Breached Standards About Emergency Care and Equipment.

Standard (vii) of the Settlement Agreement requires responses to medical emergencies be appropriate and "timely," and that emergency "medical supplies and equipment shall be regularly maintained and readily available." (Dkt. 221-1 at 10). Defendants have breached this standard.

Deanna Niece died on a prison cell floor at FCCW, days away from her release date. (FF ¶¶ 60–61). As she died, nurses "casually walk[ed]" to Niece's cell minutes after a correctional

---

[20] The Court rejects another "inability to comply" theory advanced by Defendants. They argue they were "prevented from complying based on their detrimental reliance on the Compliance Monitor" that it would take time to implement the Settlement Agreement. (Dkt. 536 at 21; *see* dkt. 535 at 51; *see also* dkt. 538 at 19). Defendants cite no law explaining how this so-called "detrimental reliance" would make their compliance objectively impossible or otherwise excuse their failure to abide by the Settlement Agreement. That Defendants might have erroneously interpreted the agreement, or relied on another's erroneous interpretation, does not demonstrate that compliance was objectively impossible or excuse their breach. *See infra* COL § VII (compiling authorities on contract law explaining that good-faith misinterpretations of a contract do not excuse party's breach).

Even if Defendants had a legally viable theory, they cite no evidence that they *in fact* detrimentally relied on assurances from the compliance monitor. To the contrary, the record affirmatively demonstrates that VDOC and FCCW leaders were (1) well aware VDOC was obligated to comply with the Settlement Agreement, and (2) concerned about the fact that it not doing so. (FF ¶¶ 2–3, 5–6, 8–12, 116).

35

officer called in an emergency. (FF ¶¶ 49–51). The nurses brought no medical equipment. (FF ¶ 51). They did not call the medical building for help. (FF ¶ 52). They realized they needed a stretcher, but none was readily available, so an officer ran to get one. (FF ¶¶ 52, 62, 64). An officer ran as well to find oxygen, which also was not readily available, despite the fact that oxygen was similarly unavailable when another inmate died four days before Niece. (FF ¶¶ 55, 62, 64–66). And although Niece had blood running from her mouth, made a "strange gurgling throaty sound," and struggled to speak, there was no suction machine readily available. (FF ¶¶ 48, 54, 57, 62, 64).

Carolyn Liberato died at FCCW after repeated complaints of chest pain and dramatic weight fluctuations that went unaddressed. (FF ¶¶ 65, 67–72). As with Niece, there was a lack of readily available oxygen when Liberato became deathly ill. (FF ¶¶ 55, 62, 66). And also as with Niece's death, Liberato's death evinced a failure of adequate medical care and systemic problems at FCCW. (FF ¶¶ 64, 73; *e.g.*, *id.* ¶¶ 69, 71).

Arlene Duke, for three consecutive days in September 2016, complained of chest or back pain, nausea, and shortness of breath. (FF ¶¶ 83–85). She stated her pain was an 8 out of 10 and that the pain felt like it did when her lung collapsed. (FF ¶¶84–85). She was given Tylenol and did not see a doctor. (FF ¶¶85). Duke died a week later after complaining of back pain. (FF ¶ 86).

In sum, the medical treatment these women received was neither timely nor appropriate, and their deaths illustrate the danger of not having appropriate medical equipment on hand.

### C.     Defendants Failed to Provide and Make Available Medical Equipment.

Relatedly, standard (xiii) of the Settlement Agreement requires that "[d]urable medical equipment in appropriate working order . . . shall be . . . *provided and available* for daily use, as

36

medically necessary." (emphasis added).  The evidence—particularly the experiences of inmates Niece, Liberato, and Reed—show that medical equipment was not available as required.  The day she died, Niece was denied a wheelchair by medical staff, despite having collapsed earlier in the day.  (FF ¶¶ 45–46).  In the last minutes of Niece's life, as she choked and bled from her mouth, neither a stretcher, nor oxygen, nor suction equipment was readily available.  (FF ¶¶ 52, 55, 62, 64).  When Carolyn Liberato died, oxygen was not initially available then either.  (FF ¶ 66).  And when another inmate's vital signs plummeted, a backboard was not nearby, forcing a nurse to run to retrieve one.  (FF ¶ 122).  These failures are illustrations of a system-wide failure to provide medical equipment.  (FF ¶¶ 64, 122).

