IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |
|---|---|
| CYNTHIA B. SCOTT, *et al.*, ) <br> ) <br> *Plaintiffs*, ) <br> ) <br> v. ) <br> ) <br> HAROLD W. CLARKE, *et al.*, ) <br> ) <br> *Defendants*. ) <br> ) <br> ) | Case No. 3:12-cv-00036 <br> (Sr. Judge Norman K. Moon) |

PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR MOTION TO ALTER OR AMEND JUDGMENT
<u>PURSUANT TO FED. R. CIV. P. 59(e)</u>

Plaintiffs, by counsel, submit this Memorandum in support of their Motion filed pursuant to Fed. R. Civ. P. 59(e). Plaintiffs respectfully assert that the relief granted in the Court's Injunction of January 2, 2019 (ECF No. 545) is insufficient to remedy the systemic violations of the Settlement Agreement identified by the Court's Findings of Fact and Conclusions of Law (ECF No. 544), and that further relief, as set forth below, is warranted.

I.  INTRODUCTION

This case concerns the health and welfare—indeed, the very lives—of 1,200 women incarcerated at the Fluvanna Correctional Center for Women. The Court is familiar with this case's seven-year history and the magnitude of Plaintiffs' suffering throughout that history. At present, Plaintiffs seek expansion of the relief granted by the Court's Injunction issued following

1

trial on Plaintiffs' Motion for Order to Show Cause. The overwhelming weight of the voluminous record developed at trial, and this Court's own Findings of Fact and Conclusions of Law based thereon, reflect the need for further relief.

The evidence before the Court in this matter is expansive. As the Court notes in its Findings of Fact and Conclusions of Law, the "volume and intensity of discovery" in this case "rivaled that of the hardest-fought merits litigation." ECF No. 544 at 4. Including expert depositions and depositions in lieu of testimony at trial, the parties conducted over 20 depositions, continuing up to the week before trial. Defendants produced over 94,000 pages of documents. Plaintiffs' two experts and Defendants' four experts all prepared reports, were deposed, and were the subject of *Daubert* motions. This intense preparation culminated in last June's week-long trial, during which the Court heard from experts, prisoners, and VDOC officials.

On January 2, 2019, the Court issued Findings of Fact and Conclusions of Law and an Injunction. The Findings of Fact are extensive and detail FCCW's failures in such areas as patient access to care, medication administration, staffing, and emergency responses. Based on the evidence before it, the Court concluded that the record confirmed that "Defendants have upheld neither their Eighth Amendment obligations nor the Settlement Agreement they reached to effectuate those obligations." *Id.* at 33, 51. Although the Court declined to find Defendants in contempt due to its interpretation of Rule 65(d) precedent in the Fourth Circuit, it did find Defendants in violation of eight provisions of the Settlement Agreement. To remedy these violations, the Court issued its Injunction, which it crafted "in light of the Court's findings and the evidence." *Id.* at 50.

By this Motion, Plaintiffs respectfully argue that the relief provided in the Court's Injunction, while welcome, is insufficient to adequately remedy the extensive harms caused by the Defendants' violations and identified by this Court's Findings of Fact. This is especially true in light of the Court's finding that "[w]hat has been lacking at FCCW is proper medical leadership and aggressive corrective action, and perhaps also *adequate motivation.*" *Id.* at 34, emphasis added. Defendants have shown throughout the years-long history of this case that they are loath to take action unless their "feet are held to the fire." *Id.* at 45. Defendants' ongoing refusal to take responsibility for their obligations under the Settlement Agreement—even following this Court's unambiguous decision finding numerous violations of the Settlement Agreement—is evidenced by Director Clarke's recent testimony to the Virginia House of Delegates Appropriations Committee. On January 16, 2019, in his testimony to the Committee, Director Clarke described the Court's Injunction as follows:

> In essence, what the Court did—the Court did not find the Department in contempt, and the Court also did not fine the Department. What—what it did, of the 22 approximately requirements that we were to fulfill in the original Settlement, the Court found that fourteen had been satisfied, and that eight of those requirements remained to be addressed. So the Court basically re-stated those eight requirements, and attached dates that they ought to be completed by. **The original Settlement allowed us up to the end of 2019 to address those issues,** so I would argue that the Plaintiffs' filing was somewhat immature—I'm sorry, premature—in so doing.[1]

This statement flies in the face of the Court's clear rejection of that argument and its finding that "Defendants' Deadline to Comply with the Settlement Agreement Came Years Ago." ECF No.

