# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CYNTHIA B. SCOTT, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 3:12-cv-36 |
| ) | |
| HAROLD W. CLARKE, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

### MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)

COME NOW defendants Harold W. Clarke, A. David Robinson, Stephen Herrick, Eric Aldridge, and Dr. Paul Targonski (collectively "Defendants"), by counsel, and submit this Memorandum in Support of their Motion to Alter or Amend the Court's Injunction Order. In support thereof, Defendants state as follows:

#### ARGUMENT & AUTHORITIES

**I.    Standard of Review**

A court may amend or alter a judgment under Rule 59(e) "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Hutchinson v. Staton, 994 F.2d 1076, 1081 (4th Cir. 1993).

**II.   Ellen Katzman Did Not Testify that the Equivalent of "78 full-time" Nurses Are Needed to Adequately Staff FCCW.**

The Court ordered Defendants to "continuously staff FCCW with the equivalent of seventy-eight full-time nurses." ECF No. 545, at *2. "Nurse(s)" is a defined term under the



Court's Order and includes registered nurses and licensed practical nurses ("LPNs"). Id.[1] The foundation for the Court's Order was its written Findings of Fact and Conclusions of Law. The Court's Findings of Fact and Conclusions of Law contains a finding of fact that FCCW nurse Ellen Katzman ("Katzman") "and another nurse determined that the equivalent of '78 full-time' nurses are needed to adequately staff FCCW." ECF No. 544, at FF ¶ 110 (citing ECF No. 523, at *127 (Katzman's trial testimony)). Katzman, however, did not testify that "78 full-time" nurses were needed to adequately staff FCCW. She testified that seventy-eight "full-time equivalents were necessary to adequately staff Fluvanna[.]" **Ex. A**, ECF No. 523 at 127:6–9. During that questioning Plaintiffs' counsel showed Katzman a document from the May 10, 2018, FCCW QA/CQI meeting. Id. at 127:10–13. That document listed the number 77.65 at the bottom, which represented the "total number of staff both with Armor and VDOC agency nurses[.]" Id. at 127:14–17. That document was RFP900003030 and submitted as part of Defendants' Trial Exhibit 12.

RFP900003030 is an assessment of the number of staff employed in the medical department at FCCW as of May 10, 2018. **Ex. B,** Defs. Trial Ex. 12, Tab 74, RFP900003030. The 77.65 number includes the Health Services Administrator ("HSA"), Medical Director, and Director of Nursing ("DON") along with other certified medical professionals (i.e., doctors, nurse practitioners ("NPs"), physician's assistants ("PAs"), registered nurses ("RNs"), LPNs, and certified nursing assistants ("CNAs")) and non-certified staff such as medical records clerks, an administrative assistant, a housekeeper, a human resources recruiter, and a utilization management coordinator/scheduler. Id.

---

[1] Pincites to ECF documents refer to the blue "Page [__] of [__]" text in the document's footer.

Indeed, when Plaintiffs' counsel attempted to characterize the staffing numbers contained in the FCCW QA/CQI meeting minutes as "line nurses," Katzman corrected Plaintiffs' counsel's misinterpretation of the staffing numbers. ECF No. 523 at 129:4–130:3. Katzman testifed: "If you read the document, there's like the medical records clerk, administrative assistant, the housekeeper, the HR recruiter, the UM coordinator." Id. at 129:14–17.

Katzman testified that FCCW needed seventy-eight full-time equivalents, including leadership (Medical Director, HSA, and DON), certified medical personnel, and non-certified medical personnel, to adequately staff FCCW's medical department. Accordingly, the Court's Order should be amended to conform with the incontrovertible testimony from Katzman to require Defendants to staff FCCW with seventy-eight full-time equivalents, which includes: the HSA, Medical Director, Physician, PA/NP, DON, Charge RN, RN, LPN and Pharmacy Tech or LPN, CAN/MOA, X-ray Tech, Medical Records Clerk, Administrative Assistant, Housekeeper, HR Recruiter, and UM Coordinator/Scheduler. See **Ex. B**.[2]

Defendants also request that the word "continuously" be stricken from the Court's Order. For example, as the Order currently stands, Defendants could employ seventy-eight full-time nurses and be in compliance with the Order. But the use of the word "continuously" means that if a nurse has an emergency one morning before her shift, fails to appear, and Defendants are unable to find any replacement that day, then they will be



FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[2] The Governor's budget has approved 123 medical positions at FCCW. This number drastically overshadows the Pew Charitable Trust's findings regarding the median number of medical personnel per 1000 inmates by surveying other facilities across the country. That study—which did not distinguish between male and female facilities—found that the national average of medical staff per 1000 inmates is 42. See **Ex. C**, The Pew Charitable Trusts, Prison Health Care: Costs and Quality, at *19–20, *101–05, (updated Dec. 8, 2017) https://www.pewtrusts.org/en/research-and-analysis/reports/2017/10/prison-health-care-costs-and-quality. FCCW's average daily population is approximately 1,200 offenders.

