IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| CYNTHIA B. SCOTT, *et al.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) ) | Case No. 3:12-cv-00036 (Sr. Judge Norman K. Moon) |
| HAROLD W. CLARKE, *et al.*, | ) ) ) | |
| *Defendants.* | ) ) ) | |

## PLAINTIFFS' MOTION FOR EMERGENCY ENFORCEMENT
## PURSUANT TO SETTLEMENT AGREEMENT

Plaintiffs, by counsel, respectfully move this Court to grant emergency relief on behalf of Ms. Margie Ryder, a prisoner at the Fluvanna Correctional Center for Women ("FCCW"), pursuant to § V.3 of the Settlement Agreement. ECF No. 221-1 at 24.

I. **Facts**[1]

   A. **Ms. Ryder's Medical Condition**

Margie Ryder is a 39-year-old prisoner at FCCW who suffers from pulmonary arterial hypertension (PAH), among other serious health conditions. PAH is a progressive disease with a life expectancy of 3-5 years if mistreated or left untreated. Ex. 1, Decl. UVA Doctors, ¶ 3. Ms.

---

[1] The medical records attached to this Motion are limited to the specific records concerning Ms. Ryder's medical care discussed herein. Due to the urgent nature of this filing, and the voluminous nature of Ms. Ryder's medical records, all records could not timely be redacted to be included with this submission. Plaintiffs are willing to provide a full copy of Ms. Ryder's medical records at the Court's request under seal.

1

Ryder's survival depends upon a fast-acting medication called Remodulin (generic name "treprostinil"). The Remodulin must be continuously administered to her through a pump near her heart. If her supply of Remodulin is disrupted, or administered incorrectly, Ms. Ryder could suffer "immediate cardiovascular collapse and death." Ex. 1, Decl. UVA Doctors, ¶ 4; Ex. 3, Decl. M.R. ¶¶ 1-5; Ex. 2, Bates UVA 181-182 (UVA specialist's note stating "It is unsafe for [Ms. Ryder] to have complications and interruptions with administrations of Remodulin."). In the words of Lauren Bedard, a Registered Nurse at the University of Virginia Hospital who works with PAH patients (including Ms. Ryder), "[d]eviations from her Remodulin regimen either by infusion interruption or inadvertent bolus, erroneous concentrations of the medication, or inaccessibility to back-up medication place Ms. Ryder at severe risk of a fatal cardiac episode." Ex. 4, Decl. L.B., ¶ 3. Continuous, uninterrupted administration of the medication is so important that proper care of a patient on Remodulin "includes not allowing the medication reservoir [in the pump] to get lower than 5cc without reloading." Ex. 1, Decl. UVA Doctors, ¶ 5. Caring for patients relying on Remodulin "requires extensive training and specialty care." *Id*.

Since arriving at FCCW in early 2018, Ms. Ryder has suffered repeated emergency hospitalizations due to FCCW's failure to appropriately manage her Remodulin. Some of these hospitalizations are detailed in the attached declarations from Ms. Ryder and Nurse Bedard and are detailed further below. *See generally* Ex. 3, Decl. M.R.; Ex. 4, Decl. L.B. Ms. Ryder's hospitalizations have been caused by FCCW's failures to supply her medication, adequately maintain her pump equipment, and appropriately mix her Remodulin (resulting in a toxic overdose). *Id; see also* Ex. 2, Bates UVA 5446-5472 (including, *e.g.*, note on Bates UVA 5451 describing "unintended overdose at corrections facility"). Although Ms. Ryder safely refilled, mixed, and administered her own medication for years prior to her incarceration, she now lives in

2

daily fear that FCCW will make a fatal mistake with her Remodulin. FCCW refuses to allow her to watch her medication being mixed to verify it is being done correctly, despite an express recommendation to the contrary by one of Ms. Ryder's UVA specialists. Ex. 3, Decl, M.R., ¶ 11, 39, 41; Ex. 2, Bates UVA 5460 (Feb. 11, 2019 note by Dr. Kennedy: "I called Dr. Targonski, the medical director at the Fluvanna Correctional Facility. I suggested allowing Ms. Ryder to watch preparation of remodulin cartridges would build Ms. Ryder's trust in the nursing staff…"). The stark contradiction between the critical, life-threatening importance of proper medication administration for Ms. Ryder and FCCW's continued and demonstrated failures to appropriate manage that medication makes it clear that emergency relief is necessary to prevent harm to Ms. Ryder.

