IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| CYNTHIA B. SCOTT, *et al.*, | ) ) ) | |
| *Plaintiffs,* | ) ) ) | Case No. 3:12-cv-00036 |
| v. | ) ) | (Sr. Judge Norman K. Moon) |
| HAROLD W. CLARKE, *et al.*, | ) ) ) | |
| *Defendants.* | ) ) ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
<u>EMERGENCY ENFORCEMENT</u>**

Plaintiffs, by counsel, respectfully offer the following reply as further support for their Motion for Emergency Enforcement Pursuant to Settlement Agreement (ECF No. 562).

**I. Ms. Ryder faces a substantial threat of immediate harm.**

FCCW's repeated failures leave Ms. Ryder at ongoing risk of immediate medical harm. Ms. Ryder's life depends on the continuous and correct administration of Remodulin via appropriately maintained equipment, for which she is entirely dependent upon FCCW. Her health condition is such that a failure or mistake in her medication supply can result in sudden death. As a result, Ms. Ryder is always at *some* risk of immediate harm (although Plaintiffs do not assert that this alone constitutes a "substantial threat of immediate harm" under § V.3.) in the sense that there is always the possibility of an unforeseeable, unavoidable confluence of circumstances that could cause a disruption in her medication. It is FCCW's repeated failures to

1

appropriately administer Ms. Ryder's Remodulin over the past year that raise the risk inherent in her health condition to the level of a substantial threat of immediate harm.

Ms. Ryder's incarceration at FCCW has been characterized by a series of emergency hospitalizations due to FCCW's failure to supply her Remodulin in a timely, safe, and sufficient manner. The nature of the failures has been wide-ranging: failure to mix the medication appropriately, failure to maintain backup medication, failure to appropriately maintain and change out pump/line equipment, inadequate nurse training. Exactly when and how the next failure will occur is unpredictable. But the repeated nature of these failures makes it clear that each time Ms. Ryder's cartridge is changed (a process that takes place every 48 hours), or she needs a new piece of pump/line equipment, she faces serious risk of harm. Defendants' repeated references to the fact that Ms. Ryder has not been hospitalized since February and has been "doing generally well" gloss over the reality that—regardless of how "generally well" Ms. Ryder may be doing on any given day—she remains subject to severe, immediate consequences if her medication is disrupted. As a result, Ms. Ryder's situation must be considered an ongoing emergency.

## II. Defendants' interpretation of § V.3 of the Settlement Agreement leaves women with serious chronic conditions subject to swift deterioration with no protection.

Defendants would like the Court to adopt an interpretation of the § V.3 "immediacy" requirement that would effectively render the section toothless as an enforcement mechanism for women with chronic conditions that can deteriorate quickly. Defendants demand that Ms. Ryder prove that her "current status of medical care at FCCW constitutes a substantial threat of immediate harm to [her]," but at the same time insist that the Court should ignore the substantial history of failures in her care—vital context demonstrating the systemic failures that put Ms.

2

Ryder at risk.[1] ECF No. 571 at 2. Under this framework, barred from presenting evidence of FCCW's pattern of dangerous behavior in the past to help prove her ongoing risk, Ms. Ryder would be prevented from seeking the Court's intervention until a "current" mistake is made with her medication. But due to Ms. Ryder's condition, once that mistake is made, it could cause swift death. There would be no time for Ms. Ryder to notify her attorneys, for her attorneys to investigate and file a motion, or for this Court to hold a hearing. In short, adopting Defendants' proposed analysis would completely disregard the reality of Ms. Ryder's situation.[2]

### III. Defendants' attempts to blame Ms. Ryder for her hospitalizations should be rejected.

Defendants attempt to blame Ms. Ryder for her hospitalizations in April 2018, July 2018, and August 2018, arguing that these hospitalizations occurred while FCCW still allowed Ms. Ryder to mix her own medication. This argument misses the mark for two important reasons. First, Defendants are incorrect that Ms. Ryder was permitted to mix her own medication throughout this time period. In fact, FCCW stopped allowing Ms. Ryder to actively participate in her medication management in July 2018. From then until August 2018, Ms. Ryder was only allowed to watch the preparation. Second, these hospitalizations were for issues that had nothing to do with the act of mixing of the medication. In April 2018, Ms. Ryder was hospitalized because FCCW failed to appropriately calculate and adjust her pump rate to account for the change in her Remodulin from the 10mg/mL strength to the 2.5mg/mL strength— not because

---

[1] Defendants employ the same argument when they suggest that the Court should not consider the testimony of Ms. Ryder's UVA providers. ECF No. 571 at 15. Testimony from Ms. Ryder's UVA medical providers will help inform the Court as to the nature of Ms. Ryder's medical needs and the serious consequences of failures in her care. The anticipated UVA testimony will help illuminate FCCW's pattern of past failures with respect to Ms. Ryder's care, and, to the extent Defendants intend to blame Ms. Ryder for her own suffering, provide rebuttal.

