CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
05/07/2020
JULIA C. DUDLEY, CLERK
BY: H. Wheeler
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CYNTHIA B. SCOTT, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> HAROLD W. CLARKE, *et al.*, <br><br> *Defendants.* | CASE NO. 3:12-cv-00036 <br><br> MEMORANDUM OPINION <br><br> JUDGE NORMAN K. MOON |

This matter is before the Court on Plaintiffs' Motion to Enforce the Settlement Agreement. Dkt. 651. Plaintiffs request that the Court order Defendants to comply with a particular provision of the Settlement Agreement, providing for quarterly reporting of information on Defendants' compliance with their obligations in the Settlement Agreement. The Court has considered the parties' submissions, *e.g.*, Dkt. 651, 652, 658, 664, and heard oral argument on the matter. For the following reasons, the Court will grant in part and deny in part Plaintiffs' motion.

**I.  Background**

The Settlement Agreement contemplates that the Court retains jurisdiction to enforce its terms. As the Court already held, the Court has the authority to enforce the Settlement Agreement. *See Scott v. Clarke*, 355 F. Supp. 3d 472, 489–90 (W.D. Va. 2019); Dkt. 221-1 ("Settlement Agreement") § V(1) ("The Court shall retain jurisdiction over the Parties for purposes of ensuring the implementation of this Settlement Agreement and shall preside over such further proceedings as may be necessary or appropriate to enforce its terms and conditions.").

On March 5, 2020, Plaintiffs filed a Motion to Enforce the Settlement Agreement, in which they "seek to compel the production of certain documents and data retained by Defendants and

1

prepared, referred to, relied upon, and maintained under the terms of the Settlement Agreement," specifically under § III(2)(b)(xxi), which Plaintiffs call a "vital provision of the Settlement Agreement." Dkt. 652 at 1–2. Plaintiffs request a Court order compelling specific performance of this provision of the agreement.

Section III(2)(b)(xxi) of the Settlement Agreement provides as follows:

III. <u>SUBSTANTIVE PROVISIONS</u> …

    2. Governing Practices And Procedures …

        b. Additional Guidelines And Standards …

            <u>Standards for FCCW</u> …

xxi. **Criteria for Performance Measures, Evaluation, and Comprehensive Quality Improvement.**

*Standard:* FCCW shall measure its performance on each aspect of the obligations imposed by this Settlement Agreement. This measurement shall be quantitative, based on focused or comprehensive medical record review where applicable. Measures shall conform to the circumstances at FCCW and shall be approved by the Compliance Monitor.

In addition, the quality management program shall consider data from mortality reviews, grievance analyses, and any patient satisfaction surveys.

Data shall be analyzed qualitatively so as to identify opportunities for improvement and identify remedies. *Performance shall be tracked and trended over time and shared with the Parties through counsel on a quarterly basis while this Settlement Agreement is in effect.*

FCCW will develop an annual quality management plan that takes into consideration known impediments to quality care and opportunities for improvement. On an annual basis, FCCW will produce a self-critical evaluation of the prior year's clinical performance and an evaluation of the value of the quality management program. This evaluation will be used to develop the annual quality management program plan.

Settlement Agreement § III(2)(b)(xxi) (emphasis added).

Plaintiffs contend that "the information described in this section … essentially entitles Plaintiffs to Defendants' Quality Assurance ('QA') and Continuing Quality Improvement ('CQI') *data, studies, analysis, and publications*." Dkt. 652 at 3 (emphasis added). In other words, Plaintiffs argue that this provision, "read in context," supports their request for "the documents and data underlying the analysis of FCCW's performance," because merely requiring Defendants to produce "unsupported, unverifiable statements regarding their progress … would be of no assistance in advancing the goals of the Settlement Agreement." *Id.* at 4.

Plaintiffs also argue that the course of dealing between the parties reflects that Defendants had previously acknowledged that Plaintiffs were entitled "to the data underlying DOC's internal performance analyses," because Defendants had in March 2017 produced numerous responsive documents to Plaintiffs' requests for "performance evaluation-related documents." Dkt. 652 at 4. But after that, Plaintiffs assert, Defendants began to refuse to produce additional responsive documents; and when they did so, it was only sporadically and upon threat of a motion to compel or an upcoming court deadline. *Id.* at 4–5.

Plaintiffs argue that, "regardless of how broadly or narrowly Section III.2.b.xxi is read, it clearly entitles Plaintiffs' counsel to the quarterly production of *something*," and the fact that Defendants have "refused to produce *any information at all*," demonstrates their noncompliance. *Id.* at 6. Plaintiffs contend that as a practical matter these documents are "essential to their ongoing efforts to enforce the Settlement Agreement," and, without access to these documents, Plaintiffs "have no sources of information regarding conditions at FCCW except for the Compliance Monitor's reports and the information they can glean from interviews with individual class members." *Id.* at 7.

