IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CYNTHIA B. SCOTT, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 3:12-cv-36 |
| HAROLD W. CLARKE, et al., | ) |
| Defendants. | ) |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' NOMINATION FOR COMPLIANCE MONITOR**

*The health systems in most correctional health systems are inadequate. They are not linked to transparency or quality in a way that we would expect for ourselves when we are out in the community, and the disparate impact on these [prisoners] who are ill should push us to rethink all levels of incarceration. . . . We are not able to provide the services and healthcare that we say we do in most of these places.*

- Dr. Homer Venters

Defendants, by counsel, pursuant to Section IV.1. of the Settlement Agreement, ECF No. 221-1, submit this response in opposition to Plaintiffs' nomination for the replacement Compliance Monitor, Dr. Homer Venters. As set forth more fully below, Dr. Venters has a clear conflict of interest, is overtly biased, lacks experience in direct patient care in the correctional health setting, and presents substantial risks for transmission of COVID-19 to the women and staff at FCCW due to his other engagements.

**I.  Response to Plaintiffs' "Procedural History"**

As the transcript attached to Plaintiffs' memorandum clearly shows, Defendants stated at the last Status Conference that they "*hope[d]* to be able to provide names of folks who are able and willing to [to serve as Compliance Monitor] no later than the end of next


FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 1 -

629.0303\NHS
4837-3654-3954 .v1

week." ECF No. 792-3, 14:10–14. Moreover, the Court did not "dismiss" the procedure for selection of a candidate posed by Defendants. The Court acknowledged at the Status Conference that the process identified by Defendants was indeed the process that resulted in Dr. Scharff's nomination, id., 12:21–23, and the Order, ECF No. 784, was silent as to the process for the nomination of a replacement monitor.

## II. Response to Plaintiffs' Initial Comments Regarding Dr. Lubelczyk

Plaintiffs' contention that Dr. Lubelczyk cannot serve as the Compliance Monitor because she has not served as a Compliance Monitor in the past is a fallacy. Based on Plaintiffs' logic, how does one ever become qualified to serve as a Compliance Monitor? Surely Plaintiffs' retained expert, Nurse LaMarre, and Dr. Venters have both served as a monitor in the past without any prior experience as a monitor. Were they unqualified for those initial engagements as well? As the monitoring tools submitted by Nurse LaMarre clearly demonstrate, monitoring is not rocket science, and Dr. Lubelczyk's education, training, and experience are more than sufficient for her to serve as the Compliance Monitor in this case. In any event, Section IV.1 of the Settlement Agreement calls for an individual "with expertise and experience in the field of correctional medicine" to fill any vacancy in the role of the Compliance Monitor. ECF No. 221-1, at *17. The Settlement Agreement does not require the replacement monitor to have served as a monitor in the past. The Settlement Agreement does not call for an expert in Quality Assurance or Continuous Quality Improvement. It requires an expert with experience actually delivering care in a correctional setting.

In fact, an individual that does not perform monitoring as his or her sole or majority source of income should be preferred. Professional monitors have an interest in



extending the length of their appointment in order to continue receiving compensation for their work. Dr. Venters has decided to leave the practice of medicine to become a professional expert. Dr. Lubelczyk has not.

Finally, Plaintiffs' contention that NCCHC surveys consist solely of a review of "written policies and procedures . . . [and] do not provide a framework for evaluating how, or to what extent, proper healthcare is actually provided," is completely belied by NCCHC's own summary explanation of its accreditation review process that consists of reviewing patient health records as well as policies and procedures, interviews of health staff, correctional officers, and inmates, and on-site inspections of the facility.[1]

### III. Dr. Venters Lacks Experience in Direct Patient Care

Defendants interviewed Dr. Venters on November 19. During that call, Dr. Venters conveyed that he provided direct patient care in a correctional facility for approximately one year while serving as a Deputy Medical Director for Correctional Health Services. Even then, he provided direct patient care only two days a week. He currently does not provide any direct patient care, and it is Defendants' understanding that Dr. Venters has not done so since 2016. Strangely, Dr. Venters relies on his experience handling settlement agreements in New York's jail facilities, but he was unable to inform Defendants as to the status of those settlement agreements upon his departure from Correctional Health Services.

The bulk of Dr. Venters' experience with Correctional Health Services in New York appears to be limited to overseeing contract monitors. While Dr. Venters may have been an employee of Correctional Health Services in New York for several years, he has very


FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[1] https://www.ncchc.org/accreditation-surveyors

- 3 -

629.0303\NHS
4837-3654-3954 .v1

little hands-on experience in delivering care to patients in a correctional facility. According to his CV, Dr. Venters is not a member of the American College of Correctional Physicians and has not pursued a certification as a Correctional Health Professional from the National Commission on Correctional Health Care.

### IV. Dr. Venters' Retention by Plaintiffs' Counsel for Other Matters Creates a Conflict of Interest.

Plaintiffs disclosed in their proposal that Dr. Venters is currently a retained expert for the Legal Aid Justice Center ("LAJC") in another matter involving conditions of confinement in a detention facility. In conclusory fashion, Plaintiffs try to brush aside this clear conflict because "[t]he LAJC attorneys involved in that case are not involved in this matter." But that ignores the fact that Dr. Venters is being compensated to provide expert opinions favorable to LAJC in a similar matter. Based on the fee schedule in his CV, it is likely that Dr. Venters has received several thousand dollars in compensation already for his work in the Santos Garcia v. Wolfe case. See ECF No. 792-4, at *15.  Dr. Venters has an incentive to continue providing favorable opinions to LAJC, which, despite his assertions to the contrary, affects his ability to remain impartial.

