IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| CYNTHIA B. SCOTT, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 3:12-cv-00036 NKM/JCH |
| v. | ) ) | |
| HAROLD W. CLARKE, *et al.*, | ) ) | |
| *Defendants*. | ) ) ) | |

**PLAINTIFFS' FEBRUARY 2021 STATUS REPORT**

Plaintiffs, by counsel, submit this Status Report in advance of the March 8, 2021 Status Hearing in this case. Pursuant to the Court's March 16, 2020 Order (ECF No. 655), this report addresses issues related to Defendants' partial compliance or non-compliance with the standards set out in the Settlement Agreement, among other pertinent issues.

The coronavirus pandemic continues to pose a serious threat to the health and well-being of the women and staff at FCCW, which has experienced multiple outbreaks over the past several months. As of the date of filing, a total of 648 women at FCCW have contracted COVID-19, and 15 of those are still considered active cases. Among VADOC facilities, only three facilities have recorded more confirmed COVID cases than FCCW. It is clear that FCCW's measures to prevent the introduction of COVID-19 to the facility or to slow the spread of the virus among the population have largely been ineffective.

Due to the resignation of Dr. Scharff and the recent appointment of Dr. Venters as Compliance Monitor, no meaningful monitoring has occurred since the parties were last before

the Court. However, based on a significant volume of consistent reports from Plaintiff class members, women continue to lack access to timely medical care, consistent access to medications, and adequate care for chronic conditions, among other problems.

I.      **COVID-19**

      A.    **D**EFENDANTS' **S**TATUS **R**EPORT **D**ID **N**OT **P**ROVIDE **C**URRENT **I**NFORMATION **R**EGARDING COVID-19 **O**UTBREAKS AT **FCCW**

Defendants' Status Report, though filed on February 8, 2021, addressed only the COVID outbreaks that occurred at FCCW during November and December 2020, implying that no other outbreaks occurred after that point. Unfortunately, that is not the case, and additional outbreaks occurred in January and into February. At the height of the February outbreak, on February 4, 2021, VADOC reported 183 active cases, with one patient hospitalized. Ex. 1 at 15. On February 8, 2021, VADOC reported 144 active COVID cases, with one patient hospitalized. Id. at 11. Thankfully, the extensive February outbreak currently appears to be abating. As of the date of filing, there are only 15 active cases, although four of those are new cases that have been reported in the last week. Id. at 3, 7 (listing 644 total cases on February 15, 2021 and 648 total cases on February 22, 2021). All told, a total of 648 women at FCCW have had confirmed cases of COVID since the pandemic began.[1]

By email on February 2, 2021, Dr. Venters requested from FCCW the following information: (1) the current COVID-19 response plan or documents that are utilized by the health and security services for the facility COVID-19 response; and (2) updated data on COVID-19 cases from the start of pandemic to now including the number of cases identified, the current number of people in quarantine or medical isolation, the total number of COVID-19 related

---

[1] VADOC's website does not list the total number of patients who have been hospitalized, only patients currently hospitalized. Thus, it is impossible for Plaintiffs' counsel to determine how many individual patients have needed hospital care due to COVID infection over the course of the pandemic.

2

hospitalizations, and the total number of people offered and who have received COVID-19 vaccination. Plaintiffs do not know whether Defendants have provided that information to Dr. Venters.[2]

According to Defendants' Status Report, three out of the four COVID outbreaks at FCCW in November and December were traced back to infected staff members, who brought the virus into the facility from the community (the fourth originated from women who were infected prior to their transfer to FCCW from jails or other facilities). ECF No. 806 at 11-14. While Defendants' Status Report is replete with attempts to blame incarcerated women for the spread of the virus among the population, it is entirely silent with regard to any measures being taken to prevent introduction of the virus in the first place. It is easy to conclude from the number of outbreaks in just the two-month period described in Defendants' Status Report, along with the high total number of cases to date, that the screening measures implemented for staff at FCCW are insufficient. Yet Defendants do not provide any information about whether staff screening measures have been improved, how many staff members have been vaccinated, or whether staff members who knowingly come to work after being exposed to COVID or experiencing symptoms face any consequences for endangering others. Further, Defendants do not describe what efforts FCCW is making to encourage and facilitate masking and social distancing guidelines within the population. For example, is FCCW ensuring that social distancing is possible during pill line and meal times, or other mandatory activities when masking is impossible? Is FCCW providing masks in adequate quantity and of adequate quality to all women? Plaintiffs' counsel have received reports from multiple women that masks are in short

---

[2] Dr. Venters has not yet issued a report or any recommendations concerning FCCW's COVID response.

supply, they lack access to sufficient cleaning supplies, and that distancing is not possible in many scenarios.

