1

Scott, et al v. Clarke, et al   3:12-cv-36  March 8, 2021

1                    UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF VIRGINIA
2                       CHARLOTTESVILLE DIVISION
   * * * * * * * * * * * * * * * *
3  CYNTHIA B. SCOTT, et al.,
                                  CIVIL ACTION 3:12-CV-00036
4  Plaintiffs,                    MARCH 8, 2021  10:00 A.M.
                                  MOTIONS HEARING VIA ZOOM
5  vs.

6  HAROLD W. CLARKE, et al.       Before:
                                  HONORABLE NORMAN K. MOON
7  Defendants.                    UNITED STATES DISTRICT JUDGE
   * * * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA
8
   APPEARANCES:
9  For the Plaintiff:             THEODORE AUGUSTUS HOWARD,
                                  ESQUIRE
10                                Wiley Rein, LLP
                                  1776 K Street N.W.
11                                Washington, DC  20006

12                                SHANNON MARIE ELLIS, ESQUIRE
                                  Legal Aid Justice Center
13                                1000 Preston Avenue, Suite A
                                  Charlottesville, VA 22903
14                                GERI MICHELLE GREENSPAN,
                                  ESQUIRE
15                                Hunton Andrews Kurth
                                  1000 Preston Avenue
16                                Charlottesville, VA 22903

17                                DEBORAH MAXINE GOLDEN, ESQUIRE
                                  ASHIKA VERRIEST, ESQUIRE
18                                GABRIELLE WYNN, ESQUIRE
                                  Washington Lawyers Committee
19                                for Civil Rights and Urban
                                  Affairs
20                                700 14th Street, NW, Suite 400
                                  Washington, DC 20005
21
   Court Reporter:   Lisa M. Blair, RMR, CRR, FOCR
22                   255 West Main Street, Room 304
                     Charlottesville, Virginia 22902
23                   (434) 296-9284

24 Proceedings recorded by mechanical stenography. Transcript
   produced by computer.
25

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   APPEARANCES CONTINUED:

2   For the Defendant:              NATHAN HENRY SCHNETZLER,
                                    ESQUIRE
3                                   KATHERINE CABELL LONDOS,
                                    ESQUIRE
4                                   Frith Anderson & Peake PC
                                    29 Franklin Road, SW
5                                   Roanoke, VA  24011

6                                   DIANE MARIE ABATO, ESQUIRE
                                    Office of the Attorney General
7                                   202 North Ninth Street
                                    Richmond, VA  23219

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1    (Proceedings commenced, 10:00 a.m.)

2              THE COURT:  Heidi, you may call the case, please.

3              CLERK:  Yes, Your Honor.

4              This is Civil Action Number 3:12-cv-36, Cynthia B.

5    Scott and others versus Harold W. Clarke and others.

6              THE COURT:  Plaintiffs ready?

7              MR. HOWARD:  We are, Your Honor.

8              THE COURT:  Defendants ready?

9              MR. SCHNETZLER:  Yes, Your Honor.

10             THE COURT:  Okay.  I'll remind any members of the

11   public that under Standing Order 2020-12, the Court's

12   prohibition against recording and broadcasting court

13   proceedings remains in force.  Attorneys, staff, and members of

14   the public accessing this hearing today may not record or

15   broadcast it.

16             We are here today on a regularly-scheduled status

17   conference to assess the state of FCCW's compliance with the

18   terms of the settlement agreement.  I thank the parties for

19   their submissions in advance of this hearing, which I -- and I

20   have reviewed those submissions.

21             Before we begin, I'll just make a few preliminary

22   remarks.  First, as the parties' filings reflect, the case is

23   in some respects in a transitional period.  The court appointed

24   Dr. Homer Venters as the new compliance monitor after

25   Dr. Scharff's resignation as monitor.  I understand that

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  Dr. Venters has already requested documents and intends to

2  visit FCCW this month, and that should be interesting.

3      Second, this transitional period should serve as a

4  stark reminder about the length of time there has not been

5  complete compliance.  The settlement agreement was approved in

6  2016.  We are now over five years after settlement, and all the

7  parties should take the opportunity and redouble their efforts

8  to quickly and sustainably hit the benchmarks.

9      Pursuant to the court's briefing schedule, the

10  parties have filed their briefs.  I think I'll hear from the

11  plaintiffs first.

12      MR. HOWARD:  Yes.  Good morning, Your Honor.  Ted

13  Howard for the plaintiffs.

14      Your Honor, with regard to the defendants' status

15  report filed on February 8th, there really are sort of three

16  main points that I think the plaintiffs would like to emphasize

17  at this point.  The first is that despite the fact that it was

18  filed on February 8th and does address COVID-19 outbreak issues

19  that were -- that arose in November and December of 2020, there

20  was a significant additional outbreak in January carrying over

21  into February that is not addressed at all in the defendants'

22  status report.  It's a little concerning and a little

23  perplexing as to why that would be the case.

24      As of February 8th, the date on which the defendants'

25  status report was filed, VDOC's online reporting with regard to

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   COVID-19 indicated that there were 144 active cases at

2   Fluvanna, including one hospitalization.  Now, certainly as of

3   today, it appears that that number has come down quite a bit,

4   which is, you know, something we're all grateful for.  But the

5   failure of the defendants to address the major outbreak in

6   January and February is concerning.  That's particularly so

7   because --

8          THE COURT:  You mean to address it in the report, not

9   to address it --

10         MR. HOWARD:  I mean in the report, yes, Your Honor.

11         THE COURT:  Okay.

12         MR. HOWARD:  It's particularly concerning to us,

13  among other reasons, because as regards the November and

14  December outbreaks that were addressed in the report, it

15  appears that the source of the infection, the originating

16  infection that caused the outbreak, was with staff in three of

17  the four instances, and a prisoner transferring in from another

18  facility in the fourth instance.  And the report does not seem

19  to address in any way what measures Fluvanna has adopted or is

20  implementing to try to, you know, prevent those sources of

21  infection from having an adverse impact on the prisoner

22  population.  And we have no information about what the sources

23  were of the infections that caused the January outbreak.

