**First Report of Dr. Homer Venters in Scott v. Clarke**

<u>Table of Contents</u>

Introduction                                          1

Methodology                                          2

Inspection and patient interviews                    4

Review of medical records and materials              8

Review of COVID-19 response                          13

Recommendations and compliance monitoring            15

<u>Introduction</u>

The settlement in Scott v. Clark occurred in 2016, stemming from a lawsuit filed in 2012 regarding substandard health services for women incarcerated in the Fluvanna Correctional Center for Women (FCCW), a facility of the Virginia Department of Corrections (VADOC). Despite a significant passage of time, it does not appear that compliance metrics have been identified for ongoing measurement quarter over quarter or even twice per year. Instead, it appears as if multiple areas of care were found deficient, and generally agreed to merit addressing, but that these areas of health services have been intermittently subject to both internal audits and reports by the compliance monitor. Review of these internal audits and the prior compliance monitor's reports shows that most areas of the settlement have been subject to this type of intermittent review, but that there has not yet been an approach that tracks compliance of these areas consistently over time.

First monitoring report of Dr. Homer Venters in Scott v. Clark

The health service of the facility has undergone significant changes in these years, with a new administrative approach to the health service being adopted that includes in-house VADOC staff instead of private vendor staff. Reports by the prior compliance monitor have detailed intermittent reviews of compliance with various elements of the settlement as well as the internal quality assurance work being conducted by FCCW health staff. This represents a substantial and important body of work and I will not review here but will cite when helpful going forward. More recently, the compliance monitor has reviewed and opined on numerous internal audits conducted by the facility due to limitations in visiting the facility and conducting independent reviews. Overall, I believe that the tremendous amount of work and review conducted by the prior monitor and the FCCW team has created an environment of improved care and transparency. In particular, it appears as if the pace and skill of internal auditing has increased in the past two years. This is crucial for working with the facility and VADOC to take the next step, which is to transition towards ongoing compliance in the individual areas of measurement, resulting global compliance as described in the settlement agreement.

Methodology

The goal of this initial report is to identify an initial group of compliance metrics that can be measured in an ongoing manner, and then build on those metrics over time. I have stressed with the facility and both sets of attorneys that this initial report is not a measurement of compliance. Over the next six weeks, we will finalize the audit tools that allow us to measure compliance starting July 1, 2021. This report is designed to report on the general concerns I have identified in my inspection that inform this first set of areas to be measured for compliance. In order to develop my opinions in this report, I incorporated multiple sources of information, including the

2

First monitoring report of Dr. Homer Venters in Scott v. Clark

reports of the prior compliance monitor, the settlement agreement and other court filings by defendants and plaintiffs as well as other information that I requested from FCCW and VADOC. I have had several phone conversations in this time period with plaintiffs and one of their experts, as well as defendants and facility leadership. These conversations focused on the prior approaches to compliance monitoring, how health services and data are established in FCCW and how my review of compliance, inspections and reports can proceed with maximum input and transparency.

Prior to my inspection, I also spoke via video phone with three women detained at FCCW to learn about their health issues and care, and have established a PO Box where I can receive letters from detained women about their health issues and care. During this time period I received 10 letters from detained women about their health concerns. The bulk of my contact with health staff and patients in FCCW occurred during my recent and first inspection visit. During my inspection, I learned of potentially clinically urgent issues and communicated them directly to the facility Medical Director who was been extremely responsive by giving me feedback on the concern and the care being provided. I am confident that any subsequent reporting will be similarly responded to.

My focus during the initial visit and in this report is chronic care, and parts of the health service that relate to care for chronic diseases.  I have also conducted a review of the COVID-19 response in the facility, although this review was not as exhaustive as other inspections where I have been appointed to focus solely on the COVID-19 response.[1] This information has been utilized to create a list of compliance metrics that will be measured starting July 1st 2021. Over

---

[1] Court-appointed expert report re Lompoc Bureau of Prisons COVID-19 Response, available at https://lompocrecord.com/venters-report/pdf_df325d91-1e1d-5fc6-b1e4-c6b9c16fd1ed.html.

First monitoring report of Dr. Homer Venters in Scott v. Clark

the next six weeks, I will elicit feedback and finalize the audit tools for use in measuring these areas of compliance (see Table 1).

