**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **CYNTHIA B. SCOTT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:12-cv-36** |
| | ) | |
| **HAROLD W. CLARKE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANTS' AUGUST 2021 STATUS REPORT

Defendants, by counsel, pursuant to the Court's March 16, 2020 Order, ECF No. 655, submit this Response to Plaintiffs' August 2021 Status Report in advance of the upcoming Status Conference scheduled for September 8, 2021. Pursuant to the Court's Order, this Status Report addresses:

> . . . areas in which the Compliance Monitor has found Defendants (1) currently non-compliant with the Settlement Agreement; (2) persistently only in partial compliance; and (3) areas where Defendants' compliance has been "downgraded" by the Compliance Monitor. For any such areas, the status reports shall address any discrete, concrete steps Defendants have taken or which can be taken to improve compliance.

ECF No. 655.

Unfortunately, despite the appointment of the new Compliance Monitor eight (8) months ago, Defendants are unable to provide a report on any of the areas above because the Compliance Monitor still has not issued a report assessing Defendants' compliance. Thus, a report regarding Defendants' compliance with the Settlement Agreement has not been issued since October 29, 2020. So, yet again, the status reports requested by the Court do not address any of the topics identified in its March 16, 2020 Order.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 1 -

## I.   The Compliance Monitor's First Report

### a.   The Report Does Not Comply with the Settlement Agreement

The Compliance Monitor's first report is rife with generalities and far too vague to provide an adequate foundation for many of the assertions throughout it. Section IV.C.2. of the Settlement Agreement states that the Compliance Monitor's reports "shall describe the measures undertaken by the Compliance Monitor to analyze conditions and assess compliance, including identification of documents reviewed, individuals interviewed, medical practices and procedures observed and locations investigated, and shall expressly and with specificity set forth the basis for each of the Compliance Monitor's findings and conclusions." Throughout the report, individuals are not identified, which completely hinders the facility from (a) providing a thorough response to any allegations or insinuations and (b) from addressing any specific patient issues.

### b.   Electronic Health Record

Next, the Compliance Monitor apparently believes that compliance with the Settlement Agreement will require the implementation of an electronic health record ("EHR"). While an EHR can be a helpful tool for health services, the Compliance Monitor's opinion is not grounded in either the Settlement Agreement or the Constitution.[1]

The Settlement Agreement contains no express language requiring an EHR to be in place despite correctional health experts for both parties assisting with the development of the Settlement Agreement's terms. And in the six years since the approval of the Settlement Agreement, aside from the electronic medication administration record, an EHR has been referenced only once (despite plaintiffs' retention of multiple correctional health experts to assess VDOC's compliance and the former Compliance Monitor's work).



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[1] Regardless, VDOC is currently in the state procurement process for securing and implementing an EHR.

629.0303\NHS
4824-6061-4647 .v1

In that singular reference, the former compliance monitor noted that it was entirely possible and expected to implement an effective CQI program with *paper records*. The fact that the suggestion that the Settlement Agreement requires an EHR is being made only now implies this is more likely a personal preference as opposed to a requirement of the Settlement Agreement and the Eighth Amendment.

Second, the Settlement Agreement is intended to ensure that constitutionally adequate healthcare is provided to the women at FCCW. Defendants have not located any legal authority supporting the proposition that an EHR is necessary in order to provide constitutionally adequate healthcare. Indeed, Virginia is not alone and multiple other states either do not have an EHR implemented into their correctional health services or are still in the RFI or RFP stages of the procurement process. The most recent review of EHR adoption across outpatient practices in the United States suggests that only 80% of practices use a functional, certified EHR, meaning that 1 in 5 operating practices do not. This corroborates that an EHR is not necessary to conduct a community standard medical practice. Third, EHRs are still susceptible to data entry and other errors, and the literature is rife with complaints from health professionals regarding the lack of utility and effectiveness of EHRs. Finally, to the extent that the Compliance Monitor contends that the facility is unable to conduct adequate and reliable audits of its health services without an EHR, we strongly dispute that statement. As the Compliance Monitor is certainly aware, respected healthcare systems conducted CQI audits of their practices without an EHR for decades. Indeed, the former Compliance Monitor noted that an effective QI program can exist absent an EHR using existing technologies. To that end, FCCW continues to conduct effective and reliable studies using the paper chart and electronic medication administration record. Indeed, FCCW informed the Compliance Monitor in May 2021 that



629.0303\NHS
4824-6061-4647 .v1

it was conducting approximately 100 metrics to study and assess compliance with the Settlement Agreement standards—all without an EHR. <u>See</u> **Exhibit A**.

