**Second monitoring report of Dr. Homer Venters in Scott v. Clark**

Table of Contents

Introduction                                    1

Methodology                                     2

Inspection and patient interviews               3

Compliance monitoring                           5

Summary and next steps                         11

Data Appendix                                  15

A. Introduction

This is the second compliance monitoring report for the Fluvanna Correctional Center for Women (FCCW) in the case of Scott v. Clark. Because the initial report focused on presenting the approach to compliance monitoring, this is the first reporting of compliance performance. Since the initial report, both plaintiffs counsel and the FCCW team have been extremely forthcoming and helpful in the collection of relevant data and information. One hearing has occurred in this case and multiple communications with the various stakeholders have also occurred.

B. <u>Methodology</u>

Information reviewed for this report includes data requested from FCCW as well as interviews with patients and staff during my site inspection and video/phone conversations before and afterwards. This report represents the first measurement of compliance with the terms of the settlement in this agreement.

Review of medical records was conducted both on site, and remotely for some records that the facility produced securely upon request. Individual audit tools utilized to measure compliance were shared in draft and final form with both plaintiffs and defendants once comments were received. Charts were requested in a consecutive manner, for example, 30 consecutive sick call or chronic care encounters were requested starting on a specific date so as to minimize selection bias. Cases in which the audit tools showed a lack of compliance with a specific measurement were shared with the defendants for response/rebuttal and one extension of time was granted for the facility to extend their review time in these rebuttals. A compliance rate of 90% was utilized as was outlined in the prior report and during the recent hearing in this case, the defendants stated that they also utilize this as an internal measurement of compliance. A data appendix is provided below.

Facility staff were helpful in providing scanned documents remotely as well as paper charts and access to the medication system during my inspection and on-site reviews. This report was shared in draft form with both plaintiffs and defendants' legal teams and the final version was completed after receipt of their comments and responses. Individual cases that raised clinical concerns were shared with the FCCW Medical Director.

Second monitoring report of Dr. Homer Venters in Scott v. Clark

C. Inspection and patient interviews

The most recent facility inspection was conducted on August 1-3. The portion of the inspection for August 1 was unannounced, as the inspection was originally scheduled for August 2,3. The focus of the unannounced portion of the inspection was the infirmary, including speaking with people being cared for in that setting. The remainder of the inspection time was spent reviewing patient records, speaking with staff and patients and observing the health system at work. I also spoke with two women prior to the inspection by video.

I spoke with several women who were currently housed or worked in the infirmary. These women raised several common concerns, including that falls were a regular occurrence among patients housed in this area, that patients who were bedbound were not adequately or reliably repositioned in their beds and that women who were bedbound and incontinent of bowel or bladder often went many hours while waiting for changing.

When I inspected the infirmary rooms, it was apparent that many of the rooms lack grab bars on the wall or at the toilet. One woman who was housed in the infirmary during her cancer treatment reported numerous falls in trying to ambulate from the bed to the toilet, and she identified a bruise on her face from a recent fall in which she fell trying to get to the toilet, striking the edge of a table with her face as she fell. The toilet in her room was approximately 6 feet from the head of her bed and was situated in a corner without any hand hold or grab bars.

I asked FCCW to produce all incident reports involving falls in the infirmary during June and July 2021, which included nine separate incidents. Of these, four involved repeated falls of the woman referenced above with documentation of injuries during falls. These reports from

3

June and July represent only a subset of the falls this one patient has experienced, with a note in June stating she "shows the nurse previous bruised purple area to L hip from prior fall on 5/24/21". Another infirmary patient had multiple falls in this two-month period, being found on the floor between the bed and toilet both times. One of these fall incidents includes a reference to potential self-injurious behavior by the physician without any further explanation or substantiation. In 8 of the 9 reports, health staff document 'yes' to the variable "environmental contribution to fall". In the ninth incident, this field of the form was not filled in.

