IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CYNTHIA B. SCOTT, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 3:12-cv-00036 NKM/JCH |
| ) | Sr. Judge Norman K. Moon |
| HAROLD W. CLARKE, *et al.*, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PLAINTIFFS' MAY 2022 STATUS REPORT

Plaintiffs, by counsel, submit this Status Report in advance of the June 16, 2022 Status Hearing in this case. This report addresses issues related to the Defendants' partial compliance or non-compliance with the standards adopted in the Settlement Agreement, among other pertinent issues.

Since the parties were last before the Court in February 2022, the Compliance Monitor, Dr. Venters, has conducted his second substantive visit to FCCW in order to audit the Settlement Agreement standards that were not addressed in his first report. He provided a draft report to the parties on May 18, 2022. Accordingly, Plaintiffs' Status Report will address issues believed to involve non-compliance based on information provided to undersigned counsel by class members and the Monitor's preliminary findings from his most recent visit.

I.   **CHANGES IN MEDICAL LEADERSHIP AT FCCW**

After several months of anecdotal reports from class members that Dr. Targonski is seen on site at FCCW with significantly decreasing regularity, Plaintiffs' counsel inquired of Defendants during the Parties' Pre-Hearing Meeting, conducted on April 28, 2022, concerning whether any formal changes in the leadership of the Medical Staff at FCCW have taken place.

Defendants' counsel stated that Dr. Targonski is now serving as Acting Chief Medical Director for VDOC as a whole, while he continues to serve as Clinical Director at FCCW. Defendants were unable (or unwilling) to provide any information concerning how frequently (*e.g.,* hours per day or days per week) Dr. Targonski is present at FCCW.

Meanwhile, Dr. Matthew Stich is serving as Acting Associate Medical Director at FCCW. The nature and scope of Dr. Stich's responsibilities in this role (including whether he assumed the duties of Clinical Director when Dr. Targonski is off-site), how long he has served in this capacity, and the anticipated duration of this arrangement, are all unknown to Plaintiffs and, insofar as they know, undisclosed to either this Court or the Monitor. As discussed more fully below, Plaintiffs' counsel requested clarification and additional information concerning these matters by email transmitted in the immediate aftermath of the Parties' Pre-Hearing Meeting on April 28. Ex. A, Email from G. Greenspan dated April 28, 2022. As of the date of this filing, no response has been provided.

These changes are of potentially great import, as class members uniformly report dissatisfaction with the medical care provided by Dr. Stich, as well as his attitude towards patients. The experiences that many patients have had with Dr. Stich raises serious concerns about his qualifications to hold a leadership position in the medical team at FCCW.

## II.     STAFFING

Despite the fact that their own data demonstrated that FCCW experienced significant losses in medical staffing levels through 2021, as reviewed in Plaintiffs' January 2022 Status Report, *see* ECF No. 854 at 2-6 & nn. 3-7, Defendants' counsel insisted in his remarks to the Court during the February 7 Status Hearing that FCCW was, and has been, fully staffed and that its staffing levels are adequate to meet patient care needs and comply with the Settlement Agreement.

In its most recent Quarterly Report on Quality Improvement, Quality Assurance and Performance Management, dated May 2, 2022, FCCW reports a modest increase in medical staffing levels during the first part of 2022 over the level previously reported: as of March 2022, there were 94 total medical staff and 32 FTE nursing staff. VDOC has also continuously advertised open medical staff positions at FCCW on its website, and as of May 5, 2022, many positions – including doctors, the Director of Nursing, and multiple positions for RNs, LPNs and CNAs – were advertised to be filled. *See* Ex. B, true and correct copy of VDOC job postings for FCCW as of May 5, 2022. The pressing need for additional staff, particularly nurses, is apparent from the May 11, 2022 "Hiring Event" referenced in the job postings for RNs and LPNs. *Id.* This certainly suggests that Defendants are well aware that additional medical staff is needed to meet the demand for medical services at FCCW and casts significant doubt on Defendants' prior claims that FCCW was already "fully staffed."

As Plaintiffs have repeatedly pointed out, neither the Settlement Agreement nor any other definitive guidance in this case establish any basis for Defendants' assertion that FCCW medical staffing at a certain level, in and of itself, justifies an inference of quality medical care.[1] And the firsthand accounts of class members continue to tell a much different story.

