IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CYNTHIA B. SCOTT, et al., | ) |
|     Plaintiffs, | ) |
| v. | )    Case No. 3:12-cv-36 |
| HAROLD W. CLARKE, et al., | ) |
|     Defendants. | ) |

## DEFENDANTS' MAY 2022 STATUS REPORT

Defendants, by counsel, pursuant to the Court's March 16, 2020, Order, ECF No. 655, submit this Status Report in advance of the upcoming Status Conference scheduled for June 16, 2022. Pursuant to the Court's Order, this Status Report addresses:

> . . . areas in which the Compliance Monitor has found Defendants (1) currently non-compliant with the Settlement Agreement; (2) persistently only in partial compliance; and (3) areas where Defendants' compliance has been "downgraded" by the Compliance Monitor. For any such areas, the status reports shall address any discrete, concrete steps Defendants have taken or which can be taken to improve compliance.

ECF No. 655.

On May 18, 2022, the Compliance Monitor submitted a draft of his Third Monitoring Report, which was his second report regarding FCCW's compliance with the Settlement Agreement. The Compliance Monitor assessed FCCW's performance regarding the following Standards from the Settlement Agreement: Provider Staffing (standard III.2.b.i), Co-Pay (standard III.2.b..v), Diagnosis and Treatment (standard III.2.b.vi); Emergency Response (standard III.2.b.vii), Infirmary Care/Conditions (standard III.2.b.viii), Infectious Disease/Waste (standard III.2.b.x), Utilization Management (standard III.2.b.xi), Medical Equipment (III.2.b.xiii), Medical Grievances (III.2.b.xv),



- 1 -

629.0303\NHS
4867-7941-7635 .v4

Training (standard III.2.b.xviii), Care/Release of Terminally Ill (standard III.2.b.xix), Performance Measures and Comprehensive Quality Improvement ("CQI") (standard III.2.b.xxi), and Performance Evaluation (III.2.b.xxii). The Compliance Monitor concluded FCCW was noncompliant in the areas of Diagnosis and Treatment, Medical Equipment, and Performance Evaluation. He concluded FCCW was compliant as to the remaining standards assessed. Thus, after two rounds of monitoring by the current Compliance Monitor, the status of FCCW's compliance with the Settlement Agreement can be summarized as follows:

| Standard | Prior Monitor | Current Monitor |
|---|---|---|
| Provider Staffing (III.2.b.i) | Compliant (10/20) | Compliant (5/22) |
| Intake screening (III.2.b.ii) | Compliant (10/20) | Compliant (10/21) |
| Comprehensive health assessments (III.2.b.iii) | Compliant (10/20) | Compliant (10/21) |
| Sick call/Access (III.2.b.iv) | Not compliant (10/20) | Not compliant (10/21) |
| Co-Pay (III.2.b.v) | Compliant (10/20) | Compliant (5/22) |
| Diagnosis and treatment (III.2.b.vi) | Compliant (10/20) | Not compliant (5/22) |
| Emergency response (III.2.b.vii) | Compliant (10/20) | Compliant (5/22) |
| Infirmary care/conditions (III.2.b.viii) | Compliant (10/20) | Compliant (5/22) |
| Chronic care (III.2.b.ix) | Not compliant (10/20) | Not compliant (10/21) |
| Infectious disease/waste (III.2.b.x) | Compliant (10/20) | Compliant (5/22) |
| Utilization Management (III.2.b.xi) | Compliant (10/20) | Compliant (5/22) |
| Medications (III.2.b.xii) | Not compliant (10/20) | Compliant (10/21) |
| Medical equipment (III.2.b.xiii) | Compliant (10/20) | Not compliant (5/22) |
| Physical therapy (III.2.b.xiv) | Compliant (10/20) | Compliant (10/21) |
| Medical grievances (III.2.b.xv) | Compliant (10/20) | Compliant (5/22) |
| Patient access to care information (III.2.b.xvi) | Compliant (10/20) | Compliant (10/21) |


FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4867-7941-7635 .v4

| Accommodation for special needs (III.2.b.xvii) | Not compliant (10/20) | Not compliant (10/21) |
| --- | --- | --- |
| Training (III.2.b.xviii) | Not compliant (10/20) | Compliant (5/22) |
| Care/release terminally ill (III.2.b.xix) | Compliant (10/20) | Compliant (5/22) |
| Mortality Reviews (III.2.b.xx) | Compliant (10/20) | Compliant (10/21) |
| PM/CQI (III.2.b.xxi) | Compliant (10/20) | Compliant (5/22) |
| VDOC Performance evaluation (III.2.b.xxii) | Compliant (10/20) | Not compliant (5/22) |
| Operational protocols/policies | Compliant (10/20) | Compliant (5/22) |

## I. Update Regarding COVID-19

As the rest of the country saw another upswing in positive COVID cases this Spring, so too did FCCW. In late-April to early May, FCCW identified positive COVID cases and implemented COVID protocols generally described in prior status reports (as updated to reflect best practices). There was a total of 151 positive cases among inmates. There were no hospitalizations and no deaths. As of Monday June 6, the facility had no positive cases.

## II. Response to Compliance Monitor's Prior Findings of Noncompliance.

The Compliance Monitor's previous report concluded that Defendants were noncompliant in the areas of sick call, chronic care, and accommodations for people with special needs. Although the Compliance Monitor did not reassess these standards as part of his most recent visit, Defendants offer the following updates.

### a. Sick call

The Compliance Monitor found FCCW noncompliant with this standard based on his conclusions that "abnormal vital signs were documented but not addressed" and



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

"inadequate assessments and plans for problems reported by patients."[1] FCCW continues to measure its compliance with this standard based on the Settlement Agreement's express language, which addresses the *timing* of the facility's response to non-emergency requests, urgent problems or deterioration of chronic conditions, and continuity of medications when sick call requests concern lapses in prescribed medication.

The average number of face-to-face patient encounters per month during the first quarter of 2021 was 735. FCCW continues to see patients within three business days of submission of sick call requests. Defendants have made sick calls part of the medical chart as requested by the Compliance Monitor, which requires constant updating due to the number of sick calls.

b. **Chronic care**

The Compliance Monitor previously found FCCW noncompliant with this standard based on four out of nineteen encounters representing "instances in which a key element of the encounter, such as medications or blood pressure readings for a patient with hypertension, were not reviewed or documented." The Compliance Monitor also noted that "chronic care . . . simply cannot be provided adequately without an electronic medical record."

Since that report, FCCW has provided additional training to CNAs on standard rooming and discharge process to aggregate patient information, prepare charts, and obtain testing to facilitate more effective chronic care encounters. See **Ex. A**, Targonski Decl., *2.[2] FCCW's own audit of this metric continues to demonstrate that chronic care



---

[1] As previously noted, ECF No. 853, *3–4, the Compliance Monitor's measurement of this standard did not comport with the clear language of the Settlement Agreement for this standard.
[2] Unless otherwise noted, evidentiary support for this Status Report is contained in Dr. Targonski's Declaration.

- 4 -

management continues on target with 90+% of audited encounters achieving the cumulative metric for appropriate laboratory testing, surveillance examination, quality of encounter, and follow-up for suboptimal control.

    c. **Accommodations for People with Special Needs**

The Compliance Monitor previously found FCCW noncompliant with this standard based on the need for additional assistive devices in the infirmary, documentation of repositioning of bedbound patients, linen changes, and toileting, and out of cell time for inmates in the mental health unit.

As noted in their previous status report, Defendants installed the requested assistive devices in the infirmary. In addition, part of the overall and infirmary orientation training addresses patients with special ambulatory or toileting needs, and this training is reinforced with staff, including documentation of repositioning, toileting, bathing, linen changes, and skin checks.

