# EXHIBIT A

DocuSign Envelope ID: 71D72944-00C3-4C4A-9987-D9C32069D44D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **CYNTHIA B. SCOTT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:12-cv-36** |
| | ) | |
| **HAROLD W. CLARKE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>DECLARATION OF PAUL V. TARGONSKI, MD, PHD, MPH</u>

Commonwealth of Virginia, City of Charlottesville, to wit:

1.  I have personal knowledge of the facts and matters herein.  Any medical opinions stated herein are stated to a reasonable degree of medical probability.

2.  My *curriculum vitae* has been previously provided to the Court.

3.  On August 25, 2018, I became the Medical Director at the Fluvanna Correctional Center for Women ("FCCW") and continue to serve in that capacity.  I also remain on the UVA medical staff and faculty.

4.  I presently serve as Acting Chief Medical Officer for the Virginia Department of Corrections ("VDOC").

5.  While serving in this dual capacity, I presently spend approximately half the work week on-site at FCCW, and I am frequently present on-site on weekends. In addition, when I am not on-site, I am available by phone and video and regularly attend meetings with FCCW staff via videoconference while working from VDOC's headquarters in Richmond, approximately one hour from FCCW.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 1 -

DocuSign Envelope ID: 71D72944-00F3-454A-997-D9C84069D619

6.   When I am not on-site at FCCW, I have designated Dr. Matthew Stich as the provider-patient point of contact, but I remain available 24/7 by phone and video. In the rare event that I am not immediately available, Dr. Stich, as appropriate and consistent with the FCCW medical leadership structure, may make necessary decisions in the role of acting Medical Director. For example, I recently authorized Dr. Stich to approve non-formulary medications effective May 19 while I was away from FCCW for vacation.

7.   I have not been apprised as to when the Chief Medical Officer position will be permanently filled, but I understand that several individuals have expressed an interest in the position, and VDOC is in the process of reviewing those individuals' credentials.

8.   As a supplement to my prior Declaration filed in this matter and dated January 10, 2022, I provide the following updates as to the areas of Sick Call, Chronic Care, and Accommodations for People with Special Needs:

  a.   Sick Call: as requested by the Compliance Monitor, FCCW maintains patient sick call requests as part of the patient's medical chart.

  b.   Chronic Care: FCCW has provided additional training to CNAs on standard rooming and discharge process to aggregate patient information, prepare charts, and obtain testing to facilitate more effective chronic care encounters. FCCW's own audit of this metric continues to demonstrate that chronic care management continues on target with 90+% of audited encounters achieving the cumulative metric for appropriate laboratory testing, surveillance examination, quality of encounter, and follow-up for suboptimal control.



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 2 -

629.0303\NHS
4870-5770-5252 .v13

c. Accommodations for People with Special Needs: As referenced in the Compliance Monitor's recent draft report, FCCW now has a Treatment Officer assigned to the Mental Health Wing of FCCW. Moreover, the mental health team reports that in addition to the Treatment Officer, a Group Technician and Wellness Coordinator also provide assistance to the mental health staff. The mental health team report that these two positions assist with:

- Stability assessments through Rounds with the treatment officer, typically daily
- Gathering information from night shift staff and updating MH staff on inmate behaviors, daily
- Provision of various psychosocial activities that promote treatment goals
- Assisting and/or supervising out-of-cell free time and meals, as needed
- Supervising yoga and exercise
- Assisting and/or supervising daily recreation
- Facilitating commissary-related tasks (assisting with ordering, reviewing orders, ensuring they are delivered to inmates)
- Responding to events on the units as needed
- Overseeing the delivery of treatment incentives
- Creating and providing inmates with wellness packets & self-help materials
- Supervising inmate MH assistants in the provision of their job responsibilities
- Overseeing room-cleaning activities weekly
- Monitoring ADLs as related to treatment goals and/or societal norms
- Coordinating and leading Community meetings
- Acting as a Role Model and Coach to assigned inmates

9. I also provide the following updates regarding the areas of Diagnosis and Treatment, Continuity in Supply and Distribution of Medical Equipment/Supplies, and Performance Evaluation and Quality Improvement, including Contractor Monitoring and Compliance, beyond expiration of the Settlement Agreement.

