**Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke***

Table of Contents

A.  Introduction                                      1

B.  Methodology                                       2

C.  Inspection and patient interviews                 3

D.  Compliance monitoring                             6

E.  Summary and next steps                            28

F.  Appendices                                        30

A.  Introduction

This is the sixth compliance monitoring report submitted for the Fluvanna Correctional

Center for Women (FCCW) in the case of *Scott v. Clarke*. This report starts the third round of

compliance monitoring, with 9 areas assessed in this round.  One hearing has occurred since the

last monitoring report in this case and multiple communications with the various stakeholders

have also occurred including regular reporting of concerns to myself directly and to Plaintiffs'

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

counsel who have aggregated and relayed them to me on a periodic basis. Among the 9 areas
assessed for compliance, all of them are assessed as fully or partially compliant. Importantly, the
areas of accommodation for people with special needs and sick call have moved from not
compliant to partially & fully compliant. In addition, chronic care and mortality reviews have
moved from compliant to partially compliant and detailed recommendations are provided to
restore those levels of compliance.

### B.  Methodology

The same approach to assessment was taken in this round of monitoring as in prior reports.
Data considered for the assessments includes reports from incarcerated women, interviews with
patients and staff during my site inspection, video/phone conversations, facility data regarding
the areas of assessment, the facility quarterly report and review of medical records. As before,
reports of health care concerns assembled by Plaintiffs' counsel have been reviewed for this
report. The individual elements for each audit category are included in the assessments below.
Clinical cases in which the audits showed a lack of compliance with a specific measurement
were shared with the Defendants for response and a compliance rate of 90% was utilized. For
any metrics that were assessed as partially compliant or noncompliant (including any that were
previously identified by the prior monitor as being fully compliant), I have included the specific
steps required to achieve full compliance. The cohort of medical records for this round of
assessments was selected by me, and based on specific encounter types starting April 1, 2023,
going forward in a consecutive manner. This report was shared in draft form with both Plaintiffs'
and Defendants' legal teams and the final version was completed after receipt of their comments
and responses. Individual cases that raised clinical concerns were shared with the FCCW

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

Medical Director. I have included a tracking of compliance that begins with the last assessments of the prior monitor and will be updated as each new round of monitoring is completed. (Appendix 1).

C.  Inspection and patient interviews

Since the last inspection report, I have reviewed several monthly reports of concerns about health services compiled by Plaintiffs' counsel. Common concerns in these reports have included interruptions of accommodation documentation, errors with medication administration or renewal, concerns about infirmary cleanliness or conditions and concerns about health staff staffing. Since my last report, I have received five letters directly from women incarcerated at FCCW. These communications included one concern about not having test results reported back to the patient, two concerns of providers not making correct treatment decisions and two reports of needing additional or renewed accommodations.

This inspection was conducted June 19-21, 2023. This visit included physical inspection of various parts of the complex, interviewing individual staff and detained people, as well as review of medical records. The facility team reported several new developments in the health service that are directly related to compliance with the settlement agreement. The FCCW Acting Warden and Medical Director had several updates to report relating to areas of the settlement agreement. The effort to utilize the infirmary observation area as an alternative to housing area 8A for women experiencing a behavioral health crisis was presented as still in the final implementation stages, not yet underway (see below). The team indicated that the already-identified vendor for the Electronic Medical Record (EMR) has also signed a contract and that implementation plan

would likely be shared in the coming weeks. Subsequent communication with the team indicated that the EMR vendor is currently mapping and building the workflows for the different aspects of facility health services. The team shared that the moving of substance use disorder screening into the initial health assessment had been started, but that only seventeen patients were currently on medications for opiate use disorder (MOUD). I spoke separately with the statewide medication assisted treatment (MAT) coordinator, and progress in this area is reviewed below. The team also reported that previously discussed issues with slow responses to call bells in the infirmary were being addressed. In the short term, the team reported that a phone had been installed that was activated whenever an infirmary patient activated their call bell. This phone is inside a locked box in the officer station requiring a correctional officer to unlock and open it order to pick up the phone and learn the patient's issue and location, which would then be reported to nursing staff. This approach was developed because of the concerns about call bells being activated and no nursing staffer either seeing or responding to the bell. The FCCW team was quick to point out that the current approach is only a stopgap and that an actual call bell system had been ordered which would allow nursing staff to be immediately notified whenever a patient call bell was activated, even when nursing staff were in the back-office area. The team indicated that this new call bell system was going to be installed in the coming 2-3 months.