### D. Self-Critical Analysis Has Not Been Conducted in Some Mortality Reviews.

After every death at FCCW, a mortality review must be completed.  (Dkt. 221-1 at 13).  Standard (xx) of the Settlement Agreement requires each review contain "self-critical" analysis, "including explicit consideration as to the whether the death was preventable."  (*Id*. at 13–14).  And "even if the death was not preventable," the review must "include a discussion of how the care might have been improved."  (*Id*. at 14).  Multiple mortality reviews failed to conduct this analysis.  (FF ¶¶ 87–88).  One such example was the report regarding Arlene Duke.  Despite (1) three separate complaints by Duke of pain, nausea, or shortness of breath in the days before her death, and (2) the fact that Duke received only Tylenol for them and was once sent away without seeing a doctor, the mortality report failed to analyze those facts with a self-critical eye.  (FF ¶¶ 83–87).  The mortality report did not discuss whether the steps leading up to Duke's death were appropriate or whether her death could have been prevented with proper care.

### E. Defendants Have Failed to Appropriately and Timely Supply, Distribute, and Administer Medications.

"Medication service" at FCCW "shall be clinically appropriate and medications shall be provided in a timely, safe, and sufficient manner." (Dkt. 221-1 at 11). Standard (xii) of the Settlement Agreement specifies that this includes "continuity of medication on intake and renewal of prescriptions." (*Id*.). Medication service, however, has not satisfied these standards. For instance, through 2016 and 2017, FCCW's records only haphazardly recorded or charted when patients missed medications. (FF ¶ 117). In 2017, VDOC's own report indicated that FCCW documented the return of un-administered medicine only 20% of the time. (FF ¶¶ 12).

Similar deficiencies continued into 2018, when the compliance monitor found that FCCW creates a "false record" by charting its failure to procure the proper medicine as a "no show" by an inmate. (FF ¶ 119). And as that finding implies, at times medical staff simply failed to reorder medications before they ran out, a problem that has spanned virtually the life of the Settlement Agreement. (FF ¶ 120). Sometimes this issue results from incorrect charting or record-keeping, and other times it is caused by nurses *not even knowing how to reorder medications*. (*Id*.). FCCW staff also "pre-pours" medications, risking confusion about whether an inmate is receiving the correct medication in the correct dose. (FF ¶ 121). In light of these failures, what happened to Toni Hartlove is hardly surprising. At various times, she has suffered from medicinal toxicity due to overdoses, was given twice the amount she needed of one medication, and the next day was denied completely a different medication. (FF ¶¶ 90–94).

Defendants therefore have not complied with standard (xii).

### F. Several Incidents Show a Lack of Unimpeded Access to Timely Medical Care.

The "diagnosis and treatment" standard of the Settlement Agreement—standard (vi)—requires "unimpeded access to timely medical care at an appropriate level." (Dkt. 221-1 at 9). A

38

doctor recommended, in February 2015, that inmate Andrea Nichols receive a colonoscopy. (FF ¶17). Yet Nichols did not receive the colonoscopy *for three years*. (FF ¶¶ 34–35). By then, she had developed rectal cancer that spread to her liver, necessitating chemotherapy. (FF ¶¶ 36–40). In the interim three years, Nichols experienced progressively worse bleeding, weight loss, and cramps. (FF ¶¶ 18–33). Moreover, FCCW's own errors prevented Nichols from receiving the colonoscopy on three separate occasions—twice because she received a prep solution it was known she could not tolerate, and once because Nichols was given no prep solution at all. (FF ¶¶ 19, 24, 28–30). A three-year delay for a doctor-recommended procedure is not "unimpeded access to timely medical care at an appropriate level." For Andrea Nichols, tragically it amounted to metastatic cancer.