---

[1] Video file: Testimony of Harold Clarke to the Virginia House of Delegates Appropriations Committee (Jan. 16, 2019) (emphasis added) (available online at https://sg001-harmony.sliq.net/00304/Harmony/en/PowerBrowser/PowerBrowserV2?fk=1587&viewMode=2) (link provided at http://hac.virginia.gov/committee/CommitteeInfo.htm.), last accessed January 30, 2019. The quoted testimony may be viewed at time marker 4:30:00-4:31:00.

3

544 at 42. Director Clarke's view that the Court's Injunction merely "restates" the requirements of the Settlement Agreement further demonstrates the need for expanded relief.

Given the Department's ongoing inertia and continued disclaimer of responsibility, the scope of the violations identified by this Court, and the lives potentially at stake, further relief is necessary if Plaintiffs' quest for adequate healthcare is to end in success. "[An] injunction must… be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion. In particular, the district court has the discretion to issue a broad injunction in cases where a proclivity for unlawful conduct has been shown." *Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010) (citations and quotations omitted).

Plaintiffs respectfully submit that the current Injunction must be expanded to be effective, and that such expansion is particularly appropriate in this case, where Defendants' proclivity to violate Plaintiffs' constitutional right of access to adequate healthcare has been established over the course of many years. Accordingly, Plaintiffs respectfully request expanded relief as set forth below.

## II.   REQUEST FOR EXPANDED RELIEF

### A.  Staffing (Standard i)

#### 1.  Nurse staffing

The Court concluded that the record "overwhelmingly demonstrates that nurse staffing at FCCW has been insufficient," noting that "by January 2018, staffing was *worse* than it was when the Settlement took effect." ECF No. 544 at 33 (emphasis in original). The remedy for FCCW's persistent understaffing provided in the Injunction is a requirement that FCCW "continuously staff FCCW with the equivalent of seventy-eight full-time nurses" and provide documentation of

4

staffing levels to the Compliance Monitor. ECF No. 545 at 2. However, crucially, the Injunction fails to specify the *types* of nurses to be employed. This is a critical omission given the evidence before the Court regarding FCCW's over-reliance on LPNs rather than more qualified nurses, including Dr. Scharff's repeated criticisms of this practice in his reports. *See, e.g.*, ECF No. 544 at 13, ¶ 63 (Deanna Niece evaluated by an LPN "in passing"); at 20, ¶¶ 111-115 (sick call conducted by LPNs ineffective). The Court specifically recognized that Deanna Niece's death was a symptom of systemic issues with deficient medical care at FCCW, including, *inter alia*, "the failure of an appropriate medical professional to evaluate her…," as she instead received only an evaluation "in passing by an LPN." ECF No. 544 at 13, ¶ 63. Yet, as currently written, FCCW could comply with the Court's injunction by staffing FCCW with 78 LPNs and no higher-qualified nurses.

Plaintiffs respectfully request that the Court amend its Injunction to specify an appropriate distribution of nursing qualifications (i.e. LPNs and RNs). Just as the Court relied upon Ms. Katzman's assessment of FCCW's nurse staffing needs in determining that 78 nurses was an appropriate staffing requirement (ECF No. 544 at 19, ¶ 110; *id*. at 50), so it can likewise rely upon her assessment in determining the appropriate distribution of staffing qualifications. Ms. Katzman's testimony on this subject was given in response to questions based on FCCW's April 5, 2018 QA/CQI meeting. ECF No. 523 at 120; DTX 12 at RFP900002918-949. As of that meeting, Ms. Katzman reported that 15 RNs were currently working at FCCW and identified 13.7 RN vacancies. Accordingly, based on FCCW's Nursing Director's own assessment in April 2018, at least 28.7 of the 78 nurses needed to properly run FCCW's medical department should be RNs. Plaintiffs request that the Court amend the Injunction to require a minimum of 29 RNs to be staffed at FCCW, and that FCCW staff a sufficient proportion of RNs on a consistent basis

to ensure coverage on every shift and adequate RN oversight of LPNs on duty at any given point in time.

In addition, Plaintiffs request that the Court amend its Injunction to require DOC to provide FCCW with sufficient funds to maintain the employment of these nurses.