- 3 -

629.0303\NHS
4820-5052-7878 .v4

out of compliance and subject to a potential contempt action. As such, Defendants request that the Order be amended to read "The Medical Department at FCCW shall be staffed with a weekly average of seventy-eight full-time equivalents to include certified and non-certified medical personnel."

### III. Only Pharmacists and Physicians "Dispense" Medication.

The Court's Order requires Defendants to "train FCCW nurses, and any other individuals who dispense medication to Plaintiffs, on how and when to reorder or refill medications to ensure a continuity of supply." ECF No. 545, at *2. "Dispense" is a term of art in the practice of medicine. "Dispense means to deliver a drug to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing and administering, packaging, labeling, or compounding necessary to prepare the substance for delivery." Va. Code § 54.1-3300; see also Va. Code § 54.1-3401. By law only pharmacists or physicians can "dispense" medication. By contrast, "professional nursing", "registered nursing", and "registered professional nursing", as defined in Va. Code § 54.1-3000 includes the ***administration*** of medications or treatments as prescribed by any person authorized by law to prescribe such medications and treatments.[3] See Va. Code § 54.1-3401; Virginia Board of Nursing Guidance Document 110-18, Interpretation of 'administer' to include preparation for administration (Sept. 29, 2015), https://www.dhp.virginia.gov/nursing/nursing_guidelines.htm. Nurses in an institutional setting do not dispense; they must request refills from the pharmacy.

---

[3] While the term "prescribe" is not defined, the term "prescription" is defined in § 54.1-3401 of the Code of Virginia as the communication of an order for drugs or medical supplies to a pharmacist by a practitioner authorized by law to prescribe. In addition, § 54.1-3408 of the Code of Virginia authorizes a prescriber to make a licensed pharmacist or nurse his agent for the purpose of transmitting an oral prescription, whether or not that pharmacist or nurse is an employee of the prescriber.

As such, Defendants request that the Court's Order be amended to read "train FCCW nurses, and any other individuals who administer, order, or manage medication to Plaintiffs, on how and when to reorder or refill medications . . . ." Likewise, Defendants request that paragraph 5(c) of the Court's Order be amended to read "train FCCW nurses on the importance of, and how to, accurately record or chart the administration of medication . . . ."

### IV. The Court Granted Relief for a Cause of Action Not Plead

Agreeing that the Fourth Circuit requires strict compliance with Rule 65, the Court concluded that it could not hold Defendants in contempt. The Court then proceeded to analyze this case as a breach of contract action. Plaintiffs, however, never alleged a cause of action for breach of contract and disclaimed the available remedy for breach of contract in their legal memoranda submitted in support of their Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt.

"[A] plaintiff may not raise new claims after discovery has begun without amending his complaint." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009). Courts across the country generally agree that a plaintiff may not raise claims for the first time in opposition to a motion for summary judgment either. See Anderson v. Donahoe, 699 F.3d 989, 998 (7th Cir. 2012) (collecting cases); Demarest v. Ocwen Loan Servicing, LLC, 481 F. App'x 352, 353 (9th Cir. 2012); Meisner v. ZymoGenetics, Inc., No. 3:12-684, 2014 U.S. Dist. LEXIS 133704, at *50 (D.S.C. July 30, 2014), adopted by, 2014 U.S. Dist. LEXIS 132355, at *40 (Sept. 22, 2014), affirmed, No. 14-2396, 612 F. App'x 182, 183, 2015 U.S. App. LEXIS 14043 (4th Cir. Aug. 11, 2015); Insurasource, Inc. v. Phoenix

Ins. Co., 912 F. Supp. 2d 433, 441 (S.D. Miss. 2012) (collecting cases); Casseus v. Verizon N.Y., Inc., 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010) (collecting cases).

Here, Plaintiffs never sought enforcement of the Settlement Agreement under standard contract principles. The Settlement Agreement's enforcement provision provides that Plaintiffs "may initiate proceedings before the Court seeking specific performance of the terms of the Settlement Agreement, contempt sanctions against the Defendant, ***or both***." ECF No. 221-1, at *24. But Plaintiffs' did not move for specific performance even in the alternative. See Fed. R. Civ. P. 8(a)(3) and (d)(2).