### 1. Ms. Ryder's Remodulin Regimen

Ms. Ryder was diagnosed with PAH by doctors at Mary Washington Hospital in Fredericksburg, Virginia in 2013. After being diagnosed, she was treated at Inova Hospital in Fairfax, Virginia. Her most important medication to treat PAH is Remodulin, administered to her through a central line and a continuous pump. To take this medication, Ms. Ryder's Remodulin is drawn from a sterile vial, and then mixed with a sterile diluent to make up 100mL of fluid containing the correct concentration of Remodulin. Remodulin comes in multiple concentrations, so the proportion of Remodulin to sterile diluent in the 100mL mixture has to take into account which concentration of Remodulin is used. This mixture is then put into a cartridge (also called a cassette), which is in turn placed into Ms. Ryder's pump. The pump rate must be set correctly to ensure she receives the appropriate continuous dose of Remodulin. If the proportion of Remodulin to sterile diluent, or the pump rate is set incorrectly, Ms. Ryder will have complications. Ex. 3,

3

Decl, M.R., ¶ 5. The cartridges are to be changed every 48 hours. The dressing around her central line and the cap on the central line are to be changed every week. Ex. 3, Decl, M.R., ¶¶ 1-7.

### 2. April 2018 Hospitalization at UVA

Ms. Ryder arrived at FCCW in late March 2018. On April 7, 2018, she developed chest pain, and FCCW sent her to the UVA Emergency Room. Ex. 5, Bates FCCW 48. Dr. Mazimba, a UVA PAH specialist, discharged her the same day noting her need for "very close follow up with her pulmonary hypertension specialist, hopefully within a week." Bates FCCW 209-214.

Shortly after returning from UVA, around April 12, 2018, Ms. Ryder began experiencing symptoms of an incorrect Remodulin dosage. Her symptoms included fluid retention, weight gain, and increased heart rate. Ex. 3, Decl, M.R., ¶ 16; Ex. 2, Bates UVA 26. Ms. Ryder developed these symptoms at the same time FCCW began to use a supply of Remodulin that came in a weaker concentration than the supply that was transferred with Ms. Ryder from the jail. While Ms. Ryder had previously used a concentration of Remodulin of 10 milligrams per milliliter, FCCW ordered a concentration of 2.5 mg/mL. Ex. 5, Bates FCCW 383 (Mar. 27, 2018 prescription from Dr. Kwiatkowski for 2.5mg/mL Remodulin; Ex. 3, Decl, M.R., ¶ 17. When using the 10mg/mL Remodulin concentration, Ms. Ryder's prescription at the time called for 2mL of the Remodulin to be mixed with 98mL of diluent. Ex. 5, Bates FCCW 382. When using the weaker 2.5mg/mL Remodulin concentration, the proportion of Remodulin to diluent needed to be increased to 8mL of Remodulin and 92mL of diluent. Ex. 5, Bates FCCW 381. During Ms. Ryder's first month at FCCW, the prison switched back and forth between the two concentrations. *See, e.g.*, Ex. 5, Bates FCCW 67 (directing use of 10mg/mL Remodulin); Ex. 5, Bates FCCW 92 (directing 5 doses with 2.5mg/mL Remodulin, then to switch back to 10mg/mL Remodulin); Ex. 5, Bates FCCW 382

4

(directing use of 2.5mg/mL Remodulin, but specifying 2mL of Remodulin to be mixed with 98mL of diluent—which would be the appropriate concentration for 10mg/mL Remodulin).