[2] Defendants' argument also disregards (and essentially seeks to penalize Plaintiffs for) the attempts made by Plaintiffs' counsel to resolve the concerns presented by Ms. Ryder's situation informally through communications with the Attorney General's Office that ultimately proved fruitless, leaving a request for this Court's intervention as the only viable alternative.

3

her medication was incorrectly mixed. In July 2018, Ms. Ryder was hospitalized because FCCW failed to keep a backup supply of Remodulin available—not because her medication was incorrectly mixed. In August 2018, Ms. Ryder was hospitalized because FCCW failed to adequately maintain her pump/line equipment and did not have a backup cap available—not because her medication was incorrectly mixed.

Patient-blaming has been a frequent tactic of Defendants in this suit. Just as the Court rejected Defendants' argument that Ms. Nichols was to blame for the delays in her colonoscopy (ECF No. 544 at 10, n.7), it should reject FCCW's unfounded implication that Ms. Ryder caused her own emergencies.

### IV. FCCW's very recent changes at FCCW with respect to Ms. Ryder's medication administration do not render her need for relief moot.

Defendants' response notes that FCCW has recently taken steps to improve Ms. Ryder's care, including providing nurse training and switching Ms. Ryder to a pre-mixed formulation of Remodulin. While Plaintiffs welcome these changes, the recent improvements do not render Ms. Ryder's request for relief moot for two reasons. First, conditions endangering Ms. Ryder persist at FCCW.[3] Second, the circumstances and timing of FCCW's implementation of improved practices around Ms. Ryder's medication suggest that those steps were largely—if not entirely—taken in response to outside pressure (a pattern of conduct with which this Court is all too familiar), and there is a significant danger that absent court intervention, Defendants will revert to their previous practices.

---

[3] Although Defendants have improved some aspects of Ms. Ryder's care at FCCW in response to pressure from Plaintiffs, some dangerous practices still remain. For example, FCCW continues to change the cap on Ms. Ryder's line only once every 6-8 weeks; it was a cracked cap, without an available replacement, that resulted in Ms. Ryder's August 2018 hospitalization. Similarly, upon information and belief, FCCW continues to experience high nursing turnover, exacerbating the risk that a new nurse will make a mistake regarding Ms. Ryder's medication or pump.

To the extent FCCW has made changes in its practices that protect Ms. Ryder, those changes were timed to avoid enforcement of the Settlement Agreement, and are likely to resume absent court intervention. It is well-established law that a defendant's "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of the power to hear and determine the case, i.e., does not make the case moot." *U.S. v. W.T. Grant Co.*, 245 U.S. 629 (1953). In addition, there is an established exception to cases that are otherwise moot when the issue presented is "capable of repetition, yet evading review." *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007). The "capable of repetition, yet evading review" exception applies to cases where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration[;] and[,] (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). As discussed above in §§ I-II, Ms. Ryder's medication must be changed every 48 hours, and the first indication of a mistake may be her sudden, possibly fatal, deterioration. There is no opportunity for a specific failure in Ms. Ryder's care to be fully litigated before its immediate consequences are exacted on her, and, given the repeated natures of the failures in her care (and the history of this case, as discussed further below), there is every reason to expect that such failures will occur again absent court intervention.

When defendants seek to avoid imposition of injunctive relief by discontinuing their illegal conduct, "courts require clear proof that an unlawful practice has been abandoned, and must guard against attempts to avoid injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption." *Porter v. Clarke*, --- F.3d. ---, *11 (4th Cir. 2019) (2019 WL 1966780) (quoting *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 367 (7th Cir 1990) (internal quotation marks omitted)).

5

The Department of Corrections has recently been rebuked for attempting to avoid accountability in exactly this manner. In *Porter*, the Fourth Circuit affirmed a district court's determination that Virginia prisoners challenging death row conditions of confinement had demonstrated a cognizable danger of recurrent violation justifying injunctive relief where the change in defendants' practice (1) "was influenced, although not entirely dependent on, the current ligitation"; (2) there was "no legal barrier" preventing defendants from reimposing the challenged conditions, and no "pre-implementation mechanism for plaintiffs to challenge such a return"; and, (3) despite defendants' statements that they did not *intend* to return to the challenged conditions, they refused to commit the Department of Corrections to the non-reversion promise, and in fact repeatedly affirmed their belief that the challenged conditions did not violate the Eighth Amendment. *Id.*

Defendants have not entirely abandoned the practices that put Ms. Ryder at risk. To the extent they have done so, however, this was clearly timed to anticipate Plaintiffs' instant Motion and render Ms. Ryder's claims moot. For example: although Defendants arranged a Remodulin training with a specialist nurse prior to Ms. Ryder's arrival at FCCW, they sought no additional training from specialists after her April 2018 hospitalization; her July 2018 hospitalization; her August 2018 hospitalization (despite her specialist's direct inquiry to FCCW inquiring "about staffing and training to change Remodulin"); or after Plaintiffs' letter raising concerns about her care on September 24, 2018. It was not until Ms. Ryder was hospitalized at UVA in February 2019 due to a mistake in her Remodulin dosage that FCCW arranged for any outside nurse training.[4] And while Defendants' response attempts to style this training as something sought out and initiated by FCCW, Ms. Ryder's UVA medical records clearly indicate that it was Dr.