Defendants oppose Plaintiffs' motion. Dkt. 658. In Defendants' view, "the plain language of the Settlement Agreement does not require Defendants to produce to the Plaintiffs the raw data or Defendants' 'own analysis of their performance.'" *Id*. at 3. They focus on the fact that one sentence of the Agreement states "*Data* shall be analyzed qualitatively …," while the next states that "*Performance* shall be tracked and trended and shared with the Parties on a quarterly basis …" *Id.* at 4. According to Defendants, "[i]f the drafters of the contract intended for 'data' to be 'shared with the Parties,' the sentence would have read 'Data and Performance shall be tracked and trended over time and shared with the Parties …,' or words to that effect." *Id.* Defendants also argue that the "measures" need not be shared with Plaintiffs; rather, they only need be approved by the Compliance Monitor. *Id.* at 5.

To Defendants, these provisions in § III(2)(b)(xxi) merely are a cross-reference to the Compliance Monitor's reports. *See* Dkt. 658 at 6 ("Read together with other provisions in the Settlement Agreement, it is clear that the Compliance Monitor's reports serve the purpose of tracking and trending Defendants' performance of Defendants' obligations and sharing that performance 'with the Parties through counsel.'"). Defendants argue that the provision's reference to sharing that performance information "with the Parties" further shows that it is refers to the Compliance Monitor. Defendants write that it would be "illogical" to read this provision of the Settlement Agreement "such that Defendants must share information with themselves and Plaintiffs through counsel." *Id.* at 5. Lastly, Defendants assert that the Compliance Monitor in correspondence with the parties did not agree with Plaintiffs' position, and noted he thought it "ill-advised to require that quality improvement *data* be shared." *Id.* at 7.

Plaintiffs argue in reply that, "this matter is straightforward"—Defendants "agreed to make quarterly productions of certain information that would track Defendants' performance of their

4

obligations under the substantive terms of the Settlement Agreement," but "Defendants have *never* maintained a regular quarterly production of this information." Dkt. 664 at 1. Plaintiffs argue that Defendants' position that the Compliance Monitor reports satisfy obligations in § III(2)(b)(xxi) would render "meaningless" the language of that provision. Specifically, they contend that such an interpretation would be an "absurd result and one contrary to law," because "no word or clause will be treated as meaningless if a reasonable meaning can be given to it." *Id.* at 4. Plaintiffs dispute Defendants' argument that that the Compliance Monitor agreed with Defendants, writing instead that the Compliance Monitor only thought that the Settlement Agreement did not designate *him* "to do the sharing of QI data." *Id.* at 5. This Court heard oral argument on Plaintiffs' Motion on April 6, 2020. This motion is ripe for disposition.

**II.     Analysis**

The most natural reading of the Settlement Agreement lies in between what Plaintiffs are requesting and the position advanced by Defendants.

       1.     *Responsibility for Tracking, Trending & Sharing Performance Information*

Section III(2)(b)(xxi) begins by stating that "*FCCW shall measure its performance* on each aspect of the obligations imposed by this Settlement Agreement." Later, the provision states that "*Performance* shall be tracked and trended over time and shared with the Parties through counsel on a quarterly basis while this Settlement Agreement is in effect." The language of this specific provision clearly places on *FCCW*—not the Compliance Monitor—the obligation to "measure *its* performance."

By contrast, other provisions of the Settlement Agreement lay out, in considerable detail, the Compliance Monitor's separate responsibilities to assess and report on FCCW's performance. *See, e.g.*, Settlement Agreement § IV ("MONITORING"); *id.* § IV(2)(a) (describing Compliance

5

Monitor's visits to FCCW); *id.* § IV(2)(b) ("The purpose and focus of the Compliance Monitor's periodic visits to FCCW shall be to observe, evaluate and analyze the nature and extent of all aspects of the Defendant's performance of its obligation to provide constitutionally-adequate medical care to the Class …"); *id.* § IV(2)(c) ("The Compliance Monitor shall prepare a written report to the Parties setting forth his findings after each visit to FCCW …"). Thus, § III(2)(b)(xxi) specifically imposes on *FCCW* the obligation to measure its own performance; § IV and elsewhere impose on the Compliance Monitor separate evaluation and reporting obligations.

To be sure, the key sentence in dispute in § III(2)(b)(xxi) is written in the passive tense: "Performance shall be tracked and trended over time and shared with the Parties through counsel on a quarterly basis while this Settlement Agreement is in effect." But, significantly, no other actor in this section is described measuring FCCW's "performance" besides FCCW. Just FCCW. Since, at beginning of the section, FCCW is responsible for "measur[ing] its performance," it stands to reason that later in the section, FCCW is responsible for performance "track[ing] and trend[ing] over time and shar[ing]" such information "with the Parties through counsel on a quarterly basis …" *Id.* § III(2)(b)(xxi).