### V. Dr. Venters' Bias Prevents Him from Being Impartial

Dr. Venters' public comments have demonstrated that he is unable to objectively monitor the medical system at FCCW. Dr. Venters is the author of the book Life and Death in Rikers Island, in which "Venters details how jails are designed and run to create new health risks for prisoners—all while forcing doctors and nurses into complicity or silence."[2] In his book, Venters writes, "American jails are horribly run institutions. By

---

[2] https://www.amazon.com/Death-Rikers-Island-Homer-Venters/dp/1421427354

- 4 -

629.0303\NHS
4837-3654-3954 .v1

design and by incompetence, jails create the risk of death, injury, and illness for the incarcerated." Homer Venters, Life and Death in Rikers Island, 135 (2019).

In March 2019, he was a guest on the National Public Radio program, Fresh Air, and Dr. Venters claimed, "I do think that the problems of Rikers are, in many cases, the problems of jails and prisons everywhere in the United States." Former Physician At Rikers Island Exposes Health Risks of Incarceration, National Public Radio, https://www.npr.org/transcripts/704424675 (last accessed November 23, 2020). More recently, Dr. Venters was a panelist along with defendant Harold Clarke and others for a discussion titled Decarceration and Community: COVID-19 and Beyond hosted by the Radcliffe Institute for Advanced Study at Harvard University. During that panel, Dr. Venters made comments to the effect of:

- There is a disconnect between evidence-based healthcare practices and what people who are incarcerated are experiencing.
- There is a constant effort to minimize and avoid dedication of resources to keep prisoners away from having their problems detected or giving them adequate care.
- Most of the structures, practices, and transparency found in community hospitals and clinics are absent in jails and prisons.
- When coronavirus gets behind bars, it spreads like wildfire.
- Most prisons have not done much at all in regard to the coronavirus.
- Many facilities destroy sick call requests or do nothing with them, which is a core weakness that is emblematic of systemic problems found in correctional health systems.


FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4837-3654-3954 .v1

- 5 -

- Prisoner access to care after the pandemic is going to be as inadequate as before, and prisoners are going to be harmed even more.

- The health systems in most correctional health systems are inadequate. They are not linked to transparency or quality in a way that we would expect for ourselves when we are out in the community, and the disparate impact on these [prisoners] who are ill should push us to rethink all levels of incarceration. . . . We are not able to provide the services and healthcare that we say we do in most of these places.

The video of Dr. Venters' comments is available online at https://www.radcliffe.harvard.edu/video/decarceration-and-community-covid-19-and-beyond-part-ii and attached to this Response in Opposition as **Exhibit 1**.

Dr. Venters' writings and statements demonstrate a clear bias against correctional facilities and correctional health systems. His myriad statements prejudging these systems make it impossible for Defendants to see how Dr. Venters could be impartial in the role of the Compliance Monitor.

### VI. Dr. Venters' Other Engagements Present Risks to the Women and Staff at FCCW.

During his interview with Defendants, Dr. Venters disclosed that he is "on the road" almost every other week to do COVID-19 inspections at other facilities or other COVID-related quality assurance projects. Dr. Venters was in an airport either in or returning from Florida during his interview with Defendants. He is currently monitoring facilities in Mississippi, California, Tennessee, New York, Illinois, and Connecticut just in regard to COVID-19 according to his CV. He also serving as a monitor in Santa Barbara County, California in addition to his COVID-19 monitoring work. In the middle of the pandemic, Dr. Venters is travelling across the country to visit different congregate


FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4837-3654-3954 .v1

settings and risking exposure to the virus to himself and others. That practice puts the health and safety of the women and staff at FCCW at risk if Dr. Venters intends to conduct in-person visits at FCCW.[3]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request entry of an Order appointing Rebecca Lubelczyk, MD, FACCP, CCHP-P, as the Compliance Monitor in this case and granting such further relief as the Court deems just and proper.

Respectfully Submitted,

HAROLD W. CLARKE, A. DAVID ROBINSON, STEPHEN HERRICK, MARIEA K. LEFEVERS, and PAUL TARGONSKI, M.D., P.H.D.

/s/
Katherine C. Londos (VSB #: 36848)
John C. Johnson (VSB #: 33133)
Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax:    540/772-9167
Email: klondos@faplawfirm.com
         jjohnson@faplawfirm.com
         nschnetzler@faplawfirm.com

---

[3] When directly asked about logistics for remote monitoring, Dr. Venters provided no response to Defendants.

629.0303\NHS
4837-3654-3954 .v1

Edward J. McNelis, III
Elizabeth M. Muldowney
Ruth T. Griggs
Sands Anderson PC
1111 East Main Street, Suite 2400
Richmond, VA 23218-1998
Phone: 804-648-1636
Fax:    804-783-7291
Email: emcnelis@sandsanderson.com
         emuldowney@sandsanderson.com
         rgriggs@sandsanderson.com


Diane M. Abato
SAAG/Chief
Office of the Attorney General
Criminal Justice and Public Safety Division
202 North 9th Street
Richmond, VA 23219
Phone: 804-786-8191
Fax:    804-786-4239
Email: dabato@oag.state.va.us

*Counsel for Harold W. Clarke, A. David Robinson, Stephen Herrick, Mariea K. LeFevers, and Paul Targonski, M.D., P.H.D.*



629.0303\NHS
4837-3654-3954 .v1

- 8 -

**CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all counsel of record.

/s/
Of Counsel



- 9 -

629.0303\NHS
4837-3654-3954 .v1