Defendants do not offer any information in their Status Report about how FCCW is providing follow up care for women who have tested positive for COVID and have lingering symptoms or sequelae. Defendants also fail to sufficiently explain the plans for vaccination of the population at FCCW, including how they will educate women about the vaccine and ensure that they have access to medical consultation and advice before obtaining or refusing the vaccine. Plaintiffs' counsel has received many reports from women with underlying medical conditions who are concerned about how the vaccine might affect them or interact with the medications they must take. Those women report that they have not been able to consult with an FCCW provider or their treating specialist about their individual risks from receiving the vaccine, despite making repeated requests for such consultations.

### B. FCCW'S RESPONSE TO OUTBREAKS EXACERBATED COVID SPREAD

Plaintiffs' counsel has received numerous consistent reports from women at FCCW that the facility's response to COVID outbreaks actually exacerbated the spread of the virus, rather than contained it. In addition, these reports suggest that FCCW frequently fails to follow VADOC's own Medical Guidelines for the Prevention and Management of Coronavirus in Correctional Facilities (VADOC Guidelines), last updated November 18, 2020, attached as Exhibit 2.

#### 1. FCCW Fails to Quickly Identify COVID Cases, Isolate Symptomatic Women, or Quarantine Close Contacts

As described during the October 2020 status hearing, there are often delays in testing or isolating women who report symptoms of COVID. The VADOC Guidelines require that people who develop symptoms consistent with COVID "should be considered a suspected COVID-19

4

case … and moved to medical isolation immediately (but not cohorted with confirmed positive cases)." Ex. 2 at 14. Despite this VADOC policy mandate, many women report waiting long periods of time, including several days, before being isolated after developing COVID-19 symptoms. See, e.g., Declaration of Cynthia Scott dated February 11, 2021 ¶ 4 (Scott Decl.), attached as Exhibit 3. The Guidelines further require asymptomatic close contacts of people with COVID to be quarantined and monitored for symptoms twice a day for 14 days. Ex. 2 at 6. In practice, close contacts of women who test positive are not quarantined at all. Rather, they are cohorted with other women in "yellow zones." See, e.g., Ex. 3, Scott Decl. ¶ 3. Finally, women also report that FCCW is slow to isolate women even after a positive test, sometimes taking several hours to move women to a red zone after positive test results are received.

### 2. FCCW Co-mingles Exposed Women, Increasing Spread of COVID

FCCW has regularly moved the asymptomatic or pre-symptomatic roommates of women who test positive into "yellow zones," where they are placed in wings with other asymptomatic women. Predictably, in many cases the roommates of COVID-positive women went on to develop symptoms and test positive. In the meantime, they may have transmitted the virus to others in the yellow zone who might otherwise not have been exposed. The cohorting of women without regard for actual risk of exposure to COVID appears to have increased the spread of the virus rather than limiting it.

Named Plaintiff Cynthia Scott, who suffers from a number of serious chronic conditions[3], was housed in a yellow zone for quarantine after returning from an outside appointment. While her outside appointment was on January 13, she did not develop COVID symptoms until the last

---

[3] Ms. Scott's conditions include kidney disease, asthma, diabetes, and sarcoidosis (an inflammatory condition that impacts her lungs, liver and spleen). She takes immunosuppressant medications for some of these conditions. Ex. 3, Scott Declaration ¶ 2.