24         We also have some significant concerns, which we have

25  outlined at pages 4 through 8 of our report filed on

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  February 22nd, about what we've heard from our clients, and

2  indications that as regards the quarantining practices being

3  utilized at the prison, that they don't seem to have been

4  effective in preventing further spread, and they don't seem in

5  some instances to actually even align with the published

6  written protocols and guidelines that VDOC has made available.

7  That concerns women being transferred to so-called yellow zones

8  where they don't appear to have been exposed or infected when

9  they got there, but it appears that they were infected while in

10  the yellow zone as a result of commingling with others who were

11  reporting signs and symptoms of infection.  And as regards the

12  red zones, where women with confirmed positives have been

13  transferred, there are significant concerns with regard to the

14  fact that there aren't call buttons in those cells.  Women have

15  to undertake extraordinary measures to actually get someone's

16  attention if they need medical care, etc.  So there are still

17  some very significant concerns that the plaintiffs have with

18  regard to COVID-19 issues.

19       We would also note that although Dr. Venters has been

20  in touch with the prison requesting specific documentation with

21  regard to certain practices and procedures that they utilize

22  with regard to COVID-19, and certain data with regard to

23  results, to the extent that he has been provided with those

24  documents, they were not provided to the plaintiffs.

25       The second point I'd like to just touch on briefly,

Scott, et al v. Clarke, et al   3:12-cv-36  March 8, 2021

1   Your Honor, is that pages 3 through 10 of the defendants'

2   status report of February 8th catalogs a whole laundry list of

3   representation -- or contains a whole laundry list of

4   representations with regard to measures that are said to have

5   been undertaken in order to address issues of noncompliance or

6   partial compliance as of the time that Dr. Scharff issued his

7   last report before he withdrew.  The concern there is just that

8   it's just a string of representations.  There are no citations

9   to documents, and no documents have been provided to support

10  those representations.  So we're left with essentially having

11  to take defendants' word for the fact that those measures were

12  actually undertaken.

13          And lastly, the continuing problem is that there is

14  just no measuring mechanism by which to evaluate what the

15  defendants say that they have done and are doing.  This is a

16  critical point that we emphasized in connection with our

17  concerns about Dr. Scharff, that he had failed to articulate

18  clear metrics by which actual progress towards compliance could

19  be evaluated, and/or we could actually make a judgment when he

20  said that they were either in compliance or partially compliant

21  as to what that actually meant.  And it really underscores how

22  critical it will be, hopefully as soon as practicable, for

23  Dr. Venters to establish those metrics by which we can actually

24  evaluate where things stand, what progress is being made, and

25  how far we still have to go.

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1          So those are the -- those are the major points that I

2   wanted to address, Your Honor.  If you have any questions, I'd

3   be happy to try to take them on.

4          THE COURT:  Okay.  Are you saying that you're getting

5   less information today than you were --

6          MR. HOWARD:  No, Your Honor.

7          THE COURT:  -- months ago?

8          MR. HOWARD:  I think it's fair to say that our

9   complaint has always been -- or at least has fairly

10  consistently been -- that, you know, our principal, and in many

11  instances only, source of information with regard to what's

12  actually happening at the prison with respect to medical care

13  on any given day is through the reports that we get from our

14  clients, not as a result of documentation that we get that

15  actually supports the information or the representations made

16  by the defendants in their -- in their papers.

17         THE COURT:  Okay.  Do you anticipate that you're

18  going to -- there will be problems with your clients taking the

19  vaccine?

20         MR. HOWARD:  Your Honor, it's a little difficult to

21  say, because I think, as we pointed out in our report, the

22  information available to our clients to assure them or to

23  reassure them as to the efficacy of the vaccine, you know, its

24  availability, what possible impact it may have on them, they at

25  least tell us that that information has been hard to come by.

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1          THE COURT:  Okay.  All right.  We'll hear from the

2     defendants.

3          MR. SCHNETZLER:  Good morning, Your Honor.  Nathan

4     Schnetzler for the defendants.

5          Your Honor, I'd like to actually jump straight to the

6     issue you just raised with plaintiffs' counsel, because there

7     seems to be a significant gap of information between class

8     counsel and class.  As of late last week, over -- or excuse me,

9     77 percent of the inmates at FCCW have received their first

10    shot.  So I would just disagree with the representation that

11    the plaintiffs are expressing, you know, lack of understanding

12    or concern about receiving the vaccine.  It's actually much

13    higher than the community rate.  And so we're doing very, very

14    well with educating there about the importance of the vaccine.

15         THE COURT:  Does plaintiffs' counsel get that

16    information from you, from the defendant, so that they would

17    know the percentage that are getting the vaccine?

18         MR. SCHNETZLER:  They have not asked us.

19         THE COURT:  Excuse me?

20         MR. SCHNETZLER:  They have not asked us, Your Honor.

21    And I don't know where -- what we're -- what system is supposed

22    to be set up that we're supposed to be providing --

23         THE COURT:  When did you start administering the

24    vaccine?

25         MR. SCHNETZLER:  I'd have to defer to Dr. Targonski

Scott, et al v. Clarke, et al   3:12-cv-36  March 8, 2021

1  on when administration started, if that's all right.

2          THE COURT:  Okay.  All right.  Go ahead.

3          Well, I'm just saying one of the things -- they

4  raised this issue in their pleadings, and it looks like the

5  information could have been given to them before today just to

6  head off the discussion.