<u>Inspection and patient interviews</u>

I conducted my initial inspection visit to FCCW on March 16-18 2021. This visit was announced and involved three days in the facility. Activities included meeting with facility leadership and staff, physically inspecting the facility, speaking with detained people and review of medical records.

My physical inspection of FCCW stared with meeting Warden LeFevers and her senior staff as well as Dr. Targonski, and undergoing N95 fit testing and COVID-19 testing. After a brief discussion of the plan for the three days, Dr. Targonski and Warden LeFevers escorted me through the facility, including general population housing areas, the segregation housing area, the medical clinic and the mental health units. I spent the second day inspecting the infirmary and conducting more in-depth interviews with detained women, and the third day reviewing medical records and speaking with staff. The FCCW leadership were extremely helpful and accommodating in facilitating all aspects of my visit.

The housing areas I inspected included 8a, which was variously described by staff as an accommodation, specialty or medical housing area or for vulnerable people. I also inspected 8c, the segregation housing area, as well as 2a, described as an inpatient mental health hospital and 2h, the infirmary. Unit 8d was empty and unit 8b was described as the spot for an eventual behavioral modification unit that is part of a Department-wide program to reduce reliance on solitary confinement or segregation.

4

First monitoring report of Dr. Homer Venters in Scott v. Clark

During my inspection, I spoke with 12 women, either in their housing areas or in a room nearby their housing areas. In introduced myself as the new compliance monitor and communicated that speaking with me was voluntary and that each woman could stop speaking with me at any time without any consequence or need for explanation. These interviews were focused on the health services and care needs of each individual person, and what, if any deficiencies or barriers they had encountered in receiving care. I asked questions that focused on medications, chronic care and other types of care that people with serious health problems might need, and also asked a series of questions about the COVID-19 response.

The main group of women I spoke with were in 8a, the unit referred to as an accommodation or medical unit by staff. This two-tier cell unit was similar to the other housing areas in the facility and staff reported that multiple people with disabilities were housed on this unit, but that it was not considered an ADA unit. I spoke with eleven women in this unit, four of whom had disabilities due to vision, hearing or mobility impairment. No aide or other worker was present on the unit and both staff and women I spoke with reported that there had previously been an inmate aide or disability aide assigned to this unit. I also spoke to one woman in the segregation housing because of self-harm concerns (of whom I asked limited questions) and one woman in unit 6c and spoke, a housing area of similar layout to 8a.

The most common issue reported by the women I spoke with was interruption of medications, of which 7 of 11 (64%) reported occurring in the past 3 months. The women reporting these concerns were prescribed medications for serious health issues that included congestive heart failure, diabetes, vascular disease, bipolar disease, seizure disorder and asthma. Several of these women reported interruptions of their medications or difficulty accessing care based on their disabilities. For example, women with hearing and vision impairment reported

First monitoring report of Dr. Homer Venters in Scott v. Clark

that when the medication cart came to the unit, other residents of the unit would be the ones to help them know that medications were being called and make their way to get their medications. One woman with serious mental illness reported that her evaluation and care for a physical health problem was interrupted for several weeks when she was placed into isolation in unit 2a for assessment of a mental health exacerbation.

Women who reported medication interruptions also reported that these issues would become apparent when their medications were not present on the cart that nursing staff came to their housing area with, resulting in nursing staff either stating that they would return with medications later that day, or simply stating that the medication was not available. None of the women I spoke with reported these problems being raised in their chronic care visits unless they raised the issues themselves, and none of the women reported that any medication interruptions were documented in their chronic care notes or in the pharmacy records they had seen.

Other issues reported by women I spoke with included having medical staff fail to prescribe or renew medication that a specialist had recommended or that were prescribed during hospitalization and that refusals for care were often entered into their records without signature when they were not actually allowed to go to an appointment. One woman reported that before her physical health problem had been correctly diagnosed, it had been characterized as potentially occurring as a result of self-harm, that she was never informed or asked about this as a potential cause and only saw when she obtained her medical records.

Women I spoke with reported that when these issues with their medications arose, they would raise them directly with staff and also write sick call and grievance notices. Several of the women who reported ongoing or unresolved issues with their medications reported over one dozen written reports to health staff.