    **c.  Despite Multiple Requests the Compliance Monitor Has Not Provided a Full Set of Performance Measuring Tools.**

        Section III.2.d. of the Settlement Agreement states as follows:

> In evaluating the Defendant's performance and satisfaction of its obligation to provide the prisoners incarcerated at FCCW with constitutionally-adequate medical care in accordance with the Eighth Amendment and the terms and conditions of this Settlement Agreement, the Compliance Monitor shall utilize and report on the basis of application of the Performance Measuring Tools to be developed by the Compliance Monitor with a focus on each of the subjects identified on the list attached as Appendix B of this Agreement and fully incorporated herein by reference.

Defendants requested a copy of the Compliance Monitor's performance measuring tools in April 2021. The Compliance Monitor did not respond. In May 2021, upon receipt of the Compliance Monitor's initial draft of his first report—and his originally expressed intention to assess compliance with four (4) of the Settlement Agreement standards during his next visit—Defendants again reminded the Compliance Monitor of his obligations under the Settlement Agreement and requested the performance measuring tools. Defendants wrote to the Compliance Monitor again in June 2021 and requested the full set of performance measuring tools. Yet again, the Compliance Monitor failed to respond. And as of this writing, the Compliance Monitor still has not provided the parties with a complete set of performance measuring tools.

    **d.  Failure to Communicate with Defendants**

        In addition to the concerns noted above regarding Defendants' requests for the Compliance Monitor's performance measuring tools, on page 2 of his report, the Compliance Monitor writes: "During this time period I received 10 letters from detained



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 4 -

women about their health concerns. . . . In all of my information gathering, when I have encountered a potentially urgent medical issue, I have communicated them directly to the facility Medical Director who has been extremely responsive." ECF No. 831-1. After receiving the initial draft of the report, Defendants commented that Dr. Targonski had no recollection of receiving *any* written or email communications expressing concerns about any patient's healthcare. Still, Dr. Venters did not respond to this comment or provide any further clarification in his report. Dr. Targonski *still* has not received a single communication from the Compliance Monitor expressing concern about or asking to investigate any patient's healthcare.

After receiving Plaintiffs' recent Status Report and reading that the Compliance Monitor gave his "initial impressions" to Plaintiffs' counsel, Defendants' counsel requested a phone call with the Compliance Monitor to discuss the allegation that "his main concerns from his first visit were largely confirmed by his second visit, including the adequacy of care in the infirmary, the conditions in the acute mental health unit, and the need for an EHR." As of this writing, the Compliance Monitor still has not responded to that request.

**II. Response to Plaintiffs' Status Report**

**a. Peggy Ellis**

Peggy Ellis came to FCCW in 2005 with a history of brittle diabetes Type 1 since the age of 18 years old, chronic kidney disease, neuropathy, and retinopathy. Despite her testimony to the contrary, her diabetes was poorly controlled in the community. At reception to FCCW, her hemoglobin A1c test result was 11.3%.[2] As addressed previously,



---

[2] The A1c test provides an average level of blood sugar over the past two to three months. The target A1c level for people with diabetes in the community is usually 7% or less.

her medical records documented that she was insulin resistant with peripheral vascular disease and hypertension, hypothyroidism, and hyperlipidemia *before* she entered FCCW. At FCCW, Ms. Ellis demonstrated nonadherence to diet and medications, refused her diabetic diet, and refused physician recommendations to start dialysis.

In April 2020, she reported to FCCW infirmary providers that she was tired of having health conditions to treat and monitor and wanted to give up. She refused to cooperate with her care plan at that time. After FCCW offered to have the chaplain speak with Ms. Ellis, she resumed her care plan, and FCCW consulted with mental health staff to increase therapy.