    The second area that multiple women reported to me concerning infirmary care involves repositioning and toileting of bedbound patients. Women reported that some nursing staff would reliably conduct the repositioning every two hours as ordered, while others would not, leaving patients to endure some shifts with little or no repositioning. Patients reported hearing some nursing staff state aloud that this was not their job, and that at the change of shift, other nursing staff would be upset that these parts of patient care were left undone. This same issue was reported for changing linens for bedbound patients who were incontinent of bowel and bladder. I requested nursing records for a bedbound patient who reported these issues to me, and while there were multiple nursing entries in her chart each shift, there was no documentation of whether repositioning was conducted at a scheduled and pre-ordered interval and no record of when linens changes and toileting occurred. The paper records for these bedbound patients appear to be the same as other infirmary patients and a single "activity of patient" field is present, with entries every 30 minutes that most often include "resting in bed" or "Asleep" with occasional other entries like "In w/c" or "changed".

    Since the first inspection report, I have received an additional 16 letters from detained people in FCCW. The most common concern raised by women revolves around recent changes

4

in how bottom bunk and other disability accommodations are being reviewed. These concerns also involve access to assistive devices and I will address this issue in my next report.

As with my first inspection, I conducted a readout with facility/DOC leadership on the last day of inspection. During this session I shared my broad concerns about the treatment and safety of people in the mental health unit and the infirmary, some of my specific observations concerning medications and the issues around window tinting as well as the general process for sharing of compliance measurements and rebuttal for the upcoming monitoring report.

### D. Compliance Monitoring

**Intake screening and comprehensive health assessments, compliant.** Measurement of 30 intake and comprehensive health assessments encounters (30 patients who received both an intake and comprehensive encounter) revealed a compliance of 93% (28 of 30), for intake and 93% (28 of 30). Noncompliant cases involved an abnormal finding not being addressed in the plan. While these are separate measurements, they are presented together because of the workflow linkage between the two types of encounters.

**Sick call, noncompliant.** Measurement of 28 encounters revealed compliance of 79% (22 of 28), noncompliant. Noncompliant encounters included instances in which abnormal vital signs were documented but not addressed, as well as inadequate assessments and plans for problems reported by patients or staff. Four patient records were excluded from this part of the review because although they were included in the sick call production, their records did not include a medical encounter and instead referenced some other documentation, such as a food handlers' clearance, a chronic care encounter or no encounter at all. One recommendation made in the initial report was to include the actual sick call form that people fill out in the medical records of

the patient. This is crucial because providers need to see what the patient reported as being a medical problem when they are seen. The facility continues to store these sick call forms outside the medical record, so that they can be accessed for internal audits, but this issue again underscores the need for an electronic medical record. When a patient reports a medical problem, their reporting of that problem should go into their medical record for use as vital clinical information, but that report should also be utilized to assess whether their report was addressed in a timely and adequate manner. One task should not be subordinate to another, both are essential standards of correctional health practice and required for compliance with this settlement agreement.

**Chronic care, noncompliant.** Measurement of 19 encounters revealed compliance of 78% (15 of 19), noncompliant. Noncompliant encounters included instances in which a key element of the encounter, such as medications or blood pressure readings for a patient with hypertension, were not reviewed or documented. In my review of paper charts, it was clear that the separation of key information across hundreds or even thousands of pages is a barrier to finding basic information, including vital signs and other basic data from prior encounters. This problem is more serious for patients with multiple medical problems, who may have a paper chart 2-5 inches thick. Some paper charts contained large groups of paper that were unsecured and would simply slide out of the outside folder when opened. Although the chronic care encounters are generally put into one part of the chart, this area also includes numerous other type of documentation and care, and the vital signs sheets, when utilized, are not in this area. Of all the types of care and services included in this settlement agreement, chronic care is the most clear example of a type of care that simply cannot be provided adequately without an electronic medical record. Asthma, diabetes and hypertension are three very common diagnoses in the FCCW chronic health clinic.