Nurse staffing in the infirmary continues to be insufficient to meet patient needs. Class members consistently report that nurses fail to respond to calls for assistance in a timely manner and often turn off the call button without responding. At times, there is only one nurse in the infirmary without regard to the number of patients housed there. Other patients are not given basic nursing care, but instead are expected to fend for themselves. For example, Rashanda Walker had

---

[1] Section 111.b.2.i of the Settlement Agreement expressly requires FCCW to "establish and maintain a sufficient number of health staff . . . as shall be necessary to provide inmates with adequate and timely evaluation and treatment, including continuity and coordination of care."

3

to bandage her own infected radiation burns in the infirmary because no nurses were there to help her. *See* Ex. C, Declaration of Rashanda Walker dated May 4, 2022 (hereinafter "Walker Declaration"), ¶ 7. The single nurse who previously helped her with bandages is no longer at FCCW. *Id.* Ms. Walker also reports horrific conditions in the infirmary in general, where no staff members clean or sterilize the dirty showers, clean up old blood and food on the floor, or do anything to address ant infestations. *Id.* at ¶ 10. Ms. Walker reports hearing other patients in the infirmary crying out because they are not receiving care. *Id.* at ¶ 13. These reports are consistent with what other class members have been reporting to Plaintiffs' counsel for years, and are consistent with conditions reported by the Monitor in his previous report.

### III. FCCW'S RECENT POLICIES VIOLATE THE SETTLEMENT AGREEMENT

    A.    <u>Medical Appointments</u>

In mid-to-late February 2022, Plaintiffs' counsel were alerted by several class members that a new written notice, prominently posted and displayed in the waiting areas of the medical clinic as well as inside exam rooms, threatened women with disciplinary action in the event that any patient attempted, in the course of an appointment, to raise any medical care need or issue *other than* that for which they were being seen. Specifically, the Notice (true and correct copy attached hereto as Ex. D) in language and format, appeared, in pertinent part, as follows:

**ALERT**

EACH PROVIDER APPOINTMENT IS FOR A SPECIFIC REASON (SICK CALL, FOLLOW UP, PENDING APPOINTMENT, ETC.)

IF A PATIENT USES ONE OF THESE APPONTMENTS FOR ANOTHER REASON, YOU WILL BE CHARGED WITH:

206– Lying or giving false information to an employee.

        AND/OR

>205– Intentionally delaying, hindering, or interfering with an employee in the performance of duties.

SICK CALLS MUST BE WRITTEN FOR NEW MEDICAL COMPLAINTS.

The class members who saw and read this Notice understandably perceived it to mean that, if a new or worsening issue of medical concern arose between the time when they filed a Sick Call request and when they were actually seen in the Clinic, they could mention the new concern only at peril of being "written up" and subjected to disciplinary proceedings. While it is unclear whether any patients have received a disciplinary charge for either of the specific infractions listed in the notice, several patients have actually either been "written up" by a medical provider, or have been threatened with disciplinary charges under the policy described in the Notice. *See* Ex. E, Declaration of Anna Stogoski dated May 9, 2022, (hereinafter "Stogoski Declaration"), at ¶¶ 3-7 (describing an incident in which Dr. Stich wrote Ms. Stogoski up, citing vulgar and insolent language, when she asked him to find the outstanding results of her bloodwork at an appointment regarding her request for vitamins); Ex. F, Declaration of Angel Tanner dated April 4, 2022 (hereinafter "Tanner Declaration"), at ¶¶ 4-5 (describing two instances in which Nurse Casen threatened to give Ms. Tanner a disciplinary charge for bringing up related medical concerns, such as hyperthyroidism and increased pulse issues, in the same appointment); Ex. G, Declaration of Joyce Reynolds dated April 1, 2022 (hereinafter "Reynolds Declaration"), at ¶¶ 4, 6 (describing (1) an incident in which Nurse Casen threatened to give Ms. Reynolds a disciplinary charge for bringing up pain in her hands and legs during a sick call appointment for blood pressure and diabetes and (2) another incident in which medical staff tried to charge Ms. Reynolds for threatening to kill them – an untrue allegation disputed by a sergeant who was present); Ex. H, Declaration of Regina Watkins dated March 21, 2022 (hereinafter "Watkins Declaration") at ¶ 9

(describing an incident where Dr. Stich threatened a disciplinary charge against another patient for requesting results of blood work at an appointment for a separate issue).