As to the mental health wing, there are three specialty mental health living units at FCCW: the Acute Unit (2A), the Residential Mental Health Unit (2B), and the Mental Health Supported General Population Wing (2E). FCCW currently has 1 specialty treatment officer that supports the mental health unit. In addition to the qualified mental health professionals on staff at FCCW, FCCW also employs a Group Technician and Wellness Coordinator. These two individuals provide support to the mental health wing and are heavily involved in:

- Stability assessments through Rounds with the treatment officer, typically daily
- Gathering information from night shift staff and updating MH staff on inmate behaviors, daily
- Provision of various psychosocial activities that promote treatment goals
- Assisting and/or supervising out-of-cell free time and meals, as needed
- Supervising yoga and exercise


FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 5 -

629.0303\NHS
4867-7941-7635 .v4

- Assisting and/or supervising daily recreation
- Facilitating commissary-related tasks (assisting with ordering, reviewing orders, ensuring they are delivered to inmates)
- Responding to events on the units as needed
- Overseeing the delivery of treatment incentives
- Creating and providing inmates with wellness packets & self-help materials
- Supervising inmate MH assistants in the provision of their job responsibilities
- Overseeing room-cleaning activities weekly
- Monitoring ADLs as related to treatment goals and/or societal norms
- Coordinating and leading Community meetings
- Acting as a Role Model and Coach to assigned inmates

Additionally, the Group Technician and Wellness Coordinator are responsible for developing and delivering other therapeutic tasks currently in various stages of implementation, such as educational groups (current events, topic-related); collaboration with Division of Education for GED- and library-related learning; structured Wellness training/education curriculum (hygiene, housekeeping, financial planning, transition to less structured environment); supervision of increased activity from yoga instructors & other wellness-related workers; and alternate therapeutic activities still in development (horticulture, butterflies, worm farming/composting).

### III. **Response to Compliance Monitor's Findings of Noncompliance.**

The Compliance Monitor's draft report concluded Defendants were noncompliant in the areas of Diagnosis and Treatment, Medical Equipment, and Performance Evaluation. The Compliance Monitor also indicates that he no plans to rate FCCW, where applicable, as "'not compliant' going forward, to include and replace the use of 'noncompliant' and 'partially compliant.'"

    **a. The Settlement Agreement Requires Evaluation of the Standards Based on a Rating of Compliant, Noncompliant, or Partially Compliant.**

The Compliance Monitor's decision to change the evaluation rankings for Defendants' compliance with the Settlement Agreement is in derogation of the express



- 6 -

language of the Settlement Agreement and this Court's Order, ECF No. 655. Section IV.2.c. of the Settlement Agreement expressly provides that "the Compliance Monitor shall rate the Defendant as non-compliant, partially compliant or fully compliant with the obligations contemplated in Section III above." Moreover, the Court's Order, ECF No. 655, expressly provides that the parties must "address areas in which the Compliance Monitor has found Defendants . . . persistently only in partial compliance" with the Settlement Agreement. ECF No. 655, *2.

The Settlement Agreement is a contract, ECF No. 544, at *47, and this decision by the Compliance Monitor improperly rewrites the Settlement Agreement's terms. And it does so to the detriment of the Defendants and to the benefit of the Plaintiffs. This is now at least the second example of the Compliance Monitor ignoring express language in the Settlement Agreement. This unilateral decision, by a nonparty to the contract, is beyond any power or authority vested in the Compliance Monitor and should not be permitted by this Court.

**b. Diagnosis and Treatment**

The Compliance Monitor concluded FCCW was noncompliant with this standard based on a review of patient records showing a diagnosis of opiate use disorder without "any record of effort to provide treatment" and the lack of any indication that patients with clear and extensive smoking histories had been identified for low dose CT scans of the chest.

As to the treatment of opiate use disorder, the Compliance Monitor correctly noted that FCCW does provide naltrexone when clinically indicated. This contradicts the Compliance Monitor's own statement that FCCW has no "record of effort to provide



- 7 -

629.0303\NHS
4867-7941-7635 .v4

treatment."[3] Dr. Targonski has also previously consulted with the University of Virginia and consulting treatment centers to provide MAT for patients using both Subutex and methadone. In addition, the Compliance Monitor states that naltrexone is "often less preferred *by patients*." (emphasis added). The Compliance Monitor does not assert or otherwise indicate that naltrexone is any less *effective* at treating opiate use disorder. In fact, naltrexone is one of three medications approved by the Food and Drug Administration to treat both alcohol use disorder and opioid use disorder.[4] Naltrexone is not an opioid, is not addictive, does not cause withdrawal symptoms with stop of use, and does not have euphoric effects. There is no abuse and diversion potential with naltrexone, and it does not require a special certification or waiver for a provider to prescribe it. Buprenorphine and methadone, by contrast, do carry higher risks of abuse and diversion, and both require a special certification or waiver in order to be dispensed.