**III.2.B.vi. Diagnosis and Treatment**



FRITH ANDERSON + PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 3 -

10. This standard requires that prisoners should have unimpeded access to timely medical care at an appropriate level, including, among other things, adequate pain management for acute and chronic conditions.

11. By its very definition, such as it is, this standard is incredibly vague and subject to myriad interpretations (e.g. "medical care at an appropriate level" and "including, among other things"). Indeed, the current Compliance Monitor has described this standard as "murky" and difficult to assess.

12. The Compliance Monitor's recent draft report rates FCCW as not compliant with this standard.

13. The Compliance Monitor reports that based on his review of patient records there is no effort to provide treatment to patients showing a diagnosis of opiate use disorder and there is a lack of any indication that patients with clear and extensive smoking histories had been identified for low dose CT scans of the chest. This is not correct.

14. As to the treatment of opiate use disorder, the Compliance Monitor correctly noted that FCCW does provide naltrexone when clinically indicated. But the Compliance Monitor also stated that FCCW has no "record of effort to provide treatment."[1] I have also previously consulted with the University of Virginia and consulting treatment centers to provide MAT for patients using both Subutex and methadone. The Compliance Monitor also states that naltrexone is "often less preferred *by patients*." Current evidence does not indicate that naltrexone is less *effective* at treating opiate use disorder than methadone or

---

[1] 2019 data suggests that only 35% of persons with OUD have received treatment within the past year (Jones CM, McCance-Katz EF. Co-occurring substance use and mental disorders among adults with opioid use disorder. Drug and Alcohol Dependence. 2019;197(1):78–82. 10.1016/j.drugalcdep.2018.12.030.) and only 28% of those who have overdosed on opioids receive MAT (D'Onofrio G, O'Connor PG, Pantalon MV, Charawski MC, Busch SH, Owens PH, Bernstein SL, Fiellin DA. Emergency department–initiated buprenorphine/naloxone treatment for opioid dependence: A randomized clinical trial. JAMA. 2015;313(16):1636–1644.).

629.0303\NHS
4870-5770-5252 .v13

FAP
FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

buprenorphine in correctional settings. Naltrexone is one of three medications approved by the Food and Drug Administration to treat both alcohol use disorder and opioid use disorder.[2] Naltrexone is not an opioid, is not addictive, does not cause withdrawal symptoms with stop of use, and does not have euphoric effects. There is no abuse and diversion potential with naltrexone, and it does not require a special certification or waiver for a provider to prescribe it. Buprenorphine and methadone, by contrast, do carry higher risks of abuse and diversion, and both require a special certification or waiver in order to be dispensed. The treatment plan, including the choice of medication, should be based on the patient's clinical needs.

15. VDOC is currently finalizing a pilot program that will institute full-scale medication assisted treatment for opioid use disorder. Under this protocol, FCCW will continue to offer naltrexone for MAT but will also offer, as appropriate, vivitrol (long-acting naltrexone), buprenorphine, and methadone once the appropriate certifications and waivers are obtained by designated FCCW providers.[3] Implementation of the pilot program is expected to start this summer with full implementation by early fall. I have already instructed providers to obtain their buprenorphine waiver to continue treatment for patients with substance use disorder when they come from jails on a treatment plan. I have applied for my X waiver for MAT prescribing.

16. The Compliance Monitor also states in his draft report that "the screening for lung cancer is an area where clearly established evidence practice is absent in FCCW." We



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[2] MAT Medications, Counseling, and Related Conditions, Substance Abuse and Mental Health Services Administration, https://www.samhsa.gov/medication-assisted-treatment/medications-counseling-related-conditions (last accessed June 9, 2022).
[3] This program was in the development stage prior to receipt of the Compliance Monitor's draft report.

629.0303\NHS
4870-5770-5252 .v13

began to screen in 2021, following publication of guidelines for screening and continue to evolve the practice.

17. The United States Preventative Services Task Force ("USPSTF") recommendations for lung cancer screening, as of March 2021, are a B grade.[4] This guidance notes the need for further implementation research to effectively deploy screening in at risk populations, indicating that uptake in not only the community at large is still poor and poorly defined, but is even more so in vulnerable populations. Thus, the expectation of a complete program capturing all patients in a correctional setting is not consistent with evidence or current community practice.