I also met with the new FCCW Mental Health Director and the VDOC Regional Mental Health Director. They provided an update on the pilot program involving use of the infirmary observation area for mental health crisis care. They also gave an encouraging update on their discussions with another DOC on how an intensive outpatient model of care could be implemented at FCCW.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

During the inspection, I spoke with eight incarcerated women for confidential interviews. The most common opinion expressed to me about health services (from seven of the eight women) was that the new Medical Director was directly or indirectly credited for significant improvement in the health encounters these women had experienced in the past four months. These improvements included more time spent explaining test results and specialist reports as well as more careful examination. Three women reported ongoing concerns that their profile accommodations may be interrupted in the DOC tracking system, but all three reported that their actual accommodations had been maintained in recent months. The specific issue they raised was the need for a clinical review every 6 months of their accommodation, which may be delayed by unforeseen factors and lead to their profile being revoked in the DOC tracking system. However, that administrative issue has not resulted in losing their accommodation. Three of the women reported problems with medication administration, including one woman who was incorrectly given another person's medications, another who had her medications given to someone else (same case) and a third who reported interruption of care when her medication expired. The Medical Director was aware of the medication error case. The patient reported that nobody had fully explained the error or the clinical consequences to her when it occurred. Two of the women I interviewed were long-term infirmary patients undergoing cancer treatment and they both reported deep frustration with the lack of programs and activities in the infirmary. Neither of them had the opportunity to speak to each other or participate in any cancer support group or activities and both expressed a need for more human contact and emotional support. The FCCW team also reported that nursing staff continued to utilize the areas of un-tinted window that were created in housing areas for medication administration.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

    D.  <u>Compliance Monitoring</u>

**Intake screening and comprehensive health assessments, compliant.** This metric was compliant when measured last year. Measurement of 29 intake and comprehensive health assessment encounters (29 patients who received both an intake and comprehensive encounter) revealed a compliance level of 100% for intake screenings and comprehensive health assessments. The cohort of records was selected by me, with a request for consecutive assessments from April 1, 2023 onward. The audit tools include the following elements.

    Intake screening:

- Was the patient screened upon arrival (within 24 hours)?

- Were urgent and emergent health problems recognized and addressed?

- Were patients/staff adequately protected from communicable disease?

    Comprehensive health assessment:

- Was appropriate cancer screening, medication reconciliation and chronic care assessment conducted or ordered?

- Did behavioral health reviews/assessments and disability reviews occur?

- Were assessments conducted within 14 days of intake?

All of the 29 charts met the criteria for both the intake screening and the comprehensive health assessment.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

|  | Intake Screening | Comprehensive Health Assessment |
|---|---|---|
| Sample size | 29 | 29 |
| Compliant | 29 (100%) | 29 (100%) |
| Non-compliant cases | na | na |

**Sick call, compliant.** This metric was not compliant when measured last year. Measurement of 29 consecutive sick call encounters revealed a compliance level of 90% (26 of 29 encounters compliant). The cohort of records was selected by me, with a request for consecutive assessments from April 1, 2023 onward. The audit tools include the following elements:

- Do health staff review requests within 24 hours of receipt?

- Do encounters for urgent/worsening chronic care issues occur within 72 hours?

- Are assessments/plans adequate to reported and documented health problems?

All of the cases reviewed showed 100% compliance with timing requirements for review of the sick call request and for having the clinical encounter. The three deficient cases all involved the adequacy of the encounter, including abnormal vital signs or other clinical issues that were not addressed. This review shows significant improvement in the timeliness of the initial review and of the scheduling of sick call encounters. In addition, the adequacy of the encounters has improved (from 70% to 90%), and the overall assessment has improved as well, resulting in compliance.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

|  | Sick call |
|---|---|
| Sample size | 29 |
| Compliant | 26 (90%) |
| Non-compliant cases | 3 total<br><br>• 3 inadequate assessment/plan |

In order to maintain compliance with this section of the settlement agreement, FCCW needs to maintain these improvements and further address the issue of ensuring that abnormal vital signs or other issues that are apparent during the encounter are addressed in the assessment and plan. FCCW has also made improvements to the sick call form that will be carried over to the electronic medical record, including more information about the reason for the sick call needs and an area for durable medical equipment requests. The implementation of the EMR will enable the health leadership team to review both the timeliness and adequacy of sick call encounters without the currently burdensome process of re-uniting sick call forms with paper charts.

**Chronic care, partially compliant.** This metric was compliant when measured last year. Measurement of 30 consecutive chronic care encounters starting April 1, 2023 revealed a compliance level of 83% (25 of 30 encounters compliant). This represents a slight decrease in compliance since last year's assessment. The audit tools include the following elements:

- Do health staff assess and create a plan based on the specific disease level of control including diabetes, hypertension and cancer?

- Are medications and relevant laboratory and diagnostic tests reviewed in the encounter?

- Does the encounter occur within the prescribed timeframe, including 6-month intervals for stable/controlled problems and 3 months for health issues that are not stable/controlled?