Care was also not timely and appropriate for others. The compliance monitor found it "remarkable" that no doctor ever examined Deanna Niece the day she died, despite her collapse and shortness of breath. (FF ¶¶ 44–46, 63–64). When an emergency was called after Niece began bleeding from the mouth and struggling to breath, nurses "casually walk[ed]" to Niece's cell. (FF ¶¶ 48–50). And FCCW's own medical director acknowledged that medical care for other inmates who died was deficient.

For instance, Carolyn Liberato should have been seen by a doctor and had an EKG performed when she reported dizziness and chest pain. (FF ¶¶ 68–69). Instead, Liberato died a month later, after her rapid weight gain also went unnoticed and unaddressed by medical providers. (FF ¶¶ 65, 71). As for Marie Johnson, FCCW's medical director observed that: (1) "medical providers did not document any notes regarding her weight loss"; (2) Johnson's repeated abnormal pulse rate went unaddressed by medical staff, and; (3) FCCW "missed an opportunity to make the diagnosis" of her condition earlier. (FF ¶¶ 77–78, 82).

39

Somewhat less drastically, the sick call process at FCCW has been so ineffective for months that it has accomplished little other than serving as a barrier to medical care and timely treatment. (FF ¶¶ 112–16). But these facts all point to one conclusion: the absence of timely, unimpeded access to medical care.

### G. The Sick Call Process Has Not Conformed to the Settlement Agreement.

Standard (iv) requires that non-emergency "requests for care" (*i.e.*, sick calls) "shall be screened for urgency within 24 hours," with referrals to a medical provider "in no more than 72 hours for urgent problems." (Dkt. 221-1 at 9). The Court concludes that requirement has not been consistently met.

As the compliance monitor has repeatedly and consistently reported, the sick call process did virtually nothing but delay meaningful care. (FF ¶¶112–15). At various times, he described it as: "ineffective"; "of almost no value"; having "little purpose"; and serving "most commonly only to delay any meaningful evaluation," "substantially to delay care," or "only to delay evaluation by a provider." (FF ¶¶ 112–15).

Of course, the Settlement Agreement provides specific timelines for evaluation—screening of sick calls within 24 hours and provider referrals within 72 hours—that are not specifically mentioned in those findings. But the compliance monitor was no doubt aware of those requirements when he repeatedly concluded that the sick call process "delayed" care. In any event, that inference is not necessary to establish a breach. That is because VDOC's own official, who was charged with monitoring compliance with the Settlement Agreement, herself concluded that FCCW was "currently not abiding by" the sick call standard. (FF ¶ 116). Specifically, she found that some sick calls had waited a week (not 24 hours) to be reviewed, and

some patients were not seen by a medical provider until a month (not 72 hours) after submitting a sick call. Thus, Defendants have breached the sick call standard.

## H. The Grievance Process at FCCW Does Not Respond to Grievances in a Meaningful Manner.

The Settlement Agreement, standard (xv), requires FCCW to respond to medical grievances "in a timely and meaningful manner." (Dkt. 221-1 at 12). Shortly after the Settlement Agreement was approved, the grievance process remained inadequate, consisting mostly of "non-responses." (FF ¶ 123). VDOC's internal annual report for July 2016 through July 2017 found problems with the grievance system. (FF ¶ 11). Despite some improvement during the middle of that period, "significant problems and deficiencies" continued. (FF ¶¶ 124). At one time in 2017, three-fourths of grievances went unread "for seemingly arbitrary reasons." (FF ¶ 125). Half a year later, one-third of grievance responses were still substantively inadequate. (FF ¶ 126). The failure to adequately respond to grievances, therefore, has been a continuous, system-wide problem. (FF ¶ 127; *e.g.*, FF ¶¶ 11, 123–26).