### 2. Nurse training.

The Injunction also mandates that nurses be trained regarding how and when to reorder or refill medications; how to accurately record or chart the distribution of medication and patient vital signs; how to timely respond to medical emergencies; and how to identify and address signs of cardiovascular and pulmonary afflictions.  ECF No. 545 at 2-3.  While Plaintiffs fully support the institution of increased training standards for FCCW staff, a remedy consisting only of additional training falls short of addressing the extent of the failures in medication availability, medication administration, record accuracy, patient charting, and emergency response identified by the Court in its Findings of Fact.  *See, e.g.*, ECF No. 544 at ¶¶ 44-64; 77; 89-94; 117-121.

In addition, the evidence before the Court indicates that FCCW nurses were *already* being trained on some of the topics identified for additional training in the Injunction.  Barbara Seabert, FCCW's Director of Nursing from December 2016 through March 2018, testified on direct examination that she instituted a nurse training system at FCCW that included training on using Sapphire, FCCW's electronic medication administration record.  ECF No. 524 at 39.  Nurse Seabert testified that she "worked days, [] worked nights, just to get my nurses trained." *Id.*  Her program also included training in CPR.  *Id.* at 40.  Nurse Seabert testified that she maintained this training program from January 2017 through the end of her employment at FCCW in early 2018.  *Id.* at 41.  The fact that FCCW was already providing training on some of

these tasks throughout the period of noncompliance demonstrates the inefficacy of a remedy that consists solely of additional training.

Accordingly, Plaintiffs respectfully request that the Court order Defendants to collect and track data regarding each topic it identified for additional nurse training (i.e., data regarding medication administration, reorders, and refills, including instances of missed doses because the medication was not available; audits of patient charts to ensure appropriate tracking of vital signs, including weight and pulse rate; and data regarding emergency responses, including the time between emergency calls and the arrival of medical staff on the scene) and that Defendants be required to provide this data to the Compliance Monitor. Plaintiffs also request that the Court order Defendants to track data regarding the occurrence and content of nurse training and provide it to the Compliance Monitor.

### B. Emergency Care and Equipment (Standard vii)

The Court found that Defendants breached the Settlement Agreement standard requiring appropriate and timely responses to medical emergencies and ready availability of properly maintained medical supplies and equipment. ECF No. 544 at 35. As the Court observed, the devastating consequences of FCCW's failure to meet this standard are reflected in the deaths of Deanna Niece, Carolyn Liberato, and Arlene Duke: "In sum, the medical treatment these women received was neither timely nor appropriate, and their deaths illustrate the danger of not having appropriate medical equipment on hand." *Id.* at 36; at 14, ¶ 73 ("Liberato's death was indicative of systemic problems at FCCW, such as deficient emergency medical care.").

The Injunction appropriately requires FCCW to place backboards/stretchers, oxygen tanks and masks, and suction machines in all housing buildings at FCCW. ECF No. 545 at 3. However, this remedy fails to reach the additional issues identified by the Court concerning the

*timeliness* and *appropriateness* of FCCW's response to medical emergencies—both of which the Court specifically found lacking. For example, the Court found that timely emergency care transportation was provided barely half the time from July 2016-July 2017, and that at various points during 2017, FCCW's compliance rate for properly charting and documenting emergency issues fell to 50%. ECF No. 544 at 7, ¶¶ 11-12. Accordingly, Plaintiffs respectfully request that the Court amend the Injunction to require FCCW to regularly evaluate the timeliness and adequacy of its emergency responses, and to provide this evaluation to the Compliance Monitor.

### C. Mortality Reviews (Standard xx)

The Settlement Agreement requires DOC to complete a mortality review after each patient death and requires each such review to contain a self-critical analysis of whether the death was preventable or, if the death was not preventable, a discussion of how the patient's care might have been improved. ECF No. 221-1 at 13-14. Tragically, DOC has had frequent cause to compose these reviews: 12 women died at FCCW in the two-and-a-half years between implementation of the Settlement Agreement and trial in this matter. Unfortunately, in this case, practice did not make perfect; as this Court stated, "[m]ultiple mortality reviews of inmates at FCCW conducted by FCCW or VDOC doctors do not contain 'self-critical analysis' or commentary." ECF No. 544 at 16, ¶ 88. The Court particularly noted DOC's failures in the case of Arlene Duke, whose mortality report entirely neglected to discuss "whether the steps leading up to Duke's death were appropriate or whether her death could have been prevented with proper care." *Id.* at 16, ¶ 87; at 37.