Plaintiffs' based their entire case on contempt. Plaintiffs' Motion for an Order to Show Cause stated that Defendants' alleged failure to comply with the Settlement Agreement "merit[ed] relief from this Court in the form of sanctions against the Defendants for civil contempt for violation of the Consent Judgment." ECF No. 265, at *1–2. In their memorandum in support of that motion, Plaintiffs argued

> While the Plaintiffs would be happy with the VDOC's *actual* "specific performance" of its obligations assumed under the Settlement Agreement, their experience over some 18 months suggests that the VDOC's compliance will not happen without compulsion. Absent the VDOC's immediate adoption and implementation of focused and effective remedial measures, the imposition of civil contempt sanctions will be both necessary and appropriate.

ECF No. 266, at *42–47. Plaintiffs' arguments with respect to their requested relief applied solely to contempt. Plaintiffs did not even cite a single case on Virginia contract law throughout the life of this contempt action.

The dilemma with the Court's contract analysis is that Defendants were deprived of raising certain defenses because they were never put on notice that this case would also be determined as a potential breach of contract claim. For instance, one affirmative



defense to a breach of contract action is that "[t]he first party to materially breach a contract cannot enforce it." Denton v. Browntown Valley Assocs., 294 Va. 76, 88, 803 S.E.2d 490, 497 (2017) (citing Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 154, 541 S.E.2d 420, 423 (2001)). "'A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.'" Countryside, 261 Va. at 154, 541 S.E.2d at 285 (quoting Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 204 (1997)).

Section III.2.c. of the Settlement Agreement required the parties to work together to develop CQI and ADA policies for FCCW, but Plaintiffs did not fulfill their part of the bargain in that respect. The Settlement Agreement states:

> The Defendant agrees that the Parties, their respective correctional medical experts/consultants and the Compliance Monitor, acting in mutual good faith and working in concert, shall develop, adopt and implement new VDOC OPs for FCCW concerning Reasonable Accommodation of Disabilities and CQI, respectively, within 120 days of the Effective Date of this Settlement Agreement.

ECF No. 221-1, at *16. "Parties" is a defined term under the Settlement Agreement and means "collectively, the Plaintiffs and the Defendant as defined" in the Settlement Agreement. Id. at *5.

Defendants provided Plaintiffs with proposed CQI and ADA policies on June 3, 2016. ECF No. 536, Defs. FF 133. Plaintiffs did not respond regarding Defendants' proposed CQI policy. Five months after initially transmitting the proposed CQI policy, Defendants again sent the proposed CQI policy to Plaintiffs on November 2, 2016. Id., Defs. FF 134. Plaintiffs responded for the first time thirteen months later on December 1, 2017—three months after filing their Motion to Show Cause—and merely stated that they could not provide meaningful feedback. Id., Defs. FF 135. Yet, the Compliance Monitor had



- 7 -

been continuously faulting Defendants for not having a CQI policy in place, and Plaintiffs, up to the time of trial, contended that Defendants failure to have an agreed CQI policy in place constituted a violation of the terms of the Settlement Agreement.[4]

The adversarial system in this country is premised on the fundamental principle that the parties are responsible for raising and presenting the issues. The Supreme Court emphasized this critical tenet in Greenlaw v. United States, 554 U.S. 237 (2008):

> In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present. To the extent courts have approved departures from the party presentation principle in criminal cases, the justification has usually been to protect a pro se litigant's rights. See Castro v. United States, 540 U.S. 375, 381-383 (2003). But as a general rule, "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." Id., at 386 (Scalia, J., concurring in part and concurring in judgment). As cogently explained:
>
> "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties. Counsel almost always know a great deal more about their cases than we do . . . ." United States v. Samuels, 808 F.2d 1298, 1301 (8th Cir. 1987) (R. Arnold, J., concurring in denial of reh'g en banc).

Id. at 243–44.[5]

---

[4] Had Defendants received proper notice they would have been entitled to raise the defenses of unclean hands and equitable estoppel as well.

[5] See also McNeil v. Wisconsin, 501 U.S. 171, 181 n.2 (1991) ("What makes a system adversarial . . . is . . . the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."); Erwin Chemerinsky, Federal Jurisdiction 268 (5th ed. 2007) ("In American courts that are committed to the adversary system, generally judges are supposed to rule only on motions brought by the parties."); Hartman v. Prudential Ins. Co. of Am., 9 F.3d 1207, 1214–15 (7th Cir. 1993) (Posner, J.) ("This is a sympathetic case for plaintiffs. But we cannot have a rule that in a sympathetic case an appellant can serve us up a muddle in the hope that we or our law clerks will find somewhere in it a reversible error. One consequence of such an approach would be that prudent appellees would have to brief issues not raised or pressed by appellants lest the appellate court fasten on such a (non)issue and use it to upend the responsibility of lawyers and to reduce competition among them, since the court would tend to side with


FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4820-5052-7878 .v4

Plaintiffs in this case never argued or requested specific performance of the terms of the Settlement Agreement. If a plaintiff may not proceed on new or alternate theories of relief without amending his complaint and may not pose new theories in opposition to a motion for summary judgment, then surely the Court cannot interpose a new theory of recovery after the close of the evidence. See, e.g., S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, L.L.C., 713 F.3d 175 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) ("A plaintiff may not amend her complaint via briefing.") (citing Car Carriers Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984)).