FCCW medical staff exhibited significant confusion at this time regarding how to administer Ms. Ryder's Remodulin. For example, during Ms. Ryder's hospitalization, one FCCW nurse's chart entry notes that Ms. Ryder's Remodulin dosage upon return from the hospital is to be Remodulin 10mg/mL, administered at a rate of 2.15 mL/hr. The same nurse subsequently corrected her entry to recognize that, when using 10mg/mL, the appropriate rate was actually 1.72mL/hr. Ex. 5, Bates FCCW 66. The 2.15 mL/hr rate would have been correct only if using the 2.5mg/mL Remodulin concentration. A detailed explanation of how to mix Ms. Ryder's medication using the two different Remodulin concentrations does not appear in her FCCW records until April 25, 2019, the day after Ms. Ryder returned from UVA Hospital approximately a month after her arrival at FCCW. Ex. 5, Bates FCCW 65. And from Ms. Ryder's arrival at FCCW through present, her FCCW records are replete with inaccurate entries regarding her Remodulin administration, including, for example, notes indicating rates of 43mL/**hour** (Ex. 5, Bates FCCW 166, 146; 43mL/**24 hours** (Ex. 5, Bates FCCW 91); and **43mL/48 hours** (Ex. 5, Bates FCCW 140, 520. These obvious inaccuracies persist throughout Ms. Ryder's FCCW medical records.

Ms. Ryder was hospitalized at UVA on April 14, 2018, two days after she began to develop symptoms which she recognized as indicative of an incorrect Remodulin dosage. Ex. 3, Decl, M.R., ¶¶ 16-18. She remained in the hospital for 10 days. *See* Ex. 2, Bates UVA 19-123. Her initial diagnosis at admission included "inappropriate remodulin dosing." Ex. 2, Bates UVA 23. During Ms. Ryder's hospitalization, UVA doctors reached out to FCCW numerous times to discuss the question of dosing. *See, e.g.*, Ex. 2, Bates UVA 26, 29, 86, 92-93. FCCW medical staff

5

represented that they had maintained the correct dosage for Ms. Ryder despite switching between differing Remodulin concentrations, and during this first hospitalization, at least some physicians at UVA appear to have taken the prison's word for this. *Id.* However, the confusion in FCCW's own records belies their confident statements to UVA.[2]

### 3. June 2018 Complications

Despite Dr. Mazimba's April 7, 2018 recommendation that Ms. Ryder see her VCU PAH specialist within a week, this appointment did not take place until May 17, 2018. Ex. 5, Bates FCCW 177-179. At that appointment, Dr. Grinnan advised increasing Ms. Ryder's daily Remodulin dosage and recommended a slow, biweekly upward titration over the coming months. *Id.* He instructed Ms. Ryder to look out for side effects including nausea, vomiting, diarrhea, muscle/joint pain, ear/jaw pain, and migraines. *Id.* By June 2018, Ms. Ryder began to have serious side effects, most notably a significant increase in migraine headaches. *See, e.g.,* Ex. 5, Bates FCCW 166-167 (June 8, 2018 chart entries note patient "state [sic] she notice [sic] since increasing dose migraine started" and that patient received only Benadryl and nausea medications for her headache); Ex. 5, Bates FCCW 164 (June 11, 2018 chart entry notes "offender c/o severe migraine 10/10. She was in bed and reported 'my head hurts really bad.'"). When the time came for the next scheduled increase in Remodulin on June 19, 2018, Ms. Ryder declined the increase until she could discuss management of her side effects with Dr. Grinnan. Ex. 5, Bates FCCW 151, 154; Ex. 3, Decl, M.R., ¶¶ 19-21.

---

[2] In reference to the accuracy of FCCW's statements to the UVA doctors, it is relevant to note that although FCCW assured UVA that the prison would have a prescription for Ms. Ryder's Remodulin ready by the time of her discharge from UVA, they did not actually do so. UVA discovered this prior to Ms. Ryder's discharge and faxed their own prescription to CVS. *See* Ex. 2, Bates UVA 103. (April 23, 2019 Event Note by Kristin Koons, MD stating "I spoke to Dr. Martin at Fluvanna infirmary regarding Ms. Ryder and discharge planning… They have been in contact with CVS Caremark and are planning to get the next shipment within two days.") *and* Bates UVA 122. (April 24, 2018 Pharmacy Note by Mary E. Roth stating "As of today, CVS Caremark had not received a prescription for her Remodulin from the correctional facility… We faxed a prescription to CVS so they have on on file until the transition is made.")