---

[4] FCCW's delay in failing to provide for any outside nurse training is especially dangerous given the high turnover of prison nursing staff in general, and FCCW staff in particular.

6

Kennedy, a UVA specialist, who "suggested additional training for the nursing staff" (Ex. 2 to Plaintiffs' initial motion, Bates UVA 5460) and indeed that Ms. Ryder's UVA doctors did not want to release her back to FCCW until that training had been accomplished. *See, e.g.*, Feb. 12, 2019 progress note: "Dr. Kennedy states she is following up with the correctional facility on getting staff trained at the correctional facility <u>before</u> sending the patient back to the facility" (Ex. 2 to Plaintiffs' initial motion, Bates UVA 5496); Feb. 14, 2019 note: "An Accredo nurse will visit the facility…to educate staff about treprostinil <u>so the pt is safe to return there</u>" (Ex. 2 to Plaintiffs' initial motion, Bates UVA 5492).

Similarly, despite Ms. Ryder's numerous medication issues starting in April 2018, Defendants did not switch Ms. Ryder to pre-mixed Remodulin until May 1, 2019. Pre-mixed Remodulin has been available throughout Ms. Ryder's incarceration at FCCW, but Defendants made no effort to take this step—described by Dr. Scharff, the FCCW Compliance Monitor, as "critically important to the safety of the patient"—until the threat of litigation was raised by Plaintiffs' March 2019 correspondences followed by their April 30, 2019 filing. Draft April 2018 Compliance Monitor Report, p. 13.

FCCW's well-established history of dragging its feet in the face of known dangerous medical practices further belies its attempt to moot Ms. Ryder's claim, and suggests a strong probability that Defendants will resume their previous dangerous practices with respect to Ms. Ryder absent relief from this Court.[5] As the history of this case demonstrates, Defendants have frequently lacked motivation to make necessary changes to their practices absent Plaintiffs'

---

[5] While Plaintiffs hold Dr. Targonski in high regard and enthusiastically support his employment at FCCW, the reality is that the problematic elements of Ms. Ryder's care have primarily been at the hands of FCCW line nurses. As talented and capable as Dr. Targonski may be, it is not possible for him to personally manage every aspect of Ms. Ryder's care. Dr. Targonski is also working within the confines of an underfunded system with an entrenched culture of patient disregard.

intervention. As this Court noted in its January 2019 Findings of Fact and Conclusions of Law, "[f]or instance, FCCW did not bring in Katzman and another nurse administrator until *several months after Plaintiffs moved for a finding of contempt,* and a month after the Court approved pre-trial discovery." ECF No. 544 at 34 (emphasis added). Similarly, despite repeated admonitions by the Compliance Monitor that LPN sick call endangered patients, FCCW did not change its practice until the Plaintiffs' enforcement motion was filed. *Id.* at 20.[6] Finally, as in *Porter*, Defendants in this case continue to maintain that their actions are lawful, and that Ms. Ryder's care has never been deficient or insufficient. ECF No. 571 at 2, n.2.

For all these reasons, the Court should provide injunctive relief to protect Ms. Ryder during her final months at FCCW.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court grant the relief sought by the Plaintiffs' Motion for Emergency Enforcement Pursuant to Settlement Agreement and grant any other relief the Court deems necessary and appropriate.

---

[6] It must be noted that DOC continues to employ the LPN sick call model at other DOC facilities, including the nearby women's prison in Goochland, despite the Department's obvious knowledge—given the proceedings in this case—of the practice's dangers. The willingness of Defendant Clarke and others to continue employing a practice so thoroughly discredited by the Compliance Monitor and this Court at prisons outside the purview of this case demonstrates the likelihood that, absent pressure from litigation, they would resume similar practices again at FCCW.

Respectfully submitted,
**PLAINTIFFS,**
*individually and on behalf of all others similarly situated*

By: /s/ Shannon Ellis

    Shannon Ellis

Brenda E. Castañeda, VSB No. 72809
(brenda@justice4all.org)
Angela Ciolfi, VSB No. 65337
(angela@justice4all.org)
Abigail Turner, VSB No. 74437
(abigail@justice4all.org)
Adeola Ogunkeyede (admitted *pro hac vice*)
(adeola@justice4all.org)
Shannon Ellis, VSB # 89145
(shannon@justice4all.org)
LEGAL AID JUSTICE CENTER
1000 Preston Avenue, Suite A
Charlottesville, VA 22903
(434) 977-0553

Philip Fornaci (admitted *pro hac vice*)
(phil_fornaci@washlaw.org)
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
(202) 319-1000

Theodore A. Howard (admitted *pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
*Counsel for Plaintiffs*

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of May 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

_____
Shannon Ellis