Defendants argue against this interpretation, asserting that it would make no sense for *Defendants* to share performance information "with *the Parties* through counsel on a quarterly basis …," since "Parties" is a defined term that includes Defendants themselves. Dkt. 658 at 5–6. There is nothing "illogical" about it. *Id.* at 5. It is commonplace for a litigant to state that they sent information or documentation to "the parties" or comparable language, even though that term will necessarily include the sender. One need look no further than a standard certificate of service. *E.g.*, *id.* at 10 (reflecting brief sent to "all counsel of record"). Nor is it illogical that the Settlement Agreement would provide that Defendants—including the individual named Defendants listed on

the first page (Harold W. Clarke, A. David Robinson, Frederick Schilling, and Tammy Brown, who were each sued in their official capacities as representatives of VDOC)—should be made aware of this information when transmitted, no later than the point when Plaintiffs receive it. Dkt. 221-1 at 1. And the fact that this provision states that FCCW shall transmit such information to Plaintiffs and Defendants "through counsel," if anything, would appear to be a safeguard to FCCW's benefit. At bottom, whatever distinction there may be in the fact that § III(2)(b)(xxi) references sending information to "the Parties" rather than "Plaintiffs," it cannot bear the weight that Defendants attribute to it.

Accordingly, the Court concludes that § III(2)(b)(xxi) has required and continues to require FCCW to track and trend its performance over time and to share such information with the Parties through counsel on a quarterly basis while the Settlement Agreement is in effect. Defendants have not been doing this. They are therefore in violation of the Settlement Agreement.

        2.    *Information FCCW Is Required to Share*

Section III(2)(b)(xxi) defines the scope of the "performance" that FCCW is responsible for measuring—namely, "FCCW shall measure its performance *on each aspect of the obligations imposed by this Settlement Agreement*."

Under the Settlement Agreement, FCCW's analysis of its own performance must have both "quantitative" and "qualitative" components. FCCW's measurement "shall be quantitative, based on focused or comprehensive medical record review where applicable," and such "measures … shall be approved by the Compliance Monitor." It should "consider data from mortality reviews, grievance analyses, and any patient satisfaction surveys." Moreover, such data "shall be analyzed qualitatively so as to identify opportunities for improvement and identify remedies."

In other words, § III(2)(b)(xxi) requires FCCW to measure its performance on "each aspect of the obligations" imposed by the Settlement Agreement based on quantitative data (mortality reviews, grievance analyses, and patient satisfaction surveys), and qualitative analysis of that data identifying opportunities for improvement and remedies for shortcomings. FCCW must "track[ ] and trend[ ]" its performance over time and share that information with the Parties through counsel on a quarterly basis.

The Court agrees with Defendants that nothing in § III(2)(b)(xxi) requires the production of underlying raw data. The provision does not say that "*data*" shall be "tracked and trended over time and shared with the Parties"; rather, it states that "*performance* shall be tracked and trended over time and shared with the Parties."

However, that does not mean that FCCW's analysis of its "performance" information that is shared can be devoid of underlying data, such that Plaintiffs would have to take Defendants' word for their self-assessment. Section III(2)(b)(xxi) provides that FCCW's self-assessment must be both quantitative and qualitative in nature and requires performance to be "tracked and trended over time." This section also provides, among other things, that FCCW's quantitative measurement of performance be "based on *focused or comprehensive medical record review*, where applicable." This language contemplates that FCCW's performance assessment on each of its obligations imposed by the Settlement Agreement that is shared with the Parties must refer to and incorporate certain underlying data, such as by including aggregate statistics or other data benchmarks; and describe whether it is based on a focused or comprehensive medical record review. Reference to certain underlying data is contemplated and indeed, necessary, so that FCCW's quantitative and qualitative performance assessment could be meaningfully done and shared with the Parties, showing trends.

8

Section III(2)(b)(xxi) does not dictate a precise format for FCCW's reporting obligations. This provision was meant to have independent effect from other reporting and monitoring terms of the Settlement Agreement, but that does not mean FCCW must reinvent the wheel. Where, for example, FCCW has quantitatively and qualitatively measured its performance on an obligation imposed by the Settlement Agreement in a status report to this Court, there is no reason that such information could not be incorporated into FCCW's assessment per § III(2)(b)(xxi).

The Court declines to further detail the metes and bounds of this obligation but encourages the parties to work cooperatively to ensure (1) Plaintiffs receive timely, fulsome quarterly reports under § III(2)(b)(xxi), and (2) Defendants not be unduly burdened with requests for performance information that are overbroad, duplicative, or of marginal utility given other sources of data and information available to Plaintiffs. Defendants shall be prepared to share with the parties its first quarterly submission no later than August 1, 2020.

The Court will take under advisement Plaintiffs' request for attorney's fees and costs. Plaintiffs shall file within ten (10) days its request for fees and costs sought and substantiating the amount of such request; Defendants' opposition is due ten (10) days after that filing; and Plaintiffs' reply is due five (5) days after Defendants' opposition. The parties shall meet and confer regarding FCCW's future compliance with § III(2)(b)(xxi) before the May 14, 2020 status conference, and be prepared to address the issue. However, the Court will allow for submissions on attorney's fees before making any ruling.

The Clerk of Court is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

Entered this 7th day of May, 2020.

*Norman K. Moon*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

9