5

weekend in January, after four other women in her wing tested positive for COVID. Ex. 3, Scott Decl. at ¶¶ 3-4. This timing makes it highly unlikely that Ms. Scott was exposed to COVID at her outside appointment, and much more likely that she contracted the virus from other women in her quarantine cohort. Ms. Scott is aware of her increased risk from COVID, and is careful to take all recommended precautions to avoid exposure, including masking and remaining in her cell as much as possible. Id. at ¶ 2. Nonetheless, she was ultimately unable to avoid infection.

The VADOC Guidelines for cohorting prohibit adding "more inmates to an existing quarantine cohort after the 14-day quarantine clock has started." Ex. 2 at 15. However, multiple women report that cohorts are frequently co-mingled, or individuals are added to yellow zone cohorts, resetting the 14-day quarantine clock multiple times. As a result, women sometimes remain in quarantine for much longer than 14 days – even up to two months – and face new potential exposures throughout that period.

Similarly, Defendants' Status Report reveals that this practice is common at FCCW. In describing the "reception outbreak" in November 2020, Defendants state that two separate cohorts of women were combined after 5 people tested positive for COVID. ECF No. 806, p. 12. Ultimately, 17 women tested positive for COVID during this outbreak. Id. at 13. Although this description does not provide dates for the receipt of positive test results, it appears that these cohorts were quarantined for almost two months, having arrived on November 5, 2020 with the index case already symptomatic, and clearing quarantine on December 30, 2020. Id. at 12-13.

The VADOC Guidelines allow release of confirmed COVID patients from isolation once at least 14 days have passed since symptoms first appeared AND at least 72 hours have passed since the last fever (without use of medications) AND symptoms have improved. Ex. 2 at 20. However, women report that some are being released from quarantine before the full 14 days

have passed, and that some women who are released still show COVID-19 symptoms. Furthermore, this section recommends testing immunocompromised women before releasing them from isolation and extending the 14-day quarantine period to 20 days since symptoms first appeared. Id. Based on client reports, FCCW does not appear to be retesting any isolated, COVID-19 positive women before releasing them, even those who are immunocompromised.

### 3.  COVID Patients in the Red Zone Lack Adequate Accommodations and Care

Multiple reports from women who tested positive for COVID and were housed in the "red zone" describe harsh conditions and a lack of access to adequate medical care. Over the past weeks, the red zone wing 8B, formerly the segregation unit[4], has been completely full. Women who have just tested positive have had to wait in the hallway for hours before being placed in a bunk. See Ex. 3, Scott Decl. ¶ 5. Women with bottom bunk profiles are housed together in cells with one upper and one lower bunk, meaning that one of them is denied a necessary accommodation. Id. at ¶ 6. But most concerning, the cells in this wing do not have call buttons. Id. at ¶ 10. Women are kept in their cells with the door locked, so they cannot seek assistance or attention when they need it. Instead, they must bang on the door to attract the attention of a guard or nurse. Sometimes it takes 15-20 minutes for anyone to hear their banging and respond. The nurses and guards do not make regular rounds, except to check vital signs every four hours and to distribute medications. Id. This lack of attention to sick patients led to Ms. Scott lying unconscious in her cell for 5 minutes without a response, and another 10-15 minutes after regaining consciousness before any officer or medical personnel responded to her roommate's

---

[4] The VADOC Guidelines provide that "solitary confinement or other punitive spaces should not be used for quarantining." Ex. 2 at 15. If these spaces are the only options, they must be outfitted with everything an inmate has in a normal cell, including communication options, entertainment, and toiletries. Id. FCCW has not made these accommodations in wing 8C.  In addition, although women are permitted to move their own property into the red zones, they often have to wait some time after the move before their property is provided to them. As a result, many women report feeling that they are being punished for being sick.

7

calls for help. Id. at 13. Despite losing consciousness, hitting her head, and having extremely low blood pressure, Ms. Scott was only given Gatorade. Id. at 15. She was not assessed for a concussion at that time or at any time since, despite having knots on her head and suffering from bad headaches for days afterwards. Id. at 15, 17. She was not provided any other evaluation for the reason she lost consciousness. Id.