7          MR. SCHNETZLER:  Your Honor, if they had asked us --

8  they have not been hesitant to ask us questions about

9  individual women, about individual concerns.

10         THE COURT:  Okay.  But -- all right.  It would

11  just -- when you do something really good, I think you ought to

12  advertise it.

13         MR. SCHNETZLER:  Sure, Your Honor.  We'll make a

14  point of that going forward.  Well taken.

15         Your Honor, with respect to the plaintiffs' concerns

16  about the documents that Dr. Venters requested and that is not

17  being provided to plaintiffs, that's incorrect as well.

18  Dr. Venters has requested the quarterly reports that the

19  facility has done, the mortality reviews, and VDOC's COVID

20  response documents.  All those have been provided to

21  plaintiffs' counsel.  So I don't know where the representation

22  is coming from that we're not providing that information to

23  opposing counsel.  I'm providing, I think almost on a weekly

24  basis, updates to VDOC's statewide manual to plaintiffs'

25  counsel and how VDOC is responding to the pandemic.  And again,

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  you know, the documents Dr. Venters requested, I have not

2  received any follow-up request for any other additional

3  information from Dr. Venters.  All that has either been

4  contemporaneously or previously provided to plaintiffs'

5  counsel.

6         And then, Your Honor, with respect to the issues that

7  the defendants focused on in our status report, which of course

8  is the purpose of these hearings, and Dr. Scharff did not find

9  that the defendants were noncompliant in any of the areas the

10 settlement agreement covers.  He addressed about a half dozen

11 areas of partial compliance.  We addressed those.  And I

12 understand that plaintiffs' counsel don't know where the

13 information is coming from with respect to what the defendants

14 are doing to continue to improve the practices at FCCW, but all

15 that information is in the most recent quarterly report we

16 provided them.  So again, I'm just at a loss as to why those

17 representations, as they have been called by opposing counsel,

18 don't seem to have any backup when we provided a significant

19 document to opposing counsel prior to filing our status report

20 that outlined those measures that the defendants have been

21 conducting with respect to the areas of partial compliance.

22        So Your Honor -- and with respect to the response to

23 the COVID outbreak, our report did go through the January

24 outbreak.  I noted that the last outbreak we discussed was one

25 that completed isolation January 18, 2021.  Those -- there was

12

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   another outbreak, Your Honor -- and it was not listed in

2   there -- that went into February.  That is correct.  Again, we

3   were working on this right there the beginning of February.

4   Did not have all the data yet for that outbreak.  I am happy to

5   report, though, that testing from the women in the yellow

6   zone -- which is where they're quarantined -- this morning

7   found that there were no positive cases in the quarantine at

8   FCCW.

9         And then finally, Your Honor, the last thing I wanted

10  to just address is there have been a number of issues raised

11  with respect to the defendants' response to the COVID

12  outbreaks.  One issue we need to point out is that part of

13  perhaps maybe the misunderstanding from plaintiffs' counsel is

14  that they are demonstrating sort of a lack of understanding of

15  how the VDOC's response measures actually are put into place.

16  They're incorrectly using quarantine and isolation

17  interchangeably throughout their status report, which those are

18  two separate concepts that should not be used interchangeably.

19  FCCW is using a program or response plan that has a yellow

20  zone, which is for quarantine, and then a red zone, which is

21  for positive cases that is considered an isolation area.  And

22  the plaintiffs continually confuse those two concepts

23  throughout their status report, and it can obviously raise --

24  if you're using the wrong terms, it's mixing up separate

25  responses.

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1          THE COURT:  So when someone goes into quarantine, is

2     there a specific time that they stay there?  Is it 14 days?

3          MR. SCHNETZLER:  There is a time, but there is

4     also -- FCCW has actually implemented a procedure where the

5     women must test out of quarantine.  So there is isolation,

6     which is 14 days, and then they have to test out of quarantine.

7     So they must have a negative test in order to be taken out of

8     quarantine.  And if I misstated something, I'll ask

9     Dr. Targonski to correct me.  And I think I may have misspoken.

10     So I may have to have him correct me.

11          THE COURT:  Well, I'm not suggesting that.  But I've

12     had this come up in some cases with prisoners in other places,

13     not necessarily the state, that they go into quarantine, and

14     then someone else comes into quarantine when they're about to

15     get out, and then they have had to extend their stay in

16     quarantine.  I'm not suggesting that's what's going on with the

17     defendant here.  But it seems like you could almost be there

18     forever, and eventually you would get the disease because

19     somebody would come into quarantine who was infected.

20          MR. SCHNETZLER:  Right.  I would rather, if I could,

21     have Dr. Targonski speak to that so that I don't make a

22     misstatement on that process.

23          THE COURT:  All right.

24          MR. SCHNETZLER:  So with that, Your Honor, the

25     defendants are anxious for Dr. Venters to begin his first

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   visit -- I believe it's set up for next week -- and anxious to,

2   as the court has noted, to get this case moving out of the

3   transition period, and to a point where we can see a light at

4   the end of the tunnel, so to speak, with respect to having this

5   case drawn to a close.

6           THE COURT:  All right.  I have some questions.  Are

7   you going to have Dr. Targonski speak?

8           MR. SCHNETZLER:  Yes, Your Honor.  If now is

9   appropriate, I'd like to have him address a couple of those

10  issues that you raised, if the Court would prefer.

11          THE COURT:  Okay.

12          DR. TARGONSKI:  So Judge, please tell me if you have

13  something specifically you want me to speak to.

14          I'll start with this idea of quarantine and

15  isolation.  Yellow zones are the areas that are used for

16  quarantine.  Quarantine is where you take people who may have

17  been exposed or have been exposed, are asymptomatic and not

18  showing evidence of disease, for them to be away from others

19  who have not been exposed in order to reduce transmission of

20  the virus, and watch them more closely to determine if they do

21  develop symptoms.  Isolation is the separation of individuals

22  who actually have disease, who are symptomatic who meet

23  criteria clinically as a case, or who have tested positive.