First monitoring report of Dr. Homer Venters in Scott v. Clark

Regarding behavioral health services, staff reported that there was no medication assisted treatment or general access to methadone or suboxone for women with substance use disorder. They stated that another facility did include such a program. I inspected building 2 with the Mental Health Director who explained that A unit was the acute or 'hospital' side and B was for subacute patients. Both sides are comprised of single cells and an open area in the middle of the lower tier. The acute side was described as a lock in unit of 21 cells that holds a mixture of patients there for observations because of acute suicidal or other mental health crisis concerns and others who are there for involuntary commitment. At time I inspected the unit, no people were out of their cells and the unit was completely silent. I was told that one psych tech is present during the day tour and conducts rounds in this and the adjacent unit and that other mental health staff come to this unit and conduct their encounters with patients either at cell side or in a nearby interview room. The level of observation for patients with acute self-harm or suicidality concerns was presented as either constant or every 15-minute checks and that patients on constant observation also may have their property taken and be placed in a suicide smock until staff deemed it safe to transition to their normal clothing. The subacute unit or residential unit was adjacent and despite having 22 cells, was described as rarely having more than 13 or 14 patients. This unit was described as having multiple programs and not being a lock in unit. A third unit, 2e, was inspected which was presented as a step-down mental health unit with approximately 30 people, but in which mental health staff move on and off to conduct their scheduled encounters, as opposed to having them stationed on site with ongoing programs throughout the day. Staff reported that there was no unit-based training for correctional staff in these areas, but that there was some general mental health training.

First monitoring report of Dr. Homer Venters in Scott v. Clark

<u>Review of medical records and other materials</u>

I reviewed the charts of 17 women, six of whom I also spoke with and eleven others who had recent chronic care and/or outside specialty or hospital care. Because this review was intended to support which metrics can be implemented in a sustainable manner, I did not perform or score an audit of each chart. Instead, I reviewed the records to assess areas of strength and deficiency in the realm of chronic and specialty care including documentation about medication concerns. I also reviewed the various areas where the reports of patients, via grievance or when quoted by staff, to compare their reports to the deficiencies and strengths they reported to me in interviews and also those I observed in the charts myself.

Very little information about medication reconciliation, adherence or whether people experience difficulty receiving or taking their medications was evident in the records I reviewed. In 5 of the 17 charts, some amount of medication information had been printed out from the Sapphire system and attached to the inside of the chart. Sapphire is an electronic system used to actually prescribe medications for women at FCCW and involves providers at the facility entering in their prescription, and contract pharmacy staff profiling the medication which results in the medication being delivered for administration by FCCW staff. I reviewed approximately 50 chronic care encounters in these 17 patient charts and only three mentioned any issues with medications, none of which were that the patient did not receive their medication as prescribed.

In reviewing the adequacy of the chronic care encounters, it was apparent that one chronic care form is utilized for almost all chronic care appointments. This is an example of the difficulty that health systems encounter in providing and measuring the adequacy of care in a paper format. One of the key steps in electronic medical record (EMR) implementation is to create a pathway that results in a template or pre-identified workflow for various types of care,

First monitoring report of Dr. Homer Venters in Scott v. Clark

including chronic care encounters. For example, people being seen for asthma should have their signs and symptoms of asthma elicited so that all of this information can be utilized to determine their level of control. This assessment, the level of control, is crucial because it is what informs whether a patient requires more/different intervention, less, or is stable. But at FCCW, this process is hampered by forcing the provider to look back for prior vital signs and clinical encounters and by using a generic form instead of one tailored to asthma. In addition, some of the vital sign measurements, such as peak flow, should be viewable in a vital sign flowchart that shows change over time, not simply left inside the chronic care encounter. Similar challenges are evident for patients with hypertension, diabetes and seizure disorders. The net effect of this paper-based approach is that many of the chronic care encounters lacked one or more of the variables we would expect to be gathered in a disease specific encounter. One specific area of concern that I noted and am confident can be addressed is the scenario where patients with hypertension have elevated blood pressure readings and monitoring is written as the plan but does not occur. Generally, most of the chronic care encounters I reviewed contained a thoughtful approach to care, but were hampered by a lack of important information about the patient's prior and other health issues. This is a prime example of how patient safety can be imperiled by systems level deficiencies despite the presence of thoughtful and caring providers.  The overall timing of the various chronic care encounters appeared to be close to or at the expectations identified by the FCCW policies.