Despite allegations to the contrary, Ms. Ellis' hemoglobin A1c improved at FCCW. By February 2021 her hemoglobin A1c was 5.4%. In March 2021, it was 6.6%.

### b. Mary Puffenbarger

On July 7, 2021, Ms. Puffenbarger was seen urgently by a nurse at 6:45 a.m. for complaints of chest pain. Her vitals were within "normal" range (aside from hypertension). Her symptoms relieved with "gas tabs." FCCW performed an EKG, which demonstrated normal sinus rhythm. On July 10, 2020 at 10:30 p.m., Ms. Puffenbarger reported to a correctional officer that she was experiencing chest pain prior to reporting her symptoms. The officer notified the nurse in the building, and the nurse assessed Ms. Puffenbarger. The nurse attempted to obtain an EKG but the electrode pads were nonadhesive. A second set of pads would not stick either. Four more sets of pads from the same box were used and none would stick to the patient's body. At 11:00 p.m., a nurse supervisor arrived with an additional set of pads, and the patient was provided Mylanta and her vitals were taken again. The EKG noted normal sinus rhythm, and Ms. Puffenbarger was provided aspirin and oxygen. Ms. Puffenbarger subsequently vomited,


FAP
FRITH
ANDERSON
+ PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 6 -

and a repeat EKG was obtained at 11:20 which showed normal sinus rhythm with ST elevation and "Acute MI/STEMI." The on-call provider was called at 11:22, and the provider immediately instructed the nurses to call 911 for emergency transport and to administer nitroglycerin and beta blocker.  911 was called at 11:23 p.m., and EMS were patched back to the building staff at 11:32 p.m.

At 11:44, Ms. Puffenbarger became unresponsive. Staff began CPR and applied AED pads and defibrillated the patient one time and resumed compressions until the patient resumed breathing with pulse. An ambulance arrived at 11:50 p.m. and the ambulance team assumed care at 11:56 p.m. Ms. Puffenbarger was awake on the way to the emergency department. Upon examination at the emergency department, Ms. Puffenbarger again became unresponsive and went pulseless. Despite efforts to resuscitate her, she was pronounced dead at 1:04 a.m.

The EMS team contacted FCCW after transporting Ms. Puffenbarger to recognize the efforts of the nursing and security teams in facilitating the expeditions and successful transfer of the patient to the hospital.

**c. Bottom Bunk Profiles**

Notably, the parties convened on July 19 to address issues for the upcoming status conference and the parties' respective reports to the Court. Despite Defendants' request for Plaintiffs to identify individuals they believed had erroneously lost their bottom bunk profiles, Plaintiffs demurred. Then, a little over a week later, an inmate signed a declaration claiming she should not have lost her bottom bunk profile. Surely, Plaintiffs were aware of this individual and that individual could have been addressed at the parties' conference. These tactics are neither helpful nor in the best interest of the women



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4824-6061-4647 .v1

at FCCW. In any event, Fantasia Lowrance has not been diagnosed with "a permanent seizure condition" or any other seizure disorder.

Bottom bunk profiles are initiated, reviewed, and/or removed based on clinical criteria. The fact of the matter is that there is a limited number of bottom bunks available in the facility. Profiles are reviewed on an interval basis, at least annually, and it is ultimately dependent upon the DOC criteria and the ancillary information determined by the patient and provider whether a profile remains in place. No profiles are written for greater than one year so that FCCW can evaluate at least annually for the benefit of the patient. This process is indeed followed even for a patient that has some form of paralysis to ensure there is an annual review of the patient's condition. In addition, for patients prescribed physical therapy or pain medication, FCCW does take into account the patient's adherence with those interventions consistent with routine community practice when considering an inmate's clinical status, which may or may not include the need for a bottom bunk.