A significant amount of new information is generated about patient's status in between chronic care encounters for these conditions, including blood pressure, blood glucose, peak flow and other measurements that nursing staff may take every day or weekly. As these measurements enter the paper charts of patient's at FCCW, it is apparent that despite common knowledge about the crucial nature of this information in determining decisions about care and significant reminders and trainings by the leadership, many providers do not have the capacity or time to review and act on this information

**Medications, compliant.** Measurement of medication data and observation of medication cart operations in multiple housing areas reveal this area to be in compliance. I generated one medication report while on site regarding medication delivery and missed medications, and requested a second report from the facility regarding medications in June 20201. Together with my inspection of the medication delivery process and the reports by patients that medication delivery had improved, these data sets lead me to give a rating of compliant for this area. Based on these reviews, medication process appears compliant but also appears to require significant extra work when medications and medication cards are not present on the medication carts, requiring additional trips or other effort to resolve  (see data appendix below). I anticipate that this area will require further review and monitoring, not only as part of this metric, but because it will likely be prominent in the review of grievance process.

One area of concern involves the practice of placing dark window tinting on the windows between the housing areas and the common spaces where the medication carts are stationed. I observed how this practice makes it difficult, if not impossible for nursing staff to see who is receiving medications through the small medication slot. This also creates a situation in which the security staff in the central bubble may have diminished visibility regarding what is

happening in the various housing areas they are there to observe. I raised this issue with the Warden and was told that some accommodation may be possible, but I will review this practice again in my next inspection, with an eye towards medication errors and patient safety.

**Access to medical information, compliant.** Interviews with patients and review of medical records reviewed for reporting of laboratory and other results revealed that patients have routine access to their health information and records. However, I have received multiple individual reports of slow or nonexistent reporting of these types of results from detained people, notwithstanding the compliance I observe when reviewing a date range of encounters. As with medications, this is likely to be an area where additional information is gleaned in review of grievances.

**Accommodations for people with special needs, Noncompliant.** This review was conducted with focus on two specific areas where people with special needs are housed/cared for; the medical infirmary and housing area 2A, also referred to as the inpatient mental health unit or hospital unit.

The medical infirmary is a housing area comprised of single and multiple occupancy rooms, all of which have hospital beds. These rooms are used for several reasons, including one multiple person room utilized for people under observation for new medical problems and who may require more regular assessments and care. Other rooms are utilized for people with known and chronic health issues who require more regular care and assessment. Several single person rooms exist along the main hallway of the unit, and I was able to speak with several patients and inspect their rooms during my most recent inspection, as outlined above (see above in inspection notes). Taken together, the reports of these patients, my observations of the lack of assistive devices and supports and the data in these incident reports are all remarkably consistent: the

infirmary setting is a place of considerable physical risk and ongoing injury due to falls for the patients who are housed there.

A second area of concern in the infirmary that relates to people with special needs is the attention to repositioning of bedbound patients and access to linen changes and toileting. The documentation of these crucial tasks for the most vulnerable patients does not appear adequately documented, such as documentation of regular repositioning or documentation of ins and outs (food and fluid intake and output/toileting every shift) in a way that would allow supervisors to see if the activities were conducted in a timely manner. It is my understanding that the VADOC has a nursing home setting for men, but has not established this level of care for women. This lack of a true continuum of care has likely caused the current dysfunction of placing women with long term care needs into an acute care infirmary. Two patients with advanced neurodegenerative diseases were present in the infirmary at the time of my inspection and I am concerned that the VADOC has elected to consign women to a lower level of care than they need. With the aging population of women in the State prisons system, these issues will not abate, but will likely become more urgent and may contribute to prison attributable deaths. Basic steps to address these concerns include a review of the facility, including the infirmary, for fall preventions measures, as well as establishing a site for nursing home and skilled nursing care for women in VADOC custody. Installation of safety rails and one to one observations for people with multiple falls are examples of interventions that can occur immediately.

My review of the mental health inpatient unit, 2A, confirmed concerns that were detailed in my first report. In this inspection, I interviewed the Mental Health Director and one of the mental health staff during this inspection. FCCW fails to provide women who are placed onto this unit with an appropriate standard of care because the unit serves two very different functions