This policy, which Plaintiffs' counsel believe to be the brainchild of the new Acting Assoc. Med. Director, Dr. Stich, flatly and transparently violates the terms of the Settlement Agreement stating that "[p]risoners should have *unimpeded access* to timely medical care at an appropriate level[.]" *Id.* Section III.2.b.vi (emphasis added). As a result of this Notice, class members have become understandably afraid to ask questions or bring up any related symptoms during sick call appointments. Instead, they must now make several different appointments to address their concerns and symptoms, resulting in delayed resolution of those issues. *See* Watkins Declaration ¶¶ 5-7; Reynolds Declaration ¶ 7; Tanner Declaration ¶ 5.

B.  Skin Care Products and Specialty Clothing

More recently, class members reported another posted Notice at FCCW stating: "[p]er DOC policy providers are no longer prescribing or reordering SOAPS, LOTIONS, DEODERANTS, SHAMPOO, BRAS or SHOES. Please use commissary for these items." *See* true and correct copy attached as Ex. I; Walker Declaration ¶ 15. Numerous class members have been prescribed specific creams, ointments and lotions as an element of their care and treatment for serious medical needs, such as psoriasis and eczema. FCCW's sudden, unilateral determination to cease either prescribing or reordering skin care products, and to require class members to pay for them (assuming patients can afford them, and assuming those products are available from commissary at all), clearly violates Section III.2.b.xii of the Settlement Agreement, which states in pertinent part:

> Medication services shall be clinically appropriate, and medications shall be provided in a timely safe, and sufficient manner, including continuity of medication on intake and renewal of prescriptions whenever clinically appropriate.

The blanket refusal to provide an entire category of medical products necessary to treat and manage diagnosed medical conditions plainly violates this standard.

## IV. MEDICATION ADMINISTRATION

As described extensively in Plaintiffs' previous status reports, class members continue to experience interruptions in medications and delays in receiving new prescriptions. Some of these issues stem from a new practice instituted by Dr. Stich, in which providers write prescriptions for only 30 days of medication at a time. Patients then have to request sick call appointments to have their prescriptions renewed. However, women are afraid to bring up medication renewal requests at appointments for other issues because of the threatened disciplinary action discussed in Section IV.A, *supra*, resulting in additional delays while they file a new sick call and wait to be seen. Watkins Declaration ¶¶ 12, 5.

Dr. Stich is also requiring a new approval request every time a provider renews a prescription for non-formulary medications. Due to the time it takes for those prescriptions to be approved, patients often experience interruptions in their receipt of those medications. *See* Watkins Declaration ¶¶ 11-12.

Finally, several class members report not receiving their prescribed medications in a timely manner or at all. In one example, Ms. Walker, who was undergoing radiation treatment for breast cancer, was prescribed Aquaphor to use prior to treatments to protect her skin. She did not receive the Aquaphor, and about two weeks into her treatment, she developed radiation burns on her skin. Walker Declaration ¶ 6. Those burns were extremely painful and ultimately got infected, requiring her to stay in the infirmary for seven days. *Id.* Ms. Walker also did not receive her prescribed pain medication and radiation cream until she was in the infirmary for her radiation burns. *Id.* at ¶ 7.

## V. DIAGNOSIS AND TREATMENT

Based on the Monitor's draft report, FCCW appears to be noncompliant in the area of diagnosis and treatment. Areas of concern based on the Monitor's assessments include pain management, diagnosis and treatment for opiate use disorder, and screening for lung cancer. The Monitor observed that FCCW does not adequately screen patients for risk of lung cancer, and does not offer adequate treatment for patients with opiate use disorder.

In addition to these areas of diagnosis and treatment that are currently neglected by FCCW, policies like those discussed herein, and the treatment that patients receive by providers like Dr. Stich and Nurse Casen, impose barriers to care that can result in negative outcomes for patients. Plaintiffs' counsel has received reports that patients are refusing needed medical appointments rather than see Dr. Stich. After her experience with Dr. Stich, Anna Stogoski filed a written complaint asking not to see him in the future, noting that she did not feel safe with him as her provider. Ex. E, Stogoski Decl. at Ex. C, Written Complaint.