Nonetheless, Defendants are finalizing a pilot program that will institute full-scale medication assisted treatment for opioid use disorder. Under this protocol, FCCW will continue to offer naltrexone for MAT but will also offer, as appropriate, vivitrol (long-acting naltrexone), buprenorphine, and methadone once the appropriate certifications and waivers are obtained by designated FCCW providers.[5] Implementation of the pilot program is expected to start this summer with full implementation by early fall. Dr.

---

[3] 2019 data suggests that only 35% of persons with OUD have received treatment within the past year (Jones CM, McCance-Katz EF. Co-occurring substance use and mental disorders among adults with opioid use disorder. Drug and Alcohol Dependence. 2019;197(1):78–82. 10.1016/j.drugalcdep.2018.12.030.) and only 28% of those who have overdosed on opioids receive MAT (D'Onofrio G, O'Connor PG, Pantalon MV, Charawski MC, Busch SH, Owens PH, Bernstein SL, Fiellin DA. Emergency department–initiated buprenorphine/naloxone treatment for opioid dependence: A randomized clinical trial. JAMA. 2015;313(16):1636–1644.).

[4] MAT Medications, Counseling, and Related Conditions, Substance Abuse and Mental Health Services Administration, https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions (last accessed June 9, 2022).

[5] This program was in the development stage prior to receipt of the Compliance Monitor's draft report.

629.0303\NHS
4867-7941-7635 .v4

Targonski has already instructed providers to obtain their buprenorphine waiver to continue treatment for patients with substance use disorder when they come from jails on a treatment plan. Dr. Targonski has applied for his X waiver for MAT prescribing.

The Compliance Monitor also states in his draft report that "the screening for lung cancer is an area where clearly established evidence practice is absent in FCCW." Again, this statement is erroneous. The Virginia Department of Health recommends low-dose computed tomography (LDCT) screening for those individuals who have smoked the equivalent of one pack of cigarettes a day for 30 years or two packs of cigarettes a day for 15 years.[6] Currently, FCCW has only 111 patients over the age of 55. FCCW began screening in 2021, following publication of guidelines for screening and continues to evolve the practice. In March, prior to the Compliance Monitor's most recent visit, Dr. Targonski screened 100 patients (10.5% of population) during chronic care visits, 10 of whom were eligible for LDCT. All ten were offered and 8 accepted. The proportion screened at 10.5% of the total FCCW population is well within the range of proportion screened in the studies cited by the United States Preventative Services Task Force (6.5% - 18.1% by state, for example)[7] despite the absence of specific implementation guidelines for correctional settings; the absence of Federal Bureau of Prisons guidelines for use of LDCT and lung cancer screening in its current preventive service guidelines;[8] the known worse screening rates in racial, ethnic and socioeconomic groups nationally suffering health disparities from which FCCW's population largely originates, and the absence of effective national programming for LDCT lung cancer screening (USPSTF cites the need for implementation research in this area). These data suggest that FCCW is in fact not

---

[6] https://www.vdh.virginia.gov/content/uploads/sites/65/2017/06/Cancer-ScreeningFlyer.pdf
[7] https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/lung-cancer-screening
[8] https://www.bop.gov/resources/pdfs/phc.pdf

629.0303\NHS
4867-7941-7635 .v4

only compliant in this area but likely leading national efforts at offering state of current evidence health screening to its patient population.

### c. Medical Equipment

The Compliance Monitor found FCCW "not compliant" with this standard based on two women who reported problems with access to disability related equipment and responses to requests/grievances regarding durable medical equipment ("DME").

One of the patients referenced by the Compliance Monitor had an ongoing issue with her hearing aids. The patient arrived at FCCW in March 2021 with hearing aids that were so old they used batteries weekly, and the batteries were not easily obtainable because of the age of her equipment and a lack of demand for those particular batteries. FCCW sent the patient to audiology for a hearing test on November 4, 2021, a hearing aid consult on November 8, 2021, and a fitting on January 4, 2021. She received new hearing aids on March 7, 2022. Although it took approximately four months to complete this process, FCCW was at the mercy of the University of Virginia Health System schedulers to estimate this patient's urgency.