18. Notably, The USPSTF reports that "One recent study using data for 10 states found that 14.4% of persons eligible for lung cancer screening (based on 2013 USPSTF criteria) had been screened in the prior 12 months. (Zahnd WE, Eberth JM. Lung cancer screening utilization: a behavioral risk factor surveillance system analysis. *Am J Prev Med*. 2019;57(2):250-255. Medline:31248742 doi:10.1016/j.amepre.2019.03.015)"

19. The Virginia Department of Health recommends low-dose computed tomography (LDCT) screening for those individuals who have smoked the equivalent of one pack of cigarettes a day for 30 years or two packs of cigarettes a day for 15 years.[5] Currently, FCCW has only 111 patients over the age of 55.

20. In March, prior to the Compliance Monitor's most recent visit, I participated in the screening of 100 patients (10.5% of population) during chronic care visits, 10 of whom were eligible for LDCT. All ten were offered and 8 accepted. The proportion screened at 10.5% of the total FCCW population is well within the range of proportion screened in the



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

---

[4] https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/lung-cancer-screening
[5] https://www.vdh.virginia.gov/content/uploads/sites/65/2017/06/Cancer-ScreeningFlyer.pdf

- 6 -

studies cited by the United States Preventative Services Task Force (6.5% - 18.1% by state, for example)[6] despite the absence of specific implementation guidelines for correctional settings; the absence of Federal Bureau of Prisons guidelines for use of LDCT and lung cancer screening in its current preventive service guidelines;[7] the known worse screening rates in racial, ethnic and socioeconomic groups nationally suffering health disparities from which FCCW's population largely originates, and the absence of effective national programming for LDCT lung cancer screening (USPSTF cites the need for implementation research in this area). These data suggest that FCCW is in fact not only compliant in this area but likely leading national efforts at offering state of current evidence health screening to its patient population.

### III.2.B.xiii. Continuity in Supply and Distribution of Medical Equipment/Supplies / Injunction 8

21. This standard requires that durable medical equipment shall be in appropriate working order and supplies shall be ordered, maintained, provided, and available for daily use, as medically necessary.

22. The Compliance Monitor focused on two patients that caused him to rate FCCW as not compliant with this standard.

23. One of the patients referenced by the Compliance Monitor had an ongoing issue with her hearing aids. The patient arrived at FCCW in March 2021 with hearing aids that were so old they used batteries weekly, and the batteries were not easily obtainable because of the age of her equipment and a lack of demand for those particular batteries. She was immediately scheduled for in house audiology exam, had multiple subsequent

---

[6] https://www.uspreventiveservicestaskforce.org/uspstf/recommendation/lung-cancer-screening
[7] https://www.bop.gov/resources/pdfs/phc.pdf

629.0303\NHS
4870-5770-5252 .v13

DocuSign Envelope ID: 74D72944-00C3-4341-9987-D9C320691A4D

visits, and after a follow up appointment in July was referred to outside audiology. FCCW sent the patient to the outside audiologist for a hearing test on November 4, 2021. She received a hearing aid consult on November 8, 2021, and a fitting on January 4, 2021. She received new hearing aids on March 7, 2022. Although it took approximately four months to complete this process, FCCW was not in the control of the scheduling, which was determined by the University of Virginia Health System schedulers to estimate this patient's urgency.

24. Another patient referenced by the Compliance Monitor complained of missing arm and footrests for her wheelchair, as well as her walker "when she was transferred from medical isolation for COVID-19." I specifically addressed this issue, in my meeting with this patient on Saturday, January 15, 2022, when meeting with patients and evaluating them in the Red Zone for patients in isolation for COVID-19. On first impression, I agreed that having missing parts was unsatisfactory and immediately addressed the problem by having the necessary parts delivered to the patient. Upon further investigation, however, I consulted with the Physical Therapy staff who advised that they had recommended that the arm and footrests be removed due to the patient's compression neuropathy in her wrist. As it turns out, the patient was *worsening* her condition by using the arm rests and by propelling herself with her arms while in the wheelchair instead of using her feet as instructed by physical therapy staff. The walker presented the same concerns as the patient's weightbearing on the wrists worsened her compression neuropathy. It is unclear whether the patient conveyed this information to the Compliance Monitor.