Several important areas of chronic care show continued improvement, including the review of medications and laboratory tests in the encounter notes. Most of the charts I reviewed have both sets of data printed out and presented in the section of notes where the chronic care encounter is placed. All of the chronic care visits I reviewed occurred within the prescribed timeframe, another important area of sustained improvement. The five deficient encounters involved blank fields in the parts of the note where objective data should be utilized to review the patient's status, or lack of a review of the overall level of control for the patient's health problem. Specific deficiencies included:

- Missing data about disease control since last encounter (3, one asthma and two hypertension)

- Missing assessment of the level of control (2, one diabetes, one asthma)

As in earlier reports, several cases appeared deficient when only the chronic care encounter form was reviewed, but review of additional encounters and documents inside the various parts of the paper chart showed that care had been provided in an adequate and timely manner. This area of review continues to be extremely time-consuming and will benefit greatly from introduction of the EMR. I expressed concern last year that the improvements in this area would be difficult to maintain without the EMR being implemented, and that concern is still valid. The deficiencies in

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

this round of review do not represent a serious deterioration in care, hence the overall rating of partial compliance, but they are a good representation of how even with considerable effort, important details can be left out of encounters when the oversight by clinical managers is paper based.

|  | Chronic care |
|---|---|
| Sample size | 30 |
| Compliant | 25 (83%) |
| Non-compliant cases | 5 total <br><br> • Missing asthma review questions <br><br> • 2x Missing BP review in HTN visit <br><br> • Missing level of control, DM visit <br><br> • Missing level of control, asthma visit |

**Medications, compliant.** This metric was rated as partially compliant last year and has now returned to being compliant, which was the case two years ago. This area of monitoring involves ensuring that patients receive the appropriate medications for treatment of their health problems, and that those medications be delivered to them in a safe and reliable manner. Last year's assessment found most elements of this area were in compliance but that concerns with some medications not being present on the medication cart and lack of effective identification of people receiving medications occurred. The specific audit elements of this metric include the following:

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

- Are bridge orders completed during the intake process?

- Are medications delivered consistently and reliably in the housing areas?

- Are labels and pill crushing practices consistent with policies?

- Are interruptions and other medication concerns adequately documented and addressed?

Because of the broad nature of this metric, multiple sources of data are required to assess compliance. In order to assess the adequacy of bridge orders, I reviewed new admission records, and among the intake screening and comprehensive health assessments referenced above, there were no errors or deficiencies in bridge orders. I also received no reports regarding this issue from women I spoke with. Another data source is the pharmacy system (Sapphire) utilized by the facility, which tracks each prescription from the initial ordering/profiling stage to the point of dispensing by nursing staff. In order to assess the potential for medication interruptions, I asked the facility to run a report for medications in the month of April 2023 that shows both medications delivered and also those not given, with reasons for the medications that were not given.

Total Medications

| Total medication Passes | Completed medication passes | Missed medication passes | Backup medication passes | Missed passes after backup |
|---|---|---|---|---|
| 108,855 | 108,751 | 104 | 3 | 101 (0.093%) |

I also requested data on the specific cases in which medications were not delivered. These represented the 104 initially missed medications. Among the 104 missed doses, the reasons given for the missed dose included the following:

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

Missed Medications

| Reason for missed medication pass | Number (%) |
|---|---|
| Med card not on cart | 15 (14.4) |
| Medication not arrived | 37 (35.6) |
| Refill needed | 52 (50.0) |
| Total | 104 |

Overall, these medication data show strong and consistent access to medications, but one area that merits attention is the medications missed due to the need for a refill. From last year's review of this metric to this year, the number of missed medications in the month reviewed increased from 14 to 50, moving from 6% to 50% of the missed medications. The overall number is still very small, but this is also an area that I have raised in previous reports. Numerous women at FCCW have reported that when they manage their own refills (for keep-on-person medications), they are able to submit a refill request with adequate time. But for medications that are given in a daily dose by the medication pass nurse, the issue arises that the nurse is the one who must recognize the need for a renewal and then act to initiate the renewal. In order to maintain compliance in this area, FCCW will need to establish a process to track and address instances when this renewal by the medication nurse does not occur.

Another source of data is reporting from women who are prescribed medications. Among the women I spoke with, those who had been in the facility more than one year reported that medications were currently more reliable in their time of administration and presence on the cart than in prior years. Three women reported specific problems with their medications, two of whom were involved in the same medication error. This error was known to the clinical

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

leadership, and the one deficiency in how it was handled involved inadequate communication with the woman who received the wrong medication. This type of error occurs in any health system, but I am concerned that the lack of stability in the Director of Nursing role may result in medication errors not being addressed with patients or with physician prescribers. There was no Director of Nursing in place at the time of my inspection, but the team has reported the arrival of a new Director of Nursing this month. This is especially important given the increase in problems in receiving medications reported in the last month's report from Plaintiffs' counsel.

In order to assess the pill crushing practices, I observed the medication cart in multiple housing areas during my visit. Each housing area usually has several crushed medication orders, and I did not have any concerns with the practices of the nursing staff. This is consistent with my prior observations. I also received no reports regarding this issue from women I spoke with or received written communication from.