## I. The Court Does Not Find Breaches of Other Provisions on the Present Record.

Plaintiffs and the compliance monitor have frequently voiced their displeasure with the co-pay policy at FCCW. The operative standard, however, does not institute a wholesale, permanent bar on co-pays. (Dkt. 221-1 at 9). Rather, it instituted a six-month moratorium on them, and then continued a limited ban on co-pays for specific categories of conditions, diseases, or medical equipment. (*Id*.). The evidence on this issue is at best sporadic and marginal, so the Court concludes Plaintiffs failed to meet their burden of showing a breach of that provision.

Standard (viii) concerns care and conditions in the infirmary. (Dkt. 221-1 at 10). Plaintiffs' evidence regarding that standard consists mostly of RN Jackie Clarke's testimony. (Dkt. 533 at PFF ¶¶ 204–09). Clarke's testimony was at times conclusory, and the Court did not

41

find it generally specific, illuminating, or helpful. (*See*, *e.g.*, dkt. 528 at 8–10, 14–15 (summary by defense counsel of problems with Clarke's testimony), 29 (testifying Clarke visited FCCW once in March 2018); *see also id*. at 13–14 (concerns expressed contemporaneously by the Court), 61 (same), 102 (admission by Clarke she "took no action to arrange to speak with staff" on her site visit)). This problem also exists to a lesser degree with the alleged breach of the "Utilization Management" standard. (*See* dkt. 533 at PFF ¶¶ 233–42 (frequently citing Clarke's testimony)). Moreover, that standard reads more like an aspirational statement rather than a discernible, enforceable obligation. The Court does not find a breach of either provision.

Finally, as for provisions governing correctional staff training (standard xviii), terminally-ill offenders (standard xix), chronic care (standard ix), and infectious diseases (standard x), Plaintiffs' proposed findings of fact did not identify evidence they believed violated those standards. (*See* dkt. 533 at 19–49). Therefore, the Court gathers Plaintiffs do not seek a finding on those standards, and it declines to scour the record *sua sponte* to evaluate them.

## V.    Defendants' Deadline to Comply with the Settlement Agreement Came Years Ago.

Defendants argue that their breaches of the Settlement Agreement cannot be confronted because they (1) are afforded time to achieve "substantial compliance" with the Settlement Agreement and (2) need only make some progress with compliance. (Dkt. 538 at 12–15; dkt. 535 at 12; *see* dkt. 535 at 59). They believe they "are not in violation of the Settlement Agreement so long as they are making progress towards full compliance with its terms." (Dkt. 535 at 12). They harp upon the supposed absence of a "provision within the Settlement Agreement that compels either substantial or complete compliance with the provisions of the Settlement Agreement at this time *or any time for that matter*." (Dkt. 538 at 14 (emphasis added)). But the Settlement Agreement does not condone lollygagging. Women at FCCW *have*

42

*died* in the months and years after approval of the Settlement Agreement. The Court holds that the agreement is and has been enforceable.

Defendants craft their argument from provisions in the Settlement Agreement addressing *monitoring* and *termination*. While the argument sounds plausible when inattentively skimmed, it crumbles upon close scrutiny. There are indeed timelines associated with monitoring and termination of the agreement, and those timelines do take into account whether Defendants have made progress toward the *goal* of constitutionally-adequate medical care. (Dkt. 221-1 at 17, 26). But the timelines do not postpone Defendants' obligation to comply with their *duties* that work toward that goal.