To remedy this violation, the Injunction requires all future mortality reviews to "contain a heading entitled 'self-critical analysis',' " under which the reviewer must include a "self-critical analysis of FCCW's medical care of the deceased inmate, including how medical care could

have been improved." ECF No. 545 at 4.  The Injunction also requires that, in the event a mortality review concludes that a decedent's care could not have been improved, the review be provided to the Court and Plaintiffs' counsel.  *Id.*

Plaintiffs welcome the requirement that Defendants submit reviews claiming that care could not possibly have been improved to the Court.  However, aside from this requirement, the Injunction does nothing more than impose obligations already set forth in the Settlement Agreement, which Defendants breached ("This review should be self-critical, including explicit consideration as to whether the death was preventable.  It should also include a discussion of how the care might have been improved, even if the death was not preventable.").  Plaintiffs respectfully submit that, given the serious and systemic deficiencies in DOC's conduct of mortality reviews, new relief consisting only of a requirement that DOC submit reports finding no possible improvements in care to the Court is insufficient.  This is especially true given that, as the Injunction is written, Defendants could avoid submitting reports to the Court by merely identifying a single potential improvement in care, no matter how inconsequential.

Plaintiffs thus respectfully request that the Court amend its Injunction to require FCCW to develop a written protocol for mortality reviews, including provisions for collecting patient data, sworn statements from medical staff who treated the patient, and interviews with prisoners who observed the patient in the time period leading up to her death.  Plaintiffs further request that the Injunction require appropriate follow-up training within a short time period for medical providers when an analysis indicates that a decedent's medical care could have been improved and/or her death prevented.

### D.  Medication Supply, Distribution, and Administration (Standard xii)

The Court found that FCCW "frequently" allowed patients' medications to run out, resulting in missed doses that were routinely inaccurately documented in the patients' charts, creating "a false record." ECF No. 544 at 21, ¶¶ 117-120. These omissions can cause devastating consequences for patients who depend on life-sustaining medicines. The Court also specifically found that FCCW's practice of "pre-pouring" medications "is dangerous because inmates receive the medicines in unmarked containers and cannot ensure that they receive the correct medicine in the correct dose." *Id.* at 21-22, ¶ 121. As the Court noted, a system that depends on pre-pouring can have serious consequences, as demonstrated by Toni Hartlove's experience. *Id*. at 38.

Based on these findings, the Court concluded that "Defendants Have Failed to Appropriately and Timely Supply, Distribute, and Administer Medications" in violation of Standard xii of the Settlement Agreement. ECF No. 544 at 38. However, the only relief bearing on medication administration offered by the Injunction is the requirement of additional training for nursing staff. While, as noted above, Plaintiffs welcome improvements in FCCW's training practices, a remedy limited solely to more training provides no guarantee that nurses will actually perform their duties in accordance with that training. As written, FCCW could comply with the Court's Injunction by conducting a round of minimal training sessions that have no practical effect on nursing practice at FCCW. Absent a requirement for actual improvement, and a way to measure that improvement, the Injunction cannot ensure that the additional nurse training it mandates will have the desired effect. Plaintiffs thus request the Court to amend the Injunction to require Defendants to enhance the FCCW medication administration system to allow documentation of unavailable doses, and require documentation of such doses; to establish written training procedures regarding medication administration and share said procedures with

Plaintiffs and the Compliance Monitor; and to monitor nurses' performance of their duties in medication administration, regularly evaluate them based on their performance, and establish disciplinary procedures for nurses who fail to follow proper procedure.

In addition, a remedy limited to additional training provides no relief at all for patients endangered by FCCW's practice of pre-pouring medications.  The Court's findings are clear about the risks pre-pouring poses to patients; yet, nothing in the current Injunction forbids this dangerous practice.  Plaintiffs respectfully request that the Court amend its Injunction to prohibit pre-pouring.

### E.  Access to Timely Medical Care (Standard vi)

The Court also found Defendants in violation of standard vi of the Settlement Agreement, which requires that patients be provided "unimpeded access to timely medical care at an appropriate level."  ECF No. 221-1 at 9.  Lamentably, the record before the Court in this case is replete with examples of the lethal consequences of DOC's failures in this regard.  Women have died: Deanna Niece, who collapsed on the morning of her death, but was never examined by a doctor; Carolyn Liberato, who should have been seen by a doctor after she reported dizziness and chest pain; Arlene Duke, who was given only Tylenol in response to her complaints of pain, nausea, and short breath days before her death; and others.  *See* ECF No. 544 at 37, 39.  Two women who died in 2017—Carolyn Liberato and Marie Johnson—experienced significant changes in weight in the weeks prior to their deaths.  *Id.* at 39.  These changes went "unnoticed and unaddressed" and were not documented by medical providers.  *Id.*  Other women have managed to survive, but now suffer from advanced illness that could have been avoided had FCCW provided the "unimpeded access" to timely care required by the Settlement Agreement.  As the Court noted, for Andrea Nichols—who waited more than three years for a diagnostic

colonoscopy—FCCW's violation of this standard "tragically . . . amounted to metastatic cancer." ECF No. 544 at 39. In short, the Court's Findings of Fact detail serious, systemic problems in diagnosis and treatment at FCCW, sometimes with fatal results.