Likewise, if the Court is not to act as a pro se litigant's advocate conjuring claims not specifically raised in a Complaint, then the same must be equally, if not more, true when the plaintiff is represented by sophisticated counsel. Accord Marsh v. Va. Dept. of Transportation, No. 6:14cv6, 2014 U.S. Dist. LEXIS 167333, at *2 n.1 (W.D. Va. Dec. 3, 2014) (quoting Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) ("[D]istrict courts are not required to 'conjure up questions never squarely presented to them.'"); see also Wood v. Milyard, 566 U.S. 463, 427–73 (2012) ("[A] federal court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system."). Indeed, Plaintiffs "neither 'plainly' nor 'properly' identified" their



---

the weaker counsel even more than it does anyway, at least when his was the more appealing case. Our system unlike that of the Continent is not geared to having judges take over the function of lawyers, even when the result would be to rescue clients from their lawyers' mistakes. The remedy, if any, for the questionable tactical decisions apparently made by the plaintiffs' counsel in this case lies elsewhere. . . . This is a case in which the lawyer for the party tells the appellate court that he does not base his claim on grounds X and Y . . . but the court's independent research and reflection persuade the court that the lawyer is wrong. If reversal on such grounds is proper, we no longer have an adversary system of justice in the federal courts.")

629.0303\NHS
4820-5052-7878 .v4

claim as arising under contract principles. See In re Under Seal, 749 F.3d 276, 288 (4th Cir. 2014).

### V. The Court's Injunction Rewrites the Settlement Agreement

Although the Court rejected Defendants' argument that the terms of the Settlement Agreement were ambiguous, the Court entered an Order with specific requirements addressing some of the very ambiguous phrases Defendants identified. As such, the Court has, in essence, rewritten the Settlement Agreement. City of Chesapeake v. Dominion Securityplus Self Storage, L.L.C., 291 Va. 327, 335, 785 S.E.2d 403, 406 (2016) (quoting Deberry & Davis, Inc. v. C3NS, Inc., 284 Va. 485, 496, 732 S.E.2d 239, 244 (2012) ("'Courts will not rewrite contracts; parties to a contract will be held to the terms which they agreed.'"). The Order inserts specific terms for exactly what the Defendants claimed to be ambiguous. Compare ECF No. 545, at *2 with ECF No. 536, at *12.

### CONCLUSION

WHEREFORE, Defendants respectfully request that the Court enter an Order granting their Motion to Alter or Amend the Judgment and granting such further relief as the Court deems just and proper.



FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

Respectfully Submitted,

HAROLD W. CLARKE, A. DAVID ROBINSON, STEPHEN HERRICK, ERIC ALDRIDGE, AND PAUL TARGONSKI, M.D.

629.0303\NHS
4820-5052-7878 .v4

/s/ _____
Katherine C. Londos (VSB #: 36848)
John C. Johnson (VSB #: 33133)
Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax:     540/772-9167
Email: klondos@faplawfirm.com
           jjohnson@faplawfirm.com
           nschnetzler@faplawfirm.com

Edward J. McNelis, III
Elizabeth M. Muldowney
Ruth T. Griggs
Sands Anderson PC
1111 East Main Street, Suite 2400
Richmond, VA 23218-1998
Phone: 804-648-1636
Fax:     804-783-7291
Email: emcnelis@sandsanderson.com
           emuldowney@sandsanderson.com
           rgriggs@sandsanderson.com

Diane M. Abato
SAAG/Chief
Office of the Attorney General
Criminal Justice and Public Safety Division
202 North 9th Street
Richmond, VA 23219
Phone: 804-786-8191
Fax:     804-786-4239
Email: dabato@oag.state.va.us

*Counsel for Howard W. Clarke, A. David Robinson, Stephen Herrick, Eric Aldridge, And Paul Targonski, M.D.*



629.0303\NHS
4820-5052-7878 .v4

- 11 -

**CERTIFICATE OF SERVICE**

I hereby certify that on January 30, 2019 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all counsel of record.

/s/
Of Counsel



629.0303\NHS
4820-5052-7878 .v4