6

Ms. Ryder's next appointment with Dr. Grinnan was scheduled for the morning of June 25, 2019. She was also due to have her Remodulin cartridge changed that day at 10:00AM. Ex. 5, Bates FCCW 145. Realizing that she would not be at FCCW at 10:00AM to have the cartridge changed, Ms. Ryder asked FCCW staff to change her cartridge early to ensure that she did not run out of medication while she was at her outside appointment. The FCCW nurses agreed and changed her cartridge around 5:00AM on June 25. Ex. 5, Bates FCCW 143; Ex. 3, Decl, M.R., ¶ 22.

Because Ms. Ryder's Remodulin cartridges are to be changed every 48 hours, the 5:00AM change on June 25 meant that her next cartridge change would be due at 5:00AM on June 27. On June 26, Ms. Ryder reminded FCCW's Infirmary staff that she would need the cartridge changed before the usual 10:00AM time the next day. FCCW staff refused to change the cartridge early and accused Ms. Ryder of being "argumentative" when she protested that a delay in changing the cartridge would be dangerous to her. Ex. 5, Bates FCCW 141-143; Ex. 3, Decl, M.R., ¶ 23. When Ms. Ryder's cartridge was changed at 10:00AM on June 27, there were only 2.5mL left of medication left—far lower than the medically-acceptable 5mL. Ex. 5, Bates FCCW 140; Ex. 1, Decl. UVA Doctors, ¶ 5. The medication level was so low that the tube was drawing bubbles, and Ms. Ryder experienced symptoms of paleness and blueness around her lips. Ex. 3, Decl, M.R., ¶ 24.

4. **July 2018 Hospitalization at UVA**

On July 11, 2018, Ms. Ryder was hospitalized again at UVA, this time due to FCCW's failure to maintain an adequate supply of sterile Remodulin. On July 9, 2018, during a regular cartridge change, Ms. Ryder noticed that the new vial of Remodulin from which her dosage had just been drawn for mixing had developed a leak during the drawing process. She pointed this out

7

to the nurse and explained that she would not be able to use any more Remodulin from that vial, since it was now compromised and not sterile. Ex. 3, Decl, M.R., ¶ 26.

On July 11, 2018, when Ms. Ryder was due for her next cartridge change, Ms. Ryder saw the nurse was about to use the same leaking vial of Remodulin. Ex. 5, Bates FCCW 514; Ex. 3, Decl, M.R., ¶ 27. Despite the fact that Remodulin is a life-sustaining medication for Ms. Ryder, the facility had no backup medication available, and Ms. Ryder had to be sent to UVA Hospital to obtain the medication. It took well over three hours for the FCCW nurses to realize there was no backup Remodulin available at FCCW, call an ambulance, and have the ambulance arrive at FCCW. Ex. 5, Bates FCCW 514-515 (noting leak at 10:15AM, ambulance arriving at FCCW at 1:25PM); Ex. 2, Bates UVA 2581, 2586, 2590, 2662; Ex. 3, Decl. M.R., ¶¶ 27-28.

Ms. Ryder remained at UVA for 13 days, during which she underwent an atrial septostomy. Ex. 3, Decl. M.R., ¶ 29. Ms. Ryder's UVA medical records from this hospitalization make it apparent that her UVA doctors were increasingly concerned about her treatment at FCCW. Before releasing her back to FCCW, one of Ms. Ryder's UVA PAH specialists, Dr. Abuannadi, called FCCW's Warden regarding his concerns about Ms. Ryder's medication supply. Ex. 2, Bates UVA 2699. Another UVA PAH specialist, Dr. Bergin, was sufficiently worried about Ms. Ryder's situation that he reached out to the UVA General Counsel's office with his concerns. Ex. 2, Bates UVA 161, 2766. A UVA case manager also met with FCCW staff to discuss Ms. Ryder's needs. Ex. 2, Bates UVA 243. One of the needs the case worker identified was an "adequate supply of Remodulin on site @ facility." *Id.* The case worker also noted that "If a back up pump and syringe were held at the facility, there could be a decrease in readmissions for this patient." Ex. 2, Bates UVA 158.