The COVID-19 Medical Guidelines recommend that facilities "be especially mindful of cases who are at higher risk of severe illness from COVID-19. Ideally, they should not be cohorted with other infected individuals." Ex. 2 at 16. Based on reports from women at FCCW, it does not appear that FCCW is attempting to differentiate between women who are at higher risk of severe illness and those who are not, and no special accommodations are made. Women such as Ms. Scott are particularly fearful that they face severe illness or death if they contract COVID, and they do not see FCCW taking particular care for their safety.

## II.   CQI QUARTERLY REPORT

The Plaintiffs received Defendants' quarterly CQI submission on February 8, 2021, covering the fourth quarter and "annual highlights" of 2020. The quarterly submission shows that while FCCW has made some progress in its development and implementation of a CQI program, that program is not yet capable of evaluating FCCW's performance as required by Section III.2.b.xxi of the Settlement Agreement.[5] Notably, FCCW does not seem to have incorporated any of the feedback provided by Plaintiffs or the Compliance Monitor about the design and objectives of its CQI studies. Instead, they repeat the same studies and ignore the other aspects of the Settlement Agreement. This is particularly disheartening given that when FCCW does

---

[5] That Section states, in part: "FCCW shall measure its performance on each aspect of the obligations imposed by this Settlement Agreement. This measurement shall be quantitative, based on focused or comprehensive medical record review where applicable. Measures shall conform to the circumstances at FCCW and shall be approved by the Compliance Monitor."

implement the CQI process, such as with infirmary nurse staffing levels, there are demonstrated improvements. However, given the limitations of the CQI program at this time, the impact of those improvements on the quality of care at FCCW is largely unknown.

As with past CQI studies, many of the studies in the recent quarterly submission are limited in scope and were not designed to examine all aspects of the Settlement Agreement standards. For example, the study of emergency response looks only at the timeliness of the response, but not whether the care provided was appropriate or the emergency could have been avoided. Given that FCCW's emergency response times have improved and seem to be largely meeting its stated objectives of late, one would expect FCCW to begin to expand its CQI studies of emergency response to include other areas that might require improvement. Dr. Scharff had also recommended that "a future audit should sample from true emergencies so that the adequacy of emergency care, as opposed to emergency response, can be examined." ECF No. 750-7 at p. 3 n. 2. FCCW has yet to adopt this recommendation.

In another example, the audit for continuity of medications looks only at the processes to ensure continuity of medication availability for women arriving at FCCW from jails or other facilities, but not whether medications for existing patients are timely refilled and administered. Another audit examined how quickly a patient receives the first dose of a medication compared to the date and time designated in the facility's prescription software. Thus, the audit only assessed the timeliness of administering the first dose of medications. Plaintiffs previously pointed out the importance of studying lapses in medication administration during the entire time the medication is prescribed (including failure to renew medications for chronic conditions) in response to FCCW's audit conducted in September 2020. Dr. Scharff agreed that continuity of medications at pill line has been a problem at FCCW in the past. He recommended that this

9

problem "be studied, and, if still prevalent, redressed, but such a study would require other data, perhaps from the grievance system." ECF No. 803-4 at 4. Five months later, FCCW has not yet undertaken a study of that important issue.

Other such shortcomings have been documented in Plaintiffs' previous Status Reports, see, e.g., ECF No. 760, and are largely still evident in the most recent quarterly report. In addition, although the report purports to also be an annual report, it does not contain an "annual quality management program plan" as required by Standard xxi of the Settlement Agreement. There is no indication that an annual quality management program plan will be forthcoming. Thus, it is clear that FCCW is not yet comprehensively evaluating its performance under the standards of the Settlement Agreement, and is still not fully in compliance with Standards xxi and xxii of the Settlement Agreement.

### III. DEATHS

Two women have died at FCCW since the last status hearing in this case. On November 24, 2020, M.C.[6] passed away after being transported to the UVA emergency department. She suffered severe internal bleeding resulting from complications of Hepatitis C. M.C. did not receive timely evaluation of or care for her Hepatitis C infection from the time of her arrival at FCCW in 2013 until the summer of 2018, by which time her disease had progressed significantly and caused permanent damage that eventually led to her death. M.C.'s records showed that for several years, Hepatitis C was noted in her medical records, but she was not evaluated for that condition, nor was she offered treatment. It is clear that the history of inadequate care at FCCW contributed to M.C.'s death. Given the recent lack of assessment of FCCW's compliance with the Settlement Agreement provision requiring evaluation and treatment of patients with Hepatitis

---

[6] These two women will be identified only by initials to preserve patient privacy.