24  And they are separated away from others who have not been

25  exposed, or may have been exposed, in order to prevent them

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  from clearly spreading the disease further within a population.

2         What happens in a community, frankly, is

3  substantially easier than what happens in congregate settings,

4  as we have all seen with nursing facilities and correctional

5  facilities throughout the country.  Our process for managing

6  quarantine and isolation is completely consistent with the CDC

7  guidances for correctional settings based upon our

8  environmental structures, and has been endorsed by the Virginia

9  Department of Health throughout.  They have never suggested

10  that we need to do anything differently, or frankly, have been

11  able to get ahead of us on suggesting things differently.

12         I think the biggest challenge is that, as

13  Mr. Schnetzler mentioned, there seems to be a confusion in the

14  plaintiffs' status report regarding how well they understand

15  quarantine and isolation, that they're not the same.  They're

16  not interchangeable.  There's a couple of pages, I think, where

17  we saw that -- pages 6, 7, and 8 -- and that yellow zones are

18  actually quarantine.

19         So in quarantine we actually have used three

20  different strata for quarantine.  There is one quarantine where

21  people may have been exposed to possible cases.  That's the

22  lowest level of quarantine.  When people go out into the

23  community, there is a risk that when they go to outside

24  appointments -- they're going to a hospital, a doctor's

25  office/hospital in particular -- there's a pretty high

1  likelihood, relatively speaking, that they could be exposed to

2  a case compared to frankly staying in the facility when there's

3  no cases in the facility, no cases in their wing.

4          The second level is when someone actually -- when a

5  case has developed within a particular wing.  Because people

6  move freely throughout their wing, we are not able to tell if

7  they may or may not have had a sufficient contact, and so we

8  end up quarantining the wing.  This is also consistent with

9  what the CDC recommends.

10         And then finally we have kind of the highest level of

11  quarantine, and that's roommates.  We find that when someone

12  has developed as a case, their roommate has a higher

13  probability of turning into a case.  They have an attack rate,

14  a subsequent attack rate, or the proportion of roommates, for

15  instance, who go on to develop disease after exposure is higher

16  than for people that are just in the wing, is higher than for

17  people that go out for outside appointments, is higher than for

18  people who are residents of the facility but haven't been

19  exposed at all.

20         So that constant replenishment of quarantine that is

21  being suggested actually does not occur with us.  What occurs

22  is that if you're in a quarantine area and a subsequent case

23  develops, then the clock has to reset for the people in that

24  quarantine because a case has developed.  It's not that people

25  with infection are being brought into those areas.  It's that

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   cases develop within those areas, and we have to -- we have to

2   be cautious about how we view the potential risk, then, for

3   those individuals.  So we have had some ladies absolutely who

4   have been in quarantine because cases have continued to develop

5   over time.

6         I think in December the plaintiffs' attorneys

7   actually recommended that we should be shortening quarantine,

8   and we thought that was a terrible idea.  It was not something

9   that we felt the literature supported.  We did not do it.  And

10   the CDC subsequently came out and agreed with us, in

11   correctional settings, that it was not a good idea to do that.

12         We also have increased the frequency of testing that

13   we do, because we found that some people don't recognize they

14   have symptoms, or some people don't want to report symptoms.

15   So we have increased the frequency of testing to improve the

16   ability to identify cases as early as possible.  The CDC has

17   also subsequently recommended that in correctional settings.

18   It was something that the FDA was suggesting, frankly, back in

19   the fall as it related to long-term care facilities.  So we

20   have been kind of pushing the limits of technology to do that.

21         We also have been aggressively using antigen tests

22   because we get the results immediately.  The plaintiffs'

23   attorneys had raised concerns and suggested we should be using

24   RT-PCR, the genetic tests.  But they didn't take into account

25   that the genetic tests, unfortunately, with the volume of

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  testing that's increased in the community, can take up to five

2  days before results can be returned.  And you can imagine if we

3  do a test on someone and wait five days to see if they're

4  positive, we are really at risk of spreading illness throughout

5  those populations.  So increased our frequency of testing and

6  our use of point-of-care testing.

7         We have done all of the comparative studies.  I don't

8  know that other correctional settings have done this, but we

9  did the comparative studies between the commercial genetic

10  tests and the tests that we're using in-house to make sure we

11  can understand reliability, take that very seriously.  And we

12  understand the reliability of those tests and how to interpret

13  them.  And we talked about that in the most recent quarterly

14  report as well, because it's an important message to share with

15  other correctional settings, and, frankly, with the community.

16  University of Virginia has appreciated when we've shared that

17  with them to help them understand, and we've had discussions

18  with other correctional settings as well.

19         So I think that -- I think that what I'm reading is

20  really more confusion on the concepts than some type of

21  subterfuge or withholding of information, frankly, on the part

22  of FCCW.  And, you know, everything we're doing has been in

23  line with, if not ahead of, frankly, the CDC and VDH.  You'll

24  recall we innovated on masks.  We innovated on extending

25  screening criteria, the front entry screening.  We started

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   testing out of quarantine back in September before CDC was

2   suggesting that.  I've already mentioned the other things that

3   we do, our vital sign checks.  We have expanded that.  And we

4   do more than the CDC, frankly, asks for.  We have developed

5   exercise programs for the ladies in quarantine so they're not

6   getting sarcopenia, muscle loss, kind of wasting away, getting

7   sicker if they have to be in quarantine.  We've developed

8   post-COVID care.  They call it long-haulers, people who have

9   symptoms after the acute COVID episode.  It's really called

10  post-acute sequelae of COVID.  We've worked with physical

11  therapy on our patients before they even come out of isolation

12  to be assisting them with physical therapy, and moves to the

13  infirmary for the ladies who may have had a little bit more

14  challenge in order prevent them from having longer-term

15  sequelae of COVID.