The interaction between disability status and access to chronic care and medications was evident in several of the charts I reviewed, but did not appear to have resulted in a system or practice of accommodation for these patients. One patient I spoke with had reported that her assessment of a purely medical problem was delayed when she was transferred into 2a for mental

health reasons. Review of her records appeared to confirm this, with staff attributing her physical illness to a mental health problem for an extended period of time until she was transferred to the hospital and ultimately received corrective surgery. Another patient who reported similar barriers to health care based on her disability had at least one instance documented in her medical records of missing medications because of her disability. I did not find any evidence of an accommodation or response plan in her chronic care encounters and she was subsequently hospitalized with life threatening complications of her chronic health problems.

One area that I found concerning in these records reviews was the high number of unsigned refusals in many of the patient charts. Theses refusals were for both medical and mental health encounters and some patients had multiple refusals in a row for the same care or encounter. I rarely found any discussion in chronic care or mental health notes about the impact of the missed care or why the refusals were unsigned. It was apparent that at least some of these unsigned refusals reflected the lack either reviewing the paper chart or potentially not having the chart at all. This is a common occurrence in correctional health systems that use paper charts because despite efforts to not double schedule appointments in a given day or session, the numerous ways in which patients may be seen in an unscheduled manner for sick call, bloodwork, dental care and other services results in the predictable outcome that some patients are seen without their charts being present, and other parts of the health services may have that chart and incorrectly assume the patient refused. One woman who did refuse an appointment wrote on the refusal sheet "They did not have my medical chart and do not know why I'm here. It may be an ongoing problem, they can't treat me without a chart."

It was also clear from some of the signed refusals that patients attempted to document that they were not refusing care but viewed that they were being denied care. One woman who

First monitoring report of Dr. Homer Venters in Scott v. Clark

reported leg pain as the reason for seeking care signed her refusal stating that she had not refused

but simply hadn't arrived on time. She had a medication refusal two days earlier that was

unsigned and where staff had written "Inmate refused to show up even after being called by

security." The standard of care when multiple refusals occur is for nursing staff to meet with the

patient to document the concerns or barriers and also for the chronic care providers to review and

discuss with the patient as part of their assessment and plan. One patient who was prescribed two

antipsychotic medications had an unsigned refusal that simply stated "no reason given, inmate in

seg" without specifying if these, or other medications were being refused. This scenario is

troubling because placement of people with serious mental illness into solitary confinement or

segregation is well established to worsen pre-existing physical and mental health concerns and

also may cause new health problems. In this scenario, a clinical response, which includes

consideration of the contribution of the segregation setting to clinical worsening, is warranted.

This nexus of refusals and the use of isolation for patients with serious mental illness is

concerning because it potentially exposes patients to new harms while making it difficult to

access care. The records I reviewed of mental health patients suggest that the isolation-based

approach to the acute unit is matched with a detailed plan of care that may simply ignore the

potential harms of isolation. For example, one patient with mental health exacerbation who was

in 2a had an encounter that read "step 11 of step plan-add bar of soap during observed shower

and return when done". I have encountered many mental health policies in correctional mental

health units that parse out basic access to hygiene and dignity as privileges to be earned during a

mental health crisis. I have found this approach to be ineffective because the emphasis is almost

solely on depriving a person the physical means to harm themselves via isolation, even while

forcing them through isolation, humiliation and discomfort. Another patient's chart clearly

First monitoring report of Dr. Homer Venters in Scott v. Clark

documented her clinical worsening in solitary confinement or segregation, "given that her level of functioning is declining and she is going to seg and putting herself at risk with head banging, I think its worth starting an antipsychotic." I have not yet fully reviewed the policies and practices for mental health emergency response and will do so and report on this area in my next report.

I reviewed two paper records of infirmary patients and while the approach to clinical care appeared appropriate, I have questions about the frequency of written assessments as well as the criteria for infirmary admission. I will conduct a more thorough review of infirmary care and practices in a subsequent visit and report.

Other areas of review included the following;

The team-based approach for chronic care described to me by staff is that patients are assigned to one of two teams, red and blue. At the time of scheduled encounters with mid-level providers or physicians, a team member will print out recent information from Sapphire, the medication profiling and prescribing system. This information should then be reviewed with the patient as part of medication reconciliation. There is no documentation of this process in the charts I reviewed and did not observe that this information was documented in the chronic care encounter forms.