### d.  Staffing

FCCW has remained in compliance with the Settlement Agreement's standard for staffing and the Court's Injunction regarding staffing the Medical Department. During the 26-week period of February 22, 2021 through August 20, 2021, a total of 1104 offsite appointments were scheduled for an average period population of 905 patients. A total of 18 appointments (1.6%) were missed due to transportation issues, including late arrivals, with never more than 2 occurrences in any one week and no weekly rate statistically significantly greater than 0%. Only one missed appointment was deemed medically urgent by FCCW medical staff, although it was not deemed urgent by the offsite consultant. For reference, there were 215 refusals (18.8%) by patients for offsite



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 8 -

appointments after they had agreed to scheduling (earlier refusal rates appeared higher due to COVID-related refusals) during the same period.

Ms. Bergen wishes to retain a bottom bunk profile. She was originally scheduled for MRI spine in September 2020, but this was rescheduled twice due to COVID. When her appointment was rescheduled to January 13, 2021, she refused the appointment. She has been seen 57 times by providers at FCCW since January 2020 for various complaints and has completed 19 visits with physical therapy during that time (and she is currently active in physical therapy). Her completed MRI was reviewed by an outside orthopedic team in 2021 who felt that "*[h]er complaints do not fit a pattern of radicular pain from stenosis, so an LESI [lumbar epidural steroid injection] is not recommended at this time, and there is no surgical indication.*" A suggestion for pain management was made, and the patient was scheduled, with her appointment completed August 16, 2021. The pain management team noted they found no functional deficits, although suggested that neurosurgical evaluation and injection may or may not alleviate symptoms.

Ms. Melissa Atkins notes that she has missed medications "*because the shot was not ordered on time.*" This is erroneous. Her medication, (Tocilizumab, Actemra) was ordered properly by FCCW and delayed by the supplier. However, the dose in question was received by FCCW and administered within the manufacturer recommended window, which was discussed with the patient. Notably, this medication is a cutting-edge treatment for rheumatoid arthritis that is made available to the patient upon the recommendation of her consulting rheumatologist. This medication has also been in high demand and there has been a global shortage not just for Ms Atkins, but for rheumatoid arthritis patients around the world since it has been found to have value in the



FAP
FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4824-6061-4647 .v1

management of COVID infection.[3] Thus, her experience mirrors that of many patients worldwide since the drug has been consumed first in clinical studies and subsequently in the clinical care of persons with COVID.[4] Any reasonable and cursory review of contemporary management of rheumatoid arthritis or lay press on COVID would identify these issues and not assign responsibility to FCCW staffing or medication management.

**e. Diets**

Defendants addressed Ms. Turner's complaints about diets and her own non-adherence in their October 2020 Status Report. ECF No. 774, *20. Ms. Turner continues to order processed foods and other food items contrary to her real and perceived dietary restrictions and recommendations. <u>See</u> **Exhibit B**.

**f. Pre-hearing Meeting**

Defendants disagree with Plaintiffs' characterization of the Pre-Hearing Meeting. While Plaintiffs' may not have found the information provided by Defendants "helpful," that is more likely because Defendants disputed the vague and generalized complaints the Plaintiffs' made about profiles and staffing numbers as discussed above.


Respectfully Submitted,

HAROLD W. CLARKE, A. DAVID ROBINSON, STEPHEN HERRICK, MARIEA K. LEFEVERS, and PAUL TARGONSKI, M.D., P.H.D.

FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[3] <u>See</u> https://www.covid19treatmentguidelines.nih.gov/therapies/immunomodulators/interleukin-6-inhibitors/.
[4] <u>See</u> https://www.gene.com/media/statements/ps_081621.

629.0303\NHS
4824-6061-4647 .v1

/s/_____
Katherine C. Londos (VSB #: 36848)
Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax:     540/772-9167
Email: klondos@faplawfirm.com
          nschnetzler@faplawfirm.com

Diane M. Abato
SAAG/Chief
Office of the Attorney General
Criminal Justice and Public Safety Division
202 North 9th Street
Richmond, VA 23219
Phone: 804-786-8191
Fax:     804-786-4239
Email: dabato@oag.state.va.us
*Counsel for Harold W. Clarke, A. David*
*Robinson, Stephen Herrick, Mariea K. LeFevers,*
*and Paul Targonski, M.D., P.H.D.*



- 11 -

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 25, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Nathan H. Schnetzler



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4824-6061-4647 .v1