simultaneously, housing women with severe mental illness who have been identified as needing a higher level of care, and housing women who are being observed for concerns or response to self-harm or potentially suicidal behavior. It is clear from both inspections as well as interviews with staff and patients that one consequence of housing these two very different groups of patients on the same small unit is that the women admitted for serious mental illness remain essentially locked in their cells most, if not all of the day. The staff have undertaken considerable and admirable efforts to try and bring some of those women to another unit, especially in preparation for transfer to a lower level of care. Although there is no record of total out of cell time for women on this unit, I am confident that the identical reports of staff and patients are correct: the lack of space and sufficient staffing has resulted in a situation that relies on cell isolation for most women identified with serious mental illness who are so ill as to be transferred into this unit. There is an effort reported by the mental health team to hire correctional staff who can receive specialized training to support the currently unmet needs of these patients for programs and care out of their cells. If this approach is implemented, and if out of cell time is tracked and documented, then substantial progress may be possible to deliver a clinically acceptable standard of care for patients with serious mental illness and this area of the settlement agreement will likely move towards compliance for the next review.

**Physical therapy, compliant.** Review of 30 encounters and discussion with staff revealed 100% compliance. One concern apparent in the notes of approximately half of PT patients is the use of a first initial instead of the writing of the first name of the patient on the encounter. In a paper-based system, in which handwriting often leaves the inmate number difficult to read, this practice increases the opportunities for errors through misidentification.

**Mortality and morbidity review, complaint.** Two women who were incarcerated at FCCW died since my initial inspection. Both cases were reviewed and the deficiencies in care adequately identified in the mortality reviews by the facility Medical Director. During my inspection, I raised a case with the Medical Director regarding a woman who fell in her housing area, was seen by nursing staff and despite documentation that raised concerns about potential injury, she was left in her housing area with a hip fracture for approximately one week. She was ultimately seen for an unrelated reason; an X-ray was ordered and she was transferred to the hospital for surgery. This case raised multiple concerns regarding the timeliness and adequacy of care she received, and the facility conducted a thorough root cause analysis of the errors and areas for improvement in this case (see data appendix).

E. <u>Summary and next steps</u>

The reviews in this compliance monitoring report show a correctional health system that has multiple areas of strength as well as some important remaining work to achieve full and sustained compliance with the settlement agreement. In particular, it is apparent that the Medical and Nursing Directors have worked to create standards of care for routine encounters, but the lack of electronic medical record creates barriers to adequate review of information that has already been gathered by health staff when they see patients for subsequent encounters. These barriers are less apparent during intake and the comprehensive health assessment, but become more apparent during sick call and chronic care encounters, as more vital health information is gathered but is not reviewed or utilized to direct care. These barriers also reflect the considerable effort that the facility leadership has put into shoring up this unsustainable health information system, which is laudable but which the DOC must address via implementation of an electronic medical record. A similar barrier is noted in the concerns with repeated falls in the infirmary, the

Case 3:12-cv-00036-NKM-JCH Document 850-1 Filed 11/01/21 Page 12 of 17 Pageid#: 23320
Second monitoring report of Dr. Homer Venters in Scott v. Clark

nursing care of bedbound patients and the emergency response of the patient who was left for approximately one week in her housing area with a hip fracture. These are patient safety concerns that should prompt automatic follow up encounters and be easily viewable as a problem that is worsening or not resolved, but in the paper-based system of FCCW, once a patient is out of sight of the health staff, this is extremely challenging.

The measurements in this report is comparable to some of the internal audits completed by FCCW staff in the past year, especially in the areas of medication access, intake screening and comprehensive health assessments. In other areas, such as sick call and chronic care, it will be important for the facility to build audits that capture whether critical data was reviewed or integrated to care encounters in their audits, not solely as part of peer review processes.

During a recent hearing, defendants asserted that they are in full compliance with the terms of this settlement without being able to point to specific supporting data. They also raised critiques of the sample size in the audits performed in this compliance monitoring. Both of these issues underscore the need for an electronic medical record that can allow for regular measurement of the full sample of encounters and large numbers of outcomes being measured without hundreds of hours of reviewing paper charts. One interim step I have requested defendants to undertake is to make copy of each chronic care encounter that is conducted, and establish a registry of the type of encounter, date of the encounter and name of the patient. This represents a new workflow but because a unique paper form is utilized in these types of encounters, and because they occur at specific times, this approach is both feasible and will generate for the first time an ongoing registry of all chronic car encounters. This approach will allow the simultaneous external and internal monitoring of this crucial area of care with review of both timeliness and adequacy of care.