## VI. DEFENDANTS' QUARTERLY REPORT AND PRODUCTION

Section III.2.b.xxi. of the Settlement Agreement imposes, in pertinent part, the following requirements upon FCCW with respect to its obligation to ensure – *and demonstrate* – improvement in the quality of the medical care provided at the facility over time:

> FCCW shall measure its performance on each aspect of the obligations imposed by this Settlement Agreement. This measurement shall be quantitative, based on focused or comprehensive medical record review where applicable . . . .
>
> In addition, the quality management program shall consider data from mortality reviews, grievance analyses, and any patient satisfaction surveys.
>
> Data shall be analyzed qualitatively so as to identify opportunities for improvement and identify remedies. Performance shall be tracked and trended over time and shared with the Parties through counsel on a quarterly basis[.]

A little over two years ago, on March 5, 2020, Plaintiffs filed a Motion seeking enforcement of the foregoing requirements of the Settlement Agreement, noting that the Defendants were simply failing to fulfill their reporting obligations under Section III.2.b.xxi. *See generally* ECF No. 652. In this submission, Plaintiffs noted that, absent reporting by Defendants in full accord with Section III.2.b.xxi., they had "no sources of information regarding conditions at FCCW except for the Compliance Monitor's reports and the information they can glean from interviews with individual class members," and that such a dearth of meaningful information was inconsistent with what the Settlement Agreement expressly contemplated. ECF No. 652 at 7.

The Court, following full briefing of Plaintiffs' Motion and oral argument, largely agreed with Plaintiffs' advocacy, granting their Motion in substantial part based on the following analysis:

> To be sure, the key sentence in dispute in § III(2)(b)(xxi) is written in the passive tense: "Performance shall be tracked and trended over time and shared with the Parties through counsel on a quarterly basis while this Settlement Agreement is in effect." But, significantly, no other actor in this section is described measuring FCCW's "performance" besides FCCW. Just FCCW. Since, at the beginning of the section, FCCW is responsible for "measur[ing] its performance," it stands to reason that later in the section, FCCW is responsible for performance "track[ing] and trend[ing] over time and shar[ing]" such information "with the Parties through counsel on a quarterly basis . . ."

*See* Memorandum Opinion at 6 (ECF No. 677). Moreover, as regards the *specific kind of information* FCCW must share with Plaintiffs on a quarterly basis, the Court went on to hold as follows:

> Under the Settlement Agreement, FCCW's analysis of its own performance must have both "quantitative" and "qualitative" components. FCCW's measurement "shall be quantitative, based on focused or comprehensive medical record review where applicable," and such "measures shall be approved by the Compliance Monitor." It should "consider data from mortality reviews, grievance analyses, and any patent satisfaction surveys." Moreover, such data "shall be analyzed qualitatively so as to identify opportunities for improvement and identify remedies."

> In other words, § III(2)(b)(xxi) requires FCCW to measure its performance on "each aspect of the obligations" imposed by the Settlement Agreement based on quantitative data (mortality reviews, grievance analyses, and patient satisfaction surveys), and qualitative analysis of that data identifying opportunities for improvement and remedies for shortcomings. *FCCW must "track and trend[]" its performance and share that data with the Parties through counsel on a quarterly basis*.

ECF No. 677 at 7-8 (emphasis added).

Considered against this Court's full explication of Defendants' reporting duties under Section III.2.b.xxi. of the Settlement Agreement, the patently deficient nature of Defendants' Quarterly Reports – including but not limited to their most recent Quarterly Report dated May 2, 2022 – is laid bare.

As a threshold matter, Defendants' most recent Quarterly Report does not reflect FCCW's measurement of its performance on "'each aspect of the obligations' imposed by the Settlement Agreement" as the Court ordered; on the contrary, the Report expressly disclaims any intention on Defendants' part to do so. *See* May 2, 2022 Quarterly Report at 9 ("[I]t will not highlight the audits and it is not meant to be a comprehensive documentation of all quality improvement, quality assurance, surveillance, performance management or other activities."). Particular subjects of compliance measurement under the Settlement Agreement *which are not addressed at all* in the May 2022 Quarterly Report include Diagnosis and Treatment of Offender Illnesses (No. 6) and Follow-up Care in Accordance with Outside Specialists' Instructions (No. 14).

In their status report filed August 25, 2021, Defendants included a set of metrics and stated that FCCW was conducting studies using those metrics to "study and assess compliance with the Settlement Agreement standards." ECF No. 842 pp. 3-4 and Appendix 1. The Quarterly Reports produced by Defendants thusfar fail to include many of these metrics – indicating that either Defendants are not actually conducting routine audits of all such metrics, or that they are not

10

reporting all of their self-evaluation activities to Plaintiffs. In either event (or both), they are failing to comply with this provision of the Settlement Agreement.