The other patient referenced by the Compliance Monitor complained of missing arm and footrests for her wheelchair, as well as her walker "when she was transferred from medical isolation for COVID-19." Dr. Targonski specifically addressed this issue, while meeting with patients in the Red Zone for isolation for COVID-19. On first impression, Dr. Targonski also agreed that having missing parts was unsatisfactory and immediately addressed the problem by having the necessary parts delivered to the patient. Upon further investigation, however, Dr. Targonski consulted with the Physical Therapy staff who advised that they had recommended that the arm and footrests be removed due to the patient's compression neuropathy in her wrist. As it turns out, the


FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 10 -

629.0303\NHS
4867-7941-7635 .v4

patient was *worsening* her condition by using the arm rests and by propelling herself with her arms while in the wheelchair instead of using her feet as instructed by physical therapy staff. The walker presented the same concerns as the patient's weightbearing on the wrists worsened her compression neuropathy.

The Compliance Monitor also referenced instances regarding alleged delays in receipt of braces that had been ordered but not yet received at the facility. Prior to the Compliance Monitor's report, FCCW instituted a new step in the DME registry to improve monitoring and coordinate on supply chain issues (as this issue was result of delayed receipt, not delayed ordering by FCCW staff). It goes without saying that supply shortages since the pandemic have affected industries and individuals across the country and is not unique to FCCW.

### d. Performance Evaluation

The Compliance Monitor rated FCCW as not compliant with this standard based on the lack of performance reviews for contract staff. This finding was based on an inadvertent oversight by FCCW in responding to the Compliance Monitor's requests for information prior to drafting the most recent report. Agency providers participate in the peer review process along with VADOC providers and are summarized in ACA audit reports when critiquing and sharing this information. Agency providers also undergo the same monthly performance review on practice and quality monitoring and their performance data are routinely shared with them at weekly provider meetings that address utilization management, medication use, and practice metrics. Thus, FCCW does conduct performance reviews on contract providers and anticipates that the Compliance Monitor will find FCCW compliant in regard to this standard.

### IV. **Response to Plaintiff's Status Report**

- 11 -

629.0303\NHS
4867-7941-7635 .v4

The "Declarations" submitted with Plaintiffs' Status Report again fail to comply with 28 U.S.C. § 1746 despite the fact that they purport to have been reviewed weeks or months prior to the filing of Plaintiffs' May 20, 2022, Status Report. In addition, Regina Watkins again falsely contends that she "was a Registered Nurse," but Defendants have found no records substantiating that assertion. See **Ex. B**.

***Staffing:*** FCCW continues to work closely with the Human Resources Department and with employment agencies to make certain there are candidates in the pipeline in the event that additional staff are needed, but the practice also continues to evolve efficiencies that offset the need for extra staff and will continue to do so consistent with best QI and best practice philosophy. FCCW has routinely met its obligation to maintain at least 78 staff on the schedule for several years, including the number of full-time equivalent registered nurses.

***Notice:*** The notices regarding providing appointments were first posted in early February as an attempt to protect the clinic, staff, and patients from inappropriate overutilization (one of the requirements of the Settlement Agreement) of clinic access as a result of patients repeatedly misrepresenting, and sometimes admittedly falsifying, complaints, which has become increasingly more common since the suspension of copay (i.e., clinic visits requested under false pretenses).

The notices were a pilot CQI project to protect access for patients with medical issues and was undertaken after proposal by clinic staff and review by overall medical staff, security, building staff and patients themselves. Plaintiffs' counsel were informed of this before submitting their Status Report but still contend their erroneous belief that the poster was the product of Dr. Stich. Expectations were low but the project reflected the priorities of both staff and patients and thus proceeded. Like most CQI projects (70-90%



- 12 -

629.0303\NHS
4867-7941-7635 .v4

of CQI projects fail), this approach had no measurable impact on sick calls submitted, clinic patients seen, emergency grievances, emergency medical responses, or patient complaints via IMS. There were 867 clinic visits in February (substantially similar to the average number for all of 2021, which was 880 visits per month), so there appears to be no objective evidence that the signs had any measurable impact on inmates' access to health care. In turn, there appeared to be no measurable change in behavior among those who repeatedly misrepresent their conditions either. So, the signs were removed.