25. The Compliance Monitor's draft report also referenced delays with respect to receipt (not ordering) of braces for patients. Prior to the Compliance Monitor's report,



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

629.0303\NHS
4870-5770-5252 .v13

DocuSign Envelope ID: 74D72944-00F3-474A-8937-DC6320692D4D

FCCW instituted a new step in the DME registry to improve monitoring and coordinate on supply chain issues. FCCW also created and intends to hire a new position to assist with this important area of care and enhance oversight with supply chain management.

**III.2.B.xxii. Performance Evaluation and Quality Improvement, including Contractor Monitoring and Compliance, beyond expiration of the Settlement Agreement**

26. Due to an inadvertent omission by me and my staff, the Compliance Monitor understood that FCCW does not conduct performance reviews of agency providers.

27. In fact, agency providers participate in the peer review process along with VDOC providers and are summarized in ACA audit reports when critiquing and sharing this information.

28. Agency providers also undergo the same monthly performance review on practice and quality monitoring and their performance data are routinely shared with them at weekly provider meetings that address utilization management, medication use, and practice metrics.

29. In addition to the information above, I provide the following in response to the Plaintiffs' most recent Status Report.

30. As to staffing, FCCW has routinely met its obligation to maintain at least 78 staff on the schedule for several years, including the number of full-time equivalent registered nurses.

31. As to the poster regarding clinic visits: The signs were first posted in early February as an attempt to protect access to the clinic and staff from inappropriate overutilization by patients misrepresenting and sometimes admittedly falsifying complaints, which has become increasingly more common since the suspension of copay (i.e., clinic visits requested under false pretenses). This pilot CQI project to protect access



FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 9 -

for patients with medical issues was undertaken after proposal by clinic staff and review by overall medical staff, security, building staff and patients themselves. Expectations were low, but the project reflected the priorities of both staff and patients and thus proceeded. Like most CQI projects (70-90% of CQI projects fail), this approach had no measurable impact on sick calls submitted, clinic patients seen, emergency grievances, emergency medical responses, or patient complaints via IMS. There were 867 clinic visits in February (substantially similar to the average number for all of 2021, which was 880 visits per month), so there appears to be no objective evidence that the signs had any measurable impact on inmates' access to health care. There also appeared here to be no measurable change in behavior among those who repeatedly misrepresent their conditions either. So, the project was abandoned. I understand there was only one instance where a patient was even written up for a violation, but that charge ultimately was not processed. There was not a single informal compliant or grievance submitted about the notice. A random survey of clinic patients found less than fifteen percent were even aware of the notice, and none indicated any concern regarding messaging. This also indicated that the posters had no effect on access. Finally, chart reviews demonstrated that patients have multiple issues addressed at all visits, and the schedulers combine visits so people can have multiple issues addressed at one visit (*i.e.*, lab, outside appointment and sick call). In discussions with me, the Compliance Monitor also noted that his review of visits demonstrated that they were multifactorial: people were seen for multiple complaints and issues simultaneously regardless of the visit type or chief complaint.



FAP

FRITH
ANDERSON
+PEAKE PC
ATTORNEYS AT LAW
Roanoke, Virginia

- 10 -

32. As to the complaints regarding Dr. Stich and Nurse Practitioner Cason, I have no concerns with these two providers' clinical competence. Pharmacy reports clearly show that Dr. Stich does not limit prescriptions to 30 days, as he has written prescriptions for Ms. Stogoski, Ms. Walker, and others for 90 days or beyond, including lotions and creams. I have not ceded my role as Medical Director at FCCW in any form or fashion. Second, as noted above, Dr. Stich himself continues to prescribe medications beyond 30 days. And finally, as noted above, Dr. Stich did not have authority to approve non-formulary medications until May 19 (months after Ms. Watkins claims to have reviewed her declaration).

33. As of June 7, FCCW had 568 over the counter dermatologic agents, including creams and lotions, prescribed to patients. Approximately 8.4% of the prescriptions at FCCW are for dermatological agents such as creams, lotions, gels, patches, pads, etc. Almost 40% of the women at the facility have prescriptions for dermatological agents that FCCW is accused of not providing.

34. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date: 6/9/2022

Paul Targonski

Dr. Paul V. Targonski, MD, PHD, MPH

629.0303\NHS
4870-5770-5252 .v13