The issue regarding nursing staff ensuring the identity of the person receiving their medication is somewhat improved based on my conversations with women at FCCW and nursing staff. The medication error mentioned above did not take place at one of the housing area windows and the issue of visibility did not seem to be involved. The use of the untinted cut-outs seems to have improved visibility between the nurse and the patient receiving medication, and the remaining issue that will require nursing oversight is to ensure these cut-outs are utilized.

**Physical Therapy, compliant.** This metric has been consistently compliant including when measured last year. Measurement of 30 consecutive physical therapy encounters starting April 1,

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

2023 revealed a compliance level of 100% (30 of 30 encounters compliant). The audit tools include the following elements:

- Do initial physical therapy encounters occur within the timeframes prescribed/ordered by physicians and follow-up encounters within the timeframe prescribed by PT staff?

- Are assessments/plans adequate to reported and documented health problems?

Several encounters initially appeared to be out of the 30-day date range, but review of records showed that in each of these cases, a patient was initially seen for one problem that was resolved and that clinical assessment identified another area requiring care, which was initiated. This remains an area where access to the EMR is important, because of the need to integrate physical therapy assessments and goals with assessments and treatment for pain management, which is often conducted by physicians.

|  | Physical therapy |
|---|---|
| Sample size | 30 |
| Compliant | 30 (100%) |
| Non-compliant cases | None |

**Access to medical information, compliant.** This metric was assessed as compliant last year. The areas required for compliance in this metric include whether testing results and outside consultant assessments are communicated to patients and whether overall communications with

health staff occur in a manner that is understood by patients. Specific audit elements for this metric include

- Were patients told about their results in a timely manner?

- Were patients afforded translation/interpreter services when needed?

To assess this area of compliance, I reviewed the medical records from intake screening/initial health assessments and chronic care encounters (referenced in sections above), as well as the eight patient interviews from my inspection for information relevant to this metric. With this data set, I was able to establish 31 instances in which patients had been informed of their results or outside consultant opinions in a timely manner and 2 in which the notification was delayed or did not occur, or 94% compliance. I was able to detect only three instances in which translation/interpreter services were needed, and in each instance the needed services were provided.  Monitoring of this metric will be greatly facilitated with the use of an Electronic Medical Record, so that dates of laboratory and diagnostic imaging review (as well as consultant evaluations) can be compared to dates of conversations with patients.

**Accommodations for people with special needs, partially compliant.**

This area of the settlement agreement is relatively broad and encompasses the need for accommodation and care for people with behavioral health concerns as well as people who require accommodation for mobility, hearing and other physical disabilities. This metric was rated as not compliant in last year's review. To achieve compliance, the settlement requires that FCCW make reasonable accommodation for people with physical and/or mental health needs,

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

including access to appropriate care and medication as well as physical plant accommodations and access to programming. The specific elements of auditing this metric include the following:

- Do people with special needs have adequate access to the level of care and medications they require?

- Are accommodations afforded to people appropriate and continuous?

- Are people treated in a non-punitive manner in mental health settings?

- Are people with heat sensitivity and other health risks housed in safe settings?

Several sources of information are required to assess compliance in this area. As mentioned above, none of the women I spoke with reported losing an accommodation during this period, although several did report concerns that their profile lapsed even if they did keep the accommodation such as a bottom bunk or bottom tier accommodation. I have suggested to the facility that they consider a longer duration between reviews, especially for women who are unlikely to have an improvement in their physical status and for whom adding another encounter every 6 months may be of no value and may actually interfere with other care or activities.

The facility has also reviewed this area in their quarterly report: "The CQI team audited this in the second quarter (audit included interviews with nurses who work in the Clinic and with FCCW's ADA representative, plus a review of 60 complaints/grievances). In Q2 no patient had medical equipment removed from their possession without first seeing a medical provider, even if their profile had expired prior to the Clinic visit." Two of the women I spoke with on my most recent visit had previously reported accommodation interruptions to me, and both stated that their accommodations were consistently provided in the past six months.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

An area of deficiency noted in the last review of accommodation involved the care of women with serious mental health issues. Since that time, the facility identified a space in the infirmary that they plan to utilize as an alternative to the 8A cells, which have been utilized both for high security and for women during a mental health crisis. Prior reports have detailed how and why this approach is clinically contraindicated. The use of the observation area in the infirmary (or a similar non-security setting) represents a crucial development for provision of care.

Another core concern from prior assessments is the reliance on a locked cell housing area for women with serious mental illness. The hiring of a mental health officer (referenced in the last two reports) helped to some extent, but there was little objective tracking of how much out-of-cell time women were experiencing or whether staffing of officers was linked to out-of-cell time for women. This most recent visit marks the first time that I have observed a dedicated mental health staff member who actively tracks the time out of cell for women with serious mental illness. This tracking includes both the time out of cell for health encounters as well as security and recreation data so that the total amount of in and out of cell time is present in a single log that the treatment team can review to inform care and health status. I asked for a specific selection of this data for a single unit (2A, acute) and another for a specific patient. The two tables below reflect how FCCW collects and tracks this information, although I have removed the patient data to avoid possible identification.