The Settlement Agreement requires the compliance monitor to visit FCCW "at least" four times a year. (Dkt. 221-1 at 16). He must do so for the first two years of the agreement. (*Id.*). The agreement then grants him the discretion to reduce his visits but limits when he can exercise it. For instance, if "in the exercise of his discretion" he finds—based on the guidelines, standards, and measuring tools in the Settlement Agreement—that "appropriate progress has been demonstrated toward the goal of constitutionally-adequate medical care on a consistent basis by the end of the second year," then he may reduce his visits to three per year. (*Id.* at 17). And if he reaches a similar conclusion at the end of the third year, he may reduce his visits to two annually. (*Id.*). In plain English, the compliance monitor can progressively reduce his visits to FCCW two years after the Settlement Agreement takes effect.

The termination provision likewise has a substantive component with temporal limits. For the agreement to end, Defendants must have "achieved substantial compliance with *all elements of the performance of* [*their*] *obligations* to provide constitutionally-adequate medical care," subject to the compliance monitor's evaluation. (Dkt. 221-1 at 26 (emphasis added)). But

43

termination cannot take place until "such substantial compliance" has been maintained for one year, and *even then* termination cannot occur before three years after the Settlement Agreement takes effect. That is, the Settlement Agreement can be terminated only if (1) it has been in place for at least three years, (2) Defendants have maintained substantial compliance with their obligations, and (3) they have done so for at least a year.

These monitoring and termination provisions naturally fit together. Plaintiffs alleged a systemic, enduring failure to provide adequate medical care at FCCW. To eradicate that failure, and to make sure it does not return, fleeting compliance with the Settlement Agreement is not enough. Instead, the agreement must exist for two years with full compliance monitor visits. It then can terminate after three years (at the earliest) only if the full third year shows that Defendants maintained "substantial compliance" with "all" of their obligations. That is the best case scenario.[21]

None of this approves of or grants the power Defendants' now claim for themselves: the right to disregard the Settlement Agreement for years with impunity. Under their theory, Defendants could ignore the Settlement Agreement, and Plaintiffs would have no recourse. (Dkt. 529 at 9). To support their view, Defendants argue the monitoring and termination provisions "implicitly and explicitly acknowledge that 'substantial compliance' will require time to achieve." (Dkt. 538 at 13). Defendants' logic, however, falsely equates (A) the requirement that the agreement lasts for at least three years (assuming substantial compliance during the third year) with (B) the assertion that the agreement does not oblige them to meet their obligations

---

[21]     Should Defendants not maintain substantial compliance for the entire third year but still show progress, the agreement continues and the compliance monitor can reduce visits to two annually. That is an intermediate case. In the worst case scenario, there is little or no progress after three years, the agreement continues, and the compliance monitor continues his quarterly visits.

before the end of year two. The timelines do not exist because compliance takes years. Rather, as the Court explained above, the timelines exist to hold Defendants' feet to the fire—*i.e.*, to require them to show prolonged, sustainable compliance with the agreement and the concomitant ability to provide adequate medical care.

Moreover, Defendants and their own officers and employees understood that the Settlement Agreements was in effect and binding. Indeed, they expressed dismay and alarm that Defendants were not in compliance. These individuals included VDOC's health services director (Defendant Herrick), FCCW's warden (Defendant Aldridge), FCCW's medical director, and the internal VDOC employee charged with monitoring FCCW's compliance with the agreement. (FF ¶¶ 2, 8–10, 116). It strains credulity to think that Defendants spent two years after the Settlement Agreement trying to comply with obligations they truly believed were unenforceable.

Indeed, the language of the Settlement Agreement provides otherwise. The Settlement Agreement explains that its "implementation" was to "*begin* no later than the Effective Date"— February 5, 2016. (Dkt. 221-1 at 24 (emphasis added); s*ee supra* COL § III). Afterwards, Defendants were required to "implement *all provisions* of this Settlement Agreement *within* 30 days of the Effective Date." That deadline was March 6, 2016. To an ordinary reader of English, the Settlement Agreement seemingly directed Defendants to start tending to their obligations under the Settlement Agreement by (at the latest) February 5, 2016, and to have completed implementing "all provisions" of the agreement a month later.