To remedy these failures, the Injunction requires DOC to "develop a protocol ensuring unimpeded access to timely medical care." ECF No. 545 at 3. In doing so, DOC is to take into account the illustrative poor care and delays experienced by certain patients, and to consider how similar experiences can be prevented in the future; they are also to evaluate deficiencies in FCCW's sick call procedure and document planned remedial actions. *Id.* at 3-4. This protocol, along with "documentation showing…satisfaction of the requirements" referenced above, is to be submitted to Plaintiffs and the Compliance Monitor. *Id.*

While a detailed protocol ensuring unimpeded access to timely medical care is certainly needed at FCCW, Plaintiffs do not believe that merely requiring the *development* of such a protocol is a sufficient remedy for the far-reaching failures identified in the Court's Findings of Fact. At the very least, some mechanism for determining adherence to the protocol is warranted. Plaintiffs request that the Court amend the Injunction to require DOC to develop performance measures to assess compliance with the protocol, and to require that these performance measures be approved by the Compliance Monitor. In addition, Plaintiffs request that the Injunction require DOC to gather and evaluate qualitative and quantitative data regarding the topics addressed in the protocol at regular intervals, and that this data be shared with the Compliance Monitor.

### F. Sick Call (Standard iv)

The Court found that DOC violated the Settlement Agreement provisions regarding sick call, noting that non-emergency requests for care were not consistently screened for urgency

within 24 hours or referred to a medical provider in no more than 72 hours. ECF No. 544 at 40. The Court cited Dr. Scharff's statement that sick call as carried out at FCCW was "ineffective" and "serve[d] substantially to delay care." ECF No. 544 at 20, ¶ 115. The Court further found that DOC's own contract monitor concluded, as of 1/26/2018, that DOC was "not currently abiding by the settlement agreement['s]" requirements with regard to the timeliness of sick call triage and provider referrals. *Id*. ¶ 116. The Court enjoined Defendants to "develop a protocol ensuring unimpeded access to timely medical care" including a command to "evaluate the deficiencies in FCCW's sick call process (including the failure to screen sick calls within 24 hours and make provider referrals within 72 hours) and document specific actions Defendants will take to remedy them." ECF No. 545 at 3-4.

Plaintiffs respectfully submit that the record reflected by the Court's Finding of Facts with regard to Defendants' noncompliance with the sick call provisions of the Settlement Agreement is sufficiently severe to warrant additional injunctive relief. Defendants' serious failures to comply with the sick call standards of the Settlement Agreement support the requirement that Defendants *not only* be required to evaluate their sick call process and document actions they will take to remedy its deficiencies, but that they *also* be required to demonstrate that they are in substantial compliance with the specific, measurable timelines provided by the Settlement Agreement. Plaintiffs further request that the Defendants be required to provide documentation of their protocol, remedial steps, *and* level of compliance with the sick call timelines to the Compliance Monitor.

### G. Grievance System (Standard xv)

The Plaintiffs are in agreement with the substance of the Court's Injunction requiring not only additional training of personnel with respect to supplying meaningful responses to medical

13

grievances, but also requiring that a system documenting the provision of meaningful responses be supplied in a timely manner. ECF No. 545 at 4. The Court further describes the inadequacy of the grievance system in its Findings of Fact, concluding that audits in 2016 and 2017 showed inadequate responses and that "[t]he failure to adequately respond to grievances is a systemic problem at FCCW." ECF No. 544 at 23, ¶ 127. The evidentiary sources to which the Court cites in making these conclusions, as well as other portions of the same documents, refer to grievances at all levels, including informal complaints (required before proceeding to a regular grievance) and emergency grievances, in addition to regular grievances. *See, e.g.*, PTX 34, Report of 3/25/16 at 3; PTX 34, Report of 6/25/2017 at 13-14, PTX 34, Report of 1/9/2018 at 15-18.