8

### 5. August 2018 Hospitalization at VCU

Unfortunately, FCCW did not improve its practices in response to the UVA doctors' concern and recommendation. Just weeks after returning from her July 2018 hospitalization at UVA, Ms. Ryder was hospitalized again, this time at VCU, due to FCCW's failure to provide adequate equipment for her Remodulin pump line.

Although the cap on Ms. Ryder's central line is supposed to be changed every week, FCCW only provided her with new caps only every 6-8 weeks. Ex. 3, Decl, M.R., ¶ 30. When Ms. Ryder requested more frequent changes, she was told that FCCW did not have extra caps available. *Id.* On August 13, 2018, the cap on Ms. Ryder's pump line cracked and blood began collecting in the line. Ms. Ryder had to be transported to the VCU Emergency Room to have the line de-clotted. From around 10:00AM, when the crack was noticed and Ms. Ryder's line clamped, until around 1:00PM, when the ambulance arrived and Ms. Ryder could be started on an IV Remodulin drip, Ms. Ryder had no Remodulin whatsoever. Ex. 5, Bates FCCW 485-487; Ex. 3, Decl, M.R., ¶¶ 30-32. As Ms. Ryder's UVA doctors have noted, sudden discontinuation of Remodulin such as occurred in this instance can "cause immediate cardiovascular collapse and death." Ex. 1, Decl, UVA Doctors, ¶ 4. FCCW's failure to keep Ms. Ryder's pump equipped with functioning parts, changed at appropriate times, risked her life.

Ms. Ryder was hospitalized at VCU for two weeks. Before releasing her back to FCCW, Dr. Grinnan informed Dr. Gable, the FCCW Medical Director, that he would be notifying VCU's risk management office of Ms. Ryder's situation. Ex. 6, Bates VCUHS 1-19; Ex. 5, Bates FCCW 468 (Dr. Gable chart entry stating "[Dr. Grinnan] stated he was not going to call attorneys like UVA had done, but he was going to report case to his risk management office"). Upon her return to FCCW, Ms. Ryder asked an FCCW nurse to see the backup cap and pump equipment, so that

9

she could know the facility had appropriate equipment on hand. The nurse refused. Ex. 3, Decl, M.R., ¶ 33.

After Ms. Ryder's August 2018 hospitalization, FCCW stopped allowing her to see her medication being mixed, as had previously been the practice (and as was the practice when she was discharged from UVA). Ex. 3, Decl, M.R., ¶ 34; s*ee, e.g.*, Ex. 2, Bates UVA 122, 113 ("patient mixed the cassette…") ("mixed with patient and pharmacist at bedside this morning"). Without being able to watch her medication being mixed, Ms. Ryder has no way of knowing if the correct amount of Remodulin has been put in her cartridge. Ex. 3, Decl, M.R., ¶ 35. Her first sign that a mistake has been made will only be when she begins to experience symptoms of an over- or under-dose—as occurred in February 2019.

### 6. February 2019 Hospitalization at UVA

On February 11, 2019, Ms. Ryder's Remodulin cartridge was changed around 7:15PM. As she was not permitted to watch the medication being mixed, her first sign that something was wrong was when she began experiencing chest pain, nausea, vomiting, and skin discoloration. Ex. 5, Bates FCCW 750; Ex. 3, Decl, M.R., ¶ 36. An FCCW nurse instructed Ms. Ryder to turn her pump off, which she did. Ex. 3, Decl, M.R., ¶ 37. From approximately 8:15PM to 9:45PM, Ms. Ryder had no Remodulin. *Id.*; Ex. 2, Bates UVA 5451("Pump had been turned off prior to transport (1.5 hours prior to arrival)"). Once again, FCCW's failures left Ms. Ryder without a fast-acting, life-sustaining medication, putting her at serious risk of immediate death. Ms. Ryder was admitted to UVA with an overdose of Remodulin and remained hospitalized for three days. Ex. 2, Bates UVA 5446-5508. During that hospitalization, her UVA doctors again contacted FCCW with concerns about management of Ms. Ryder's medications. Dr. Kennedy called Dr. Targonski, the new Medical Director at FCCW, and recommended that FCCW allow Ms. Ryder