C, it is impossible to determine whether or not M.C. would fare any better if admitted to FCCW today.

On January 13, 2021, U.C. passed away. U.C. was elderly and suffered from many serious and chronic ailments. Her health had been in decline for many months prior to her death, but the immediate cause of death was sepsis from an infection in a foot ulcer related to diabetes. U.C.'s infection worsened to this point as a result of miscommunications or failures in the communications and transmission of medical records between UVA and FCCW, which were not solely the responsibility of FCCW. However, U.C.'s medical records from FCCW do not document the nursing care she received for the wound on her foot for long periods of time. Therefore, it is unclear whether the wound was monitored or treated appropriately by FCCW, or whether the development of fatal sepsis was avoidable.

Defendants failed to provide Plaintiffs' counsel with notice of U.C.'s death, and counsel only learned of her death from client reports. Plaintiffs' counsel asked Defendants for information about the death and lack of notice by email on February 3, 2021. See Exhibit 4. In response, Defendants' counsel confirmed that U.C. had passed away on January 13, 2021, and that Dr. Venters had been notified. Id. After past deaths, Defendants had routinely copied Plaintiffs' counsel on this notification to the Compliance Monitor within 24 hours of the death, and indeed had done so at the time of M.C.'s death in November 2020. Id. Defendants provided no explanation for this sudden and dramatic change in practice or why they believe that Plaintiffs' counsel are not entitled to timely notification of the death of one of their clients.

### IV. NEW COMPLIANCE MONITOR

Dr. Venters has already begun his review of certain policies and protocols, and plans to speak with the named plaintiffs in this case by videoconference prior to his first visit to FCCW,

11

which is scheduled for mid-March. During that visit, Dr. Venters plans to focus on evaluation of FCCW's COVID response, access to care, chronic care, and care of medically-complicated individuals.

Plaintiffs have asked FCCW to post a notice about Dr. Venters' appointment in each housing wing, along with a release form patients can use to write to him. Defendants responded that they would only post the notice and form if Plaintiffs made certain edits to the documents. Because these documents are communications from Plaintiffs' counsel to the class, it is inappropriate for Defendants to attempt to control the content of those communications. Discussions between counsel on this issue are on-going, but if necessary, Plaintiffs' Motion for relief on this issue will be forthcoming.

## V.    CONCLUSION

The past months have demonstrated FCCW's inability to prevent the introduction of COVID into the facility, or to effectively control its spread among the general population once introduced. While FCCW's CQI quarterly report suggests that the CQI process has resulted in some improvements, substantial work needs to be done in order to bring FCCW into compliance with the Settlement Agreement. The Plaintiffs look forward to Dr. Venters' first visit to FCCW and his subsequent report for a more thorough assessment of the quality of health care at FCCW.

Respectfully submitted,
**PLAINTIFFS,**
*individually and on behalf of all others similarly situated*

By: /s/ Shannon Ellis
    Shannon Ellis

| | |
|---|---|
| Brenda E. Castañeda, VSB No. 72809 (brenda@justice4all.org) Angela Ciolfi, VSB No. 65337 (angela@justice4all.org) Shannon Ellis, VSB # 89145 (shannon@justice4all.org) LEGAL AID JUSTICE CENTER 1000 Preston Avenue, Suite A Charlottesville, VA 22903 (434) 977-0553 | Mirela Missova (*pro hac vice*) (mirela_missova@washlaw.org) WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS 700 14th St., NW, Fourth Floor Washington, D.C. 20005 (202) 319-1000 |

Theodore A. Howard (*pro hac vice*)
(thoward@wileyrein.com)
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel for Plaintiffs*

### CERTIFICATE OF SERVICE

    I hereby certify that on this 22nd day of February, 2021, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Shannon Ellis
Shannon Ellis