16          When you look at -- you know, when you look at what

17  we're doing, if we had been doing a bad job at this, we would

18  have had bad outcomes.  Now, I know Ms. Ellis had said she

19  thought it would be a miracle if nobody died from COVID.  Thank

20  goodness -- and I agree with Mr. Howard -- we're all very

21  grateful we have not had a patient die of COVID.  And frankly,

22  if you look at our hospitalization rates even, if you look at

23  hospitalization rates at FCCW from December through now, which

24  includes that outbreak in December and January and an outbreak

25  that -- the reason I didn't put the outbreak in January in the

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  quarterly report was because the quarterly report goes through

2  December 31st.  I have no problem sharing information if people

3  ask.  But if an assumption is made that the quarterly report

4  dates are going to change -- we said what the quarterly report

5  dates are, and I'm trying to stick to something that our staff

6  understands as well, because they're also stakeholders expected

7  to read and understand these quarterly reports.  The outbreak

8  that started in January, if you combine the two, about 495

9  cases total.  Definitely a large amount of COVID.  But if you

10 actually look at the epidemic curves for our community -- and

11 the Kaiser Family Foundation and other organizations have

12 identified that the biggest factors influencing the development

13 of COVID in congregate settings is, of course, what's happening

14 in the community.  I absolutely agree with Mr. Howard; it

15 doesn't spontaneously generate like flies from raw meat, COVID.

16 It's imported.  We had reception cases imported.  We actually

17 had one lady who went for an outside appointment and acquired

18 COVID there, unfortunately, despite that it ought to be low

19 risk.  And then, of course, if it has come in, it's either

20 staff have brought it in or there's contamination.  And we work

21 really hard to minimize contamination with things being brought

22 into the facility.

23          Nonetheless, our hospitalization rates are less than

24 1 percent.  And if you look at the hospitalization rates around

25 the United States just for the average age group that we have

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   here, 18 to 49 year-olds, our hospitalization rates, frankly,

2   are anywhere between three and five times lower than what's

3   being seen around the country for COVID cases.  So the work

4   that we're doing here to keep people healthy while they're

5   having COVID is working.  We're not having to send people,

6   thankfully, to the hospital.  And it's not because we're

7   keeping them here and abusing them.  It's because we're

8   aggressively working to prevent them from having the symptoms

9   that would require them to have to be hospitalized.

10          Most of what we've seen the last two -- you know, the

11  last two months has been different than September where it was

12  a lot of GI stuff.  Most of what we're seeing has been upper

13  respiratory, runny noses, sore throats, congestion.  We've had

14  a number of ladies that were at risk of dehydration, and we've

15  been trying to manage them aggressively, because we found that

16  that's one of the greatest risks for people getting ill.  The

17  cases that went -- unfortunately, every single lady that ended

18  up having to go to the hospital had asthma or COPD.  Not

19  completely unexpected.  And so there's still things we're

20  learning.  And we're trying to share that not just across the

21  DOC, but nationally as well, so other people can keep their

22  antenna up and manage things the right way.

23          I hope that answers that for you.

24          THE COURT:  Okay.  Are you getting any resistance

25  from the inmates to the vaccine?

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1           DR. TARGONSKI:  Actually, that's a great question.  A
2    tremendous amount of resistance early on, and the -- oh, so let
3    me tell you -- I actually think this is a good thing -- we
4    received our first doses of vaccine for distribution in
5    Phase 1A, which was to healthcare providers and kind of a
6    certain subset of severe illness patients on January 6, if I'm
7    not mistaken.  And I have to admit I was kind of hacked off
8    about that.  I actually thought a much better strategy would
9    have been, frankly, to give it to the patients in correctional
10   settings and congregate settings, if our goal was to prevent
11   transmission, versus keep people in positions to reduce
12   mortality solely.
13           Now, I had the chance to meet with the Secretary of
14   Public Safety Moran in December, as well as representatives of
15   VDH, Lilian Peake, who I have worked with previously here in
16   the health district.  And I want to say that I think they
17   actually did a really good job advocating for patients in
18   correctional settings, because I presented evidence and a
19   philosophy around why we needed to vaccinate patients in
20   correctional settings.  And Secretary Moran I believe worked
21   really hard.  The initial plans were for the patients in
22   correctional settings to be Phase 3, which means they still
23   wouldn't even be eligible, but he got them moved up to Phase
24   1B, I believe -- of course, along with other people too.  So
25   that gave us the opportunity to start to vaccinate a little

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   bit -- obviously a lot earlier.  So we were vaccinating roughly

2   by the middle to last third of January.  And when we look at

3   the epidemic curve, the outbreak in January, you can actually

4   see that there has been an impact of the vaccine in helping

5   drop that curve fast towards the end, and get us to where we

6   are today with no cases of COVID and no patients in quarantine

7   for COVID.

8           So the resistance that we saw to the vaccine early

9   was the same as we see in the general population.  It is:

10  Don't trust the government, afraid of side effects, and the

11  vaccine is too new.  People don't trust it.  So we did -- the

12  DOC had its own kind of advertising campaign on this,

13  information education campaign.  And then I did videos, and we

14  did face to face with people, and answered questions in the

15  yellow zones.  Red zones, unfortunately, it was too late.  I

16  was really discouraged by that; we couldn't have prevented more

17  cases.  But what we saw over time was that resistance waned

18  substantially.  And so I think, you know, we've been accused of

19  not providing education.  And the reality is our ladies were

20  sophisticated enough to be discouraged by the emergency use

21  authorization not accurately representing the true process that

22  the FDA goes through for a slower and more detailed look at

23  vaccines.  So they're sophisticated enough to have picked up

24  this information; and, in fact, the advertising on COVID

25  vaccine that LAJC was doing where they're asking, if people

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   have questions, to go to LAJC to get their questions answered

2   has mistakes in some of these areas about emergency use

3   authorization process and other things.  And our ladies picked

4   that up.  So they questioned us a lot.