Staff reported that the sick call system operates via paper-based system which includes an initial triage to ensure no life-threatening issue is present and a secondary review to determine the next step in response. Sick call providers are present to provide care Monday through Friday, and the forms are triaged every day of the week. Per staff, these forms are not placed into the patient charts but kept in a separate location for quality assurance review. They also reported that

First monitoring report of Dr. Homer Venters in Scott v. Clark

a separate grievance system includes routine grievances as well as emergency grievances, which result in being seen within 8 hours.

FCCW and VADOC have also provided additional information that I requested, including mortality reviews and quarterly quality reports. The quarterly reports contain a large amount of information about the clinical activities of the health service during the reporting period, with the November 2020 report spanning 358 pages. Inside this report, there is detailed description of clinical care for COVID-19 as well as staffing and hiring updates. Also include are several quality assurance or improvement projects that measure outcomes that directly bear on the settlement, including intake assessment, sick call and emergency care. Each of these is explained and presented as an individual project. Missing from this document is a presentation of the performance in these specific areas over a 1- or 2-year time span, with compliance listed quarter by quarter or semi-annually. I am accustomed to quarterly reports that present a series of metrics in tabular form, showing each metric in a row, with columns showing compliance or measurement over time, with notations for significant changes towards or away from compliance. The volume and lack of structure in these reports hampers their utility, especially for staff and stakeholders who need to assess what is working well and what needs improvement in the health service quarter over quarter.

Review of COVID-19 response

Although I did not conduct an exhaustive assessment of the COVID-19 responses in the facility, I did review several key elements of the FCCW plan. For vaccinations, I was told by

13

First monitoring report of Dr. Homer Venters in Scott v. Clark

staff that 100% of detained women and staff had been offered vaccination at the time of my visit, with over 50% of both staff and detained women accepting. I also learned that patients who were high risk and who had refused vaccination were being counseled by Dr. Targonski and other clinical staff.

When I inspected the housing area used for new admission quarantine (1A), I was told that people are in this housing area for 14 days and are tested for COVID-19 before moving to other housing units. I was also told that any high-risk patient would be in a single cell during their intake quarantine period. I was told that there is no pre-release quarantine or automatic pre-release testing in place and that approximately 100 women were nearing their release dates.

When I inspected the cell unit that was used for medical isolation, staff reported that the cell doors were left unlocked on the unit while women were held there for COVID-19 reasons because the cells lacked alarm or duress alert buttons. They also reported that a nurse was present on the unit 24/7, conducting vital sign checks every four hours. They also reported that security staff would allow four women out of their cells at one time, keeping them socially distanced through verbal commands and that this approach had worked well. I spoke with one woman who reported this practice occurred as described that it did not.

The physical therapy team reported that they were very involved in the recovery process for COVID-19 patients. They described a program of recovery offered to every person diagnosed with COVID-19 that included incentive spirometry and walking and more intensive therapy for people with persisting symptoms.

First monitoring report of Dr. Homer Venters in Scott v. Clark

Recommendations and compliance monitoring

    My initial visit and document review has revealed clear strengths and areas for

improvement in the health service at FCCW. The team-based approach implemented by the

Medical Director and the intermittent quality assurance projects implemented by the health

service display the skills and motivation required to create a sustainable environment of

evidence-based care. Barriers to this approach being implemented start with the lack of an EMR,

and are clear in the many silos that have developed in its absence. In addition, the interaction

between physical and behavioral health disability and access to care appears challenged by

existing policies and practices.

    Because the process of implementing the EMR is still evolving, this objective is

presented in Table 1 as a function of several already-established areas of performance. In each

report, I will ask for and report an update on the progress of the EMR implementation in

VADOC.  While the specific timing of EMR implementation steps is somewhat unclear, the

absolute requirement for the EMR to be in place for FCCW to be substantially compliant with

the terms of this settlement is apparent. The manner in which the facility quality committee has

jumped from one topic to another over the past several years reflects the incredible amount of

work that goes into measuring any single process indicator or health outcome across multiple

paper and electronic systems. The lack of connectedness between what patients experience with

the medication carts in the housing areas, what is documented in Sapphire, and what is

documented and discussed in chronic care encounters is another glaring example. Dental staff

reported that they sometimes create a temporary chart for patients they see because the actual

medical records chart is unavailable. This process results in them asking the patient about their

medical history but without the benefit of information that is already documented from medical

First monitoring report of Dr. Homer Venters in Scott v. Clark

staff. The information about dental encounters is stored on several laptops in a series of spreadsheets. Radiology services, which involve a contract with UVA, are set up so that clinicians in FCCW cannot view an image unless they have separate access to the UVA EMR. Each of the care teams has one person with this access, but absent utilizing this system, clinical staff would rely on the written radiology reports in provision of care.