The plan for next steps in compliance monitoring is to conduct a similar set of reviews for the remaining areas of the settlement agreement. These are;

- Provider staffing levels
- Co-Pay policy
- Diagnosis and treatment
- Responses to emergencies/emergency medical care
- Infirmary conditions and operations
- Infectious disease and infectious waste management
- Utilization management
- Medical equipment and supplies
- Medical grievances
- Training of correctional staff
- Care/release of terminally ill patients
- Performance and quality measurement

Each of these areas has an audit tool that reflects the elements of the settlement, and which has been shared with both parties in the case for comment. An inspection visit to the facility is anticipated early in the new year to measure these areas of compliance.

Overall, the staff and leadership of FCCW display a clear sense of mission towards the health of their patients. In the areas of care and patient safety that they have direct control over, quality is relatively high. However, the barriers to achieving compliance in this settlement appear to flow from systemic challenges, including the lack of an electronic medical record, the lack of a safe setting in the infirmary and in the mental health unit. The leadership of FCCW have plans or

Second monitoring report of Dr. Homer Venters in Scott v. Clark

at least designs in place to address many of these systemic barriers, which will be important for the health of patients and achieving overall settlement compliance.

Executed this 29th day of October, 2021 in Port Washington, NY

Signed,

Homer Venters MD, MS

Second monitoring report of Dr. Homer Venters in Scott v. Clark

Appendix 1. Data Sources

1. Intake screening and comprehensive health assessments.

    Compliant based on 28 of 30 encounters (93%) being found compliant.

    Data reviewed included 30 consecutive intake assessments, 30 consecutive comprehensive assessments.

    Noncompliant cases involved;

    - Abnormal vital sign findings not being addressed in the assessment/plan,
    - Abnormal physical exam findings not being addressed in the assessment/plan,

2. Sick call

    Noncompliant based on 22 of 28 encounters (79%) being found compliant,

    Data reviewed included 28 consecutive sick call assessments,

    Noncompliant cases involved;

    - Abnormal vital sign findings not being addressed in the assessment/plan,
    - Abnormal physical exam findings not being addressed in the assessment/plan,
    - No plan for problem identified during encounter,

3. Chronic care

    Noncompliant based on 15 of 19 encounters (79%) being found compliant,

    Data reviewed included 19 consecutive chronic care assessments,

    Noncompliant cases involved;

    - Failure to review vital signs
    - Failure to assess/document level of control
    - Failure to review medications

4. Medications

    Compliant based on;

    - Observation of pill call/administration process in 5 housing areas,
    - Interviews with individual detained people,
    - Review of medication report produced by the facility which showed;
        - 329 instances of some 'medication issue' being documented in medication reporting. Facility staff report that these issues were addressed and subsequently closed out, usually within 24 hours.

- o 13 missed medications during June 2021, one true miss with adequate reasons for all other cases
- o Acceptable reasons for missed medications included wrong entry type, medication stopped by providers for side effects and medications stopped for treatment reasons.



5. Access to information regarding care

    Compliant based on review of 30 consecutive encounters for sick call and chronic care;

    Evidence of compliance include;

    - Documentation of laboratory and diagnostic testing results being discussed
    - Response to requests for information being addressed in sick call encounters

6. Accommodation for people with special needs (see main body of report)

7. Physical therapy

    Compliant based on 30 encounters (100%) being found compliant.

    Data reviewed included 30 physical therapy encounters.

8. Mortality and morbidity review

    Compliant based on review of two mortality and one morbidity cases.

    - All three addressed the following questions;
        - o Was the standard of care met?
        - o Was the outcome or clinical event worsened or impacted by conditions/care?

- Neither death was found to be prison attributable (caused or significantly made more likely by conditions/care),
- The morbidity case revealed multiple deficiencies in care and response for addressing by the clinical team,

9. Rebuttals
   - Data on case citations (instances of noncompliance) were shared with the clinical team for review and rebuttal,
   - In 4 instances, rebuttals were accepted, for the following reasons;
     - Care/documentation was readily apparent in an adjacent or related part of the records (2 instances)
     - Initial reason for noncompliance was incorrect
     - The encounter was not meant to address the area of noncompliance