Beyond the fact that the May 2022 Quarterly Report is incomplete, it is also inadequate in its failure to reflect *either* the tracking and trending of FCCW's performance "over time" *or* any genuinely *qualitative* assessment of its performance with respect to the audited elements of medical care it purports to address. In virtually all instances, the Quarterly Report details the findings yielded by the audits conducted as against the metrics measured only for the first three months of 2022; with minor exceptions, it does not compare those findings with results from prior quarterly evaluations during the time that the Settlement Agreement has been in effect. Likewise, while the Quarterly Report may shed light on the quantitative aspects of FCCW's performance of its obligations under the Settlement Agreement, any actual information about the quality of its performance is conspicuous by its absence. As but one example, the Report's representation that "[i]n the first two months of 2022, 45 of 50 patients [requesting Sick Call] were seen within 3 business days or 90 percent," (*id.* at 26), provides no basis whatsoever for assessing the substance of those encounters or whether the class members who were seen left those appointments feeling that their concerns were noted and understood and that their needs were met – *i.e.*, the kind of information that a patient satisfaction survey might yield if one were actually undertaken.

## VII. PRE-HEARING MEETING

As referenced above, the Parties convened by video conference on April 28, 2022 pursuant to this Court's June 16, 2021 Order (ECF No. 833). Due to a conflicting obligation, the Compliance Monitor was unable to participate. Although Plaintiffs' counsel provided an Agenda to Defendants well in advance of the meeting, identifying the subjects about which they hoped to obtain information, Defendants' counsel read from narrowly pre-scripted responses and were either unwilling or unable to engage further.

11

When counsel for the Parties and Dr. Venters met and conferred on December 20, 2021 in anticipation of the February 7, 2022 Status Hearing, Defendants indicated that VDOC hoped to choose a vendor and begin negotiating a contract to design and implement an Electronic Medical Record (EMR) for VDOC by the end of January 2022.  *See* Plaintiffs' January 2022 Status Report at 12 (ECF No. 854).  Defendants reported during the Parties' April 28 Pre-Hearing Meeting only that "the procurement process is continuing," and that VDOC is expected to issue a "Notice of Intent to Award" sometime within the next three months. Defendants' counsel was unable to provide any further clarification on whether a vendor had been selected, or when VDOC expected a vendor to begin building and implementing the EMR.

While Defendants' counsel claimed openness to receiving follow-up questions from Plaintiffs after the meeting, Plaintiffs' list of questions, transmitted within a matter of hours after the meeting concluded remains unanswered. Ex. A, Email from G. Greenspan dated April 28, 2022.

## VIII.   CONCLUSION

In conclusion, Plaintiffs' counsel continues to receive serious reports of systemic and individual failures in the medical care provided at FCCW. In addition, the Defendants have resumed a position that appears to be antagonistic to sharing information – hindering the ability of the parties to work cooperatively to move this case toward resolution.

DATED: May 20, 2022

Geri M. Greenspan, VSB No. 76786
(ggreenspan@huntonAK.com)
HUNTON ANDREWS KURTH LLP
1000 Preston Ave., Suite A
Charlottesville, VA 22903
(804) 788-8651

Respectfully submitted,

Theodore A. Howard (*pro hac vice*)
(thoward@wiley.law)
WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

| | |
|---|---|
| Jacqueline Kutnik-Bauder (*pro hac vice*) (jacqueline_kutnik-bauder@washlaw.org) Ashika Verriest (*pro hac vice*) (ashika_verriest@washlaw.org) WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND UUBAN AFFAIRS 700 14th Street, NW, 4th Floor Washington, DC 20005 (202) 319-1000 | Angela Ciolfi, VSB No. 65337 (angela@justice4all.org) LEGAL AID JUSTICE CENTER 1000 Preston Ave., Suite A Charlottesville, VA 22903 (434) 977-0553<br><br>Deborah M. Golden (*pro hac vice*) (dgolden@debgoldenlaw.com) THE LAW OFFICE OF DEBORAH M. GOLDEN, PLLC 700 Pennsylvania Ave., SE, 2nd Floor Washington, DC 20003 (202) 630-0332 |

By: */s/ Theodore A. Howard*
 Theodore A. Howard

*Attorneys for Plaintiffs Cynthia B. Scott, et al.*

**CERTIFICATE OF SERVICE**

    I hereby certify that on this 20th day of May, 2022, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

    /s/ Geri Greenspan