There was only one instance when a patient was written up for a violation, but security staff decided not to process that charge. There was not a single informal complaint or grievance submitted about the notice. A random survey of clinic patients found less than fifteen percent were even aware of the notice, and none indicated any concern regarding messaging. The number of sick call requests remained relatively static during this time as well, which also indicates the posters had no effect on access. Moreover, chart reviews demonstrate that inmates have multiple issues addressed at all visits, and the schedulers combine visits so people can get multiple issues addressed at one visit (*i.e.*, lab, outside appointment and sick call). The Compliance Monitor also noted that his review of visits demonstrated that they were multifactorial—people were seen for multiple complaints and issues simultaneously regardless of the visit type or chief complaint—in his discussion with Dr. Targonski about diagnosis and treatment audits.

***Complaints regarding Dr. Stich and Nurse Practitioner Cason:*** Ms. Stogoski admitted during her disciplinary hearing that she called Dr. Stich "stupid" and that Dr. Stich "did not know what he was doing." This admission is contained in the audio recording of the hearing. See **Ex. C**. Those statements were the basis for the charge against her. In addition, Stogoski's pharmacy report demonstrates that Dr. Stich (contrary to

- 13 -

other "declarants'" assertions) has written her multiple prescriptions for 90 days or beyond (as recently as May 5, 2022, and May 12, 2022). Angel Tanner contradicts herself in her own declaration by claiming that Cason remains behind her desk during visits but also admitting that Cason evaluated her neck when Tanner complained of neck pain. The clinic notes also document that Cason completed the exam. Rashanda Walker's medication report demonstrates that Dr. Stich has prescribed medications for beyond 90 days (as recently as April 28, May 11, and May 13, 2022). In addition, Walker's oncology note from her visit on 4/18/22 states that there were "no rashes present" on her skin. Moreover, Dr. Stich did not instruct providers to write prescriptions for only 30 days, and he did not have authority to approve non-formulary medications at the time Watkins "reviewed" her "declaration."[9] FCCW continues to prescribe over the counter creams and lotions to patients. Almost 40% of the women at the facility have prescriptions for dermatological agents that FCCW is accused of not providing.

## CONCLUSION

Defendants continue to work collaboratively with the Compliance Monitor as he continues his assessment of FCCW's compliance with the Settlement Agreement and continue to adapt and improve their practice, if not already done so, in the areas focused on by the current Compliance Monitor and not previously addressed by the former monitor.

Respectfully Submitted,

---

[9] Watkins claimed this was said to her in March. But Dr. Stich did not receive authorization to approve non-formulary medications until May 19 as Dr. Targonski would be away from the facility for vacation. Regardless, the approval rate for non-formulary medications is greater than 99% and is typically accomplished within 1-3 days, not weeks.

- 14 -

629.0303\NHS
4867-7941-7635 .v4

HAROLD W. CLARKE, A. DAVID ROBINSON, STEPHEN HERRICK, MARIEA K. LEFEVERS, and PAUL TARGONSKI, M.D., P.H.D., M.P.H.

/s/_____
Katherine C. Londos (VSB #: 36848)
Nathan H. Schnetzler (VSB #: 86437)
FRITH ANDERSON + PEAKE, P.C.
29 Franklin Road, SW
P.O. Box 1240
Roanoke, Virginia 24006-1240
Phone: 540/772-4600
Fax:     540/772-9167
Email: klondos@faplawfirm.com
           nschnetzler@faplawfirm.com

Diane M. Abato
SAAG/Chief
Office of the Attorney General
Criminal Justice and Public Safety Division
202 North 9th Street
Richmond, VA 23219
Phone: 804-786-8191
Fax:     804-786-4239
Email: dabato@oag.state.va.us
*Counsel for Harold W. Clarke, A. David Robinson, Stephen Herrick, Mariea K. LeFevers, and Paul Targonski, M.D., P.H.D. M.P.H.*



629.0303\NHS
4867-7941-7635 .v4

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing to all counsel of record.

/s/ Nathan H. Schnetzler



FRITH ANDERSON +PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4867-7941-7635 .v4