Unit level, 2A

| Week 6/4/23- 6/10/23 | Exercise | Shower | Phone/kiosk | Rec | Activity | Group | TV | Meals | Appointment | Therapy | Total (min) | Total (hour) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient 1 | | | | | | | | | | | |
| Patient 2 | | | | | | | | | | | |
| Patient 3 | | | | | | | | | | | |
| Patient 4 | | | | | | | | | | | |
| On precautions | | | | | | | | | | | |

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

Patient level, 2A

| Patient 1 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 6 | Exercise | Shower | Phone/kiosk | Rec | Activity | Group | TV | Meals | Appointment | Therapy | Total (min) | Total (hour) |
| 5/7/23-5/13/23 | | | | | | | | | | | | |
| 5/14/23-5/20/23 | | | | | | | | | | | | |
| 5/21/23-5/27/23 | | | | | | | | | | | | |
| 5/28/23/-6/3/23 | | | | | | | | | | | | |
| 6/4/23-6/10/23 | | | | | | | | | | | | |

I was able to interview the mental health team member who collects this data and learned that these tables are used by the team to keep track of who needs more engagement, who may be experiencing worsening symptoms and who may be improving to the point of benefiting from another setting. This data is also collected and utilized for the other mental health settings, including the step-down unit. This collection and use of data represents a best practice in correctional settings because it integrates what security staff observe with what health staff observe in a way that allows for joint review of activities and out-of-cell time at the patient and unit level. Review of this data showed that women in this unit, many of whom spent most of their hours inside a locked cell when I started monitoring at FCCW, are now regularly engaged in activities out of their cells. In fact, I was able to observe firsthand the use of the outside recreation space away from the acute unit for the cohort of women who are housed there. I also

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

reviewed data to indicate that this is a routine practice, essentially unheard of just three years

ago. This use of data represents a tremendous improvement over the baseline I observed and

reported in my initial inspections in 2021, when most women spent all or most of their time

inside a locked cell. My main concern in the ability of the facility to maintain this level of

performance is the pending need for two more mental health officers and the need for the EMR

to be implemented, so that this level of care can be well-coordinated with the medical providers

without the need for one service to have the paper chart to document encounters or review care at

any given time. The facility reports that a total of four treatment officer positions have been

approved for FCCW and that hiring and filling the third and fourth positions is underway.  One

of the key lessons from this tracking data and conversations with staff is that adding a second

mental health officer results in a dramatic increase in out-of-cell time. Getting to four officers in

this role will be important to cement these improvements, not only in 2A but in the stepdown

unit, the acute crisis settings and for any intensive outpatient model.

Regarding heat sensitivity, FCCW continues to have two important areas of strength.

When the temperature in living spaces is ≥ 85°F there is real risk of increased illness and death

among people who are heat sensitive. Heat sensitivity is generally considered to include people

with certain medical problems, those who are taking specific medications that may promote

dehydration, and people who are older.[1] FCCW continues to be fully air-conditioned facility, but

there have been sporadic issues with air conditioning not working adequately in a single housing

---

[1] From settlement in *Benjamin v. Horn*, No. 75 Civ. 3073 (HB), Opinion and Order at 4 (S.D.N.Y June 18, 2006), heat sensitivity includes receiving Lithium, diuretics and other medications that increase heat sensitivity, requiring infirmary care, having Type I or II diabetes and 60 years of age or older, being over the age of 65, having dementia, being confused or suicidal, having heart or kidney disease or diabetes. https://www.casemine.com/judgement/us/59146a62add7b049342e942b

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

area. This issue was also raised in the most recent monthly report by Plaintiffs' counsel. The operations team conducts regular monitoring of temperatures in all housing areas and there have not been any instances where the housing area exceeded 80°F, let alone approached 85°F. In addition, because of the FCCW medical team's development and use of high-risk patient surveillance during COVID-19, if air conditioning did falter in a more significant way, the health service is well-equipped to quickly identify and protect heat sensitive patients.

Prior reports have identified the need for direct access to intranasal naloxone for women incarcerated at FCCW and included reporting of opiate overdose reversals by incarcerated people when this approach is taken.[2] The FCCW team has procured and placed intranasal naloxone in housing areas so that people can access this life-saving medication without needing to wait for correctional staff. In addition, this medication is being placed in discharge kits when women who leave the facility and they are being trained on naloxone use.