Perhaps sensing this, Defendants seize upon the words "implementation" and "implement" as supposedly ambiguous. (Dkt. 536 at 14–15). For starters, they assert that ambiguous terms "must be construed in the[ir] favor," (dkt. 535 at 15), but that is not at all

obvious in this instance.[22]  In any event, "implement" and "implementation" are not ambiguous.

Relying on common dictionaries, courts have concluded that implement and implementation

mean:  "carrying out or accomplishing or giving practical effect to and ensuring . . . actual

fulfillment by concrete measures," *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d

697, 707 (E.D. Va. 2010); or to "fulfill," "perform," or "complete."  *Project Vote, Inc. v. Kemp*,

208 F. Supp. 3d 1320, 1337 (N.D. Ga. 2016).  The terms, then, do not connote *trying* to do

something, or *partially* doing something, or *meeting about* doing something, or *starting* to do

something with vague aspirations of finishing.  Rather, those terms mean *actually doing it*.[23]

And the "it" here was Defendants' implementation of "all provisions of this Settlement

Agreement," including the standards the Court has found they have thus far failed to satisfy.[24]

As a last line of retreat, Defendants maintain that what matters is not the language of the

Settlement Agreement, but the *compliance monitor's interpretation* of it.  (Dkt. 538 at 13–15).

---

[22]    The Settlement Agreement section addressing "construction" of the document is silent as to which, if any, party the agreement should be construed against.  Moreover, the agreement was the joint product of the parties' negotiations.

[23]    This point undercuts the relevance of Defendants' contention that they have "seriously attended to their obligations" under the Settlement Agreement.  (Dkt. 538 at 15–16).  They make much ado about their "seriousness of purpose" and thousands of pages of meeting minutes taken during a lengthy series of well-attended internal deliberations.  (*Id.* at 15–16; dkt. 535 at DFF ¶¶ 77–81, 87).  Those things are meaningless without results.  Defendants are not charged with talking about improving medical care at FCCW, or meeting about improving it, or wanting to improve it, or hoping that it improves.  They are charged with actually improving it, and doing so by adhering to the obligations they undertook in the Settlement Agreement.  Meeting minutes and self-congratulations do not provide adequate medical care to the women at FCCW whose lives and well-being depend on it.

[24]    Contrary to Defendants' view, the plain meaning of "implement" and "implementation" does not render other features of Settlement Agreement meaningless.  They believe, for instance, that if implementing their obligations means completing them, then there is no point or reason for compliance monitor site visits.  But the requirement that Defendants meet their obligations is consistent with provisions that test whether they in fact have done so. The maxim "trust, but verify" applies, especially given the facts and history of this case.

But the Settlement Agreement did not and could not outsource the judicial role in interpreting the agreement. The agreement itself, as well as the final judgment order, make plain that the Court retains jurisdiction over and enforces the Settlement Agreement. That the compliance monitor plays a part in evaluating compliance to decide whether to exercise his discretion to reduce site visits, or in the eventual termination of the agreement, does not oust the Court's ultimate role in interpreting and enforcing the agreement. The compliance monitor is just a monitor, not an arbitrator. Moreover, when, as here, a contract is not ambiguous, its meaning is a question of law for the Court to decide. *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 188 (Va. 2016); *S'holder Representative Servs., LLC v. Airbus Americas, Inc.*, 292 Va. 682, 692–93 (Va. 2016); *Sch. Bd. of City of Newport News v. Virginia*, 279 Va. 460, 467–68 (Va. 2010).[25]

## VI. The Standards Defendants Have Breached Are Not Unenforceably Subjective.

It is regrettably necessary to address Defendants' position that their obligations under the Settlement Agreement are so "subjective" they do not inform Defendants what is required. (Dkt. 536 at 12). First, the Settlement Agreement is a contract, a deal Defendants struck to avoid trial. If they felt its language *about their own obligations* did not sufficiently apprise them of what they had to do, then that is their own fault. Second, Defendants pluck a few phrases or headings from the Settlement Agreement and assert that they are not clear enough. (Dkt. 536 at 12). There is no effort to analyze the terms of the agreement or specific standards, draw out their details, or explain why or how they are so subjective that they cannot be enforced.