Plaintiffs thus request that the Injunction be amended to clarify that the prescriptions of paragraph 12 of the Injunction apply not only to regular grievances, but to all levels of the grievance process, including informal complaints and emergency grievances. Furthermore, the Plaintiffs request that the Injunction require DOC to share its documentation system and data demonstrating meaningful and timely responses with the Compliance Monitor.

### H. Plaintiffs' Access to Information

As the Court noted in its Findings of Fact, the parties engaged in "extensive discovery" in this proceeding, the "volume and intensity [of which] rivaled that of the hardest-fought merits litigation." ECF No. 544 at 1, 4. This included "several conferences and hearings to resolve various motions and discovery matters" and the submission of numerous motions in limine. Id. at 4. Much of this discovery, and the associated expense (to both parties) and judicial resources, was necessitated by Plaintiffs' lack of access to information regarding medical operations at FCCW. Although the Settlement Agreement expressly provides for data and analysis from FCCW's performance measures to "be tracked and trended over time and shared with the Parties

through counsel on a quarterly basis," Plaintiffs have been unsuccessful in obtaining information from the Attorney General's office on this basis since early 2017.  ECF No. 221-1 at 14.

Plaintiffs are committed to fulfilling the Court's admonishment at the November 2015 Fairness Hearing to see to it that the changes agreed upon in the Settlement Agreement are actually carried out.  To best enable Plaintiffs to fulfill this obligation, and in the interest of avoiding expense and conserving judicial resources in any future proceedings, Plaintiffs respectfully request that the Court amend its Injunction to require Defendants to share all performance measure information provided to the compliance monitor within 30 days of Plaintiffs' request, with such request by Plaintiffs to be made not more than four times per year.

### III.  Incorporation of Specific Provisions of the Settlement Agreement

As expressly noted by the Court, Fed. R. Civ. P. 65(d)(1)(c) "requires that every injunction must 'describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required.'"  ECF Dkt. No. 544 at 23.  Applying this standard in accordance with the strict construction it deemed to be mandated by governing Fourth Circuit precedent, the Court concluded that its February 5, 2016 Order formally adopting and approving the Parties' Settlement Agreement, which was incorporated by reference in the Order, did not comply with Rule 65(d)(1)(c).  As a result, the Court held that its prior Order could not be enforced by a finding of contempt against the VDOC Defendants for their numerous violations of the Settlement Agreement's terms.  *See id.* at 26-29 and case authorities cited and discussed therein.

Without conceding the correctness of the Court's determination that the Court of Appeals' interpretation of Rule 65(d) allows no latitude for a finding that the VDOC Defendants waived (or forfeited) their reliance on the Rule in order to avoid a contempt finding by failing to

raise it until the post-trial briefing stage of these lengthy proceedings, Plaintiffs – looking forward – seek to avoid any future contention, should circumstances of further breach arise, that the substantive terms of the Settlement Agreement are not amenable to enforcement through an exercise of this Court's contempt power. To negate this prospect, Plaintiffs respectfully suggest that the Court's Injunction, in lieu of merely reciting that the Settlement Agreement remains in full force and effect, be modified and supplemented by express inclusion, *in full text*, of Sections III through VII of the Settlement Agreement, ECF Dkt. No. 221-1 at 3-27. Through adoption of this measure, there will no longer be any room for argument that the Injunction *itself* fails to "describe in reasonable detail . . . the act or acts restrained or required" as mandated by Rule 65(d)(1)(c), and the full panoply of civil contempt sanctions – including monetary fines – will be available for imposition by the Court in the hopefully unlikely event that the VDOC Defendant's recalcitrance persists.

Plaintiffs also suggest that the Court employ the same definitions used in the Settlement Agreement in its amended Injunction, so as to avoid any potential ambiguities.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court grant their Rule 59(e) motion, enter the Proposed Amended Injunction attached hereto as Exhibit 1, and any further relief that the Court deems just and necessary.

Respectfully submitted,

**PLAINTIFFS,**

*individually and on behalf of all others similarly situated*

By: /s/ Shannon Ellis

    Of Counsel

Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Angela Ciolfi, VSB No. 65337
(angela@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Adeola Ogunkeyede (admitted *pro hac vice*)
(adeola@justice4all.org)
Shannon Ellis, VSB # 89145
(shannon@justice4all.org)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553


Philip Fornaci (admitted *pro hac vice*)
(phil_fornaci@washlaw.org) WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP

17

1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 30th day of January 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_/s/ Shannon Miller_
Of Counsel