10

to watch the preparation of her medication in the future.  Ex. 2, Bates UVA 5460.  UVA also arranged for a nurse from Accredo, a company that sells Remodulin, to go to FCCW and train the nurses there in how to care for Ms. Ryder.  Ex. 2, Bates UVA 5492 (February 14, 2018 note by Jessica Darcy, NP stating "An Accredo nurse will visit the facility on Thursday … to educate staff about treprostinil so the pt is safe to return there").  Ms. Ryder's UVA records indicate that her doctors were not comfortable returning Ms. Ryder to FCCW without further training of the FCCW nurses.  *See, e.g.*, Ex. 2, Bates UVA 5496 ("Dr. Kennedy states she is following back up with the correctional facility on getting staff trained at the correctional facility before sending the patient back to the facility"); Ex. 2, Bates UVA 5508 ("waiting return to facility after ensuring safety").

Ms. Ryder was discharged from UVA on February 14, 2019.  Despite the recommendations of Dr. Kennedy, FCCW still refuses to permit Ms. Ryder to watch her medication being mixed.  Ms. Ryder continues to live in fear of another mistake like the ones that have repeatedly jeopardized her life over the past year.  Ex. 3, Decl, M.R., ¶ 43.

### B. Prior Attempts to Resolve Failures in Ms. Ryder's Care

Plaintiffs' counsel have been attempting to resolve Ms. Ryder's situation without seeking intervention of the Court since July 2018, after learning that Ms. Ryder had recently been hospitalized twice in short succession due to FCCW's failure to appropriately manage her Remodulin.  At that time, Plaintiffs' counsel notified Dr. Scharff, the *Scott v. Clarke* Compliance Monitor, of their concerns regarding Ms. Ryder's care at FCCW.  Dr. Scharff in turn relayed these concerns to FCCW's then-Medical Director Dr. Gable.  Ex. 7, Email from Dr. Gable to Dr. Scharff dated July 14, 2018.  Dr. Gable's response accused Ms. Ryder of causing the problems herself, despite casually acknowledging that FCCW "did not have a spare" piece of her equipment "laying around" in case of emergency.  Ex. 8, Email from Dr. Gable to Dr. Scharff dated July 16, 2018.

11

Dr. Gable did not present any records to support his statements to Dr. Scharff, and it appears their correspondence ended on July 17, 2018 without verification of Dr. Gable's representations. Ex. 9, Emails between Dr. Scharff and Dr. Gable dated July 17, 2018.

In September 2018, after learning about yet another emergency hospitalization due to problems administering Ms. Ryder's Remodulin, Plaintiffs' counsel contacted the Attorney General's office directly to request a conference with Ms. Ryder's FCCW and specialist physicians for the purpose of developing a coordinated care plan for her. *See* Ex. 10, Letter from Shannon Ellis to Diane Abato dated September 24, 2018. Plaintiffs received no response to this request. Ex. 11, Decl. S.E., ¶ 3.

In February 2019, Plaintiffs' counsel learned that Ms. Ryder had suffered yet another emergency hospitalization due to overdosing of Remodulin at FCCW. Plaintiff's counsel contacted the Attorney General's office to renew their previous request for a meeting to develop a coordinated care plan. *See* Ex. 12, Letter from Plaintiffs' Counsel to Diane Abato dated February 22, 2019. This request was refused. *See* Ex. 13, Letter from Katherine Londos to Shannon Ellis dated March 1, 2019.

Still hoping to resolve the situation without seeking the intervention and assistance of the Court, Plaintiffs' counsel initiated a telephone conference that took place on March 6, 2019, during which their request for a meeting was again flatly denied. Ex. 11, Decl. S.E., ¶ 5. In the spirit of compromise, Plaintiffs' counsel suggested that a written protocol for Ms. Ryder's care could be developed by Dr. Targonski, the current Medical Director at FCCW, and Ms. Ryder's specialists, and subsequently shared with Plaintiffs' counsel without the need for a meeting. This request was also refused—indeed, even the request to know whether a protocol *existed* for Ms. Ryder's care was refused. Ex. 11, Decl. S.E., ¶ 5.