5          And what we've got right now is 77 percent of our

6   population who are eligible have received the vaccine.  That is

7   substantially higher than the general population.  It is

8   embarrassingly higher than healthcare workers in the United

9   States.  And I think it speaks to the attention that the ladies

10  expect to this issue, as well as their willingness to listen to

11  us.

12         The, you know, reports for decades -- and I have

13  published on this -- the provider endorsement to vaccination is

14  the single greatest factor that influences vaccine receipt.

15  And we have endorsed the vaccine here.  And I'm not going to

16  say all of the ladies trust us, because they don't, but the

17  ladies -- many of the ladies -- most of the ladies, I believe,

18  do trust us and trust our intentions with this, and they've

19  received the vaccine.  And it's contributed to the reductions

20  that we're seeing now.  They're getting good education.

21  They're questioning us about the right things.  They are

22  allowed to question us.  They have access to us.

23         I was in one of the quarantine wings about a week

24  ago, and the ladies were giving me all kinds of ideas of how we

25  should change the vaccination strategy and how we should change

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  the quarantine strategies.  And I welcome that feedback because

2  they're seeing things different than I am.  So it helps us --

3  it helps us to do things -- do things better.

4        So we are -- we are -- in fact, I think we -- the

5  plaintiffs' attorneys mentioned that people don't have access

6  to the providers to answer questions, and mentioned they don't

7  have access to treating specialists.  And I can tell you that's

8  not true.  One of the primary plaintiffs, I guess, in the case

9  actually went and saw her rheumatologist and misinterpreted

10  what the rheumatologist had said about the vaccine, and refused

11  it.  And when I saw that she had refused it, I reached out to

12  her rheumatologist honestly to kind of yell at him first,

13  because I thought he told her not to get it, but in fact he was

14  endorsing it.  And so I went back to her and I said, You

15  misunderstood your rheumatologist.  Here is what we know about

16  your condition.  Here is what we know about the medications you

17  take.  Here is what we know about the vaccine.  I went over the

18  data on people with autoimmune diseases in the clinical trials

19  from Moderna and Pfizer, about 75,000 patients.  I reviewed all

20  of that with her.  I reviewed with her what her provider had

21  said.  We went through his notes again.  I showed her his email

22  to me to corroborate that we had talked, and he agreed.  And

23  she got the vaccine.  And I think it was the right thing to do.

24        So people do have access to their treating

25  specialists.  They do have access to their providers.  I'm sure

Scott, et al v. Clarke, et al   3:12-cv-36  March 8, 2021

1  Mr. Howard and Ms. Ellis and their team hear people that say it

2  doesn't happen.  And I will never lie to you; I cannot promise

3  that everybody has access the way they want to have access.

4  And I'm sure there are people who will always be unhappy, but

5  really we're doing -- we're doing a very good job here.

6        And all of our metrics around COVID, frankly, are

7  saying that if we're constitutionally inadequate in our care,

8  then our country is constitutionally inadequate.  And there is

9  some people who actually might agree with that, frankly.  I

10  don't think we're doing a good enough job for everyone in the

11  country, but we are doing a good job here.  I think many of the

12  ladies are trying very hard here.

13        THE COURT:  Do you have enough vaccine for those who

14  will take it?

15        DR. TARGONSKI:  Yeah.  We actually have -- the

16  reality is we actually have more than enough vaccine, and we

17  are a distribution hub for some of the other facilities.  And

18  one of the ethical challenges I have always been concerned

19  about is as a vaccine hub, you know, I don't want to be put in

20  the position where I have to feel like I'm being selfish and

21  hoarding vaccine here, and then someone else is not getting it.

22  But the reality is that we have more than enough vaccine to

23  distribute not only to all of our patients, but all of our

24  staff, and in addition still be a hub so that the other sites

25  that work with us have enough vaccine to get to all of their

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  patients and all of their staff.

2       And in addition to that, we have created a network

3  where we can share vaccine across regions.  So we had people

4  from southwest Virginia last week that had six extra doses left

5  in a vial that they couldn't use.  So we drove and met them

6  halfway to go get the vial and bring it back here so we could

7  use the vaccine here, even though we had enough, because we

8  don't want it to go to waste.  If you don't use it within six

9  hours, it's considered no good anymore.  We don't want to waste

10 vaccine.  So we're even doing those kinds of things to make

11 sure that we're utilizing all of the vaccine as responsibly as

12 possible.

13       I talked to the director of the health district and

14 indicated that if she had extra vaccine, she should let us know

15 and we would find ways to use it, if she was afraid she was

16 going to lose it.  We've even talked about doing that for them.

17 If we end up in a weird spot and feel like we've got a couple

18 of doses we don't want to go to waste, we're finding partners

19 to be able to share that with as well.  And the DOC has told us

20 it's okay to explore that.  Everybody wants to be responsible

21 with this vaccine.  It's too important for the community.

22       THE COURT:  One of the things that's come up I

23 noticed a number of times is that in one of the -- is it maybe

24 the red zone, that the ladies do not have a push button for

25 call, but have to beat on the bars to attract attention.

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1           DR. TARGONSKI:  Yeah, I can let the warden talk about

2   call buttons, but I can tell you I have frankly never gone into

3   the red zone when all of the doors to the rooms were closed.