The efforts of the facility staff to build connections between these various parts of the health system are clear and admirable, but they are neither sustainable nor amenable to measurement. For example, the facility has recently implemented a medication reconciliation workflow to promote this basic clinical step (checking in with patients about their medications) that involves someone from each of the two care teams printing out records from Sapphire to discuss with the patient. In reviewing paper charts, neither these records nor documentation of these discussions is apparent, and many of the patients I spoke with reported that this process does not occur reliably. VADOC has responded to the necessity of having and EMR by arguing that the EMR was not a prominent feature of prior discussions and that there is no legal precedent for this requirement. I am not equipped to opine on legal matters, but the lack of focus on the EMR is at the heart of ongoing problems and deficiencies. For example, Dr. Scharrf noted in his final report that chronic care represents the most significant, ongoing area of deficiency. As I have related above, the lack of EMR creates significant barriers to both the provision and measurement of chronic care at FCCW, especially in light of the separate systems of records for medication ordering and delivery of clinical care.

There are several general observations from my inspection and review that I believe are relevant to the overall health of women detained in FCCW and the quality of care they receive.

First monitoring report of Dr. Homer Venters in Scott v. Clark

- The FCCW health and security leadership form a dedicated and well-integrated team. This represents a significant source of strength in the health service and for their patients. The leaders of the security and health departments displayed very good working knowledge not only of their own areas of responsibility but of the policies and lines of communication regarding workflows and tasks of those in the other services areas. This cohesion will be extremely vital in implementing the EMR.

- The COVID-19 response appears quite strong at FCCW and appears to meet or exceed most of the recommendations of the CDC. The effort to provide medical isolation but still ensure access to care and refrain from locking cell doors represents an important intervention to balance infection control and clinical surveillance while minimizing risk of isolation. The facility vaccination efforts at the time of my visit were on par or even ahead of many other facilities where I have assessed COVID-19 responses recently. One COVID-19 change I would suggest is the cohorting of people pre-release who are in their final 14 days and also offering all of them COVID-19 testing. This is now a basic standard of care/management in prison settings.

- The physical therapy team at FCCW is among the strongest I have encountered in a correctional setting. Their involvement in rehabilitation of patients with ongoing COVID-19 symptoms, as well as their familiarity and plans of care for patients with PT needs was impressive. Because of the higher rates of almost every chronic health problem among incarcerated women than men, and the increase in incarcerated people over the age of 50, the presence of this service is crucial to promoting health during and after incarceration.

- I am very concerned that the current mental health unit (2a) that is referred to as a hospital or inpatient level of care operates on the practice of isolating patients in their

cells 23 (or more) hours per day. The practice of isolation is associated with increased physical and mental health problems and even when a mental health term or label is applied to isolation, it often represents an inappropriate response to mental health crises.[2] My experience is that isolation increases morbidity and mortality by improving new health risks as well as interfering with access to physical and behavioral health care. Part of my monitoring going forward will include the time in/out of cell and in treatment for women in mental health crisis.

- There is a clear need for a disability aide or some sort of special accommodation assistance in unit 8a. The name and role of this unit is vague, but it houses people with various short- and long-term disabilities. These disabilities are not currently accommodated in a way that allows people access to prescribed medication and other care they need. Whatever term is applied to 8a, there is an obvious concentration of people with disabilities there who require accommodation and support. Part of my monitoring going forward will be to assess these access to care concerns for people with disability, including the continuity of accommodations provided to them.

- I recommend that individual sick call forms be placed into the medical records of the patients who submit them. While I appreciate the benefit of holding those records in a central location for periodic quality assurance review, photocopies can be made for this purpose. My concern (and observation from review of actual charts) is that the written health problems reported in these records are not always documented or addressed by health staff and by removing them, it removes the one actual denominator (what the patient reported and when they reported it) and leave behind only the numerator (what the

---

[2] https://www.justice.gov/opa/pr/justice-department-alleges-conditions-massachusetts-department-corrections-violate

First monitoring report of Dr. Homer Venters in Scott v. Clark

health service documented or delivered). This issue is especially true when a person reports more than one health issue in their sick call form but may be seen or assessed for just one of these issues.