One area of remaining concern is accommodation/care for people with substance use disorders, specifically MOUD. The number of people receiving MOUD has remained as a very small percentage of the overall number of people who likely meet clinical criteria for treatment. At the time of this inspection, only five people were in treatment with buprenorphine and another twelve on naltrexone, which is less than on prior inspections. It is likely that more than 200 people meet clinical criteria for treatment given local and state data regarding opiate use disorder. One concern that women raised to the Plaintiffs' counsel in recent weeks is that they were currently on an oral, daily dose of buprenorphine and had been switched to a monthly injection of the same type of medication without engaging them about their wishes. This

---

[2] https://www.wlky.com/article/louisville-narcan-opioid-overdose-jail-inmate-saved/41144396# and https://www.cnn.com/2021/05/29/us/california-inmates-save-overdose-narcan/index.html

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

apparently led some women to choose to discontinue treatment altogether, but intervention by the FCCW Medical Director has resulted in these women being able to continue their prior and preferred regimens. The statewide MAT coordinator was very helpful in explaining the current status of MOUD access at FCCW and essentially confirmed that after an internal review of MOUD options, VDOC had decided to select a monthly injectable form of buprenorphine as the primary and preferred formulation of MOUD with few exceptions. The two main reasons given for this change were the cost effectiveness of monthly injections which are more expensive as a medication but less staff intensive, and concerns about diversion of daily doses. These concerns are common in correctional settings, but changes to treatment options in FCCW appear to have been made with little engagement of patients, and they also appear to have occurred without input of an addiction medicine specialist. Other State Prison and County Jail systems have successfully implemented an approach that allows for patients to discuss the best MOUD option with their providers and choose the option that is best suited to their clinical needs and likelihood of treatment success. In one model program (Rhode Island DOC), patients were offered monthly *or* daily formulations.[3] It is well-established that ability of MOUD to prevent death flows directly from whether not a patient is engaged in the treatment, and access to MOUD in prison is an effective way to provide evidence-based care and also increase treatment and reduce overdose occurrence after release.[4] Access to MOUD can be achieved at FCCW but like any form of health services, it requires staffing and other resources to achieve. A recent analysis of MOUD in

---

[3] https://www.sciencedirect.com/science/article/abs/pii/S0740547222001337

[4] https://www.nashp.org/wp-content/uploads/2021/05/VT-DOC-report-4-29-2021.pdf and
https://www.vnews.com/Study-finds-successes-in-prison-opioid-treatment-program-51931053

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

carceral settings has identified six priorities for preventing diversion during program

implantation[5];

1.  Determine reasons for diverting medications which enables the staff to tailor their response to different types of diversion (e.g., coerced, euphoria, split-dosing, and accidental)
2.  Use routine but flexible dosing protocols that can be adapted to patients' needs.
3.  Communicate with and educate patients about how jail staff are effective at intercepting and preventing diversion as well as medication safety.
4.  Provide a sufficient staff-to-patient ratio to ensure adequate and constant supervision during MOUD initiation.
5.  Conduct routine surveillance to detect potential diversion, including searching housing units, monitoring phone calls for mention of diversion or substance use, and checking urine testing results.
6.  Develop strategies to respond to diversion that provide patients opportunities to continue treatment, such as changes to medication type, dosage amount, individual counseling sessions, and being dosed individually.

I am concerned that the official policy of VDOC in this area may damage engagement with the

small number of patients who are on treatment and may limit the number of new patients who

engage in maintenance and initiation of MOUD, both of which are required elements of a

correctional health service. The involvement of the FCCW Medical Director is an important one

but underscores the need for evidence-based practices and active involvement of an addiction

medicine specialist in both policy development and care. The risks of diversion are serious

concerns in MOUD implementation, but they should not overshadow the need for individualized

and evidence-based care. The same is true for other medications that are routinely prescribed in

carceral settings, including pain and psychotropic medications. Diversion of medications by a

---

[5] https://www.addictionpolicy.org/post/six-strategies-to-prevent-moud-diversion-in-jail-based-treatment-programs (see Appendix 2)

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

patient should trigger re-assessment of the clinical plan, but this approach, like the initial medication choice and formulation, should reflect an individualized treatment plan. In order to come into full compliance with this area of the settlement, FCCW will need to take the following steps:

- Expand MOUD for women who meet clinical criteria for treatment and engage an addiction medicine specialist to help ensure that treatment options meet evidence-based clinical guidelines for each individual.
- Maintain recent improvements in mental health engagement in the acute and subacute units.
- Implement a non-punitive clinical setting for all women experiencing a mental health crisis.
- Continue recent improvements in maintaining accommodations, consider a more than 6-month timeframe for accommodation review.

**Mortality review, partially compliant.** This area was assessed as compliant in the most recent review and is now assessed as partially compliant. Since the last time this area was reviewed, three women incarcerated at FCCW have died. I was informed in a timely manner by the Medical Director in each instance and medical records and the mortality reviews were made available to me as required by the settlement agreement. Two of these deaths involved women with longstanding medical concerns and the third involved a case of suicide, the first at FCCW since 2016.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

The review of the patient suicide included a serious review of potential systemic issues that merit addressing, including the now-completed recruitment for a new Mental Health Director and other staff lines. In addition, the role of correctional mental health officers and mental health technicians was reviewed in the context of this patient's suicide. I believe that the significant movement reported above in tracking and addressing engagement with patients in the acute and step-down units represents a positive response to this case. In addition, the new Mental Health Director reported on plans for an intensive outpatient model of care and this mortality review discusses the systemic barriers and opportunities for an increased level of care for patients leaving a dedicated mental health unit.