---

[25]  Defendants further point to the testimony of Plaintiffs' nursing expert to show that compliance with some standards would not be expected until perhaps 60 days after the effective date. But this is unconvincing. First, the Court has not adopted that testimony in its findings of fact. Second, even if it had, Defendants' noncompliance has lasted well beyond the supposed 60-day window. And third, again, the Court does not outsource the interpretation of the Settlement Agreement.

47

The key point, however, is that the Settlement Agreement does not set an Olympic bar for Defendants. It does not require FCCW to be the Mayo Clinic or Johns Hopkins Hospital. Instead, the Settlement Agreement simply imposes very basic medical standards and tasks that will bring medical care to an adequate level, something that has been and continues to be absent in significant respects. The kinds of failures that have gone on at FCCW, and the standards implemented to remedy them, are fundamental ones that any reasonable person responsible for medical care should be familiar with.

The Court has reviewed the eight standards it has found Defendants breached, as well as the egregious facts surrounding many of them. (*Supra* COL §§ IV.A–H). The Court finds those standards are clear enough that Defendants should easily have known that what has transpired at FCCW is unacceptable under the agreement. No reasonable person could read the Settlement Agreement and think that it was permissible, *e.g.*: for Andrea Nichols to wait three years for a colonoscopy while cancer rotted her body and invaded her liver; or for a medical prison to lack ready access to emergency medical equipment; or for nurses to fail to (and even not know how to) reorder medications; or for extreme chest pain, wheezing, and excessive weight changes to go uncharted and unexamined by a doctor.

## VII. The Substantial Compliance and Good Faith Defenses Do Not Apply.

Defendants further contend the Settlement Agreement must not be enforced against them because they have substantially complied with their obligations.[26] (Dkt. 536 at 19–20). Substantial compliance or substantial performance "does not constitute a complete defense to liability for breach of contract, but is designed rather to prevent total forfeiture by a contracting party who is guilty of only trivial breaches of contract." *Ballou v. Basic Const. Co.*, 407 F.2d

---

[26] Note the tension of that position when juxtaposed against Defendants' prior argument. On one hand, Defendants assert the Settlement Agreement is so subjective they do not know what to do. On the other hand, Defendants assert they've substantially done it.

48

1137, 1140 (4th Cir. 1969). "Substantial compliance is the inverse of the proposition that a breach of the contract must be 'material' or significant . . . ." *Culpeper Reg'l Hosp. v. Jones*, 64 Va. App. 207, 214 (Va. Ct. App. 2015); *e.g.*, *Bile v. RREMC, LLC*, No. 3:15CV051, 2016 WL 4487864, at *6 (E.D. Va. Aug. 24, 2016). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Va. Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 655 (4th Cir. 2017) (quoting *Horton v. Horton*, 254 Va. 111, 115 (Va. 1997)). So if a defendant has substantially complied, his contractual shortcomings are by definition immaterial.

The Court assumes that the substantial compliance doctrine applies to the Settlement Agreement.[27] Defendants' breaches are nonetheless material and significant. They go to the heart of the Settlement Agreement. In its "substantive provisions" under the heading "statement of purpose," the agreement makes plain that Defendants are "obligated to achieve and maintain compliance with," among other things, the eight standards the Court finds they have violated. (Dkt. 221-1 at 5; *see id*. at 8–15 (setting out 22 standards)). The whole point of these standards, and indeed the agreement, is that Defendants must abide by them, and in doing so improve medical care at FCCW.