On March 15, 2019, in a final attempt to avoid turning to the Court, Plaintiffs' counsel provided the Attorney General's office with statements from Nurse Bedard and Ms. Ryder and stated their intent to seek Court intervention absent meaningful cooperation to ensure Ms. Ryder's care going forward. *See* Ex. 14, Letter from Shannon Ellis to Diane Abato dated March 15, 2019. With the threat of litigation imminent, the Attorney General's office finally agreed to provide a "medical report" regarding Ms. Ryder's care. *See* Ex. 15, Letter from Katherine Londos to Shannon Ellis dated March 19, 2019. However, the report provided failed to set forth an adequate care plan. Instead, it merely comprised a list of Ms. Ryder's medical conditions and medications, and general instructions for "routine surveillance" and "continue[d] management." *See* Ex. 16, Letter from Katherine Londos to Shannon Ellis dated March 22, 2019. The document lacks any specific provisions or plans to prevent the medication mistakes that have repeatedly endangered Ms. Ryder's life.

### C.  Ms. Ryder's Current Situation

Ms. Ryder confirmed as recently as April 24, 2019 that FCCW continues to refuse to allow her to watch her medication being mixed. Ex. 3, Decl. M.R.., ¶ 41. Although Ms. Ryder's UVA doctors sent a nurse to FCCW specifically to train the FCCW staff in administering Remodulin following Ms. Ryder's latest hospitalization, Ms. Ryder has no way of knowing which nurses have been trained, and ongoing staff turnover exacerbates this concern.

## II.  The Settlement Agreement Provides for Emergency Relief.

The Settlement Agreement provides that, "[i]n the event of a medical emergency posing a substantial threat of immediate harm to any prisoner residing at FCCW," the notice and cure provisions of the Agreement are waived and Plaintiffs may seek immediate enforcement of its terms by the Court. ECF No. 221-1 § V.3. Although the Settlement Agreement requires FCCW

13

to provide continuity in supply and distribution of patients' medication—including provision of medication "in a timely, safe, and sufficient manner, including continuity of medication on intake and renewal of prescriptions…"—Ms. Ryder's repeated hospitalizations over the past year make it painfully apparent that the prison is not living up to this obligation. ECF No. 221-1 at 11. Ms. Ryder's cartridge must be changed every two days, and she must have functioning pump equipment at all times. Ex. 3, Decl. M.R., ¶ 1-7.; Ex. 1, Decl. UVA Doctors, ¶ 4. When an emergency occurs, she has minutes to hours for it to be resolved. The pattern of these emergencies over the past year demonstrates that she is subject to a constant substantial threat of immediate harm.

### III. The Court's January 2019 Findings of Fact and Injunction Support the Need for Relief for Ms. Ryder.

The life-threatening lapses in Ms. Ryder's care at FCCW over the past year track the failures identified by this Court in its Findings of Fact and Conclusions of Law issued January 2, 2019. *See* ECF No. 544. This Court has already confirmed FCCW's failure to keep medical equipment "regularly maintained and readily available" (*id.* at 35) so that it is "available for daily use, as medically necessary" (*id.* at 26-27); the inaccuracies throughout FCCW's medical charting (*id.* at 38); the prison's failure to keep sufficient supplies of medication on hand and re-order as necessary (*id.*); and the lack of unimpeded access to timely medical care experienced by patients across the board, but especially by patients facing emergency situations (*id.* at 38-39). The Court's Injunction also recognized the significant unmet need for appropriate nurse training at FCCW, ordering training in areas including medication administration, accurate record-keeping, and responding to medical emergencies. ECF No. 545 at 2-3.

14

Many of the Court's factual findings regarding these failures drew from the circumstances surrounding multiple patient deaths at FCCW. The Court heard days of testimony that identified continued disruptions and failures which caused deaths and risks of serious harm. Ms. Ryder faces similar life-threatening risks as a patient dependent upon Remodulin. The fact that Ms. Ryder has been hospitalized at UVA since the Court's Injunction with yet another Remodulin mistake indicates that these violations persist. Moreover, the prison's continued refusal to let Ms. Ryder watch her medication being mixed indicates that its longstanding culture of indifference bordering on cruelty towards patients continues.