4   Most of the time that I go into the red zone, all of the doors

5   to the rooms are open.  And they're open, and it's requested

6   that the ladies adhere with the protocols, which is not to be

7   out walking around and going to multiple places more than, you

8   know, a person being out for shower, a person being out for

9   phone, a person being out for nursing, or whatever.  But it's

10  been rare that I've gone in there and everything is all locked

11  up.  If everything is all locked up, frankly, it's been when

12  there's been a request by security to pause, because there has

13  been too much activity and people aren't adhering with the

14  protocols, and everybody kind of goes and does a reset.

15          But, you know, we put our -- frankly, we put our best

16  nurses in there, and I've made it very clear to our director of

17  nursing what I expect from our nurses in the red zone, and how

18  they're going to treat patients.  And my expectation is that

19  the nurses are aware of the patients.  And they have been.  I

20  think some of the things that you're hearing -- the reports

21  that I get at the time that an event occurs are not consistent

22  with the reports that were written into the documents that were

23  shared, frankly.  Everybody always has a different perspective

24  on what does and doesn't happen.  But, you know, we have nurses

25  checking vital signs every four hours while the patients are

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  awake.  I have told them not to be punitive to the patients.

2  Don't wake people up at 2 a.m. to check vital signs, but

3  they're expected to check on the patients and make sure that

4  they're okay.  We've expanded the vital signs because of what

5  we've seen clinically happening.  So we do more than the CDC or

6  DOC asks at our facility.  We think it's the right thing to do.

7        And could there have been a time when somebody's door

8  was closed and they were banging on the door?  Absolutely.  I

9  mean, whenever there is a door closed, if it were me I might

10  bang on it too, frankly, because you're closed in.  But I have

11  not seen a single instance in the hundreds and hundreds and

12  hundreds of encounters I have had with COVID patients where I

13  couldn't get to a patient, or a patient couldn't get to me when

14  there was a need for that, frankly.  So, I mean, the warden

15  might answer otherwise on call buttons and stuff, but honestly

16  I didn't -- I'm not seeing that as an issue in the provision of

17  care.

18        Those rooms, too, those rooms have their own toilets.

19  They have their own running water and stuff like that.  So

20  there is -- it's not like people are being deprived.  Even in

21  the quarantine zones, the doors are open.  We ask the people,

22  please, we don't want people sick.  You're in a room so that

23  it's safe for you.  One of our big challenges is, you know,

24  constantly needing to ask the ladies -- the day room is closed.

25  Please don't six of you congregate two and three feet apart.

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  You're going to increase your risk.  Please don't go into

2  someone else's room.  You need to adhere to the CDC mitigation

3  guidelines.  We had asked the plaintiffs' attorneys to endorse

4  that message with us back in December, and they didn't do that.

5  And the ladies don't always adhere with the mitigation

6  strategies.  And so we spend a lot of time kind of trying to

7  re-educate and re-request and manage that.  And it's part of

8  the correctional environment.  It's one of the reasons that,

9  you know, the attack rates are higher in congregate settings

10  than when you have the capacity to simply say, I was exposed to

11  COVID; I'm going to stay in my house and be in my bedroom with

12  bath and have somebody bring me food and kind of hang out.

13          We have provided to the ladies -- they get their

14  JPays, they get their televisions, the ladies who haven't had

15  televisions.  When we have extra televisions, we bring extra

16  televisions.  They're given -- we have book carts.  We've put

17  in the -- they like puzzles and coloring books for activities,

18  and we bring those to people so they don't have to be bored,

19  because they're sitting there for two weeks.  We understand.

20  Nobody should like that.  But we're trying to do all those

21  things to address the physical, psychological, emotional

22  aspects of COVID quarantine and isolation.

23          THE COURT:  All right.  Does the defendant have

24  anything else you would like to bring up?

25          MR. SCHNETZLER:  Nothing further from the defendants,

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1  Your Honor.

2           THE COURT:  All right.  I'll ask the plaintiffs, is

3  there any issue that you would like for me to bring up that I

4  haven't?

5           MR. HOWARD:  No, Your Honor.  I do have some -- a few

6  general responses to what we've heard from the defendants --

7           THE COURT:  Okay.

8           MR. HOWARD:  -- and Dr. Targonski.  But if you --

9           THE COURT:  Okay.  Go ahead.

10          MR. HOWARD:  Your Honor, a couple of things.  One is

11  that we do get quarterly reports, and we appreciate those, and

12  they're obligated to provide them.  But even the quarterly

13  reports don't have underlying data in many instances.  And so

14  we're not in a position to, you know, just confirm as a result

15  of documentation we've been provided the accuracy of

16  representations that are made without citation and without a

17  specific supporting document, as is reflected in the status

18  report.

19          Secondly, if the quarterly report -- the most recent

20  one was for a period concluding in December, which we don't

21  question.  But there was a separate outbreak after that of

22  COVID-19 at the prison before February 8th when the defendants

23  filed their status report, then there is no reason and no

24  excuse for it not to be mentioned in the status report.

25          Third, the problem that is reflected in the colloquy

Scott, et al v. Clarke, et al    3:12-cv-36   March 8, 2021

1   here is -- is fundamental to the situation that we're in.  We

2   sent emails to defense counsel indicating that women were

3   expressing concern about the lack of information that they had

4   about the safety and efficacy of the vaccination.  Then we hear

5   that all this information has been provided, and as a result 77

6   percent of the population has been vaccinated.  Well, why would

7   it be so difficult for them to just tell us that in response?

8        We cannot possibly get this case resolved in the way

9   contemplated by the settlement agreement if we can't have

10  better communication between the parties than we have now.

11  Every inquiry or email that we send them seems to be regarded

12  as an attack of some sort, when all we're asking for is

13  information.  We have no reason to complain to you about a lack

14  of information if we're getting it.  And we also can make more

15  progress towards that date on which a year of full compliance

16  begins to run if we're collaborating and cooperating with one

17  another, rather than reacting to every single communication as

18  if it's some adversarial attack.