- Multiple women reported that acute intoxication with illicit substances has sharply increased in the past year. They also reported that this increase has been associated with increased bullying, extortion and behavioral issues that both staff and detained women are faced with. While this is an area not specifically envisioned in the settlement agreement, I will report out issues or findings that I encounter which may have an impact on health.

- Access to methadone and suboxone appear quite limited at FCCW and access to these evidence-based medications has been provided in a safe manner for decades in U.S. correctional settings and is crucial to offering treatment to women who meet clinical criteria, decreasing overdose deaths after released and decreasing the demand for illicitly used substances inside the facility. The facility responded to this concern by stating that the Medical Director has prescribed MAT "for at least one prisoner" during his tenure. The facility also questioned the scope of MAT in prison settings as compared to jails. Many of the nation's longest standing and most successful MAT programs treat people in prisons, including those in New Mexico (started in 2005), Rhode Island (stared in 2016), Pennsylvania and New York (started in 2019) and numerous others.[3] Opiate use disorder is common health problem among people in prison, is directly linked to overdose death

---

[3] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/02/26/this-state-has-figured-out-how-to-treat-drug-addicted-inmates and
https://www.nmlegis.gov/handouts/LHHS%20110117%20Item%2013%20Dr%20Bruce%20Trigg_MAT%20in%20Corrections.pdf and https://www.media.pa.gov/Pages/corrections_details.aspx?newsid=406 and
https://atforum.com/2019/08/methadone-allowed-upstate-ny-prison-inmates-come-from-rikers-otp-first/

inside prison as well as after release and there is simply no medical or public health rationale for denying people life-saving treatment for a health problem they have and for which we have safe, effective medications.

I have identified a list of compliance measurements that I will begin auditing as of July 1, 2021 (Table 1). While I am eager to start this measurement as soon as possible, it is important to share the audit tools with the facility to ensure they can provide the data I request, and with both parties generally for transparency and feedback. I am very focused on the logistics of how the various data elements will be provided and how a response/rebuttal process can be created that is timely and transparent. This approach is extremely difficult in a paper-based world, such as the FCCW. By comparison, when I led the health service in the NYC jails, I led a team of approximately 20 nurses and quality experts to conduct the chart reviews and measure our 30 performance indicators and 30 performance measurements before we implemented the electronic medical record. That was a larger system, to be sure, but most of the 22 areas of compliance in this settlement require opening paper charts and looking for individual notes. With an EMR, many of these areas of compliance can be measured automatically as long as the implementation includes design of aggregate reports that extract data from structured variables built into chronic care, sick call, specialty, dental, mental health and other care encounters.

First monitoring report of Dr. Homer Venters in Scott v. Clark

Table 1. Compliance metrics for measurement starting 7/1/21

| Measurement Area | Elements |
|---|---|
| Intake screening* | • timeliness of receiving screen<br>• content of receiving screen |
| Comprehensive health assessments* | • timeliness of assessment<br>• content of assessment |
| The Sick Call Process/Access to Health Services* | • Daily screening for urgency<br>• Time interval to midlevel or provider referral<br>• Appropriate recognition of urgency in requests<br>• Appropriate management of requests for missed or lapsed medication |
| Chronic Care* | • Appropriateness of care for common conditions (asthma, hepatitis C, heart disease & hypertension, cancer care, seizure disorder, diabetes, mental illness, substance use disorder) including disease-specific assessments of level of control.<br>• Specialty care and hospital recommendations are documented and addressed in clinical encounters. |
| Continuity in Supply and Distribution of Medications* | • "Bridge orders" at intake<br>• Time interval between prescription and delivery of medications<br>• Policy and procedure governing location and time of medication administration lines<br>• Labelling of medications<br>• Pill crushing policy, procedure, and practice<br>• Documentation of medication access, interruptions, reconciliation in clinical encounters |
| Physical Therapy | • Availability of physical therapy as ordered<br>• Treatment capacity, timeliness for physical therapy |
| Appropriate Access to Information Regarding Medical Care* | • Policy and/or procedure regarding communicating access to health care services at reception<br>• Policy and/or procedure regarding communicating results of laboratory and other diagnostic testing and findings and recommendations of consultants<br>• Timeliness and content of communicating diagnostic and consultation results, plan of care |
| Appropriate Accommodations for People with Special Needs* | • Access to care and medications<br>• Continuity of accommodations and assistance<br>• Time out of cell for behavioral health treatment |
| Conduct of and Follow-up Regarding Mortality Reviews* | • timeliness of review<br>• content of the review<br>• utilization of the review in the QI process |