The movement from full to partial compliance in this area relates to the two medical death cases. Neither of the mortality reviews for the two women who died from medical causes gave sufficient attention or self-assessment regarding palliative care. Hospice transfer was discussed, but both patients were in FCCW with serious illness for extended periods of time and review of their care and conditions at FCCW should include an honest assessment of the level of pain management, supportive care, nutrition and other elements of palliative care that they received before hospital or hospice transfer. In order to restore this area to full compliance, FCCW should:

- Include palliative care (when relevant) in review of care in mortality cases at FCCW, including pain management, nutrition, recreation, social contact other daily needs.

- Balance the mortality reviews between a recitation of clinical history and clear assessment of the adequacy of care and corrective action plans for deficiencies and room for improvement. The mental health review for the patient suicide is closer to this model than the reviews for the two medical deaths.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

**Other issues**

The most recent inspection visit showed that the new Medical Director and Mental Health Director are working closely together with each other, their respective teams and with their State-level leadership to improve health services at FCCW. This is an encouraging development. However, most of the care delivered in a carceral setting involves nursing, and there is a serious need to ensure stable leadership in the Nursing Director role. This is especially crucial given the impending implementation of the EMR. Likewise, stability at the Warden position is crucial, especially for supporting MOUD expansion and hiring of two further mental health officers.

One area that shows ongoing progress at FCCW is the need to eliminate dehumanizing language when referring to women in their care. The charts I reviewed for this report showed far less use of dehumanizing terms like inmate, felon or offender. Most of the individual staff I interact with at FCCW also take this approach, and this represents an important shift.

FCCW has also produced their most recent quarterly report (Q2 2023), and some of the data and information from that work is incorporated in this report, alongside my own independent assessments. This report, and the process FCCW utilizes to internally assess their own performance, have improved considerably in the past several years. These improvements have been iterative in that each round of independent monitoring and internal quarterly reports have brought the two efforts more in line with each other, a crucial effort to establish lasting compliance. One remaining example is the need for palliative care program at FCCW to be reviewed in these reports. The current quarterly report reflects some new communications with outside hospice care partners. In my most recent (5th) report, I discussed the need for more palliative care programs and support for women who are in the midst of being assessed and

26

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

treated for serious illness. That report reviewed the difference between palliative care (holistic

care for people with serious illness with or without curative treatments) and hospice care

(integrative support and care for people with terminal illness) and both hospice and palliative

care are required in the settlement agreement. Like other areas of care that are crucial to

incarcerated women, the report should work to establish a numerator of who received this service

and a denominator of who needed the service.

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

E.  <u>Summary and next steps</u>

FCCW has made significant headway towards compliance in this case and in establishing sustainable improvements to the health service. This round of monitoring shows important progress in the areas of mental health services and care as well as in sick call encounters.

The move from full to partial compliance in chronic care this round likely reflects the great amount of time is takes to review individual encounters in paper records. The quality of the encounters, as well as their timeliness, will be much easier to monitor once the EMR is in place. The move from full to partial compliance for the mortality review process is addressable and I do not anticipate barriers towards full compliance. A recent update with the facility included their report that the contract with the EMR vendor had been signed and that the vendor was expected to come to the facility in the coming weeks.

The most serious concerns I have with establishing and maintaining full compliance relate to the still-needed EMR implementation and the implementation of substance use treatment, namely MOUD.  Other areas of pending improvements, like improving patient communication as well as programs and access to recreation in the infirmary, are very much within the abilities of the current team. It is crucial that FCCW retain a full time Director of Nursing, especially to secure improvements in the infirmary, sick call and medication administration. Most of the people using the EMR and most of the encounters will be provided by nursing staff, so this is a crucial role to support.  I have proposed to the facility initiating a more frequent informal review of outstanding issues across all areas of the settlement agreement, so that the next report will not only reflect the completion of the third round of monitoring, but also provide more detailed updates on the areas included in this report. In order to accomplish this, I have begun monthly calls with the facility to receive a regular update on the remaining

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

areas of pending compliance and offer technical support in these areas. I plan to return in the fall

to compete the third round of monitoring assessments.