Defendants also tout their own good faith efforts to comply. But a party's good faith "will not prevent his failure to perform a duty from amounting to a breach." *Bile v. RREMC, LLC*, No. 3:15CV051, 2016 WL 4487864, at *7 (E.D. Va. Aug. 24, 2016) (quoting *Restatement (Second) of Contracts* § 241 cmt. f); *see Flanders & Medeiros, Inc. v. Bogosian*, 65 F.3d 198, 204 n.9 (1st Cir. 1995) (noting that "good faith is not a defense to a breach-of-contract claim")

---

[27] The doctrine does not cover all contracts. It applies to some agreements like deeds of trust, *Stansbury v. Fed. Home Loan Mortg. Corp.*, No. 7:16-CV-00516, 2017 WL 3821669, at *3 (W.D. Va. Aug. 31, 2017), *aff'd*, 732 F. App'x 216 (4th Cir. 2018), but not others, like escrow agreements. *Davis v. Holsten*, 270 Va. 389, 396 (Va. 2005).

49

(citing *Restatement (Second) of Contracts* § 11, introductory note (1979)); E. Allen Farnsworth, *Contracts* § 12.8, at 761 (4th ed. 2004) (explaining that contract law is "a law of strict liability" and "operates without regard to fault"); 14 Williston on Contracts § 43:5 (4th ed. Nov. 2018 Westlaw) ("[G]ood faith differences between the parties as to the scope of their contractual undertakings do not relieve either party of its duty of performance."). A "pure heart and an empty head are not enough." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 (4th Cir. 2007) (holding that good faith is not a defense to breach of fiduciary duty claim). So to the extent good faith exists, it is legally irrelevant.

## VIII. Remedies for Breaches of the Settlement Agreement.

Finally, the Court comes to the question of remedy. Post-trial, Plaintiffs submitted a proposed order enforcing the Settlement Agreement. (Dkt. 537 at ECF 25–41). Some facets of Plaintiffs' proposal appear no longer needed (*e.g.*, hiring a full-time on-site medical director). Other aspects, in the Court's view, are not narrowly drawn, or extend further than necessary, or are not the least intrusive means of providing a remedy, or might adversely affect the criminal justice system's operation at FCCW: *e.g.*, imposing certain conditions on requests for proposals at FCCW; mandating access to certain information and deeming it admissible in any future proceeding; reassigning authority to hire and fire medical personnel; creating quarterly evidentiary hearings with the Court. (*See* dkt. 537 at ECF 35–37; 18 U.S.C. § 3626).

The Court, therefore, will craft its own injunctive order that more appropriately tailors the relief in light of the Court's findings and the evidence. For instance, the order will require 78 full-time nursing equivalents at FCCW, which is what Nurse Katzman found necessary to adequately staff her team. (FF ¶ 110). Medical equipment such as backboards and suction machines—the type of equipment not readily available during multiple inmate deaths, (*e.g.*, FF ¶¶ 51–62, 66, 73)—will be in every FCCW building. The order will also require nurses to be

50

trained on how to reorder medications, as well as identify and respond to signs of cardiovascular or pulmonary problems. (*See* FF ¶¶ 49–51, 68–71, 75–78, 83–86). The Court recognizes that several months have passed discovery concluded and the trial took place, so some aspects of relief may no longer be necessary. Moreover, the parties and the compliance monitor have expertise that the Court necessarily lacks. The parties may thus seek reconsideration of the relief tailored by the Court within the period provided by Fed. R. Civ. P. 59(e).

## CONCLUSION

Over six years ago, women at FCCW filed this lawsuit, seeking a remedy for pervasive constitutionally deficient medical care. Their quest continues. Some women have died along the way. But this case has survived because Defendants have upheld neither their Eighth Amendment obligations nor the Settlement Agreement they reached to effectuate those obligations. Accordingly, for the reasons explained above, the Court will enter an order enforcing the Settlement Agreement, and the show cause order regarding contempt will be discharged. The Clerk is directed send a copy of these findings and conclusions to counsel.

Entered this ___2nd___ day of January, 2019.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

51