## IV. The Court Has Authority to Enforce the Settlement Agreement.

This Court has already determined that it possesses jurisdiction to enforce the Settlement Agreement. ECF No. 544 at 23-25. As the Court noted, district courts "have inherent authority, deriving from their equity power, to enforce settlement agreements." ECF No. 544 at 2 (citing Hensley v. Alcon Labs, Inc., 277 F.3d 535, 540 (4th Cir. 2002)). In addition, the Settlement Agreement and Final Judgment Order expressly vested the Court with broad powers to enforce the Settlement Agreement. The Settlement Agreement provided that the Court "shall retain jurisdiction over the Parties for purposes of ensuring the implementation of this Settlement Agreement and shall preside over such further proceedings as may be necessary or appropriate to enforce its terms and conditions." ECF No. 221-1 at 23 (emphasis added). The Final Judgment Order included identical language. ECF No. 262 at 2.

As detailed above, the Settlement Agreement specifically provides for emergency enforcement of its terms. In the context of FCCW's repeated and continuing failures in her care, Ms. Ryder's day-to-day vulnerability constitutes an ongoing emergency, and the Court should exercise its power to enforce the Settlement Agreement in order to protect her life.

V. **Conclusion**

Ms. Ryder's situation at FCCW is too precarious to permit delay in resolution. As her specialists have explained, "small" mistakes in her medicine—a broken piece of equipment without backup, an unavailable cartridge, an overdose—can easily cause her death. Ex. 1, Decl. UVA Doctors, ¶ 4. All of these situations have occurred at FCCW in the last 12 months. Nurse Bedard emphasized the risks Ms. Ryder faces without adequate protections in place: "[e]very time I see this patient… I wonder whether it will be the last time I see her alive." Ex. 4, Decl. L.B., ¶ 11.

WHEREFORE, for the reasons stated above, Plaintiffs respectfully ask that this Court order:

A. Defendants to develop a comprehensive, coordinated remedial care plan for Ms. Ryder's remaining months at FCCW, to include, at a minimum, a protocol to ensure timely, safe, and sufficient administration of Ms. Ryder's Remodulin that specifies procedures to avoid repeating the past mistakes her in care, with provision for appropriate oversight to regularly verify that the protocol is being followed, and that Ms. Ryder be provided a copy of the plan;

B. Defendants to designate specific nurses to be responsible for Ms. Ryder's Remodulin management and develop a written protocol, to be approved by Ms. Ryder's UVA PAH team, to ensure appropriate training for said nurses, and that Ms. Ryder be provided a copy of the protocol;

C. Defendants to begin using pre-mixed Remodulin for Ms. Ryder, or, in the alternative, permit Ms. Ryder to watch her medication being mixed;

D. Defendants to provide monthly progress reports to the Court on compliance with sections A and B and FCCW's adherence to the same;

E. upon request of either Plaintiffs or Defendants, counsel for the Parties along with FCCW medical personnel shall meet to attempt to resolve any issues concerning Ms. Ryder's medical care;

F. Plaintiffs, through counsel, shall be permitted to communicate concerns regarding Ms. Ryder directly to the FCCW Medical Director while copying defense counsel; and

G. Defendants shall not unreasonably withhold information regarding Ms. Ryder's care from Plaintiffs.

Plaintiffs also ask the court to award them reasonable attorneys' fees pursuant to §§ V.2-3 of the Settlement Agreement.

Respectfully submitted,

**PLAINTIFFS,**
*individually and on behalf of all others similarly situated*

By: /s/ Shannon Ellis
    Shannon Ellis

Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Angela Ciolfi, VSB No. 65337
(angela@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Adeola Ogunkeyede (admitted *pro hac vice*)
(adeola@justice4all.org)
Shannon Ellis, VSB # 89145
(shannon@justice4all.org)
LEGAL AID JUSTICE CENTER

1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553


Philip Fornaci (admitted *pro hac vice*)
(phil_fornaci@washlaw.org)
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.
Suite 400
Washington, D.C. 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

    I hereby certify that on this 30th day of April 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____
Shannon Ellis