19       And so I really think there needs to be some behavior

20  modification here.  And frankly, I mean, all we have to go on

21  is what we hear from our clients.  And if they disagree -- and

22  when we tell them in an informal communication, this is what

23  we're hearing; can you please let us know whether it's true or

24  false or somewhere in between, and they don't respond at all, I

25  don't know how we make progress under those circumstances.

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1          Lastly, I guess that I would point out, as we stated

2     in our status report -- and this is at the bottom of page 2

3     carrying over to page 3 -- by email on February 2nd, 2021,

4     Dr. Venters requested from FCCW the following information:

5     One, the current COVID-19 response plan or documents that are

6     utilized by the health and security services for the facility

7     COVID-19 response; and two, updated data on COVID-19 cases from

8     the start of the pandemic to now, including the number of cases

9     identified, the current number of people in quarantine or

10    medical isolation, the total number of COVID-19-related

11    hospitalizations, and the total number of people offered and

12    who have received COVID-19 vaccination.

13          Plaintiffs do not know whether defendants have

14    provided that information to Dr. Venters.  We still don't know.

15    We assume that they provided it, because we haven't seen any

16    follow-up emails from him to them asking for it again.  But if

17    they did, we didn't get it.  So that's an example of a

18    situation in which they could provide us the information at the

19    same time as they provide it to the monitor, and we would know,

20    rather than having to complain about it in a status report and

21    then be told --

22          THE COURT:  Okay.  Let's stop right there.  Can the

23    defendant answer that, why the information couldn't be provided

24    right at the same time?

25          MR. SCHNETZLER:  And Your Honor, I mentioned this

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1   earlier.  It was information that we had previously provided to

2   the plaintiffs.  All the information that I provided to

3   Dr. Venters had been previously provided.  So if they would

4   like me to resend that information, I can do that.  Dr. Venters

5   requested it.  I provided it to him.  So I don't know what else

6   I'm supposed to do in that situation.  And I have not heard

7   anything -- any additional -- as Mr. Howard said, there has

8   been no follow-up or additional request for other information

9   from Dr. Venters.  So if I have neglected to provide anything

10  to Dr. Venters, or that we had not previously provided to

11  plaintiffs' counsel, we would copy him.  We copied plaintiffs'

12  counsel on multiple communications to Dr. Venters about the

13  COVID plan.  So it did not seem to make sense to me to send

14  thousands of pages of documents to Ms. Howard and Ms. Ellis

15  that had already been previously transmitted to them.

16          THE COURT:  Well, when they ask for something you've

17  already sent, at least you could maybe say, Look, I've already

18  sent this to you, look in your file, rather than just not

19  responding.

20          MR. SCHNETZLER:  And I'm not -- I mean, Mr. Howard

21  didn't -- or Ms. Ellis didn't request copies of any of the

22  materials that Dr. Venters requested.  There was no followup

23  from them.

24          THE COURT:  All right.  Mr. Howard, would you like to

25  proceed before I interrupted you?

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1          MR. HOWARD:  Your Honor, that's fine.  I guess the

2     last thing I would say is that because Dr. Venters is here and

3     with us today, if he has any comments on the basis of the

4     information that he has been provided to date regarding

5     COVID-19 protocols or any other observations that he would like

6     to make, we would certainly welcome those.

7          THE COURT:  Well, I'm glad to see Dr. Venters here,

8     and I will let him comment.  But I hope we can take this

9     opportunity for everyone to commit to doing what needs to be

10    done to bring this matter to a head and bring the center into

11    full compliance.

12         Dr. Venters, any observation you would like to make

13    at this time?  You're not required to.  I mean, I'm not asking

14    you to speculate, if you don't have -- haven't reached any

15    conclusions or anything, but is there anything you would like

16    to say?

17         DR. VENTERS:  No, Your Honor.  I'm happy to be part

18    of the team working toward the conclusion that you've

19    referenced.  I have an email ready to go that I was just

20    waiting until the hearing today to make sure nothing changed it

21    about my visit, which is next week, which will go over three

22    days.  I do have just a couple of additional document requests

23    that I'll include in that email, and I propose the activities

24    that I'll undertake for the visit next week.  And so I'm eager

25    to use that time to both identify numerators of what's

Scott, et al v. Clarke, et al  3:12-cv-36  March 8, 2021

1 happening, and also denominators of what we think should

2 happen, and what we can all agree should be metrics that we can

3 measure on an ongoing basis month over month.  So I'm eager to

4 get moving on this case.

5          THE COURT:  All right.  Thank you.  Anyone else have

6 any observation they would like to make at this time?

7          Well, if not, I appreciate all of you getting

8 together with us, and the reports you've filed.  And I think

9 we'll look forward to the next few months, and hopefully we'll

10 be able to see a lot of progress.

11          So we're going to adjourn at this time.  Thank you

12 very much.

13

14 (Proceedings concluded, 10:58 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Scott, et al v. Clarke, et al   3:12-cv-36   March 8, 2021

1                C E R T I F I C A T E

2        I, Lisa M. Blair, RMR/CRR, Official Court Reporter for

3   the United States District Court for the Western District of

4   Virginia, appointed pursuant to the provisions of Title 28,

5   United States Code, Section 753, do hereby certify that the

6   foregoing is a correct transcript of the proceedings reported

7   by me using the stenotype reporting method in conjunction

8   with computer-aided transcription, and that same is a

9   true and correct transcript to the best of my ability and

10  understanding.

11       I further certify that the transcript fees and format

12  comply with those prescribed by the Court and the Judicial

13  Conference of the United States.

14       /s/ Lisa M. Blair                Date: March 9, 2021

15

16

17

18

19

20

21

22

23

24

25