*Represent areas of measurement that require EMR or where lack of the EMR currently creates barriers to delivery or measurement of care.

First monitoring report of Dr. Homer Venters in Scott v. Clark

The information I have reported above is not presented as a measurement of compliance. I reiterate this point because the feedback I received on my initial draft included a large amount of case rebuttal content, which is appropriate for responding to compliance measurements. I do not view every report from a patient or blank entry in a medical record as representing a systemic problem. But in the areas I have reported on above, there is consistency is what patients have reported to me, what I have observed so far in medical records and what the staff have shared with me. Accordingly, I do not view the information I have reported above as a compliance measurement but instead as an initial effort to understand what is currently working in the health services and which of the 22 performance areas I will prioritize in my first monitoring effort. One question raised in the rebuttal process was how I interpret Dr. Scharff's most recent report on which areas are compliant. This interpretation is again a reminder of how gaps in monitoring prolong compliance assessments unnecessarily. For example, his final compliance report from October 2020 outlines that some areas he assessed as being in compliance were last assessed by him a full year before his report. In general, I view more recent assessments to be a better indicator than more distant ones, but I plan to discuss this more thoroughly with both parties in the coming weeks. Another question I received regard the portion of the settlement agreement labelled as "Guidelines for FCCW". The points raised in this section of the settlement agreement are fairly specific, and I will review them and share with both parties a plan to address, which I have not found in the work already completed.

Both parties provided helpful feedback to my draft report, much of which has been incorporated here. One shared request was to begin with as large a set of measurements as possible, which I have done and built into the list above. I have stressed to both parties that the approach I propose will require multiple site inspections as well as the ability to review

First monitoring report of Dr. Homer Venters in Scott v. Clark

considerable amounts of information remotely. I plan to conduct four facility inspections in my
first year as compliance monitor (consistent with the settlement agreement), at least one of which
will be unannounced. I believe that four inspections may be required in the second year as well,
given the lack of EMR and the need to ensure that each area of compliance is measured twice per
year once the audit tools are established. I have spoken with both parties about the path forward
to implement this monitoring. Over the next six weeks, I will share audit tools for these initial
metrics with the facility, elicit their feedback and ensure that data is set to be shared remotely as
well as on site.

In addition, I have already discussed some individual elements of these metrics with the
facility staff and believe that aside from representing elements of care that are clinically
important, and any minor workflow changes can be implemented relatively quickly. For
example, adding a question to the chronic care form that asks whether the patient has
encountered any problems getting or taking medications would allow for documentation of this
question along with any plan that flows from positive responses. FCCW has conducted a
medication audit since my inspection, and that data and work is very useful, but the size and
scope of that audit would be difficult to repeat on a quarterly or semi-annual basis alongside 20
other ongoing measurements. Adding data elements to the actual care encounters allows for
active measurement without a special project, which is the essential difference between quality
assurance and quality improvement (monitoring versus project-based review/analysis). For some
measurements that require clinical assessment, such as chronic care adequacy, I am confident
that the appropriateness review of chronic care encounters can be conducted by Dr. Targonski
and myself as he already performs similar review functions on a regular basis. Part of the chronic

First monitoring report of Dr. Homer Venters in Scott v. Clark

care audits I utilize will include the basic elements of assessment and care for common chronic health problems, which I will seek his feedback on.

My initial impression is that FCCW has the required leadership and practices to come into compliance with the settlement agreement. Barriers include a history of intermittent monitoring, some of the aforementioned clinical and custodial practices, as well as the multiple silos in medical information and medical care. Overall, I am confident that compliance is achievable and am pleased to begin this engagement with all parties.

Executed this 15th day of May, 2021 in Port Washington, NY

Signed,

Homer Venters MD, MS