Executed this 20th day of September 2023 in Port Washington, NY

Signed,

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

Appendix 1. FCCW Compliance Monitoring in Scott v. Clark

| Metric | Prior Monitor | Round 1 | Round 2 | Round 3 |
|---|---|---|---|---|
| Provider Staffing | Compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |
| Intake screening | Compliant (10/20) | Compliant (10/21) | Compliant (10/22) | Compliant (8/23) |
| Comprehensive health assessments | Compliant (10/20) | Compliant (10/21) | Compliant (10/22) | Compliant (8/23) |
| Sick call/Access | Not compliant (10/20) | Not compliant (10/21) | Not compliant (10/22) | Compliant (8/23) |
| Co-Pay | Compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |
| Diagnosis and treatment | Compliant (10/20) | Not compliant (5/22) | Partially compliant (4/23) | |
| Emergency response | Compliant (10/20) | Compliant (5/22) | Partially compliant (4/23) | |
| Infirmary care/conditions | Compliant (10/20) | Partially compliant (5/22) | Partially compliant (4/23) | |
| Chronic care | Not compliant (10/20) | Not compliant (10/21) | Compliant (10/22) | Partially compliant (10/22) |
| Infectious disease/waste | Compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |
| Utilization Management | Compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |
| Medications | Not compliant (10/20) | Compliant (10/21) | Partially compliant (10/22) | Compliant (8/23) |
| Medical equipment | Compliant (10/20) | Not compliant (5/22) | Partially compliant (4/23) | |
| Physical therapy | Compliant (10/20) | Compliant (10/21) | Compliant (10/22) | Compliant (8/23) |
| Medical grievances | Compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |
| Patient access to care information | Compliant (10/20) | Compliant (10/21) | Compliant (10/22) | Compliant (8/23) |
| Accommodation for special needs | Not compliant (10/20) | Not compliant (10/21) | Not compliant (10/22) | Partially compliant (8/23) |
| Training | Not compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |
| Care/release terminally ill | Compliant (10/20) | Partially compliant (5/22) | Partially compliant (4/23) | |
| Mortality Reviews | Compliant (10/20) | Compliant (10/21) | Compliant (10/22) | Partially compliant (10/22) |
| PM/CQI | Compliant (10/20) | Partially compliant (5/22) | Partially compliant (4/23) | |
| VDOC Performance evaluation | Compliant (10/20) | Partially compliant (5/22) | Compliant (4/23) | |
| Operational protocols/policies | Compliant (10/20) | Compliant (5/22) | Compliant (4/23) | |

Sixth monitoring report of Dr. Homer Venters in *Scott v. Clarke*

Appendix 2. Diversion Prevention Strategies (Evans et al., footnote 5)



**6 KEY STRATEGIES** to prevent MOUD diversion in jail-based programs



Diversion of medication for opioid use disorder (MOUD) treatment (e.g., buprenorphine) is often cited as a concern among key stakeholders and a reason for not offering the treatment in jails and prisons. Researchers from the University of Massachusetts published a study in 2023 that detailed promising practices in program design to help limit medication diversion and inform correctional officials and lawmakers as they consider whether and how to provide MOUD treatment in correctional settings.

**1. Determine reasons for diversion**



People divert medications for different reasons:
- "Strong-arming," or coerced diversion, includes any activity involving buprenorphine patients "being forced to give up their medications."
- Patients hoarding buprenorphine to take a bigger dose for euphoric effects.
- Split-dosing to take buprenorphine throughout the day to reduce withdrawal symptoms.
- Accidental diversion i.e. patient actions are misconstrued as diversion.

Enable staff to tailor their response to different types of diversion.

**2. Use dosing protocols**



Use routinized dosing protocols that can be adapted to specific patient needs and make environments safer for patients and staff. Protocols should enable staff to show they care about patient health and safety and want the medication to work.

**3. Communicate with and educate patients**

Sharing with patients how jail staff are good at intercepting diversion can reduce its occurrence. Educate patients about the medication, including why and how it works, and the importance of taking it as prescribed. Patients may not know how diversion can worsen their health, making communication of health consequences key.



**4. Provide sufficient staff-to-patient**



Constant supervision during dosing is needed to prevent diversion. For example, many jails use two corrections officers and one nurse for no more than 15-20 patients in a designated buprenorphine dosing room. Corrections officers have designated roles, with one doing mouth checks while another observes and a third monitors surveillance cameras. Train jail staff on MOUD to understand, for example, why it is important for sublingual buprenorphine to completely dissolve under the tongue as it won't work if swallowed.

**5. Conduct routine surveillance**

To detect potential diversion, staff can search housing units for diverted medication, monitor phone calls for mentions of diversion and substance use, check for large changes in commissary accounts, check urine test results for MOUD, and use surveillance cameras to examine patients' movements during and after dosing.

**6. Strategies to respond to diversion**

>> Graduated responses to diversion are designed to provide patients with opportunities to continue treatment. Options can include changes to medication type and dosage amount, more individual counseling sessions, and being dosed individually.

>> Talk with patients to better understand all suspected and substantiated diversion incidents.



Source: Evans, E. A., Pivovarova, E., Stopka, T. J., Santelices, C., Ferguson, W. J., & Friedmann, P. D. (2022). Uncommon and preventable: Perceptions of diversion of medication for opioid use disorder in jail. Journal of substance abuse treatment, 138, 108746. https://doi.org/10.1016/j.jsat.2022.108746

**NIH HEAL INITIATIVE** — JUSTICE COMMUNITY OPIOID INNOVATION NETWORK (JCOIN)